## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

**Andrew Floyd**; **Jonathan Caravello**; **City of New Haven**; **National Abortion Federation**; and **Common Cause**,

Plaintiffs,

v.

**Department of Justice; Todd Blanche**, in his official capacity as Acting Attorney General; **Stanley Woodward Jr.**, in his official capacity as Associate Attorney General; **Department of the Treasury**; **Scott Bessent**, in his official capacity as Secretary of the Treasury; and **Anti-Weaponization Fund**,

Defendants.

**Case No.**
**Jury Trial Demanded**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"*Power tends to corrupt, and absolute power corrupts absolutely.*" Lord Acton

## INTRODUCTION

1.      The Department of Justice and the Department of Treasury have created a $1.776 billion slush fund—from taxpayer dollars—to dispense payment to those the Trump-Vance administration favors. Since its inception, this fund has been on a collision course with the United States Constitution.

2.      By its own terms, the Anti-Weaponization Fund is available only to claimants who assert that they were targeted by "Democrat" administrations, even though the current administration has weaponized the awesome power of the federal government against its perceived political opponents like no other administration before it. Neither the First Amendment nor the Equal Protection guarantee of our Constitution countenance such blatant partiality.

3.      Created following a collusive agreement between the President and his own administration, this Fund has no congressional authorization, no basis in law, and no accountability.

4.      Plaintiffs bring this suit to halt and set aside the creation and operation of this lawless Fund. Plaintiffs include individuals and entities that were targeted by the Trump-Vance administration as ideological or political opponents. One was arrested for exercising his First Amendment right to protest, while another, a career prosecutor with over a decade of experience, was fired for no discernible reason other than he prosecuted January 6 rioters. Plaintiff City of New Haven has been targeted by the administration through retaliatory civil litigation and threatened funding terminations. None of these individuals or entities can make a claim for monetary payment, or even for an apology, from the Anti-Weaponization Fund.

1

5.      Instead, the Fund rewards and incentivizes unlawful behavior and facilitates an astounding abuse of taxpayer funds. The Fund puts members of Plaintiff National Abortion Federation ("NAF"), an association of providers of reproductive healthcare including abortion, at risk of increased threats, as the Fund explicitly identifies individuals convicted of crimes against NAF's members as presumptively entitled to payments. The Fund also operates without basic transparency requirements, evading the review of the public and watchdogs, like Plaintiff Common Cause, that track abusive spending on the public's behalf.

6.      The Fund is unlawful. It violates core constitutional requirements, including the First Amendment, the guarantee of Equal Protection, and the Separation of Powers, and the more obscure, but once again relevant, express constitutional prohibition on paying "any debt or obligation incurred in aid of insurrection or rebellion against the United States." U.S. Const. amend. XIV, § 4. The Fund violates statutory and regulatory requirements safeguarding the use of taxpayer dollars out of the Judgment Fund. And its operation and use of funds without any reasonable justification, guardrails, or parameters violate the basic good governance requirements of the Administrative Procedure Act.

7.      The unlawfulness that has imbued the Anti-Weaponization Fund from its inception requires that it be wholly dismantled.

**PARTIES**

8.      Plaintiff **Andrew Floyd** is a former Assistant United States Attorney at the U.S. Attorney's Office in Washington, D.C. and resides in Alexandria, Virginia. Mr. Floyd was a career federal prosecutor in the U.S. Attorney's Office for nearly 11 years, beginning his career combatting local crimes ranging from theft to arson in the District of Columbia, and later prosecuting a wide range of federal offenses. During the first Trump administration, he was

2

promoted to Deputy Chief of the Felony Trial Unit, supervising cases involving unlawful possession of firearms and narcotics that the U.S. Attorney's Office brought in D.C. Superior Court. Days after the failed insurrection on January 6, 2021, Mr. Floyd was asked to lead a task force that would seek to investigate and prosecute individuals who had violently attacked D.C. Metropolitan Police Department officers on January 6. As the January 6 investigation grew, Mr. Floyd became a supervisor within the U.S. Attorney's Office Capitol Siege Section, devoted to investigating and prosecuting individuals for crimes committed during the failed insurrection that day. In January 2025, Mr. Floyd asked to return to prosecuting local crime in the D.C. Superior Court Division, and he began working in the USAO's Early Case Assessment Section, reviewing more than 300 criminal warrants for probable cause before he was fired from the Department of Justice in June 2025. His termination letter, which was provided to him without any warning or indications of dissatisfaction with his performance, simply asserted that he was being terminated pursuant to Article II of the United States Constitution. He was fired the same day as at least two other prosecutors who had worked on cases arising out of January 6, and believes he was fired in retaliation for that work. He was given no other discernible reason for his termination.

9.      Plaintiff **Jonathan Caravello** is a professor at California State University Channel Islands who resides in Ventura, California. As part of the Trump-Vance administration's efforts to punish dissent and opposition to its militarized immigration enforcement operations, Mr. Caravello was arrested by federal agents while protesting a massive immigration raid in Camarillo, California. ICE's raid was so chaotic that it resulted in the death of a migrant farm worker. Despite video evidence undermining the government's case, the Department of Justice charged Mr. Caravello with felony assault of a federal officer using a deadly or dangerous weapon. Mr. Caravello stood trial and was acquitted by a jury on April 9, 2026. Judgment of Discharge, *United*

3

*States v. Caravello*, No. 2:25-cr-00686 (C.D. Cal. Apr. 22, 2026), ECF No. 92. Prior to being acquitted, Mr. Caravello was held in jail for days and then subject to strict conditions of pre-trial release, including limitations on his movement, among other harms. Mr. Caravello's case is not unique. The local U.S. Attorney's Office "has aggressively pursued charges against anti-immigration-enforcement protesters under the direction of [U.S. Attorney] Bill Essayli, an acolyte of President Trump," "charg[ing] more than 100 people since June, alleging assaults on agents or interference with immigration enforcement."[1] The office has "lost every assault on a federal officer case they've brought to trial against immigration protesters."[2]

10.    Plaintiff **City of New Haven**, Connecticut, is a municipal corporation organized under Connecticut law and has the capacity to bring a suit in its own name. *See* Conn. Gen. Stat. § 52-73. New Haven is the second-most populous city in Connecticut, with a population of about 135,000 residents. The Trump-Vance administration has targeted New Haven, along with other cities, as part of a sustained campaign to use the levers of federal government to punish what it views as "sanctuary" jurisdictions. As part of that campaign, the administration recently filed suit against New Haven and its mayor, challenging a mayoral executive order that affirmed New Haven as "a Welcoming City" and validly directed local law enforcement in the conduct of their duties. *See* Compl., *United States v. Connecticut*, No. 3:26-cv-568 (D. Conn. Apr. 13, 2026), ECF No. 1. As part of the same campaign, the administration has sought to withhold federal funds from New Haven, in an effort that a federal court determined was likely unlawful on multiple grounds. *See City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d 1077 (N.D. Cal. 2025). Both lawsuits

---

[1] Brittny Mejia, *"Amateur hour at the U.S. attorney's office": L.A. prosecutors face more losses in protest cases*, L.A. Times (Apr. 3, 2026), https://perma.cc/X8F6-4TMP.

[2] *Id.*

4

have resulted in a substantial expenditure of city resources and staff time that is expected to continue through the pendency of the cases.

