**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Andrew Floyd, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Department of Justice, et al.,<br><br>Defendants. | **Case No. 26-cv-1399-LMB** |

**DECLARATION OF POOJA A. BOISTURE**

I, Pooja A. Boisture, declare as follows:

1. I am an attorney at Democracy Forward Foundation, counsel for Plaintiffs in the above-captioned action. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order, or in the alternative, a preliminary injunction with expedited briefing, and for a stay under 5 U.S.C. § 705.

2. Exhibit A, previously filed in this case at docket number 1-2, is a true and correct copy of a "Settlement Agreement" purporting to resolve *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.), signed and dated May 18, 2026, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/F8VF-L8FC.

3. Exhibit B, previously filed in this case at docket number 1-3, is a true and correct copy of an addendum to that agreement, signed and dated May 19, 2026, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/F8VF-L8FC.

4.      Exhibit C, previously filed in this case at docket number 1-4, is a true and correct copy of an order issued by Acting Attorney General Todd Blanche and dated May 18, 2026, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/SV39-DB4Q.

5.      Exhibit D, previously filed in this case at docket number 1-5, is a true and correct copy of a Department of Justice fact sheet, which Democracy Forward obtained from the X website and which is publicly available at Andrew Desiderio (@AndrewDesiderio), X (May 21, 2026, at 10:43 AM ET), https://perma.cc/7NF9-9XGW.

6.      Attached as Exhibit E is a true and correct copy of a memorandum issued by Attorney General Pam Bondi entitled *Restoring the Integrity and Credibility of the Department of Justice* and dated February 5, 2025, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/UK34-L9PP.

7.      Attached as Exhibit F is a true and correct copy of a press release issued by the Department of Justice entitled *Justice Department Reveals the Biden Administration's Weaponization of Federal Law Against Pro-Life Americans* and dated April 14, 2026, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/J7NZ-3RPF.

8.      Attached as Exhibit G is a true and correct copy of Peter Charalambous et al.'s ABC News article entitled *Here's a list of the individuals, including James Comey, targeted by the Trump administration*, dated April 29, 2026, which Democracy Forward obtained from the ABC News website and which is publicly available at https://perma.cc/8YBG-DKFD.

9.      Attached as Exhibit H is a true and correct copy of Glenn Thrush et al.'s New York Times article entitled *Justice Dept. Fires Prosecutors Who Worked on Trump*

*Investigations*, dated January 27, 2025, which Democracy Forward obtained from the New York Times website and which is publicly available at https://perma.cc/K3AB-LVMP.

10.    Attached as Exhibit I is a true and correct copy of Spencer S. Hsu's Washington Post article entitled *Seven top D.C. prosecutors demoted in purge by Trump U.S. attorney*, dated February 28, 2025, which Democracy Forward obtained from the Washington Post website and which is publicly available at https://perma.cc/6H4E-UTF8.

11.    Attached as Exhibit J is a true and correct copy of Alanna Durkin Richer's PBS News article entitled *DOJ abruptly fires 3 prosecutors involved in Jan. 6 criminal cases, AP sources say*, dated June 28, 2025, which Democracy Forward obtained from the PBS News website and which is publicly available at https://perma.cc/Q238-LS7R.

12.    Attached as Exhibit K is a true and correct copy of a complaint that was filed at docket number 1 in *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.) on January 29, 2026.

13.    Attached as Exhibit L is a true and correct copy of an order that was filed at docket number 41 in *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.) on April 24, 2026.

14.    Attached as Exhibit M is a true and correct copy of an order that was filed at docket number 43 in *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.) on April 29, 2026.

15.    Attached as Exhibit N is a true and correct copy of a notice of voluntary dismissal filed at docket number 52 in *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.) on May 18, 2026.

16.    Attached as Exhibit O is a true and correct copy of a Truth Social post from President Trump's account (@realDonaldTrump) dated May 22, 2026 at 9:49 AM, which Democracy Forward obtained from the Truth Social website and which is publicly available at https://perma.cc/V73G-NNTF.

3

17.    Attached as Exhibit P is a true and correct copy of Andrew Duehren's New York Times article entitled *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, dated May 19, 2026, which Democracy Forward obtained from the New York Times website and which is publicly available at https://perma.cc/XC6U-34CB.

18.    Attached as Exhibit Q is a true and correct copy of a memorandum issued by Attorney General Pam Bondi entitled *Reinstating the Prohibition on Improper Third-Party Settlements* and dated February 5, 2025, which Democracy Forward obtained from the Department of Justice website, and which is publicly available at https://perma.cc/Q9FL-A5VS.

19.    Attached as Exhibit WR is a true and correct copy of Ryan J. Reilly's NBC News article entitled *DOJ official told GOP ally that big payouts were coming for Jan. 6 defendants*, dated May 19, 2026, which Democracy Forward obtained from the NBC News website and which is publicly available at https://perma.cc/DPW9-VCD9.

20.    Attached as Exhibit S is a true and correct copy of Seb Starcevic's Politico article entitled *Trump floats possibility of compensation for Jan. 6 rioters*, dated March 25, 2025, which Democracy Forward obtained from the Politico website and which is publicly available at https://perma.cc/Q58F-VKTR.

21.    Attached as Exhibit T is a true and correct copy of Luke Fountain's CNBC article entitled *Blanche won't rule out Jan. 6 rioters getting Trump DOJ fund payouts*, dated May 19, 2026, which Democracy Forward obtained from the CNBC website and which is publicly available at https://perma.cc/U7Q9-A75X.

22.    Attached as Exhibit U is a true and correct copy of Ryan Grenoble's Yahoo! News article entitled *Trump Dodges on Whether Violent Jan. 6 Rioters Should Get Payouts*

4

*From New Fund*, dated May 18, 2026, which Democracy Forward obtained from the Yahoo! News website and which is publicly available at https://perma.cc/9L5M-5BQ6.

23.    Attached as Exhibit V is a true and correct copy of a verdict form filed at docket number 804 in *United States v. Nordean et al.*, No. 1:21-cr-00175 (D.D.C.) on May 4, 2023.

24.    Attached as Exhibit W is a true and correct copy of Jim DeFede's CBS News article entitled *Proud Boys leader Enrique Tarrio expects "tens of millions" from anti-weaponization fund*, dated May 24, 2026, which Democracy Forward obtained from the CBS News website and which is publicly available at https://perma.cc/H8Y6-XJKD.

25.    Attached as Exhibit X is a true and correct copy of an X post from Michael Caputo's account (@MichaelRCaputo), dated May 19, 2026 at 7:17 PM, which Democracy Forward obtained from the X website and which is publicly available at https://perma.cc/UJN4-EW32.

26.    Attached as Exhibit Y is a true and correct copy of Dan Rosenzweig-Ziff's Reuters article entitled *'I'm Not Greedy': January 6 Rioters and Trump Allies Eye $1.8 Billion 'Weaponization' Fund*, dated May 20, 2026, which Democracy Forward obtained from the Reuters website and which is publicly available at https://perma.cc/VK2B-P5K2.

27.    Attached as Exhibit Z is a true and correct copy of Katherin Doyle's NBC News article entitled *Exclusive: Michael Cohen says he will apply for payments from DOJ's 'anti-weaponization' fund*, dated May 21, 2026, which Democracy Forward obtained from the NBC News website and which is publicly available at https://perma.cc/NL67-MKGL.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28, 2026.

_____
Pooja A. Boisture

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:26-cv-20609-KMW**

PRESIDENT DONALD J. TRUMP, et al.,

    Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,

    Defendants.

_____/

**SETTLEMENT AGREEMENT**

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

## I.    INTRODUCTION

This is a civil lawsuit ("the Case") brought by President Donald J. Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC ("Plaintiffs") against the Internal Revenue Service ("IRS") and the U.S. Department of the Treasury ("Defendants") under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. § 552(a)(e)(10). In the interest of resolving the dispute between the parties, they hereby stipulate and agree as follows:

## II.    RECITALS

A. On January 29, 2026, Plaintiffs filed a complaint in the U.S. District Court for the Southern District of Florida, stating that a former IRS employee/contractor, Charles Littlejohn had illegally obtained access to, and illegally disclosed, Plaintiffs' tax returns and/or tax return information to media outlets in violation of the Internal Revenue Code and the Privacy Act. Counsel for Plaintiffs have indicated that, but for this settlement, they would intend to amend their complaint, including in order to likely add a putative class claim.

B. President Trump has also submitted two claims for relief pursuant to the Federal Tort Claims Act, based on the unlawful raid on Mar-a-Lago, in Palm Beach, Florida, in August of 2022, and the Russia-collusion hoax throughout his first term as President, and beyond (together, "the Pending Agency Claims"). Those claims are currently pending at the administrative level.

C. The conduct alleged in the Case and in the Pending Agency Claims is representative of the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons ("Lawfare" and "Weaponization"). Other well-known examples of Lawfare and Weaponization include the Biden Administration's abuse of the FACE Act, the Biden Administration's wrongful labeling of certain parents as domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria.

D. To bring the Case and the Pending Agency Claims to a close FOREVER and FINALLY, the parties have determined to settle the Case and Pending Agency Claims, effective May 18, 2026 ("Effective Date").

## III.    RELIEF AND LEGAL AUTHORITY

A. As sole and complete relief for allegations in the Case and the Pending Agency Claims, Plaintiff President Donald J. Trump, and the other named Plaintiffs in the Case and in the Pending Agency Claims, will receive a formal apology from the United States, but will not receive any monetary payment or damages of any kind. *See Griffin v. IRS*, 1:22-cv-24023, S.D. Fla; WALL STREET JOURNAL, *The IRS Apologizes to Ken Griffin* (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-tax-data-charles-littlejohn-propublica-d18b1917.

1

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

B. In exchange for the relief provided in this Settlement Agreement, and except as provided herein (e.g., the claims process described below), Plaintiffs hereby RELEASE, WAIVE, ACQUIT, and FOREVER DISCHARGE Defendants and the United States from, and are hereby FOREVER BARRED and PRECLUDED from prosecuting or pursuing, any and all claims, charges, counterclaims, causes of action, appeals, or requests for any relief, including injunctive, monetary, damages, tax payments, debt relief, costs, attorney's fees, expenses, and/or interest, that—as of the Effective Date—have been or could have been asserted by Plaintiffs in the Case or the Pending Agency Claims, by reason of, with respect to, in connection with, or which arise out of, matters in the Case or the Pending Agency Claims.

C. To provide a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization, the Attorney General of the United States agrees to create "The Anti-Weaponization Fund," subject to the terms and limitations described herein.

## IV.    COMPOSITION AND OPERATION OF THE ANTI-WEAPONIZATION FUND

A. An accompanying order of the Attorney General, issued within 30 days of the Effective Date, shall establish funding and any other relevant requirements, rules, conditions, terms, and waivers, which shall be treated as incorporated herein. The Attorney General may also change the formal name of The Anti-Weaponization Fund by order. The corpus of The Anti-Weaponization Fund's funding does not represent the value of any current claim by Plaintiffs, but rather is based on the projected valuation of future claimants' claims, and accordingly the corpus of The Anti-Weaponization Fund's funding is not taxable income as to Plaintiffs, who receive no economic benefit from this Settlement Agreement.

B. The Anti-Weaponization Fund shall consist of five Members. Within 30 days of the Effective Date, the Attorney General shall issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund, with such order being treated as incorporated herein. One of the Members shall be chosen in consultation with congressional leadership. The Members shall serve until The Anti-Weaponization Fund is concluded as described below, unless they resign or are removed by the President, who can remove any Member without cause. Any replacement shall be made by the same method as the initial appointment. A quorum is three Members. A majority of a quorum is authorized to take action.

C. Consistent with this Settlement Agreement, The Anti-Weaponization Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179, ECF No. 1098 (E.D. La. Feb. 2, 2011). The Anti-Weaponization Fund may make those procedures public in whole or in part, in its discretion.

D. The Anti-Weaponization Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or

2

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies.

E.  On a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, nature of such relief.

F.  The Department of Justice, or a third-party contractor of the agency as designated by the Attorney General, may audit the claims submitted pursuant to this Agreement. The Department of Justice and/or any other government agency may, to the full extent permitted by law, make referrals for investigation or prosecution or prosecute or take other enforcement action to address any evidence of fraud.

G.  The Anti-Weaponization Fund shall cease processing claims no later than December 1, 2028.

H.  In the event that there is a balance remaining in The Anti-Weaponization Fund's account(s) after December 15, 2028, The Anti-Weaponization Fund shall transfer such balance before January 1, 2029, to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President. *See, e.g.,* 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522.

I.  The recipient of any relief from The Anti-Weaponization Fund will have sole responsibility to comply with their own applicable federal, state, and local tax requirements that arise as a result of this Settlement Agreement and any relief from The Anti-Weaponization Fund.

V.  **LIMITATIONS ON CLAIMS**

A.  Submission of a claim to The Anti-Weaponization Fund is voluntary. Claimants can include entities.

B.  A claimant can choose whether to accept relief from The Anti-Weaponization Fund. If a claimant does so, the claimant must forgo all other relief, including judicial relief, whether previously asserted or not.

C.  To be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization.

D.  In evaluating claims, The Anti-Weaponization Fund shall consider the totality of the circumstances, including:

   a.  The strength of the claim and supporting evidence.
   b.  The claimant's actions.

3

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

    c. The claimant's actual damages incurred as a result of the Lawfare and Weaponization.

    d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.

    e. Any time the claimant spent in prison or otherwise in federal prison or custody as a result of the Lawfare and Weaponization.

    f. Whether and to what extent the claimant has already obtained any form of relief for the Lawfare and Weaponization from any source.

    g. Other factors The Anti-Weaponization Fund deems just and appropriate.

E. A claimant who already has a claim pending in court or administrative proceedings may be eligible for relief, subject to paragraph V.B.

F. The Anti-Weaponization Fund shall take reasonable steps to protect private personal and financial information submitted to them under this Settlement Agreement.

G. The Anti-Weaponization Fund shall impose controls and systems to avoid fraudulent claims.

## VI.    ENFORCEMENT

A. This Settlement Agreement is enforceable and challengeable solely by Plaintiffs, Defendants, and the United States.

B. Because the claims process is voluntary, there shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund. Denial by The Anti-Weaponization Fund, the pendency of a claim, or rejection of an offer by a claimant does not preclude a claimant from seeking judicial or other relief outside The Anti-Weaponization Fund process, if otherwise allowed by law.

## VII.   INTEGRATION AND COUNTERPARTS

This Settlement Agreement, including the accompanying orders by the Attorney General, constitutes the entire agreement of the Parties, and no prior statement, representation, agreement, or understanding, oral or written, that is not contained herein, will have any force or effect. This Settlement Agreement may be executed in counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument.

## VIII.  MODIFICATION

This Settlement Agreement may be modified only with the written agreement of the Parties.

## IX.    DUTIES CONSISTENT WITH LAW AND REGULATIONS

Nothing contained in this Settlement Agreement shall impose on Defendants or their agents, employees, or contractors any duty, obligation, or requirement, the performance of which would

4

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

be inconsistent with federal statutes. The Parties to this Settlement Agreement shall defend against any challenges to it in any forum.

## X.    SEVERABILITY

Should any provision of this Settlement Agreement be found by a court to be invalid or unenforceable, then the validity of other provisions of this Settlement Agreement shall not be affected or impaired, and such provisions shall be enforced to the maximum extent possible, including by modification by mutual agreement, if appropriate.

## XI.    DISMISSAL OF THE CASE AND WITHDRAWAL OF PENDING AGENCY CLAIMS

Plaintiffs agree to file a dismissal with prejudice of the Case under Rule 41(a)(1)(A)(i) on or before May 18, 2026. *See Am. Cyanamid Co. v. McGhee*, 317 F.2d 295, 297 (5th Cir. 1963). The parties further agree that by June 15, 2026, they will withdraw, terminate, and no longer pursue in any setting or forum the Pending Agency Claims.

5

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

**AGREED:**

For Plaintiffs:

_____    DATED: ___May 18, 2026_____

Daniel Z. Epstein, D.C. Bar No. 1009132
Epstein & Co. LLC
8903 Glades Rd, Ste A8 #2090
Boca Raton, FL 33434
E-mail: dan@epsteinco.co


Alejandro Brito, Florida Bar No. 098442
BRITO, PLLC
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385
Primary: abrito@britopllc.com
Secondary: apiriou@britopllc.com

Counsel to Plaintiffs President Donald J. Trump et al.

6

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

**AGREED:**

For the United States:

_____   DATED: _____**05. 18. 26**_____

Stanley E. Woodward, Jr.
Associate Attorney General
U.S. Department of Justice

*SETTLEMENT AGREEMENT, TRUMP V. IRS (SDFL)*

**AGREED:**

For the Internal Revenue Service:

DATED: _____5/18/26_____

Frank J. Bisignano
Chief Executive Officer
Internal Revenue Service

# Exhibit B



# Office of the Attorney General
## Washington, D. C. 20530

May **19**, 2026

A. The Settlement Agreement in *Trump v. Internal Revenue Service*, No. 1:26-cv-20609 (S.D. Fla.), has created the Anti-Weaponization Fund (the "Fund"). The Settlement Agreement directed the Attorney General to issue an order establishing funding and any other relevant requirements for the Fund.

B. Capitalized terms in this document shall have the same meaning as in the Settlement Agreement.

C. The United States RELEASES, WAIVES, ACQUITS, and FOREVER DISCHARGES each of the Plaintiffs from, and is hereby FOREVER BARRED and PRECLUDED from prosecuting or pursuing, any and all claims, counterclaims, causes of action, appeals, or requests for any relief, including injunctive relief, monetary relief, damages, examinations or similar or related reviews, appeals, debt relief, costs, attorney's fees, expenses, and/or interest, whether presently known or unknown, that—as of the Effective Date of the Settlement Agreement—have been or could have been asserted by Defendants against any of the Plaintiffs or related or affiliated individuals (including, without limitation, family or others filing jointly), or parties including trusts, parent, sister, or related companies, affiliates, and subsidiaries, by reason of, with respect to, in connection with, or which arise out of (1) any matters that were raised or could have been raised in the Case or the Pending Agency Claims; (2) Lawfare and/or Weaponization; or (3) any matters currently pending or that could be pending (including tax returns filed before the Effective Date) before Defendants or other agencies or departments.

Todd Blanche
Acting Attorney General

# Exhibit C



## Office of the Attorney General
### Washington, D. C. 20530

May 18, 2026

A. The Settlement Agreement in *Trump v. Internal Revenue Service*, No. 1:26-cv-20609 (S.D. Fla.), has created the Anti-Weaponization Fund (the "Fund"). The Settlement Agreement directed the Attorney General to issue an order establishing funding and any other relevant requirements for the Fund.

B. Capitalized terms in this document shall have the same meaning as in the Settlement Agreement.

C. Within 60 days of the Effective Date, the United States shall provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $1,776,000,000 to an account for the sole use by the Anti-Weaponization Fund ("Designated Account"). The corpus of the Anti-Weaponization Fund's funding does not represent the value of any claim by Plaintiffs, but rather is based on the projected valuation of future claimants' claims.

D. Once the funds are deposited into the Designated Account, the United States has no liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds.

E. The funds deposited into the Designated Account may be used to pay for per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund. The Members of the Anti-Weaponization Fund shall serve as volunteers and gratuitous service providers, without any further compensation for their work on the Fund. They are allowed travel expenses, including per diem in lieu of subsistence, to the extent permitted by law.

F. None of the funds deposited or claimed shall be deemed to qualify for reimbursement by the Department of Justice to the Treasury or to the judgment fund.

G. Funding of the Anti-Weaponization Fund fully accords with longstanding authorities. The Automatic Payment of Judgments Act, ch. 748, § 1302, 70 Stat. 678, 694–95 (1956) (codified as amended at 31 U.S.C. § 1304), known as the Judgment Fund, established a permanent appropriation for the payment of settlements against the United States. The government may pay a settlement out of the Judgment Fund if: (1) the payment is not otherwise provided for; (2) the Secretary of the Treasury has certified the payment; and (3) the judgment is payable under one of several specified statutory provisions. *See Appropriate Source for Payment of Judgments and Settlements in United States v. Winstar Corp. and Related Cases*, 22 Op. O.L.C. 141, 153 (1998). Congress has provided for the payment of "final" judgments rendered against the United States, including "compromise settlements" and "imminent" claims. 28 U.S.C. § 2414.

H. Previous cases have been settled on similar terms. For example, in the *Keepseagle* litigation, the plaintiffs alleged improper behavior by the Department of Agriculture over a period of years, and the Obama Administration settled the case by establishing an

administrative claims process funded by $680,000,000 paid from the Judgment Fund, which was deposited into a bank account to fund the claims received. *Keepseagle v. Vilsack,* 102 F. Supp. 3d 306, 309 (D.D.C. 2015); *see also Garcia v. Vilsack,* No. 00–2445 (D.D.C.) & *Love v. Vilsack,* No. 00–02502 (D.D.C.).

Todd Blanche
**Acting Attorney General**

# Exhibit D



# THE UNITED STATES
# DEPARTMENT of JUSTICE

## Overview of the Department of Justice's Anti-Weaponization Fund

**What is the Anti-Weaponization Fund?**
- The Anti-Weaponization Fund was created to hear and redress claims of Americans who suffered from lawfare and weaponization, defined as the use of government power to target them for "improper and unlawful" reasons.
- The Fund results from the settlement of a case involving unlawfully leaking tax returns, unlawfully searching the President's home, and improperly targeting/investigating the President.

**Who will benefit from the Fund?**
- This is about seeking accountability for all Americans who were victims of lawfare and weaponization: millions of Americans whose online speech was censored at the behest of the government, parents silenced at schoolboards, Senators whose records were secretly subpoenaed, churchgoers targeted by the FBI, and so on.
- Submission of a claim is voluntary—nobody is required to do so. That is why court approval was not required.
- There is no partisan restriction: Democrats can submit claims, too.
- As part of the settlement, the President, his sons, and the Trump Organization, LLC will receive a formal apology but no monetary payment or damages of any kind. They cannot receive any money from the Fund, either.

