**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Andrew Floyd, et al.,

       Plaintiffs,

v.

Department of Justice, et al.,

       Defendants.

**Case No. 26-cv-1399-LMB**

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER, OR IN THE ALTERNATIVE,
A PRELIMINARY INJUNCTION WITH EXPEDITED BRIEFING,
AND FOR A STAY UNDER 5 U.S.C. § 705**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    A.   The Trump-Vance Administration and "Weaponization" of Government ........................2

    B.   The Anti-Weaponization Fund ..............................................................................4

    C.   This Lawsuit ........................................................................................................7

LEGAL STANDARD ..........................................................................................................8

ARGUMENT .......................................................................................................................9

I.    Plaintiffs have standing to pursue their claims. ........................................................9

II.    Plaintiffs are likely to succeed on the merits...........................................................12

    A.   Plaintiffs are likely to succeed on their First Amendment and Equal Protection claims. .13

    B.   Plaintiffs are likely to succeed on their separation of powers claim. ..............................16

    C.   Plaintiffs are likely to succeed on their APA claims. ......................................................18

        1.   The creation of the Anti-Weaponization Fund constitutes final agency action. ...........18

        2.   The creation of the Anti-Weaponization Fund was arbitrary and capricious...............18

        3.   The creation of the Anti-Weaponization Fund was contrary to law and constitutional right..................................................................................…………………………22

        4.   The creation of the Anti-Weaponization Fund was without authority. ........................26

III.    Plaintiffs will suffer irreparable harm without preliminary relief. .................................27

IV.    The balance of equities and public interest overwhelmingly favor Plaintiffs. ..................30

CONCLUSION ...................................................................................................................30

**INTRODUCTION**

The Department of Justice and the Department of Treasury have created a $1.776 billion slush fund—from taxpayer dollars—to disburse payment to those the Trump-Vance administration favors. The patently unequal treatment of this "Anti-Weaponization Fund," which expressly benefits those who claim to have been targeted by "Democrat" administrations, but not those targeted by Republican administrations, violates both the First Amendment and the Equal Protection guarantee of our Constitution. Furthermore, in creating the payment scheme, Defendants are using appropriated funds in a manner that violates the constraints Congress imposed. The Fund finds no basis in the Constitution, nor any statute, and it violates the Separation of Powers. And, because the Fund was created and will remain shrouded in secret (among other reasons) it also violates the good governance requirements of the Administrative Procedure Act.

Plaintiffs are already being irreparably harmed by the unconstitutional and unlawful creation of the Anti-Weaponization Fund, and that harm will be permanent if the administration takes action, including by irreversibly disbursing funds, before this Court can act. Only last week did the administration circumvent the *Trump v. IRS* court's oversight of its actions; Plaintiffs seek to avoid that same result here. Prior to filing this motion, counsel for Plaintiffs conferred with counsel for Defendants and sought assurances that Defendants would not begin distributing payments until the Court had a chance to address Plaintiffs' request for preliminary relief. Defendants provided no such assurances. The government's refusal to provide transparency surrounding the Fund means that Plaintiffs have no way to know sufficiently far in advance when money will begin going out. In order to prevent irreparable harm and preserve its ability to resolve this case on the merits, the Court should enter a temporary restraining order, or in the alternative,

a preliminary injunction with expedited briefing, and a stay under 5 U.S.C. § 705, as set forth in the attached proposed order.

## FACTUAL BACKGROUND

### A.      The Trump-Vance Administration and "Weaponization" of Government

President Trump and his allies have long accused Democrats of using the government and the legal system as political weapons. In doing so, the Trump-Vance administration fails to acknowledge the unprecedented campaign of targeting individuals and entities for retribution on personal and ideological grounds that it has carried out.

Beginning in June 2023, after the Department of Justice (DOJ) charged then-former President Trump with mishandling classified documents, Trump posted a video on social media exclaiming, "This is warfare for the law . . . . Our country is going to hell, and they come after Donald Trump, weaponizing the Justice Department, weaponizing the FBI."[1] Republican lawmakers quickly adopted the same language, even creating a House select subcommittee "on the Weaponization of the Federal Government."[2] *See* H.R. 12, 118th Cong. (2023).

Then, on the first day of his second administration, President Trump issued an executive order to "ensure accountability for the previous administration's weaponization of the Federal Government against the American people." Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025). The order cites several examples of the Biden administration's alleged weaponization, including "politically motivated funding revocations" and the "ruthless[] prosecut[ion of] more than 1,500 individuals associated with January 6." *Id.*

---

[1] Roll Call Factbase Videos, *Donald Trump Vlog: Statement on Indictment — June 8, 2023* at 1:50 (YouTube, May 26, 2025), https://www.youtube.com/watch?v=D74k5KbDdxs.
[2] The subcommittee was dissolved shortly before President Trump began his second term.

In a similar vein, on the day she took office, then-Attorney General Pam Bondi established a Weaponization Working Group within DOJ to "conduct a review [sic] the activities of all departments and agencies exercising civil or criminal enforcement authority of the United States over the last four years . . . to identify instances where . . . conduct appears to have been designed to achieve political objectives or other improper aims." Ex. E at 2.[3] Like the executive order that came before it, the DOJ memo focuses solely on alleged weaponization by Democrats, citing as examples Special Counsel Jack Smith's investigation of President Trump, New York's cases against President Trump, the investigation and prosecution of January 6 rioters, and criminal prosecutions of individuals that illegally disrupted abortion clinic access in violation of the Freedom of Access to Clinic Entrances (FACE) Act. *Id.* The Weaponization Working Group issued its first report last month, alleging misconduct by "[t]he Biden DOJ" by, for example, improperly "pursu[ing] significantly harsher sentences for pro-life defendants than violent pro-abortion defendants." Ex. F at 2.

Notably, the Working Group identified no "weaponization" abuses by Republican officials, even as those abuses have proliferated. For example, DOJ has—at President Trump's direction—sought indictments against the President's political opponents, including former FBI Director James Comey, New York AG General Letitia James, and six members of Congress. Ex. G. It has launched investigations into President Trump's critics like California Sen. Adam Schiff, former New Jersey Gov. Chris Christie, and Jack Smith. *Id.* And, it has fired and demoted prosecutors who worked with Jack Smith or were involved in criminal cases concerning January 6. Exs. H–J; *see also* Compl. ¶¶ 85–93 and sources cited therein.

