**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

<table>
<tr><td>

Andrew Floyd, et al.,

      *Plaintiffs*,

      v.

Department of Justice, et al.,

      *Defendants*.

</td><td>

Case No. 26-cv-1399

</td></tr>
</table>

**DECLARATION OF ANDREW FLOYD**

I, Andrew Floyd, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2.      I am a United States citizen. I live in Alexandria, Virginia.

3.      I am an attorney by training, and a member of the bars of Maryland and the District of Columbia, and am also an associate member of the Virginia bar.

4.      Starting in January 2009, I served as a foreperson for a local grand jury for three months. At that time, I was teaching social studies and was in my fifth year as a public school educator. My experience on the grand jury inspired me and, for the first time, I seriously considered attending law school and was motivated to become a local prosecutor.

5.      Also in January 2009, I taught my A.P. United States Government and Politics students about the peaceful transfer of power in our country. Our local newspaper, *The Berkshire Eagle*, interviewed me for a story they were writing about the upcoming inauguration and quoted me as saying: "When you look at the history of governments around the world and compare it, it's

1

unique . . . . Here is a peaceful transfer of power. That's 44 times that someone who has had the power has transferred it without incident, and that's remarkable."[1]

6.      I graduated from law school in 2013. Immediately thereafter, I moved to the D.C. area and clerked for Judge John R. Fisher of the District of Columbia Court of Appeals. Judge Fisher was a veteran of the United States Attorney's Office for the District of Columbia ["USAO-DC"], where I hoped to work, and he extolled the virtues of the office, including its high standards, rigorous work, and strong camaraderie. At the time, the USAO-DC required a year of professional experience, so I navigated their application process while I was clerking. On May 27, 2014, I received a call from the United States Attorney himself, offering me my dream job as an Assistant United States Attorney ("AUSA") at USAO-DC. I still have his voicemail from that call.

7.      In October 2014, I began my career with the Department of Justice as an AUSA at the USAO-DC.

8.      When I started at USAO-DC, I prosecuted local crimes on behalf of the United States in the District of Columbia Superior Court. I started with cases involving assault, theft, and trespassing and worked my way up to burglary, robbery, assaults with a dangerous weapon, and arson.

9.      In 2018, as part of an initiative to combat unlawful firearms possession in the District of Columbia, I was asked to transfer from USAO-DC's Superior Court Division, which conducted local prosecutions, to the USAO-DC's Criminal Division, where individuals were charged with violations of federal law in D.C. District Court. While there, as a member of the Violent Crimes and Narcotics Trafficking Unit, in addition to prosecuting individuals who unlawfully possessed firearms, I conducted multiple federal arson investigations, a complex

---

[1] *See* Amanda Burke, *Jan. 6 prosecutor and Pittsfield native has no regrets after being fired by the Trump administration*, Berkshire Eagle (July 7, 2025), https://www.berkshireeagle.com/news/central_berkshires/pittsfield-native-fired-justice-department/article_d862e273-fec7-46f1-91d1-7a55e69f6b9a.html, enclosed as Attachment A.

narcotics investigation, a time-sensitive cyberstalking case, as well as several robbery and violent threats cases.

10.    In September 2019, I applied to be and was promoted to Deputy Chief of the Felony Trial Unit in USAO-DC's Superior Court Division. This allowed me to return to prosecuting local crime and, in that capacity, I trained newer AUSAs and supervised them as they handled their first felony cases. These cases typically involved the unlawful possession of firearms and narcotics and were most of these AUSA's first jury trials.

11.    On January 6, 2021, I spent the day watching a mob storm the U.S. Capitol and attack officers from the District of Columbia's Metropolitan Police Department ("MPD-DC") and U.S. Capitol Police during Congress's certification of the 2020 presidential election. My fellow supervisors and I discussed how we could investigate and prosecute people who committed crimes that day, which would reinforce the rule of law and hopefully avoid our jurisdiction hosting quadrennial displays of unlawful mayhem by supporters of politicians who had lost free and fair elections.

