IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

-------------------------------------------------------------X

ANDREW FLOYD ET AL.,

      Plaintiffs,

         -v.-

DEPARTMENT OF JUSTICE, ET AL.,

      Defendants.

-------------------------------------------------------------X

Case No. 1:26-cv-01399

**[PROPOSED] BRIEF
OF AMICUS CURIAE
JASON GOODMAN**

### INTEREST OF AMICUS CURIAE

Amicus curiae Jason Goodman is a journalist, video producer, and pro se litigant who has

publicly reported on, and personally litigated issues involving, alleged government-linked

censorship, platform coordination, retaliatory legal activity, abusive litigation tactics, retaliatory

litigation, and legal weaponization commonly described as "lawfare."

Amicus did not participate in the January 6 activities that form part of Plaintiffs' attack on

the Anti-Weaponization Fund. His interest is different and more directly related to the relief

Plaintiffs seek. Plaintiffs ask this Court to halt, vacate, and dismantle the Fund in its entirety;

stop the acceptance or processing of any claim; stop any payment; prevent the appointment of

Fund members; and prohibit reconstitution of the Fund under another name. That relief would

reach far beyond Plaintiffs, far beyond the facts alleged in their Complaint, and far beyond any

concrete injury they plausibly identify.

Amicus is a potential absent claimant whose alleged lawfare injuries have no connection

to January 6, abortion-clinic protests, election disputes, or any alleged threat to Plaintiffs. Based

on his journalism, litigation history, and public reporting concerning alleged government-linked

[PROPOSED] BRIEF OF AMICUS CURIAE

1

censorship and lawfare, amicus may be among the persons whose legitimate claims the Fund was designed to consider. Whether any such claim would ultimately be accepted is not before this Court and need not be decided here. The relevant point is that Plaintiffs seek relief broad enough to extinguish or freeze the opportunity for absent citizens like amicus to seek relief before any claim is filed, any claimant is identified, any payment is approved, any eligibility interpretation is applied, or any individualized adjudication occurs.

Plaintiffs' theory confirms amicus's interest. Plaintiffs allege that legal weaponization can exist, that victims of such weaponization may suffer concrete injuries, and that exclusion from a government-created redress process can itself be a legally cognizable injury. But Plaintiffs then seek the wrong remedy. If the Fund is underinclusive, viewpoint-discriminatory, procedurally defective, or insufficiently transparent, the proper remedy is to cure the defect, require lawful and neutral administration, require transparency where law demands it, or sever unlawful limitations. It is not to destroy every potential claim belonging to absent citizens.

Amicus submits this brief to explain why Plaintiffs' requested relief is overbroad; why their standing theory depends on a false and premature interpretation of the Settlement Agreement; why the Complaint's "Democrats-only" premise mistakes a descriptive recital for an operative eligibility bar; why their APA theory cannot convert speculation about future claim decisions into present injury; why their Section 4 theory remains legally defective; and why any relief should preserve, rather than extinguish, lawful anti-lawfare claims of absent nonparties.

**SOURCE OF AUTHORITY TO FILE**

This brief is submitted conditionally with a motion for leave to file. District courts possess broad discretion to permit amicus participation when a proposed brief may assist the Court by presenting relevant matters not adequately addressed by the parties.

[PROPOSED] BRIEF OF AMICUS CURIAE

2

Amicus does not seek intervention or party status. Amicus seeks only leave to submit this brief to assist the Court in evaluating final agency action, Article III standing, ripeness, the scope of any remedy, the interests of absent nonparty claimants, the distinction between discriminatory exclusion and wholesale destruction of a remedial process, and the absence of any legally operative Section 4 predicate.

**DISCLOSURE STATEMENT**

No party's counsel authored this brief in whole or in part. No party, party's counsel, or other person contributed money intended to fund the preparation or submission of this brief. Amicus Jason Goodman is a natural person, has no parent corporation, subsidiary, affiliate, or publicly held corporation owning any interest in him. Amicus files this brief pro se and on his own behalf.

**I.    INTRODUCTION**

Plaintiffs ask this Court to dismantle the Anti-Weaponization Fund before any claimant has applied, any claim has been accepted or rejected, any eligibility rule has been applied, any payment has been made, or any record exists. Their theory rests on a false premise: that the Settlement Agreement categorically limits Fund relief to persons alleging lawfare by Democrats or Democratic administrations. It does not.

The language Plaintiffs rely on is a recital describing "the conduct alleged in the Case and in the Pending Agency Claims." Settlement Agreement § II.C. "The Case" is *Trump v. IRS*, and the "Pending Agency Claims" are President Trump's own administrative claims. Settlement Agreement §§ I, II.B. That recital describes the allegations being settled; it is not an operative eligibility bar governing every future claimant. The operative provisions are broader: the Fund exists to hear claims from others alleging "similar Lawfare and Weaponization," and claimants

must assert legal claims subject to individualized review of evidence, conduct, damages, fees, custody time, prior relief, and other just factors. Settlement Agreement §§ III.C, V.C–D. Plaintiffs' own Complaint further pleads that DOJ's fact sheet stated: "There is no partisan restriction: Democrats can submit claims, too." Compl. ¶ 63.

