# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ANDREW FLOYD, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DEPARTMENT OF JUSTICE, *et al.*, <br><br> *Defendants.* | Case No. 26-cv-01399 |

**BRIEF OF *AMICI CURIAE*
UNITED STATES SENATORS CORY BOOKER AND BILL CASSIDY**

## TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF *AMICI CURIAE* ...................................................................................1

INTRODUCTION .........................................................................................................2

ARGUMENT..................................................................................................................4

I.  The Anti-Weaponization Fund Constitutes an End-Run Around Congress's Institutional Authority Under the Constitution. ........................................................................5

    A.    The Fund Violates the Spending and Appropriations Clauses.................................5

    B.    The Fund Violates the Appointments Clause...........................................11

II.  The Anti-Weaponization Fund Will Compensate January 6th Insurrectionists, Striking at the Core of Congressional Authority and the Constitutional Order It Embodies. .........................15

CONCLUSION..............................................................................................................17

i

# TABLE OF AUTHORITIES

**Cases**

*Buckley v. Valeo*, 424 U.S. 1 (1976)..................................................................................14

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ..............................................6

*Edmond v. United States*, 520 U.S. 651 (1997) ........................................................11, 14

*Flast v. Cohen*, 392 U.S. 83 (1968) ..................................................................................10

*Freytag v. Commissioner*, 501 U.S. 868 (1991) ..............................................................14

*Griffin v. IRS*, No. 22-cv-24023 (S.D. Fla. 2023)............................................................10

*Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017) ....................................................9

*Keepseagle v. Veneman*, No. 99-cv-3119 (D.D.C.)............................................................9

*Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025)..........................................12, 14

*Lucia v. SEC*, 585 U.S. 237 (2018)..............................................................................13, 14

*Morrison v. Olson*, 487 U.S. 654 (1988) .........................................................................13

*Muskrat v. United States*, 219 U.S. 346 (1911) ..........................................................9-10

*Myers v. United States*, 272 U.S. 52 (1926).....................................................................14

*Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) ................................................................4

*Reeside v. Walker*, 52 U.S. (11 How.) 272 (1850) ............................................................5

*Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, No. 25-cv-139,
     ECF No. 31, at 1 (D. Md. 2025) .............................................................................10

*Trump v. IRS*, No. 26-cv-20609 (S.D. Fla. 2026) ....................................................2, 3, 11

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021).............................................................14

*United States v. Eaton*, 169 U.S. 331 (1898)....................................................................13

*Wille v. Lutnick*, 158 F.4th 539 (4th Cir. 2025).................................................................12

**Statutes**

28 U.S.C. § 2414........................................................................................................6, 7, 11

31 U.S.C. § 1304..............................................................................................................2, 6

**Regulations**

31 C.F.R. § 256.1 ........................................................................................................6, 7, 9

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ...............................................................................................1, 5

U.S. Const. art. I, § 9, cl. 7 ............................................................................................1, 5, 8

U.S. Const. art. II, § 1, cl 7 ..................................................................................................1

U.S. Const. art. II, § 2, cl. 2 ...............................................................................................12

**Other Authorities**

*Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.LC. 126, 136 (1999) ...............................................................8

Vivian S. Chu, Vivian S., & Yeh,  Brian T., Cong. Research Serv., R42835, The Judgment Fund: History, Administration, and Common Usage 6 (2013) ...............................................11

Dreisbach, Tom, *Police Sue Trump as Jan. 6 Rioters Gloat Over 'Weaponization' Fund*, NPR News (May 21, 2026) ..........................................................................................................15

Duehren, Andrew, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026).......................................................................................10

Durkee, Alison, *Trump's $1.8B 'Anti-Weaponization' Fund Is Dead—For Now*, Forbes (Jun. 1, 2026),......................................................................................................................................4

Feuer et al., Alan, *Inside the Deal to Drop Trump's $10 Billion Suit Against the I.R.S.*, N.Y. Times (May 30, 2026) ..............................................................................................................16

Fountain, Luke, *Blanche won't rule out Jan. 6 rioters getting Trump DOJ fund payouts*, CNBC (May 19, 2026) .......................................................................................................................16

Graef, Aileen and Ferris, Sarah, Trump suggests he hasn't dropped the 'anti-weaponization' fund, CNN (June 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump..............................3

Jalonick, Mary Clare, *'A Difficult Year.' How Officers Who Defended the Capitol Are Grappling with Efforts to Downplay Jan. 6 Violence*, PBS News (Jan. 5, 2026) ....................................17

