**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **Andrew Floyd, et al.**,<br><br>     Plaintiffs,<br><br>v.<br><br>**Department of Justice, et al.**,<br><br>     Defendants. | Case No. 1:26-cv-01399-LMB |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION AND FOR A 5 U.S.C. § 705 STAY**

# TABLE OF CONTENTS

Introduction................................................................................................................1

Background.................................................................................................................5

Procedural History ...................................................................................................9

Legal Standard ........................................................................................................10

Argument .................................................................................................................11

    I.       PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ...................................11

        A.  This Case Is Moot ...............................................................................11

        B.  Plaintiffs Lack Standing......................................................................12

        C.  Plaintiffs' Claims Are Not Ripe For Adjudication .............................19

    II.      PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS ............21

        A.  Plaintiffs' First Amendment And Equal Protection Claims Fail ..................21

              i.       First Amendment....................................................................21
             ii.      Equal Protection......................................................................22

        B.  Plaintiffs' Separation Of Powers Claims Fail ....................................23

        C.  Plaintiffs' APA Claims Fail ................................................................23

              i.       All APA claims fail because there has been no final agency action .........23
             ii.      Plaintiffs cannot show that the Settlement Agreement and corresponding order are arbitrary and capricious, contrary to law, or beyond statutory authority ........................................................................25

    III.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM ......................27

    IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT ENJOINING OR STAYING A FUND THAT DOES NOT EXIST ..........27

Conclusion ...............................................................................................................28

**INTRODUCTION**

This dispute concerns an Anti-Weaponization Fund that had not been set up and is now not going forward. As a result, Plaintiffs' claims are not justiciable. Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution thus "ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* "Federal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. National Ass'n of Immigration Judges*, 608 U.S. ---, 2026 WL1463466, at *2 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is all the more inappropriate when challengers have already received "the precise relief that [they] requested," rendering a case "moot." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. The United States thus opposes Plaintiffs' request for relief on justiciability and other grounds—not because the Fund will continue (it will not), but to protect the government's institutional interests in the proper application of Article III limitations on judicial review.

Plaintiffs—an individual, the city of New Haven, Connecticut, and two ideological organizations—ask this Court to have the last word in a political debate. On May 18, 2026, the Department of Justice announced through a Settlement Agreement the establishment of "The Anti-Weaponization Fund" that would provide a systematic process to hear and redress certain claims alleging use of the levers of government power to target individuals, groups, and entities for improper and unlawful reasons. ECF No. 1-2. The Acting Attorney General issued a

corresponding order the same day.  ECF No. 1-4.  The Settlement Agreement and order garnered significant attention and provoked widespread discussion about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations.  But when Plaintiffs filed this case, no money had been transferred to the Fund. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims.  None of the five contemplated "Members" who would establish and administer such procedures for the Fund had even been appointed.  And after Plaintiffs filed this case, the political process continued to play out.  On June 2, 2026, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." House Appropriations Committee, Oversight Hearing – Department of Justice, at 40:30-42:50.[1]

Plaintiffs nevertheless continue to seek, on an emergency basis, "an order enjoining Defendants from taking any further action pursuant to the creation or operation of the . . . Fund," as well as "a stay of the creation of the . . . Fund under 5 U.S.C. § 705."  ECF No. 24 at 1, 2.  They claim that the Fund violates the First and Fourteenth Amendments, the separation of powers, and the Administrative Procedure Act (APA).  ECF No. 25 at 1.  But the Court need not reach those claims, because this is not a case or controversy within the meaning of Article III.  Plaintiffs' claims are moot.  In light of the Acting Attorney General's statements to Congress on June 2, 2026, Plaintiffs' claims are "no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

Really, they never have been justiciable; Plaintiffs have always lacked standing.  From the start, they could not show any "injury in fact that is concrete, particularized, and actual or

---

[1] *Available at* https://www.youtube.com/watch?v=rt_bIvnvq3o.  Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

2

imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). Plaintiffs primarily argue that they have standing based on "discriminatory treatment" because, in their view, they will not be able to submit successful claims to the Fund. ECF No. 25 at 10. But any differential treatment is entirely speculative when Plaintiffs have not (and could not have) even submitted claims. And Plaintiffs' premise—that hypothetical claimants must have been targeted by Democrat, rather than Republican, administrations—misreads the plain language of the Settlement Agreement. Plaintiffs' requested relief (shutting down the non-existent Fund) also would not remedy their claimed injury (exclusion from the non-existent Fund). It would leave them in the exact same position they claimed to be in when they filed their complaint, and which they are in now that the Fund is not going forward: unable to obtain relief from the Fund.

