**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **Andrew Floyd**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**Department of Justice**, et al.,<br><br>Defendants. | **Case No. 26-cv-1399-LMB** |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE,
A PRELIMINARY INJUNCTION WITH EXPEDITED BRIEFING,
AND FOR A STAY UNDER 5 U.S.C. § 705**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

SUPPLEMENTAL FACTUAL BACKGROUND ...........................................................1

ARGUMENT .....................................................................................................................3

I.    The Acting Attorney General's unsworn and unsubstantiated statement about the status of the Fund does not render this case moot. ...............................................................3

II.   Plaintiffs have standing to pursue their claims, which are ripe for review. .............................4

   A.  Plaintiffs Floyd and Caravello have suffered Equal Protection and First Amendment injuries, and New Haven has suffered Equal Protection injuries......................................5

   B.  Plaintiffs NAF and Common Cause are injured from the threat of increased violence resulting from the Fund................................................................................8

   C.  Plaintiff Common Cause is injured by the Fund's lack of transparency. ........................10

   D.  Plaintiffs' injuries are traceable to the Anti-Weaponization Fund and redressable by dissolution of the unconstitutional and illegal Fund. ........................................11

   E.  Plaintiffs' claims are ripe for review...............................................................12

III.  Plaintiffs are likely to succeed on the merits. ...........................................................14

   A.  Plaintiffs are likely to succeed on their First Amendment and Equal Protection claims. 14

   B.  Plaintiffs are likely to succeed on their Separation of Powers claim..............................16

   C.  Plaintiffs are likely to succeed on their APA claims. ....................................................17

IV.   Plaintiffs will suffer irreparable harm without preliminary relief.........................................20

V.    The balance of equities and public interest weigh in Plaintiffs' favor..................................20

CONCLUSION ..................................................................................................................20

**INTRODUCTION**

Defendants' position before this Court is that Plaintiffs' challenge to the Anti-Weaponization Fund is moot because the Acting Attorney General said so. But Defendants have failed to substantiate that position with any competent evidence, despite repeated requests from Plaintiffs, much less evidence of a written modification of the *Trump v. IRS* Agreement that created the Fund or a rescission of the Acting Attorney General's order funding it. Remarkably, after Defendants submitted their brief on June 5, the President continued to speak out in favor of the Fund. And even more remarkably, Defendants' most recent communication to Plaintiffs (dated June 8) did not mention *any* plans to abandon the Fund, appearing to backpedal their days-earlier position. The Court simply cannot rely on Defendants' representations to date and should proceed to resolve Plaintiffs' pending motion for preliminary relief. That said, if the Court agrees that there are outstanding questions about the status of the Fund, it should grant Plaintiffs' recent motions for expedited discovery (ECF No. 70) and to amend the scheduling order (ECF No. 72).

And while Defendants would prefer that this issue play out through the "political process," that process has not imposed any restriction on the Fund. Given that the Fund was plainly created without respect for Congress, the Constitution, applicable statutes, or any other aspect of the political process, Plaintiffs cannot expect that any political process will remedy their injuries. Only this Court can do that. This Court should grant Plaintiffs' motion for preliminary relief and enjoin Defendants from taking any further action to create or operate the Fund. In the alternative, to prevent irreparable harm, the Court should order Defendants to provide 14 days' notice to the Court and Plaintiffs before transferring any money to the Fund while litigation continues.

**SUPPLEMENTAL FACTUAL BACKGROUND**

After Plaintiffs filed their motion for preliminary relief, Defendants began indicating in

public statements that they were not moving forward with the Anti-Weaponization Fund. First, on June 1, the Department of Justice posted on social media that it intends to "abide by the Court's ruling" in this case (as it is, of course, required to do). Ex. A.[1] By a letter the same day, Ex. B, Plaintiffs asked Defendants to confirm what that post meant; they heard nothing in response. Then, on June 2, the Acting Attorney General told Congress, albeit not under oath or in writing, that notwithstanding what the Department does in this and other litigations, it was not moving forward with the Fund.[2] Plaintiffs subsequently sent another letter requesting clarification of the Acting Attorney General's statements about the Fund. Ex. C. Defendants again failed to respond.

For his part, the President has made a variety of statements about the status of the Fund— none consistent with the Acting Attorney General's statement to Congress. On June 3, the President said "I'd have to ask the lawyers. I don't know," when asked whether the government had fully abandoned the Fund. Ex. D. In a separate interview the same day, the President responded to the same question with, "No, a court ruled against it," presumably referring to the May 29 Order in this case, and then continued to defend the Fund, saying he was "very proud to have given [people] pardons" and that he "thinks they should be reimbursed for a crooked government."[3]

It was not until Defendants filed their opposition brief that they made their first written representation that the Fund would not move forward. But that claim was not accompanied by any sworn statement or any other evidentiary support. After Defendants filed their opposition brief, the President again made public statements that were at odds with Defendants' representation to this

---

[1] All exhibits cited in this brief are attached to the Boisture Declaration, filed with this reply.