11.    Plaintiff **National Abortion Federation** ("NAF") is a nonprofit organization incorporated in Delaware that supports and represents abortion providers and the people they serve, in pursuit of accessible and equitable abortion care. It brings this lawsuit on behalf of itself and its more than 400 provider members—which include clinics specializing in abortion care (both brick-and-mortar and virtual clinics), health centers that provide abortion care within a broader primary care or OB-GYN practice, hospitals, and individual physicians and clinicians—across the country, including in this judicial district. The creation of the Anti-Weaponization Fund substantially increases the ongoing and severe risk of violence to NAF's members. By offering people who have engaged in criminal attacks on abortion clinics monetary compensation, the Anti-Weaponization Fund will further embolden criminal activity against NAF's members, who experience continuous and ongoing threats and violence. Both NAF and its individual members have diverted significant time and resources from their core activity of facilitating reproductive healthcare to respond to ongoing threats. Prior to this administration, individuals who blockaded and invaded NAF member clinics were prosecuted under the Freedom of Access to Clinic Entrances (FACE) Act. President Trump, however, has pardoned individuals convicted of FACE Act violations, and some of those individuals have reoffended at NAF member clinics after they were pardoned.[3]

12.    Plaintiff **Common Cause** is a nonpartisan, grassroots organization organized under the laws of the District of Columbia that has a mission of upholding the core values of American

---

[3] Julianne McShane, *Abortion Providers Saw Waves of Threats in 2025 as Trump Pardoned Their Detractors: Report*, MS NOW (May 19, 2026), https://perma.cc/LLS7-K2TR.

democracy. Common Cause has nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. Common Cause works to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process. Common Cause believes that public officials should act in all of our interest, not just to line their own pockets. The organization works to ensure that those empowered to act on everyone's behalf disclose their personal finances, uphold the rule of law, and not turn their public service into a personal profit scheme. Common Cause is also one of the nation's premier organizations working to protect the safety and integrity of U.S. elections. Each election cycle, Common Cause recruits, trains, and deploys thousands of volunteers to help voters overcome barriers and ensure fair voting. Common Cause devotes significant resources to promoting voter participation and deploying staff to monitor election procedures. After elections, Common Cause works to ensure election results are processed fairly and that the public understands and respects the outcomes of a free and fair election. Throughout, Common Cause conducts educational and advocacy efforts to reduce the risks of political violence.

13. Defendant **Department of Justice** is a federal agency headquartered in Washington, D.C.

14. Defendant **Todd Blanche** is Acting United States Attorney General and is sued in his official capacity.

15. Defendant **Stanley Woodward Jr.** is Associate Attorney General and is sued in his official capacity.

16. Defendant **Department of the Treasury** is a federal agency headquartered in Washington, D.C.

17. Defendant **Scott Bessent** is Secretary of the Treasury and is sued in his official capacity.

18. Defendant **Anti-Weaponization Fund** is a governmental entity unlawfully established by the actions challenged in this suit.

19. Defendants Department of Justice, Acting Attorney General Blanche, Associate Attorney General Woodward, Department of the Treasury, and Secretary Bessent are collectively referred to as the **Agency Defendants** herein.

## JURISDICTION

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*

## VENUE

21. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this District. Venue is proper in this division for the same reason. *See* Local Civil Rule 3(C).

## FACTUAL BACKGROUND

**President Trump's $10 Billion Lawsuit Against His Own Administration**

22. In January 2026, President Trump, his sons, and the Trump Organization filed a lawsuit against the IRS and Treasury Department in federal court, alleging that the disclosure of their tax return information by former government contractor Charles Littlejohn entitled them to $10 billion in damages. Compl., *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Jan. 29, 2026), ECF No. 1.

23.     From the start, the President's unprecedented lawsuit appeared likely to result in a collusive agreement.

24.     First and foremost, the President controlled both sides of the litigation.

25.     On the plaintiffs' side, President Trump was the lead plaintiff, alongside his family members and his family business. The Trump Organization is reportedly in a trust managed by his children, but not a blind trust—and the President appears to retain ultimate control and access to its assets.[4]

26.     On the defendants' side, the President claimed complete supervisory authority via executive order, where he declared the power to make "authoritative interpretations of law for the executive branch" that "are controlling on all employees in the conduct of their official duties." Exec. Order No. 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447, 10448 (Feb. 24, 2025).

27.     The President himself confirmed the same. In response to press questions about the case, the President remarked: "I'm supposed to work out a settlement with myself."[5]

28.     Given this apparent lack of adverseness, the presiding Judge noted "it is unclear to this Court whether the Parties are sufficiently adverse to each other so as to satisfy Article III's case or controversy requirement." *Trump v. IRS*, No. 1:26-cv-20609, 2026 WL 1145973, at *2 (S.D. Fla. Apr. 24, 2026).

---

[4] Dan Alexander, *Trump Organization Admits President Still Controls His Business In New Filing*, Forbes (May 6, 2025), https://perma.cc/8G8D-G65D; Michelle Conlin & Heather Timmons, *Trump will not be involved in managing family business as president, company says*, Reuters (Jan. 10, 2025), https://perma.cc/7XR4-HC6R.

[5] White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (YouTube, Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE.

29.    The President's claims also had substantial flaws on the merits, many of which IRS lawyers reportedly identified internally,[6] but which the government did not raise before the Court.

30.    The President failed to bring his primary claim, for an unauthorized disclosure of tax returns, within the two-year statute of limitations. 26 U.S.C. § 7431(d). But the challenged leak became known more than two years ago, and others subject to the same leaks brought their cases much earlier.

31.    Nor did the President properly bring that claim against the United States, as Littlejohn was not an "officer or employee of the United States," *id*. § 7431(a)(1), but rather a federal contractor not acting at the direction of any federal employee.

32.    And the President's request for $10 billion in damages was untethered from any reasonable or lawful damages award. Section 7431 sets damages at the greater of $1,000 per unauthorized disclosure, *id*. § 7431(c)(1)(A), or actual and punitive damages, *id.* § 7431(c)(1)(B).

33.    The President's other claim, brought under the Privacy Act's cause of action for damages, suffered from similar defects, including that it was time-barred and that the President did not plead that he or the other plaintiffs sustained actual damages because of the alleged violation.

**The Trump-Vance Administration's Agreement to Terminate Trump's Lawsuit**

34.    *Amici*, including Plaintiff Common Cause, promptly raised these issues—and more—in briefs filed with and accepted by the court, *see, e.g.*, Brief of Amici Curiae Former Government Officials and Public Interest Organizations, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Feb. 5, 2026), ECF No. 7-1. But Department of Justice (DOJ) lawyers did not so much as enter an appearance in the case.

---

[6] Andrew Duehren, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026),  https://perma.cc/XC6U-34CB.

35. The case instead unfolded exactly as *amici* and the public feared, and as the President himself predicted.

36. First, the attorneys for the Trump family moved to extend the government's deadline to respond to the complaint, specifically so that the parties could "engage in discussions designed to resolve this matter and to avoid protracted litigation." Plaintiffs' Consent Motion, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Apr. 17, 2026), ECF No. 40 at 2.

37. In response, and recognizing potential jurisdictional concerns, the court *sua sponte* ordered the parties and court-appointed *amici* to brief whether the case satisfied Article III. Order, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Apr. 24, 2026), ECF No. 41; Order, *id.* (Apr. 29, 2026), ECF No. 43.

38. Court-appointed *amici* filed a comprehensive brief on the lack of adverseness. Memorandum of Court-Appointed *Amici Curiae*, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 14, 2026), ECF No. 45. That brief stated that the case "presents significant Article III subject matter jurisdiction concerns" and "[t]here is also reason to believe that the President is, in fact, exercising his control over the Defendants in this litigation." *Id.* at 11.

39. The parties' briefs on the Article III issue were due on May 20, 2026, with a hearing to follow on May 27.

40. However, rather than file their briefs, the parties instead chose to end the litigation on May 18, side-stepping the constitutionally required inquiry for maintaining a lawsuit.

41. That day, the plaintiffs filed a notice of voluntary dismissal, taking pains to argue that there was no room for any judicial oversight. *See* Plaintiffs' Notice of Voluntary Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) at 2, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026), ECF No. 52 ("Upon the filing of this Notice, no judicial analysis is

10

appropriate, and any subsequent order purporting to dismiss all claims . . . [would be] a nullity."
(citation and internal quotation marks omitted)).

42.    The plaintiffs did not attach any purported settlement agreement to the notice of voluntary dismissal.

43.    Later that same day, DOJ announced that the parties in *Trump v. IRS* had reached an agreement.

44.    The parties' "settlement" of the President's lawsuit against the IRS is anything but an ordinary settlement involving the government.

45.    In a press release dated May 18, 2026, DOJ announced the establishment of a $1.776 billion "Anti-Weaponization Fund" as "part of" the agreement to "settle" the *Trump v. IRS* case.[7] Agreement (Ex. A) ¶ III.A.[8]

46.    The Agreement provides that Trump and the other *Trump v. IRS* plaintiffs will receive a formal apology but no monetary compensation. *Id.* ¶ III.A.