**Structure**
- The Fund will consist of five members appointed by the Attorney General (AG). One Member will be chosen in consultation with Congressional leadership.
- The Members will be tasked with creating guidelines for those applying to the Fund and will ultimately decide which claims should be paid out. Claims are awarded on a case-by-case basis, and the Commissioners must consider a claimant's personal conduct and character when making a determination.
- This structure is not without precedent. Most notably, in a case referred to as *Keepseagle*, a group of Native American farmers sued, alleging racism over past decades. The Obama DOJ settled by putting $680 million from the judgement fund into a bank account for a single claims administrator to dole out.

**Funding**
- This funding will come from the judgment fund, which is a perpetual appropriation created by Congress in 1956 allowing DOJ to settle cases, including future claims, and the details of such settlements are rarely made public.
- The Fund will receive $1.776 billion, a fair estimate of potential claims, given that literally tens of millions of Americans were subjected to improper and unlawful government targeting, including extensive government censorship and aggressive lawfare.
- The Acting AG executed a separate document releasing claims that were or could have been brought in the litigation, including the IRS' right to audit the President, his family, and his companies. That is standard in litigation and **does not apply to future tax actions** the President, his family, and his companies may take

**Oversight**
- On a quarterly basis, the Fund shall send a report to the Attorney General outlining who has received relief and what form of relief was awarded. The A/AG committed to sharing these reports with Congress (with appropriate redactions to accommodate for privacy concerns and privileges). Senators and Members are welcome to submit additional inquiries regarding the Fund to DOJ OLA at any time.
- The Fund can be audited, including by a third party. The Fund must take steps to protect private information and avoid fraud.
- To ensure swift processing for victims, the Fund shall cease processing claims in 2028. Any money left will revert back to the federal government.

1

# Exhibit E



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              THE ATTORNEY GENERAL

SUBJECT:           RESTORING THE INTEGRITY AND CREDIBILITY OF THE
                   DEPARTMENT OF JUSTICE[1]

The Department of Justice must take immediate and overdue steps to restore integrity and credibility with the public that we are charged with protecting, and to ensure that the Department's personnel are ready and willing to faithfully implement the policy agenda of the duly elected President of the United States. These steps are required because, as President Trump pointed out following his second inauguration, "[t]he prior administration and allies throughout the country engaged in an unprecedented, third-world weaponization of prosecutorial power to upend the democratic process." Executive Order, *Ending the Weaponization of The Federal Government* (Jan. 20, 2025). Thus, "[t]he American people have witnessed the previous administration engage in a systematic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies and the Intelligence Community against those perceived political opponents in the form of investigations, prosecutions, civil enforcement actions, and other related actions." *Id.*

The reconciliation and restoration of the Department of Justice's core values can only be accomplished through review and accountability. The Department has already started this process but much more work is required. No one who has acted with a righteous spirit and just intentions has any cause for concern about efforts to root out corruption and weaponization. On the other hand, the Department of Justice will not tolerate abuses of the criminal justice process, coercive behavior, or other forms of misconduct.

I hereby establish the Weaponization Working Group, which will be led by the Office of the Attorney General and supported by the Office of the Deputy Attorney General, the Office of Legal Policy, the Civil Rights Division, the U.S. Attorney's Office for the District of Columbia, and other personnel as necessary to achieve the objectives set forth herein. The Weaponization Working Group will conduct a review the activities of all departments and agencies exercising

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

civil or criminal enforcement authority of the United States over the last four years, in consultation with the heads of such departments and agencies and consistent with applicable law, to identify instances where a department's or agency's conduct appears to have been designed to achieve political objectives or other improper aims rather than pursuing justice or legitimate governmental objectives.  The Department of Justice will provide quarterly reports to the White House regarding the progress of the review.

During this review, the Weaponization Working Group will examine, among other things:

•       Weaponization by Special Counsel Jack Smith and his staff, who spent more than $50 million targeting President Trump, and the prosecutors and law enforcement personnel who participated in the unprecedented raid on President Trump's home.

•       Federal cooperation with the weaponization by the Manhattan District Attorney Alvin Bragg, New York Attorney General Letitia James, their respective staffs, and other New York officials to target President Trump, his family, and his businesses.

•       The pursuit of improper investigative tactics and unethical prosecutions relating to events at or near the United States Capitol on January 6, 2021—**as distinct from good-faith actions by federal employees simply following orders from superiors**—which diverted resources from combatting violent and serious crime and thus, were pursued at the expense of the safety of residents of the District of Columbia.

•       The January 23, 2023, memorandum in which the Federal Bureau of Investigation suggested that certain Catholic religious practices were affiliated with violent extremism and criminal activity.

•       Prior Justice Department guidance, policy memoranda, and practices concerning the investigation of parents of school children who expressed sincere, good-faith concerns at local government meetings, including the October 4, 2021 memorandum of former Attorney General Merrick Garland regarding these issues.[2]

•       Criminal prosecutions under the Freedom of Access to Clinic Entrances Act for non-violent protest activity.

•       The retaliatory targeting, and in some instances criminal prosecution, of legitimate whistleblowers.

---

[2] For the avoidance of doubt, former Attorney General Garland's October 4, 2021, Memorandum is hereby rescinded.

# Exhibit F

Case 1:26-cv-01399-LMB-JDD   Document 25-1   Filed 05/28/26   Page 28 of 172
PageID# 207



**PRESS RELEASE**

# Justice Department Reveals the Biden Administration's Weaponization of Federal Law Against Pro-Life Americans

Tuesday, April 14, 2026

**For Immediate Release**

Office of Public Affairs

## DOJ Weaponization Working Group Report Outlines Corrective Action Taken to Restore the Public's Confidence in Lawful Treatment of All Americans

Today, the Justice Department's Weaponization Working Group published a report detailing the Biden Administration's weaponization of the Freedom of Access to Clinic Entrances (FACE) Act. Based on a review of over 700,000 internal records, the report not only details specific ways the Biden Justice Department weaponized federal law, but also outlines the corrective action taken by the current Justice Department to make right the wrongs of the prior administration.

"This Department will not tolerate a two-tiered system of justice," said Acting Attorney General Todd Blanche. "No Department should conduct selective prosecution based on beliefs. The weaponization that happened under the Biden Administration will not happen again, as we restore integrity to our prosecutorial system."

President Trump promised to end the weaponization of the federal government. To many Americans, prosecutions under the FACE Act have been the prototypical example of this weaponization. The Justice Department conducted a thorough review of internal discussions,

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 29 of 172
PageID# 208

case files, and prosecutorial decisions under the Act and concludes that the Biden DOJ weaponized the FACE Act in several ways.

- The Biden DOJ closely collaborated with pro-abortion groups to track pro-life activists' First Amendment activity. Pro-abortion groups — especially the National Abortion Federation, Planned Parenthood, and Feminist Majority Foundation — capitalized on their relationship with the Biden DOJ to gain internal information and push targets for enforcement. These groups compiled evidence and dossiers that ultimately gave rise to search warrants and charges. The Biden DOJ affirmatively asked pro-abortion groups about pro-life individuals' travel and constitutionally protected advocacy. The Biden DOJ and career attorneys monitored pro-life activists for years before charging them.

- The Biden DOJ's prosecutors engaged in inappropriate conduct and comments. Prosecutors knowingly withheld evidence that defense counsel requested to prepare an affirmative defense, tried to screen out jurors based on religion, and authorized aggressive arrest tactics instead of allowing pro-life defendants to self-surrender.

- The Biden DOJ helped a pro-abortion group secure funding. The lead prosecutor on each FACE Act prosecution served as a reference on the National Abortion Federation's application for a private grant. We found no record of ethics approval for the attorney to take an interest in the financial outcome of a party having business before the Biden DOJ.

- The Biden DOJ pursued significantly harsher sentences for pro-life defendants than violent pro-abortion defendants. The Biden DOJ requested an average sentence of 26.8 months for pro-life defendants, compared to 12.3 months for pro-abortion defendants.

- The Biden DOJ violated the rights of Americans through its biased enforcement of the FACE Act. Though the Act was supposed to protect both pro-choice and pro-life facilities, the Biden DOJ provided extensive support to abortion clinics, while ignoring and downplaying vandalism and attacks against pregnancy resource centers.

The Biden DOJ's actions were wrong. The Trump Administration and Acting Attorney General Todd Blanche are committed to rectifying these wrongs by taking the following actions.

- On January 23, 2025, President Trump issued full and unconditional pardons to many of the pro-life Christians unfairly targeted by the Biden DOJ.

- DOJ has settled civil cases to address the injustices and took personnel action against those responsible.

- DOJ leadership has dismissed, with prejudice, three civil lawsuits against pro-life activists: *United States v. Connolly*, No. 2:24-cv-04467 (E.D. Penn.); *United States v. Zastrow, et al.*, No. 2:24-cv-00576 (M.D. Fla.); *United States v. Citizens for a Pro-Life Society, et al.*, No. 1:24-cv-00893 (N.D. Ohio).

- The Trump DOJ issued a directive that, moving forward, DOJ prosecutors may only bring abortion-related civil actions and prosecutions under the FACE Act in extraordinary circumstances or in cases presenting significant aggravating factors.

- To prepare this report, DOJ reviewed approximately 700,000 internal records. Acting Attorney General Blanche has approved a limited waiver of privileged information to provide the public the opportunity to review the underlying materials.

"The behavior unearthed in this report is shameful," said Assistant Attorney General Daniel Burrows, Office of Legal Policy. "Lawyers who should have known better withheld evidence, worked to keep committed religious people off juries, and generally allowed the Department of Justice to be used as the enforcement arm of pro-abortion special interests."

DOJ is committed to prosecuting crime in a manner that is consistent with its mission to uphold the rule of law, to keep our country safe, and to protect civil rights. Should other affected individuals have concerns, DOJ will assess their allegations without fear or favor.

You can find the report and over 800 pages of exhibits [here](#).

*Updated April 14, 2026*

## Components

[Office of the Attorney General](#)  |  [Office of Legal Counsel](#)

Press Release Number: 26-354

# Related Content

**PRESS RELEASE**

## EOIR Announces 77 Immigration Judges and 5 Temporary Immigration Judges

The Executive Office for Immigration Review (EOIR) announced the swearing in of 77 immigration judges and 5 temporary immigration judges – the largest class of new adjudicators in EOIR's history...

May 21, 2026

**PRESS RELEASE**

## United States Unseals Superseding Indictment Charging Raul Castro and Five Castro Regime Co-Defendants for 1996 Shoot-Down of Brothers to the Rescue Aircraft

The U.S. Department of Justice today announced the unsealing of a superseding indictment charging Raul Modesto Castro Ruz, 94, of Holguin, Cuba; along with Lorenzo Alberto Perez-Perez of Las Tunas...

May 20, 2026

**PRESS RELEASE**

## Justice Department Announces Anti-Weaponization Fund

The U.S. Department of Justice today announced that as a part of the settlement agreement in *President Donald J. Trump v. Internal Revenue Service,* the Attorney General established "The Anti-Weaponization...

May 18, 2026

 **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 **Office of Public Affairs Direct Line**

202-514-2007

**Department of Justice Main Switchboard**

202-514-2000

# Exhibit G

Case 1:26-cv-01399-LMB-IDD Document 25-1 Filed 05/28/26 Page 34 of 172 PageID# 213



| | Live | Video | Shows ⌄ | Good Morning America | ShopGMA | | | | Stream on |

# Here's a list of the individuals, including James Comey, targeted by the Trump administration

The administration says these actions are "driven by law and not by politics."

By Peter Charalambous, Benjamin Siegel, Alexander Mallin, Katherine Faulders, and Elizabeth Schulze
April 28, 2026, 4:56 PM



**Grand jury rejects indictment of 6 Democrats** Sources tell ABC News a grand jury declined to indict six Democratic lawmakers, including Sens. Mark Kelly and Elissa Slotkin, over a video urging service members to refuse illegal orders.

The Justice Department's second attempt to indict former FBI Director James Comey is the latest salvo in what critics call a campaign of retribution on the part of the Trump administration since Donald Trump returned to the presidency in 2025.

Administration officials have insisted that any such actions are, as Vice President JD Vance said, "driven by law and not by politics." But they come after Trump vowed during his presidential campaign that he would seek retribution

if reelected.

---

**Related**
**DOJ fails to secure indictments for Democratic members of Congress in military video case**    →

---

The moves follow months of the administration vowing investigations into perceived enemies, stripping individuals of security clearances, and removing protective details.

Here's a look at some of the actions that the president's critics have experienced, which many of them perceive as retribution.

## INDICTMENTS SOUGHT

### James Comey, former FBI Director

Comey was indicted on April 28 over a controversial Instagram post from last year that prosecutors say was a threat against the president. Comey, in a since-deleted Instagram post, shared a picture showing the numbers "86 47" -- interpreted to mean "get rid of" Trump -- written in seashells on the beach, with the caption "Cool shell formation on my beach walk."

The former FBI director was previously indicted on Sept. 25 on charges of making a false statement and obstruction related to his testimony before the Senate Judiciary Committee in 2020, just days after Trump issued a public demand for his Justice Department to act "now" to bring prosecutions against Comey and other political foes. Comey pleaded not guilty at his arraignment.

The charges followed Trump's ousting of the U.S. attorney for the Eastern District of Virginia, Erik Siebert, who according to sources had expressed doubts internally about bringing cases against Comey and New York Attorney General Letitia James after Trump appointed him to lead the office.



Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 36 of 172
PageID# 215

In this June 8, 2017 file photo, former FBI Director James Comey testifies before the Senate Intelligence Committee, Washington D.C.

Mark Reinstein/Corbis via Getty Images, FILE

Trump then immediately moved to install Lindsey Halligan, a White House aide and his former defense attorney, to lead the office, despite her having no prior prosecutorial experience. Halligan quickly sought an indictment from the grand jury, despite career prosecutors in her office informing her that they could not establish probable cause to charge Comey, ABC News first reported.

U.S. District Judge Cameron McGowan Currie subsequently dismissed the criminal case against Comey on the grounds that Halligan's appointment was invalid.

## Letitia James, New York attorney general

James was indicted on Oct. 9 on at one count of bank fraud and one count of making false statements to a financial institution after Halligan presented allegations to a federal grand jury that James had committed mortgage fraud related to a home she purchased in 2020. She pleaded not guilty at her arraignment.

James, who brought a $454 million civil fraud case against Trump, has been labeled, without evidence, a "corrupt attorney general" by Trump, whose ousting of Siebert came after sources say Siebert declined to bring a criminal case against James following a five-month investigation.

According to the indictment, James falsely described a property she purchased in Norfolk, Virginia, as a second home instead of an investment property in order to obtain a lower mortgage rate. James said she purchased the property for her great-niece and allowed her and her children to live in the house rent-free.

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 37 of 172
PageID# 216



New York Attorney General Letitia James speaks, Feb. 16, 2024, in New York.
Bebeto Matthews/AP, FILE

Along with the Comey case, Judge Currie dismissed the case against James on the grounds that Halligan's appointment was invalid.

James was also issued subpoenas in August inquiring about her civil fraud case against Trump and a corruption case she filed against the National Rifle Association, multiple sources told ABC News. A federal judge in New York threw out the subpoenas in January and disqualified the U.S. attorney investigating the case on the grounds that he was unlawfully appointed.

## 6 members of Congress

The U.S. attorney's office in Washington, D.C., in February sought but failed to secure an indictment against six Democratic members of Congress, according to sources, after Trump accused them of "seditious behavior" that could be "punishable by death" for releasing a video in which they said that U.S. service members could refuse illegal orders.

Following a classified briefing on the deadly strikes on alleged drug boats in Latin America, Sen. Mark Kelly, Sen. Elissa Slotkin, Rep. Maggie Goodlander, Rep. Jason Crow, Rep. Chrissy Houlahan, and Rep. Chris DeLuzio, all former members of the military and intelligence community, posted a video telling current members that -- per the Uniform Code of Military Justice -- they should refuse to carry out unlawful orders.

"Each one of these traitors to our Country should be ARRESTED AND PUT ON TRIAL," Trump posted to social media on Nov. 20.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 38 of 172 PageID# 217



Rep. Elissa Slotkin and Sen. Mark Kelly speak during a news conference at Capitol Hill, Feb. 11, 2026, in Washington.
Jose Luis Magana/AP

Prosecutors under U.S. Attorney Jeanine Pirro sought to convince a grand jury to indict the six lawmakers, but the panel did not comply. It is exceedingly rare for a grand jury to not indict after prosecutors have made their presentation.

The Department of Defense also said on Nov. 14 it was launching a "thorough review" of Kelly, a retired U.S. Navy captain and the husband of former Rep. Gabby Giffords, for his role in the video, in which Kelly and his colleagues told service members, "Our laws are clear. You can refuse illegal ordered. No one has to carry out orders that violate the law or our Constitution."

In January, Defense Secretary Pete Hegseth censured Kelly, an administrative action that will result in a reduction in his rank and retirement pay.

## John Bolton, former national security adviser

Former Trump national security adviser John Bolton was indicted Oct. 16 on charges that he allegedly unlawfully transmitted and retained classified documents.

The indictment, handed up by a federal grand jury in Maryland, charges Bolton with eight counts of unlawful transmission of national defense information as well as 10 counts of unlawful retention of national defense information.

Bolton has long been a target of Trump's ire since leaving his first administration and publishing a tell-all book. Federal agents in August searched Bolton's Maryland residence and Washington, D.C., office.

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 39 of 172 PageID# 218



Former National Security Adviser John Bolton speaks to reporters after speaking in a panel hosted by the National Council of Resistance of Iran, August 17, 2022 in Washington.

Anna Moneymaker/Getty Images

More recently, Trump has taken aim at Bolton's criticisms of Trump's engagements with Russian President Vladimir Putin. Trump told reporters in August that he didn't know about the FBI search of Bolton's house.

## FACING INVESTIGATION

### Jerome Powell, Federal Reserve chair

Following the Trump administration's increasingly hostile push to pressure the independent Federal Reserve to lower interest rates, federal prosecutors have launched a criminal investigation into Powell, the Fed chair confirmed in a statement on Jan. 11.

The investigation is related to Powell's congressional testimony last June regarding the multi-year renovation of the Federal Reserve buildings, Powell said in a video message released by the Fed.

But Powell said it's clear the probe is ultimately part of the Trump administration's pressure campaign on the Fed, which helps shape the nation's monetary policy.

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 40 of 172
PageID# 219



Federal Reserve Chairman Jerome Powell testifies during the Senate Banking, Housing and Urban Affairs Committee, June 25, 2025.
Tom Williams/CQ-Roll Call, via Getty Images

"This is about whether the Fed will be able to continue to set interest rates based on evidence and economic conditions -- or whether instead monetary policy will be directed by political pressure or intimidation," Powell said.

In a statement to ABC News, a spokesperson for Attorney General Pam Bondi said, "The Attorney General has instructed her U.S. Attorneys to prioritize investigating any abuse of taxpayer dollars."

Trump denied any involvement in the criminal investigation during a brief interview with NBC News following Powell's statement.

"I don't know anything about it, but he's certainly not very good at the Fed, and he's not very good at building buildings," Trump said.

## Lisa Cook, Federal Reserve governor

Trump in August said he was firing Cook, a member of the seven-person Federal Reserve board of governors, over allegations raised by Federal Housing Finance Agency Director Bill Pulte that she committed mortgage fraud by improperly designating both her homes in Georgia and Michigan as her primary residence.

In a statement, Cook -- who has not been charged with any crime and denies any wrongdoing -- said that she would continue to serve in her role as a Fed governor, and she subsequently filed suit against Trump over his move to fire her.

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 41 of 172
PageID# 220



Lisa Cook testifies before a Senate Banking Committee hearing on her nomination to be a member of the Federal Reserve Board of Governors on Capitol Hill in Washington, June 21, 2023.

Jonathan Ernst/Reuters, Files

"President Trump has no authority to remove Federal Reserve Governor Lisa Cook," said her attorney Abbe Lowell. "His attempt to fire her, based solely on a referral letter, lacks any factual or legal basis. We will be filing a lawsuit challenging this illegal action."

Trump has been urging the Federal Reserve to slash interest rates in an effort to boost the economy, and replacing Cook on the board would give Trump's appointees the majority. No president has ever attempted to remove a Fed governor in the Fed's 112-year history.

After a federal judge blocked the attempted firing, the Supreme Court is scheduled to hear Cook's case on Jan. 21, with Powell expected to attend oral arguments, a person familiar with the matter told ABC News. It's a rare move and an usual public show of support for the Fed chair to attend arguments in person.

## Adam Schiff, United States senator

Schiff, who served as the lead manager during the first impeachment trial of President Trump in 2019, is being investigated by the DOJ for alleged insurance fraud related to a property in Maryland after Attorney General Pam Bondi named U.S. Pardon Attorney Ed Martin as a special prosecutor in the probe.

Schiff's attorney has denied the allegations, calling them "transparently false, stale, and long debunked."

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 42 of 172 PageID# 221



Sen. Adam Schiff departs a Democratic luncheon at the U.S. Capitol on November 6, 2025 in Washington, DC.

Eric Lee/Getty Images

"I have always suspected Shifty Adam Schiff was a scam artist," Trump wrote on his social media platform in July. "Mortgage Fraud is very serious, and CROOKED Adam Schiff (now a Senator) needs to be brought to justice."

Schiff's lawyer has called the allegations "transparently false, stale, and long debunked."

"This is the kind of stuff you see tinpot dictators do. It is designed to intimidate his political opponents and somehow try to silence them," Schiff said in a video statement.

## Eric Swalwell, United States representative

Swalwell, a Democratic representative from California, said in a lawsuit filed on Nov. 25 that he was the target of a criminal referral issued by Pulte in October.