---

[3] Unless otherwise noted, all citations to exhibits in this brief can be found as exhibits attached to the Boisture Declaration, filed with this brief.

3

### B.        The Anti-Weaponization Fund

The targeting of the President's critics was soon accompanied by explicit preferential treatment for his allies. In January 2026, President Trump, his sons, and the Trump Organization filed a lawsuit against the IRS and Treasury Department in federal court, alleging that the disclosure of their tax return information by a former government contractor entitled them to $10 billion in damages. Ex. K. As was clear to all involved, the President controlled both sides of the litigation. *See, e.g.*, Exec. Order No. 14215, 90 Fed. Reg. 10447–48 (Feb. 24, 2025) (declaring the President's complete supervisory authority over the executive branch, including the power to make "authoritative interpretations of law" that "are controlling on all employees in the conduct of their official duties"). When the President explained the case, he said "I'm supposed to work out a settlement with myself."[4] That obvious lack of adverseness led the presiding Judge to order the parties and court-appointed *amici* to brief whether the case satisfied Article III's bedrock case or controversy requirement. Exs. L–M.

As IRS lawyers themselves recognized, the President's claims lacked merit in several key respects, including that they were brought outside the statute of limitations and the contractor who disclosed the information was not an "officer or employee of the United States." *See* Compl. ¶¶ 29–33 (quoting 26 U.S.C. § 7431(a)(1), (c), (d)); Ex. P. Rather than pursuing these arguments, which the DOJ raised in other lawsuits stemming from the same leaks, it settled the lawsuit with the President and his family. Ex. P. On May 18, President Trump's private attorneys filed a notice of voluntary dismissal, taking pains to argue that there was no room for judicial oversight. *See* Ex. N at 2 ("Upon the filing of this Notice, no judicial analysis is appropriate . . . .") (quotation marks

---

[4] *See* White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (YouTube, Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE.

omitted). Later that day, DOJ announced a $1.776 billion "Anti-Weaponization Fund" as "part of" the agreement to "settle" *Trump v. IRS*. Ex. A ¶ III.A.

According to the Agreement, the purpose of the Anti-Weaponization Fund is "[t]o provide a systematic process to hear and redress claims of others who, like [the *Trump v. IRS* plaintiffs], state that they incurred harm from similar Lawfare and Weaponization." Ex. A ¶ III.C. The Agreement defines "Lawfare and Weaponization" as "the sustained use of the levers of government power by *Democrat* elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *Id.* ¶ II.C (emphasis added). It lists several representative examples of "Lawfare and Weaponization," all purportedly perpetrated by Democratic administrations: "the Biden Administration's abuse of the FACE Act, the Biden administration's wrongful labeling of certain parents as domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." *Id.*

The Agreement provides that the Fund "shall consist of five Members" appointed by the Attorney General and removable at will by President Trump, and authorizes the Fund to act at the direction of as few as two members. *Id.* ¶ IV.B. The Fund is empowered "to determine its own procedures for submitting, receiving, processing, and granting or denying claims" and to decide whether and to what extent to "make those procedures public." *Id.* ¶ IV.C. To apply for recovery from the Fund, a claimant "must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." *Id.* ¶ V.C. In response, the Fund has "the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting

with, federal agencies." *Id.* ¶ IV.D. Per the Agreement, Anti-Weaponization Fund payments will not be subject to judicial review, *id.* ¶ VI.B, and the claimants' identities and compensation amounts paid by the Fund will not be made public, *id.* ¶¶ IV.E, V.F. The Fund will stop processing claims no later than December 1, 2028, just before President Trump's term ends. *Id.* ¶ IV.G.

The Anti-Weaponization Fund is to receive a $1.776 billion payment from the Judgment Fund. Ex. C ¶ C. The Judgment Fund is an appropriation by Congress available to the Attorney General for a specific and limited purpose: to make payment for "final judgments rendered by a district court" and "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." 28 U.S.C. § 2414. According to the Acting Attorney General's Funding Order, once Treasury has sent Judgment Fund money to the Anti-Weaponization Fund, "the United States has no liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds." Ex. C ¶ D. The money that is transferred may be used to pay claims as well as such amounts "as may be necessary to carry out the mission of the [Fund]." *Id.* ¶ E. In the event there is a balance remaining in the Anti-Weaponization Fund after December 15, 2028, it will be transferred to any federal government account of the President's choosing. *Id.* ¶ H.

To date, at least one claim has already been submitted to the Fund. Ex. X. The secrecy and lack of public reporting requirements make it impossible to determine how many more claims may already have been submitted. But many of President Trump's allies have announced that they intend to make claims on the Fund and that they expect the Fund to be drawn down quickly. *See* Compl. ¶¶ 96–105 and sources cited therein. The Agreement requires the Fund's five Members to be appointed within 30 days from the date of the Agreement (*see* Ex. A ¶ IV.D.), but it is unclear

6

from publicly reported information whether the Acting Attorney General has yet appointed any of them.

###### C.      This Lawsuit

Plaintiffs are individuals and organizations who are harmed by the Anti-Weaponization Fund. Plaintiff Andrew Floyd is a former career federal prosecutor in the U.S. Attorney's Office in D.C. who was fired after leading a task force to investigate and prosecute individuals who took part in the January 6 attack. Floyd Decl. ¶¶ 7–24. Mr. Floyd resides in this District. *Id.* ¶ 2. Plaintiff Jonathan Caravello is a professor at California State University Channel Islands who was arrested while protesting an operation by federal immigration agents. Caravello Decl. ¶¶ 1–2, 5–10. Despite video evidence undermining the government's case, DOJ charged Mr. Caravello with felony assault of a federal officer. *Id.* ¶ 12. Like many others the local U.S. Attorney's Office has charged with interfering with immigration enforcement, Mr. Caravello was acquitted—but only after being held in jail for days and then subject to strict conditions of pre-trial release. *Id.* ¶¶ 11–13.