12.    In the immediate aftermath of January 6, supervisors at the USAO-DC began working with the Department of Justice (in the remaining days of President Trump's first term) to determine how to approach the unlawful conduct that had occurred that day. Several task forces and groups of prosecutors were set up to determine what conduct was worthy of prosecution, which criminal statutes had been violated, and whether violations should be brought in D.C. Superior Court or D.C. District Court. My supervisors asked me to lead a task force of approximately a dozen experienced D.C. Superior Court AUSAs to investigate violent assaults on MPD-DC officers. Working in teams of two, with at least one of the AUSAs on each team having experience in District Court, we worked closely with investigators from MPD-DC and the FBI to identify as many individuals who had violently assaulted MPD officers on January 6, 2021 as possible and then charge them. We brought these cases based on the facts and the law and did so expeditiously to ensure justice for the crimes committed and deter further violence. Following the inauguration, I continued to believe it was my job to rigorously prosecute individuals who committed crimes on

January 6, 2021, as it cannot be acceptable to use violence and attack law enforcement officers to interfere with the peaceful transfer of presidential power.

13.     As the head of the Assault on Police Officer (APO) Task Force, I coordinated with law enforcement investigators and assigned new investigations to the teams of AUSAs. I met regularly with AUSAs to discuss their progress, give feedback, review warrants and pleadings, and discuss investigative and trial strategy. The AUSAs I supervised amazed me with their unceasing and diligent work as they coordinated with law enforcement investigators to build thorough and complete cases in areas of the law that were new to them and, in some cases, in a court in which they had never practiced. I was also responsible for providing USAO-DC management with periodic updates on the progress of the APO Task Force. Although leading the APO Task Force proved to be a full-time job, I remained responsible for 10 Felony Trial Unit AUSAs and their hundreds of unlawful firearm and narcotics cases, which was also a full-time job. During the six months I held these two roles, the vast majority of my time was focused on illegal conduct on January 6, 2021, and the unlawful possession of firearms and narcotics in the District of Columbia.

14.     In June of 2021, the USAO-DC formally established the Capitol Siege Section (CSS), a permanent group in the Criminal Division to charge those responsible for criminal activity on January 6, 2021.  I was promoted to be a Deputy Chief of that section, allowing me to focus my efforts entirely on the work I had been doing with the APO task force. In this role, I conducted trainings for new CSS prosecutors, supervised trial teams, and reviewed warrants and legal filings. In addition to these tasks, which were shared by all CSS deputy chiefs, I eventually became responsible for running our law enforcement intake and keeping all of the investigation's data and analytics.

15.     I served as a supervisor in the CSS for three and a half years. In that time, I was the primary supervisor for dozens of investigations and trials, meeting regularly with AUSAs to discuss their case decisions and strategy. The cases the AUSAs I supervised brought held individuals responsible for theft, destruction of property, possession of firearms and destructive

4

devices, assaults on police officers, including with weapons ranging from makeshift clubs to explosives, and, in one case, the unlawful discharge of a weapon on the grounds of the U.S. Capitol.

16. In addition to my traditional supervisory tasks, I also filled several other specialized roles. I met with experts on the use of tasers and pepper spray, helping our team to establish the dangerousness of those devices, particularly in the context of January 6, 2021. I was also the primary point of contact for several of our police officer victims who did not have a designated AUSA, either because they had unidentified assailants or because they had been assaulted by multiple different individuals whose cases were assigned to different AUSAs. Another one of my duties was to maintain our internal database, tracking all of our statistics and analytics. This meant that I often had to respond to time-sensitive inquiries from DOJ leadership, members of Congress, and the media.