That premise cannot support the universal relief Plaintiffs seek. If Fund creation is the final agency action, Plaintiffs' present injury is, at most, alleged exclusion from a claims process, remediable by neutral access, lawful criteria, clarification, severance, or correction. If Plaintiffs' injury depends on future approvals, denials, payments, secrecy, or third-party conduct, the case is premature. Nor do Plaintiffs identify any claimant, payment, debt, obligation, record, Section 4 determination, or conviction under 18 U.S.C. § 2383. The Court should not convert Plaintiffs' speculative reading of an unapplied settlement recital into a universal veto over every absent lawfare claimant. Any defect should be cured narrowly; the Fund should not be dismantled before absent claimants are ever heard.

## II.    SUMMARY OF ARGUMENT

First, Plaintiffs' standing theory rests on a false eligibility premise. They treat a recital describing Trump's allegations in *Trump v. IRS* and his pending agency claims as if it were an operative eligibility bar against every claim not involving Democrats. The Settlement Agreement contains no such categorical bar.

Second, the Administration's own public explanation, as pleaded by Plaintiffs, undercuts their categorical-exclusion theory. Plaintiffs allege that DOJ's fact sheet stated, "There is no partisan restriction: Democrats can submit claims, too." Plaintiffs attempt to avoid that statement by arguing that it does not expressly say persons targeted by non-Democrats can apply. But that

[PROPOSED] BRIEF OF AMICUS CURIAE

is a negative inference derived from a false conclusion arising from Plaintiffs' misinterpretation of a recital. It is not an operative exclusion clause.

Third, Plaintiffs cannot have it both ways on APA final agency action, injury, and ripeness. If the final agency action is creation and funding of the Fund, Plaintiffs' present injury is limited to present legal consequences and, at most, alleged exclusion from a process. If the injury depends on future claim procedures, eligibility interpretations, denials, approvals, payments, secrecy, or third-party conduct, then the lawsuit is premature and unripe.

Fourth, the Settlement Agreement expressly contemplates further implementation. It provides that an accompanying Attorney General order will establish funding and other relevant requirements, rules, conditions, terms, and waivers, and that the Fund will determine its own procedures for submitting, receiving, processing, granting, or denying claims. Plaintiffs sue before those procedures have been finalized or applied.

Fifth, Plaintiffs mischaracterize a settlement-created claims-administration mechanism as though it were a freestanding federal agency or congressionally established benefits program. The Fund arose from the settlement of claims brought by Trump and other private plaintiffs against IRS and Treasury, not from legislation creating a new agency or entitlement program. Even if the settlement, funding order, or later implementation may be reviewable in some respect, Plaintiffs cannot simply presume that every statutory, regulatory, transparency, or administrative requirement governing separately established federal agencies applies wholesale to a settlement-created claims process. Nor may they transform that claims process into a new "agency" by pleading conclusion. The reviewable question, if any, must be tied to a concrete agency action, legal consequence, claimant decision, payment, denial, or disclosure obligation. Plaintiffs instead collapse the Judgment Fund, the settlement agreement, the funding order, and a

[PROPOSED] BRIEF OF AMICUS CURIAE

not-yet-implemented claims process into one supposedly unlawful entity, then demand the most destructive remedy available. That is not analysis; it is remedial bootstrapping.

Sixth, Plaintiffs overstate their Judgment Fund theory. The relevant 31 U.S.C. § 1304 question, if any, concerns the Government's use of Judgment Fund money to resolve or fund the Trump settlement and related claims-administration mechanism. That question is analytically distinct from the merits of future claimant-level lawfare claims submitted to the Anti-Weaponization Fund. A defect in funding, certification, disclosure, transfer procedure, or payment mechanism would not adjudicate the validity of absent claimants' underlying lawfare claims, nor would it justify extinguishing those claims before they are filed, reviewed, or denied. At most, such a defect would support relief tailored to the funding or disclosure problem itself. Plaintiffs instead attempt to convert an alleged Judgment Fund defect into a universal merits adjudication against every absent claimant. That leap does not follow.

Seventh, Plaintiffs' strongest theory, if accepted, supports corrective relief, not abolition. If Plaintiffs are unlawfully excluded, the remedy is inclusion, neutral administration, severance, or correction, not destruction of the entire remedial mechanism for everyone.

Eighth, Plaintiffs' facial attack fails because the Fund has lawful potential applications. Even if some applications, criteria, procedures, or payments could later prove unlawful, the Fund may still lawfully process claims involving censorship, platform coercion, IRS targeting, retaliatory investigations, wrongful prosecutions, malicious litigation, or other nonviolent lawfare unrelated to Plaintiffs. A facial challenge cannot be used to destroy every lawful or potentially lawful application before any application has occurred.