*Jan. 6, 2021: A Visual Archive of the Capitol Attack*, NPR News (Jan. 4, 2026)...........................17

Order of the Acting Attorney General, Office of the Attorney General, (May 18, 2026) ................9

*President Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trump-administration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410 ....................................................10

Press Release, *Justice Department Announces Anti-Weaponization Fund*, May 18, 2026 ..............9

Reilly, Ryan J., *DOJ Official Told GOP Ally That Big Payouts Were Coming for Jan. 6 Defendants*, NBC News (May 20, 2026).......................................................................................16

Romero et al., Laura, *Trump Allies, Jan. 6 Defendants Lining Up to Apply for $1.7 Billion 'Anti-Weaponization Fund,'* ABC News (May 21, 2026).............................................................15

@SalilKapur, Bluesky (June 3, 2026 10:23 AM) https://bsky.app/profile/sahilkapur.bsky.social/post/3mnfcps55rc26 .....................................4

*Settlement Authority of the United States in Oil Shale Cases*, 4 Op. O.L.C. 756, 757-78 (1980)...8

*The Benny Show*, at 43:56 (May 16, 2025)......................................................................................16

U.S. Dep't of Justice, Justice Manual § 1-17.000.............................................................................8

U.S. Dep't of Justice, Justice Manual § 4-3.400...............................................................................8

U.S. Dep't of Justice, Justice Manual § 4-3.432 ..............................................................................9

U.S. Gov't Accountability Off., GAO-08-978SP, 3 *Principles of Federal Appropriations Law* 14-35 (3d ed. 2008).......................................................................................................................11

White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (Jan. 31, 2026) ........................................................................................................10

iii

*President Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trump-administration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410 ......................................................10

## INTEREST OF *AMICI CURIAE*

*Amici curiae* Cory Booker and Bill Cassidy are Members of the United States Senate. Bipartisan *amici* are interested in this case because they took an oath to uphold and defend the Constitution of the United States and the principles of separation of powers. They have an interest in the institutional role of the Legislative Branch under Article I of the Constitution as the People's duly-elected representatives, including in ensuring that acts of Congress are faithfully executed by the Executive Branch.

*Amici* also have a strong interest in ensuring that the Executive Branch properly guards the public fisc. That includes complying with the Constitution's commands that only Congress has the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States[,]" U.S. Const. art. I, § 8, cl. 1, and that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[,]" *id.* art. I, § 9, cl. 7. Likewise, *amici* have a strong interest in safeguarding the Senate's role under the Appointments Clause, which specifies that the President must make appointments of principal officers "by and with the Advice and Consent of the Senate." *Id.* art. II, § 2, cl. 2. The "Anti-Weaponization Fund" constitutes an improper and unconstitutional transfer of taxpayer dollars, including to those who engaged in a violent insurrection against the United States and its democratically elected representatives—including the United States Senate—on January 6, 2021. And it entirely bypasses Congress's crucial role under the Appointments Clause in determining who may wield authority as an officer of the United States, including the members who will administer this "Anti-Weaponization Fund."

With this brief, *amici* aim to assist the Court by explaining how the "Anti-Weaponization Fund" at issue in this case constitutes an end-run around Congress's institutional authority. *Amici*

1a

bring the unique perspective of current members of the U.S. Senate in a lawsuit that raises serious questions about the separation of powers, the Appropriations Clause, and the Appointments Clause. They also are uniquely situated to explain how Congress's appropriations to the Judgment Fund, 31 U.S.C. § 1304, contain specific constraints that foreclose the use of its monies for the Anti-Weaponization Fund.

## INTRODUCTION

In January of this year, President Donald J. Trump, his sons, and the Trump Organization filed a lawsuit against the Internal Revenue Service (the "IRS") and the U.S Department of the Treasury, alleging that the disclosure of their tax return information by Charles Littlejohn, a government contractor who leaked tax return information associated with more than 400,000 taxpayers, somehow caused the Trumps $10 billion in damages. *Trump v. IRS*, No. 26-cv-20609, ECF No. 1, Complaint (S.D. Fla. Jan. 29, 2026). Given the President's control over the defendant agencies in his case, the lawsuit raised understandable concerns with the assigned judge, who appointed a group of *amici* to advise on whether the parties were sufficiently adverse to each other so as to satisfy the U.S. Constitution's case or controversy requirement under Article III. *Id.*, ECF No. 43 (S.D. Fla. Apr. 29, 2026).