Plaintiffs' other standing theories are even weaker and more speculative. Paranoid assertions that the Fund would somehow "condon[e] . . . criminal attacks on abortion clinics," "embolden—and even directly finance—criminal activity," and "reward[] people bent on undermining free, fair, and safe elections" cannot establish standing. ECF No. 25 at 11, 12. And any purported informational injuries about "the amount of any payments made and the basis for the claims paid," ECF No. 25 at 11, cannot support standing when Plaintiffs have not sought, let alone been denied, any such information—which does not and will not exist. Even if the Fund were going forward, such information could have been subject to release under the Members' express authority to make Fund matters "public in whole or in part, in [their] discretion," ECF No. 1-2 at 2, as well as any applicable federal law (which the Settlement Agreement expressly

3

contemplates), *id.* at 4–5 (Settlement Agreement does not impose requirements "inconsistent with federal statutes"). And here again, there is a dramatic mismatch between the claimed informational injury, for which any remedy would be limited to the disclosure of information, and Plaintiffs' requested relief.

That leads to another "justiciability doctrine" that independently bars review—"ripeness." *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). Ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808. A federal agency's action is not "ripe for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm [them]." *Id.* Here, there has been (and will be) no concrete action. The dubious assumptions about how the Fund might have operated underlying all of Plaintiffs' theories confirm there is no basis for judicial intervention.

Because mootness, standing, and ripeness are all fatal to Plaintiffs' motion, there is no need to reach the merits. But to be clear, Plaintiffs do not come close to establishing a likelihood of success on the merits. Plaintiffs' First and Fourteenth Amendment claims fail on the facts (because they rely on the same misreading of the Settlement Agreement) and the law (because even under Plaintiffs' reading, there is no viewpoint discrimination or irrational unequal treatment). Their separation of powers claim is unintelligible. And their APA claims fail to allege any final agency action, among other defects.

Nor can Plaintiffs satisfy the other factors for prospective equitable relief. Plaintiffs are not suffering irreparable harm, or any harm. The balance of equities and public interest also cut against opining on the Fund after it has already been halted but before it ever took shape. Such

4

matters are best "hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (quoting Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)). That is exactly what has happened.

The Court should deny Plaintiffs' motion.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump, Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019, and the New York times published stories about the returns starting in September 2020. Littlejohn separately stole tax data for thousands of wealthy individuals and shared that information with another media company.

Under 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony. Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024).[2]

The federal tax code also provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment,

---

[2]  *Available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency."  5 U.S.C. § 552a(e)(10), (g)(1).

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions.  *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.).  The United States unsuccessfully moved to dismiss the tax code claim on the ground that Littlejohn was not technically an employee of the United States (despite his contractor label).  *See Griffin*, ECF No. 108 at 4–7.  The court contemplated summary judgment proceedings, and potentially a trial, on that question.  *See id.* at 10.  Although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume that the Privacy Act would otherwise apply.  *See id.* at 9–10.  Ultimately, the victim settled with the United States for a formal apology.[3]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida.  *See President Donald J. Trump, et al. v. IRS*, 1:26-cv-20609-KMW, ECF No. 1 (Jan. 29, 2026).  They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. 552(a)(e)(10).  *See id.*  Their counsel indicated that they intended to amend their complaint to add a putative class claim.  ECF No. 1-2 at 1.  President Trump had also submitted Federal Tort Claims Act (FTCA) administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax.  *See id.*

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges.  At the same time, Presidents do not forfeit their legal rights.  Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA

---

[3]  WALL STREET JOURNAL, *The IRS Apologizes to Ken Griffin* (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

administrative claims without the United States having to give the plaintiffs "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. ECF No. 1-2 at 1. Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." ECF No. 1-2 at 2. "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while "taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." ECF No. 1-2 at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a

confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "To be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." ECF No. 1-2 at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.
> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4.

The Settlement Agreement contains a rule of construction stating that "Nothing contained in this Settlement Agreement shall impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." ECF No. 1-2 at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* ECF No. 1-4. The order stated that the United States would "provide the U.S. Department of the Treasury with all necessary forms and documentation to direct a payment of $1,766,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also clarified that Fund Members would serve on a volunteer basis. *Id.* And it

noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).[4]

## PROCEDURAL HISTORY

On May 22, 2026, Plaintiffs—Andrew Floyd, a former career federal prosecutor who was fired; the City of New Haven, Connecticut; the National Abortion Federation (NAF), a nonprofit that supports and represents abortion providers; and Common Cause, a political nonprofit—filed this lawsuit. ECF No. 1. On the premise that the "Fund is available only to claimants who assert that they were targeted by 'Democrat' administrations," they claim the Fund violates the First Amendment and the Equal Protection Clause. *Id.* ¶ 3; *see also id.* ¶¶ 121–136. They also claim the Fund violates the separation of powers and the APA. *Id.* ¶ 144–189.