[2] CBS News, *Blanche refuses to put end of "anti-weaponization" fund in writing*, at 3:39 (YouTube, June 2, 2026), https://www.youtube.com/watch?v=BL8XsCqMtJ8.

[3] Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed: Bibi, "Are You Effing Crazy?!"*, at 40:34–41:13 (YouTube, June 3, 2026), https://www.youtube.com/watch?v=SLnB5l1PxCY.

Court. On June 6, the President vehemently defended the Fund, an idea he still "love[d]," explaining that it was designed to compensate individuals charged and convicted in the January 6 attack, individuals whose lives the President believed "were destroyed by dirty cops and by weaponization," and he maintained that "[m]any of those people should be compensated." Ex. E. And when Defendants finally responded to Plaintiffs' repeated letters on June 8, they did not mention any plans to abandon the Fund at all, thus providing even *fewer* assurances about the status of the Fund than what Defendants represented in their opposition brief. Ex. F.

## ARGUMENT

### I.    The Acting Attorney General's unsworn and unsubstantiated statement about the status of the Fund does not render this case moot.

Defendants' brief primarily attacks Plaintiffs' claims as moot because, as Defendants assert, the "Anti-Weaponization Fund" at issue in this case "is now not going forward." Opp., ECF No. 62, at 1. But Defendants only indicated their purported change in plans after Plaintiffs filed their motion, and even now—despite repeated entreaties by Plaintiffs—have refused to confirm that change with competent evidence, all while the President continues to speak out in favor of the Fund. *See* ECF Nos. 70, 71. Given that Defendants have not been forthright with Plaintiffs or the Court about whether they have abandoned all plans to create the Anti-Weaponization Fund, they have hardly met their "heavy burden" to moot this case by "abandoning [their] injurious conduct." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1130 (2026) (quotation omitted). It is far from clear that they have abandoned the conduct, much less that it will not recur.

Legally, Plaintiffs' claims cannot be mooted by the Acting Attorney General's unsworn testimony that Defendants are not moving forward with the Fund. Opp. at 10. That statement, which has yet to be reduced to writing, has no effect on the documents that created the Fund: It did not rescind the May 19 Order establishing the Fund. ECF No. 25-1 at 18. And it did not modify

the Agreement in *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla.), which, by its terms cannot be modified without written agreement by both parties. ECF No. 25-1 at 12. Nor have Defendants separately produced evidence of a written agreement between the *Trump v. IRS* parties modifying the Agreement or any evidence suggesting that the Department does not consider the Agreement valid. In fact, the evidence suggests the opposite: the President, a named plaintiff in *Trump v. IRS* and a party to the Agreement, has repeatedly *declined* to confirm that he has abandoned the Fund.

Even if the Acting Attorney General's statement had some binding effect, Defendants' voluntary cessation of the Fund does not deprive this Court of its authority to determine the legality of the Fund, as it does "not preclude [Defendants] from reenacting precisely the same provision if the District Court's judgment were vacated"—as the President's statements explicitly advocate. *N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jack., Fla.*, 508 U.S. 656, 662 (1993) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Indeed, "[w]hen a defendant voluntarily ceases a challenged program, … the analysis requires additional rigor." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018). Given the mixed messages being sent by Defendants and the President, and the lack of any competent evidence confirming the Fund's cessation, Defendants have plainly failed to meet their "'heavy burden of persuading' the court that 'subsequent events [make] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Deal*, 911 F.3d at 191 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).[4]

## II.    Plaintiffs have standing to pursue their claims, which are ripe for review.

Each Plaintiff has established standing here, though only one must satisfy Article III for

---

[4] Even in their opposition, Defendants make no representation that they will not try to create a new fund using the Judgment Fund to benefit the administration's allies. Nor have they agreed to end their efforts altogether, saying, at most, that the Fund is not "going forward." That does not render the case moot. *See Deal*, 911 F.3d at 191 (suspension of program does not demonstrate mootness).

this suit to proceed. U.S. Const. art. 3, § 2, cl. 1; *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026). And Defendants' repeated references to their mootness arguments is improper (even if they had established a factual basis for mootness, which they have not) because standing is assessed "at the time the action commences." *Friends of the Earth, Inc.*, 528 U.S. at 191.