47.    An addendum to the Agreement released by DOJ on May 19 provides the President and the other plaintiffs in *Trump v. IRS* with a liability waiver that permanently protects them from audits and prosecutions "before Defendants or other agencies or departments" that are "currently pending or that could be pending." Addendum to Agreement (Ex. B). According to public reporting, the liability waiver would protect the President from a federal tax liability of more than $100 million.[9]

---

[7] Dep't of Justice, Press Release, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://perma.cc/7W9V-M9PG.

[8] Agreement (May 18, 2026), https://perma.cc/F8VF-L8FC.

[9] Russ Buetner, *With Trump's Deal, a Possible $100 Million I.R.S. Penalty Melts Away*, New York Times (May 19, 2026), https://www.nytimes.com/2026/05/19/us/politics/trump-settlement-irs.html?smid=nytcore-ios-share.

**The Creation of the Anti-Weaponization Fund**

48.      As part of their Agreement, Defendants have created the Anti-Weaponization Fund "[t]o provide a systematic process to hear and redress claims of others who, like [the *Trump v. IRS* plaintiffs], state that they incurred harm from similar Lawfare and Weaponization." Ex. A ¶ III.C.

49.      The Agreement defines "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *Id.* ¶ II.C.

50.      The Anti-Weaponization Fund "shall consist of five Members." *Id.* ¶ IV.B. Within thirty days of the effective date of the Agreement, May 18, 2026, all five members will be appointed by the Attorney General, and one of the five will be chosen in consultation with congressional leadership. They are subject to removal at will by the President. *Id.* Final decisions can be made by as few as two members. *Id.* ("A quorum is three Members. A majority of a quorum is authorized to take action.").

51.      "The Anti-Weaponization Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* ¶ IV.C. By the terms of the Agreement, these procedures need not be made public. *Id.* Rather, the Fund has "discretion" whether to "make those procedures public in whole or in part." *Id.*

52.      The Fund shall "have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* ¶ IV.D.

12

53.     To apply for recovery from the Fund, a claimant "must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." *Id.* ¶ V.C.

54.     The Fund must consider "the totality of the circumstances" to assess each such claim, including "actual damages," "attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization," and "[a]ny time the claimant spent in prison or otherwise in federal prison [sic] or custody as a result of the Lawfare and Weaponization." *Id.* ¶ V.D.

55.     According to the Agreement, Anti-Weaponization Fund payments will not be subject to judicial review. *Id.* ¶ VI.B.

56.     According to the Agreement, the identity of claimants and amount of compensation paid by the Fund will not be made public. *Id.* ¶¶ IV.E, V.F.

57.     The Fund will stop processing claims no later than December 1, 2028, and after December 15, 2028, the Fund will transfer any money remaining in its account "to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* ¶¶ IV.G, IV.H.

58.     The Anti-Weaponization Fund is funded by a $1.776 billion payment from the Judgment Fund. Funding Order (Ex. C) ¶ C.[10] The Judgment Fund is an appropriation by Congress available to the Attorney General for a specific and limited purpose: payment from the Judgment Fund can be made for "final judgments rendered by a district court," as well as "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." 28 U.S.C. § 2414.

59.     According to the Acting Attorney General's Funding Order, once Treasury has sent Judgment Fund money to the Anti-Weaponization Fund, "the United States has no liability

---

[10] Acting Attorney General Todd Blanche, Order (May 18, 2026), https://perma.cc/SV39-DB4Q.

whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds." Ex. C ¶ D.

60.     Some of the $1.776 billion in funds may be used for "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund." *Id.* ¶ E.

61.     On May 21, 2026, DOJ sent a fact sheet to Senate Republicans about the Anti-Weaponization Fund ahead of their meeting with Acting Attorney General Blanche. Ex. D.[11]

62.     Although the fact sheet largely confirmed the language in the Agreement and Funding Order, it made several additions.

63.     For example, the fact sheet states that "[t]here is no partisan restriction: Democrats can submit claims, too." *Id.* It does not, however, say that those who claim to have been *targeted* by non-Democrats can submit claims.

64.     It also asserts that "the Commissioners must consider a claimant's personal conduct and character when making a [claim] determination." *Id.*

65.     It notes that "[t]he A/AG committed to sharing [the Fund's quarterly] reports with Congress (with appropriate redactions to accommodate for privacy concerns and privileges)" and that "Senators and Members are welcome to submit additional inquiries regarding the Fund to DOJ OLA at any time." *Id.*

66.     Finally, it contends, but does not require, that "[t]he Fund can be audited, including by a third party" and that "[t]he Fund must take steps to protect private information and avoid fraud." *Id.*

---

[11] Andrew Desiderio (@AndrewDesiderio), X (May 21, 2026, at 10:43 AM ET), https://perma.cc/7NF9-9XGW.

67.    Of course, these statements are not binding given that "[t]he Settlement Agreement may be modified only by the written agreement of the Parties," Ex. A ¶ VIII, and they are not reflected in the Acting Attorney General's funding order, either.

**Trump and His Allies' Longstanding Fixation on Democratic "Weaponization"**

68.    The creation of the Anti-Weaponization Fund follows directly from President Trump and his allies' longstanding and frequent accusations that Democrats used the government and the legal system as political weapons.

69.    For example, in June 2023, after DOJ charged then-former President Trump with mishandling classified documents, Trump posted a video on social media exclaiming, "This is warfare for the law . . . . Our country is going to hell, and they come after Donald Trump, weaponizing the Justice Department, weaponizing the FBI."[12]

70.    Republican lawmakers quickly adopted the same language. Florida Governor Ron DeSantis posted that "the weaponization of federal law enforcement represents a mortal threat to a free society," and then-Speaker of the House Kevin McCarthy pledged on Twitter that House Republicans would "hold this brazen weaponization of power accountable."[13]

71.    Even before his election to a second term, members of President Trump's campaign spent months developing a scheme to compensate those of Trump's political allies who were purportedly the victims of "weaponization."[14]

---

[12] Roll Call Factbase Videos, *Donald Trump Vlog: Statement on Indictment — June 8, 2023* at 1:50 (YouTube, May 26, 2025), https://www.youtube.com/watch?v=D74k5KbDdxs.

[13] *Trump Indicted: Trump Is Charged in Classified Documents Inquiry*, N.Y. Times (June 8, 2023), https://www.nytimes.com/live/2023/06/08/us/trump-indictment-documents.

[14] Adam Cancryn et al., *Trump's 2024 campaign discussed an anti-weaponization fund. They didn't know where to get the money — until now*, CNN (May 21, 2026), https://perma.cc/GV8Y-9NGU.

72.    On Day 1 of his second administration, President Trump issued an executive order titled "Ending the Weaponization of the Federal Government," claiming to "ensure accountability for the previous administration's weaponization of the Federal Government against the American people." Exec. Order No. 14147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025).

73.    As examples of "weaponization," the order cited "activities directed at parents protesting at school board meetings," "politically motivated funding revocations," and the "ruthless[] prosecut[ion of] more than 1,500 individuals associated with January 6." *Id.*

74.    And on the day she took office, then-Attorney General Pam Bondi established the Weaponization Working Group to "conduct a review [sic] the activities of all departments and agencies exercising civil or criminal enforcement authority of the United States over the last four years . . . to identify instances where . . . conduct appears to have been designed to achieve political objectives or other improper aims."[15]

75.    As examples of "weaponization," Bondi's memo cited Special Counsel Jack Smith's investigation of Trump, New York prosecutors' cases against Trump, the investigation and prosecution of January 6 rioters, and criminal prosecutions under the FACE Act, a statute passed with overwhelming bipartisan support, among others.[16]

76.    The Weaponization Working Group issued its first report last month, charging that "[t]he Biden DOJ" improperly "pursued more severe charges and significantly harsher sentences for peaceful pro-life defendants than violent pro-abortion defendants," "ignored" anti-abortion

---

[15] Att'y Gen. Pam Bondi, *Memorandum re: Restoring the Integrity and Credibility of the Department of Justice*, Dep't of Just. (Feb. 5, 2025), https://perma.cc/UK34-L9PP..