The suit, which Swalwell filed against Pulte, accused Pulte of violating Sewell's First Amendment rights and privacy by allegedly using government databases to "concoct fanciful allegations of mortgage fraud" against him, the complaint said.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 43 of 172
PageID# 222



In this June 4, 2024, file photo, House Judiciary Committee member Rep. Eric Swalwell speaks during a hearing in the Rayburn House Office Building on Capitol Hill in Washington, D.C.

Chip Somodevilla/Getty Images, FILE

Pulte has maintained that the documents from his criminal referrals are part of the public record.

Swalwell has denied committing mortgage fraud, arguing that he maintains his primary residence in California while his wife's primary residence is in Washington, D.C., and has sued Pulte for allegedly misusing federal resources to target Trump's political opponents.

## Chris Christie, former New Jersey governor

Christie, an ABC News contributor, was an early supporter of Trump's 2016 presidential campaign and served as the head of his transition team, though he has since become one of the president's fiercest critics. Trump in August threatened to investigate Christie over an old political scandal related to the closure of a lane on the George Washington Bridge in order to retaliate against a political opponent.

Trump, who called for the probe on his social media platform, told reporters in the Oval Office that Christie is "guilty" but deferred to Attorney General Pam Bondi.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 44 of 172
PageID# 223



Former Governor of New Jersey Chris Christie gestures as he speaks during the fourth Republican presidential primary debate at the University of Alabama in Tuscaloosa, Alabama, December 6, 2023.

Jim Watson/AFP via Getty Images

"I know Chris better than anybody in the room. I always felt he was guilty," Trump said. "If they want to look at it, not for me, if they want to look at it, they can. You could ask Pam [Bondi]. I think we have other things to do, but I always thought he got away with murder."

Trump had previously defended Christie's actions related to the lane closure, calling the original investigation an "Obama DOJ scam," and saying that Christie won a "complete and total exoneration" when the Supreme Court overturned the conviction of two of Christie's top staffers.

## Jack Smith, former special counsel

Smith, who led the classified documents and Jan. 6 investigations into Trump, is being investigated by the U.S. Office of Special Counsel over whether his probes violated the Hatch Act, which limits the political activities of federal employees.

The investigation follows a referral from Republican Sen. Tom Cotton of Arkansas that asked the OSC to investigate Smith for his investigative and prosecutorial activities before the 2024 election, which Cotton argued were intended to harm Trump's political prospects.

Attorneys representing Smith have criticized the investigation as "imaginary and unfounded," describing the reasoning for the probe as baseless and "partisan" in nature.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 45 of 172 PageID# 224



Special counsel Jack Smith speaks to members of the media at the US Department of Justice building in Washington, August 1, 2023.
Saul Loeb/AFP via Getty Images

In October, Republican House Judiciary Committee Chairman Jim Jordan, in a letter, asked Smith to testify before the panel so the committee can "understand the full extent to which the Biden-Harris Justice Department weaponized federal law enforcement."

"Deranged Jack Smith, in my opinion, is a criminal," Trump told reporters in the Oval Office the next day.

Smith testified in December during a closed-door hearing of the House Judiciary Committee, arguing his actions were "based on what the facts and the law required." He then publicly testified before the same panel on Jan. 22.

## Miles Taylor, former chief of staff of the U.S. Department of Homeland Security

Taylor, who authored an anonymous op-ed in The New York Times in 2019 claiming that "senior officials in his own administration are working diligently from within to frustrate parts of [Trump's] agenda and his worst inclinations," is being investigated after Trump signed an executive order in April directing the Secretary of Homeland Security to "review Miles Taylor's activities as a Government employee" and submit a record with "recommendations for appropriate remedial or preventative actions to be taken to protect America's interests."

## Christopher Krebs, former director of the Cybersecurity and Infrastructure Security Agency

Krebs, who was fired by Trump after he contradicted Trump's false claims about election fraud following the 2020 election, is the subject of a probe after Trump signed an executive order in April directing the attorney general and the secretary of Homeland Security to conduct a review to "identify any instances where Krebs' conduct appears to have been contrary to suitability standards for Federal employees, [or] involved the unauthorized dissemination of classified information."

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 46 of 172
PageID# 225

Related

MORE: Trump has moved quickly to exact 'retribution.' More revenge could come: ANALYSIS    →

## ACCUSED OF CRIMES

### Former President Joe Biden

During a March 14 speech at the Department of Justice, Donald Trump said that Biden was "essentially found guilty" of retaining classified documents in 2024 after a special counsel declined to charge him.

"In fact, he was essentially found guilty, but they said he was incompetent and therefore, let's not find him guilty, I guess. Nobody knows what that ruling was, but I didn't want any part of it. I think I would have rather been found guilty than what they found with him," Trump said.

"Bottom line is the special counsel in my case decided against moving forward with any charges," Biden said following the release of the special counsel's report. "And this matter is now closed."

### Former President Barack Obama

Trump in July accused Obama of treason by alleging, without evidence, that he led an effort to undermine Trump's 2016 presidential campaign.

"Look, he's guilty. It's not a question," Trump said. "This was treason. This was every word you can think of. They tried to steal the election. They tried to obfuscate the election." A spokesperson for Obama called Trump's remarks "ridiculous and a weak attempt at distraction."

"Out of respect for the office of the presidency, our office does not normally dignify the constant nonsense and misinformation flowing out of this White House with a response. But these claims are outrageous enough to merit one," an Obama spokesperson said.

## REVOKED OR THREATENED WITH REVOCATION OF SECRET SERVICE PROTECTION / SECURITY DETAIL

### Kamala Harris, former vice president, 2024 Democratic presidential nominee

Trump on Aug. 29 revoked Secret Service protection for Harris, who he defeated in the 2024 presidential election, after Joe Biden, as president, had extended Harris' protective detail an additional year beyond the six months required by law for former vice presidents, according to multiple officials.

### Hunter Biden, son of former President Joe Biden

After Hunter Biden was pardoned by his father in 2024 following convictions on tax evasion and federal gun charges, Trump vowed to remove the Secret Service protection for the younger Biden on March 17 after a reporter asked him about the security detail assigned to Hunter Biden during his vacation in South Africa.

Representatives for the Secret Service and the office of former President Biden did not immediately respond to requests for comment.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 47 of 172 PageID# 226



Hunter Biden listens while his father, President Joe Biden, speaks during a Hanukkah reception in the East Room of the White House in Washington, Dec. 16, 2024.

Rod Lamkey/AP

### Ashley Biden, daughter of former President Joe Biden

Trump vowed to remove the Secret Service protection for Ashley Biden on March 17 after a reporter asked him about the security detail assigned to Hunter Biden during his vacation in South Africa. Representatives for the Secret Service and the office of former President Biden did not immediately respond to requests for comment.

### Alejandro Mayorkas, former U.S. secretary of Homeland Security

Trump revoked Alejandro Mayorkas's Secret Service detail in March after Joe Biden, as president, had extended it. A representative for the Secret Service did not immediately respond to requests for comment.

### Mike Pompeo, former secretary of state

Trump revoked Pompeo's security protection in January despite warnings from the Biden administration that he faced an ongoing threat from Iran.

### Brian Hook, former U.S. special representative for Iran

Trump revoked Hook's security protection in January despite warnings from the Biden administration that he faced an ongoing threat from Iran.

### Mark Milley, former chairman of the Joint Chiefs of Staff

Defense Secretary Pete Hegseth stripped Milley of his security detail in January and ordered the inspector general to begin investigating whether Milley committed crimes by undermining the chain of command.

### John Bolton, former national security adviser

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 48 of 172
PageID# 227

Trump revoked the Secret Service detail assigned to Bolton within hours of taking office.

## Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases

Fauci had his government security detail revoked on Jan. 23, sources familiar with the matter told ABC News. Fauci was protected by private security that was paid for by the government, but has since hired his own security detail following the cancellation.

## SECURITY CLEARANCE REVOKED

### Joe Biden, former president

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

### Antony Blinken, former secretary of state

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

### Jacob Sullivan, former national security adviser

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

### Lisa Monaco, former deputy attorney general

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

### Mark Zaid, whistleblower attorney

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

### Norman Eisen, co-counsel for the House Judiciary Committee during first Trump impeachment

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

### Letitia James, New York attorney general

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

### Alvin Bragg, Manhattan district attorney

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 49 of 172 PageID# 228



Manhattan District Attorney Alvin Bragg addresses the media about indictments in last monthâ⊠⊠s shooting of an off-duty federal agent, New York City, August 6, 2025.

Adam Gray/Reuters

## Andrew Weissmann, lead prosecutor in Robert Mueller's special counsel's office

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

## Hillary Clinton, former secretary of state, 2016 Democratic presidential nominee

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

## Liz Cheney, vice chair of the House Jan. 6 Committee

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

## Kamala Harris, former vice president, 2024 Democratic presidential nominee

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

## Adam Kinzinger, member of House Jan. 6 Committee

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

## Fiona Hill, witness in 2019 House impeachment inquiry

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for her to access classified information.

### Alexander Vindman, witness in 2019 House impeachment inquiry

Clearance was revoked after the White House announced March 21 that it was "no longer in the national interest" for him to access classified information.

---

**Related**
MORE: Biden's intelligence access to President's Daily Brief revoked, DNI Gabbard says                    →

---

### Kimberly Cheatle, former director of Secret Service

The United States Secret Service announced it canceled her security clearance process on Aug. 4.

### Miles Taylor, former chief of staff of the U.S. Department of Homeland Security

Trump signed a memo on April 9 ordering his administration to revoke his security clearance of Taylor, alleging that he "stoked dissension," published classified information, and violated his oath of office.

"I don't want to go out there and say this order achieved the president's objective of destroying my personal life, but the reality is that I had to step away from work because I couldn't do the work that I did anymore with this blacklisting in Washington," Taylor told Politico in June.

### Christopher Krebs, former director of the Cybersecurity and Infrastructure Security Agency

Trump signed a memo on April 9 ordering his administration to revoke his security clearance of Krebs, alleging he was a "significant bad-faith actor who weaponized and abused his Government authority." Krebs, who Trump had fired as CISA director in 2020, resigned from his current job after Trump issued his executive order.

"This will require my complete focus and energy. It's a fight for democracy, for freedom of speech, and for the rule of law. I'm prepared to give it everything I've got," he told his former coworkers when announcing his resignation.

### John Bolton, former national security adviser

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### James Clapper Jr., former U.S. director of national intelligence

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Michael Hayden, former director of the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Leon Panetta, former U.S. secretary of defense

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## John Brennan, former director of Central Intelligence

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Thomas Fingar, former chair of the National Intelligence Council

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Richard Ledgett, former deputy director of the National Security Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Michael Morell, former director of the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

---

**Related**
**MORE: Trump has taken steps to make his campaign promise to seek 'retribution' reality, critics say**    →

---

## Michael Vickers, former under secretary of defense for intelligence

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Douglas Wise, deputy director of the Defense Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Nicholas Rasmussen, former director of the National Counterterrorism Center

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

## Russell Travers, former U.S. acting director of the National Counterterrorism Center

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Andrew Liepman, former principal deputy director of the National Counterterrorism Center

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### John Moseman, former chief of staff for the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Larry Pfeiffer, former chief of staff at the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Jeremy Bash, former chief of staff at the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

---

**Related**
MORE: Trump targets law firm Paul Weiss, restricting government access →

---

### Rodney Snyder, former chief of staff at the Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Glenn S. Gerstell, former general counsel of the National Security Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### David B. Buckley, former inspector general at Central Intelligence Agency

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### Additional former intelligence officials associated with Hunter Biden laptop probe

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 53 of 172 PageID# 232

Clearance was revoked when Trump, on his first day back in office, signed an executive order that removed the security clearance of fifty former intelligence officials because they signed a letter discrediting reporting about the Hunter Biden scandal.

### 37 former intelligence leaders associated with assessment of Russia's attempt to influence 2016 election

On Aug. 19, Director of National Intelligence Tulsi Gabbard accused 37 current and former intelligence officials whose security clearances she revoked of having "aided and abetted" in what she called a "seditious conspiracy" that undermined U.S. democracy and the Republic.

## Law firms

Trump targeted a group of law firms with executive orders and memos that sought to strip attorneys of their security clearance and limit their ability to enter government buildings. Some of the firms reached agreements to offer the Trump administration pro bono services, while others successfully challenged the orders in court.

- Covington & Burling

- Perkins Coie

- Jenner & Block

- Milbank

- WilmerHale

- Skadden Arps, Slate, Meagher, & Flom

- Paul, Weiss, Rifkind, Wharton & Garrison

- Willkie Farr & Gallagher

*ABC News' Jack Date, Luke Barr, Elizabeth Schulze and Devin Dwyer contributed to this report.*

## Related Topics

**Trump Administration**



## Sponsored Content by Taboola

**12 Things To Cut When Living On Retirement**

**Sponsored** / Greensprout

5/27/26, 3:15 PM
Here's a list of the individuals, including James Comey, targeted by the Trump administration - ABC News

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 54 of 172
PageID# 233

**Why You're Exhausted No Matter How Much You Sleep**

Sponsored / Dose

Shop Now

**Why Your Sciatic Nerve Won't Heal (What Most Doctors Miss)**

Sponsored / RejuvaCare

**Edema Is Not From Salty Food. Meet The Real Enemy Of Swollen Legs**

Sponsored / RejuvaCare

**12 Expenses Retirees Are Quietly Dropping**

Sponsored / Greensprout

**This Common Medication Has Been Linked To Memory Loss**

Sponsored / Brain & Memory Post

Read More

**Tingling Feet? Avoid These 3 Foods Like The Plague**

Sponsored / Peripheral Health Institute

Learn More

**Extreme Tinnitus Associated With a Popular Habit. (Stop!)**

Sponsored / Soft sound

**New Research Links Popular Kitchen Oil To Brain Fog**

Sponsored / Brain Health Report

Learn More

ABC News Network   Privacy Policy   Your US State Privacy Rights   Children's Online Privacy Policy   Interest-Based Ads   About Nielsen Measurement   Terms of Use
Your Privacy Choices   Contact Us
© 2026 ABC News

# Exhibit H

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 56 of 172
PageID# 235

# *Justice Dept. Fires Prosecutors Who Worked on Trump Investigations*

The termination of more than a dozen lawyers who worked with the special counsel, Jack Smith, came hours after the department's most senior career official was reassigned.

---

▶  Listen · 7:02 min

  

**By Glenn Thrush, Devlin Barrett and Adam Goldman**
Reporting from Washington

Jan. 27, 2025

The acting attorney general on Monday fired more than a dozen prosecutors who worked on the two criminal investigations into Donald J. Trump for the special counsel Jack Smith, saying they could not be trusted to "faithfully implement" the president's agenda, a Justice Department spokesman said.

Justice Department veterans called the firings an egregious violation of well-established laws meant to preserve the integrity and professionalism of government agencies.

What made it all the more jarring, current and former officials said, was that such a momentous and aggressive step had been initiated by an obscure acting attorney general, James McHenry, operating on behalf of a president with a stated desire for vengeance, and few advisers with the stature or inclination to restrain him.

The department did not name the fired prosecutors. But a person who worked with some members of Mr. Smith's team said that many of the dismissals appeared to target career lawyers and most likely violated civil service protections for

Case 1:26-cv-01390-LMB-IDD    Document 25-1    Filed 05/28/26    Page 57 of 172
PageID# 236

nonpolitical employees.

The move was abrupt, but not unexpected: Mr. Trump had vowed to fire Mr. Smith as soon as he took office, but the special counsel and some of his top prosecutors quit before Inauguration Day. Others, however, including some assigned to the U.S. attorney's office in Washington, returned to their old posts.

The announcement kicked off a second week of convulsive change at a department Mr. Trump has vowed to dismantle and reconstruct, ushering in a new era of more direct White House control of federal law enforcement agencies.

In the letters to the prosecutors, which were transmitted electronically on Monday afternoon, Mr. McHenry claimed that Mr. Trump had constitutional authority over personnel matters under Article II of the Constitution to fire career staff members, rather than arguing they were terminated for cause based on poor performance or improper conduct.

"Given your significant role in prosecuting the president, I do not believe that the leadership of the department can trust you to assist in implementing the president's agenda faithfully," the firing memo said.

Greg Brower, who was a U.S. attorney during the George W. Bush administration, said the move was unheard-of.

"This is unprecedented, given the career status of these people, which makes them not subject to dismissal by the president, and the apparent lack of any cause that the department has been able to articulate," Mr. Brower said. "And so I suspect we will see them exercise their rights to appeal" to the Merit Systems Protection Board, an independent agency that reviews the claims of dismissed civil service workers and can reinstate them.

The rationale expressed in the firing memo contradicts decades of civil service law, which says employees can be fired only for misconduct or poor performance, not for doing their jobs, said Kristin Alden, a lawyer who specializes in federal employment issues.

Trump Administration Fires Prosecutors Who Aided Jack Smith Investigations - The New York Times

"The whole reason we have the Civil Service Reform Act is to get away from the spoils system," she said.

The firings, reported earlier by Fox News, came just hours after news of a major personnel move made by the Trump team that underscored its intention to quickly remove officials who might contradict its plans. The department's most senior career official, a well-respected department employee responsible for some of the most sensitive cases, was reassigned to a much less powerful post.

Were that official, Bradley Weinsheimer, to remain as the associate deputy attorney general, he would have handled critical questions about possible recusals — a thorny issue for a department that will soon be run by a number of Mr. Trump's former lawyers.

It follows the reassignments of some of the department's most experienced and highly regarded supervisors, including top officials with expertise in national security, international investigations, extraditions and public corruption. On Monday, one of them, the chief of the public integrity section, resigned.

It is not yet clear who will replace them.

Like many of the other officials who have received transfer emails, Mr. Weinsheimer has been given the option of moving to the department's sanctuary cities task force — an offer seen by some in the same situation as an effort to force them into quitting.

Mr. Weinsheimer, a respected veteran of the department for three decades, played a critical role under multiple administrations, often acting as a critical arbiter of ethical issues or interactions that required a neutral referee.

He was appointed to his current role on an interim basis by Attorney General Jeff Sessions in July 2018 during Mr. Trump's first term, a move that was made permanent by one of his successors, William P. Barr.

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 59 of 172
PageID# 238

Mr. Weinsheimer also served four years in the department's Office of Professional Responsibility, which investigates complaints about prosecutors. An email to his government account was not immediately returned.

In 2021, Mr. Weinsheimer cleared the way for former Trump administration officials to testify before Congress about the president's actions after the 2020 elections — over the objection of Mr. Trump's lawyers. But transcripts showed that he had tried to strictly limit the scope of questioning, to the ire of Democratic committee staff members.

Mr. Weinsheimer also ran point for the department in a testy series of exchanges with President Joseph R. Biden Jr.'s lawyers over the inclusion of the highly damaging assessment of Mr. Biden's mental acuity contained in the special counsel report on his handling of classified information.

Also on Monday, the chief of the Justice Department's public integrity section stepped down rather than be forced to transfer.

The chief, Corey Amundson, was informed in recent days that he would be reassigned to work on immigration. Mr. Amundson was one of many senior career officials told he was being sent to work on the task force focused on sanctuary cities — jurisdictions that are expected to be reluctant to comply with administration officials trying to ramp up deportations and immigration arrests.

In his resignation letter, which was obtained by The New York Times, Mr. Amundson recounted the many significant corruption cases he oversaw in his 26 years at the department.

"I spent my entire professional life committed to the apolitical enforcement of federal criminal law and to ensuring that those around me understood and embraced that central tenet of our work," he wrote in his letter to Mr. McHenry. "I am proud of my service and wish you the best in seeking justice on behalf of the American people."

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 60 of 172
PageID# 239

He added that he wished the department well as it pursued Mr. Trump's agenda, "including to protect all Americans from the scourge of violent crime and public corruption."

**Glenn Thrush** covers the Department of Justice and has also written about gun violence, civil rights and conditions in the country's jails and prisons.

**Adam Goldman** writes about the F.B.I. and national security. He has been a journalist for more than two decades.

A version of this article appears in print on , Section A, Page 14 of the New York edition with the headline: Trump Administration Fires Prosecutors Who Aided Smith's Investigations

# Exhibit I

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 62 of 172
PageID# 241

*Democracy Dies in Darkness*

**Legal Issues**

# Seven top D.C. prosecutors demoted in purge by Trump U.S. attorney

U.S. Attorney Ed Martin wiped out office leadership, including prosecutors of top Trump advisers and allies, Jan. 6 seditious conspiracy and public corruption.

Updated February 28, 2025   More than **1 year ago**

 By Spencer S. Hsu

Seven top leaders of the U.S. attorney's office for Washington, D.C., were demoted to misdemeanor and entry-level intake positions Friday, according to people familiar with the matter, in the latest Trump administration purge of career Justice Department prosecutors who handled politically sensitive cases.

The prosecutors are among a larger group targeted for "retribution" by President Donald Trump and loyalists, including interim U.S. attorney Ed Martin, because of their roles in Jan. 6 Capitol seditious conspiracy and riot cases and others, including ones involving Trump allies such as advisers Stephen K. Bannon and Peter Navarro, according to eight people close to the office, speaking on the condition of anonymity for fear of reprisals.

The seven prosecutors were notified by email Friday morning of their immediate removal from high-ranking supervisory or senior roles in the federal criminal division of the nation's largest U.S. attorney's office. Their jobs included overseeing or leading public corruption, fraud, major violent crimes and complex conspiracy cases, according to the office's website and public records.

They were reassigned to misdemeanors or early case assessment screening in D.C. Superior Court, the people said. The federal prosecutor's office in the nation's capital also has jurisdiction over locally charged crimes.