Plaintiff City of New Haven has been targeted, along with other cities, by the Trump-Vance administration as part of a sustained campaign against what it views as sanctuary jurisdictions. Elicker Decl. ¶¶ 4–8. As part of that campaign, the administration has filed burdensome litigation against the city and threatened to cut off its access to federal funding for vital services and programs, which has necessitated still more litigation. *Id.* ¶¶ 9–16.

Plaintiff National Abortion Federation ("NAF") is a nonprofit that supports and represents abortion providers and the people they serve, in pursuit of accessible and equitable abortion care. Fonteno Decl. ¶ 6. The creation of the Anti-Weaponization Fund substantially increases the risk of violence to NAF's members by condoning the illegal actions of people who have engaged in criminal attacks on abortion clinics, as it expressly invites those that the Biden administration

7

convicted under the FACE Act to submit claims. *Id.* ¶¶ 22–29; *see also* Ex. A ¶ II.C. NAF's provider members are diverting significant time and resources from their core activity of facilitating reproductive healthcare to respond to ongoing threats. Fonteno Decl. ¶¶ 33-35, 39-40.

Plaintiff Common Cause is a nonprofit organization with nearly one million members and a mission of upholding the core values of American democracy. Nunez Decl. ¶¶ 4–6. As a watchdog group dedicated to holding power accountable and creating open, honest, and accountable government, Common Cause is injured by the Fund's procedural violations and its lack of transparency, including the withholding of information that DOJ is required by law to publish. Bellows Decl. ¶¶ 8–11, 13–15. And as one of the nation's premier groups working to protect election integrity, Common Cause is injured by the Fund's emboldening of January 6 defendants and other election deniers who will directly impede Common Cause's voter engagement and protection efforts and put Common Cause's staff and volunteers at personal risk. Nunez Decl. ¶¶ 8–23. Common Cause will be forced to expend more resources to ensure the physical security of its staff, volunteers, members, and individuals involved in election administration. *Id.* ¶¶ 18–20.

Plaintiffs bring this suit against DOJ, Acting Attorney General Todd Blanche, Associate Attorney General Stanley Woodward Jr., Department of the Treasury, and Treasury Secretary Scott Bessent ("Agency Defendants") for their roles in creating the Anti-Weaponization Fund, and against the Fund itself. Among other claims, they allege that the Fund violates the Constitution, including the First and Fifth Amendments, as well as the Administrative Procedure Act.

## LEGAL STANDARD

The same standard applies to a motion for a temporary restraining order as applies to a request for a preliminary injunction. *Ga. Vocational Rehab. Agency Bus. Enter. Program v. United*

8

*States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018). In either case, a plaintiff must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). The APA likewise empowers courts to "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for temporary relief under Section 705 is also the same as for a preliminary injunction. *Casa De Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).

## ARGUMENT

### I.    Plaintiffs have standing to pursue their claims.

Plaintiffs have standing. "To establish standing, a plaintiff must show: '(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *AFSCME v. Soc. Sec. Admin.*, 172 F.4th 361, 367 (4th Cir. 2026) (en banc) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "At the preliminary injunction stage, a plaintiff must make a clear showing that [it] is *likely* to establish each element of standing." *Id.* (quotation marks omitted; emphasis added).

Plaintiffs are likely to show that Defendants' actions cause them several types of injury. As set forth below, the Fund violates First Amendment and Equal Protection principles by: discriminating on the basis of viewpoint; treating Plaintiffs Floyd, Caravello, and New Haven differently from similarly situated parties solely because they were targeted by a Republican rather than Democratic administration; and creating a mechanism for those alleging weaponization by

9

Democrats to petition for government redress while shutting the door on Plaintiffs and others like them. *See* Floyd Decl. ¶¶ 26–31; Caravello Decl. ¶¶ 13–16; Elicker Decl. ¶¶ 8–16, 22–23. It is well established that such discriminatory treatment itself constitutes injury in fact. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 634 (2020) ("[T]he Court has squarely held that a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others."); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790–92 (4th Cir. 2004) ("Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes"); *Nat'l Pub. Radio, Inc. v. Trump*, No. 25-cv-1674, 2026 WL 877434, at *15 (D.D.C. Mar. 31, 2026) ("Plaintiffs are injured because the [challenged action] precludes them from even participating in the competition for federal . . . financial benefits."). That injury is especially acute given that the discrimination here implicates protected First Amendment rights. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation marks omitted)).

Plaintiff NAF and its members also face harm as a direct result of the Fund's endorsement and financing of unlawful conduct. About half of NAF's abortion provider members reported incidents of violence or harassment in 2025. Fonteno Decl. ¶ 17. Yet the Trump-Vance administration has made it a priority to protect individuals who threaten abortion providers. For example, days into his second term, President Trump pardoned 23 people convicted under the FACE Act, 18 U.S.C. § 248, several of whom had targeted NAF's members. *Id.* ¶ 19. Since then, multiple pardoned individuals have been rearrested at abortion clinics. *Id.* And NAF's members have seen unprecedented levels of violence. For example, a Wisconsin clinic member was confronted with an anti-abortion blockade inside its own building, and a Pennsylvania clinic

10

member was invaded by pardoned FACE defendants who poured and sprinkled unknown substances around the facility. *Id.* ¶¶ 20–21. The Agreement on which the Fund is based specifically identified "the Biden Administration's abuse of the FACE Act" as an example of the Weaponization it is designed to remediate. Ex. A ¶ II.C. By condoning the criminal attacks on abortion clinics, the Fund will further embolden—and even directly finance—criminal activity against NAF's members. Fonteno Decl. ¶¶ 22–29. NAF's members now face an even greater threat of violence and attempts at intimidation. *Id.* ¶¶ 30–32, 36–38; *TransUnion*, 594 U.S. at 435 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). NAF's provider members are also presently harmed by having to divert significant time and resources from their core activity of facilitating reproductive healthcare to respond to ongoing threats, a need that directly interferes with their central missions. Fonteno Decl. ¶¶ 33–35, 39–40; *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (organizations may challenge actions that "directly affect[] and interfere[] with [their] core business activities").