17. Using my background in history, I suggested dividing the events of January 6, 2021 into several temporal and physical zones called "hot spots" so that AUSAs could focus their attention on a smaller subset of cases and evidence while working with supervisors who also specialized in that zone. Particularly early on in the investigation, the hot spots helped AUSAs share information, investigate more efficiently, and enabled them to understand and contextualize the conduct of each defendant as they approached trial and sentencing. One of my designated hot spots was a door on the West Front of the Capitol building that became known as "the tunnel." This door is not typically used as an entrance, but is prominently located on the front of the building and is of symbolic importance because it is where the president-elect enters the stage prior to the inauguration. In this location on January 6, 2021, hundreds of rioters attempted to enter the building while dozens of police officers fought them off. These officers, many of whom had already been engaged in prolonged and significant physical conflicts with the mob and then been overrun, were seriously outnumbered. Despite this, they fought valiantly, inch-by-inch, to regain the mouth of this ten-foot wide hallway. While they pushed, the officers were beaten, sprayed with a variety of substances, and subject to all manner of invective. One officer in this location became trapped in a doorframe and screamed in pain as he was beaten with a baton, crushed under the

5

weight of the mob's collective push, and had his gas mask forcibly removed from his face by a rioter. Additionally, at various times in this location, five officers were dragged into the crowd, where they were at the mercy of the mob, who stripped them of equipment, beat them with hands and weapons, and tased one of the officers in the neck. I remain incredibly proud of the amazing work that the talented AUSAs and law enforcement investigators did in identifying these assailants, building thorough cases against them, obtaining convictions based on evidence and the law, and ultimately securing just sentences for their conduct.

18.     Eventually, my largest role was as the primary gatekeeper for case intake, reviewing hundreds of investigative files and determining whether they were worthy of prosecution based on charging standards that had been established early in the investigation by USAO-DC management in conjunction with Department of Justice leadership. If the identification of the individual was strong enough and their conduct met our charging standards, I assigned the case to a prosecutor. If the identification was not sufficient or the conduct did not meet our charging guidelines, I closed the case.

19.     My time working on the January 6 effort was one of the most demanding, challenging, and rewarding periods of my legal career. Our team brought charges against hundreds of people who committed violence that day to try and prevent the certification of an American election. Our work was not partisan or political, and we strived to only bring cases that were rigorously considered and well-supported by evidence. This sort of diligent work was appropriate for the gravity of what occurred on January 6; it would have done a disservice to the country and the victims for us to bring weak cases, or to look like we were engaged in a partisan effort. I strongly believe that our work was critical to reinforcing the rule of law in the United States, and making sure that the American people get the final say in who their leaders are, as well as honoring the heroic actions police officers performed that day. Because this work was so critical, I and many of my colleagues sacrificed leisure, sleep, and time with our families, because we knew we played a critical role in defending our nation's democracy and upholding the rule of law.

20.    In January 2025, I asked to return to USAO-DC's Superior Court Division so that I could continue prosecuting local crime in D.C. Superior Court as this work was what had initially compelled me to attend law school.

21.    I began working in the USAO's Early Case Assessment Section, reviewing criminal warrants for probable cause. I had reviewed hundreds of warrants by the time I received notice from DOJ that I was being terminated in June 2025.

22.    I am not aware of any complaints or concerns with my performance at DOJ, and the termination letter DOJ provided me did not indicate any. Instead, the letter simply asserted that I was being terminated pursuant to Article II of the United States Constitution—as I understand it, the President was asserting the authority to terminate any federal employee he wanted to for whatever reason he pleased.

23.    Nobody told me why I was fired from DOJ, but I believe it was in retaliation for my work on cases arising out of January 6. Two of my colleagues who worked on those cases were fired the same day as me, receiving the same bare "Article II" explanation that I did. I was given no other discernible reason to be terminated last year. During my tenure at DOJ, my performance was consistently rated as Outstanding. I earned U.S. Attorney "Special Act" awards in 2015, 2016, 2017, 2018, and 2023 and in 2022 was part of a group that was honored with the U.S. Attorney's Team Award. USAO-DC also selected me as one of the honorees to receive the Anti-Defamation League's Service, Honor, Integrity, Excellence, Leadership, and Dedication (SHIELD) Award on behalf of the January 6 prosecution team.