[PROPOSED] BRIEF OF AMICUS CURIAE

6

Ninth, Plaintiffs' organizational safety theories remain speculative. Claims that future payments may embolden future misconduct by independent actors depend on a chain of contingencies insufficient to establish standing under Article III.

Tenth, Plaintiffs' Section 4 theory fails because no legally operative insurrection predicate is before the Court. Section 4 is debt-specific and obligation-specific. Political labels do not substitute for claimant-specific adjudication.

Eleventh, Plaintiffs' requested remedy is universal relief that exceeds Article III and traditional equitable limits. Even if some Plaintiffs have standing to challenge some aspect of the Fund, that does not give them standing to extinguish unrelated claims belonging to absent nonparties.

Twelfth, the Settlement Agreement's duties-consistent-with-law clause and severability clause require narrow treatment. If any term conflicts with law, the Court can sever, clarify, or require lawful administration. Plaintiffs are not entitled to universal nullification.

## III.    ARGUMENT

### 1.    Plaintiffs' lawsuit rests on a false eligibility premise.

The Complaint repeatedly asserts, assumes, or implies that the Anti-Weaponization Fund is limited to persons alleging lawfare by Democrats or Democratic administrations. That premise drives Plaintiffs' First Amendment claim, Equal Protection claim, APA claims, alleged exclusion injury, and request to dismantle the Fund.  The premise is false.

Plaintiffs rely on a recital in the Settlement Agreement. That recital states that "[t]he conduct alleged in the Case and in the Pending Agency Claims is representative of" the sustained use of government power by certain actors to target persons for improper political, personal, or ideological reasons. Settlement Agreement § II.C. But "the Case" is *Trump v. IRS*. Settlement

[PROPOSED] BRIEF OF AMICUS CURIAE

7

Agreement § I. The "Pending Agency Claims" are Trump's own pending agency claims. Settlement Agreement § II.B. The sentence describes what Trump alleged in the matters being settled. It does not purport to establish a comprehensive eligibility rule for every future claimant.

The difference matters. A settlement recital explaining the settled plaintiff's allegations is not the same thing as an operative exclusion clause. Plaintiffs treat it as one anyway.

The Agreement does not state that only victims of Democrats may recover. It does not state that only victims of Democratic administrations may recover. It does not state that claimants alleging weaponization by Republican officials are barred. It does not state that claimants alleging weaponization by nonpartisan or career federal employees are barred. It does not state that judicial involvement defeats eligibility. It does not state that mixed-actor claims are barred. It does not state that the political identity of any actor cited in a claim must be Democratic.

Plaintiffs' reading is especially weak because lawfare claims often involve multiple actors. A claimant might allege misconduct by elected officials, agency heads, career employees, prosecutors, federal contractors, private platforms acting under government pressure, congressional actors, or judges. A January 6 defendant, for example, might allege that a Biden-era DOJ, federal agents, prosecutors, congressional actors, and media-amplified government narratives produced lawfare, while particular rulings were made by judges appointed by Presidents of different parties. The Settlement Agreement does not answer those hypotheticals because no claim has been filed and no procedure has been applied.

Plaintiffs ask this Court to presume the most exclusionary and constitutionally defective reading before the Fund has applied the language to anyone. That is not a proper basis for Article III standing, APA review, or universal injunctive relief.

[PROPOSED] BRIEF OF AMICUS CURIAE

8

## 2. The operative provisions create a claimant-specific process, not the categorical partisan bar Plaintiffs describe.

The actual operative language is materially broader than Plaintiffs' characterization. Section III.C states that the Fund exists "to provide a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization." Settlement Agreement § III.C. The word "similar" has significance. It does not mean "identical." It does not mean "only by Democrats." It does not bar mixed-actor, nonpartisan, judicial, career-employee, contractor, or state-linked private action claims.

Section V.C provides that, to be eligible, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization. Settlement Agreement § V.C. It does not say "only claims against Democrats." It does not say "only claims arising during Democratic administrations." It does not say "only claims approved by a partisan test."

Section V.D requires individualized evaluation of the totality of circumstances. The Fund must consider the strength of the claim, supporting evidence, the claimant's own actions, actual damages, reasonable attorneys' fees, time in custody, prior relief, and other just and appropriate factors. Settlement Agreement § V.D. Those factors are claimant-specific, evidence-specific, and record-dependent.

The Settlement Agreement also contemplates audits, fraud controls, and referrals for investigation or prosecution of fraudulent claims. Settlement Agreement §§ IV.F, V.G. That structure undermines Plaintiffs' portrayal of the Fund as an automatic, no-questions-asked partisan cash machine.

[PROPOSED] BRIEF OF AMICUS CURIAE

Plaintiffs may dislike the recital and examples. They may believe the Agreement is susceptible to an unlawful construction. But the operative provisions do not create the categorical exclusion Plaintiffs need for their standing theory and requested remedy.