Rather than respond to that order or defend the interests of the People of the United States, on May 18, 2026, the U.S. Department of Justice (the "DOJ") and the IRS entered into an unprecedented settlement with a sitting President, his family, and his business. ECF No. 1-2, Settlement Agreement. The settlement established an "Anti-Weaponization Fund," *id.* § III.C, to be distributed to those who incurred harm from "Lawfare and Weaponization," defined as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for

2a

improper and unlawful political, personal, and/or ideological reasons." *Id.* § II.C. The authority to distribute the Fund's money falls to five members appointed by the Attorney General, only one of whom will be chosen "in consultation" with Congressional leadership. *Id.* § IV.B. All of them are subject to removal only by the President, and final decisions are unreviewable and only require a majority of a three-member quorum. *Id.* An order issued the same day by Acting Attorney General Todd Blanche instructs the Treasury to transmit $1.776 billion in taxpayer money to the Fund. *See* ECF No. 1-4, DOJ Settlement Order. An addendum to the Agreement released the next day, signed only by Acting Attorney General Todd Blanche, provides the President and his co-plaintiffs with a broad liability waiver that purports to permanently protect them from "any and all claims, counterclaims, causes of action, appeals, or requests for any relief, . . . whether presently known or unknown, . . . before Defendants or other agencies or departments" that are "currently pending or that could be pending." ECF No. 1-3. The Southern District of Florida subsequently issued an order requiring President Trump and his co-plaintiffs to respond to allegations of collusion and deception, and to address whether the case should be reopened due to fraud on the Court. *Trump v. IRS*, No. 26-cv-20609, ECF No. 65, Order (S.D. Fla. May 29, 2026).

President Trump publicly stated within the past day that the Anti-Weaponization Fund has not been rescinded, despite Acting Attorney General Todd Blanche's contrary testimony before Congress. *See* Graef, Aileen and Ferris, Sarah, Trump suggests he hasn't dropped the 'anti-weaponization' fund, CNN (June 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump; Salil Kapur, Bluesky (June 3, 2026 10:23 AM) https://bsky.app/profile/sahilkapur.bsky.social/post/3mnfcps55rc26 (Pod Force One Interviewer: "The Anti-Weaponization Fund, have you dropped that?" President Trump: "No. A court ruled against it."). Nor would voluntary rescission of the Fund necessarily moot the threat posed by

Defendants' actions. *See, e.g., Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017). In short, this case warrants the Court's immediate attention.

*Amici curiae* are United States Senators who took an oath to support and defend the Constitution of the United States. They write not as partisans but as representatives of the taxpayers whose funds have been committed to this scheme without statutory authorization, and as legislators who retain a direct constitutional stake in ensuring that the Executive Branch does not convert the public monies into an instrument of political reward. The Anti-Weaponization Fund presents each of those concerns in their most acute form, including the award of monies to those who stormed the U.S. Capitol on January 6, 2021.

*Amici* respectfully urge this Court to recognize that what is at stake in this litigation is not an ordinary dispute about executive spending authority or the boundaries of the clemency power. It is a question of whether the machinery of democratic government may be turned, by design and with explicit intent, against the democratic foundations it exists to serve. The establishment of the Anti-Weaponization Fund violates the Spending, Appropriations, and Appointments Clauses of the Constitution. The Fund is also the result of a collusive settlement and therefore ineligible for Judgment Fund monies appropriated by Congress.

The Anti-Weaponization Fund presents an immediate and dire threat to our constitutional order and the authority of Congress. Indeed, among other purposes, the Fund is designed to compensate the insurrectionists who stormed the U.S. Capitol on January 6th. The existence of the Fund strikes at the core of Congressional authority and our Constitutional order. *Amici* urge this Court to maintain an injunction against the implementation of the Anti-Weaponization Fund and ultimately render judgment for the Plaintiffs in this matter.

**ARGUMENT**

4a

## I.    The Anti-Weaponization Fund Constitutes an End-Run Around Congress's Institutional Authority Under the Constitution.

As sitting U.S. Senators, *amici* are duty-bound to protect the institutional authority of Congress and its duly-elected representatives. The Constitution of the United States directs the power of the purse to Congress alone, not the Executive Branch. And the President cannot make appointments without either the advice and consent of the U.S. Senate or authorization vested to him by Congress. The Anti-Weaponization Fund circumvents these bedrock legislative powers. It is an unconstitutional attempt to spend the People's money without Congressional approval, and cannot withstand separation of powers scrutiny under the Spending, Appropriations, and Appointments Clauses of the Constitution.