Although counsel for the United States informed counsel for Plaintiffs that no money had been transferred to the Fund and no Members had been appointed, such that no formal processes existed and no claims had or could be paid, *see* ECF No. 30 at 3–4, Plaintiffs moved for a temporary restraining order or preliminary injunction and for a stay under 5 U.S.C. § 705. ECF No. 25. They seek an order enjoining Defendants "from taking any further action pursuant to the creation or operation of the Anti-Weaponization Fund." ECF No. 24-1. "[T]o ensure that no funds are irreversibly disbursed . . . while plaintiffs' motion is pending," the Court temporarily enjoined

---

[4] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

Defendants "from taking any further action pursuant to the creation or operation of the Anti-Weaponization Fund, which includes the transferring of money to the Fund; the consideration of any claims submitted to the Fund; and the disbursing of any funds from the Fund."  ECF No. 31.

Political debate surrounding the Fund—and similar past settlements, *see* n.4, *supra*—continued.  On June 2, 2026, the Acting Attorney General testified at a congressional hearing:

> A: ". . . We're not moving forward with the Fund . . . We are not moving forward with the Fund, period. . . . The reasons for the Fund remain as important as they were before, but we are not moving forward with the Fund."

> Q: "Not moving forward ever?"

> A: "Correct."

> Q: "Oh, there's no more Fund then."

> A: "Well, to the extent there was a Fund.  Remember, the Fund wasn't set up yet.  There were no commissioners named, there were no claims made yet, so yes we are not moving forward with the Fund."

> ***

> Q: . . . Is there any way that you could put this in writing . . . ?

> A: I'm telling you it's not . . . Notwithstanding what we do in those litigations and protecting our rights and making sure those rights are protected, we're not moving forward with the Fund.

House Appropriations Committee, Oversight Hearing – Department of Justice, at 40:30-42:50.

## LEGAL STANDARD

"A plaintiff seeking a temporary restraining order or preliminary injunction must be able to show 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *GW Acquisition Co., LLC v. Pageland Limited Liability Co.*, 2023 WL 6541851 at *4 (E.D. Va. Oct. 6, 2023) (Brinkema, J.) (quoting *Winter v. Nat. Res. Def. Council,*

10

*Inc.*, 555 U.S. 7, 20 (2008)).  When the government is a party, the balance of equities and public interest "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."  *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

## ARGUMENT

## I.     PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

### A. This Case Is Moot

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies."  U.S. Const. Art. III, § 2, cl. 1.  "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

This case is moot, and thus does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome."  *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted).  The Acting Attorney General's statements to Congress make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (quotation omitted).  And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit."  *Id.*  Because "the court is not empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

11

### B. Plaintiffs Lack Standing

In truth, this case has *never* presented an Article III Case or Controversy. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.,* 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein*, 551 U.S. at 593. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). Standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602 U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). To count as a concrete harm, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Certain "intangible harms can also be concrete" if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.* "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *Id.* at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, Plaintiffs must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998). Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated

13

public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiffs flunk the standing inquiry at every step. For the same reasons this case is moot, Plaintiffs cannot "establish a sufficient likelihood of future injury" to seek injunctive relief. *All. for Hippocratic Med.*, 602 U.S. at 381. And as ideological objectors to a proposed program that could have resulted in government expenditures, Plaintiffs have always been no different from the many litigants who have unsuccessfully sought to invoke taxpayer standing; they have no individualized interests separate from "the interests of the public at large." *Hein*, 551 U.S. at 600.

Plaintiffs try to manufacture standing on the theory that "the Fund violates First Amendment and Equal Protection principles." ECF 25 at 9. As discussed below, that merits argument fails. And for standing purposes, such "generalized grievances about the conduct of government" are insufficient. *Schlesinger*, 418 U.S. at 225 (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). Plaintiffs would need "to demonstrate a concrete and particularized injury" resulting from such purported violations. *TransUnion*, 594 U.S. at 423. But they barely try to do so. Plaintiffs state only that they are "suffer[ing] unequal treatment" because, in Plaintiffs' view, claimants "targeted by a Republican rather than Democratic administration" cannot obtain relief from the fund, ECF No. 25 at 9, 10 (quotation omitted).