### A. Plaintiffs Floyd and Caravello have suffered Equal Protection and First Amendment injuries, and New Haven has suffered Equal Protection injuries.

Defendants baselessly argue that the standing of Plaintiffs Floyd, Caravello, and City of New Haven rests on erroneous theories because they are not excluded from applying to the Fund. However, courts must not conflate the merits of the legal arguments with standing. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022) (accepting for standing purposes as valid claims of unconstitutional burdening of speech); *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (similar). And, as the Fourth Circuit has held, "standing [and] ripeness requirements are … relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240.

In any event, for the reasons discussed *infra* § III.B, Defendants' argument that they have not violated the Equal Protection Clause or the First Amendment because the Fund will be available to Democrats and Republicans alike fails on the facts. Per the Agreement, "Lawfare" and "Weaponization" are explicitly defined as improper targeting "by Democrat elected officials, political and career federal employees, contractors, and agents."[5] ECF No. 25-1 at 9. And because relief from the Fund is limited to claimants that assert "at least one legal claim … of Lawfare and/or Weaponization," ECF No. 25-1 at 11, as defined above, Plaintiffs are expressly ineligible

---

[5] The word "Democrat" in that sentence attaches to all the words that follow it. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive ... modifier normally applies to the entire series."); *Facebook, Inc. v. Duguid*, 592 U.S. 395, 410 at asterisk (2021) (Alito, J., concurring) ("As set out in Reading Law 147, this canon also applies when the modifier precedes the series of verbs or nouns.").

5

for such relief. This straightforward reading is reinforced by the President's consistent characterization of the Fund's purpose, including on June 6 when he explained that the Fund is a mechanism to pay "[p]eople [who] have been hurt so badly by radical left lunatics that worked for the Biden administration" "the kind of money that they deserve." Ex. G.

Defendants also fail in their attempt to categorize Plaintiffs' claims as generalized grievances, arguing that Plaintiffs challenge the Anti-Weaponization Fund but have "no legal right to participation in a bespoke federal claims process." Opp. at 15. But what Defendants call "bespoke" is more accurately described as a government program that clearly favors some political viewpoints over others—in other words, a program that is "as content-based as it gets." *Barr v. Am. Assoc. of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020). Parties subjected to "unequal treatment" by such a program suffer a "First Amendment injury." *Id.* at 634. And but for that favored political viewpoint, Plaintiffs Floyd and Caravello would have valid claims because they have been targeted by a weaponized federal government (just under a Republican administration) in retaliation for their perceived political actions and beliefs. Floyd Decl. ¶¶ 7–24, ECF No. 25-2; Caravello Decl. ¶¶ 1–2, 5–10, ECF No. 25-2; Elicker Decl. ¶¶ 4–16, ECF No. 25-4.

In creating a fund that denies benefits to Plaintiffs Floyd and Caravello on the basis of the party of the administration that targeted them, Defendants have unconstitutionally burdened their First Amendment rights. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). The harm that results from that disparate treatment is real—to obtain any relief for their claims of weaponization by the Trump-Vance administration, Plaintiffs will have to file claims through more arduous legal channels. Their counterparts that have been targeted by "Democrat" administrations, however, can avoid those channels altogether and obtain fast-track relief through the Anti-Weaponization Fund. That harm is different than the type a party would face because it

6

cannot demonstrate membership in a class that has obtained court-approved, class-wide relief based on specific discrimination faced by members of the class. Defendants' desperate attempt to rebut Plaintiffs' First Amendment and Equal Protection claims by alluding to *Keepseagle v. Veneman*, No. 1:99-cv-3119, 2001 WL 34676944 (D.D.C. Dec. 12, 2001), is thus meritless.

For similar reasons, Plaintiffs Floyd, Caravello, and New Haven have standing to raise their Equal Protection claims, which stem from Defendants' grant of benefits from the Anti-Weaponization Fund to individuals targeted by "Democrat" administrations alone. *See Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes."). These Plaintiffs are "able and ready" to apply for relief from the Fund, *N.E. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666, but because the Fund discriminates against applicants on the basis of the political party they were targeted by, *see infra* § III.B, they are ineligible for relief. Defendants argue that New Haven does not have standing to raise First Amendment or Equal Protection claims. Opp. at 23 n.9. While New Haven does not have a First Amendment claim, it does have an Equal Protection claim to "protest Defendants' unequal treatment of their [federal] funding based on a classification … that is not rationally related to a legitimate government interest." *City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 73 (D.D.C. 2026).