[16] *Id.*

groups while engaging with "pro-abortion" groups, and engaged in conduct and comments that evinced bias, among other allegations.[17]

77.   The creation of the Anti-Weaponization Fund, too, relies on similar examples of "weaponization."

78.   For examples of lawfare and weaponization, the Agreement lists "the Biden Administration's abuse of the FACE Act, the Biden Administration's wrongful labeling of certain parents as domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." Ex. A ¶ II.C.

79.   DOJ's May 21 fact sheet described "victims of lawfare and weaponization" as including those "whose online speech was censored at the behest of the government, parents silenced at schoolboards, Senators whose records were secretly subpoenaed, [and] churchgoers targeted by the FBI." Ex. D.

80.   The Trump-Vance administration's focus on Democratic administrations' "weaponization" has also resulted in substantial monetary relief and protection for those it considers victims.

81.   DOJ reached a $1.1 million settlement earlier this year with anti-abortion activist Mark Houck, after a trial court judge had dismissed his lawsuit seeking damages for his prosecution under the FACE Act, which resulted in his acquittal.[18]

---

[17] Dep't of Just., *The Biden Administration's Weaponization of the Freedom of Access to Clinic Entrances Act*, *supra* note 1.

[18] *Id.* at 30 & n. 202; *see also* Julianne McShane, *DOJ paid more than $1 million in settlement to anti-abortion protester — after a federal judge tossed his suit,* MS NOW (Apr. 14, 2026), https://perma.cc/BZ5V-DRT8.

82.     DOJ also reached a $1.25 million settlement with Michael Flynn, a former Trump administration official who pleaded guilty to a felony count of making false statements to the FBI and who Trump pardoned in 2020.[19]

83.     President Trump pardoned 23 anti-abortion activists who had been convicted of criminal violations under the FACE Act and/or related crimes.[20]

84.     And of course, President Trump granted sweeping clemency for people charged or convicted for their role in the Capitol insurrection on January 6, 2021, on his first day of his second term.[21]

**The Trump-Vance Administration's Own "Lawfare and Weaponization"**

85.     Notably, none of the administration's efforts to combat "weaponization" include any mention or review of abuses of government authority by Republican officials.

86.     But Trump himself has used "the levers of government power" in unprecedented ways "to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *See* Ex. A ¶ II.C.

87.     During his first term, Trump broke historical norms by being the first president to reject the post-Watergate firewall that separated the White House's political decisions from independent DOJ criminal investigations.[22]

---

[19] Alan Feuer, *Justice Dept. Settles Flynn's Wrongful Prosecution Suit for $1.25 Million*, N.Y. Times (Mar. 25, 2026), https://perma.cc/B8T5-NNJC.

[20] *Clemency Grants by President Donald J. Trump (2025-Present)*, Dep't of Just. (updated Mar. 2, 2026), https://perma.cc/P6G8-JD9A.

[21] The White House, *Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021* (Jan. 20, 2025), https://perma.cc/85YB-RAP3.

[22] *See*, *e.g.*, Megan Mineiro, *Experts Troubled by Lack of Independence at Trump's Justice Department*, Courthouse News Service (Feb. 14, 2020), https://perma.cc/V59Q-8NPC.

88.     In his second term, Trump has been arrogating and using power in increasingly unprecedented and abusive ways to carry out his personal political agenda.

89.     For example, DOJ has sought indictments against Trump's political opponents, including former FBI Director James Comey, New York Attorney General Letitia James, and six Democratic members of Congress.[23] It has also launched investigations into Trump's critics like California Senator Adam Schiff, former New Jersey Governor Chris Christie, and former Special Counsel Jack Smith.[24] Trump revoked the security clearances of 50 people he accused of aiding former President Biden's presidential campaign, including former top intelligence officials. Exec. Order No. 14152, *Holding Former Government Officials Accountable for Election Interference and Improper Disclosure of Sensitive Governmental Information*, 90 Fed. Reg. 8343 (Jan. 20, 2025).

90.     Trump also reinstituted a first-term executive order that made it easier to fire federal workers—including by adding a provision stating that failure to "faithfully implement administration policies" is grounds for dismissal. Exec. Order No. 14171, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, 90 Fed. Reg. 8625 (Jan. 20, 2025). Within weeks, DOJ fired more than a dozen prosecutors who worked on Special Counsel Jack Smith's investigations into President Trump,[25] demoted seven of the most senior prosecutors in the District of Columbia's U.S. Attorney's Office to entry-level roles for political reasons,[26] and

---

[23] Peter Charalambous et al., *Here's a list of the individuals, including James Comey, targeted by the Trump administration*, ABC News (Apr. 29, 2026), https://perma.cc/8YBG-DKFD.

[24] *Id.*

[25] Glenn Thrush et al., *Justice Dept. Fires Prosecutors Who Worked on Trump Investigations*, N.Y. Times (Jan. 27, 2025), https://perma.cc/K3AB-LVMP.

[26] Spencer S. Hsu, *Seven top D.C. prosecutors demoted in purge by Trump U.S. attorney*, Wash. Post (Feb. 28, 2025), https://perma.cc/6H4E-UTF8.

reassigned nearly twenty career attorneys to undesirable or sham positions because their work was contrary to the President's agenda.[27] A few months later, it fired several prosecutors involved in January 6 criminal cases.[28]

91.    President Trump has also deployed thousands of federal agents and national guard troops to cities run by leaders affiliated with the Democratic Party, noting that he was targeting the "enemy within."[29]

92.    He signed sweeping executive orders targeting prominent law firms and lawyers that had represented Democrats or taken litigation positions adverse to Trump. *See*, *e.g.*, Exec. Order No. 14230, *Addressing Risks from Perkins Coie LLP*, 90 Fed. Reg. 11781 (Mar. 6, 2025); Exec. Order No. 14246, *Addressing Risks from Jenner & Block*, 90 Fed. Reg. 13997 (Mar. 25, 2025).

93.    The Trump-Vance administration has illegally sought to withhold federal funds to coerce or punish perceived political opponents. For example, the administration has targeted states led by Democratic officials with funding freezes and cuts.[30]

94.    But the Anti-Weaponization Fund does not even purport to cover victims of the Trump-Vance administration's weaponization. The Agreement defines Lawfare and Weaponization as being imposed by "Democrat" officials or federal employees, not officials or employees with other (or no) party affiliation. Ex. A ¶ II.C. It also characterizes the eligible

---

[27] Andrew Goudsward and Sarah N. Lynch, *Trump administration reassigns close to 20 Justice Department officials, sources say*, Reuters (Jan. 23, 2025), https://perma.cc/K8WF-YRP5.

[28] Alanna Durkin Richer, *DOJ abruptly fires 3 prosecutors involved in Jan. 6 criminal cases, AP sources say*, PBS News (June 28, 2025), https://perma.cc/Q238-LS7R.

[29] *Trump defends use of the U.S. military against the "enemy within,"* NPR (Sep. 30, 2025), https://perma.cc/JE3B-C82K.

[30] *See, e.g.*, Minho Kim, *Health Dept. Freezes $10 Billion in Funding to 5 Democratic States*, N.Y. Times (Jan. 6, 2026), https://perma.cc/BQA5-FRBT.

claimants as being "like Plaintiffs" in the case against the IRS, in that they "incurred harm from similar Lawfare and Weaponization." *Id.* ¶ III.C.

95.    When answering questions from reporters about the newly created Anti-Weaponization Fund on May 20, 2026, President Trump confirmed this inherent bias, stating, "the Obama administration started it, the Biden administration was horrible in terms of, what they've done to people is incredible, and we're reimbursing people for their legal fees and for their costs and for anybody involved. . . . It was the most violent thing I've ever seen in politics, what they did."[31] He then made light of his own actions, quipping, "And yet if I say, oh let's look at this one or that one, they say 'weaponization, weaponization.'"[32]

**Trump Allies' Claims to the Anti-Weaponization Fund**

96.    Unsurprisingly, then, President Trump's allies have already begun to stake their claims to the Anti-Weaponization Fund.