"As you know, each U.S. Attorney must assess the needs of his office to achieve the goals set forth by the President and Attorney General," Martin wrote to one of the prosecutors in an email obtained by The Washington Post from a person outside of the government. "Therefore, I am assigning you to Misdemeanors effective immediately," he wrote, advising the recipient to report "at once" and that "the change is not temporary."

"With professionalism, you should transfer any of your cases to members of the unit in which you previously worked and are now departed from," Martin wrote.

Former prosecutors called the demotions unprecedented and punitive, assigning many of the most experienced and skilled career public servants in the office to positions including ones normally rotated among the rawest newcomers.

"It's outrageous that top experienced prosecutors have been suddenly sent to the misdemeanor section, which is for brand-new hires," said Melanie Sloan, a former federal prosecutor in the office who is a senior adviser to American Oversight, a watchdog group. "This will endanger the safety of the residents of the District of Columbia, all so that Ed Martin and Trump can continue their vendetta against line prosecutors who were doing their job."

While Trump campaigned against D.C. as a "nightmare of murder and crime," and Martin and administration officials have said they are prioritizing the fight against violence in the nation's capital, their actions have caused it to shed U.S. prosecutors who do the work.

The shake-up echoes upheaval at the Justice Department under Attorney General Pam Bondi and acting deputy Emil Bove. At least eight senior U.S. public corruption prosecutors resigned in February when the department moved to drop corruption charges against New York Mayor Eric Adams (D), including lawyers with substantial conservative credentials, who accused Bove of rewarding Adams for supporting Trump's anti-immigration policies.

According to current and former colleagues, those demoted Friday have expertise spanning from national security and bribery cases to health care, opioid fraud and child pornography prosecutions, as well as with complex federal sentencing rules.

The prosecutors were identified by multiple people as:

- John Crabb, former criminal division chief at the time of the Jan. 6, 2021, Capitol attack, perhaps the most experienced trial prosecutor in the office, who was involved in the cases against Bannon and Navarro, the prosecution of a Libyan man in the 2012 attack on U.S. facilities in Benghazi, and numerous public corruption cases, including the bribery case against D.C. Council Member Trayon White Sr. (D-Ward 8). White has pleaded not guilty.

5/22/26, 6:31 PM
Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 64 of 172
7 DC prosecutors demoted as Trump U.S. attorney to purge - The Washington Post
PageID# 243

- Greg Rosen, head of the Capitol siege prosecution unit before it was disbanded and he was sidelined in January.

- Melissa Jackson and Meredith Mayer-Dempsey, chief and deputy chief of the federal major crimes unit, which handles firearms, drug, armed robbery, carjacking, immigration, assault and threat cases that the Trump administration has said it seeks to prioritize.

- Kathryn Rakoczy and Liz Aloi, deputy chiefs of a public corruption, fraud and civil rights section. Rakoczy prosecuted leader Stewart Rhodes of the far-right Oath Keepers extremist group for seeking to oppose by force the 2020 presidential transition in an effort to keep Trump in power. Aloi led prosecutions into FBI and police abuses, including two pardoned by Trump.

- Jason McCullough, who prosecuted leader Henry "Enrique" Tarrio of the far-right Proud Boys for plotting political violence against police and the congressional certification of the 2020 presidential election. He was part of special counsel Robert S. Mueller III's team investigating Russian interference in the 2016 U.S. presidential election, including a Russian internet trolling operation.

The seven declined or did not respond to requests for comment.

The office has already seen its top leadership ranks thinned, going nearly two weeks without a criminal division chief. Three-decade veteran Denise Cheung resigned from that post Feb. 17 after refusing to carry out what she wrote was Martin and Bove's demand to freeze the bank accounts of a $20 billion Biden administration environmental grant program without sufficient evidence.

Shortly after taking office, Martin fired prosecutors who worked on Trump's cases with special counsel Jack Smith as well as Jan. 6 prosecutors still under probationary periods, and sought to change the subject from Trump's pardoning all of nearly 1,600 Capitol riot defendants, including several hundred charged with assaulting police or other violent acts.

Martin, who had no prosecutorial experience, recently gained permission to fill some slots amid an administration hiring freeze. But quickly replacing several top prosecutors with decades of experience could be difficult.

In the email obtained by The Post, Martin wrote, "I must assign attorneys where I assess there is need and where I believe each AUSA can contribute." He added, "Misdemeanors does important work and needs assistance," referring to a section that handles lesser offenses punishable by no more than one year in jail. Colleagues noted that supervisors who have been demoted will also lose reserved parking spaces.

Upon taking office, Trump signed an executive order aimed at the "weaponization" of the Justice Department, which repeated misleading accusations against the Biden administration and directed appointees to scour federal law enforcement and intelligence agencies for what he called unfair use of the criminal justice system against him, supporters and conservatives.

A subsequent "weaponization working group" memo from Bondi has vowed to identify, among other things, "the pursuit of improper investigative tactics and unethical" Capitol riot prosecutions that diverted resources "from combating violent and serious crime" in the District.

Bondi also targeted prosecutions for "nonviolent protest activity" under the Freedom of Access to Clinic Entrances Act, a 1994 law that prohibits threats to and obstruction of a person seeking reproductive health services or providers.

Crabb and Aloi prosecuted Navarro — named a top trade adviser by Trump after serving four months in jail last year for refusing to cooperate with a House Jan. 6 committee — as well as a woman who was the first person sentenced for the combination of conspiring to violate reproductive health rights under a federal civil rights law and violating the clinic access act.

That person was pardoned by Trump in January. Aloi also prosecuted two former D.C. police officers pardoned by Trump that month after they were convicted and sentenced in the cover-up and deadly vehicle pursuit of a moped driver.

Crabb prosecuted Bannon for a similar contempt of Congress offense as Navarro. In 2020, Crabb — then-head of the office's criminal division — also stepped in after four career prosecutors quit the case over the Justice Department's softening of the sentencing recommendation of longtime Trump political confidant Roger Stone for lying to Congress in its Russian interference investigation. Trump had called the initial proposed penalty a miscarriage of justice that could not be allowed, and pardoned Stone at the end of his first term.

"The Department of Justice and the United States attorney's office is committed to following the law without fear, favor or political influence," Crabb said at Stone's sentencing, defending the office's work. "This prosecution was and this prosecution is righteous."

*Keith L. Alexander contributed to this report.*

---

## What readers are saying

The comments express strong disapproval of the demotion of experienced prosecutors to misdemeanor positions in the D.C. U.S. attorney's office, viewing it as a waste of resources and a politically motivated act of retribution. Many commenters criticize the move as damaging to... Show more

# Exhibit J

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 67 of 172
PageID# 246



# DOJ abruptly fires 3 prosecutors involved in Jan. 6 criminal cases, AP sources say

**Politics**    Jun 28, 2025 11:48 AM EDT

WASHINGTON (AP) — The Justice Department on Friday fired at least three prosecutors involved in U.S. Capitol riot criminal cases, the latest moves by the Trump administration targeting attorneys connected to the massive prosecution of the Jan. 6, 2021, attack, according to two people familiar with the matter.

Those dismissed include two attorneys who worked as supervisors overseeing the Jan. 6 prosecutions in the U.S. attorney's office in Washington as well as a line attorney who prosecuted cases stemming from the Capitol attack, the people said. They spoke on the condition of anonymity to discuss personnel matters.

**WATCH: After Jan. 6 pardons, judges who oversaw cases express frustrations**

A letter that was received by one of the prosecutors was signed by Attorney General Pam Bondi. The letter did not provide a reason for their removal, effective immediately, citing only "Article II of the United States Constitution and the laws of the United States," according to a copy seen by The Associated Press.

A Justice Department spokesperson declined to comment Friday evening.

The terminations marked yet another escalation of norm-shattering moves that have raised alarm over the Trump administration's disregard for civil service protections for career lawyers and the erosion of the Justice Department's independence from the White House. Top leaders at the Justice Department have also fired employees who worked on the prosecutions against Trump and demoted a slew of career supervisors in what has been seen as an effort to purge the agency of lawyers seen as insufficiently loyal.

Trump's sweeping pardons of the Jan. 6 rioters have led to worries about actions being taken against attorneys involved in the massive prosecution of the more than 1,500 Trump supporters who stormed the Capitol as lawmakers met to certify President Joe Biden's election victory. Trump pardoned or commuted the sentences of all of them on his first day back in the White House, releasing from prison people convicted of seditious conspiracy and violent assaults on police.

During his time as interim U.S. attorney in Washington, Ed Martin in February demoted several prosecutors involved in the Jan. 6 cases, including the attorney who served as chief of the Capitol Siege Section. Others demoted include two lawyers who helped secure seditious conspiracy convictions against Oath Keepers founder Stewart Rhodes and former Proud Boys national chairman Enrique Tarrio.

In January, then-acting Deputy Attorney General Emil Bove ordered the firings of about two dozen prosecutors who had been hired for temporary assignments to support the Jan. 6 cases, but were moved into permanent roles after Trump's presidential win in November. Bove said he would not "tolerate subversive personnel actions by the previous administration."

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 68 of 172
PageID# 247

# A free press is a cornerstone of a healthy democracy.

Support trusted journalism and civil dialogue.

## Donate now →

By — Alanna Durkin Richer, Associated Press

We use cookies to enhance your web experience, measure our audience, and collect useful information that allows PBS and our partners to tailor our marketing efforts. Click Cookie Settings to set your preferences or view more in our Privacy Policy

**Accept Cookies**

**Reject Optional Cookies**

**Cookie Settings**

# Exhibit K

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC.

*Plaintiffs,*

*v.*

INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY

*Defendants.*

No. _____

JURY TRIAL DEMANDED

## COMPLAINT

1.      President Donald J. Trump is the Founder and former Chief Executive Officer of the Trump Organization. President Trump served as the 45th President of the United States, and is the 47th President of the United States. President Trump brings this suit in his personal capacity.

2.      Donald J. Trump Jr. is an Executive Vice President at The Trump Organization, where he works to expand the company's real estate, retail, commercial, hotel, and golf interests.

3.      Eric Trump is an Executive Vice President of the Trump Organization. He oversees all aspects of the management and operation of the global real estate business, including new project acquisition, development, and construction.

4.      The Trump Organization is the preeminent developer of some of the most valuable and prized luxury real estate assets in the world, including five-star luxury hotels, championship golf courses, global realty services, residential & commercial buildings, property management, entertainment, dining, retail, and more.

5.      The Trump Organization includes The Trump Organization, LLC, as well as 418

other entities that received notices from Defendant U.S. Department of the Treasury's Internal Revenue Service ("IRS") between December 2024 and May 2025 ("The Trump Organization").

6. At all relevant times, President Donald J. Trump, Donald Trump Jr., Eric Trump, and The Trump Organization, LLC ("Plaintiffs") filed tax returns with the IRS, which contained confidential, personal financial information.

7. From May 2019 through at least September 2020, former IRS employee Charles "Chaz" Littlejohn, who was jointly employed by the IRS and/or one of its contractors, illegally obtained access to, and disclosed Plaintiffs' tax returns and return information to the *New York Times*, *ProPublica*, and other leftist media outlets. *See Information*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343-ACR (D.D.C. Sept. 29, 2023), ECF No. 1 ("Criminal Information").

8. Defendants had a duty to safeguard and protect Plaintiffs' confidential tax returns and related tax return information from such unauthorized inspection and public disclosure. *See* 26 U.S.C. § 6103, 5 U.S.C. § 552a. Accordingly, Defendants were obligated to have appropriate technical, employee screening, security, and monitoring systems to prevent Littlejohn's unlawful conduct.

9. Defendants failed to take such mandatory precautions.

10. Mr. Littlejohn has admitted that he disclosed to outlet *ProPublica* "Trump information [that] included all businesses that he had owned." *Plaintiff's Notice of Filing Redacted Version of ECF 111-2 in Compliance with Court Order (ECF 114)*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 25, 2024), ECF No. 119 Exhibit 1 (Deposition of Charles Littlejohn) ("Littlejohn Dep.") at 200. *ProPublica* then falsely reported that Plaintiffs' leaked confidential tax returns contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies*,

2

(Oct. 16, 2019), https://tinyurl.com/4x9nak4e, and falsely characterized Plaintiffs' accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://tinyurl.com/4pwea2hk.

11.     Defendants have caused Plaintiffs reputational and financial harm, public embarrassment, unfairly tarnished their business reputations, portrayed them in a false light, and negatively affected President Trump, and the other Plaintiffs' public standing. Joshua D. Blank, *Presidential Tax Transparency,* 40 Yale L. & Pol'y Rev. 1, 55 (2021) (describing how public claims about the President's taxes inform voters' electoral choices). Defendants' failures have caused significant and irreparable harm to Plaintiffs, their reputations, and their substantial financial interests.

12.     This Court has already held these alleged facts sufficient to support Defendants' liability for violations of section 6103 of the Internal Revenue Code. *Order Den. in Part and Granting in Part Mot. to Dismiss*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 1 ("April Order"). The IRS "acknowledges that it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure of Mr. Griffin's confidential data." IRS, News Releases, No. IR-2024-172, *IRS statement as part of the resolution of Kenneth C. Griffin v. IRS, Case No. 22-cv-24023* (S.D. Fla.), (June 25, 2024), https://perma.cc/4T62-6HWG. As to Plaintiffs, the facts are even more egregious and warrant swift and sweeping relief to remedy Defendants' breach of Plaintiffs' rights under federal law.

3

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1340, 1346, 26 U.S.C. § 7431(a), and 5 U.S.C. § 552a(g)(1)(D).

14. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

## PARTIES

15. Plaintiff President Donald Trump is a citizen of the United States and is a resident of Florida.

16. Plaintiffs Donald Trump Jr. and Eric Trump each reside in Palm Beach County, Florida, and lead and operate Trump Organization LLC and its affiliated entities from Palm Beach County, Florida, specifically Jupiter, Florida.

17. Plaintiff, The Trump Organization LLC is a limited liability company with its principal place of business at 115 Eagle Tree Terrace, Jupiter, Florida. Its officers include Eric Trump, a resident of Florida; and Donald J. Trump, Jr., a resident of Florida. Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp., The Miami Restaurant Hospitality Member Corp, and THC Miami Restaurant Hospitality LLC (together with the Trump Organization LLC, the "Trump Entities") are all located in Miami, Florida, within this Division.

18. Defendant U.S. Department of the Treasury is an Executive Department of the United States of America that oversees the IRS and the Treasury Inspector General for Tax Administration ("TIGTA"). Defendants, as the United States, are proper party defendants in this action and have waived sovereign immunity under 26 U.S.C. § 7431 and 5 U.S.C. § 552a(g)(1)(D).

19. Defendant Internal Revenue Service is a bureau of the U.S. Department of the

4

Treasury responsible for administering and enforcing the Internal Revenue Code.

## FACTS

**I.      The IRS is Responsible for Charles Littlejohn's Actions**

20.     "In or about September 2017 . . . and—in February 2018—[Mr. Littlejohn was] granted [ ] access to unmasked taxpayer data." *Government's Sentencing Mem., U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Jan. 16, 2024), ECF No. 23 at 2 ("Government's Sentencing Memorandum"); Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024), https://archive.is/ItQSG.

21.     Mr. Littlejohn was authorized, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2. "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law." *Id.* at 1.

22.     At all relevant times, Mr. Littlejohn was an officer or employee, joint employee, and contractor of the United States by virtue of his work for the IRS.

23.     Mr. Littlejohn had staff-like access to tax returns and confidential tax return information, and Defendants exercised the power to control the detailed physical performance of his work. April Order at 2, 6; *see also* Internal Revenue Manual ("IRM") § 7.11.13.1.1(3) (Feb. 12, 2018) ("All IRS employees (including managers, executives *and contractors*) are responsible for protecting the confidentiality and privacy of taxpayer information to which they have access.") (emphasis added), https://tinyurl.com/muc75h6r. Mr. Littlejohn testified that he "work[ed] at the IRS." Littlejohn Dep. at 204 ¶ 17.

5

Case 1:26-cv-06091-KMW Document 1 Filed 05/28/26 Page 75 of 172
Case 1:22-cv-24023-KMW Document 125-1 Entered on FLSD Docket 06/29/2026 Page 7 of 27
PageID# 254

24. The IRS (including IRS Contracting Officer Representatives) exercised extensive, detailed, day-to-day supervision of Mr. Littlejohn's work. April Order at 2, 6 (describing the IRS's "supervision and control" of Littlejohn). IRS Contracting Officer Representatives are "IRS employees who oversee day-to-day operations of contracts and contractors." U.S. GOVERNMENT ACCOUNTABILITY OFFICE, GAO- 23-105395, SECURITY OF TAXPAYER INFORMATION, IRS NEEDS TO ADDRESS CRITICAL SAFEGUARD WEAKNESSES, at 35 (August 2023), https://tinyurl.com/yrbvzvrn.

25. The IRS's supervision and control included "managing the scope and purpose of Mr. Littlejohn's daily tasks and projects; ensuring that Mr. Littlejohn completed required training, monitoring Mr. Littlejohn's technical performance; ensuring Mr. Littlejohn was aware of data safeguards and appropriately protecting taxpayer information; and exercising control over the parameters of Mr. Littlejohn's access to IRS data and confidential tax return information." April Order at 2 (replacing "his" with "Mr. Littlejohn").

26. During Mr. Littlejohn's employment, joint employment, and contractor status, "the IRS also had authority to both reprimand and terminate Littlejohn." *Id*. According to the IRS, all IRS employees—*i.e.*, "all IRS personnel," which "[a]lso includes all contractors who have staff-like access"—"may be subject to administrative penalties for the willful and unauthorized attempted access of their own or another taxpayer's records." *See* IRM § 10.5.5.1.6(2) and (3); IRM § 10.5.5.2(2). IRS administrative penalties include, but are not limited to, the removal and suspension of employees.

27. These facts more than support the "plausible inference that Littlejohn was an employee of the United States." *Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 6.

28. Indeed, Mr. Littlejohn testified that his work for the IRS was his "full-time job"

6

from May 2019 through at least September 2020. Littlejohn Dep. at 264 ¶ 7.

29.     At all relevant times, Mr. Littlejohn's work at the IRS was supervised by Paul Wight, Supervisory Management and Program Analyst at the Department of Treasury. *Id*. at 265 ¶¶ 11-15.

30.     Mr. Littlejohn testified that Mr. Wight directed his work. *Id*. at 301 ¶ 7-9.

31.     Due to Mr. Littlejohn's employment, joint employment, and contractor status, the IRS had a duty to oversee and control his access to and removal of records. 36 C.F.R. §§ 1222.32(a) & (b) establishes that the IRS must oversee and control contractor, employee, or joint employee records and that such records are federal records for which unlawful removal requires actions for recovery by the executive branch. *See, e.g.,* 44 U.S.C. § 3106.

**II.     Defendants Willfully Failed to Establish Appropriate Administrative, Technical, and Physical Safeguards to Ensure the Security and Confidentiality of Plaintiffs' Confidential Tax Return Information, Compounding the Risk of Unauthorized Inspection and Disclosure.**

32.     "Every year from 2010 through 2020, the Treasury Inspector General for Tax Administration ("TIGTA") has warned the IRS about security deficiencies related to the protection of taxpayers' confidential tax return information." *Id.* at 1; ¶¶ 8-9, 26, 28-31, 64.

33.     "Many of these deficiencies went uncorrected and . . . allowed Littlejohn to misappropriate the information, upload it to a private website, and then disclose it[.]" *Id.*

34.     "The IRS also disclosed [Plaintiffs'] confidential tax return information to Littlejohn regardless of whether Littlejohn completed or was up to date with all [of] his purportedly required privacy and data-security training." *Id.*

35.     "In October 2023, a few weeks after being criminally charged for the disclosures, Littlejohn pleaded guilty to a violation of 26 U.S.C. § 7213(a) for the unlawful disclosure of confidential tax return information," including Plaintiffs' confidential tax returns and related return

7

information. *Id*. at 3.

36.     In Mr. Littlejohn's own words, to disclose Plaintiffs' tax returns, he "made use of a private website that I could log into and I could upload the return data and then – you know, on my IRS computer, I could do that. And then, on a separate computer, I could log in and download the data." Littlejohn Dep. at 142.

37.     Mr. Littlejohn has admitted that the IRS did "not block creating a private website" on IRS computers. *Id*. Before Mr. Littlejohn stole Plaintiffs' returns via a private website on an IRS computer or computers, he tested the viability of using such a website by having "uploaded an image file to a website that I had control over, and it worked." *Id*. at 143.

38.     As a result of Defendants' incomplete and failed compliance procedures set forth in 5 U.S.C. § 552a (the "Privacy Act"), among other failures and procedure violations, it only took "[a] few hours" for Mr. Littlejohn to take Plaintiffs' tax returns into his personal custody. *Id*. at 145.

39.     Defendants' Privacy Act compliance and other security procedures were so insufficient that it took three years for the IRS to detect that Littlejohn breached the confidentiality and security protections of Plaintiffs' confidential tax returns and related tax information. *Id*. at 146-47 ¶¶ 19-22, and 1-8.

40.     Once Mr. Littlejohn uploaded Plaintiffs' tax returns and return information onto his private website, he placed them "on a flash drive" in his house. *Id*. at 148.

41.     From October 2019 until at least January 2020, Mr. Littlejohn repeatedly accessed IRS data to illegally provide additional information to the *New York Times* and *ProPublica,* which was all undetected by Defendants despite his initial breach several months earlier. *Id*. at 160, 163-64.

42.     Because the IRS tax return data lacked proper encryption, Mr. Littlejohn was able to put Plaintiffs' confidential tax return information as a draft in an e-mail account, and then provide the *New York Times* and *ProPublica* with login information to the account, in order to unlawfully retrieve the return information. *Id*. at 165.