Plaintiff Common Cause is harmed by the procedural violations in the creation of the Fund, the lack of transparency in its operations, and the Fund's emboldening of January 6 defendants and other election deniers. First, and most relevant here, Defendants' actions regarding the Fund obscure critical information—such as the amount of any payments made and the basis for the claims paid. Common Cause would have been entitled to this information and would have sought, analyzed, and publicized it had the Defendants followed the statutory requirements for Judgment Fund payments. Bellows Decl. ¶¶ 8–11, 13–14; *see* 31 U.S.C. § 1304(d). That denial of information constitutes an injury in fact. *See Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) (plaintiff establishes informational injury where it alleges that it "failed to obtain

11

information which must be publicly disclosed pursuant to a statute" (quotation marks and alteration omitted)). Second, by rewarding people bent on undermining free, fair, and safe elections, Defendants' actions will put at risk Common Cause's election protection and voter engagement efforts and its staff and volunteers. Nunez Decl. ¶¶ 18–21. Common Cause is directly injured by the setback to its ability to carry out its core mission caused by this denial of information about the administration's dispensation of public money to its political allies, and by being forced to divert additional time and resources to protect election integrity and promote voter participation. *Id.* ¶¶ 18–23; *All. for Hippocratic Med.*, 602 U.S. at 395.

The remaining two elements of standing—causation and redressability—are readily satisfied. Plaintiffs' injuries are directly traceable to Agency Defendants' creation of the Anti-Weaponization Fund and to Defendants' operation of the Fund. And those injuries could be redressed by an order halting and setting aside Defendants' actions with respect to the Fund. *See, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (all that is required for redressability is that a judicial order would "likely" redress "at least some of" a plaintiffs injuries); *Barr*, 591 U.S. at 632 ("When the constitutional violation is unequal treatment, as it is here, a court . . . can cure that unequal treatment . . . by nullifying the benefits . . . for all.").

## II.    Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to prevail on their claims that the Anti-Weaponization Fund violates both the First Amendment and Equal Protection, including because the Fund is available to individuals who express views that are oppositional to, or perceived to be oppositional to, Democratic administrations, but not also available to individuals who express views oppositional to Republican administrations. Plaintiffs are also likely to prevail on their claims that the Fund violates the separation of powers and that its creation violates the Administrative Procedure Act

because it was arbitrary and capricious, contrary to law and constitutional right, and undertaken without any authority. There is no basis for the Agency Defendants to unilaterally reappropriate vast sums of taxpayer money into a slush fund to secretly dispense to their supporters. And even if they had that authority—which they do not—their action was both substantively unreasonable and unsupported by any reasonable explanation.

### A. Plaintiffs are likely to succeed on their First Amendment and Equal Protection claims.

Plaintiffs are likely to show that Defendants' actions with respect to the Anti-Weaponization Fund violate the First Amendment and Equal Protection in several related ways.

First, the Fund is explicitly founded on content-based viewpoint discrimination. By its terms, the Fund exists to compensate claimants who allege "Lawfare and Weaponization" by Democratic administrations but not Republican ones. Ex. A ¶ II.C (defining "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents"). The only examples of "Lawfare and Weaponization" cited in the Agreement concern Democratic administrations. *See id.*; *see also* Ex. D (same). President Trump and his allies have long fixated on alleged abuses by Democrats, *see, e.g.*, Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025) (focusing exclusively on "the previous administration's weaponization"), while giving no indication that they understand weaponization as something Republicans can engage in. Even as this case was being filed, President Trump continued to emphasize that the Fund is meant to help those "who were so badly abused by an evil, corrupt, and weaponized Biden Administration." Ex. O.

That the Fund represented content-based viewpoint discrimination is clear. A claim to the Fund that says, "I was improperly targeted by a Democratic administration" will be considered and possibly redressed by the Fund's members; a claim that says, "I was improperly targeted by a

13

Republican administration" will not. "That is about as content-based as it gets." *Barr*, 591 U.S. at 619. And the distinction the Fund draws is not only content-based but viewpoint-based—a particularly egregious form of content discrimination. Such discrimination is presumptively unconstitutional and subject to strict scrutiny. *Id.*; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015); *see generally Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) ("At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."). Defendants could not possibly hope to satisfy that demanding standard here, including because there is no government interest at all—let alone a "compelling" one—in the distinction they have drawn, as evidenced by the administration's own unprecedented record of leveraging government power against its perceived opponents. *See, e.g.*, Compl. ¶¶ 85–95 and sources cited therein.

Relatedly, the express terms under which the Fund operates and the administration's singular focus on alleged weaponization by Democrats confirm that the Fund exists to endorse, promote, and finance certain viewpoints while suppressing or disfavoring other viewpoints by depriving them of the same largesse. But the government cannot pick winners and losers in the marketplace of ideas like that. After all, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220–21 (2013) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

The same conclusion obtains if the Fund is viewed as akin to a limited public forum in which claimants may petition the government for redress of claims that Democrats harmed them but not for redress of claims of having been harmed by Republicans. When the government creates

14

such a forum, it cannot close the door to specific viewpoints while favoring others, as Defendants have done here. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (evaluating funding program as a limited public forum and emphasizing that government may not "exercise viewpoint discrimination, even when the limited public forum is one of its own creation"); *Planned Parenthood*, 361 F.3d at 798 ("[B]ecause the State has established a license plate forum for the abortion debate, it cannot limit the viewpoints expressed in that forum").

Second, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev.*, 570 U.S. at 214 (quotation marks omitted); *see also Am. Ass'n of Pol. Consultants v. Small Bus. Admin.*, 613 F. Supp. 3d 360, 368 (D.D.C.) (explaining that the government's "funding choices" will raise First Amendment concerns if "they are the product of invidious viewpoint discrimination" (quotation marks omitted)), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020); *cf. Nat'l Pub. Radio*, 2026 WL 877434, at *1 (the First Amendment prohibits the government from "us[ing] government power—including the power of the purse—to punish or suppress disfavored expression by others" (quotation marks omitted)). The Fund represents a choice by Defendants to allocate $1.8 billion in government funds based on invidious viewpoint discrimination—favoring and financing those who claim weaponization by Democratic administrations while disfavoring and freezing out those who, like Plaintiffs, can claim abuse by Republican administrations. They are barred from doing so by the First Amendment. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) (government funding conditioned on not advancing certain legal arguments in court violated First Amendment).