24.    I have spoken to the five individuals who were in my direct management chain in the USAO-DC, under the United States Attorney, on the day I was fired. All were colleagues who I had worked closely with for much of my more than a decade at USAO-DC and who were personally familiar with me and my work. All have apologized to me and/or otherwise indicated that they believed I should not have been terminated. On the night I was fired, I called my direct supervisor to let her know that I would not be able to complete the time-sensitive criminal warrants that she had assigned to me. She was my evaluating official and expressed shock that no one had

informed her or otherwise discussed with her that I was going to be terminated. My call was the first that she had heard about it. A short time later, another supervisor in my management chain wrote, unprompted, to tell me, "I just heard. I'm just dumbfounded and so incredibly sorry. I know there's nothing I can say that will make this any better but this is so incredibly unfair and wrong." Later that night, a different supervisor in my direct management chain wrote, "I am so incredibly upset for and with you. I can't believe it. You are salt of the earth. An incredible, decent, dedicated, and unfailingly fair prosecutor. I feel so helpless."

25.     I loved working at USAO-DC. I was deeply committed to the mission, and proud of the work I did to enforce our laws in our nation's capital with integrity. I had never considered seeking a job outside of the Department of Justice and would have been proud to spend decades continuing the work I had done for over a decade on behalf of the American people at the USAO-DC.

26.     I believe I was fired unjustly, in retaliation for work that I did to serve the public interest. My work was not at all partisan in nature—the January 6 investigation was started by DOJ while President Trump was still in office at the end of his first term, led by individuals he had selected. The standards set at that time continued throughout our efforts to investigate and prosecute very serious and violent crimes against Congress, law enforcement officers, and American democracy. But I believe I was fired because my work on the January 6 investigation was wrongly viewed as a political attack on this President and his allies.

27.     I find it appalling that a President would seek to fire dozens of law enforcement officials for doing their jobs, just because some of the people they prosecuted were the President's political allies. No President should abuse his authority in this way. The President's targeting of me and others involved in January 6 prosecutions leaves our country in a very dark place, sending a message that insurrection and sedition will be protected (and even encouraged) as long as it is on behalf of this administration.

28.     Because I believe it is clear that I was fired for improper political reasons, I am already in the process of pursuing employment claims against the federal government over my

unlawful termination. If the federal government ever saw fit to provide additional legal avenues for those improperly targeted by President Trump and his allies, I would seek any remedy available to me. I believe monetary damages would be appropriate to make me whole and deter future similar government misconduct. I also believe an official apology or admission of wrongdoing by the government would be important to send a clear signal that the work I and my colleagues were doing—holding people accountable who sought to alter the results of a democratic election by force and intimidation—was an effort to defend our nation's democracy with integrity, *not* so-called "Lawfare and Weaponization."

29.    A legally-proper additional avenue for addressing my claims would also be attractive to me because the current Congressionally-created administrative process for the employment claims I am pursuing can be slow, complex, uncertain, and limited.

30.    But the President's "Anti-Weaponization Fund" is not a serious attempt to redress the weaponization and abuse of government power. While I have been targeted by the abusive exercise of government power, the elected official responsible is a Republican, not a Democrat, and by its own terms the Fund is not available to me. I also believe it is clear that the Fund is simply not intended to address claims like mine, given that the Members are all appointed by President Trump's Attorney General, and all of the examples of "Lawfare and Weaponization" cited by the Fund (and by this administration's public statements) are perceived injustices committed during Democratic administrations.

31.    This administration is gifting the people I helped investigate and prosecute after January 6 access to an illegally-created remedial process with minimal structure or oversight, so that this administration can rush money out the door to perceived political allies, while treating me and people like me as disfavored enemies.  This is a disservice to the work of thousands of diligent public servants, including the investigators, witnesses, prosecutors, defense attorneys, judges and staff who made sure that these individuals received due process

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 28th day of May, 2026

Andrew Floyd

**ATTACHMENT A**

# Jan. 6 prosecutor and Pittsfield native has no regrets after being fired by the Trump administration

berkshireeagle.com/news/central_berkshires/pittsfield-native-fired-justice-department/article_d862e273-fec7-46f1-91d1-7a55e69f6b9a.html

By Amanda Burke, The Berkshire Eagle Amanda Burke                    July 7, 2025

WASHINGTON — A former federal prosecutor from Pittsfield who helped convict Jan. 6 rioters and was later fired by the attorney general appointed by President Donald Trump says he has no regrets about his time at the Justice Department.