**3. The Administration's public explanation, as pleaded by Plaintiffs, undercuts Plaintiffs' exclusion theory.**

Plaintiffs' own Complaint alleges that DOJ's fact sheet stated: "There is no partisan restriction: Democrats can submit claims, too." Compl. ¶ 63. Plaintiffs then attempt to dismiss that statement because it does not, in their view, say that those targeted by non-Democrats can submit claims.

That maneuver reveals the weakness in Plaintiffs' theory. Their claim depends not on what the Agreement expressly says, but on what Plaintiffs infer from what the Agreement does not say. Plaintiffs infer that a recital describing Trump's allegations excludes all other claims. They then infer that a public statement denying partisan restriction is insufficient because it does not negate every possible exclusion. They then ask this Court to treat those stacked inferences as present injury. Article III and the APA require more.

The Administration's statement that "Democrats can submit claims, too" at least undermines Plaintiffs' claim that eligibility is a simple partisan identity test. It confirms that the claimant's party is not the disqualifying feature. It also reinforces the need to await implementing procedures and actual eligibility decisions before assuming categorical exclusion. If the Government later interprets the Fund unlawfully, a claimant actually denied or burdened by that interpretation may challenge it then. But Plaintiffs cannot obtain universal relief now based on speculation about how an unimplemented process might be construed.

**4. Plaintiffs cannot have it both ways on final agency action, injury, and ripeness.**

[PROPOSED] BRIEF OF AMICUS CURIAE

10

The Complaint identifies the creation and funding of the Anti-Weaponization Fund as the final agency action Plaintiffs challenge. Plaintiffs say that action is final because it establishes a claims process and transfers money into a remedial mechanism. But many of the harms they plead do not flow from creation alone. They depend on future procedures, future applications, future eligibility interpretations, future approvals, future denials, future payments, future secrecy, future claimant conduct, and future third-party actions. That is the central APA problem.

Under *Bennett v. Spear*, final agency action generally must mark the consummation of the agency's decisionmaking process and determine rights or obligations, or produce legal consequences. Bennett v. Spear, 520 U.S. 154, 177–78 (1997). Finality alone, however, does not establish standing or ripeness. Plaintiffs must still show a concrete injury fairly traceable to the challenged action and likely redressable by the requested relief. The Complaint slides between theories to avoid that requirement.

If creation and funding of the Fund is the final agency action, then Plaintiffs' present injury must be tied to present legal consequences. At most, certain Plaintiffs allege that they might be excluded from a claims process. That theory supports, at most, a challenge to exclusion, a request for neutral eligibility, or clarification of the Fund's criteria. It does not support abolition of the Fund.

If, by contrast, Plaintiffs' injury arises from future approvals, future denials, future payments, future lack of disclosure, or future third-party conduct, then the case is premature. No claimant-specific decision is before the Court. No application has been accepted or rejected. No payment is before the Court. No denial is before the Court. No administrative record exists. No claimant has accepted relief and waived claims. No official interpretation has been applied to Floyd, Caravello, New Haven, NAF, Common Cause, amicus, or anyone else.

[PROPOSED] BRIEF OF AMICUS CURIAE

11

Ripeness doctrine prevents courts from deciding abstract disagreements before an agency action has been applied in a concrete way. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148–49 (1967); Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807–08 (2003). The Supreme Court has rejected premature challenges where later site-specific or application-specific decisions would provide a concrete record. See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733–37 (1998).

That principle fits here. The Fund's creation may make future claim decisions possible, but Plaintiffs' most sweeping injuries depend on future application-specific decisions that have not occurred. Plaintiffs cannot invoke creation of the Fund as final agency action while relying on speculative downstream consequences to establish standing, hardship, and universal equitable relief. Either the action is final now, in which case the remedy must be tied to present legal consequences and present injury, or the alleged injuries depend on future claim-specific implementation, in which case the claims are unripe or the remedy must await a concrete record.

5. **The Settlement Agreement contemplates further implementation, reinforcing ripeness defects.**

The Agreement itself refutes Plaintiffs' rush to judgment. It provides that an accompanying Attorney General order will establish funding and other relevant requirements, rules, conditions, terms, and waivers. Settlement Agreement § IV.A. It also provides that the Fund will determine its own procedures for submitting, receiving, processing, granting, or denying claims. Settlement Agreement § IV.C.

That means the process Plaintiffs attack is not yet fully implemented in the way Plaintiffs presume. Plaintiffs sue before procedures are finalized, before eligibility has been officially

[PROPOSED] BRIEF OF AMICUS CURIAE

12

construed, before any claimant has applied, before any claimant has been denied, and before any award has been made.

This matters under both finality and ripeness principles. A court cannot evaluate many of Plaintiffs' claims in the abstract because the operative procedures, application standards, record requirements, transparency practices, and eligibility decisions have not yet been applied. Plaintiffs ask the Court to preempt the entire process based on predictions about how that process might operate. That is not adjudication. It is anticipatory veto.