### A.    The Fund Violates the Spending and Appropriations Clauses.

The creation and funding of the Anti-Weaponization Fund independently violate the Spending Clause and the Appropriations Clause of the Constitution. The Spending Clause grants Congress the "Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States[.]" U.S. Const. art. I, § 8, cl. 1. The Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequences of Appropriations made by Law[.]" *Id.* § 9, cl. 7. The Appropriations Clause imposes a strict "restriction upon the disbursing authority of the Executive department," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress."). By demarcating Congress's paramount role in the power of the fisc, both Clauses are foundational pillars for the principle of separation of powers.

Here, the Defendants have taken money appropriated under the Judgment Fund, 31 U.S.C. § 1304, and used it for purposes that go well beyond the statutorily authorized use of that money. They have bypassed Congressional authority to create a fund for the payment of claims against the United States without Congressional accountability and oversight. Such use of a Congressional appropriation outside and beyond the limited statutory purposes enumerated for the appropriation violates not only the statutes themselves; it also runs afoul of the Constitution. *See Cincinnati Soap Co.*, 301 U.S. at 321 ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.").

Congress's appropriations to the Judgment Fund come with specific constraints that foreclose the settlement establishing the Anti-Weaponization Fund. One of those express constraints is that "compromise settlements" are only authorized when the settlement is payable pursuant to specific statutes, including the Settlements Authority Statute, 28 U.S.C. § 2414, and other statutes not applicable here. Crucially, under § 2414, the Attorney General has authority only to make "compromise settlements of claims . . . for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States . . . ." The regulation enumerating the Department of the Treasury's authority for certifying payment from the Judgment Fund, 31 C.F.R. § 256.1 (2025), is in accord: Congress only authorizes "settlement of claims arising under actual or imminent litigation . . . ." *See also id.* at § 256.1(b) ("Fiscal Service requires that requests for payment identify the statute that forms the basis of the underlying claim. The award or settlement must comply with the statutory and regulatory requirements that authorize the award or settlement."). The settlement and resulting Anti-Weaponization Fund violate the Judgment Fund statute—and hence the Spending and Appropriations Clauses—for two separate reasons.

6a

*First*, the Anti-Weaponization Fund is constitutionally and statutorily inapposite to the Judgment Fund's express limitations because Anti-Weaponization Fund claimants are not involved in actual or imminent litigation against the United States. *See* 28 U.S.C. § 2414. Third parties seeking compensation from the Fund do not have claims related to the statutory causes of action at issue in President Trump's lawsuit against the IRS. The Anti-Weaponization Fund is thus not a lawful "compromise settlement" for which use of Judgment Fund monies is authorized. *Id.* And, most importantly, Congress has not expressly authorized any fund, much less one involving billions of taxpayer dollars, for "Anti-Weaponization" purposes.

Additionally, 31 C.F.R. § 256.1(a) (2025) states that "amounts owed under compromise agreements negotiated by the U.S. Department of Justice in settlement of claims arising under actual or imminent litigation are normally paid from the Judgment Fund, if a judgment on the merits would be payable from the Judgment Fund."  Under the Settlement Agreement and the Order creating the Anti-Weaponization Fund, however, individual claimants will submit claims for payment of Judgment Fund money for which the members of the Anti-Weaponization Fund, not the DOJ, will determine whether, and how much, payment is appropriate. And claimants are able to receive payments from the Anti-Weaponization Fund without first obtaining a judgment against, or entering a settlement with, the United States. ECF No. 1-2, Settlement Agreement. Accordingly, any payment out of the Judgment Fund to compensate Anti-Weaponization Fund claimants would violate the Appropriations Clause. U.S. Const. art. I, § 9, cl. 7.

The DOJ has long been aware of Congress's limitations on the Judgment Fund, as evidenced by its own policies, but chose to ignore them here. The Justice Manual requires that any compromise entered by the DOJ be "specifically limited to the immediate subject matter of the claim which was in fact compromised. In no case should a general release be issued to the debtor

7a

. . . ". U.S. Dep't of Justice, Justice Manual § 4-3.400. In fact, the Justice Manual goes further by requiring all third-party payments in a settlement to "have a strong connection to the underlying violation or violations of federal law at issue[.]" *Id.* § 1-17.000. It even prohibits the DOJ and its client agencies from retaining "post-settlement control over the disposition or management of the funds[.]" *Id.*[1] Though the Attorney General has broad settlement discretion, that power must be exercised in a "manner that conforms to the specific statutory limits that Congress has imposed upon its exercise." *Auth. of the U.S. to Enter Settlements Limiting the Future Exercise of Exec. Branch Discretion*, 23 Op. O.L.C. 126, 136 (1999). And as the DOJ has previously acknowledged, "it should go without saying that the Attorney General is bound by the duty imposed on the President under Article II of the Constitution to 'take care that the laws be faithfully executed,' and that consequently there may be some forms of settlement that would be foreclosed, as where the settlement would result in action plainly at variance with Congress' intent." *Settlement Auth. of the U.S. in Oil Shale Cases*, 4 Op. O.L.C. 756, 757-78 (1980).