That claimed injury is "too indeterminable, remote, uncertain, and indirect to furnish a basis for an appeal to the preventive powers of the Court." *Hein*, 551 U.S. at 600. As an initial

14

matter, no one can obtain relief from the Fund, because no formal claims process has been or will be established. Regardless, nothing in the Settlement Agreement would have precluded persons targeted by a Republican administration from submitting a claim. Claimants need only "assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization," ECF No. 1-2 at 3, meaning they were "target[ed] . . . for improper and unlawful political, personal, and/or ideological reasons," ECF No. 1-2 at 1. To be sure, the Settlement Agreement notes "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to" engage in such "target[ing]." *Id.* But that recital does not narrow the scope of claims.[5] And even if the Settlement Agreement were ambiguous in that respect, such contractual indeterminacy would just underscore Plaintiffs' lack of injury prior to the Fund being implemented (which now will not occur) by its Members (who have never existed). In any event, Plaintiffs do not meaningfully explain what "legal claim[s]" they planned to "assert," ECF No. 1-2 at 3, let alone why those claims would be precluded under the actual terms of the Settlement Agreement.

Even if Plaintiffs had somehow made that showing, exclusion from a targeted, settlement-derived compensation scheme does not pose any harm to "a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). There is no legal right to participation in a bespoke federal claims process. Otherwise, anyone omitted from a compensation program would have standing to challenge it despite having a "plainly undifferentiated" and "generalized grievance." *Id.* at 575 (internal quotation marks omitted). Given that targeted compensation schemes are ubiquitous, accepting Plaintiffs' standing theory would have broad and unpredictable

---

[5] Even if that language were relevant to the scope of claims, the word "Democrat" modifies only "elected officials." If there were any doubt, the person who leaked President Trump's tax returns, ultimately leading to the Settlement Agreement, was a contractor working in a Republican administration. *See* p. 5, *supra*.

consequences. For example, it would imply that all non-"Native-American[s]" claiming discrimination under various government programs would have had standing to challenge the *Keepseagle* settlement despite not having suffered the discrimination the class action was filed to remedy. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1043 (D.C. Cir. 2017). The absence of harm to a legally protected interest is even more apparent here. Plaintiffs ignore that the Settlement Agreement contemplates that claimants would have been required to "assert at least one legal claim," ECF No. 1-2 at 3—and that nothing would prevent Plaintiffs from bringing such claims by other means.

Relatedly, the relief that Plaintiffs seek does not redress their claimed injury—the purported exclusion from the Fund's claims process. Rather than seeking relief that would allow them to submit claims, Plaintiffs ask the Court to shut down the (never running, already shut down) Fund. *See* ECF No. 24-1. That would leave Plaintiffs in the same position they are in now and claimed to be in before. In that respect, Plaintiffs are similar to the challengers who lacked standing in *Department of Education v. Brown*, 600 U.S. 551 (2023). Those challengers did "not qualify for the maximum relief available" under a loan forgiveness program and "sued to enjoin it" as unlawful. *Id.* at 556. But their theory that they were "injured because the Government has not adopted a lawful benefits program under which they would qualify" failed. *Id.* at 563–64. "It would be quite strange to think that a party experiences an Article III injury by *not* being affected" by a government action that the same party argues is "unlawful." *Id.* at 564; *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45–46 (1976) (plaintiffs lacked standing to challenge an IRS tax-exemption policy that allegedly allowed hospitals to deny them emergency care when revoking the exemptions would not predictably "result in [them] receiving the hospital treatment they

16

desire"). Federal courts do not "exercise general legal oversight of the . . . Executive Branch[.]" *TransUnion*, 594 U.S. at 423–24.[6]

Plaintiffs' ancillary standing theories fare no better. In fact, they are frivolous. For example, NAF claims to "face harm as a direct result of the Fund's endorsement and financing of unlawful conduct." ECF No. 25 at 10. Plaintiffs do not explain how a government "endorsement" could ever cause a cognizable, Article III injury that a court can redress. Regardless, nothing in the Settlement Agreement or accompanying order endorses unlawful conduct. A claimant "must assert at least one legal claim." ECF No. 1-2 at 3. And the Settlement Agreement's reference to "the Biden Administration's abuse of the FACE Act," ECF No. 1-2, obviously refers to overzealous prosecutions under the FACE Act. *See* U.S. Department of Justice, *The Biden Administration's Weaponization of the Freedom of Access to Clinic Entrances Act* (April 14, 2026).[7] Seeking to redress unethical prosecution tactics is plainly not the same as "condoning . . . criminal attacks on abortion clinics." ECF No. 25 at 11. And nothing in the Settlement Agreement or accompanying order "finances" anything, let alone criminal activity. The Fund was never set up. No claims were granted. And the idea that *future* relief from the fund could *indirectly* finance *future* criminal activity due to the *future* choices of third parties is "unadorned speculation" that cannot establish standing. *Simon*, 426 U.S. at 44. Plus, courts should never "presume illegal activities on the part of actors not before the[m]." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994).