Defendants also argue that these three Plaintiffs lack standing because they have not applied for benefits from the Fund, but that argument is misguided. For standing purposes, Plaintiffs need only demonstrate that they *would* have applied but for the Fund's design "ma[king] it unlikely that such amount would be repaid." *Cruz*, 596 U.S. at 300. Nor is the injury in fact the inability to *obtain* the benefit. As the Supreme Court made clear more than three decades ago, "[w]hen the government erects a barrier that makes it more difficult for members of one group to

7

obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *N.E. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666. All that these Plaintiffs have to show is that Defendants' discriminatory policy "prevents [them] from [competing] on an equal basis," *id.*, which they have done.

**B.      Plaintiffs NAF and Common Cause are injured from the threat of increased violence resulting from the Fund.**

Plaintiffs NAF and Common Cause have also suffered injuries in fact. For a significant portion of NAF's members, the creation of the Anti-Weaponization Fund will result in increased incidents of violence and harassment. Fonteno Decl. ¶ 17, ECF No. 25-5. Unlike in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), NAF does not rely on mere "speculation," but has set forth "specific facts" that make it likely they will succeed in showing a "sufficiently imminent and substantial" risk of future harm resulting from the administration's support for violent anti-abortion activists. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 415, 431 (2021); *see generally Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019), as amended (Jan. 9, 2019) (plaintiffs allege a "credible threat" when they have been harmed by similar government action in the past). To start, the Anti-Weaponization Fund specifically identified individuals "targeted" under the FACE Act as an example of those who can seek claims from the Fund. ECF No. 25-1 at 9. And FACE defendants have already noted their plans to apply. Fonteno Decl. ¶ 23. The last time the administration gave its imprimatur to these violators' illegal actions—when the President pardoned 23 people convicted under the FACE Act last year—several of them were rearrested at abortion clinics, including NAF member clinics. *Id.* ¶ 19. No doubt that that endorsement by the Fund will significantly embolden these violators to continue to illegally block access to the dwindling number of abortion providers left in our country, as the pardons did. *Id.* ¶¶ 22–29. And with the

8

promise of financial reward, anti-abortion networks will expand their existing capabilities, which already include coordinated interstate travel, training, and legal support. *Id.* ¶ 29.

Further, NAF's provider members are diverting significant time and resources from their core activity of facilitating reproductive healthcare to respond to ongoing threats. Fonteno Decl. ¶¶ 33-35, 39-40. As is evident from NAF's supporting declaration, with which Defendants do not engage at all, this is hardly a voluntary expenditure, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024), but instead is required for NAF's members to continue providing their "core business activities." *Id.* at 395. That harm also suffices for demonstrating an injury in fact. *Id.*; *see also Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) (plaintiffs had standing where they alleged that defendants' actions directly impact Plaintiffs' core organizational missions (citation omitted)).

Similar to NAF, Common Cause is injured by Defendants' provocation of future election violence through the creation of the Fund. Nunez Decl. ¶¶ 18–21, ECF No. 25-6. Indeed, some January 6 rioters have already indicated that they intend to file claims with the Fund. *See* ECF No. 25-1 at 155–59, 164–68. What FACE Act violators are to NAF, violent election deniers are to Common Cause. Given that the President and his administration have branded the Anti-Weaponization Fund as a resource for January 6 rioters, and the President's zealous defense that those individuals should be paid by the Fund because they did nothing wrong, Ex. E, there is a real and impending risk that election deniers will be reinvigorated by their ability to obtain relief from the Anti-Weaponization Fund, and that they will incite future election interference as a result. To combat that interference, Common Cause is required to invest additional time and resources to fulfill its mission-related work of getting voters to the polls safely, maintaining election integrity, and ensuring that their election volunteers are safe from harm. Nunez Decl. ¶¶ 18–23. This Court

should therefore follow the long line of decisions finding that Common Cause and other voter outreach organizations have standing where election hurdles adversely affect their election-related work. *See, e.g.*, *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025) ("impair[ment]" of "core mission of providing voting counseling, voter outreach" forcing organization to "divert their resources to re-register voters."); *Democracy N.C. v. Hirsch*, No. 1:23CV878, 2025 WL 4033053, at *2 (M.D.N.C. July 21, 2025); *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1291 (N.D. Ga. 2018); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1152 (S.D. Ind. 2018), *aff'd*, 937 F.3d 944 (7th Cir. 2019)).