97.    The day after the creation of the Anti-Weaponization Fund, Michael Caputo, a former Trump administration official, posted a letter on X requesting $2.7 million in "restitution and reimbursement" from the Fund. He characterized him and his family as "survivors of the illegal Russiagate investigations" and seeks money for the "costs of the decade-long attack."[33]

---

[31] The White House, *President Trump Gaggles with Press Upon Arrival at Joint Base Andrews* (YouTube, May 20, 2026), http://youtube.com/watch?v=CwQB96husNE.

[32] *Id.*

[33] Michael Caputo (@MichaelRCaputo), X (May 19, 2026, 7:17 PM ET), https://perma.cc/UJN4-EW32.

21

98.     Enrique Tarrio, the Proud Boys leader sentenced to 22 years for seditious conspiracy over the January 6 insurrection, said he planned to apply to the Fund. He said that he assumed he could get between $2 and $5 million.[34]

99.     Jenny Cudd, another January 6 defendant, told reporters that "all J6ers will apply for restitution," noting that news of the Anti-Weaponization Fund was widely circulating among January 6 defendants on social media and "group chats."[35]

100.    Caroline Engelbrecht, a prominent election denier and founder of True the Vote, a group that amplified conspiracies that the 2020 election was stolen, stated: "I would put myself and True the Vote … squarely in that camp who have been targeted, and we have the receipts to show just how deep that targeting ran. And hopefully, we will see some level of compensation."[36]

101.    Several attorneys aligned with Trump's allies have confirmed that they, too, have already received many requests about submitting claims to the Fund.[37]

102.    For example, Steve Crampton, senior counsel at the Thomas More Society, which defends and advocates on behalf of abortion opponents prosecuted under the FACE Act, said his group is "actively exploring available avenues to seek compensation for clients who were unfairly targeted by politically motivated government overreach."[38]

---

[34] Dan Rosenzweig-Ziff, *'I'm Not Greedy': January 6 Rioters and Trump Allies Eye $1.8 Billion 'Weaponization' Fund*, Reuters (May 20, 2026), https://perma.cc/VK2B-P5K2.

[35] Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply,"* CBS News (May 19, 2026), https://perma.cc/KR7C-25KX.

[36] *True the Vote founder hopes "we will see some level of compensation" from Trump's weaponization fund*, Media Matters for America (May 21, 2026), https://perma.cc/WK9W-GS3G.

[37] *Id.*

[38] Brian Schwartz, C. Ryan Barber & Louise Radnofsky, *Trump Allies and Foes Jockey for Payouts From 'Anti-Weaponization' Fund*, Wall St. J. (May 21, 2026), https://www.wsj.com/politics/policy/trump-anti-weaponization-fund-claims-af2cde5a.

103.    Another such lawyer, Mike Howell, submitted a request to DOJ declaring his candidacy for one of the Anti-Weaponization Fund's five member positions in order to destroy the "mythology" of the "Radical Left." He stated that, if selected, he would organize "a national gathering of the thousands of victims of weaponization," including "those who had to pay legal fees because of their support for President Trump, those who were sent to prison, including those involved with January 6th, 2021."[39]

104.    And Peter Ticktin, who represents more than 400 January 6 defendants, said the $1.776 billion-Fund may not be sufficient to cover all of the claims: "People lost multi-million dollar businesses while they were locked up. I don't think the DOJ is ready for us yet."[40]

105.    Trump himself suggested the fund may be too small. "You're talking about peanuts," he told reporters at Joint Base Andrews on May 20, 2026, asserting that "what [the Biden and Obama administrations] did in terms of weaponization . . . destroyed the lives of many, many people." [41]

## INJURIES TO PLAINTIFFS

106.    The creation and existence of the Anti-Weaponization Fund, including its discriminatory structure, its illegal secrecy, and its implicit endorsement of dangerous conduct harm Plaintiffs in a number of ways.

---

[39] Gabe Kaminsky, *Ally of DOJ pardon attorney seeks to join board of Trump's $1.7+ billion fund*, CBS News (May 20, 2026), https://perma.cc/KW6J-3EQD; *see also* Letter from Mike Howell, President of Oversight Project, to Todd Blanche, Acting Att'y Gen. (May 20, 2026), *available at* https://www.scribd.com/document/1041476230/Letter-to-Acting-AG-Blanche-From-Mike-Howell-and-Oversight-Project.

[40] Rosenzweig-Ziff, *'I'm Not Greedy,'* https://perma.cc/VK2B-P5K2.

[41] *President Trump Gaggles with Press Upon Arrival at Joint Base Andrews*, The White House (May 20, 2026), http://youtube.com/watch?v=CwQB96husNE.

**Harms to Plaintiffs from Unconstitutional Discrimination**

107. The Anti-Weaponization Fund ostensibly seeks to compensate individuals and entities who have been targeted by government actors and their agents for "improper and unlawful political, personal, and/or ideological reasons."

108. As described above, Plaintiffs Mr. Floyd, Mr. Caravello, and City of New Haven have been targeted in this way. Mr. Floyd was apparently fired in retaliation for prosecuting the President's allies—January 6 defendants who are now themselves entitled to recover from the Fund. Mr. Caravello was subject to an unwarranted and abusive prosecution for protesting immigration enforcement and went through an ordeal much like the one the Trump-Vance administration ascribes to anti-abortion and January 6 rioters. And City of New Haven has faced a sustained campaign involving litigation brought against it by the federal government as well as the threat of federal funding termination to punish its opposition to the Trump-Vance administration's agenda. Moreover, each of these Plaintiffs has incurred significant costs as a result of this targeting, including legal fees, loss of income, diversion of critical resources, and reputational damage. Each of these Plaintiffs would be entitled to, and would pursue, redress for these harms through a fair and lawful process.

109. But the Anti-Weaponization Fund does not treat these Plaintiffs and their claims as equally worthy of consideration or relief, solely because these Plaintiffs were targeted by *Republican* officials or federal employees, rather than Democratic ones. By its own terms, the Anti-Weaponization Fund thus treats these Plaintiffs as a disfavored class, excluding them from a government program on the basis of the political affiliation of those who targeted them for abuse, and, by extension, on the basis of the perceived political affiliation of the Plaintiffs themselves.

24

110.    These Plaintiffs are injured by being treated as "less worthy participants in the political community," and "personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984).

111.    That harm is compounded by the fact that the Fund's discriminatory treatment implicates First Amendment concerns. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 632 (2020) ("[T]he First Amendment is a kind of Equal Protection Clause for ideas." (quotation marks omitted)). The Fund improperly differentiates between those claiming persecution by one political party but not the other. And it creates a mechanism by which those alleging weaponization by Democratic officials or federal employees may petition the Fund for redress from the government, while shutting the door entirely on those who would allege weaponization by Republicans. *See id.* at 634 (confirming plaintiffs' standing where "the First Amendment complaint at the heart of their suit was unequal treatment" and rejecting argument that plaintiffs lacked standing to challenge "a discriminatory exception that favors others"); *cf. Nat'l Pub. Radio, Inc. v. Trump*, --- F. Supp. 3d ---, 2026 WL 877434, at *15 (D.D.C. Mar. 31, 2026) ("Plaintiffs are injured because the Executive Order precludes them from even participating in the competition for federal grants or other financial benefits" on the basis of their disfavored speech).

**Harms to Plaintiffs from the Anti-Weaponization Fund's Endorsement of Unlawful Conduct**

112.    Plaintiffs NAF and Common Cause also face harm as a direct result of the Fund's endorsement, financing, and emboldening of unlawful conduct.

113.    NAF and its members face increased threats of vigilante violence due to the creation of the Anti-Weaponization Fund. Section II.C. of the Agreement on which the Fund is based lists "the Biden Administration's abuse of the FACE Act" as an example of the Lawfare and

Weaponization that the Fund is designed to remediate. Ex. A ¶ II.C. The creation of the Fund is thus a dog whistle for FACE Act violators to continue violating the law with the government's blessing. NAF's member clinics have been and continue to be targeted by these FACE Act violators. This new funding stream will foment and facilitate the vigilante violence that NAF's member clinics face.