43.     The IRS continued its failure to implement appropriate safeguards through at least Fiscal Year 2020 (ending September 30, 2020). In its *Annual Assessment of the Internal Revenue Service's Information Technology Program for Fiscal Year 2020*, the Treasury Inspector General for Tax Administration reported that 54% of the employees audited had unnecessary access to the IRS Centralized Authorization File, which houses tax information authorizations. *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2021-20-001, ANNUAL ASSESSMENT OF THE INTERNAL REVENUE SERVICE'S INFORMATION TECHNOLOGY PROGRAM FOR FISCAL YEAR 2020 (Oct. 30, 2020), https://tinyurl.com/bdysc8b3.

44.     Similarly, the Treasury Inspector General for Tax Administration has found that the IRS failed to establish safeguards to *detect*, let alone prevent, unauthorized access to confidential tax return information.

45.     Indeed, on July 31, 2020, the Treasury Inspector General for Tax Administration revealed that "the IRS could not provide an accurate inventory of all applications that store or process taxpayer data and [Personally Identifiable Information]." *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2020-20-033, MOST INTERNAL REVENUE SERVICE APPLICATIONS DO NOT HAVE SUFFICIENT AUDIT TRAILS TO DETECT UNAUTHORIZED ACCESS TO SENSITIVE INFORMATION at 2 (July 31, 2020), https://tinyurl.com/3rythsr3.

46.     Notwithstanding all of these data security failures, the IRS put, and continued to put long after this breach, Plaintiffs' and other United States taxpayers' confidential tax return

9

information at risk. Defendants failed to implement effective training, including training mandated for Mr. Littlejohn, to protect Plaintiffs' confidential tax returns and return information.

47.    Defendants' failure to establish necessary administrative, technical, and physical safeguards over its systems of records allowed Mr. Littlejohn to exploit these failures in order to repeatedly inspect and misappropriate Plaintiffs' confidential tax return information, and to unlawfully disclose that information to the *New York Times, ProPublica*, and others for widespread, unlawful publication.

### III.    Defendants Failed to Appropriately Screen Mr. Littlejohn and Failed to Properly Safeguard Plaintiffs' 6103-protected Information

48.    At all relevant times, Mr. Littlejohn was authorized, even though he should not have been, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2.

49.    Because Defendants did not properly screen Mr. Littlejohn, they failed to determine that Mr. Littlejohn posed a risk to protected taxpayer information, including Plaintiffs' confidential tax returns and related tax information.

50.    Because Defendants did not institute proper controls and safeguards over Mr. Littlejohn's activities, he was able to engage in the unauthorized disclosure of Plaintiffs' confidential tax returns and related information to, among others, the *New York Times* and *ProPublica* for widespread, unlawful publication.

51.    To illustrate, if Defendants had ensured that Mr. Littlejohn had all IRS-based information in his possession connected to IRS-approved cybersecurity programs, they would have detected that Mr. Littlejohn was removing Plaintiffs' taxpayer information from his devices, prevented Mr. Littlejohn from leaving his office of employment carrying taxpayer records with

10

him for the purpose of disclosing them at a location in Gallaudet University, and detected and prohibited his use of a burner phone to orally disclose 6103-protected information. *See* ¶¶ 53-64, *infra*.

IV. **Defendants' Privacy Act Violations Emboldened Mr. Littlejohn to Repeatedly and Unlawfully Inspect and Disclose Plaintiffs' Confidential Tax Returns and Tax Return Information.**

52.     "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law."   Government's Sentencing Memorandum at 1.

53.     On or around April or May 2019, Mr. Littlejohn disclosed Plaintiffs' confidential tax returns and/or return information to the *New York Times*. Littlejohn Dep. at 123, 140 ¶ 1.

54.     In response to the *New York Times'* continuous negative reporting regarding the Plaintiffs, Mr. Littlejohn decided to disclose Plaintiffs' confidential tax returns to the media outlet through its Signal account. Littlejohn Dep., *supra* at 148 ¶ 13-18 and 149 ¶1-4. Mr. Littlejohn then intentionally and maliciously disclosed those materials to the *New York Times* for unlawful, widespread publication. Mr. Littlejohn took Plaintiffs' confidential tax returns and related tax information, and illegally disclosed them in-person to *New York Times* reporters Susanne Craig and Russ Buettner at the Kellogg Business Center on the Gallaudet University campus. *Id*. at 152. Subsequently, in July 2019, Mr. Littlejohn met with the *New York Times* reporters and their editor at a safehouse in New York City to discuss providing legally protected materials to the reporters. *Id*. at 155. In October 2019, Mr. Littlejohn unlawfully provided the *New York Times* with a flash drive of several years of Plaintiffs' tax returns, and allowed the *New York Times* to illegally download those returns onto its computer. *Id*. at 160.

55.     In or around September 2020, Mr. Littlejohn contacted a second media outlet,

11

*ProPublica*, to discuss the possibility of unlawfully providing them with the confidential tax information in his possession, including Plaintiffs' confidential tax returns and related information. *Factual Basis for Plea, U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Oct. 12, 2023), ECF No. 9 ("Factual Basis for Plea") at 3.

56.     In or around that time, Mr. Littlejohn illegally provided Plaintiffs' confidential tax returns and related tax information to *ProPublica* by mailing it on a password-protected personal data storage device. *Id.*

57.     In or around November 2020, Mr. Littlejohn unlawfully provided the password-protected data storage device password to a *ProPublica* journalist, who proceeded to illegally access Plaintiffs' confidential tax returns and related tax information. *Id.*

58.     Mr. Littlejohn later admitted that he disclosed to *ProPublica* "Trump information [that] included all businesses that he had owned." Littlejohn Dep. at 200.

59.     From as early as April 2019 until at least September 2020, based on deposition testimony, Littlejohn Dep. at 166-69, Mr. Littlejohn exploited Defendants' data integrity failures to repeatedly and unlawfully disclose Plaintiffs' confidential tax returns and related tax information.

60.     Defendants' failure to "ensure that all Windows computers connected to its network were authorized and compliant with security policy" allowed Mr. Littlejohn to use virtual machines that simulated physical computers to avoid IRS protocols designed to detect and prevent large downloads or uploads from IRS devices or systems.

61.     Further, Defendants' failure to use adequate encryption allowed Mr. Littlejohn to illegally store and to transmit Plaintiffs' confidential tax returns and tax information to the *New York Times* and *ProPublica* on a personal data storage device.

12

62. According to court documents, "Littlejohn accessed tax returns associated with [Plaintiffs] – and related individuals and entities – on an IRS database after using broad search parameters designed to conceal the true purpose of his queries. He then evaded IRS protocols established to detect and prevent large downloads or uploads from IRS devices or systems." *See,* e.g., U.S. Department of Justice, Press Release, https://tinyurl.com/2vjru7z7 (paraphrasing filings).

63. "Littlejohn then saved the tax returns to multiple personal storage devices, including an iPod, before contacting [the *New York Times*]. Between August 2019 and October 2019, Littlejohn provided [the *New York Times*] with the tax return information associated with [Plaintiffs]. Littlejohn then stole additional tax return information related to [Plaintiffs] and provided it to [the *New York Times*]. In September 2020, [the *New York Times*] published a series of articles about [Plaintiffs'] tax returns." Criminal Division of the U.S. Department of Justice, Case Summary, *United States v. Charles E. Littlejohn,* https://tinyurl.com/5n7b4fpz.

64. The IRS, through Littlejohn, unlawfully disclosed Plaintiffs' confidential tax return information to the *New York Times* on a personal storage device. Eileen Sullivan, *Former Contractor Who Leaked Trump's Tax Returns Sentenced to 5 Years in Prison*, N.Y. TIMES (Jan. 29, 2024), https://tinyurl.com/vyumarcu.

65. Littlejohn committed these crimes because he considered President Trump to be "dangerous" and a "threat to democracy," and that disclosure was, in Littlejohn's view, necessary due to political "norms." Littlejohn Dep. at 85-87.

66. In fact, once the IRS granted Mr. Littlejohn access to Plaintiffs' confidential tax returns and related tax information, it was certain that the information would be illegally disclosed, including to the press.

13

67. Littlejohn sought employment, joint employment, and contractor status with the IRS with "the goal of getting access to taxpayer information from Donald Trump[.]" *Id.* at 88. When asked, "so you were looking to do something to cause some kind of harm to him?" Mr. Littlejohn responded, "Less about harm, more just about a statement. I mean, there's little harm that can actually be done to him, I think. . . He's shown a remarkable resilience." *Id.* at 90.

68. Mr. Littlejohn's deposition in *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, *supra*, quoted the government's statements at his January 29, 2024, sentencing hearing, where the prosecution stated, "All Americans are obligated to provide an enormous amount of financial information about their private lives to the IRS -- to the government. And in exchange, in turn, what we expect from the government and what we expect from the IRS is that they will secure the data. They will protect the data. The defendant's crime undermined that faith. It undermined that trust." *Id.* at 286 ¶ 7-15.

69. At that sentencing, Mr. Littlejohn admitted: "I felt that the American people should have the opportunity to see the tax returns of the sitting President before they decided on how they were going to vote." *Id.* at 287 ¶ 3-6. Mr. Littlejohn clearly committed his crimes, which the Defendants allowed to occur, in order to improperly influence the results of the 2020 presidential election.

70. In his Factual Basis for Plea, Mr. Littlejohn expressly admitted that his "disclosure of the [Plaintiffs] tax returns and return information . . . was knowing and willful." *U.S.A. v. Littlejohn*, Case No. 23-cr-00343, Dkt. No. 9, at ¶ 16.

71. U.S. District Court Judge Ana C. Reyes, at sentencing, expressly found: "Mr. Littlejohn's targeting of a sitting President of the United States is part of a three-year criminal scheme, including working with reporters to help him understand the tax returns, deciding again

14

and again and again to take the law into his own hands." *Id*. at 289 ¶ 7-12.

72.    Judge Reyes further found that Mr. Littlejohn sought to harm President Trump: "Despite what Mr. Littlejohn argues, I find it implausible that he did not intend to harm at least some taxpayers. Indeed, he provided the returns to the *New York Times* and *ProPublica* so that they could write articles about Mr. Trump and wealthy individuals." *Id*. at 291 ¶ 16-21.

73.    Because of Defendants' wrongful conduct, Plaintiffs were subject to, among many others, at least eight ("8") separate stories in the *New York Times* which wrongly and specifically alleged various improprieties related to Plaintiffs' financial records and taxpayer history, including:

- False allegations that President Trump engaged in "tax avoidance," Russ Buettner, Susanne Craig, and Mike McIntire, *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance,* N.Y. Times (Sept. 27, 2020), https://tinyurl.com/yhhvep2d;

- False allegations that President Trump "reduced his tax bill with questionable measures," David Leonhardt, *18 Revelations from a Trove of Trump Tax Records*, N.Y. Times (Sept. 27, 2020), https://tinyurl.com/w93vrbty;

- False allegations that President Trump "suffered heavy business losses," Charlie Smart, *Here Are the Key Numbers From Trump's Tax Returns*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/46pfw63b;

- False allegations regarding the specifics of existence of various IRS audits of Defendants; Jim Tankersley, Susanne Craig and

15

Russ Buettner, *Trump Tax Returns Undermine His Image as a Successful Entrepreneur*, N.Y. Times (Dec. 30, 2022), https://tinyurl.com/mvbv7m22;

- False allegations regarding President Trump's charitable contributions; Jim Tankersley, Susanne Craig and Russ Buettner, *Key Takeaways From Trump's Tax Returns*, N.Y. Times, (Dec. 30, 2022), https://tinyurl.com/bdf5nwfs;

- False allegations that President Trump's returns and information had "red flags," Jim Tankersley, Susanne Craig and Russ Buettner, *Trump's Taxes: Red Flags, Big Losses, and a Windfall From His Father*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/muz53b7x;

- False allegations that President Trump "paid no federal income taxes in 11 of 18 years", Trump's Taxes: I.R.S. Didn't Audit Trump for 2 Years in Office, House Committee Says, N.Y. Times (Dec. 20, 2022), https://tinyurl.com/yu4as6zf; and

- False allegations that President Trump paid "$750 in federal income taxes in 2017", Russ Buettner, Mike McIntire, Susanne Craig and Keith Collins, *Trump Paid $750 in Federal Income Taxes in 2017. Here's the Math.*, N.Y. Times (Sept. 29, 2020), https://tinyurl.com/2pcywfm6.

74. Likewise, *ProPublica* published at least 50 articles as a result of Defendant's unlawful disclosures, many of which contained false and inflammatory claims about Defendants'

16

confidential tax documents.  *See* Government's Sentencing Memorandum at 4.

75.     For instance, *ProPublica* falsely reported that President Trump's unlawfully leaked tax information contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies* (Oct. 16, 2019), https://tinyurl.com/4x9nak4e; and mischaracterized his accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://perma.cc/2FYA-W7UA.

76.     President Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until January 29, 2024, when the IRS sent a letter addressed to "Donald J. Trump and Melania," that stated, "We're providing you this letter to notify you that an Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information between 2018 and 2020."

77.     When the first relevant *New York Times* story was released on September 27, 2020, Plaintiffs had no reason to believe that an unauthorized disclosure had occurred for at least two reasons. First, the *New York Times* reporting did not state that the information came from the IRS, and second, the IRS Commissioner supposedly investigated and found that the disclosure did not come from the IRS. Littlejohn Dep., *infra* at 172.

78.     Eric Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

79.     The § 7431 notice received by Eric Trump informed that "[a]n Internal Revenue

17

Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

80. Donald Trump, Jr. did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he first received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

81. The § 7431 notice received by Donald Trump, Jr. informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

82. To date, the Trump Organization continues to receive notices from Defendants pursuant to Internal Revenue Code § 7431.

83. The notices that were sent to Plaintiffs disclosed numerous violations of § 6103 that were committed in connection with The Trump Organization's corporate tax returns, as well as the corporate tax returns of subsidiaries of, and/or fully owned affiliates of, the Trump Organization.

84. Between December 2024 and May 12, 2025, the Trump Organization received § 7431 notices with respect to 418 Trump Entities.

85. All § 7431 notices received by the Trump Organization informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

86. Plaintiffs were not able to bring an action against an unknowable, indeterminate defendant to vindicate their rights until such notification occurred—which, in this case, was

pursuant to the statutory requirement imposed upon the Secretary of the Treasury to notify a taxpayer "as soon as practicable" if "any person is criminally charged by indictment or information with inspection or disclosure of" that taxpayer's return or return information. 26 U.S.C. § 7431(e). 26 U.S.C. § 7431(e) provides the Defendants' notice requirement to Plaintiffs, while 26 U.S.C. § 7431(d) governs the two-year time period within which Plaintiffs must generally file their action pursuant to 26 U.S.C. § 7431(a)(1).

87. All conditions precedent to this action have been performed, excused, or waived.

## CLAIMS FOR RELIEF

### Count I - Violations of 26 U.S.C. § 6103 and 26 U.S.C. § 7431(a)(1)

88. Plaintiffs repeat each of Paragraphs 1 to 87 as if fully alleged herein.

89. 26 U.S.C. § 6103 provides that tax "[r]eturns and return information shall be confidential" and prohibits disclosure and inspection by United States employees and other defined persons, except as specifically authorized by law." *Id*. § 6103(a)(3).

90. Under 26 U.S.C. § 6103(a), no such person who has received tax returns or return information "shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." The statute defines "officer or employee" as a former officer or employee. *Id*.

91. Section 6103(a) provides that, with limited exceptions, federal tax "[r]eturns and return information shall be confidential," and it imposes this confidentiality obligation on, among other persons, federal contractors who receive access to returns or return information. 26 U.S.C. § 6103(a)(2).

92. "Return" is defined as:

> [A]ny tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this

title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

26 U.S.C. § 6103(b)(1).

93. "Return information" includes:

[A] taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

26 U.S.C. § 6103(b)(2)(A).

94. "[D]isclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

95. The IRS's Internal Revenue Manual § 10.5.5.1.6(2) defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." The Internal Revenue Manual § 10.5.5.1.6(3) defines "staff-like access" to mean "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS information."

96. The Internal Revenue Manual defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." *See IRS Unauthorized Access, Attempted Access, Or Inspection of Taxpayer Records ("UNAX") Program Policy, Guidance, and Requirements ("UNAX Policy")*, IRM § 10.5.5.1.6(2).

97. According to the IRS, "staff-like access" means "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS

20

information." *See id.* § 10.5.5.1.6(3).

98.     26 U.S.C. § 6103(n) permits the disclosure of returns and return information to any person "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration."

99.     26 C.F.R. § 301.6103(n)-1(b)(2) prohibits such disclosures under 26 U.S.C. § 6103(n) if the disclosure is not "necessary" or, in the alternative, if the services for which the disclosure is made under 26 U.S.C. § 6103(n) can be:

> [R]easonably, properly, or economically performed by disclosure of only parts or portions of a return or if deletion of taxpayer identity information […] reflected on a return would not seriously impair the ability of the employees to perform the service, then only the parts or portions of the return, or only the return with taxpayer identity information deleted, may be disclosed.

100.     26 U.S.C. § 7431 provides taxpayers a private right of action for damages against the United States for the knowing or negligent unauthorized inspection or disclosure of tax return information in violation of 26 U.S.C. § 6103.

101.     An affected taxpayer may bring a civil action for damages "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103."

102.     As alleged herein, Defendants, through Mr. Littlejohn, acting as an employee, contractor, and jointly-employed individual of Defendants, repeatedly violated 26 U.S.C. § 6103 from as early as March 2019 through at least September 2020 by unlawfully inspecting Plaintiffs' confidential tax return information and then unlawfully disclosing that information to the *New York*

*Times* and *ProPublica*, with the expectation that this information would be widely published and harm Plaintiffs.

103. Defendants, through Mr. Littlejohn, knowingly and unlawfully disclosed Plaintiffs' "tax returns and return information dating back *more than 15 years*," from at least 2000 through 2020, to the *New York Times* and *ProPublica*, which the expectation that this information would be widely published and harm Plaintiffs. *See* Information at 1.

104. Thus, Defendants violated § 6103 in connection with each of the Plaintiffs, including the unlawful inspection and disclosure of numerous confidential tax returns covering the time period of at least 2005 through 2020, to at least two media outlets, *The New York Times* and *ProPublica*. The unlawful disclosure of *each* confidential tax return and/or return information, for *each* year and to *each* outlet, and each time that confidential tax return and/or return information was viewed as a result of the unlawful disclosure constitutes a separate violation of 26 U.S.C. § 6103. *See, e.g., Snider v. United States* 468 F.3d 500, 508 (8th Cir. 2006) ("Direct disclosures to multiple persons multiplies the harm to the taxpayer . . . one disclosure to two people counts as two separate disclosures.") (citing *Mallas v. United States*, 993 F.2d 1111, 1125 (4th Cir. 1993)); *Minda v. United States*, 851 F.3d 231, 236 (2d Cir. 2017) (noting that 26 U.S.C. § 7431(c) "clearly provides an aggrieved taxpayer $1,000 in statutory damages for 'each act' of unauthorized disclosure."). This information was likely seen by tens of millions of viewers. *See e.g.,* Sarah Diamond, *What Makes a Times Article Go Viral?*, The New York Times, (Mar. 16, 2022), https://tinyurl.com/4v9h3zhr (stating "articles evoking high-arousal emotions like awe, anger, surprise and anxiety were more likely to go viral" and thus "amass[ ] millions of page views") ("Diamond Article").

105. Those unlawful inspections and disclosures encompassed, among other things, the

wage information, charitable contributions, financial and securities transactions, adjusted gross income, and information sufficient to calculate the purported effective federal income tax rates of President Trump, Eric Trump, and Donald Trump, Jr. The unlawful inspections and disclosures also encompassed sensitive corporate financial information of The Trump Organization and the Trump Entities.

106. Defendants made these unlawful disclosures knowingly—or at the very least negligently or with gross negligence—because they willfully failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' confidential taxpayer information and protect from the exact unlawful disclosures that occurred.

107. As shown above, Defendants, through Littlejohn, illegally disclosed the confidential return information to the *New York Times* and *ProPublica* with the intent that the *New York Times* and ProPublica would widely publicize the information through its print and online reporting.

108. Defendants' illegal disclosures of Plaintiffs' tax return information did not result from a "good faith, but erroneous interpretation of section 6103," 26 U.S.C. § 7431(b)(1), but rather from knowing violations, gross negligence, and/or negligence.

109. Defendants' unlawful disclosures of Plaintiffs' tax return information to the *New York Times* were not "requested by the taxpayer," i.e., Plaintiffs, under 26 U.S.C. § 7431(b)(2).

110. Therefore, the IRS's disclosure of Plaintiffs' tax return information violated 26 U.S.C. § 6103.

111. Under 26 U.S.C. § 7431, Plaintiffs are entitled to statutory damages of $1,000 "for *each* act of unauthorized disclosure of a return or return information[.]" 26 U.S.C. § 7431(c)(2).

23

112. Plaintiffs are also entitled to punitive damages under 26 U.S.C. § 7431(c)(1)(B)(ii), because the IRS's unlawful disclosure of their confidential tax return information was either willful or a result of gross negligence.

113. There are several further aggravating factors that support the award of punitive damages in this case, including, without limitation: (i) the overtly political nature of Defendants' conduct—which was targeted at a then-sitting (and now current) President, his family, and entities bearing his name; (ii) the fact that the unlawful disclosures were committed with the express purpose of influencing and/or interfering with the 2020 presidential election; (iii) the unprecedented size and scope of the breach of privacy and the sheer number of individuals and entities affected (which forced Plaintiffs to have to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information); and (iv) the reckless abandon displayed by Defendants with respect to the complete and utter failure to safeguard the confidential, sensitive, and highly sought-after tax return information of the President of the United States, his family members, and businesses bearing his name.

114. Plaintiffs are entitled to the costs of the action and reasonable attorney's fees under 26 U.S.C. § 7431(c)(3).

### Count II - Violation of 5 U.S.C. § 552a(e)(10)

115. Plaintiffs repeat the allegations contained in paragraphs 1 through 87 as if fully alleged herein.

116. The IRS is an agency within the meaning of the Privacy Act.

117. The IRS maintained Plaintiffs' records, including his confidential tax return information, in a system of records as defined in the Privacy Act.