Third, the distinction the Fund draws between those allegedly targeted by Democrats and those targeted by Republicans violates not only First Amendment principles but the Fifth

15

Amendment's Equal Protection guarantee. That guarantee requires "all persons similarly situated [to] be treated alike" by the federal government. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis under any level of scrutiny. *Id.* at 447 (quotation marks omitted); *see also City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 74 (D.D.C. 2026) (concluding that "grant-termination decisions primarily—if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump" lacked any rational relationship to a legitimate governmental interest); *Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the . . . guarantee of equal protection under the law, . . . settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government . . . ."), *appeal pending*, No. 25-5241 (D.C. Cir.). Claimants who believe they have been the subject of "Lawfare and Weaponization" by the federal government are similarly situated, regardless of the party that they claim targeted them. Yet the Fund does not treat them alike. As explained, it entertains claims from—and distributes $1.8 billion in government money to—one group but not the other. That distinction is irrational and unmoored from any legitimate governmental interest. Instead, it is motivated by animus towards the actual or assumed political views of claimants who believe they have been the subject of "Lawfare and Weaponization" by Republican administrations. Such action cannot be reconciled with the Constitution's Equal Protection guarantee. *See City of Saint Paul*, 816 F. Supp. 3d at 74; *Perkins Coie*, 783 F. Supp. 3d at 168.

      **B.**      **Plaintiffs are likely to succeed on their separation of powers claim.**

Plaintiffs are also likely to succeed in showing that the Anti-Weaponization Fund violates the separation of powers. Although that "doctrine is not explicitly stated in the Constitution, it is nevertheless deeply rooted in our jurisprudence." *Plyler v. Moore*, 100 F.3d 365, 370 (4th Cir.

16

1996). "As the Supreme Court has noted, the separation of powers is not merely a matter of convenience[; i]ts object is basic and vital, namely, to preclude a commingling of these essentially different powers of government in the same hands." *Id.* (quotation marks omitted). Indeed, "[t]he safety of our institutions depends in no small degree on a strict observance of th[e] salutary rule" that "[o]ne branch of the government cannot encroach on the domain of another without danger." *Union Pac. R. Co. v. United States*, 99 U.S. 700, 718 (1878).

Under founding principles, Congress—not the Executive—has "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quotation marks omitted); *see also* U.S. Const. art. I, §§ 8–9. This "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *OPM v. Richmond*, 496 U.S. 414, 427–28 (1990). It is a "bulwark" against an executive who would otherwise "possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Dep't of Navy*, 665 F.3d at 1347 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213–14 (1833)).

The Anti-Weaponization Fund turns that bulwark to rubble. By funneling money out of the Judgment Fund and into a secretive slush fund for allies, Defendants have usurped congressional appropriating power. Moreover, they intend to use the funds at their own discretion, further circumventing Congress's appropriation authority. *See, e.g.*, Ex. C ¶ H. Defendants compound the constitutional error by effectively creating a new agency to dole out funds—at odds with the principle that only Congress has the authority to set up new governmental bodies and assign duties, and with Congress's role in appointing officers to carry them out. *See* U.S. Const. art I, § 1; art. I,

17

§ 7, cl. 2; art. II, § 2, cl. 2; *see also Myers v. United States*, 272 U.S. 52, 129 (1926). The Fund fundamentally thwarts this constitutional order.

### C.    Plaintiffs are likely to succeed on their APA claims.

#### 1.    The creation of the Anti-Weaponization Fund constitutes final agency action.

The APA makes reviewable "final agency action." 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

Plaintiffs are likely to show that the creation of the Anti-Weaponization Fund constitutes final agency action. First, the creation of the Fund "mark[s] the consummation of the agency's decisionmaking process" because there are no further steps the Agency Defendants need take to determine whether they will create the Fund: it now exists. Indeed, Acting Attorney General Blanche has already issued an order recognizing that the Fund "has [been] created" and providing the Fund with money for its "sole use." Ex. C. Second, the creation of the Fund constitutes action "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 178, because it establishes a legal process by which some individuals (but not others) have the right to pursue claims against the United States. The creation of the Fund also establishes obligations, including the transfer of $1.776 billion from the Judgment Fund and a permanent bar on claims that claimants could otherwise pursue.

#### 2.    The creation of the Anti-Weaponization Fund was arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious if the agency relies on factors that Congress did not

18

intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a matter contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the Court "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *State Farm*, 463 U.S. at 43). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable *and* reasonably explained." *Id.* (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

The creation of the Anti-Weaponization Fund falls far short of these standards. First, it is substantively unreasonable. The Agency Defendants' action to siphon off $1.776 billion from the public fisc into a slush fund for their allies does not meet a baseline level of rationality. The suggestion that creating the Fund was required because of this administration's alleged liability in *Trump v. IRS* is a farce, especially when considering (1) the weaknesses in President Trump's legal claims, which would have failed if the President had not controlled both sides of the litigation; and (2) the fact that the unlawful disclosure of taxpayer information at issue in that case occurred during President Trump's first administration—not a "Democrat" administration. Ex. P. The Court of Appeals has previously concluded that unfounded fears of litigation cannot insulate an agency's arbitrary and capricious decisionmaking. In *Casa De Maryland v. DHS*, for example, the Attorney General's decision to rescind Deferred Action for Childhood Arrivals was arbitrary and capricious, notwithstanding the Attorney General's determination that "potentially imminent litigation would

19

result in a ruling . . . enjoining DACA." 924 F.3d 684, 704 (4th Cir. 2019) (quotation marks omitted). The Court found that the Attorney General's determination lacked explanation, and that the Department of Justice also "had before it at the time it rescinded DACA a reasoned analysis from" the Office of Legal Counsel "that supported the policy's legality." *Id.* at 705. So too here, given the *Trump v. IRS* court's statements expressing skepticism that the lawsuit met Article III's case or controversy requirement, *Trump v. IRS*, No. 1:26-cv-20609, 2026 WL 1145973, at *2 (S.D. Fla. Apr. 24, 2026), and reports that the IRS had prepared a memorandum outlining flaws in the lawsuit and advising DOJ to move to dismiss it, Ex. P.