Andrew Floyd was one of three prosecutors dismissed last month by Attorney General Pam Bondi, according to NBC News. Floyd, a graduate of Pittsfield High School who went on to teach at his alma mater, traces his roots back to the Berkshires.

It was the first round of DOJ firings targeting career prosecutors who had a hand in Capitol riot cases, rather than those newly appointed to their posts, the outlet reported, and it coincides with a wave of veteran law enforcement officials departing amid growing political pressure from the Trump administration.

Floyd prosecuted cases against individuals charged after a violent mob stormed the United States Capitol in Washington, D.C., on Jan. 6, 2021, attempting to stop the certification of the 2020 presidential election, which Trump lost.

He sent a letter to colleagues Thursday after his termination, and his writings were first reported by NBC News. Floyd said he was not immediately available for an interview. His father, the Rev. Richard L. Floyd, who served as pastor at First Church of Christ in Pittsfield, did not immediately respond to requests for comment on Saturday.

In his letter, which was obtained by The Eagle, Floyd wrote that he was proud to have sought justice for "despicable and illegal acts against our brothers and sisters in uniform" during the attacks.

Among the defendants who pleaded guilty to assaulting an officer during the insurrection is Troy Sargent of Pittsfield, though Floyd was not listed in court documents as a lead prosecutor on that case. Sargent was sentenced to over a year in prison but said he was among the over 1,500 Capitol siege defendants who later was pardoned by Trump.

1/3

# The Berkshire Eagle

## A Pittsfield man who assaulted police during the Jan. 6 attacks is off probation thanks to President Trump's sweeping pardon

Floyd was one of many lawyers working in the Capitol Siege Section unit within the U.S. Attorney's Office in Washington, D.C. The unit was dissolved after Trump took office in January, but Floyd worked on other assignments for the office until last month.

His tenure in the department spanned more than a decade. He wrote that he spent his final five months in a different unit "prosecuting everything from theft to serious shootings in order to reduce crime in D.C."

Referencing former President Theodore Roosevelt's speech known colloquially as "The Man in the Arena," Floyd wrote that the officers at the Capitol "entered the arena and were assaulted. Later, they were re-victimized. Called crisis actors, vilified, threatened, and told that what they experienced did not happen. I am so proud of each case in which we were able to achieve justice for them."

Roosevelt's speech would be emailed to Justice Department prosecutors after losing tough cases, he wrote — a reminder of the importance of working to uphold the rule of law even when all doesn't go according to plan.

"Last Friday afternoon, I received a different kind of email," he wrote. "I was fired 'effective immediately,' with the stated reason, 'Article II of the Constitution.' With that one message, my phone ceased to work and I was no longer permitted in the Patrick Henry Building. My days of entering the arena with you are over. I also have no regrets."

Article II of the U.S. Constitution established the executive branch and defined the powers of the president.

Floyd signed off with a quote from Jackie Robinson, the first Black American to play in modern Major League Baseball.

"If I had a room jammed with trophies, awards, and citations," Robinson wrote. "And a child of mine came into that room and asked what I had done in defense of Black people and decent whites, fighting for freedom. If I had to tell that child I had kept quiet, that I had been timid, I would have to mark myself a total failure in the whole business of living."

Floyd commended his colleagues for living up to those words.

"I know from my communications with you over the years that the people in this building do not keep quiet and are not timid. You pursue justice. You enter the arena. Win or lose," Floyd wrote. "From now on, although I can no longer join you, I'll be on the sidelines cheering you on."

After his time in Pittsfield Public Schools, Floyd attended Pomona College in Claremont, Calif., and ultimately studied law at the University of Arizona, according to the New York Times.

Floyd first returned to Pittsfield to work as an educator, teaching history, social studies and politics in the city school system in his 20s.

When he was a teacher, he was quoted in a 2009 story in The Eagle about how local students and educators were observing the inauguration of President Barack Obama.

"When you look at the history of governments around the world and compare it, it's unique," he said. "Here is a peaceful transfer of power. That's 44 times that someone who has had the power has transferred it without incident, and that's remarkable."