6. **Plaintiffs mischaracterize a settlement-created claims facility as a freestanding federal agency.**

Plaintiffs' APA, separation-of-powers, Appointments Clause, and notice-and-comment theories depend heavily on treating the Anti-Weaponization Fund as though the President unilaterally created a new federal agency or legislative program with independent statutory jurisdiction. The Settlement Agreement, as published, does not support that characterization.

The Fund is better understood as a settlement-created claims-administration mechanism. The Settlement Agreement resolves Trump v. IRS and related pending agency claims. It provides the named Trump plaintiffs no monetary payment. It creates a process for other persons who assert similar lawfare or weaponization claims to present claimant-specific proof. That structure may raise questions about funding, administration, transparency, appointment, or statutory compliance. But it does not automatically transform every later claim decision into a present legislative rule, every later claimant into a Judgment Fund settlement party, or the claims facility itself into a freestanding agency that can be dismantled wholesale before any claim is heard.

This distinction matters. A settlement agreement can create a claims process without becoming a congressional agency. A claims administrator can evaluate claims without becoming

[PROPOSED] BRIEF OF AMICUS CURIAE

13

a legislature. A settlement fund can process applications without converting each future distribution into the same legal event as the initial settlement transaction. Plaintiffs collapse these categories to obtain a universal remedy that their own alleged injuries do not justify.

If the Court concludes that a particular funding mechanism, appointment method, confidentiality term, procedure, or eligibility interpretation violates law, the Court can require lawful administration. But Plaintiffs' "new agency" label does not justify halting every claim, reversing every transfer, barring appointments, and prohibiting reconstitution of any mechanism for redressing lawfare. The Court should address any proven defect at the level of the defect, not at the level of every absent claimant's underlying right to seek redress.

### 7. If Plaintiffs prove exclusion, the remedy is correction, not destruction.

Plaintiffs' most substantial theory is that the Fund allegedly creates a benefit process for one category of lawfare victims while excluding similarly situated victims who allege weaponization by different political actors. Floyd, Caravello, and New Haven allege that they were harmed by federal weaponization or retaliatory action associated with the Trump-Vance administration and that the Fund does not treat their claims as equally worthy.

Amicus does not ask the Court to decide that issue in this brief. The point is remedial. If Plaintiffs are correct, the injury is exclusion from a benefit or redress process. The remedy for unlawful exclusion is generally to cure the exclusion. It is not to destroy the benefit for every other person.

Plaintiffs attempt to convert alleged underinclusion into abolition. That is the central defect of their prayer for relief. They ask this Court to set aside the Fund, stay its operation, reverse transfers, halt all claim processing, prevent payments, block appointments, and bar reconstitution under another name. That remedy would not merely address Plaintiffs' alleged

[PROPOSED] BRIEF OF AMICUS CURIAE

14

exclusion. It would nullify claims belonging to absent nonparties who have not been heard and whose facts may have nothing to do with Plaintiffs.

That is a disproportionate remedy. If the Fund is unlawfully limited, the Court can require lawful limits. If the Fund is viewpoint discriminatory, the Court can require viewpoint neutrality. If the Fund unlawfully excludes certain claimants, the Court can order that such claimants not be excluded on that basis. Nothing about Plaintiffs' alleged injury requires extinguishing lawful claims by everyone else.

Plaintiffs' own theory proves the point. They say legal weaponization can impose real costs: lost employment, prosecution, legal fees, reputational harm, diversion of resources, threats, chilling effects, and unequal access to governmental processes. If such harms are real when alleged by Plaintiffs, they cannot be categorically dismissed in anticipation of future allegations by presently unknown but unquestionably absent claimants. Plaintiffs cannot use their own claimed injury from exclusion as a basis to exclude everyone else.

8. **The Settlement Agreement requires narrow treatment: duties must be consistent with law, and invalid provisions are severable.**

Two provisions of the Settlement Agreement cut directly against Plaintiffs' request to dismantle the Fund.

Section IX states that nothing in the Settlement Agreement imposes any duty, obligation, or requirement whose performance would be inconsistent with federal statutes. Settlement Agreement § IX. That clause matters. Plaintiffs repeatedly assert that the Agreement requires unlawful conduct. But the Agreement itself disclaims any duty to violate federal law. If there is a conflict between a Fund procedure and federal law, the proper result is lawful administration, not automatic destruction.

[PROPOSED] BRIEF OF AMICUS CURIAE

15

Section X contains a severability clause. It provides that if any provision is found invalid or unenforceable, the validity of other provisions is not affected or impaired, and the remaining provisions should be enforced to the maximum extent possible. Settlement Agreement § X. That clause is fatal to Plaintiffs' maximalist remedial posture. Plaintiffs ask for wholesale dismantlement even though the parties to the Settlement Agreement expressly contemplated preserving lawful portions if a provision is invalid.