The DOJ has followed none of these longstanding safeguards protecting Judgment Fund monies here. The settlement is not limited to President Trump's IRS claims and benefits third-party beneficiaries with no connection to that case. It keeps the disposition of the settlement funds in the control of the DOJ and the President. And the DOJ went even further by issuing a purported general

---

[1] The Justice Manual also requires that DOJ not "propose the selection of any particular third party to receive payments," that a copy of the settlement be made publicly available when the court would not have authority to order a third-party payment, and that the Deputy Attorney General or the Associate Attorney General approve payment to non-governmental authorities with an accompanying explanation of how the settlement complies with the Justice Manual. U.S. Dep't of Justice, Justice Manual § 1-17.000. The DOJ, as far as *amici* and the public are aware, have not complied with any of these requirements.

8a

release. All of these features of the settlement are in direct violation of the Justice Manual.[2] *See* ECF No. 1-2, Settlement Agreement, at 1-2.[3]

*Second*, the Anti-Weaponization Fund is the result of a collusive settlement in President Trump's lawsuit against the Internal Revenue Service, which was not an "actual or imminent litigation" eligible for Judgment Fund monies in the first place. 31 C.F.R. § 256.1 (2025). The parties to that lawsuit, which was never an adversarial proceeding subject to Article III jurisdiction, used the filing as an end-run around Congressional authority and the Constitution. The settlement that resulted thus violates the Spending Clause and the Appropriations Clause.

Article III of the Constitution makes plain that the judicial power extends only to "the right to determine actual controversies arising between adverse litigants," *Muskrat v. United States*, 219 U.S. 346, 361 (1911), and not to collusive lawsuits, *Flast v. Cohen*, 392 U.S. 83, 100 (1968)

---

[2] The Justice Manual further provides that substantial settlements of claims under the Federal Tort Claims Act ("FTCA")—like the one brought by President Trump based on the Mar-a-Lago raid and his IRS claims—"must receive explicit and advance approval through the Civil Division of the Department of Justice . . . . Requests are expected to demonstrate a thorough, thoughtful exploration of any issues relating to jurisdiction, liability, and damages, with the ultimate goal of ensuring that a proposed settlement is in the best interests of the United States[.]" *Id.* § 4-3.432; *see also* ECF No. 1-2, Settlement Agreement, at 1-2 (releasing President Trump's pending FTCA claims). It is highly unlikely that the "thoughtful exploration" required by the Justice Manual occurred.

[3] Moreover, the DOJ's references to the *Keepseagle* settlement to justify its actions in both its press release announcement of the Fund and the Acting Attorney General's same-day order regarding the Fund are a red herring. *See* Press Release, *Justice Department Announces Anti-Weaponization Fund*, May 18, 2026, ; Order of the Acting Attorney General, Office of the Attorney General, (May 18, 2026), . The appropriateness of the distribution of unclaimed funds in that case turned on the *cy près* doctrine, which is wholly inapplicable here. Moreover, in *Keepseagle* there was a long-running adversarial dispute litigated in the federal courts, and the settlement was approved by an Article III court. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1042-44 (D.C. Cir. 2017) (describing case posture); *see also Keepseagle v. Veneman*, No. 99-cv-3119 (D.D.C.) (lower court docket with nearly 20 years of activity).

(describing adverseness as prohibiting suits that are "friendly," "feigned," or "collusive").[4] But President Trump's presence on both sides of the IRS litigation, and his own blunt statements that the case was merely an opportunity for him to "work out a settlement with myself,"[5] make evident that he and the government defendants were not adversaries at all. And the DOJ's failure to raise numerous meritorious arguments for dismissal further demonstrates that the lawsuit was collusive from the start. Tellingly, the DOJ ignored a memorandum prepared by IRS employees outlining ways to challenge the President's claims.[6] And it failed to raise obvious defenses, such as a statute-of-limitations bar and the fact that the alleged discloser of IRS records was not a government employee—arguments it had raised in other cases involving essentially identical facts.[7]

Because the very lawsuit that sparked the settlement was collusive and therefore could not be heard in a federal court, and accordingly no monetary award would have been available through that collusive litigation, the Judgment Fund is not available. A collusive settlement over which no

---

[4] For additional legal analysis on the case and controversy requirement of Article III in President Trump's IRS lawsuit, see *Trump v. IRS*, No. 26-cv-20609, Memorandum of Court-Appointed *Amici Curiae*, ECF No. 45 (S.D. Fla. May 14, 2026).