---

[6] To be sure, in distinguishable circumstances a plaintiff may have standing to challenge an "underinclusive scheme" when the reviewing court can "either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or . . . extend the coverage of the statute to include those who are aggrieved by the exclusion." *Heckler v. Mathews*, 465 U.S. 728, 738 (1984). But that principle does not apply here, because Plaintiffs request only a total shutdown of the Fund. *See* ECF No. 24-1. *Heckler* also did not address a scenario where the challengers could obtain relief through an alternative procedural avenue like a lawsuit. *See* 465 U.S. at 738 (plaintiff challenged inability to secure social security benefits). And *Heckler* addressed a challenge to an exception from a neutral statutory entitlement, not a targeted and settlement-derived compensation scheme.
[7] *Available at* https://www.justice.gov/opa/media/1436006/dl.

For the same reasons, NAF cannot rely on vague speculation about "ongoing threats" from unidentified persons with no apparent connection to the Fund to establish standing, and Common Cause cannot rely on the purported "emboldening of January 6 defendants and . . . election deniers." ECF No. 25 at 11. These are classic attenuated, "conjectural," and "hypothetical" non-injuries. *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012). Further, any choice to "divert additional time and resources" is just that—Plaintiffs' own choice—because the Settlement Agreement and accompanying order do not "force[]" Plaintiffs to do anything. *Contra* ECF No. 25 at 12; *see All. for Hippocratic Med.*, 602 U.S. at 390 (purported injury based on "diverting resources and time" is "too speculative or otherwise too attenuated to establish standing").

Common Cause also posits that it has standing based on purported "procedural violations in the creation of the Fund" and "the lack of transparency in its operations." ECF No. 25 at 11. But Plaintiffs do not even explain what those purported procedural violations are—let alone how such purported violations would injure Plaintiffs in a concrete way. Nor can Plaintiffs claim an injury based on a lack of "information" about "the amount of any payments made and the basis for the claims paid" when no such information even exists. *Id.* Any hypothetical denial of information in the future was always speculative given that the Settlement Agreement (i) expressly states that the Fund's future Members could make the Fund's "procedures public in whole or in part," and (ii) expressly does not override "federal statutes," including any that might require disclosure of information. ECF No. 1-2 at 2, 5. Regardless, an "asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442. Plaintiff "ha[s] identified no downstream consequences' from failing to receive [any] required information." *Id.* (internal quotation marks omitted). And the relief Plaintiffs seek—shutting down the Fund—would have been untethered from any claimed injury based on a denial of information about the Fund.

18

### C. Plaintiffs' Claims Are Not Ripe For Adjudication

This is a rare case that is simultaneously moot *and* premature. One of the reasons Plaintiffs were forced to speculate so much about how the Fund would operate is because so little had happened when they sued. As a result, ripeness doctrine bars Plaintiffs' claims as well.

Ripeness doctrine "rest[s] both on Article III concepts and on discretionary reasons of policy." Wright & Miller, Fed. Practice and Procedure § 3532 (3d ed. April 2026 update). It requires analyzing "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *National Park Hospitality Ass'n*, 538 U.S. at 808. For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.* By contrast, "[a] claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). Ripeness is thus lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). This includes "[i]njuries that are 'contingent upon a decision to be made by a third party that has not yet acted'." *Wild Virginia v. Council on Envtl. Quality*, 56 F.4th 281, 296 (4th Cir. 2022) (quoting *Doe*, 713 F.3d at 758). "The plaintiff bears the burden of establishing ripeness." *Id.* at 293 (quoting *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022)).