### C.    Plaintiff Common Cause is injured by the Fund's lack of transparency.

Defendants incorrectly argue that Common Cause has no informational standing because Defendants "could" choose to make information available under the current scheme. But future *discretionary* choices by the administration do not remedy the fact that Common Cause is denied what should be a statutory *entitlement* to information about payments made from the Anti-Weaponization Fund under 31 U.S.C. § 1304(d) and the Freedom of Information Act (FOIA). Common Cause regularly relies on these statutorily required disclosures to conduct oversight of government and campaign operations and bring related legal challenges, like they did when investigating false claims about election integrity in 2020. Bellows Decl. ¶¶ 8–11, ECF No. 25-7. And a plaintiff "need not receive a specific denial" of information from an agency "to sustain an informational injury"; rather "a plaintiff suffers an informational injury when an agency . . . *adopts a rule that places a legally unsupported limit on its statutory reporting requirements*." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023) (citing *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017)) (emphasis added); *see also CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (plaintiff may challenge a "policy or practice [that]

will impair [its] lawful access to information in the future") (citation omitted). The Fund's lack of transparency thus harms Common Cause concretely. Where, as here, a party is attempting to compel the Department of Justice to comply with its disclosure requirements "in order to monitor its workings and participate more effectively … in the … process," refusal to permit scrutiny to the extent the relevant statute allows "constitutes a sufficient[] distinct injury to provide standing to sue." *Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989). Additionally, Defendants' argument fails to address Common Cause's right to information under FOIA.

> **D.     Plaintiffs' injuries are traceable to the Anti-Weaponization Fund and redressable by dissolution of the unconstitutional and illegal Fund.**

The relevant inquiry for traceability is whether Defendants' actions are "at least in part responsible for" Plaintiffs' injuries. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). Plaintiffs Floyd, Caravello, and New Haven easily meet that standard—they have detailed how their harms stem directly from their viewpoint-based exclusion from the Fund. And NAF and Common Cause have demonstrated that the Fund's emboldening of violent actors that would target them or their members or volunteers increases the risk of harm and requires a diversion of resources to continue their core activities. *Hippocratic Med.*, 602 U.S. at 383 ("[T]o thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). Common Cause additionally has demonstrated that its informational injury results directly from the Fund's lack of transparency requirements. *See supra* § II.C.

It follows that "a judicial decree directing the [Defendants] to discontinue its program would 'redress' the injury." *N.E. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666 n.5. "[P]laintiffs in discrimination cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group

11

or by denying benefits to the favored group." *Planned Parenthood of S.C. Inc.*, 361 F.3d at 790 (citing *Heckler v. Matthews*, 465 U.S. 728, 738–39 (1984)). Extending benefits to the disfavored group, the more common outcome, *Barr*, 591 U.S. at 632, makes little sense when the discriminatory provision consists of *favorable* treatment for a discrete group. *Sessions v. Morales-Santana*, 582 U.S. 47, 74–75 (2017) (curing unequal treatment of children born to unwed U.S.-citizen fathers by extending a burden to children of unwed U.S.-citizen mothers). It would also be impossible here given that the Fund cannot operate lawfully for reasons other than its discrimination. *See infra* §§ III.B, III.C. And finally, no part of the Anti-Weaponization Fund could be altered to protect NAF and Common Cause from the harm caused by the Fund's message to the agitators that seek to inhibit the mission-related work of those organizations. Thus, the remedy of dissolving the Anti-Weaponization Fund, and only that remedy, will redress the various harms Plaintiffs face. *See Heckler*, 465 U.S. at 739 ("[W]e have frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class.").

### E.    Plaintiffs' claims are ripe for review.

In determining whether claims are ripe for review, courts consider (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983) (citation omitted). Contrary to Defendants' arguments otherwise, there is no concern that this case is premature. *Cf. Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 295 (4th Cir. 2022) ("To be sure, ripeness can rest on anticipated future injury."). Plaintiffs' claims are fully crystalized and "purely legal," and—based on the record before this Court—Defendants'

decision to create the Fund and the eligibility requirements imposed by the Agreement are "final and not dependent on future uncertainties." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006)). That the administration of the Fund may change certain details is irrelevant to the legal questions surrounding its lawfulness. *Lansdowne*, 713 F.3d at 199 (whether an agreement "unlawfully grant[s]" an "exclusive [business] right ... is a legal question that is, in a sense, frozen in time: the answer does not change no matter how actively or passively [Defendant] chooses to exercise that right"). Waiting for Plaintiffs to apply for relief from the Fund "would not improve the parties' advocacy[,] ... clarify the legal issues presented for review[,] ... or ... contribute in any way to [the court's] ability to decide a question presented and contested by parties"; accordingly, there is no reason for the Court to wait to decide the issues. *Planned Parenthood of S.C. Inc.*, 361 F.3d at 790–92 (citation and internal quotation marks omitted). Further, "First Amendment rights … are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss." *Cooksey*, 721 F.3d at 240. Similarly, Plaintiffs' Separation of Powers claim "inflicts a here-and-now injury." *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (citation and internal quotation marks omitted).