114.    Indeed, about half of NAF's more than 400 members reported incidents of violence or harassment in 2025 in NAF's annual survey. These findings follow the Trump-Vance administration's repeated efforts to protect individuals who protest at clinics that provide abortions. Days into his second term, President Trump pardoned 23 individuals convicted of criminal FACE Act violations, several of whom were convicted due to activity at NAF's clinic members. Since being pardoned, FACE defendants have operated with a renewed license to mobilize, and at least three of the 23 individuals have been rearrested on multiple occasions for participating in blockades of abortion clinics.[42] Right after the pardons, DOJ's political leadership imposed strict limitations on "abortion-related" FACE Act cases, permitting cases to proceed only in "extraordinary circumstances," such as cases involving death, serious bodily harm, or significant property damage.

115.    Now, by offering those who protested at clinics that provide abortions monetary compensation, the Anti-Weaponization Fund will further embolden such violence and harassment against NAF's members, who already reasonably feel as though they are under siege. NAF's provider members must devote significant time and money to strengthening security measures at their clinics, at the expense of focusing on their core mission of providing reproductive healthcare.

---

[42] Julianne McShane, *'We're Going to Disrupt This Country': Pardoned Anti-Abortion Activists Plot Mass Clinic Protests*, MS NOW (Jan. 29, 2026), https://perma.cc/S7J8-QYA8.

For example, brick-and-mortar clinics are installing security cameras and secure locked doors, and providers of all kinds are setting up new trainings and drills for staff.

116. Common Cause also faces direct harm from the creation of the illegal Anti-Weaponization Fund, as it disrupts Common Cause's voter education and protection efforts. First, by rewarding people bent on undermining free, fair, and safe elections, the Fund's establishment will force Common Cause to invest additional time and resources to fulfill a core part of its mission and to keep its staff and volunteers safe. Every part of this election protection process—from recruiting day-of election protection volunteers, to analyzing electoral conduct, to promoting the safety of election officials—will be made markedly more time consuming, more costly, and more challenging as a result of the Fund. That election deniers, such as the former Colorado elections clerk Tina Peters, who conspired with Trump's allies to breach voting systems, and those convicted of violence on January 6, can be Fund beneficiaries emboldens and funds those seeking to undermine elections through illegal and violent intimidation tactics, which puts Common Cause's election protection staff and volunteers personally at risk. [43]

117. Additionally, since those participating in elections will similarly share fears for their own security due to the Fund's enablement of violent election deniers, Common Cause will be forced to expend more resources to convince voters of the security of our elections and to promote their participation. Defendants' actions have undermined the effectiveness of Common Cause's core activities of promoting political participation by chilling voter participation. And these injuries are heightened by the ongoing election cycle, for once an election passes, "there can

---

[43] Aaron Blake, *Defenders of Trump's 'anti-weaponization' fund are few. And they're struggling,* CNN (May 22, 2026), https://perma.cc/WN8A-ZQ3D.

be no do over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

**Injuries to Common Cause from the Lack of Transparency and Procedure**

118.    As a watchdog group dedicated to holding power accountable and creating open, honest, and accountable government that serves the public interest, Common Cause is also injured by the procedural violations in the creation of the Fund and the lack of transparency required for its operations.

119.    Common Cause routinely files comments on federal rulemakings and actions impacting government accountability. For example, earlier this year it commented on DOJ Proposed Rule OAG199, which would strip independent state bar associations of their power to enforce state ethics rules against their own attorneys.[44] Common Cause also serves its membership through educating them about comment opportunities and coordinating comment campaigns. For example, Common Cause garnered thousands of comments from its members on DOJ's Proposed Rule OAG199. Had the establishment of the Fund been made available for public comment, Common Cause would have commented on it and would have educated its membership on the proposal and promoted the opportunity for them to also provide comments.

120.    Common Cause is also injured by the secrecy permitted in the Fund's operations because this impairs its core work and withholds information otherwise required to be made public. Among its core activities in pursuit of its mission to promote government accountability, Common Cause reviews government spending and, when it identifies unlawful or unethical payments, files complaints with appropriate oversight bodies. It also uses publicly available information regarding

---

[44] *Common Cause Opposes DOJ "Self-Policing" Ethics Rule*, Common Cause (Apr. 2, 2026), https://perma.cc/2MCR-ZYPU.

government spending to raise awareness about corruption and advocate for legislative oversight. For example, Common Cause has filed complaints with the Federal Election Commission and DOJ alleging that the payment of $130,000 from a shell company established by President Trump's personal lawyer to adult film actress Stormy Daniels was an unreported and illegal in-kind contribution to the Trump campaign.[45] It has similarly filed complaints against Colorado state legislators alleging that they accepted luxury resort expenses funded by a special interest group in violation of Colorado Ethics Law.[46] And it has filed numerous other complaints addressing government ethics violations and seeking accountability in relation to the conduct of public officials of both parties. If basic descriptive information, including payment amounts made by the fund and the basis for the claim were made public or additional information was made available through Freedom of Information Act requests, Common Cause would make such FOIA requests, track this spending, and identify potentially unlawful or unethical payments to file complaints with appropriate oversight bodies as well as raise public awareness of them. Additionally, had the entity overseeing the Fund been established through normal rule-making procedures under the Administrative Procedure Act requiring notice and comment, Common Cause would have had the opportunity to provide comments that would need to be considered by DOJ. Had the Administration made these payments based on the normal protocols of the Judgment Fund, there would be a statutory requirement to publish such information about them. 31 U.S.C. § 1304(d). The Fund's confidentiality frustrates Common Cause's entitlement to this information, its ability

---

[45] *Read Our Complaints: Stormy Daniels Hush Money*, Common Cause, https://perma.cc/KLR7-T5CA.

[46] *Colorado Common Cause Files Complaints Over Undisclosed Dark Money Luxury Retreat for Legislators*, Common Cause (Nov. 5, 2025), https://perma.cc/B27Z-EL8M.

to use that information to pursue relief via complaints, and its ability to raise awareness about apparently corrupt payments.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the First Amendment—Viewpoint Discrimination
### & Unconstitutional Conditions
### (Against All Defendants)

121.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

122.    The First Amendment of the United States Constitution protects both "the freedom of speech" and the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Assoc. v. Vullo*, 602 U.S. 175, 187 (2024).

123.    The First Amendment prohibits the government from "us[ing] government power—including the power of the purse—'to punish or suppress disfavored expression' by others." *Nat'l Pub. Radio*, 2026 WL 877434, at *1 (quoting *Vullo*, 602 U.S. at 188). In a similar vein, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (quotation marks omitted).

124.    Those protections prohibit the federal government from conditioning funding or access to benefits on a viewpoint-preferential basis, whether in the context of a public forum or otherwise.

125.    The Anti-Weaponization Fund does not offer benefits to victims of ideological targeting by Democrats and Republicans alike; instead, it offers benefits to those who have

30

espoused views that were, or were perceived to be, oppositional to Democratic administrations, but not to those who have espoused views that were, or were perceived to be, oppositional to Republican administrations.

126.    And on the face of its terms, the Anti-Weaponization Fund is not viewpoint neutral, as required by the First Amendment. It makes access to the Anti-Weaponization Fund dependent on whether the claimant's viewpoint is that they were the subject of "Lawfare and Weaponization" by "Democrat" officials or federal employees, as opposed to Republican or nonpartisan officials or federal employees.

## COUNT II
### Violation of the Fifth Amendment—Equal Protection
### (Against All Defendants)

127.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

128.    The Fourteenth Amendment of the United States Constitution guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

129.    This equal protection guarantee is applicable to the federal government, and all of its agencies, officials, and employees through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

130.    These principles require "all persons similarly situated [to] be treated alike" by the federal government. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

131.    "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis under any level of scrutiny. *Id.* at 447 (quotation marks omitted); *see also Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the . . . guarantee of equal protection under the law, . . . settling personal

31

vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government . . . .").