24

118.    The IRS has long been aware of serious deficiencies in its privacy safeguards, including due to repeated notices from the Treasury Inspector General for Tax Administration.

119.    The Privacy Act requires that Defendants "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination[.]" 5 U.S.C. § 552a(e)(5).

120.    Defendants failed to do so with respect to Plaintiffs' tax return information.

121.    Mr. Littlejohn's unlawful disclosure of Plaintiffs' tax returns and related information to *The New York Times* and *ProPublica* caused reputational and financial harm to Plaintiffs and adversely impacted President Trump's support among voters in the 2020 presidential election.

122.    At Mr. Littlejohn's January 29, 2024, criminal sentencing, the prosecutors charged that Mr. Littlejohn's "disclosures were intended to damage his victims' reputations, and through that criminal damage, he sought to influence an election and to reshape our nation's political discourse and political process." Littlejohn Dep. at 285 ¶ 3-7.

123.    As a result of Defendants' repeated violations of the Privacy Act, Plaintiffs incurred substantial financial and other damages, including having to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information.

124.    Plaintiffs will continue to sustain substantial financial, reputational, and other damages as a result of Defendants' repeated violations of the Privacy Act set forth above.

125.    Plaintiffs are therefore entitled to substantial damages under 5 U.S.C. §§ 552a(g)(1)(D), (g)(2)(A), and (g)(4).

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs President Donald Trump, Donald Trump Jr., Eric Trump, and the Trump Organization respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully accessed and inspected Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

B. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully disclosed Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

C. Awarding Plaintiffs, pursuant to 26 U.S.C. § 7431(c)(1), the greater of either $1,000 in damages for each unauthorized disclosure of their tax return information, including each subsequent disclosure by third parties, including by the *New York Times*, *ProPublica,* and by many additional print, broadcast, cable, social media and other platforms, which amounts to at least $10,000,000,000.00, *see* Diamond Article, *supra*, or the actual damages sustained by Plaintiffs and all related entities, including each of the 418 Trump Organization-affiliated entities that received notices from the IRS, which also amounts to at least $10,000,000,000.00;

D. Awarding Plaintiffs reasonable costs and attorney's fees pursuant to 26 U.S.C. § 7431(c)(2)-(3), and as may otherwise be permitted by law;

26

E.    Awarding Plaintiffs punitive damages pursuant to 26 U.S.C. § 7431(c)(1)(B)(ii) because the unlawful disclosure of their confidential tax returns and return information was either willful or the result of gross negligence;

F.    Ordering Defendants to pay damages under the Privacy Act's damages provision, 5 U.S.C. § 552a(g)(4)(A), for actual damages resulting from the IRS's failure to maintain its records in a confidential manner;

G.    Awarding costs and pre-and post-judgment interest as allowed by law; and

H.    Any such other relief as the Court deems just and proper.

Dated: January 29, 2026                  Respectfully submitted,

                                         **BRITO, PLLC**
                                         2121 Ponce de Leon Boulevard
                                         Suite 650
                                         Coral Gables, FL 33134
                                         Office: 305-614-4071
                                         Fax: 305-440-4385

                                         By: /s/ *Alejandro Brito*
                                                 **ALEJANDRO BRITO**
                                                 Florida Bar No. 098442
                                                 Primary: abrito@britopllc.com
                                                 Secondary: apiriou@britopllc.com
                                                 **IAN MICHAEL CORP**
                                                 Florida Bar No. 1010943
                                                 Primary: icorp@britopllc.com

                                                 **Daniel Z. Epstein**
                                                 D.C. Bar No. 1009132
                                                 Epstein & Co. LLC
                                                 E-mail: dan@epsteinco.co
                                                 *\* Pro Hac Vice Forthcoming*

                                                 *Counsel to Plaintiffs*
                                                 *President Donald J. Trump et al.*

27

JS 44 (Rev 04/21) FLSD Revised 12/02/2022

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS
PRESIDENT DONALD J. TRUMP
DONALD J. TRUMP JR.
ERIC TRUMP AND THE TRUMP ORGANIZATION LLC

(EXCEPT IN U.S. PLAINTIFF CASES)

**(b)** County of Residence of First Listed Plaintiff

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alejandro Brito Esq. Brito PLLC
2121 Ponce de Leon BLVD. Suite 650, Coral Gables, FL 33134, 305-614-4071

### DEFENDANTS
INTERNAL REVENUE SERVICE AND U.S.
DEPARTMENT OF THE TREASURY

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excl. Veterans) | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | | | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Acts | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - Med. Malpractice | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| | | | | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

### VI. RELATED/ RE-FILED CASE(S)
(See instructions): a) Re-filed Case ☐ YES ☒ NO   b) Related Cases ☐ YES ☒ NO
JUDGE: DOCKET NUMBER:

### VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*
26 USC 6103, 26 USC 7431
LENGTH OF TRIAL via 4-5 days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 10,000,000,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**
DATE 1/29/2026
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY : RECEIPT #** ____ **AMOUNT** ____ **IFP** ____ **JUDGE** ____ **MAG JUDGE** ____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.** **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

# Exhibit L

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

      Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on Plaintiffs' Consent Motion for a 90 Day
Extension ("***Motion***") (DE 40). In the Motion, Plaintiffs ask the Court "to grant an extension
for a period of ninety (90) days in all proceedings in this matter." (DE 40 at 1). The only
scheduled event at issue is Defendants' response to the Complaint. For the reasons
stated below, the Court will, *sua sponte*, stay Defendants' obligation to respond and set
a briefing schedule to address the question of the Court's subject matter jurisdiction.

### I.    BACKGROUND

On January 29, 2026, Plaintiffs President[1] Donald J. Trump ("***President Trump***"),
Donald J. Trump Jr., Eric Trump, and The Trump Organization LLC (collectively,
"***Plaintiffs***") filed a complaint against Defendants the Internal Revenue Service ("***IRS***")
and the United States Department of the Treasury ( "***Treasury,***" and, together with the
IRS, "***Defendants***") (DE 1; "***Complaint***"). In the Complaint, Plaintiffs assert two counts:

---

[1] In their Complaint, Plaintiffs state that "President Trump is bring[ing] this suit in his
personal capacity." (DE 1 at 1). The Court notes, however, that President Trump's political
title is used in the caption and throughout the Complaint.

violations of 26 U.S.C. § 6103 and 26 U.S.C. § 7431(a)(1) ("**Count I**") and violation of 5 U.S.C. § 552a(e)(10) ("**Count II**"). Before Defendants could respond to the Complaint, Plaintiffs filed the instant Motion, requesting a global extension of time so the Parties can "engage in discussions designed to resolve the matter[.]" (DE 40 at 2).

## II.    DISCUSSION

"Federal courts are courts of limited jurisdiction." *Isom v. Bulso*, No. 20-14074, 2022 WL 682215, at *4 (11th Cir. 2022) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "We possess only that power authorized by Constitution and statute." *Id.* (internal quotations omitted). Thus, this Court has "an independent obligation to police the constitutional and statutory limits on [its] jurisdiction." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997). One such constitutional mandate is set forth in Article III, which limits federal courts to adjudicating "Cases" or "Controversies." U.S. CONST. art. III, § 2; *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021). "The existence of a case or controversy is a "bedrock requirement" of our jurisdiction; we cannot exercise judicial power without it." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). Accordingly, before the Court can rule on Plaintiffs' Motion, it must first confirm its jurisdiction.

A key characteristic of the case or controversy requirement is the existence of adverseness, or "a dispute between parties who face each other in an adversary proceeding." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 242 (1937). "There must be an honest and actual antagonistic assertion of rights by one individual against another, which is neither feigned nor collusive." *Muransky*, 979 F.3d at 981 (internal quotation marks and citations omitted). Typically, adverseness is found in a

situation where one party is asserting its right and the other party is resisting. *Nat'l Lab. Rels. Bd. v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 400 (4th Cir. 2022) (internal quotations and citations omitted). Consequently, if there is no adverseness, there is no case or controversy. *See Druhan v. Am. Mut. Life,* 166 F.3d 1324, 1326 (11th Cir. 1999).

In the instant case, Defendants have not yet filed any notices of appearance. Nonetheless, the Parties have advised the Court that they are engaging in discussions to resolve this matter. Moreover, although President Trump avers that he is bringing this lawsuit in his personal capacity, he is the sitting president and his named adversaries are entities whose decisions are subject to his direction.[2] Indeed, President Trump's own remarks about this matter acknowledge the unique dynamic of this litigation.[3] Accordingly, it is unclear to this Court whether the Parties are sufficiently adverse to each other so as to satisfy Article III's case or controversy requirement.

---

[2] President Trump has issued multiple executive orders which shape the relationship of the agencies of the executive branch to his presidency. For example, "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law . . . that contravenes the President['s] . . . opinion on a matter of law, including but not limited to . . . positions advanced in litigation[.]" Exec. Order No. 14215, § 7. One such employee of the executive branch, the Attorney General, has a statutory obligation to defend the IRS when it is hailed into court, but then is ostensibly required by executive mandate to adhere to the President's opinion on a matter of law in such a case. This raises questions over whether the Parties here are truly antagonistic to each other.

[3] *See, e.g,* White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE; NBC News, *Full Interview: Tom Llamas exclusive with President Trump* (Feb. 8, 2026), at 40:10, https://www.youtube.com/watch?v=EJfyAcfE5HM.

## III.    CONCLUSION

The Court hoped to evaluate this issue after Defendants responded to the Complaint. However, in light of Plaintiffs' Motion, the Court will ask the Parties to address the question of subject matter jurisdiction before addressing the relief requested in the Motion.

Accordingly, it is **ORDERED AND ADJUDGED** that, by May 20, 2026, the Parties shall each file a memorandum of law that addresses the issue of whether a case and controversy exists in this matter so as to establish the Court's jurisdiction. The Court **SETS** a hearing for 10:00 A.M. on May 27, 2026. The Parties should come prepared to discuss the issues identified above.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 24th day of April, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Exhibit M

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

     Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

     Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court *sua sponte*. As set forth in its Order (DE 41), the Court has concerns about whether it has subject matter jurisdiction in this case. Accordingly, the Court appoints attorneys from the following law firms as *amici curiae* to assist the Court in identifying the applicable law governing an analysis of this issue:

> John Gleeson and David A. O'Neil,
> Debevoise & Plimpton LLP
>
> Donald B. Verrilli, Jr.,
> Munger Tolles & Olson LLP
>
> Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton,
> Selendy Gay PLLC

*See, e.g*, *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint "friends of the court" to assist in their proceedings."); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991) (internal quotations and citations omitted) ("[I]t is solely within the discretion of the court to determine the fact, extent, and manner of participation by the *amicus*.").

The *amici* shall file a memorandum addressing this Court's subject matter jurisdiction by May 21, 2026.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>29th</u> day of April, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Exhibit N

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY<br><br>*Defendants.* | No. 1:26-cv-20609-KMW |

**PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL WITH PREJUDICE**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1)(A)(i)**

Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump

Organization, LLC (collectively, "Plaintiffs"), by and through undersigned counsel, hereby give

notice of the voluntary dismissal of this action **with prejudice** pursuant to Federal Rule of Civil

Procedure 41(a)(1)(A)(i).[1]

Defendants Internal Revenue Service and the United States Department of the Treasury

have neither served an answer nor a motion for summary judgment in this action. Accordingly,

voluntary dismissal under Rule 41(a)(1)(A)(i) is available as of right, and requires neither leave of

Court nor the consent of any party. *See* Fed. R. Civ. P. 41(a)(1)(A)(i); *Matthews v. Gaither*, 902

---

[1] Although Rule 41(a)(1)(A)(i) filings are sometimes colloquially styled as "motions," the Eleventh Circuit has made clear that a Rule 41(a)(1)(A) dismissal is self-executing, terminates the action upon filing, and divests the district court of jurisdiction. See *Est. of W. v. Smith*, 9 F.4th 1361, 1367–68 (11th Cir. 2021); *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1277–78 (11th Cir. 2012). Plaintiffs accordingly file this document as a Notice rather than a motion, as the notice does not require judicial action. *Est. of W.*, 9 F.4th at 1368.

F.2d 877, 880 (11th Cir. 1990) (a notice of voluntary dismissal under Rule 41(a)(1) is effective immediately upon filing); *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1277–78 (11th Cir. 2012) (Rule 41(a)(1) dismissals are "self-executing," and divest the district court of jurisdiction upon filing); *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1358 (11th Cir. 1999) ("When a plaintiff takes a voluntary dismissal, the effect is to remove completely from the court's consideration the power to enter an order, equivalent in all respects to a deprivation of 'jurisdiction.'") (cleaned up). The same principle applies to all dismissals under Rule 41(a)(1)(A), including those under Rule 41(a)(1)(A)(i). *See Matthews*, 902 F.2d at 880; *Anago Franchising*, 677 F.3d at 1278; *see also Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (Rule 41(a)(1) terminates the action upon filing, and "[n]o order of the district court is required to put the dismissal into effect" (cleaned up)). Upon the filing of this Notice, no judicial analysis is appropriate, and any "subsequent order purporting to dismiss 'all claims' . . . [would be] a nullity." *Est. of W.*, 9 F.4th at 1368.

Each party shall bear its own attorneys' fees and costs.

Dated: May 18, 2026

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ Alejandro Brito
ALEJANDRO BRITO
Florida Bar No. 098442
Primary: abrito@britopllc.com

/s/ Daniel Z. Epstein
DANIEL Z. EPSTEIN
D.C. Bar No. 1009132
EPSTEIN & CO. LLC
E-mail: dan@epsteinco.co

*Counsel to Plaintiffs President
Donald J. Trump et al.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2026, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

/s/ Alejandro Brito

# Exhibit O



### ← Truth Details
5194 replies



**Donald J. Trump** ✔ ➕
@realDonaldTrump

I gave up a lot of money in allowing the just announced Anti-Weaponization Fund to go forward. I could have settled my case, including the illegal release of my Tax Returns and the equally illegal BREAK IN of Mar-a-Lago, for an absolute fortune. Instead, I am helping others, who were so badly abused by an evil, corrupt, and weaponized Biden Administration, receive, at long last, JUSTICE! President DJT

**10.9k** ReTruths   **47.6k** Likes                    May 22, 2026, 9:49 AM

# Exhibit P

Case 1:26-cv-01399-JMB-JDP   Document 25-1   Filed 05/28/26   Page 114 of 172
PageID# 293

# The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway

Officials wrote a memo outlining ways to challenge President Trump's suit against the Internal Revenue Service. The administration is instead creating a compensation fund.

 Listen · 7:19 min

 **By Andrew Duehren**
Reporting from Washington

May 19, 2026

Lawyers at the Internal Revenue Service sought to contest President Trump's lawsuit against the agency, recommending several potential defenses in a case that the Justice Department nevertheless decided to resolve by creating an extraordinary $1.8 billion fund that could soon be used to pay Mr. Trump's political allies.

I.R.S. officials prepared a 25-page memorandum outlining what they saw as flaws in Mr. Trump's suit and advising the Justice Department to move to dismiss it, according to two people familiar with the memo. That memo was provided to Treasury officials in April, and it is unclear if they passed it along to its intended recipients at the Justice Department, according to the people, who spoke anonymously to discuss internal government deliberations.

No lawyers from the Justice Department ever appeared in court to respond to the suit or disputed any of Mr. Trump's claims, which demanded at least $10 billion from the I.R.S. for not doing enough to prevent the leak of his tax information. The Justice Department instead made a highly unusual deal in the case. In exchange

Case 1:26-cv-01399-JMB-JDD    Document 25-1    Filed 05/28/26    Page 115 of 172
PageID# 294

for Mr. Trump's dropping the suit, the Trump administration created the $1.776 billion "anti-weaponization" fund for people who say they were wrongly targeted by the federal government.

The existence of the internal memo, which has not been previously reported, shows that the Trump administration disregarded readily available defenses to a lawsuit filed by the president against an agency he controls. While the Justice Department has said that Mr. Trump will not receive money from the new fund, critics have slammed the arrangement as a corrupt attempt at paying Mr. Trump's political supporters, including, potentially, those who were convicted and later pardoned for storming the Capitol on Jan. 6, 2021.

The Treasury Department and the I.R.S. did not respond to requests for comment. The Justice Department did not respond to questions about why it chose to settle the case.

Todd Blanche, the acting attorney general, will be able to appoint five people to a commission that will oversee the disbursement of the money, though Mr. Trump can fire any of those people at will. The Justice Department has so far offered few other details about who will be eligible for payments from the fund.

Among Republicans on Capitol Hill and within the Trump administration, there has been concern about the fund. Brian Morrissey, a Trump appointee and the general counsel at the Treasury Department, resigned on Monday soon after its creation.

On Tuesday, the Justice Department expanded its agreement with Mr. Trump, promising that the I.R.S. would drop any audits of him, his family or related entities. I.R.S. procedures call for an annual audit of the president's tax returns, but is unclear if any of the Trumps are otherwise currently subject to an I.R.S. exam.

In 2024, The New York Times reported that a loss in an I.R.S. audit could cost Mr. Trump more than $100 million.

The I.R.S. memo was prepared by career civil servants in the agency's office of chief counsel, who followed the agency's normal procedures for responding to a lawsuit, the people said. While the Justice Department represents the I.R.S. in

Case 1:26-cv-01399-IMB-JDD    Document 25-1    Filed 05/28/26    Page 116 of 172
PageID# 295

federal court, lawyers at the agency routinely provide their views on tax law.

## Are you a federal worker? We want to hear from you.

The Times would like to hear about your experience as a federal worker under the second Trump administration. We may reach out about your submission, but we will not publish any part of your response without contacting you first.

Continue »

In the memo, the I.R.S. lawyers laid out several issues with Mr. Trump's suit that they thought the federal government should point out in court.

One was that Mr. Trump might have filed his suit too late. Federal law allows people to sue the I.R.S. if their tax information is released without authorization, but they must do so within two years. In his suit, Mr. Trump said he did not become aware that his tax information had been leaked from the I.R.S. until he received an official notice from the agency on Jan. 29, 2024, exactly two years before he filed the complaint this January.

But the I.R.S. memo calls that claim into question. It refers to the fact that Alina Habba, a personal lawyer for Mr. Trump, appeared in court when Charles Littlejohn, a former I.R.S. contractor, pleaded guilty to leaking the tax information of Mr. Trump and thousands of wealthy Americans, according to the people familiar with it. That was in October 2023, more than two years before Mr. Trump filed his suit.

Another recommendation in the memo, according to the people with knowledge of it, was for the Justice Department to challenge whether the I.R.S. could be held liable for the conduct of Mr. Littlejohn.

Mr. Littlejohn was employed by the consulting firm Booz Allen Hamilton when he leaked the tax information to The Times and ProPublica in 2019 and 2020. In response to other suits stemming from the same leaks, lawyers for the Justice Department took the position that people could not blame the I.R.S. for the behavior of Mr. Littlejohn because he was a contractor.

Case 1:26-cv-01399-JMB-JDD    Document 25-1    Filed 05/28/26    Page 117 of 172
PageID# 296

Those arguments may or may not have succeeded in court. The I.R.S. did settle a case brought by the hedge fund billionaire Ken Griffin over the leak of his tax information. In that instance, the government did not make any payments but publicly apologized to Mr. Griffin.

Mr. Trump, who sued the I.R.S. alongside two of his sons and his family businesses, will also receive an apology as part of the settlement with the Justice Department.

While I.R.S. lawyers followed the typical process for responding to a lawsuit, officials at the Justice Department did not. Lawyers at the Justice Department struggled with whether they could oppose a lawsuit filed by Mr. Trump, The Times previously reported, given that he leads the executive branch and signed an order binding government lawyers to his view of the law.

When the Justice Department neared the mid-April deadline for responding to Mr. Trump's suit in court, Mr. Trump's personal lawyers, rather than the government, asked the judge to extend the deadline. Lawyers for Mr. Trump, in that filing, said they were in talks with unnamed officials at the Justice Department.

That prompted the judge overseeing the case, Kathleen M. Williams of the Southern District of Florida, to question whether Mr. Trump could legally sue an agency that he controls as president. She ordered Mr. Trump's personal lawyers and the Justice Department to write briefs discussing whether they were actually in opposition to each other — or if they were, in fact, on the same side of the suit. Such collusion would require the judge to dismiss it.

The parties had until Wednesday to write those briefs. But Mr. Trump withdrew his suit on Monday, the same day the Justice Department rolled out the anti-weaponization fund. Judge Williams closed the case.

Frank Bisignano, who is working in the newly created role of chief executive of the I.R.S., signed the agreement with the Justice Department to create the fund. Mr. Bisignano was not confirmed by the Senate to that I.R.S. job, and he is splitting his duties there with his job as the commissioner of the Social Security Administration.

**Andrew Duehren** covers tax policy for The Times from Washington.

A version of this article appears in print on , Section A, Page 18 of the New York edition with the headline: Memo Shows I.R.S. Had Plan to Fight Suit, but Justice Dept. Gave In

# Exhibit Q



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:          THE ATTORNEY GENERAL

SUBJECT:       REINSTATING THE PROHIBITION ON IMPROPER THIRD-PARTY SETTLEMENTS[1]

       Department of Justice attorneys sometimes settle civil and criminal matters to achieve justice at a reasonable cost to the taxpayer. Settlements, including civil settlement agreements, deferred prosecution agreements, non-prosecution agreements, and plea agreements, are a useful tool for Department attorneys, and should be used, first and foremost, to compensate victims, redress harm, or punish and deter unlawful conduct. Except in limited circumstances, however, settlements should not be used to require payments to non-governmental, third-party organizations that were neither victims nor parties to the lawsuits.