And even if it were rational to create an Anti-Weaponization Fund in some form—which it was not—it was irrational to do so in a way that privileges individuals who claim to have been victimized by "Democrat" administrations, while ignoring those claiming to have been victimized by Republican ones. *Cf. Bedford Cnty. Mem. Hosp. v. HHS*, 769 F.2d 1017, 1023 (4th Cir. 1985) (finding that a rule that did not "treat similarly situated hospitals similarly" was "arbitrary and capricious, especially in view of the unfair and illogical results to which it obviously might lead"). And, more troubling still, the creation of the Fund was designed to move public money beyond the public eye. These actions are further arbitrary and capricious because, as set forth below, they conflict with both the Constitution and the law.

Given the myriad substantive problems with the creation of the Fund, it is unsurprising that it is also unreasonably explained. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (quotation marks omitted). Here, at most, the Agency Defendants say that they created the Fund to settle *Trump v. IRS*—but there is no logical connection between those two events, particularly because by the Agreement's own terms, the plaintiffs in that case derive no

20

economic benefit from the Fund. *See* Ex. A ¶¶ III.A, IV.A. There is no explanation for why the creation of the Anti-Weaponization Fund is the best way—or even just a reasonable way—to accomplish the stated goals. There is no explanation for why the Fund benefits only a select group of people (and ignores the "Lawfare" and "Weaponization" perpetrated by Republicans, including by the current administration). There is no explanation for why the Fund should be shrouded in secrecy. And the scant explanation that is provided for re-appropriating a vast sum of taxpayer funds without authorization—that $1.776 billion "is based on the projected valuation of future claimants' claims," Ex. C ¶ C—is laughable on its face. There is no methodology given for that calculation, which was instead seemingly chosen for its resonance with the Declaration of Independence. Nor did the Agency Defendants consider any alternatives to these policy choices. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives," as here, "has led uniformly to reversal.").

DOJ's failure to provide a reasoned explanation is particularly pronounced given that the creation of the Fund marks a sea change from DOJ's prior positions. Although an agency can change course, it must "provide a reasoned explanation for the change," and "[a]t a minimum," "display awareness that it is changing position and show that there are good reasons for the new policy." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)) (quotation marks omitted). But DOJ has displayed no awareness that the creation of the Anti-Weaponization Fund is irreconcilably at odds with its own policy prohibiting settlements that involve payments to third-party organizations "that were neither victims nor parties" to the suit. *See* Ex. Q. Still less has it offered any actual explanation for the abrupt change in course. Nor has DOJ explained how permitting the Fund to determine its own procedures—and to keep those procedures secret, Ex. A ¶ IV.C—can be

21

reconciled with DOJ's policy that settlements not be confidential, *see* 28 C.F.R. § 50.23. This kind of "unexplained inconsistency in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez-Cedillo*, 885 F.3d at 298 (quotation marks omitted).

The Agency Defendants further failed to consider, or account for, the irreparable harm that the creation of the Anti-Weaponization Fund would entail. For example, emboldening individuals who believe they are the victims of "Democrat Lawfare"—in some cases, people who have been tried and convicted by a jury of their peers for political violence—could well lead them to further violence, including at venues such as abortion clinics and polling places. This is, needless to say, "an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

### 3. The creation of the Anti-Weaponization Fund was contrary to law and constitutional right.

The APA also directs courts to hold unlawful final agency action "found to be . . . contrary to constitutional right, power, privilege, or immunity," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (B). That reference to "law," the Supreme Court has held, "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). The creation of the Anti-Weaponization Fund violates several constitutional provisions, federal statutes, and Treasury's own regulations.

As already explained, the creation of the Fund is contrary to the First Amendment because it discriminates on the basis of viewpoint, to the Fifth Amendment because it violates the guarantee of equal protection, and to the separation of powers because it usurps congressional authority.

22

It is also in conflict with the Appointments Clause, which requires that certain procedures be followed when naming officers, which Fund Members plainly are. The members of the Fund have the power to issue monetary relief using Judgment Fund money, grant and deny claims, defer review of claims, and receive and request evidence. Ex. A ¶ IV.D. They likewise "have the power to determine [their] own procedures for submitting, receiving, processing, and granting or denying claims," *id.* ¶ IV.C. In other words, the members exercise quintessential officer authority. *See Lucia v. SEC*, 585 U.S. 237, 245, 247–49 (2018) ("significant authority" to qualify as an officer includes ability to issue binding decisions, receive evidence, conduct hearings, impose penalties, or exercise discretion on behalf of the United States). Given that the members' office continues, even if the individuals are removed, their office "occup[ies] a 'continuing' position established by law," further supporting the officer status. *Id.* at 245; *cf. United States v. Donziger*, 38 F.4th 290, 296–97 (2d Cir. 2022).

Members of the Fund are principal officers—not inferior officers that Congress has the power to jointly appoint—because they "have the power to render a final decision on behalf of the United States without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *United States v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (quotation marks omitted). Indeed, the Agreement specifically provides that "there shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund." *See* Ex. A ¶ VI.B. As principal officers, members of the Fund can be appointed only by "the President, with the advice and consent of the Senate." *Id.* at 12 (quotation marks omitted).[5]

---

[5] The members are clearly not inferior officers, "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). They instead have unfettered power to determine their own procedures, keep them secret if they like, and resolve claims. *See* Ex. A ¶¶ IV.C–D. And even if they were inferior officers, only Congress is permitted "to dispense with joint appointment," *Arthrex*, 594 U.S. at 12—which it plainly has not done here.

But that is not how the Fund is designed: members are appointed instead by the Attorney General. Ex. A ¶ IV.B. Only one of those members "shall be chosen in consultation with congressional leadership," *id.*—a far cry from "the advice and consent of the Senate." And because a quorum is only three members, *id.*, the Fund can proceed without even that limited congressional involvement.