Severability is not cosmetic. It embodies the principle that courts should preserve lawful parts of an arrangement when possible rather than destroy the whole. That principle is especially important here because Plaintiffs seek to extinguish the rights of absent nonparties. If a discrete term is unlawful, sever it. If a procedure is flawed, correct it. If confidentiality conflicts with a statute, mandate required disclosures. If appointments are defective, require lawful appointment. If eligibility criteria are unlawful, require lawful criteria. If a funding mechanism is defective, address the funding mechanism. None of those problems requires abolishing every claim.

Plaintiffs' Complaint treats any alleged defect as contagious. The Settlement Agreement treats defects as severable. The Court should follow the latter approach.

### 9. Plaintiffs' facial attack fails because the Fund has lawful potential applications.

Plaintiffs do not merely challenge a particular exclusion, payment, appointment, procedure, disclosure practice, or claimant-specific decision. They seek to dismantle the Fund itself. That is a facial attack in substance, regardless of how the Complaint labels it.

That attack fails because the Fund has lawful or potentially lawful applications. The Agreement can be construed to permit claims involving censorship pressure, platform coercion, IRS targeting, retaliatory investigations, school-board parent targeting, wrongful prosecution, malicious litigation, abusive incarceration, improper subpoenas, or state-linked private action.

[PROPOSED] BRIEF OF AMICUS CURIAE

16

Some such claims may have nothing to do with January 6, FACE Act prosecutions, election disputes, abortion clinics, Trump, Plaintiffs, or any alleged threat.

Even if Plaintiffs could identify some unlawful applications, that would not justify destroying every lawful application. A court can address unlawful criteria, require viewpoint-neutral administration, correct procedures, require disclosures, order lawful appointments, or enjoin a particular unlawful payment. Plaintiffs' facial attack skips all of that and asks this Court to erase every possible application before any application has occurred.

That is not a narrow remedy. It is an anticipatory veto over absent claimants. The existence of potential lawful applications is another reason the Court should reject Plaintiffs' demand to halt claims, reverse transfers, bar appointments, and prohibit any reconstituted Fund.

## 10. Plaintiffs' organizational safety theories depend on speculative future conduct by independent third parties.

NAF and Common Cause allege injury not because they are excluded from the Fund, but because future payments may embolden future third parties to commit future misconduct. NAF alleges that compensation to persons prosecuted under the FACE Act may embolden abortion-clinic blockades or violence. Common Cause alleges that compensation to election-related defendants or activists may embolden election intimidation, increase security burdens, chill voting, and interfere with voter-protection work. Those theories are speculative.

They depend on a chain of contingencies: a claimant must apply; the Fund must approve the claim; the amount must be sufficient to change conduct; the recipient must use funds or perceived vindication to facilitate unlawful activity rather than lawful expenses; the future conduct must target Plaintiffs or their members; and the requested injunction must likely prevent the future injury. That is the kind of attenuated chain the Supreme Court has rejected. See *Lujan*

[PROPOSED] BRIEF OF AMICUS CURIAE

17

*v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976); *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

The problem is not that Plaintiffs' safety concerns are impossible. The problem is that Article III requires more than fear of how independent third parties might react to government action affecting someone else. The Fund does not order anyone to blockade a clinic, threaten voters, intimidate volunteers, or commit violence. If third parties commit crimes, existing law can punish those crimes. Plaintiffs cannot obtain a universal injunction against all Fund claims based on predicted future misconduct by unidentified independent actors.

The requested relief also fails redressability. Enjoining the Fund would not prevent ideological hostility, private fundraising, public advocacy, political organizing, prior pardons, criminal intent, or independent third-party action. It would only eliminate a compensation mechanism for everyone, including claimants with no relationship to NAF, Common Cause, or any alleged threat.

**11. Plaintiffs' Section 4 theory still lacks a legally operative insurrection predicate.**

Plaintiffs again invoke Section 4 of the Fourteenth Amendment, asserting that the Fund may pay claims to persons involved in January 6 and that such persons "engaged in an act of insurrection." That is political characterization, not a legally operative predicate.

Section 4 does not prohibit payments to people Plaintiffs dislike. It does not prohibit payments to people who were politically criticized. It does not prohibit payments to people described by media, advocacy organizations, or litigants as "insurrectionists." It prohibits the United States or a State from assuming or paying a "debt or obligation incurred in aid of insurrection or rebellion against the United States." U.S. Const. amend. XIV, § 4.

[PROPOSED] BRIEF OF AMICUS CURIAE

18

That text requires specificity. Plaintiffs identify no approved claim. They identify no payment. They identify no claimant. They identify no debt. They identify no obligation. They identify no administrative record. They identify no Fund decision. They identify no conviction under 18 U.S.C. § 2383. They identify no judicial finding that any particular debt or obligation was incurred in aid of insurrection or rebellion.