[5] *See* White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (Jan. 31, 2026), . When asked in a different interview what he would tell Treasury Secretary Scott Bessent and then-Attorney General Pamela Bondi, President Trump stated that he would "tell 'em to pay me." *Read the full transcript: President Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), .

[6] Andrew Duehren, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026), .

[7] *See, e.g., Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, No. 25-cv-139, ECF No. 31, at 1 (D. Md. July 23, 2025) (government's motion to dismiss claim "for the unlawful inspection and disclosure of [plaintiffs'] return information"); *Griffin v. IRS*, No. 22-cv-24023, ECF No. 58 (S.D. Fla. Nov. 27, 2023) (government's motion to dismiss claim relating to disclosure of "return information" on ground that the discloser, Charles Littlejohn, was a contractor and thus "not an officer or employee of the IRS").

10a

court has jurisdiction is not "actual or imminent litigation." As the Government Accountability Office ("GAO") explains, the statement in 28 U.S.C. § 2414 "for defense of imminent litigation or suits against the United States" requires that "[t]he agency must be confronted with a genuine disagreement or impasse . . . . There must be a *legitimate* dispute over either liability or amount." U.S. Gov't Accountability Off., GAO-08-978SP, 3 *Principles of Federal Appropriations Law* 14-35 (3d ed. 2008) (emphasis added). After all, "the Judgment Fund is limited to litigative awards, meaning awards that *were or could have been made in a court.*" Vivian S. Chu & Brian T. Yeh, Cong. Research Serv., R42835, The Judgment Fund: History, Administration, and Common Usage 6 (2013) (emphasis added). And indeed, the judge overseeing the IRS matter recently issued an order requiring President Trump and his co-plaintiffs to respond to allegations of collusion and deception, and to address whether the case should be reopened due to fraud on the Court. *Trump v. IRS*, No. 26-cv-20609, ECF No. 65, Order (S.D. Fla. May 29, 2026). There is thus no legal Congressional appropriation to settle the President and his family's claims against the IRS, including through the establishment of an "Anti-Weaponization Fund."

### B.    The Fund Violates the Appointments Clause.

The Fund violates separation of powers principles in another way: its authority to give away taxpayer money is vested in officers whose selection is incompatible with the Constitution's Appointments Clause. That Clause "is among the significant structural safeguards of the constitutional scheme[,]" serving both as a check on Congressional power and "to curb Executive abuses of the appointment power" and "to promote a judicious choice of [persons] for filling the offices of the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (citations omitted). Under the Appointments Clause, only the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by

11a

Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

The Appointments Clause thus makes "two distinctions": "between those who are 'Officers of the United States' and those who are not," and "between those who are 'inferior' officers" and principal officers. *Wille v. Lutnick*, 158 F.4th 539, 546 (4th Cir. 2025). "Principal officers must be appointed by the President 'with the Advice and Consent of the Senate.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025) (quoting Art. II, § 2, cl. 2). Inferior officers can also be appointed "via Presidential nomination and Senate confirmation" but the Framers also authorized "an additional and streamlined method of appointment for inferior officers": "Congress may 'by Law vest' appointment of inferior officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id* at 760. (quoting Art. II, § 2, cl. 2).

The Members of the Anti-Weaponization Fund are plainly subject to the Appointments Clause because they are officers exercising authority of the United States rather than acting as mere employees. But their appointments satisfy neither the required process for Principal Officers nor for Inferior Officers. Instead, according to the DOJ settlement, the "The Anti-Weaponization Fund shall consist of five Members," all of which are appointed directly by the Attorney General. ECF No. 1-2, Settlement Agreement § IV.B. Only "[o]ne of the Members shall be chosen in consultation with congressional leadership." *Id.* Notably, once appointed, the Members answer to no one else; only the President "can remove any Member without cause." *Id.* That follows neither the Appointment Clause's nominate-and-confirm process nor its alternate process for inferior officers of *Congress* vesting selection authority in another appropriate authority.