Plaintiffs cannot carry that burden here. No Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied. No claimant received money, let alone engaged in any of the (highly attenuated) conduct that Plaintiffs are concerned about. And the Acting Attorney General's statements to Congress

19

only underscore that all of these events could not occur as Plaintiffs anticipate—in fact, they will not "occur at all." *Texas*, 523 U.S. at 300. The United States is not aware of any federal court ever adjudicating a claim in similar circumstances. On the contrary, courts routinely decline to adjudicate claims based on speculative fears. *See id.* at 301 (challenge that relied on contingent and uncertain action by State authorities under state law "involve[d] too remote and abstract an inquiry for the proper exercise of the judicial function); *Wild Virginia*, 56 F.4th at 296 (where plaintiffs' "fears ha[d] not yet ripened into actionable injuries," their claims were not justiciable).

There is also no hardship to Plaintiffs from this Court withholding consideration of their claims. The bare existence of the Settlement Agreement and corresponding order has no "direct effect on the day-to-day" operations of Plaintiffs. *Texas*, 523 U.S. at 301. Plaintiffs cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* But requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiffs' claims, would cause the parties significant hardship.

Doing so would cause the Court hardship as well. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, *supra*, § 3532.1. The Court should instead let the political resolution regarding the Fund stand on its own. "[T]he values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies." *Id.* And "refusal to decide may itself be a healthy spur to inventive private or public planning that alters the course of possible conduct so as to achieve the desired ends in less troubling or more desirable fashion." *Id.*

20

## II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS

Given all those justiciability issues, there is no need to reach the merits.  That said, Plaintiffs' claims are not likely to succeed.

### A.  Plaintiffs' First Amendment And Equal Protection Claims Fail

Plaintiffs' convoluted mash-up of constitutional claims primarily serves to reveal their confusion about the Fund.

#### i.    First Amendment

Plaintiffs' argument that the Fund is "founded on content-based viewpoint discrimination," ECF No. 25 at 13, does not make sense.  On its face, the Settlement Agreement contemplates the submission of claims by putative victims of Lawfare and Weaponization without regard to a claimant's speech or viewpoint.  Indeed, Plaintiffs themselves submitted to the Court a Department of Justice overview document stating that "Democrats can submit claims too."  ECF No. 25-1 at 23.  Yet Plaintiffs assert viewpoint discrimination on the convoluted theory that "the Fund exists to compensate claimants who allege 'Lawfare and Weaponization' by Democratic administrations but not Republican ones."  ECF No. 25 at 13.

This theory suffers from several defects (beyond justiciability).  To start, Plaintiffs misread the Settlement Agreement, which covers both Republican and Democrat administrations.  *See* p. 5, *supra*.  And even if Plaintiffs' (mis)interpretation were correct, there would be no First Amendment problem.  Limiting the scope of a claims process is not conditioning or denying a "benefit . . . based on invidious viewpoint discrimination."  ECF No. 25 at 15.  The government is free to "selectively fund a program," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), so long as the government does not "seek to leverage funding to regulate speech outside the contours of the program." *Agency for Int'l Dev. v.  All. for Open Soc'y Int'l, Inc.*, 570 US. 205, 214–15 (2013).  There is no apparent way that the Fund's (hypothetical) Members could have regulated speech.

21

And if that somehow occurred, it would at most have been the basis for a challenge on such concrete facts—not one resting on hypotheticals and inapposite quotes about the "marketplace of ideas." ECF No. 25 at 14.

At bottom, Plaintiffs are grasping at straws. The Fund would plainly not have been a "limited public forum," ECF No. 25 at 14, which "is property . . . the government has opened for expressive activity to . . . some segment of the public." *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2004). It would have been an adjudicative process.

### ii. Equal Protection

Plaintiffs similarly assert an equal protection theory based on the supposed "distinction the Fund draws between those allegedly targeted by Democrats and those targeted by Republicans." ECF No. 25 at 15. Once again, this claim fails for the simple reason that the Settlement Agreement does not draw this distinction. And once again, even if it did, that would not give rise to an equal protection claim. The government can create compensation programs to address limited categories of past misconduct, as in *Keepseagle* (which involved a "political" preference for Native Americans, *see Moron v. Mancari*, 417 U.S. 535, 553 n.24 (1974)), without incurring an obligation to compensate other categories of grievances on the same terms. *See* 856 F.3d at 1043–44.[8] Such a classification does not "affect fundamental rights nor proceed along suspect lines," so it would not trigger heightened scrutiny. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). And there is a "a rational basis for the classification," *id.* at 320 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)), because the Fund was part of a Settlement Agreement that resolved specific

---

[8] Even under Plaintiffs' misreading, Democrats targeted by Democrats could have asserted claims. *See* Emily Goodin, *Hunter Biden could be among those that cash in as Trump drops IRS suit in exchange for $1.776B fund for victims of gov't weaponization*, New York Post (May 18, 2026), *available at* https://nypost.com/2026/05/18/us-news/trump-drops-irs-suit-in-exchange-for-apology-1-776b-fund-for-victims-of-government-weaponization-and-even-hunter-biden-can-ask-for-award/.