Delayed adjudication would also result in hardship for Plaintiffs given the lack of transparency in the procedures of the Anti-Weaponization Fund, including the non-public appointment of the Fund's members, who can then utilize confidential proceedings to transfer unreported money from the Fund to claimants. The longer it takes to get relief, the more likely it is that Defendants will have already transferred untraceable sums of money from the Fund. Moreover, the increased risk of harm to NAF's members and to Common Cause as a result of Defendants' creation of the Fund already exists.

13

### III.    Plaintiffs are likely to succeed on the merits.

Despite their insistence that it is "absolutely clear" that the Fund is not moving forward, Defendants spend several pages defending the Fund on its merits. Nevertheless, their arguments largely boil down to bald expressions of incredulity and strawman comparisons to the *Keepseagle* settlement. Plaintiffs are likely to succeed on the merits of all of their claims.[6]

### A.    Plaintiffs are likely to succeed on their First Amendment and Equal Protection claims.

Defendants' First Amendment arguments badly miss the mark. At the outset, Plaintiffs' interpretation of the Agreement is not a "misreading," Opp. at 21—it is "required by the ordinary rules of grammatical construction." *Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) ("The use of the adverb 'forcibly' before the first of the string of verbs, with the disjunctive conjunction used only between the last two of them, shows quite plainly that the adverb is to be interpreted as modifying them all."); *see supra* note 5.

And Defendants' assertion that "Democrats can submit claims too" misunderstands the relevant discrimination. Opp. at 21. The Fund is open only to those who claim persecution by Democrats, regardless of their own political party, and who this administration therefore understands to be its friends (the enemy of its enemies). *See id.* 22 at n.8; Ex. H. Contrary to Defendants' suggestion, the claimant's party registration is irrelevant to the constitutional inquiry, which rests on one's associations (or perceived associations) rather than their formal political party. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715 (1996) (describing right as "political association or the expression of political allegiance"); *cf. Heffernan v. City of*

---

[6] In any event, for purposes of obtaining preliminary relief, Plaintiffs need only show a likelihood of success on one claim, provided they can satisfy the other preliminary injunction factors (they can). *Roe v. Dep't of Def.*, 947 F.3d 207, 234 (4th Cir. 2020), *as amended* (Jan. 14, 2020).

*Paterson, N.J.*, 578 U.S. 266, 273 (2016) (perceived political activity is protected).[7]

Defendants' next argument—that the Fund is simply a selective funding program—likewise fails. Unlike the government's funding program in *Rust v. Sullivan*, 500 U.S. 173 (1991), to which Defendants attempt to analogize, Opp. at 21, the Anti-Weaponization Fund does not purport "to use[] private speakers to transmit specific information pertaining to its own program," but rather "favor[s]" certain speakers over others "[i]n the realm of private speech or expression." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 833 (1995) (distinguishing *Rust*); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (confirming that *Rust* was a government speech case); *Rust*, 500 U.S. at 194–95 (distinguishing the fact pattern at issue there from one in which the government action "singl[ed] out a disfavored group on the basis of speech content," which *would* run afoul of constitutional principles). Put differently, here, the private individuals seeking to avail themselves of the Fund are the ones speaking—not the government itself, as it was in *Rust*.

Indeed, an alternate but equally fatal way to evaluate the Fund is as a government system that "den[ies] a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (The government may not "leverage its power to award subsidies on the

---

[7] To the extent Defendants argue that it is acceptable to deny benefits to an individual based on the political affiliation of that individual's opponents, that is nonsensical. "None would deny" that under our Constitution "Congress may not enact a regulation providing that no Republican [] shall be appointed to federal office," *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 100 (1947); it would be quite a loophole if Congress could rescue such a law by instead providing that "no political opponent of Democrats shall be appointed to federal office." Nor is Defendants' defense that the contractor who leaked the President's returns did so during a Republican administration persuasive. Opp. at 15 n.5. That contractor would likely be a "Democrat … contractor" under the Fund's definitions. ECF. No. 25-1 at 9. Indeed, the Trump Organization has publicly criticized that contractor as a "politically-motived employee" leaking information to "left-wing news outlets." Ex. I.

basis of subjective criteria into a penalty on disfavored viewpoints."). As in *Perry*, the government here is denying a benefit—redress from the Fund—to individuals, including Plaintiffs Floyd and Caravello, "because of [their] constitutionally protected speech or associations." 408 U.S. at 597 (applying this principle to re-employment, even though the individual "has no 'right' to [that] valuable government benefit"; *see also Speiser v. Randall*, 357 U.S. 513 (1958) (applying same principle to tax exemptions). Defendants' reliance on the basic proposition that in some circumstances the government may be liable to discrete classes of individuals does not support their extrapolation that the government may select a class of individuals with a preferred viewpoint on which to confer benefits and do so without any showing of compelling government interest.