132.    The Anti-Weaponization Fund does not treat all persons similarly situated alike.

133.    Specifically, the Anti-Weaponization Fund is available only to claimants whose claims are based on alleged "Lawfare and Weaponization" "by Democrat elected officials, political and career federal employees, contractors, and agents." Ex. A ¶ II.C. The Anti-Weaponization Fund is, definitionally, not available to claimants who say that they have been the subject of "Lawfare and Weaponization" by Republican or nonpartisan elected officials or federal employees. The only examples of "Lawfare and Weaponization" cited in the Agreement concern Democratic administrations. *See id.* And the Trump-Vance administration—which has established and will oversee the operations of the Fund—has, from Day 1, focused relentlessly on alleged "weaponization" by "[t]he prior administration and allies throughout the country." Exec. Order No. 14147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025). Simultaneously, it engaged in unprecedented actual weaponization of the federal government; yet those experiencing this weaponization will not be eligible.

134.    Claimants who believe they have been the subject of "Lawfare and Weaponization" are similarly situated, regardless of the perceived political affiliation of the person the claimant believes was unfairly exercising government power.

135.    There is no rational basis for the Anti-Weaponization Fund's unequal treatment of potential claimants.

136.    Rather, Defendants' differential treatment is motivated by animus towards the actual or assumed political views of claimants who believe they have been the subject of "Lawfare

32

and Weaponization" by Republican or nonpartisan officials or federal employees, as compared to claimants alleging mistreatment by "Democrat" officials or federal employees.

## COUNT III
### Violation of the Separation of Powers
### (Against All Defendants)

137. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

138. The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

139. Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

140. Congress has the exclusive power under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds for purposes defined by Congress. *See* U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl. 7. The "fundamental" purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

141. The President may not confer powers upon other federal officers or agencies within the Executive Branch that he does not himself possess.

142. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. *See* U.S. Const. art. I, § 7, cl. 2.

143. The President does not have the power under the Constitution unilaterally to amend statutes.

144.    The Anti-Weaponization Fund, which exists and operates as a governmental slush fund outside the appropriations of Congress, shielded from congressional oversight, and wielding substantial independent authority, exceeds presidential and executive authority and usurps legislative authority conferred by the Constitution, in violation of the separation of powers.

**COUNT IV**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(Against Agency Defendants)**

145.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

146.    The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

147.    Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

148.    Plaintiffs challenge the government's creation of the Anti-Weaponization Fund, an agency action that encompasses both establishing and funding that entity.

149.    The government's creation and funding of the Anti-Weaponization Fund marks the consummation of DOJ and Treasury's decisionmaking process because it affirmatively establishes the Fund. As Acting Attorney Blanche has stated, the Agreement in *Trump v. IRS* "created the Anti-Weaponization Fund." Ex. C. Acting Attorney General Blanche has likewise issued an order "establishing funding and any other relevant requirements for the [Anti-Weaponization Fund]." *Id.*

150.    The creation of the Anti-Weaponization Fund is also an action by which rights or obligations have been determined or from which legal consequences will flow because it establishes a legal process by which some individuals (but not others) have the right to pursue

34

claims against the United States. The creation of the Anti-Weaponization Fund also establishes obligations, including the transfer of $1,776,000,000 from the Judgment Fund and a permanent bar on claims that claimants could otherwise pursue.

151.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

152.    The creation of the Anti-Weaponization Fund is arbitrary and capricious in multiple respects. Several examples follow.

153.    First, as set forth herein, the creation of the Anti-Weaponization Fund conflicts with laws, regulations, and constitutional provisions. This alone renders it arbitrary and capricious.

154.    Second, the Agency Defendants have failed to proffer a reasonable explanation for the creation of the Anti-Weaponization Fund, including addressing those conflicts with laws and constitutional provisions. Although the Agency Defendants purport to create the Fund to settle the *Trump v. IRS* lawsuit, the creation of the Anti-Weaponization Fund has no connection to the claims at issue there. Indeed, the Agreement provides the *Trump* plaintiffs with "a formal apology from the United States" outside the procedures of the Anti-Weaponization Fund and further states that the *Trump* plaintiffs "receive no economic benefit from this Settlement Agreement." Ex. A ¶¶ III.A, IV.A.

155.    Third, the creation of the Anti-Weaponization Fund fails to address, and is irreconcilably at odds with, DOJ's own policy prohibiting settlements that involve payments to third parties "that were neither victims nor parties" to the suit. Mem. from the Att'y Gen. to All Dep't Emps., *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025), https://perma.cc/Q9FL-A5VS. DOJ has failed to offer an adequate explanation for its change in position.

156. Fourth, the creation of the Anti-Weaponization Fund reflects no consideration of reasonable alternative approaches. The Agency Defendants fail to explain, for example, why the existing Judgment Fund is insufficient to address legitimate claims by individuals they believed were targeted and why only claimants allegedly subject to certain kinds of "Lawfare and Weaponization" are permitted.

157. Fifth, the creation of the Anti-Weaponization Fund failed to consider important aspects of the problem. For example, the Agency Defendants altogether failed to consider the increased harm organizations like NAF and Common Cause would face when agitators that are rewarded through the Anti-Weaponization Fund are further emboldened to commit more acts of violence and disruption in abortion clinics and at polling places, among other venues.

158. Sixth, the creation of the Anti-Weaponization Fund does not set forth procedures for an adversarial process to test claims or to permit the government to produce evidence that the investigation or prosecution targeting the claimant was well founded. Nor does it require that awards under it be made public, as is required for payments under the Judgment Fund and as is consistent with DOJ's policy that settlements not be confidential. 28 C.F.R. § 50.23. Indeed, it does not set forth meaningful procedural safeguards at all, instead permitting the Fund "to determine its own procedures," which it may or may not even make public.

159. Seventh, the lack of adversarial process and the secrecy—among other procedural deficiencies—fails to adequately safeguard the taxpayer dollars at issue, and the Agency Defendants provide no explanation for their failure to do so.

160. Eighth, the creation of the Anti-Weaponization Fund itself, for such an astronomical sum, is substantively unreasonable because the sum does not reflect the true value of future claimants' claims under the Anti-Weaponization Fund; it instead appears to refer, arbitrarily, to the

year of our nation's independence. The creation of the Anti-Weaponization Fund was likewise unreasonably explained, because the Agency Defendants did not provide (and could not have provided) a rational explanation of why they set aside near two billion dollars provided by taxpayers for a small subset of people who may not have even filed litigation against the federal government. Rather, the entire process of why Defendants created the fund, how they determined its amount, and how they will evaluate claims is shrouded in secrecy and creates grave risk of corruption.

161.    For these and other failings, the creation of the Anti-Weaponization Fund is arbitrary and capricious.

**COUNT V**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right**
**(Against Agency Defendants)**

162.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

163.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

164.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the First Amendment because it discriminates on the basis of viewpoint.

165.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the Fifth Amendment because it violates the guarantee of equal protection.

166.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the separation of powers guaranteed by the United States Constitution.

167.    The Fourteenth Amendment of the United States Constitution provides that the United States shall not "assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States," but that "all such debts, obligations and claims shall be held

37

illegal and void." U.S. Const. amend. XIV, § 4. The creation of the Anti-Weaponization Fund is contrary to Section 4 of the Fourteenth Amendment because it provides for the United States to pay claims, calculated to include debts such as attorney's fees, to individuals who were arrested and/or prosecuted for their participation in the January 6, 2021 riots, even though those individuals had engaged in an act of insurrection against the United States by attempting to prevent by means of violence the certification of a presidential election.

168.   Under the Appointments Clause of the United States Constitution, people exercising "significant authority pursuant to the laws of the United States" and who "occupy a continuing position established by law" must be appointed as officers. *See Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quotation marks omitted). "Only the President, with the advice and consent of the Senate," can appoint "principal officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (quotation marks omitted). "[T]he Appointments Clause permits Congress to dispense with joint appointment, but only for inferior officers." *Id.* The creation of the Anti-Weaponization Fund is contrary to the Appointments Clause because it provides for the Attorney General, rather than the President, to appoint its members. This is impermissible because the members are principal officers: they "have the power to render a final decision on behalf of the United States without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *Id.* at 14 (quotation marks omitted). Indeed, the Agreement specifically provides that "there shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund." *See* Ex. A ¶ VI.B. But even if they were inferior officers, only Congress can dispense with joint appointment, and Congress has not done so here.