       To avoid the improper use of settlements to funnel payments to non-governmental, third-party organizations, I hereby rescind the May 5, 2022 Memorandum from the Attorney General entitled *Guidelines and Limitations for Settlement Agreements Involving Payments to Non-Governmental Third Parties* and the July 28, 2023 Memorandum from the Assistant Attorney General for the Environmental and Natural Resources Division entitled *Community Service Payments in Environmental Crimes Cases*.

       Moreover, I am directing the Associate Attorney General to provide a report to me within 30 days concerning strategies and measures that can be utilized to eliminate the illegal or improper use memoranda to direct payments to non-governmental, third-party organizations that were neither victims nor parties to the lawsuits.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

# Exhibit R



**EXCLUSIVE**

JUSTICE DEPARTMENT

# DOJ official told GOP ally that big payouts were coming for Jan. 6 defendants

Months before the $1.8 billion "anti-weaponization" fund was announced, Ed Martin predicted Capitol rioters would get millions, even if it took until 2028, two people told NBC News.

▶ **Listen to this article with a free account**

00:00                                                    10:16    1x    ⓘ



— Supporters of President Donald Trump rally at the U.S. Capitol on Jan. 6, 2021.

Jose Luis Magana / AP file

May 19, 2026, 5:43 PM EDT / Updated May 20, 2026, 12:44 PM EDT

By Ryan J. Reilly

Earlier this year, not long after Trump administration official Ed Martin was stripped of his role as head of the Justice Department's "weaponization" working group that targeted the president's political foes, he sat down for breakfast at an upscale spot near the White House.

---

 **Subscribe to read this story ad-free**
Get unlimited access to ad-free articles and exclusive content.

---

Inside the Peacock Lounge at the Willard InterContinental in Washington D.C., Martin dined with Republican operative Norm Coleman.

The two touched on the upcoming 2026 midterm elections, D.C. federal grand juries and former special counsel Jack Smith, according to two people with direct knowledge of their conversation.

Martin also predicted the Justice Department would dole out millions of dollars to those charged, and then later pardoned, in the Jan. 6, 2021, riot at the U.S. Capitol, the people said. Even if it took until the end of President Donald Trump's term.

Martin estimated it would be something like $40 million, the people said.

The pot ended up much, much larger.

This week, the Justice Department announced a $1.776 billion fund using taxpayer dollars to provide payouts for those "who suffered weaponization and lawfare" at the hands of the government. The money comes as part of a settlement with President Donald Trump, who sued the executive branch that he oversees – an unprecedented legal move, experts said.

Trump, his sons and the Trump Organization filed a $10 billion lawsuit against the Internal Revenue Service over the leak of his tax returns, and he made other claims of damages in connection with a 2022 search of his Florida home and the investigation into Russian interference in the 2016 election.

As part of the agreement to drop the claims, the fund was born.

Responding to an email asking about his discussion with Martin, Coleman, a former senator from Minnesota, wrote the people "must have taken part of a conversation totally out of context" and said he had "no interest in discussing snippets of breakfast conversation with a friend."

5/27/26, 3:53 PM
Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 124 of 172
DOJ official told GOP ally that big payouts were coming for Jan. 6 defendants
PageID# 303

Martin did not respond to a request for comment, and the White House referred a request for comment to the Justice Department. Before the fund was announced, a Justice Department spokesperson said that Martin "did not make these remarks," though they did not say which aspect of the comments was in dispute.



—— Ed Martin speaks at a news conference outside the Republican National Committee on Capitol Hill on Nov. 5, 2020. Al Drago / Getty Images file

Ed Martin has been one of the biggest supporters of Jan. 6 defendants in the Trump administration. The conservative activist called for "die-hard true Americans" to work until their "last breath" to "stop the steal" of the 2020 presidential election in a speech at the Capitol on the eve of Jan. 6, 2021.

Martin got to know Trump when he hosted fundraisers for Capitol siege defendants on Trump properties. Martin was then named interim top federal prosecutor in the District of Columbia,

where he oversaw the dismissal of hundreds of Jan. 6 cases and the firing or demotions of dozens of prosecutors who worked on the case.

It was his support for the "J6ers" that cost him the backing of Sen. Thom Tillis, R-N.C., who blocked Martin's confirmation to hold the post permanently.

He told a conservative podcaster that Tillis asked him if he favored "reparations" for Jan. 6 rioters. "We should do it, we shouldn't be afraid," Martin said in the May 2025 interview. "You're damn right I want to pay J6ers. If you got wronged by the government, then you should be made right. That's America."

Jan. 6 officers sue over Justice Department's $1.8 billion 'anti-weaponization' fund
03:57



After the fund was announced Monday, Martin praised the decision in an online post.

"To the survivors of political weaponization: The lesson of the last few days is to never stop fighting. Never stand down, never disarm, and follow the lead of President Trump who never stops fighting," he posted on X.

Acting Attorney General Todd Blanche, testifying before the Senate Appropriations Committee on Tuesday, said that anyone may apply to receive a payout, though decisions on who or how much they receive will be made by a commission made up of five members; four chosen by

Blanche, and one chosen by Blanche in consultation with Congress. Trump can remove anyone he chooses. Justice officials did not say whether Martin would be one of them.

Blanche said there was a broad lane for anyone to apply who felt they were the victims of a weaponized government.

"So whether you're Hunter Biden, or whether you're another individual who believed they were a victim of weaponization, they can all apply," he said, referring to the son of former President Joe Biden who was convicted of gun charges in a case he decried as political.

Applying doesn't mean a guarantee of money, and Blanche insisted that Jan. 6 rioters weren't automatically going to be paid out.

"Does it mean they're going to get money? No," he said. "It just means they are allowed to apply."

That's not how rioters see it.

Thousands of Trump supporters stormed the Capitol on Jan. 6, 2021, in a failed effort to stop the certification of Biden's win. More than 140 police officers were injured in the melee and millions of dollars in damage was done. Five people died, including Jan. 6 rioter Ashli Babbitt, who was shot and killed as she jumped through a broken window leading to the House Speaker's Lobby. The Trump administration settled with her estate last year.

Vice President JD Vance said Tuesday the requests would be evaluated on a case-by-case basis, including possibly those accused of harming police.

"We're trying to compensate people where the book was thrown at them, they were mistreated by the legal system," Vance said.

The president has described the rioters as peaceful protesters. During his 2024 presidential campaign, Trump began to suggest he would pardon some of the 1,500 people charged by the Justice Department in the largest single prosecution in the department's history.

On his first day back in office, Trump pardoned the majority, while erasing punishments for a handful of others.



—    President Donald Trump at a rally near the U.S. Capitol on Jan. 6, 2021.    Jacquelyn Martin / AP file

There was already a growing legal effort to win civil settlements, but until news of the fund was made public, the Justice Department had been defending Jan. 6-related lawsuits. It's not clear whether those suits will still be defended.

It may not matter. Two lawyers who were involved with the legal effort and say they represent more than 400 Jan. 6 participants said Tuesday that they expected their clients to apply through the fund, rather than continue with litigation.

Martin has been a critical player in the effort, they said. Even after he was pushed out as head of the "weaponization working group," Martin has maintained influence in the Trump administration. He's frequently seen at the White House, and continues in the role of U.S. pardon attorney, advising the president on clemency actions.

"Ed's a real trouper for us," said one of the Jan. 6 lawyers, Mark McCloskey, a St. Louis-based attorney behind one of the legal efforts. McCloskey and another lawyer, Peter Ticktin, who

attended the New York Military Academy with the president, said they had been lobbying the White House for payouts on behalf of their clients.

In an interview after Monday's announcement, McCloskey said he was "pretty darn excited" about the fund, calling it "very similar" to what they had been suggesting.

"It's a program that we've been lobbying for for the past 13, 14 months, and I couldn't be happier that it's finally coming to fruition," McCloskey said.

"It was kind of shocking to me ... with all the other things going on, that he would do this right now," McCloskey said. "I thought his mind would be occupied elsewhere, but I'm very pleased that he paid attention."

Ticktin, who had criticized Blanche for not taking action for the Jan. 6 defendants sooner, credited Trump with pushing forward with the fund.

"We're moving in the direction that the president had originally wanted to go," Ticktin said. "For some reason it wasn't happening in the DOJ under Todd Blanche, and now it is happening under Todd Blanche, I think because he's looking for the position of attorney general, so now he has to show that he can perform."

Blanche has repeatedly denied that he's auditioning for the job, but has said it would be an honor to be nominated.

The news of the fund, which is expected to be challenged in court, drew immediate scrutiny from Democrats, who described it as a slush fund for Trump allies, and from some Republicans.

"Not a big fan," said Senate Majority Leader John Thune, R-S.D., said Tuesday. "I'm not exactly sure how they would use it ... But yeah, I don't see a purpose for that."

Skye Perryman, the president and CEO of Democracy Forward, a national legal group formed in the wake of the 2016 presidential election, said there was no legal authority for it. The group on has demanded Trump administration officials preserve their internal communications over the decision, a sign of an upcoming legal challenge.

Unlike a civil lawsuit, where a federal judge adjudicates claims, evidence is gathered and legal arguments are made in open court, the Justice Department's fund will have no other oversight aside from the commissioners and Justice Department. There will be little ability to scrutinize how the taxpayer money is spent or to whom the money is awarded.

'Anybody can apply': Blanche pressed over who can get compensation from DOJ fund

01:15



Last year, one Jan. 6 defendant, Andrew Paul Johnson, posted online that he was expecting "restitution" for Jan. 6 defendants. Months later, after he was arrested on charges of child molestation, law enforcement officials said Johnson tried to bribe a victim with the money he expected to get from the Trump administration.

At the Senate hearing on Tuesday, Blanche tried to slough off any knowledge that Jan. 6 rioters had been seeking what they have called reparations, and said the fund would be doled out on a "case-by-case basis." But he would not say whether rioters would not be allowed to partake.

"You're asking me to speculate on the possibility of something," he told lawmakers.

Sen. Chris Van Hollen, D-Md., exasperated, asked whether Blanche could say that Johnson, who was convicted and sentenced to life in prison this year, would be barred from receiving money from the fund.

Blanche said he found the details of the case "disgusting."

But he wouldn't say whether Johnson was eligible for money.

---

🔺    Ryan J. Reilly

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 130 of 172
PageID# 309



Ryan J. Reilly is a justice reporter for NBC News.

Frank Thorp V and Katie Taylor contributed.

# Exhibit S



# Trump floats possibility of compensation for Jan. 6 rioters

"A lot of the people that are in the government now talk about it," the president said.



President Donald Trump delivers remarks in the Roosevelt Room at the White House in Washington, Monday, March 24, 2025. (Pool via AP) | AP

By SEB STARCEVIC
03/25/2025 11:00 PM EDT

   

President Donald Trump on Tuesday floated the possibility of financial compensation for people who were prosecuted for taking part in the riot at the Capitol in 2021.

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 133 of 172 PageID# 312

Speaking to Newsmax on Tuesday night, Trump said he had taken "care" of his supporters who attempted to overturn his 2020 election loss and added there is "talk" about compensating them.

Advertisement

AD

"A lot of the people that are in the government now talk about it because a lot of the people in government really like that group of people," he said, referring to the Jan. 6 defendants, who he described as protesting "peacefully and patriotically."

Some of the freed Jan. 6 rioters and their advocates, such as Ed Martin, whom Trump appointed to be the top federal prosecutor in Washington, have long called for financial reparations for those who took part in the Capitol attack, many of whom subsequently spent time behind bars.

The president also described himself as a "big fan" of Ashli Babbitt, who was shot and killed by a Capitol police officer as she attempted to climb through a shattered window into the Speaker's Lobby.

"Ashli Babbitt was a really good person who was a big MAGA fan, Trump fan. And she was innocently standing there, they even say trying to sort of hold back the crowd," Trump said. "And a man did something to her that was unthinkable when he shot her."

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 134 of 172 PageID# 313

Asked whether he would take action against the officer who killed Babbitt and is still employed in Capitol law enforcement, Trump said he would "take a look at it." U.S. Capitol Police Lt. Michael Byrd was investigated by the Justice Department for the shooting and cleared of any wrongdoing.

Trump's blanket pardon for his supporters fulfilled one of his key campaign pledges, though he had previously stopped short of promising monetary compensation. The president signed an order on his first day in office granting clemency to about 1,500 rioters who were prosecuted for taking part in the Jan. 6, 2021, attack on the Capitol, including hundreds convicted of assaulting police, carrying firearms and destroying property.

**FILED UNDER:** DONALD TRUMP, JAN. 6 CAPITOL RIOT



## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT







**Prepare for an AI jobs…**

The Economist

**After 60, Leg Strength…**

primenutritionfindings.c…

**Honey: The Greatest…**

The Real Culprit Is Here

Health Weekly

**12 Things To Cut When…**

greensprout.com

**Russia is stumbling o…**

The Economist

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

FAQ

Feedback

Headlines

Photos

Press

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do Not Sell or Share My Personal Information and Opt Out of Targeted Advertising

© 2026 POLITICO LLC

# Exhibit T

5/27/26, 3:59 PM
Case 1:26-cv-01399-LMB-IDD  Document 25-1  Filed 05/28/26  Page 137 of 172
Trump DOJ fund might pay Jan. 6 defendants, Blanche says
PageID# 316

 ⦿ LIVESTREAM  🔍  SIGN IN

**POLITICS**

# Blanche won't rule out Jan. 6 rioters getting Trump DOJ fund payouts

PUBLISHED TUE, MAY 19 2026·11:36 AM EDT   UPDATED TUE, MAY 19 2026·3:29 PM EDT



**Luke Fountain**
@LUKE_FOUNTAIN25

WATCH LIVE

## KEY POINTS

Acting Attorney General Todd Blanche said "anybody" could apply to a new $1.78 billion Justice Department fund created to compensate people who claim they were targeted by the Justice Department during the Biden administration.

Blanche, under questioning from Congress, would not commit to barring payouts to Trump campaign donors or people convicted of assaulting police officers on Jan. 6, 2021.

The fund was announced Monday as part of President Donald Trump's agreement to drop his lawsuit against the IRS over the leak of his tax returns.


MARKETS


VIDEO


WATCHLIST


MENU

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 138 of 172 PageID# 317

● LIVESTREAM                    SIGN IN



**Acting U.S. Attorney General Todd Blanche testifies during a Senate Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related AgenciesHearing in the Dirksen Senate Office Building on Capitol Hill on May 19, 2026 in Washington, DC.**

*Anna Moneymaker | Getty Images*

Acting Attorney General Todd Blanche on Tuesday would not rule out allowing people convicted of assaulting police officers during the Jan. 6, 2021 Capitol riot to seek payments from a new Department of Justice fund created to compensate people who claim they were politically targeted by the Biden administration.

Pressed at a Senate appropriations subcommittee hearing, Blanche said, "anybody in this country can apply" to a new $1.8 billion "Anti-Weaponization Fund" and said a commission would decide the rules for who can receive compensation.

"The commission will set the rules," Blanche said when asked whether members of the Proud Boys, Oath Keepers or others convicted of attacking Capitol Police officers could receive payments. "That's not for me to set. That's for the commissioners."

Vice President JD Vance later Tuesday also declined to say that Jan. 6 defendants would be barred from receiving payments from the fund.

"I'm not committing to giving anybody money or committing to giving no one money," Vance said in a White House press briefing after the hearing.



MARKETS



VIDEO



WATCHLIST

MENU

 ⦿ LIVESTREAM     SIGN IN

officer.

"We're trying to give money — not give money, we're trying to compensate people where the book was thrown at them, they were mistreated by the legal system," Vance said.

Blanche also declined to commit that donors to President Donald Trump's campaigns would be excluded from the fund, saying only that the payments would be governed by the settlement agreement.

When asked, "Will you commit that none of President Trump's family will receive a direct payout from this fund?" Blanche replied, "Yes."

The exchange came a day after the DOJ announced the fund as part of an agreement with Trump that included him dropping his $10 billion lawsuit against the Internal Revenue Service over the leak of his tax returns.

Democrats on the panel criticized Blanche for the fund.

"This all seems to be an obvious abuse of power by the Department of Justice, by the president," Sen. Jack Reed, D-R.I., told Blanche. "You're his appointee, the IRS are his appointees, he's the plaintiff, and the American people, I don't think, are surprised that suddenly all this money is going to his friends or people that he has in his orbit."

The DOJ on Monday said the fund will create a process for people who claim they were victims of "weaponization and lawfare" to seek financial compensation or formal apologies.

The hearing also touched on the resignation of Treasury Department General Counsel Brian Morrissey, which has been reported as linked to the fund's creation, though CNBC has not confirmed the reason.

Asked whether it was a coincidence that Morrissey resigned the same day Treasury was required to certify the payments, Blanche said, "I don't know if it's a coincidence," adding that he had not checked why Morrissey resigned.

A Treasury spokesperson told CNBC: "As general counsel, Brian Morrissey has served the United States Treasury with both honor and integrity. We wish him all the best in his next endeavors."

Democrats and government watchdogs are denouncing the fund as a taxpayer-backed "slush


 

created a fund that would allow his appointees to decide which political allies receive taxpayer funded payments.

"It's not a slush fund," Blanche said. "It's been done many times."

The Justice Department has not yet released detailed eligibility rules for the fund, which will be overseen by a five-member commission appointed by the attorney general.

> Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.

## TRENDING NOW



**Oil prices fall more than 5% after Rubio says U.S. will give Iran talks 'every chance to succeed'**



**Analysis: What Stephen Miller gets wrong about debt, deficits and immigration**



**Dow rises 200 points to record as oil declines, but a pause in the chip rally weighs on the S&P 500**

**Piper Sandler says Strait of Hormuz to remain closed for months and oil to hit new highs**

CLUB **Here's our monthly update on all 33 portfolio stocks, including 4 to buy right now**





Subscribe to CNBC PRO               Subscribe to Investing Club

Licensing & Reprints                CNBC Councils

Select Personal Finance             Join the CNBC Panel

⊙LIVESTREAM          SIGN IN

Corrections                                    About CNBC

Site Map                                       Podcasts

Careers                                        Help

Contact

f    𝕏    in    ◎    ▶    🖼    🔊

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## Advertise With Us

PLEASE CONTACT US

## CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Ad Choices

Privacy Policy

Your Privacy Choices

CA Notice

Terms of Service

© 2026 Versant Media, LLC. All Rights Reserved. A Versant Media Company.

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

## Market Data Terms of Use and Disclaimers

Data also provided by

 

# Exhibit U

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 143 of 172 PageID# 322

 

# Trump Dodges On Whether Violent Jan. 6 Rioters Should Get Payouts From New Fund

**Ryan Grenoble**
Mon, 18 May 2026 at 5:04 pm GMT-51 min read

 Add Yahoo on Google



**Like this article? Keep independent journalism alive. Support HuffPost.**

Donald Trump told reporters Monday he knew "very little" about the $1.7 billion "anti-weaponization fund" the Justice Department has agreed to set up in exchange for the president dropping his lawsuit against his own government for $10 billion.

"Well, it's been very well received," Trump told reporters of the new fund, which he indicated would be used to pay people convicted of storming the U.S. Capitol on Jan. 6, 2021.

"I know very little about it," he claimed. "I wasn't involved in the creation of it and the negotiation."

Case 1:26-cv-01399-LMB-IDD   Document 25-1   Filed 05/28/26   Page 144 of 172
PageID# 323

ADVERTISEMENT

Asked in a follow-up if he believes people who committed violence against police officers should get paid, Trump said it would be up to an as-yet unannounced committee to decide.

"It'll all be dependent on a committee," he said. "A committee's being set up of very talented people, very highly respected people. I think it's a committee of five."

"It's all going to be determined by a group of four to five people that are respected and very brilliant at what they do," he added.

# Exhibit V

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

ETHAN NORDEAN,
JOSEPH BIGGS,
ZACHARY REHL,
ENRIQUE TARRIO, and
DOMINIC PEZZOLA,

*Defendants.*

Criminal Action No. 21-175 (TJK)

**VERDICT FORM**

**Count One: Seditious Conspiracy**

**A. Do you find that the government has proved beyond a reasonable doubt the existence of the conspiracy charged in Count One?**

No _____ Yes __X__

If your answer is "No," you must enter a verdict of Not Guilty as to Count One for each defendant listed in C below.

If your answer is "Yes," answer parts B and C below.

**B. Did the conspiracy charged in Count One include one or both of the following goals?**

> **Goal One:** To oppose by force the authority of the Government of the United States?

> No _____ Yes __X__

> **Goal Two:** To use force to prevent, hinder, or delay the execution of any law of the United States?

> No _____ Yes __X__

1

C. **Verdict as to each defendant:**

    **(1) *Ethan Nordean***

    Not Guilty _____ Guilty _X_

    **(2) *Joseph Biggs***

    Not Guilty _____ Guilty _X_

    **(3) *Zachary Rehl***

    Not Guilty _____ Guilty _X_

    **(4) *Enrique Tarrio***

    Not Guilty _____ Guilty _X_

    **(5) *Dominic Pezzola***

    Not Guilty _X_ Guilty _____

---

**Count Two: Conspiracy to Obstruct an Official Proceeding**

A. **Do you find that the government has proved beyond a reasonable doubt the existence of the conspiracy charged in Count Two?**

    No _____ Yes _X_

    If your answer is "No," you must enter a verdict of Not Guilty as to Count Two for each defendant listed in B below.

    If your answer is "Yes," answer part B below.