The creation of the Fund likewise violates a provision of the Fourteenth Amendment forbidding "the United States" to "assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States," and declaring that "all such debts, obligations, and claims shall be held illegal and void." U.S. Const. Art. XIV § 4. "[T]he events of January 6 constituted an insurrection." *Anderson v. Griswold*, 543 P.3d 283, 330 (Co. 2023), *rev'd on other grounds sub nom Trump v. Anderson*, 601 U.S. 100 (2024); *see also State v. Griffin*, No. D-101-CV-2022-00473, 2022 WL 4295619, at \*16 (N.M. Dist. Sep. 6, 2022) ("[T]he January 6 Attack and surrounding planning, mobilization, and incitement were an 'insurrection' against the Constitution of the United States."), *appeal dismissed sub nom Griffin v. State*, No. S-1-SC-3957 1 (N.M. Nov. 15, 2022). The Fourteenth Amendment forbids the United States from making any "promise or contract, the consideration of which was something done . . . to aid" an insurrection. *Keith v. Clark*, 97 U.S. 454, 464 (1878).

The Fund transgresses these clear constitutional boundaries. Administration officials have shown on multiple occasions that one of the core purposes of the Fund is to provide restitution to individuals convicted of crimes committed in connection with the January 6 insurrection. Exs. W–X. Administration officials have refused to disclaim the use of the Fund to pay individuals who engaged in violence against law enforcement officials on January 6. Exs. Y–Z. And individuals convicted of seditious conspiracy in connection with January 6 have announced their intention to

24

file claims from the Fund. *See*, *e.g.*, Ex. V at 1–2 (finding Enrique Tarrio Guilty of seditious conspiracy); *see also* Ex. W. But the United States may not pay these individuals restitution for being investigated for, or convicted of, insurrection; to do so would force the government to assume obligations incurred in aid of insurrection in violation of the Fourteenth Amendment.

In addition to these constitutional violations, the creation of the Fund also violates several statutes and regulations that govern the Judgment Fund from which the Anti-Weaponization money was siphoned. First, 31 U.S.C. § 1304, which appropriates money for the Judgment Fund, requires the Secretary of the Treasury to "make available to the public on a website" information about each payment from the Judgment Fund, including the name of the claimant and their counsel, the name of the agency whose actions gave rise to the claim, the name of the agency that submitted the claim, the amount paid, and a brief description of the facts that gave rise to the claim. *See* 31 U.S.C. § 1304(d). The creation of the Anti-Weaponization Fund shields claims from this transparency (although the money has been funneled from the same appropriation), instead permitting the Fund to make "its own procedures for submitting, receiving, processing, and granting or denying claims . . . public in whole or in part, in its discretion." Ex. A ¶ IV.C.

Second, 28 U.S.C. § 2414, which governs the Judgment Fund, provides for "payment of final judgments rendered by a district court," as well as "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." But the Anti-Weaponization Fund permits settlement of claims that do not fall within those strictures, including claims where no lawsuit has been or possibly ever will be filed. *Cf.* Ex. A ¶ V.E (acknowledging that "[a] claimant who already has a claim pending in court or administrative proceedings may be eligible for relief," but not limiting claims to such people). The creation of the Anti-Weaponization Fund also violates binding agency regulations that impose parallel limits. *See*

25

31 C.F.R. § 256.1(a) (confirming that the Judgment Fund can be used for settlements only of "claims arising under actual or imminent litigation").

Third, the Anti-Weaponization Fund's lack of procedural rigor, *see* Ex. A ¶ IV.C, violates other portions of 31 C.F.R. part 256. Under those binding regulations, the "Department of Justice must normally submit the request for payment from the Judgment Fund." 31 C.F.R. § 256.10(a). But the Anti-Weaponization Fund permits individual claimants to submit requests for payment (of money initially appropriated to the Judgment Fund), and members of the Anti-Weaponization Fund, not DOJ, will determine if the amount requested is appropriate. Similarly, those binding regulations require that a request for payment (from an agency) be accompanied by "a copy of the judgment or settlement agreement, as applicable." *Id.* § 256.12(a). But the Anti-Weaponization Fund circumvents that requirement, as neither a judgment nor a settlement agreement is required to submit a claim. Because the creation of the Fund conflicts with Treasury's own regulations, it is invalid. *See Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

### 4.    The creation of the Anti-Weaponization Fund was without authority.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "An agency," in other words, "*literally has no power to act*—including under its regulations—unless or until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (emphasis added). Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

No statute authorizes DOJ or Treasury to create a slush fund that will dole out money to political allies without oversight or accountability. Section 2414 and Section 1304 do not authorize

26

this action; rather, as explained above, the creation of the Fund actively violates those laws. The Agency Defendants' lack of authority is particularly apparent in light of the sweeping and unprecedented nature of the power they seek to exercise. The Supreme Court has emphasized repeatedly in recent years that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *OSHA*, 595 U.S. at 117 (quoting *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021)). That rule applies equally in cases involving regulatory obligations and "in cases involving benefits." *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). There can be no doubt that the power the Agency Defendants claim here—to will into existence a new government entity charged with redirecting $1.776 billion from the congressionally appropriated Judgment Fund to the President's political allies—is one of "vast economic and political significance." "Given these circumstances, there is every reason to hesitate before concluding that Congress mean to confer on [the Agency Defendants] the authority [they] claim[]." *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quotation marks omitted).

## III.    Plaintiffs will suffer irreparable harm without preliminary relief.

Where a plaintiff "allege[s] violation of First Amendment rights, . . . irreparable harm is inseparably linked to the likelihood of success on the merits." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190–91 (4th Cir. 2013). Here, "[b]ecause there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see also Roman Cath. Diocese*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). That is no less true of Plaintiffs' Equal Protection claim. *See, e.g.*, *Beautiful Struggle*, 2 F.4th at 346; *Doe v. Hanover Cnty. School Bd.*, No. 3:24-cv-493, 2024 WL 3850810, at *14–15 (E.D. Va. Aug. 16, 2024) ("Because the Court concludes that Janie has

27

demonstrated a likelihood of prevailing on the merits of her . . . equal protection claims, she has necessarily shown irreparable harm."); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017).