Plaintiffs also conflate debts incurred in aid of an event with consequences incurred because of prosecution after the event. Even assuming arguendo the Court accepts Plaintiffs' "insurrection" characterization, Section 4 still requires a particular debt or obligation to have been incurred in aid of insurrection or rebellion. Defense fees incurred after the fact to respond to prosecution are not automatically "in aid of" the alleged underlying event. Restitution is an obligation imposed as punishment, not a debt incurred to aid rebellion. Custody time is not a "debt or obligation" in the ordinary financial sense. A claimed injury from allegedly unlawful or excessive prosecution is not itself a debt incurred in aid of the prosecuted conduct.

Section 4 is not a roving license to enjoin all payments to politically disfavored people. Any Section 4 challenge, if one ever becomes justiciable, must be claimant-specific, payment-specific, debt-specific, obligation-specific, and supported by a legally operative record.

## 12. Plaintiffs' requested remedy is universal relief that exceeds Article III and traditional equitable limits.

Plaintiffs ask for extraordinary relief. They seek an order declaring the Fund unlawful, vacating and setting it aside, staying its creation, stopping money transfers, reversing transfers already made, barring acceptance or processing of claims, barring payments, barring appointments, and prohibiting reconstitution under a different name.

That is not plaintiff-specific relief. It is universal destruction of a remedial process.

[PROPOSED] BRIEF OF AMICUS CURIAE

A plaintiff must establish standing for each claim and each form of relief. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Standing is not dispensed in gross. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Even if some Plaintiffs have standing to challenge exclusion from the Fund, that does not give them standing to extinguish unrelated claims belonging to absent nonparties.

Traditional equitable principles require relief no broader than necessary to redress the plaintiff's injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Gill v. Whitford*, 585 U.S. 48, 68 (2018). *In Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Supreme Court emphasized that universal injunctions likely exceed federal equitable authority when they extend beyond what is necessary to provide complete relief to plaintiffs with standing.

Those principles are decisive here. Even if Plaintiffs are correct about some legal defect, they are wrong about the remedy. If Floyd, Caravello, or New Haven are unlawfully excluded, complete relief may require an opportunity to apply under lawful criteria. It does not require destroying claims belonging to amicus or other absent citizens. If Common Cause is entitled to information, complete relief may require legally required disclosure. It does not require eliminating every payment. If NAF can show a concrete injury from a specific payment, complete relief may address that payment. It does not require freezing every unrelated claim. If appointment, funding, or procedure is defective, the Court can order lawful appointment, lawful funding, lawful disclosure, or lawful procedure.

Plaintiffs repeatedly ask this Court to take the most aggressive possible remedy from the least developed possible record. That reverses the proper order of adjudication. Courts decide concrete disputes on concrete records and grant relief tailored to concrete injuries. They do not presume the most unconstitutional interpretation of an unapplied agreement and then use that

[PROPOSED] BRIEF OF AMICUS CURIAE

20

presumption to abolish every absent claimant's rights. The requested remedy is broader than any alleged injury. It should be denied.

### 13. Procedural, transparency, appointment, or Judgment Fund defects, if proven, should be cured narrowly.

Plaintiffs raise statutory and procedural objections concerning the Judgment Fund, 28 U.S.C. § 2414, 31 U.S.C. § 1304, 31 C.F.R. part 256, FOIA, appointment authority, confidentiality, notice and comment, and final agency action. Amicus does not ask the Court to decide those issues in this brief.

But even if one or more of those objections has merit, the remedial question remains. Plaintiffs treat every alleged defect as a warrant to dismantle the Fund and extinguish all claims. That does not follow. A procedural defect is not a blank check for universal destruction. A transparency defect can be addressed through transparency. An appointment defect can be addressed through lawful appointment. A confidentiality defect can be addressed by mandating disclosure. A notice-and-comment defect can be addressed by requiring suitable procedures. An Appointments Clause defect can be addressed by lawful appointment or supervision.

The Judgment Fund argument requires particular care because Plaintiffs conflate two distinct issues: the legality of the Government's use of Judgment Fund money to settle or fund the Trump v. IRS resolution, and the substantive validity of future lawfare claims belonging to absent nonparties. The first issue concerns funding source, certification, payment authority, and any disclosure obligations tied to the settlement transaction. The second issue concerns whether an individual claimant can prove a lawful entitlement to relief. A defect in the former does not adjudicate the latter.

[PROPOSED] BRIEF OF AMICUS CURIAE

21

Section 1304(d), if applicable, concerns public disclosure for payments made pursuant to that section. Plaintiffs assume that every later distribution by the Anti-Weaponization Fund must be treated as though it were itself a separate Judgment Fund payment. That conclusion is not self-evident from the Settlement Agreement. The initial legal event is the settlement and funding transaction. Later claimant-level distributions are downstream administration of a settlement-created claims process. If the Court concludes that § 1304(d), § 2414, Treasury regulations, or other fiscal-law provisions require different disclosure, certification, funding, or payment mechanics, the Court can require compliance with those laws. It need not hold that every absent claimant's underlying lawfare claim is void before any claim exists.