But the Members of the Fund are officers of the United States, triggering Appointments Clause limitations. They would purportedly exercise "significant authority pursuant to the laws of

12a

the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quotation marks omitted). *See also* ECF No. 1-4, DOJ Settlement Order § G (citing federal statutes for Fund's authority). To wit, the Fund Members are to be the ultimate arbiters of whether to pay funds to individuals claiming grievances against the federal government. The Fund Members' apparently unfettered power over the fund spans both procedure, *see* Settlement Agreement § IV.C ("Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims"), and substance, *see id.* at § IV.D ("Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies."). In fact, there is to be no review whatsoever of decisions by the Fund Members. *See id.* § VI.B ("[T]here shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund.").[8]

Persons with such powers could not be "'mere employees'—officials with lesser responsibilities who fall outside the Appointments Clause's ambit." *Lucia*, 585 U.S. at 243. Their authority would be far more sweeping than that of others the Supreme Court has deemed subject to the Appointments Clause, including administrative law judges at the Securities and Exchange Commission, *id.*, and special trial judges of the United States Tax Court, who could not issue final

---

[8] That the Fund's timeline for processing claims is limited in duration, *see* Settlement Agreement § IV.G, makes no difference to the applicability of the Appointments Clause. *See Morrison v. Olson*, 487 U.S. 654, 672 (1988) (holding office of independent counsel subject to Appointments Clause despite fact that counsel "is appointed essentially to accomplish a single task, and when that task is over the office is terminated"); *United States v. Eaton*, 169 U.S. 331, 343 (1898) (holding office of vice consul, "charged with the duty of temporarily performing the functions of the consular office" under "special and temporary conditions," is an officer subject to Appointments Clause).

decisions in many instances, *Freytag v. Commissioner*, 501 U.S. 868 (1991). Put another way, "[i]f a postmaster first class, *Myers v. United States*, 272 U.S. 52 (1926), and the clerk of a district court, *Ex parte Hennen*, 38 U.S. 225 (1839), are inferior officers of the United States within the meaning of the Appointments Clause, as they are," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), then Fund Members, who answer to no superior officer except the President, must also be subject to the Appointments Clause as well.

Indeed, the remarkably broad powers of the Fund Members make them principal officers subject to the requirements of Presidential nomination and Senate confirmation. While "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate," *Edmond*, 520 U.S., at 663, Fund Members apparently have no "superior" other than the President. Although the Members are appointed by the Acting Attorney General, their work is not supervised by him, and the Acting Attorney General cannot remove Members. *See also Braidwood*, 606 U.S. at 761 (noting "[i]nferior officers are most readily defined by their relationship to principal officers," and thus U.S. Preventive Services Task Force members were inferior officers because they are removable at will by the Health and Human Services Secretary). And like in *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021), where "the unreviewable authority wielded by APJs [Administrative Patent Judges of the Patent Trial and Appeal Board] during inter partes review is incompatible with their appointment by the Secretary [of Commerce] to an inferior office," the lack of review of the Fund Members' decisions makes them principal officers whose appointments must follow the Appointments Clause's requirements of Presidential nomination and Senate confirmation. But to be clear, even if they were Inferior Officers rather than Principal Officers,

14a

DOJ's process would still be unconstitutional because at no point did Congress vest in the Acting Attorney General such authority.

Because the appointment of Fund Members is untethered from the Appointments Clause, Plaintiffs are likely to succeed on Count V of their Complaint.

## II.    The Anti-Weaponization Fund Will Compensate January 6th Insurrectionists, Striking at the Core of Congressional Authority and the Constitutional Order It Embodies.

The Anti-Weaponization Fund presents a threat to our constitutional democracy that this Court has never before been asked to confront. Less than a week after the DOJ announced the Fund, defendants who stormed the U.S. Capitol on January 6, 2021, began lining up to seek their share.[9] Among them are Enrique Tarrio, the former Proud Boys leader and extremist convicted of seditious conspiracy, and Jake Lang, who used a bat to attack Capitol Police officers.[10]

These intended beneficiaries were not a secret to those who designed the Anti-Weaponization Fund. When pressed at a Senate appropriations subcommittee hearing, Acting Attorney General Blanche declined to rule out payments to members of the Proud Boys, Oath Keepers, or others convicted of assaulting Capitol Police officers and obstructing the very functioning of Congress, stating only that "anybody in this country can apply" and that the Fund's commission would set the eligibility rules.[11] And months before the Fund was announced, Ed

---

[9] *See* Laura Romero et al., *Trump Allies, Jan. 6 Defendants Lining Up to Apply for $1.7 Billion 'Anti-Weaponization Fund,'* ABC News (May 21, 2026),