litigation by targeting compensation for the same category of Lawfare and Weaponization that prompted the lawsuit. There is nothing "invidious" about trying to solve a particular problem "without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.[9]

### B. Plaintiffs' Separation Of Powers Claim Fails

The substance of Plaintiffs' separation-of-powers claim is indiscernible. Plaintiffs argue only that "Congress—not the Executive—has 'exclusive power over the federal purse.'" ECF No. 25 at 17 (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.)). But that general power does not preclude the Fund, as the court-ratified *Keepseagle* settlement confirms. *See Keepseagle v. Vilsack*, 815 F.3d 28, 30 (D.C. Cir. 2016). No one suggested the *Keepseagle* adjudicators comprised a "new agency." ECF No. 25 at 17. So it would be especially odd to treat the hypothetical Fund—which consists of zero Members—as one.

### C. Plaintiffs' APA Claims Fail

> *i.    All APA claims fail because there has been no final agency action.*

The APA contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "The core question is whether the agency has completed its decisionmaking

---

[9] Plaintiff the City of New Haven also does not have rights under the First Amendment or the Equal Protection Clause. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (contrasting a "political subdivision" of a State with "[a] private corporation [that] enjoys constitutional protections").

process, and whether the result of that process is one that will directly affect the parties." *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiffs.

Plaintiffs' threadbare argument to the contrary misses the mark. They say the Fund reflects "the consummation of the agency's decision process because there are no further steps the Agency Defendants need to take to determine whether they will create the Fund: it now exists." ECF No. 25 at 18. But any time an agency does X, there are "no further steps" needed to do X. Such circular reasoning does not mean an overarching decisionmaking process has concluded—particularly given that the Fund does *not* "exist[]" in any meaningful sense, as the Acting Attorney General's statements to Congress confirm. Plaintiffs' reasoning gets even more tortured when they assert that the Acting Attorney General has "provid[ed] the Fund with money." ECF No. 25 at 18. In reality, the Acting Attorney General directed that the Department of Justice give the Department of the Treasury "all necessary forms and documentation to direct a payment" "within 60 days." ECF No. 1-4 at 1. Even if money was now in the Fund—it is not, and the Fund is not going forward—there would still be only tentative, interlocutory action that does not impact Plaintiffs. In fact, Plaintiffs' only argument that the Fund determines rights and obligations, and causes legal consequences, is that the government has "establishe[d] a legal process by which some individuals . . . have the right to pursue claims." ECF No. 25 at 18. That is indisputably inaccurate.

24

In sum, there is no final agency action here, and that alone is fatal to Plaintiffs' APA claims.

>      ii.    *Plaintiffs cannot show that the Settlement Agreement and corresponding order are arbitrary and capricious, contrary to law, or beyond statutory authority.*

Even ignoring the lack of final agency action, Plaintiffs' scattershot APA claims would have no likelihood of success.

*First*, Plaintiffs argue the Settlement Agreement and accompanying order are "substantively unreasonable." ECF No. 25 at 19. But even assuming arbitrary-and-capricious review could apply in this posture, Plaintiffs ignore the actual explanation in the settlement agreement. They argue about the federal Defendants' potential liability in the settled lawsuit. *See* ECF No. 25 at 19. But the Settlement Agreement provides a different explanation: to address "conduct . . . representative of the sustained use of the levers of government power . . . in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." ECF No. 1-2 at 1. Plaintiffs do not challenge that rationale. And, as discussed, the Settlement Agreement does not "ignor[e] those claiming to have been victimized by Republican" administrations. ECF No. 25 at 20. Not that it would be "irrational to do so." *Id.* As noted, nothing requires a claims process to right all wrongs at the same time.

*Second*, Plaintiffs rehash various points to argue the Settlement Agreement and accompanying order are contrary to law and constitutional right. ECF No. 25 at 22. Those arguments fail for the reasons already discussed. Plaintiffs tack on a theory under the Appointments Clause. *See id.* at 23. But Plaintiffs do not try to explain how they could have standing to challenge appointments of Fund Members who have not been and will not be appointed. Regardless, the Members would not have been "officers," because they exercise limited, temporary authority to administer a Settlement Agreement. *See Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (distinguishing adjudicators who work "on a temporary, episodic basis, whose

positions are not established by law, and whose duties and functions are not delineated in a statute"). Notably, Plaintiffs' contrary argument would imply that the *Keepseagle* adjudicators were improperly appointed.