Defendants' Equal Protection arguments fare no better. As explained above, the Fund *does* "affect fundamental rights." *See* Opp. at 22. And "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 72 (D.D.C. 2026). Finally, Defendants' unprompted analogy to the *Keepseagle* settlement is a red herring. *See infra* § III.C. Unlike in *Keepseagle*, the Fund here does not "resolve specific litigation." Opp. at 22–23. Rather, the conduct that "prompted the [*Trump v. IRS*] lawsuit" was tax disclosures by a contractor in Trump's own first administration, not "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents" against would-be claimants. ECF No. 25-1 at 9.

### B.   Plaintiffs are likely to succeed on their Separation of Powers claim.

Defendants have no meaningful response to Plaintiffs' separation of powers claim. They provide no analysis substantiating their authority to spend the money funneled to the Fund, instead

16

pointing only to the existence of the *Keepseagle* settlement. But as Plaintiffs set forth in their opening brief, the Anti-Weaponization Fund is not a legal use of the Judgment Fund, and therefore traditional appropriations principles apply. And, again, Defendants' baseless comparisons to *Keepseagle*, which does not opine on any separation of powers implications for that settlement, much less one such as this, lacking in all guardrails, get them nowhere. *See infra* § III.C.

C.    **Plaintiffs are likely to succeed on their APA claims.**

Defendants' attempted rebuttal of Plaintiffs' APA claims likewise fails. *First*, there is no doubt that the creation of the Fund was a final agency action "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). Although Defendants continue to protest that the Fund is not in effect, that assertion is at odds with the plain language of the documents, which are self-executing. And even if the Fund did not directly affect Plaintiffs, *but see supra* § II, it would still meet the "rights, obligations, legal consequences" requirement. *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-243, 2026 WL 280089, at *3 (D. Md. Feb. 3, 2026) (explaining that policy could have legal consequences sufficient to be final agency action "[e]ven if [it] had no direct impact on the rights or obligations of [p]laintiffs"); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (holding that policy eliminating agency staff discretion had legal consequences sufficient to establish finality). The Fund establishes a legal process by which some individuals (but not others) have the right to pursue claims against the United States, involves the transfer of $1.776 billion from the Judgment Fund, and permanently bars claims that claimants could otherwise pursue. ECF No. 25-1 at 7–18; *see HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 683 n.18 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021) (holding that "[r]ights and consequences clearly flow from [an] Order and Funding Notice" that "determine eligibility for funding in certain

17

jurisdictions in the first place"). The policy therefore meets the APA's "pragmatic" finality test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).[8]

 *Second*, Defendants barely engage with Plaintiffs' arbitrary and capricious claim, contending only that "the actual explanation in the settlement agreement" is sufficient. Opp. at 25. But even crediting this reasoning, the Agreement does not begin to answer the numerous omissions and errors in reasoning identified in Plaintiffs' opening brief.

 *Third*, Defendants' cursory responses to the claim that the Fund is contrary to law and constitutional right are unpersuasive. To be sure, Defendants do not meaningfully rebut Plaintiffs' Fourteenth Amendment argument, arguing only that relief is limited to "legal claim[s]," Opp. at 26, but failing to answer Plaintiffs' evidence that the Fund's purpose is to compensate individuals convicted of crimes in connection with the January 6 insurrection, without guardrails. In rebutting Plaintiffs' Appointments Clause arguments, Defendants ignore that "[i]f the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object." *Bond v. United States*, 564 U.S. 211, 223 (2011). They also cite an inapposite case, *Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991), which holds that special trial judges who "perform more than ministerial tasks" are indeed subject to the Appointments Clause. Like such judges, the Fund's members would "exercise significant discretion," *id.*, as Defendants' own brief confirms. *See* Opp. at 7, 24. And Defendants' argument that the Fund will not run afoul of the Judgment Fund statutes again amounts to asking the Court to take their word for it. Given their track record in this litigation, the Court should not oblige.

---

[8] Defendants the Department of Justice and the Department of the Treasury are indisputably agencies subject to the APA, but so is the Anti-Weaponization Fund itself, as it is an independent authority that can take final and binding action that affects the rights and obligations of individuals. *See Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) ("[T]he APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.").