169.   The creation of the Anti-Weaponization Fund is contrary to constitutional right because it is contrary to these many provisions.

38

## COUNT VI
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B)
### Contrary to Law
### (Against Agency Defendants)

170.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

171.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

172.    The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

173.    28 U.S.C. § 2414, which governs the federal government's Judgment Fund, provides for "payment of final judgments rendered by a district court," as well as "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." The Creation of the Anti-Weaponization Fund is contrary to Section 2414 because it permits the settlement of claims that do not fall within those strictures.

174.    Moreover, the "imminent litigation" in *Trump v. IRS*, the resolution of which resulted in the creation of the Anti-Weaponization Fund, is wholly unrelated to the alleged claims of the unnamed and unlimited claimants of the Anti-Weaponization Fund. In *Trump v. IRS*, the President, two of his sons, and their family business alleged that the government unlawfully disclosed their tax return information. The creation of the Anti-Weaponization Fund for claims of third parties has no connection to *Trump v. IRS*. Because the United States has no "obligations or liabilities" to those third parties from which payment from the Judgment Fund could be made using the *Trump v. IRS* lawsuit as its basis, the use of the Judgment Fund for the creation of the Anti-Weaponization Fund is unlawful. *See* 28 U.S.C. § 2414.

39

175. The creation of the Anti-Weaponization Fund separately violates the statute because it permits payment from the Judgment Fund to claimants that need not bring "imminent litigation or suits." *Id.*

176. 31 U.S.C. § 1304, which appropriates money for the Judgment Fund, requires the Secretary of the Treasury to "make available to the public on a website" information about each payment from the Judgment Fund, including the name of the claimant and their counsel, the name of the agency whose actions gave rise to the claim, the name of the agency that submitted the claim, the amount paid, and a brief description of the facts that gave rise to the claim. *See* 31 U.S.C. § 1304(d). The creation of the Anti-Weaponization Fund is contrary to section 1304(d) because it does not require this level of transparency, and instead permits the Anti-Weaponization Fund to make "its own procedures for submitting, receiving, processing, and granting or denying claims . . . public in whole or in part, in its discretion." Ex. A ¶ IV.C.

177. The creation of the Anti-Weaponization Fund also violates the APA because it is contrary to binding agency regulations implementing the Judgment Fund, 31 C.F.R. part 256. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). For example, under those binding regulations, the Judgment Fund can be used for settlement of "claims arising under actual or imminent litigation." 31 C.F.R. § 256.1(a). But, as noted above, the creation of the Anti-Weaponization Fund permits claimants to come forward without filing litigation, and it thus violates that regulation. Those binding regulations also require that the "Department of Justice must normally submit the request for payment from the Judgment Fund." *Id.* § 256.10(a). The creation of the Anti-Weaponization Fund is contrary to those regulations because it permits individual claimants to submit requests for payment (of money that was initially appropriated to the Judgment Fund), and the members of the Anti-Weaponization Fund, not DOJ, will determine

if the amount requested is appropriate. Similarly, the binding regulations require that a request for payment (from an agency) must be accompanied by "a copy of the judgment or settlement agreement, as applicable." *Id.* § 256.12(a). But the creation of the Anti-Weaponization Fund circumvents that requirement, as neither a judgment nor a settlement agreement is required to submit a claim.

178.    The Freedom of Information Act requires federal agencies to make certain records available to the public. *See* 5 U.S.C. § 552(a). The Anti-Weaponization Fund is acting as an agency, and would ordinarily be subject to FOIA. Or in the alternative, and at a minimum, the Fund is administered by two agencies that are subject to FOIA, and so falls within those FOIA obligations. The creation of the Anti-Weaponization Fund is contrary to FOIA because it permits the Anti-Weaponization Fund to make "its own procedures for submitting, receiving, processing, and granting or denying claims," procedures which the Anti-Weaponization Fund can make "public in whole or in part, in its discretion." Ex. A ¶ IV.C. The Anti-Weaponization Fund is thus empowered to keep its procedures entirely secret—contrary to both the letter and spirit of FOIA.

179.    The creation of the Anti-Weaponization Fund is not in accordance with law because it is contrary to these many provisions.

**COUNT VII**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(C)**
**In Excess of Statutory Authority**
**(Against Agency Defendants)**

180.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

181.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

41

182.   "An agency . . . literally has no power to act—including under its regulations— unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

183.   No statutory provision, including 31 U.S.C. § 1304 or 28 U.S.C. § 2414, authorizes Agency Defendants to create the Anti-Weaponization Fund.

184.   The creation of the Anti-Weaponization Fund therefore is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

## COUNT VIII
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(D)
### Failure to Observe Required Procedure
### (Against Agency Defendants)

185.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

186.   A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

187.   The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See id.* § 553(b), (c). Defendants failed to provide notice and an opportunity for public comment regarding the creation of the Anti-Weaponization Fund, including its governing procedures.

188.   The Creation of the Anti-Weaponization Fund is a legislative rule within the meaning of the APA.

189.   Had the creation of the Anti-Weaponization Fund been the subject of advance publication and notice-and-comment rulemaking under the APA, the Agency Defendants could have considered comments from Plaintiff Common Cause. Because the Agency Defendants chose not to follow these procedures, they were not, and will not be able to, consider comments opposing the creation of the Anti-Weaponization Fund.

**COUNT IX**
**Ultra Vires Action**
**(Against All Defendants)**

190.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

191.    "[J]udicial review is available when an agency acts *ultra vires*." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). Neither the President nor an agency or its officials may take any action that exceeds the scope of their constitutional or statutory authority. An agency acts constitutionally or statutorily *ultra vires* when it plainly acts in excess of its delegated powers or has violated the law. Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions . . . reflects a long history of judicial review of illegal executive action.").

192.    There is no statute, constitutional provision, or other source of law that authorizes the Anti-Weaponization Fund. Rather, the Anti-Weaponization Fund is contrary to law and constitutional right, as set forth above. Such "exercising [of] immense power without any grant of statutory authority whatsoever" is "the sort of extreme legal error that can sustain a claim for *ultra vires* review." *New Mexico v. Musk*, --- F.Supp.3d ----, 2026 WL 799635, at *13 (D.D.C. Mar. 23, 2026) (quotation marks omitted).

193.    Plaintiffs have a non-statutory right of action to declare unlawful, set aside, and enjoin Defendants' actions as constitutionally and statutorily ultra vires.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

43

a.    Declare unlawful the creation of the Anti-Weaponization Fund as in violation of the Constitution and the APA, and as *ultra vires*;

b.    Vacate and set aside the creation of the Anti-Weaponization Fund as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A); contrary to constitutional right under 5 U.S.C. § 706(2)(B); not in accordance with law under 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); without observance of procedure required by law under 5 U.S.C. § 706(2)(D);

c.    Stay the creation of the Anti-Weaponization Fund during the pendency of this lawsuit under 5 U.S.C. § 705;

d.    Preliminarily and permanently enjoin Defendants, their officers, employees, and agents from taking any further action pursuant to the creation of the Anti-Weaponization Fund, including, but not limited to,

    i.    Transferring any money to an account for the Fund, or, if such money has already been transferred, ordering Defendants to immediately reverse that transfer;

    ii.    Accepting or processing any claim submitted to the Fund;

    iii.    Making any payment out of the Fund;

    iv.    Appointing any Members to the Fund; and

    v.    Reconstituting the Fund under a different name.

e.    Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements deemed appropriate; and

f.    Grant such other relief as the Court deems necessary, just, and proper.

44

Dated: May 22, 2026

Respectfully submitted,

*/s/ Joel McElvain*
Joel McElvain (Va. Bar No. 95215)
Pooja A. Boisture*
Jyoti Jasrasaria*
Kevin E. Friedl*
Aman George*
Jessica Anne Morton*
Ayesha Khan*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jmcelvain@democracyforward.org
pboisture@democracyforward.org
jjasrasaria@democracyforward.org
kfriedl@democracyforward.org
ageorge@democracyforward.org
jmorton@democracyforward.org
akhan@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

*motions for admission *pro hac vice*
forthcoming