B. **Verdict as to each defendant:**

    **(1) *Ethan Nordean***

    Not Guilty _____ Guilty _X_

    **(2) *Joseph Biggs***

    Not Guilty _____ Guilty _X_

**(3) *Zachary Rehl***

Not Guilty _____ Guilty __X__

**(4) *Enrique Tarrio***

Not Guilty _____ Guilty __X__

**(5) *Dominic Pezzola***

Not Guilty _____ Guilty _____

---

**Count Three: Obstruction of an Official Proceeding**

**(1) *Ethan Nordean***

Not Guilty _____ Guilty __X__

**(2) *Joseph Biggs***

Not Guilty _____ Guilty __X__

**(3) *Zachary Rehl***

Not Guilty _____ Guilty __X__

**(4) *Enrique Tarrio***

Not Guilty _____ Guilty __X__

**(5) *Dominic Pezzola***

Not Guilty _____ Guilty __X__

---

**Count Four: Conspiracy to Prevent Members of Congress or Federal Officers from Discharging Their Duties**

A. Do you find that the government has proved beyond a reasonable doubt the existence of the conspiracy charged in Count Four?

No _____ Yes __X__

If your answer is "No," you must enter a verdict of Not Guilty as to Count Four for each defendant listed in C below.

If your answer is "Yes," answer parts B and C below.

**B. Did the conspiracy charged in Count Four include one or both of the following goals?**

> **Goal One:** To prevent a Member of Congress or federal officer from discharging a duty as a Member of Congress or federal officer?

> No _____ Yes _X_

> **Goal Two:** To induce a Member of Congress or federal officer to leave the place where the Member of Congress or federal officer's duties are required to be performed?

> No _____ Yes _X_

**C. Verdict as to each defendant:**

> **(1) *Ethan Nordean***

> Not Guilty _____ Guilty _X_

> **(2) *Joseph Biggs***

> Not Guilty _____ Guilty _X_

> **(3) *Zachary Rehl***

> Not Guilty _____ Guilty _X_

> **(4) *Enrique Tarrio***

> Not Guilty _____ Guilty _X_

> **(5) *Dominic Pezzola***

> Not Guilty _____ Guilty _X_

---

## Count Five: Obstructing Officers During a Civil Disorder

> **(1) *Ethan Nordean***

> Not Guilty _____ Guilty _X_

**(2)** *Joseph Biggs*

Not Guilty _____ Guilty _X_

**(3)** *Zachary Rehl*

Not Guilty _____ Guilty _X_

**(4)** *Enrique Tarrio*

Not Guilty _____ Guilty _X_

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _X_

---

## Count Six: Destruction of Government Property of Value Over $1,000 (fence)

**(1)** *Ethan Nordean*

Not Guilty _____ Guilty _X_

**(2)** *Joseph Biggs*

Not Guilty _____ Guilty _X_

**(3)** *Zachary Rehl*

Not Guilty _____ Guilty _X_

**(4)** *Enrique Tarrio*

Not Guilty _____ Guilty _X_

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _X_

If you find a defendant Not Guilty of Count Six, proceed to Count Six (A). If you find a defendant Guilty of Count Six, do not answer Count Six (A).

5

**Count Six (A): Destruction of Government Property of Value Less Than $1,000 (fence)**

    **(1)** *Ethan Nordean*

    Not Guilty _____ Guilty _____

    **(2)** *Joseph Biggs*

    Not Guilty _____ Guilty _____

    **(3)** *Zachary Rehl*

    Not Guilty _____ Guilty _____

    **(4)** *Enrique Tarrio*

    Not Guilty _____ Guilty _____

    **(5)** *Dominic Pezzola*

    Not Guilty _____ Guilty _____

---

**Count Seven: Destruction of Government Property of Value Over $1,000 (Capitol window)**

    **(1)** *Ethan Nordean*

    Not Guilty _____ Guilty _____

    **(2)** *Joseph Biggs*

    Not Guilty _____ Guilty _____

    **(3)** *Zachary Rehl*

    Not Guilty _____ Guilty _____

    **(4)** *Enrique Tarrio*

    Not Guilty _____ Guilty _____

    **(5)** *Dominic Pezzola*

    Not Guilty _____ Guilty __X__

If you find a defendant Not Guilty of Count Seven, proceed to Count Seven (A). If you find a defendant Guilty of Count Seven, do not answer Count Seven (A).

**Count Seven (A): Destruction of Government Property of Value Less Than $1,000 (Capitol window)**

**(1)** *Ethan Nordean*

Not Guilty _____ Guilty _____

**(2)** *Joseph Biggs*

Not Guilty _____ Guilty _____

**(3)** *Zachary Rehl*

Not Guilty _____ Guilty _____

**(4)** *Enrique Tarrio*

Not Guilty _____ Guilty _____

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _____.

---

**Count Eight: Assaulting, Resisting, or Impeding Certain Officers (water bottle)**

**(1)** *Ethan Nordean*

Not Guilty _____ Guilty _____

**(2)** *Joseph Biggs*

Not Guilty _____ Guilty _____

**(3)** *Zachary Rehl*

Not Guilty _____ Guilty _____

**(4)** *Enrique Tarrio*

Not Guilty _____ Guilty _____

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _____

---

**Count Nine:** **Assaulting, Resisting, or Impeding Certain Officers (riot shield)**

**(1)** *Ethan Nordean*

Not Guilty _X_ Guilty _____

**(2)** *Joseph Biggs*

Not Guilty _X_ Guilty _____

**(3)** *Zachary Rehl*

Not Guilty _X_ Guilty _____

**(4)** *Enrique Tarrio*

Not Guilty _X_ Guilty _____

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _X_

---

**Count Ten: Robbery of Personal Property of the United States**

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _X_

If you find the defendant Not Guilty of Count Ten, proceed to Count Ten (A). If you find the defendant Guilty of Count Ten, do not answer Count Ten (A).

**Count Ten (A): Theft of United States Government Property**

**(5)** *Dominic Pezzola*

Not Guilty _____ Guilty _____

---

Date: **May 4** , 2023

Signature of Foreperson

# Exhibit W



## Why Enrique Tarrio thinks he could get money from the new anti-weaponization fund
(07:21)

Facing South Florida

# Proud Boys leader Enrique Tarrio expects "tens of millions" from anti-weaponization fund

By Jim DeFede

May 24, 2026 / 10:30 AM EDT / CBS Miami

⊞ Add CBS News on Google

Enrique Tarrio, the former national head of the Proud Boys, who was convicted of seditious conspiracy for his role in the January 6 attack on the Capitol, says he will seek millions of dollars from the fund President Trump created to pay his supporters who believe they have been politically persecuted.

"Look, people don't have to like me, but to say that I got 22 years correctly, is wrong," Tarrio told CBS News Miami. "I was targeted and I do believe that this fund does apply to me."

Tarrio said since President Trump announced the formation of the $1.8 billion so-called anti-weaponization fund, he has been inundated with calls from others convicted for January 6 related activities.

"I've gotten probably a million calls in the past three days from J-6ers that are like, okay, how does this work?" Tarrio told CBS Miami's Jim DeFede. "And I'm like, look, I'm not, I'm not a guru. I don't I don't know how this works. I can only speculate."

Case 1:26-cv-01399-LMB-JDD   Document 25-1   Filed 05/28/26   Page 157 of 172 PageID# 336

Watch CBS News

The fund has drawn widespread outrage from both Democrats and Republicans in Congress as Acting Attorney General Todd Blanche has offered no clear guidance on who would qualify for the money, or how it will be distributed. Blanche refused to rule out the notion that individuals convicted of assaulting police officers would be eligible to obtain money.

"Look, I get the argument that, 'Oh, well, do these people that assault police officers get it?'" Tarrio responded "And the truth is If they were weaponized against that, that is the parameter, if they were weaponized. It doesn't mean we're compensating these people just because they assaulted police officers, it's because of the system that they were in."

"I get it," Tarrio said. "People that did bad things, you don't want to give money from the government to. But it doesn't matter because the baseline of this is weaponization. Were you persecuted?"

Tarrio was convicted in May 2023 by a jury in Washington that found he helped orchestrate the attack on the Capitol from a hotel room in Baltimore. Prosecutors presented evidence showing Tarrio created a special chapter of the Proud Boys known as the "Ministry of Self-Defense." The group's goal was to prevent the certification of the 2020 election in which Trump lost to Joe Biden. Prosecutors also revealed private messages to from Tarrio to senior leaders of the Proud Boys taking credit for the insurrection.

According to the Justice Department, at least 140 law enforcement officers were injured during the attack, which went on for hours. U.S. District Court Judge Timothy

Proud Boys leader Enrique Tarrio expects tens of millions from anti-weaponization fund - CBS Miami

Watch CBS News

Kelly found that Tarrio's conduct was so egregious, it qualified as an act of terrorism and sentenced him to 22 years in prison.

Tarrio served three years before Trump granted him, and the other 1,600 people convicted in the January 6 attack, a full pardon.

Exactly how much - if anything - Tarrio will receive is unclear.

Tarrio, who said he is currently the president of the South Florida chapter of the Proud Boys, said if he was looking for "some type of restitution for the things that, like, I went through and my family was put through, yeah, I think it might be in the tens of millions." But he added he does not know how the money will be divided and the $1.8 billion might not be enough.

Tarrio predicted many of the January 6 individuals will be "philanthropic" with their payouts from the fund.

"I think you're going to see a lot of philanthropic endeavors come from this money when it comes to J-6ers," Tarrio said. "J-6ers are very adamant on creating changes. And I think that you'll see people start, you know, maybe some of them will use it to run for office. You know, local offices don't require a lot of money raised in order to campaign."

Tarrio said he would also like to run for office someday in South Florida. He said his ultimate goal it be elected to Congress.

Tarrio said he was grateful to President Trump.

"I won't say I expected it to happen," he said. "I think this is a campaign promise, making our lives whole. I think these are promises made, promises kept. I'm very thankful to the President for everything he's done."

In:   **Proud Boys**   **South Florida**

© 2026 CBS Broadcasting Inc. All Rights Reserved.

**Featured**

Trump News

Iran War Coverage

2026 NFL Schedule

2026 USMNT World Cup Roster

**Follow Us On**

YouTube

Facebook

Instagram

X

**CBS News Miami**

Meet the Team

Program Guide

Contests & Promotions

Advertise With Us

Terms & Conditions

Sitemap

**Regulation**

**Watch CBS News**

Public File for WFOR-TV

Public File for WBFS-TV

Public Inspection File Help

FCC Applications

EEO Report

**Privacy**

Privacy Policy

California Notice

Your Privacy Choices

Terms of Use

Minors' Privacy Policy

**Company**

About Paramount

Advertise With Paramount

Join Our Talent Community

Help

Feedback

Contact the Ombudsman

©2026 CBS Broadcasting Inc. All Rights Reserved.

# Exhibit X

 **Michael Caputo** ✔
@MichaelRCaputo



The machinery of government was clearly politically weaponized against my family from July 2016 to December 2025. They found nothing; we lost everything.

#AWF



**MICHAEL R. CAPUTO**

May 19, 2026

The Honorable Todd Blanche
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Acting Attorney General Blanche:

As survivors of the illegal Russiagate investigations, our family was encouraged by news of the Anti-Weaponization Fund. I write with profound gratitude to you and President Donald J. Trump for creating a process to right these wrongs.

I was a 2016 target of the illegal Crossfire Hurricane investigation and our family suffered greatly during that dark era of political weaponization. As soon as Joe Biden was inaugurated in 2021, his FBI initiated yet another secret criminal investigation into me, this time regarding my One America News documentary, "The Ukraine Hoax," which detailed Biden corruption in Ukraine. This investigation continued during the entire Biden presidency and for the first full year of President Trump's new term.

The machinery of government was clearly politically weaponized against my family from July 2016 to December 2025. This nine-year assault drained our savings, destroyed our peace of mind, ruined my career, wrecked my health, and wreaked far more havoc on our family. They found nothing; we lost everything.

I respectfully request $2.7 million in restitution and reimbursement from the Anti-Weaponization Fund to help repair what what is left of our family. The costs of the decade-long attack are difficult to enumerate so this amount may change.

Despite all this, we never stopped trusting the President; we knew he would never let this injustice stand. There are thousands of families just like ours, all remnants of political weaponization, who are heartened by this announcement during the 250th birthday of our nation – a truly historic act of Presidential mercy in a jubilee year.

Sincerely,

Michael R. Caputo

7:17 PM · May 19, 2026 · **60.5K** Views

# MICHAEL R. CAPUTO



May 19, 2026

The Honorable Todd Blanche
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Dear Acting Attorney General Blanche:

As survivors of the illegal Russiagate investigations, our family was encouraged by
news of the Anti-Weaponization Fund. I write with profound gratitude to you and
President Donald J. Trump for creating a process to right these wrongs.

I was a 2016 target of the illegal Crossfire Hurricane investigation and our family
suffered greatly during that dark era of political weaponization. As soon as Joe Biden
was inaugurated in 2021, his FBI initiated yet another secret criminal investigation into
me, this time regarding my One America News documentary, "The Ukraine Hoax,"
which detailed Biden corruption in Ukraine. This investigation continued during the
entire Biden presidency and for the first full year of President Trump's new term.

The machinery of government was clearly politically weaponized against my family from
July 2016 to December 2025. This nine-year assault drained our savings, destroyed our
peace of mind, ruined my career, wrecked my health, and wreaked far more havoc on
our family. They found nothing; we lost everything.

I respectfully request $2.7 million in restitution and reimbursement from the Anti-
Weaponization Fund to help repair what what is left of our family. The costs of the
decade-long attack are difficult to enumerate so this amount may change.

Despite all this, we never stopped trusting the President; we knew he would never let
this injustice stand. There are thousands of families just like ours, all remnants of
political weaponization, who are heartened by this announcement during the 250th
birthday of our nation – a truly historic act of Presidential mercy in a jubilee year.

Sincerely,

Michael R. Caputo

# Exhibit Y

Learn more about **LSEG**

# 'I'm not greedy': January 6 rioters and Trump allies eye $1.8 billion 'weaponization' fund

By **Dan Rosenzweig-Ziff**

May 20, 2026 6:02 PM EDT · Updated May 21, 2026

  

Former national chairman of the Proud Boys, Enrique Tarrio, holds a megaphone following a march from The Ellipse to the U.S. Capitol in memory of those who died on, or in the aftermath, of the... Purchase Licensing Rights [↗] **Read more**

## Summary

Capitol riot defendants and Trump allies seek compensation from new fund

Democrats and some Republicans question fund's legality and IRS audit ban

Some Democrats, including James Comey, consider applying for compensation

WASHINGTON, May 20 (Reuters) - (This story contains strong language in paragraph 3)

Since President Donald Trump's administration announced the creation of a $1.776 billion fund for Americans deemed to be victims of political "weaponization," January 6 Capitol riot defendants and other Trump allies have scrambled to figure out how to get their share.

> Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up <u>here.</u>

Enrique Tarrio, the Proud Boys leader sentenced to 22 years for seditious conspiracy over the January 6, 2021 riot, said he planned to apply to the fund, assuming he could get between $2 and $5 million.

"I'm not greedy," Tarrio said. "But my life was all fucked up because of this."

Trump pardoned more than 1,500 January 6 defendants last year. Some have now begun to calculate the cost of their prosecution, jail time and businesses lost in the hope of compensation for what they regard as abuses by the Justice Department under former President Joe Biden.

Peter Ticktin, an attorney representing more than 400 January 6 defendants, said the fund may not be enough.

"People lost multi-million dollar businesses while they were locked up," he said. "I don't think the DOJ is ready for us yet."

Trump also suggested the fund may be too small. "You're talking about peanuts," he told reporters at Joint Base Andrews. "It destroyed the lives of many, many people."

Democrats and some Republicans have questioned the legality of the fund, as well as a part of the settlement "forever barring" the IRS from auditing past tax claims by Trump, his relatives and his businesses.

Two police officers who defended the U.S. Capitol from Trump supporters on January 6, <u>filed</u> a lawsuit on Wednesday seeking to halt the compensation fund, which they described as a "taxpayer-funded slush fund" for Trump followers who engaged in violence.

U.S. acting Attorney General Todd Blanche <u>told lawmakers</u> on Tuesday that even people who assaulted police on January 6 would not be barred from receiving money.

Tarrio, for his part, thinks those who assaulted police should get their share.

"The Justice Department overprosecuted for political gain," he said. "So everyone deserves to get money."

In a Wednesday letter ☐, Democratic Representatives Jamie Raskin and Richard E. Neal asked Treasury Secretary Scott Bessent, Blanche and IRS CEO Frank Bisignano, who negotiated the settlement, whether individual awards would be capped and what reports would be made public.

"Never in American history has a President pursued corruption this brazenly or on such a colossal scale," they wrote.

Democratic Senator Chris Coons of Delaware said on Wednesday he would try to block the fund through spending-bill amendments, though he acknowledged the issue might have to be resolved separately.

Ticktin, the January 6 lawyer, said he plans to file hundreds of claims once the Justice Department creates the application process and the attorney general appoints the five-member commission overseeing the fund. He said he suggested the idea to Trump, his high school classmate, in a March email, but doesn't know if that had any impact on the creation of the fund.

Some January 6 defendants praised the Justice Department for adopting terms they have long used — including "lawfare," "weaponization" and "victims" — and cast the fund as payback for years of injustice.

"Now liberals wanna cry about righting the wrong, too bad," wrote Jennie Carso-Heinl, who pleaded guilty to parading, demonstrating or picketing in a Capitol building, on X. "Justice is coming."

At least one Trump ally has already made a formal request: Michael Caputo, a former administration official, asked Blanche for $2.7 million in "restitution" over investigations by the Biden administration and special counsel Robert Mueller.

Some Democrats have floated applying too, arguing that Trump's Justice Department has pursued flimsy political cases against them. Blanche told lawmakers Tuesday the fund could pay members of both parties.

Former FBI Director James Comey, twice indicted since Trump began his second term, said on CNN that he has considered applying.

"It's to compensate people who've been targeted by the Justice Department for, they say, personal, political or ideological reasons," Comey said. "So I'm guessing I'll be in line."

For some Trump supporters, though, the fund may not go far enough.

Barry Ramey, a Proud Boys affiliate convicted of attacking police officers, said he is unsure whether to apply because taking money could jeopardize his claim against the Bureau of Prisons.

"My commitment to justice is not about the money," he said. "I want to show they acted illegally."

But if he could secure $2 million, he said, he might reconsider.

Reporting by Dan Rosenzweig-Ziff, Editing by Michael Learmonth and Alistair Bell

Our Standards: **The Thomson Reuters Trust Principles.** ⤢

Suggested Topics:

Government   White Collar Crime   Public Policy

Purchase Licensing Rights

## Read Next / Editor's Picks

World

**Trump administration proposes NDAs for federal workers to crack down on leaks to journalists**

22 hours ago

World

**US Justice Department sues UCLA alleging antisemitic educational environment**

20 hours ago

Government

**Trump's redistricting push suffers setbacks in Alabama, South Carolina**

17 hours ago

Government

**US Justice Department seeks to lift injunction on ballroom project after shooting**

May 26, 2026

## Latest

Home

Authors

Topic Sitemap

Archive

Article Sitemap

## Media

📹 Videos

📷 Pictures

🖼 Graphics

🎧 Podcasts

## Browse

World

Business

Markets

Sustainability

Legal

Breakingviews

Technology

Investigations

Sports

Science

Lifestyle

## About Reuters

**About Reuters** ⬈

**Media Center** ⬈

**Advertise with Us** ⬈

**Careers** ⬈

**Reuters News Agency** ⬈

**Brand Attribution Guidelines** ⬈

**Reuters and AI** ⬈

**Reuters Leadership** ⬈

**Reuters Fact Check**

**Reuters Diversity Report** ⬈

**Commercial Disclosure (Japan)** ⬈

## Stay Informed

**Download the App (iOS)** ⬈

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 170 of 172
PageID# 349

**Download the App (Android)** ⌕

**Newsletters**

**Subscribe**

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

𝕏  ⓕ  ⓞ  ▶  in  ☏

LSEG Products

**Workspace** ⌕

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Data Catalogue** ⌕

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ⌕

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ⌕    **Advertising Guidelines**    **Purchase Licensing Rights** ⌕

All quotes delayed a minimum of 15 minutes. See here for a list of exchanges and delays.

**Cookies** ⌕    **Terms & Conditions**    **Privacy** ⌕    **Copyright** ⌕    **Digital Accessibility** ⌕    **Corrections**
**Data Disclosure and Sources** ⌕    **Site Feedback** ⌕

© 2026 Reuters. All rights reserved

# Exhibit Z

Case 1:26-cv-01399-LMB-IDD    Document 25-1    Filed 05/28/26    Page 172 of 172 PageID# 351

# Exclusive: Michael Cohen says he will apply for payments from DOJ's 'anti-weaponization' fund

 Katherine Doyle

Michael Cohen, Trump's former lawyer who served nearly three years in prison on tax evasion and other charges, told NBC News he plans to apply for a payout from the Justice Department's so-called anti-weaponization fund. He said he's working through the process on his own and will submit a letter directly to the Justice Department.

"Nobody told me or called me up to say, 'Hey, you should do this,'" he said. "I saw it on television. I saw Michael Caputo put it in via a letter."

Caputo, a longtime Trump ally, posted on X a letter to acting Attorney General Todd Blanche asking the Justice Department for $2.7 million and calling out "the machinery of government," which he said "was clearly politically weaponized against my family."

Cohen said: "My understanding is that there actually is no formal application that exists. You do it via letter to the Department of Justice, and I have drafted that letter — I'm on my third rendition of it. I wanted it to be perfect."

Blanche announced the fund this week, after Trump agreed to end his lawsuit against the IRS over his leaked tax returns.

"What Trump complains about happened to him happened to me twice," Cohen said, referring to his tax returns' being unlawfully leaked by an IRS contractor in 2018. John C. Fry pleaded guilty in 2019 to downloading Cohen's personal financial information from the Treasury Department's FINCEN system and leaking it to lawyer Michael Avenetti, who in turn gave it to a reporter.

"As I write in my letter, if the weaponization fund truly exists to support individuals destroyed by politically motivated law enforcement tactics, selective prosecution, government leaks, abuses of power and intentional destruction of reputation, then there is perhaps no clearer example than what happened to me," he said.