All Plaintiffs also face irreparable injury stemming from the speed and secrecy with which Defendants may drain the Fund. The Fund's Members will be in place no later than June 17, 2026, and may have already been appointed. *See* Ex. A, ¶ IV.B. Indeed, the Agency Defendants are already showing great haste: the Agreement provides 30 days for the Attorney General to issue an order establishing funding, *see* Ex. A ¶ IV.A, but Acting Attorney General Blanche did so the same day the Agreement was signed, *see* Ex. C. This administration similarly worked quickly and behind the scenes to settle the *Trump v. IRS* case, dislodging the case from the court's purview within two days of a court-imposed deadline to address that court's jurisdictional concerns. Compl. ¶¶ 39-40.

There is every indication that, absent preliminary relief, the administration will deplete the fund to similarly moot this case; indeed, the public record reveals that at least one claim has already been submitted, seeking $2.7 million. Ex. X. It is unknown how many others may have been submitted but not made public. Many of President Trump's allies have announced that they too will submit claims. *See* Compl. ¶¶ 96–105 and sources cited therein. Some of these claimants— and President Trump himself—have indicated that their claims will quickly overwhelm the resources available in the Fund. Ex. Y at 2 (reporting that "an attorney representing more than 400 January 6 defendants, said the fund may not be enough").[6] That risk of depletion is heightened by the apparent ease of submitting a claim. According to Michael Cohen, President Trump's former lawyer, "My understanding is that there actually is no formal application that exists. You do it via letter to the Department of Justice, and I have drafted that letter." Ex. Z. Because the Fund can act

---

[6] *See also President Trump Gaggles with Press Upon Arrival at Joint Base Andrews*, The White House (May 20, 2026) (calling the Fund amount "peanuts" compared to harm done by Democratic "weaponization"), http://youtube.com/watch?v=CwQB96husNE.

with a majority of just three members and can determine for itself its own procedures, Ex. A ¶¶ IV.B, IV.C, there is no apparent external impediment to how quickly it can move. And because, in Defendants' view, nothing about the Fund is required to be made public, *see id.* ¶¶ IV.C, IV.E, V.F., there is presently no way for Plaintiffs, the Court, or the public to know if and when members have been appointed and to know sufficiently ahead of time when claims will begin being processed or paid. For all that the public record reveals, money may already be going out the door by the time this motion is fully briefed. Notably, Defendants have refused to provide necessary assurances on these points during the pre-motion meet-and-confer process.

Without preliminary relief, many of Plaintiffs' injuries could become effectively irreparable, including because there is no guarantee the money could ever be clawed back. *See Foltz v. U.S. News & World Rep.*, 760 F.2d 1300, 1308 (D.C. Cir. 1985) (finding irreparable harm where "any cause of action against [an employee profit-sharing plan] would effectively be lost by the Plan's paying out the lion's share—if not all—of its current assets, and most emphatically so if the Plan then proceeds promptly to wind up its affairs and effectuate its own dissolution as an entity"). And without relief regarding the administration's transparency, Plaintiff Common Cause would be unable to gather, analyze, and publicize information of vital public importance about the claims on and payments from the Fund. Bellows Decl. ¶¶ 13–14.

NAF and its members would face the heightened threat of violence and attempts at intimidation by committed foes now emboldened and enriched by their share of the Fund's billions, and all but officially endorsed by the Department of Justice. Fonteno Decl. ¶¶ 19, 22–29. Plaintiffs Floyd, Caravello, and New Haven would have no obvious recourse for their claims that the Fund unconstitutionally discriminates against them and others like them. Preliminary relief is thus necessary to maintain the status quo, prevent irreparable harm to Plaintiffs, and preserve the

29

Court's ability to order effective relief. *See Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (finding irreparable harm where court would "be unable to grant effective relief" "if the government . . . is permitted to distribute the $10 million [at issue] to other organizations").

**IV.     The balance of equities and public interest overwhelmingly favor Plaintiffs.**

The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken*, 556 U.S. at 435). These factors weigh heavily in favor of preliminary relief here. "[I]t is well-established that the public interest favors protecting constitutional rights." *See Beautiful Struggle*, 2 F.4th at 346. And "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d at 230–31 (quotation marks omitted). Moreover, Plaintiffs have marshaled strong evidence of irreparable harm that will only worsen as the Fund begins to make decisions and pay out claims without transparency or accountability. And that harm will be made permanent if Defendants are allowed to empty the Fund's coffers before the Court can decide the merits of this case. *See supra* 28–29. No countervailing interest exists in allowing Defendants' illegal payouts to move forward at this time.

**CONCLUSION**

For all these reasons, the Court should grant Plaintiffs' motion for a temporary restraining order and a stay under 5 U.S.C. § 705.

Dated: May 28, 2026                                    Respectfully submitted,

                                                      */s/ Joel McElvain*
                                                      Joel McElvain (Va. Bar No. 95215)
                                                      Pooja A. Boisture*
                                                      Jyoti Jasrasaria*
                                                      Kevin E. Friedl*
                                                      Aman George*
                                                      Jessica Anne Morton*

30

Ayesha Khan*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
pboisture@democracyforward.org
jjasrasaria@democracyforward.org
kfriedl@democracyforward.org
ageorge@democracyforward.org
jmorton@democracyforward.org
akhan@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

 *Counsel for Plaintiffs*

*admitted *pro hac vice*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of May, 2026, I will cause the foregoing memorandum of law (and accompanying declarations and exhibits) to be electronically filed with the Clerk of Court using the CM/ECF system. I will then promptly cause those documents and a notification of such filing (NEF) to be sent to counsel for all Defendants via e-mail, to which they have consented in writing. *See* Fed. R. Civ. P. 5(b)(2)(E).

I will also cause those documents to be sent by first-class mail to the proposed intervenor at:

> Joseph A. Camp
> 1317 Edgewater Drive #66983
> Orlando, FL 32804

> */s/ Joel McElvain*
> Joel McElvain (Va. Bar No. 95215)
> Democracy Forward Foundation
> P.O. Box 34553
> Washington, DC 20043
> (202) 448-9090
> jmcelvain@democracyforward.org