Nor does a disputed funding source make the underlying claims illegitimate. A claimant may have a valid lawfare claim even if the Government chose the wrong payment mechanism. A claimant may have a valid injury even if a particular settlement corpus must be restructured. A claimant may be entitled to seek relief even if the Fund must publish additional information, use a different account, obtain different authorization, or follow different procedures. Plaintiffs' leap from alleged Judgment Fund defect to total claim extinguishment is remedial overreach.

The Settlement Agreement's claimant-screening provisions are relevant here as well. The Agreement requires legal claims, evidence, consideration of claimant conduct, actual damages, reasonable attorneys' fees, custody time, prior relief, audits, and fraud controls. Plaintiffs' rhetoric suggests a no-questions-asked partisan giveaway, but the Agreement contains mechanisms for claimant-specific proof and denial. If the Court concludes those mechanisms are inadequate, it can require more. It need not destroy the process.

[PROPOSED] BRIEF OF AMICUS CURIAE

22

The Court should separate alleged defects from Plaintiffs' preferred remedy. Plaintiffs are not entitled to turn every fiscal, procedural, transparency, or appointment objection into an injunction extinguishing every potential lawfare claim.

**14. Plaintiffs' public-interest branding does not justify a universal veto over absent lawfare claimants.**

Plaintiffs frame this case as a challenge to partisan misuse of public resources. But their own posture deserves the same scrutiny they demand for the Fund. Plaintiffs are represented by Democracy Forward Foundation, whose public IRS filings indicate that it was formed on March 29, 2017, shortly after President Trump took office, and identify it as a tax-exempt § 501(c)(3) organization claiming public-charity status under 26 U.S.C. § 170(b)(1)(A)(vi). Its initial public IRS filings identify a panoply of senior Democratic legal and political figures among its directors, including Marc Elias, John Podesta, and Ron Klain. Podesta and Klain later held prominent positions in the Biden Administration. Democracy Forward's own stated mission is to work through the legal system and administrative processes to hold government accountable, and its public materials describe it as a litigation organization providing legal representation and expert counsel free of charge, including under an express litigation category for "Weaponization of Government."

Those facts do not require this Court to adjudicate Democracy Forward's tax status or decide any collateral Internal Revenue Code issue. The narrower point is remedial. Plaintiffs invoke taxpayer-protection rhetoric while relying on a politically aligned, tax-subsidized litigation organization that itself invites the same scrutiny Plaintiffs demand for the Fund. Nonprofit branding does not supply Article III standing, prove neutrality, enlarge equitable power, or convert a political litigation objective into neutral public-interest law. A tax-subsidized

[PROPOSED] BRIEF OF AMICUS CURIAE

23

public-interest litigation organization cannot condemn alleged partisan public-resource lawfare while asking the Court to impose the opposite ideological veto over every absent claimant.

If Plaintiffs are correct that any aspect of the Fund is unlawfully partisan, the remedy is neutral access, lawful procedure, statutory compliance, disclosure where required, severance where appropriate, and claimant-specific adjudication. It is not an order halting all claims, stopping all payments, reversing transfers, barring appointments, and prohibiting reconstitution of the Fund under another name. That remedy would not cure alleged partisanship. It would replace one allegedly partisan legal settlement with another partisan litigation outcome.

**CONCLUSION**

The Court need not decide whether every feature of the Anti-Weaponization Fund is lawful to reject Plaintiffs' demand for wholesale destruction. The issue presented by this amicus brief is narrower: Plaintiffs have not justified a remedy that would extinguish unrelated claims belonging to absent nonparties before any claim is filed, any eligibility interpretation is applied, any payment is made, or any record exists.

Plaintiffs' Complaint is built around a contradiction. Plaintiffs insist that legal weaponization is real enough to injure them, but not real enough to justify relief for others. They insist that exclusion from a redress process is a cognizable injury, but ask this Court to exclude every absent claimant from that process. They attack political selectivity while seeking a remedy that would impose their own political veto over every lawfare claim in the country. The Court should reject that overreach.

For the foregoing reasons, if the Court permits amicus participation, amicus respectfully urges that any relief be limited to Plaintiffs' own concrete injuries; that any unlawful exclusion, procedure, confidentiality rule, appointment mechanism, or funding defect be corrected

[PROPOSED] BRIEF OF AMICUS CURIAE

24

narrowly; that Plaintiffs' Section 4 theory be rejected absent a claimant-specific and payment-specific adjudication; and that the Court deny any injunction or vacatur that would dismantle the Anti-Weaponization Fund or extinguish unrelated lawfare and weaponization claims belonging to absent nonparties.

Dated: May 26, 2026

Respectfully submitted,

Jason Goodman
Amicus Curiae Pro Se
252 7th Avenue Apt 6S
New York, NY 10001
347-201-6017
truth@crowdsourcethetruth.org

LOCAL CIVIL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that no attorney has prepared, or assisted in the preparation of, this Proposed Brief of Amicus Curiae Jason Goodman.

Jason Goodman

Signature: _____

Executed on: May 26, 2026

[PROPOSED] BRIEF OF AMICUS CURIAE

25