[10] *Id.*; Tom Dreisbach, *Police Sue Trump as Jan. 6 Rioters Gloat Over 'Weaponization' Fund*, NPR News (May 21, 2026),

[11] *See* Luke Fountain, *Blanche won't rule out Jan. 6 rioters getting Trump DOJ fund payouts*, CNBC (May 19, 2026), ; *see also* Ryan J. Reilly, *DOJ Official Told GOP Ally That Big Payouts Were Coming for Jan. 6 Defendants*, NBC News (May 20, 2026),

Martin—then serving as the Justice Department's pardon attorney and a central architect of the administration's January 6th clemency effort—privately predicted that Capitol rioters would receive millions in payouts, even if it took until 2028.[12] Martin had previously indicated that he favored "reparations" for January 6th rioters, saying on a podcast "[w]e should do it, we shouldn't be afraid. . . . You're damn right I want to pay J6ers."[13]

The January 6th prosecutions arose from a coordinated violent effort to prevent Congress from performing its constitutional duty of certifying the results of a presidential election. Regardless of the Executive Branch's authority to extend clemency to those defendants, the further step of affirmatively compensating them from public funds transforms a decision not to punish into a declaration that the conduct itself was legitimate and deserving of remedy. The gravity of that transformation cannot be overstated. Congress was not an incidental bystander to the events of January 6th: it was the direct and intended target. Members of Congress fled or sheltered in place, fearing for their safety, as rioters roamed the halls. Staff were shepherded to secure locations or barricaded behind doors as rioters pushed past severely outnumbered Capitol Police officers, breaking windows and vandalizing offices. And approximately 140 police officers were criminally assaulted by the rioters, including one who was mortally injured.[14]

---

[12] *See* Ryan J. Reilly, *DOJ Official Told GOP Ally That Big Payouts Were Coming for Jan. 6 Defendants*, NBC News (May 20, 2026),

[13] *See The Benny Show*, at 43:56 (May 16, 2025), ; *see also* Alan Feuer et al., *Inside the Deal to Drop Trump's $10 Billion Suit Against the I.R.S.*, N.Y. Times (May 30, 2026), https://www.nytimes.com/2026/05/30/us/politics/trump-irs-lawsuit-deal.html.

[14] *See* Mary Clare Jalonick, *'A Difficult Year.' How Officers Who Defended the Capitol Are Grappling with Efforts to Downplay Jan. 6 Violence*, PBS News (Jan. 5, 2026),

To deliberately deploy public funds, in violation of the Constitution and the laws of this nation, to compensate these perpetrators is to use the machinery of democratic government to subsidize an attack on that government's most fundamental processes. Congress itself, as both victim and the federal government's sole appropriating authority, has a compelling institutional interest in ensuring that no public fund is converted into a reward for those who laid siege to it. A scheme deliberately designed to recast insurrectionists—including those who perpetrated violence against law enforcement officers—as victims and legitimate prosecutions as persecution does not merely rewrite history; it creates incentives for similar conduct in the future, with the explicit encouragement of the officials responsible for administering justice. *Amici* submit that the Court should weigh these consequences with the seriousness they demand.

## CONCLUSION

For the foregoing reasons, the Court should maintain an injunction against the implementation of the Anti-Weaponization Fund and ultimately render judgment for the Plaintiffs in this matter.

---

; *see also Jan. 6, 2021: A Visual Archive of the Capitol Attack*, NPR News (Jan. 4, 2026), .

17a

June 3, 2026

Respectfully submitted,

*/s/ Samantha P. Bateman*
Samantha P. Bateman (VA Bar #80110)
**Washington Litigation Group**
1717 K St. NW
Suite 1120
Washington, DC 20006
Phone: (202) 521-8750
Email:
sbateman@washingtonlitigationgroup.org

Matthew J. Platkin*
Angela Cai*
Ravi Ramanathan*
Aaron E. Haier*
Conor Bradley*
**PLATKIN LLP**
413 Washington Ave.
Unit 174
Belleville, NJ 07109
Phone: (973) 561-1951
Email: mplatkin@platkinllp.com

Norman L. Eisen*
David W. Ogden*
Stephen A. Jonas*
**DEMOCRACY DEFENDERS ACTION**
600 Pennsylvania Ave. SE #15180
Washington, D.C. 20003
(202) 594-9958
Email: norman@democracydefenders.org

*Counsel for Amici Curiae U.S. Senator Cory Booker and Bill Cassidy*

**Pro hac vice* admission pending

18a