Plaintiffs' other theories in support of this APA claim do not hold up, either. Their characterization of the Fund as violating the Fourteenth Amendment's prohibition on paying debts or obligations "incurred in aid of insurrection or rebellion against the United States," ECF No. 25 at 24 (citing U.S. Const. amend. XIC § 4), is so moot, premature, speculative, paranoid, and hyperbolic that it does not warrant a detailed response. Plaintiffs ignore that the Settlement Agreement states that claimants must assert "at least one legal claim" and contemplates "monetary relief" only where the Fund determines that such relief is "owed to claimants as a result of their legal rights." ECF No. 1-2 at 2–3. And Plaintiffs' assertions that federal law requires the Secretary of the Treasury to provide information about payments from the Judgment Fund, ECF No. 25 at 25 (citing 31 U.S.C. § 1304(d), and any payments from the Judgment Fund to adhere to certain procedures, *id.* at 25 (citing 31 C.F.R. §§ 256.10(a), 256.2(a)), ignore that there have been no payments, that any payments could have been made consistent with those requirements, and that the Settlement Agreement expressly does not require any action inconsistent with federal statutes. *See* ECF No. 1-2 at 4–5.

*Finally*, Plaintiffs argue the Settlement Agreement and accompanying order were without statutory authority. *Keepseagle* suggests otherwise. While the Settlement Agreement arose in a unique context, it is not "unprecedented" given that and other similar settlements. *See* n.4, *supra*.

## III.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs' irreparable harm arguments essentially duplicate their standing arguments. *See* ECF No. 25 at 27–30. Plaintiffs cannot show irreparable harm for all the same reasons their claims are moot, they lack standing, and their claims are not ripe. If the Court denies Plaintiffs' motion

for emergency prospective relief, it will not cause Plaintiffs any cognizable injury, let alone an irreparable one.

The supposed "speed and secrecy with which Defendants may drain the Fund" does not change this analysis. ECF No. 25 at 28. There were never mechanisms in place for that to happen (and no reason to believe it would). Regardless, the process for adjudicating claims does not exist, never has, and now never will. *Contra id.* at 28.[10]

## IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT ENJOINING OR STAYING A FUND THAT DOES NOT EXIST

The equities and the public interest do not favor this Court interjecting itself in a political process to shut down a Fund that is already not going forward. As noted above, the Fund has been the subject of vigorous public debate. That process may seem messy. But the push-and-pull of such debate is a feature of our constitutional republic. Indeed, one of the main points of Article III is that "the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches." *All. For Hippocratic Med.*, 602 U.S. at 380. By nevertheless accepting Plaintiffs' baseless standing theories and meritless claims, the Court would effectively unwind a preferable political resolution. All in service of Plaintiffs who are classic ideological objectors rather than genuinely injured parties. That would undermine, rather than promote, "the core values of American democracy" that Plaintiffs purport to be defending. ECF No. 25 at 8.

---

[10] Plaintiffs' statement that "[t]he administration . . . worked quickly and behind the scenes to settle the *Trump v. IRS* case, dislodging the case from the court's purview within two days of a court-imposed deadline to address that court's jurisdictional concerns," ECF No. 25 at 28, is disingenuous. All settlement negotiations take place "behind the scenes." And the case's settlement *before* a court deadline does not imply the United States "worked quickly" to settle the case *after* it was filed nearly five months earlier. Ultimately, the plaintiffs in *Trump v. IRS* voluntarily dismissed the case, as they could do under Rule 41(a) of the Federal Rules of Civil Procedure for any reason or no reason at all.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order or a preliminary injunction and a § 705 stay. [11]


Dated: June 5, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*


/s/ ANDREW J. BLOCK
Andrew J. Block (VSB No. 91537)
*Senior Counsel to the Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

---

[11] If the Court is inclined to grant Plaintiffs' motion for a preliminary injunction—it should not for all the reasons stated in this brief—Defendants request that the Court requires Plaintiffs to post a bond pursuant to FED. R. CIV. P. 65(c), in the amount of the damages the Plaintiffs allege to have suffered or, in the alternative, the cost to the United States to litigate this unripe case. *See S.W., et al., v. Loudoun County School Board*, 1:25-cv-1536-LMB (Oct. 10, 2025) (granting Plaintiffs' motion for preliminary injunction and requiring a bond in the amount of Defendant's anticipated costs to defend the lawsuit).

28

**Certificate of Service**

I hereby certify that on June 5, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block