*Finally*, Defendants do not identify any statutory authority to create the Anti-Weaponization Fund, retorting only that it has been done once before. But "[p]ast practice does not, by itself, create power." *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). In any event, their analogy to *Keepseagle* fails. First, the *Keepseagle* case involved a class action, in which USDA ultimately settled discrimination claims by an identified class of plaintiffs *before the court, see* Settlement Agreement, *Keepseagle*, ECF No. 570 at II.E (Oct. 19, 2010), and only after "extensive investigation of the facts and the law[,] … vigorous arm's-length negotiations," and thorough review by that court, including an opportunity for objections and a hearing. Order, *Keepseagle*, ECF No. 606 at 1 (Apr. 28, 2011).

At bottom, the *Keepseagle* settlement followed vigorous litigation confirming the viability of plaintiffs' claims (unlike claims for "Lawfare" or "Weaponization") and therefore justified payment from the Judgment Fund. 28 U.S.C. § 2414; *see also Keepseagle v. Veneman*, 99-cv-3119, 2005 WL 8159814, at *7, *9–11 (D.D.C. Mar. 31, 2005) (Plaintiffs properly stated claims under the Equal Credit Opportunity Act and Administrative Procedure Act, and their claims were not barred by *res judicata*); *cf also Garcia v. Vilsack*, 563 F.3d 519, 524-26 (D.C. Cir. 2009) (noting that Hispanic and female farmers likely had valid ECOA claims against USDA). The *Keepseagle* settlement therefore bears no resemblance to Defendants' claimed authority here—to create a fund for an undefined set of potential claimants who were not before the court in the underlying case, for amounts untethered to any exposure in actual or imminent litigation against the United States, and for non-existent legal claims. Indeed, unlike the court-approved settlement in *Keepseagle*, the Agreement in *Trump v. IRS* seems to have sought to purposely *evade* judicial supervision, a course of conduct that is now being examined as potential fraud upon a federal court. Order, *Trump v. IRS*, No. 26-cv-20609 (S.D. Fla. May 29, 2026), ECF No. 65.

19

## IV. Plaintiffs will suffer irreparable harm without preliminary relief.

Defendants merely regurgitate their arguments on mootness, standing, and ripeness to argue Plaintiffs will not suffer irreparable harm. But that argument fails if the Court agrees it has jurisdiction. Instead, Plaintiffs' likelihood of success on the merits is outcome determinative on irreparable harm for their First Amendment and Equal Protection claims. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190–91 (4th Cir. 2013); *Doe v. Hanover Cnty. School Bd.*, No. 3:24-cv-493, 2024 WL 3850810, at *14–15 (E.D. Va. Aug. 16, 2024). And many of Plaintiffs' injuries will be irreparable if Defendants spend down the Fund prior to relief from this Court.

## V. The balance of equities and public interest weigh in Plaintiffs' favor.

Defendants' remaining arguments hinge on the ongoing "political process" to shut down the Fund. But the Fund was undisputedly created without respect for the political process, which is why this suit exists in the first place. Defendants have not provided competent evidence to support the Fund's abandonment. Until they do so, for the reasons stated in Plaintiffs' opening brief, the balance of the equities and public interest tip decidedly in Plaintiffs' favor.[9]

### CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction and a § 705 stay.

Dated: June 10, 2026

Respectfully submitted,

/s/ Joel McElvain
Joel McElvain (Va. Bar No. 95215)
Catherine M.A. Carroll (Va. Bar No. 50939)
Pooja A. Boisture*
Jyoti Jasrasaria*

---

[9] Defendants' contention that Plaintiffs should post a bond "in the amount of the damages the Plaintiffs allege to have suffered or, in the alternative, the cost to the United States to litigate this unripe case," Opp. at 28 n.11, is unfounded, especially where the government is supposedly abandoning the Fund. Regardless, the Court has "discretion to set the [Rule 65(c)] bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013)). Accordingly, Plaintiffs request the Court require no bond or a nominal bond only.

20

Aman George*
Ayesha Khan*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
ccarroll@democracyforward.org
pboisture@democracyforward.org
jjasrasaria@democracyforward.org
ageorge@democracyforward.org
akhan@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of June, 2026, I will cause the foregoing memorandum of law to be electronically filed with the Clerk of Court using the CM/ECF system, thereby serving all counsel who have appeared in this case.

> /s/ Joel McElvain
> Joel McElvain (Va. Bar No. 95215)
> Democracy Forward Foundation
> P.O. Box 34553
> Washington, DC 20043
> (202) 448-9090
> jmcelvain@democracyforward.org
>
> *Counsel for Plaintiffs*