**CQ Congressional Transcripts**
Jun. 2, 2026

Jun. 02, 2026 Revised Final

# House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department

## LIST OF SPEAKERS

HAROLD ROGERS:

Committee -- subcommittee will be in order. Without objection, the chair is authorized to declare a recess at any time. I'll begin by recognizing myself for an opening statement and I want to welcome our witness, the Honorable Todd Blanche, Acting Attorney General of the United States, to testify before our subcommittee today.

Last month, the Fiscal Year 2027 Commerce, Justice, Science and Related Agencies bill cleared the full House Appropriations Committee and the Attorney General's leadership of the Department of Justice comes at a crossroads. On the one hand, the subcommittee recognizes the strides taken by the department to make communities safe again across the United States and to address the misguided priorities of the previous administration.

On the other hand, the subcommittee recognizes areas for improvement, such as communicating with the subcommittee and the ... testimony ahead of our bill moving forward. Additional areas of concern deal with getting appropriated dollars out the door and making progress with already approved projects.

From the proposed federal prison in Letcher County, Kentucky, in my district, that has been stalled to the delay of several grant programs, including the prescription drug monitoring program, which I worked to start in response to the opioid crisis and that's vital for many communities like mine. It's critical for this department to move with speed and meet Congressional intent.

Finally, to date, we're still waiting on responses to questions for the record, from two Fiscal 2026 department hearings. While I would have preferred to start the Fiscal 2027 year cycle differently by having this conversation prior to last month's markup, this hearing is hopefully the start of productive dialog between the subcommittee and the department under your leadership.

I look forward to hearing your priorities and vision for the department and responses to our questions regarding the recent announcements. Your testimony will still be valuable to the committee as the Fiscal Year 2027 appropriations process continues. Over the past year, the Department of Justice has made great strides in combating drug cartels and curbing the flow of illicit drugs, including fentanyl.

The Drug Enforcement Administration and Department of Justice have taken down some of the most notorious cartel bosses, such as El Mayo, the co-founder of the Sinaloa cartel, and Nicolas Maduro, the leader of the Cartel of the Suns and former President of Venezuela. While these are significant wins, the department must continue this fight to eradicate the flow of illicit drugs and bring more cartel leaders to justice.

While issues such as illegal immigration have been addressed head on, other issues have emerged over the past year. I applaud the department's efforts to tackle emerging issues, such as fraud that pits

6/13/26, 2:57 PM
Case 1:26-cv-01399-LMB-IDD
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department
Document 93-1
Filed 06/19/26
Page 3 of 90 PageID#
1872

the underworld against American and their hard earned taxpayer dollars, and we look forward to hearing more about the department's plans to continue these efforts.

I also look forward to hearing about the Departments efforts in supporting state, local, and tribal law enforcement agencies. Over the past year from Washington to Memphis, Tennessee, the Department of Justice has aided local law enforcement agencies in surge operations to combat violent crime. American streets are safer now because of the actions of this department and the Trump Administration.

General [ph] Blanche, I stand ready to support you in your efforts to ensure that the American public lives in a society that is free from crime and abuse. I look forward to hearing more from you today regarding areas of progress, areas of need and plans, and to continue the department's momentum. While the Fiscal 2027 appropriations cycle has already commenced, there are critically important funding decisions ahead of us, and I hope we gain a better sense of your priorities today so that we can make the best decisions on behalf of the American people.

Before I turn to Mrs. Meng for opening remarks, on behalf of this subcommittee, I would like to send well wishes for a quick and healthy recovery to former Attorney General Bondi. Let me now recognize the ranking member of this subcommittee, Mrs. Meng, for any remarks that she cares to make.

GRACE MENG:
Thank you, Mr. Chairman, and welcome acting Attorney General Blanche, and thank you, everyone for your patience as we finished up the prior hearing with Secretary Rubio. Uh, tens of thousands of

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 4 of 90 PageID# 1873

public servants at the Department of Justice work very hard to protect public safety and try their best to uphold the rule of law.

However, the leadership of the department has greatly damaged it over the past 16 months. Hardworking Americans continue to struggle with higher and higher costs of gas, groceries, and other necessities yet the Trump Administration is doing nothing to help them. President Trump himself has said that he doesn't, quote, "Think about American's personal financial situation." At the same time, a growing number of Trump Administration officials and their family members are enriching themselves in the millions of dollars by making personal business deals directly connected to their official government decisions.

Working and middle class Americans are paying their taxes but the acting attorney general signed an order two weeks ago directing the IRS to permanently avoid auditing past tax returns of the Trump family. Members of the Trump family are now off the hook for at least $100 million in taxes. On top of that, the Trump Administration and the Justice Department are actively working to hand $1.8 billion in taxpayer dollars over to insurrectionists and other violent felons, hundreds of whom assaulted police officers here in the Capitol.

One of the insurrectionists, Jared Wise, openly encouraged fellow writers to attack and to kill police officers. He was hired last year by the Trump Administration as a senior advisor and counselor at the Justice Department. There have been many other outrages over the past 16 months. Under this department's leadership, and following an interview by then Deputy Attorney General Blanche, Jeffrey Epstein's closest associate, the child -- the convicted child sex trafficker Ghislaine Maxwell, was moved to a cushy minimum security prison and was given special treatment and unique privileges.

Hundreds of experienced career agents, investigators and prosecutors have been fired or forced out of DOJ as part of a campaign of political retribution by the Trump Administration. Just days before the launch of US military strikes in Iran this year, at least ten FBI counterintelligence agents and support staff, including those specializing in the Middle East and Iran, were fired in retaliation for work they had been ordered to do several years ago in the Mar-a-Lago classified documents case.

As The New York Times reported in March, after a year of continuous firings, resignations, and other disruptions to work, elite counterterrorism and counterintelligence units at the Justice Department have been stretched thin and left short staffed, but the threats to our country are growing. As part of their retribution campaign, the Trump Administration and DOJ have also deliberately targeted and investigated numerous current and former public officials for criminal prosecution on extremely flimsy grounds, if any.

DOJ has also trampled on the First Amendment by targeting journalists engaged in investigative reporting, including an FBI criminal probe of a reporter from The Atlantic magazine after its recent reporting about the FBI director's dereliction of his duties. Multiple news outlets have also reported on the administration's corrupt practice of receiving pay for pardons or clemency for millionaire and billionaire criminals.

For example, we know that the founder of Binance was pardoned last October after the company took actions that enriched the Trump family by hundreds of millions of dollars. In December, President Trump pardoned the former President of Honduras, Juan Orlando Hernandez, who had been sentenced to 45 years in prison for allowing drug traffickers to export more than 400 tons of cocaine into

the US. Not only was he pardoned, but the Bureau of Prisons helped relocate him from a federal prison in West Virginia to the Waldorf Astoria Hotel in New York City after his release.

All of this has happened in full public view, and the Trump Administration has simultaneously gutted the DOJ's Public Integrity section and shut down the public corruption squad of the FBI Washington Field office. There's more. Over the past 16 months, the DOJ's highly respected civil rights division has been gutted.

The FBI has stopped using a national database that tracks hate crime cases, and DOJ is proposing to eliminate the three grant programs aimed at fighting and preventing hate crimes, while hate crimes are at a record high. The administration also wants to eliminate the Community Relations Service, which was created by the Civil Rights Act of 1964 to prevent and resolve conflicts in American communities.

At the same time, DOJ is seizing state voting records and has sued more than 30 states to access their voter information. Nearly all of the roughly 30 career lawyers in the voting section of the Civil Rights Division are gone. Last month, Acting Attorney General Blanche stated that he sees no problem with deploying ICE officers to polling places, even though 18 US Code Section 592 prohibits sending armed personnel to polling places.

An equally as egregious, the Justice Department has taken steps to allow criminals to own guns and continues to illegally restore the gun possession rights of convicted felons and domestic abusers. These actions, and much more prove that since the start of this Trump Administration, the Justice Department has failed the American people.

Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 7 of 90 PageID#
1876

I look forward to the discussions of these critically important issues today. Thank you, Mr. Chairman, and I yield back.

HAROLD ROGERS:

Chair now recognizes the ranking member of the House Appropriations Committee, Ms. DeLauro, for any remarks you may wish to make.

ROSA DELAURO:

Thank you very much, Chairman Rogers and Ranking Member Meng, Acting Attorney General Blanch, welcome. There's much I would like to cover today, the president's budget proposes steep cuts to important programs that combat hate crimes, protect civil rights, prevent gun violence, along with other changes that I believe will weaken efforts to keep our community safe.

In an ordinary time, during an ordinary administration, these are topics that I would focus on, but these are not ordinary times and this is not an ordinary administration. No, this administration has engaged in what are perhaps the most brazen acts of flagrant corruption I've ever seen. And you are at the center of many of them, Mr. Blanche.

I know you do not like it when people bring up the fact that before you joined the Justice Department, you were President Trump's personal attorney. But when you are issuing memos granting the president, his children and their companies immunity from audits or prosecution for tax offensive, offenses, your previous role becomes relevant information.

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 8 of 90 PageID# 1877

When you preside over a deal to take $1.8 billion of taxpayer money to create a slush fund to pay out violent criminals who pleaded guilty to assaulting police officers, you cannot be surprised when people question your impartiality. Federal courts have blocked the fund from paying out any claims for the time being, but I am not at all convinced that this administration has given up. You left yourself a lot of room with your carefully worded statement, Mr. Blanche.

There is effectively no oversight to this slush fund. You appoint every member of the commission and the president can fire any of them at any time for any reason. There is no definite standard for who is and is not eligible to receive a payout. Quote, "Weaponization and lawfare are not legally defined terms." Who does and does not qualify appears to be entirely at the discretion of the people that you appoint.

There is no transparency built into the fund, there is no Congressional oversight. The public has no way of knowing who has filed a claim, of how much, or on what grounds. Conversely, we do not know who has been denied a claim or why it was denied. We do not even know the process by which claims will be filed or payments disbursed.

All we know for certain is that President Trump's personal lawyer, turned acting attorney general, set up a $1.8 billion fund with taxpayer money that can be used to pay off just about anyone for just about anything. It can be used to pay out violent criminals who assaulted police officers and ransacked the Capitol on January 6. I was evacuated from the Capitol on January 6. These are the people who were arrested, they were tried, convicted and then pardoned by the administration and now he wants to raid the Treasury to pay them.

It is unconscionable. This sort of a scandal, that it would ruin any other administration at any other time. But because President Trump

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 9 of 90 PageID#
1878

has rendered House Republican leadership so completely impotent, there will be likely no accountability until the next Congress. In addition to the slush fund, you issued a memo stating that the United States is, quote, "Hereby forever barred and precluded from prosecuting or pursuing any and all claims," end quote, against the President, his family, or their businesses related to ongoing tax investigations.

Retroactive immunity would be a curious benefit to bestow on someone who has done nothing wrong. If the president, his associates and family members were innocent of whatever they were being investigated for, the investigation would surely bear that out. But now we will never know. Congress and the American people are left to speculate what could have possibly prompted this unprecedented settlement that exempts the president from any accountability for his actions.

This is staggering. I had not planned on using my time during this hearing to raise these issues, but I would be deficient in my duty as a member of the Congress were I to ignore this extraordinary display of self-dealing, self-service, self-enrichment by this administration, beginning with the president on down.

All year on this committee, we have seen dramatic cuts to programs that help American families who are struggling with the cost of living. We do not have money for food or for housing, to bring down the cost for utilities or gasoline or health care, the president said there will be no money for daycare, for Medicaid, for Medicare, but by God, we do have $1.8 billion for a corrupt payout scheme for the president and his political allies.

It is shameful. I look forward to hearing your answers to our questions today, Mr. Blanche. Thank you, and I yield back.

HAROLD ROGERS:

I now want to recognize our witness, Acting Attorney General Blanche, for an opening statement. Without objection, your written statement will be entered into the record. The floor is yours.

TODD BLANCHE:

Thank you. Thank you very much, Chairman Rogers and Ranking Member Meng, as well, and members of the subcommittee. Thank you for the opportunity to present President Trump's Fiscal Year 2027 budget for the Department of Justice. As you all know, the request totals $41.2 billion, which is a 13 percent increase over Fiscal Year 2026, underscoring our department's renewed focus on reducing violent crime, combating the fentanyl crisis, strengthening the border and immigration enforcement, expanding fraud prevention and ensuring that our law enforcement agencies have the resources they need to protect the American people.

Violent crime reduction remains one of the department's highest priorities. Since January 20, 2025, the Department of Justice has indicted more than 260 TDA members, crippling leadership and dismantling operational networks. Across our major law enforcement components, the results have been historic. Federal law enforcement helped drive a 20 percent increase, decrease, in the national murder rate in 2025, arrested 44,000 violent offenders, which was double the previous year, and seized over 2200 kilograms of fentanyl.

Last year, law enforcement captured eight of the FBI's ten most wanted fugitives, located 6,300 missing children, and arrested more

than 2,000 child predators. The DEA has made thousands of fentanyl related arrests and seized millions of fentanyl pills and hundreds of kilograms of fentanyl powder. In an August surge alone, DEA executed over 600 arrests, seized multi-ton quantities of narcotics and recovered more than 11 million in drug proceeds.

DEA continues to disrupt global supply chains from source to street. The United States Marshal Service, which is one of the smallest federal law enforcement agencies with roughly 3,800 deputies, arrested more than 73,000 fugitives, conducted 308,000 prisoner movements, housed over 55,000 detainees and provided protection for 18 federal protectees, including Supreme Court justices residences.

The marshals also, as you all know, manage over $10.4 billion in seized assets and remain essential to federal judicial security. ATF continues to be a leader in the federal effort to combat violent crime. Since January 2025, ATF has arrested more than 8,700 violent offenders and seized nearly 44,000 illegal firearms, including 5,100 interdicted before reaching their destination of Mexico.

ATF agents also seized 2.7 million rounds of illegal ammunition, more than 28,300 illegal explosives and conducted over 3,500 arson and explosives investigations. To sustain these historic results, the Fiscal Year 2027 budget includes $22.2 billion for DOJ's law enforcement components and US Attorney's offices.

This is a 16 percent increase over Fiscal Year 2026. These investments build on our tremendous progress and will ensure continued momentum in violent crime reduction nationwide. We are also strengthening immigration enforcement efforts. The Executive Office for Immigration Review has reduced the immigration case

backlog by more than 447,000 cases since President Trump took office.

The budget provides almost 900 million for EOIR to continue rebuilding its workforce and to modernize case processing systems. Across the entire Department of Justice, nearly $4 billion supports immigration related enforcement activities. And finally, the department launched the National Fraud Enforcement Division to expand federal fraud enforcement and better protect taxpayer funded programs.

The budget includes $30 million to hire 100 attorneys and enhance data analytics capabilities, with a goal of combating large scale criminal fraud schemes. The DOJ is also modernizing the grants process by consolidating Cops OJP and OVW into the new Bureau of Justice grants. The goal is to provide a unified and simplified approach to federal grant making while preserving the missions of each office.

The department also faces serious budgetary constraints. Fiscal Year 2026 marked the second year of flat budgets for several components, basically equating to a decrease in funding because costs and expenses increase year over year. The Bureau of Prisons remains under-resourced, funded at $8.1 billion, almost $300 million below Fiscal Year 2025. It risks insolvency without additional support.

The president's request of $10.3 billion is essential to restore staffing and to maintain safe and secure facilities. In closing, the Fiscal Year 2027 budget reflects our unwavering commitment to public safety, strong law enforcement partnerships and responsible stewardship of taxpayer dollars. With your continued support, the Department of Justice will remain strong, effective, and fully equipped to protect the American people.

6/13/26, 2:57 PM
Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 13 of 90 PageID#
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department
1882

Thank you, and I look forward to answering your questions, chairman.

HAROLD ROGERS:

Thank you, general. We will now proceed under the five minute rule with questions for the witness, and I'll begin by recognizing myself. We all too well, drug trafficking and drug abuse continue to devastate our communities and towns. In December of 2025, President Trump designated fentanyl as a weapon of mass destruction by executive order.

How has that historic designation aided the department in its fight against illicit fentanyl? And please share how your 2027 budget request reflects that designation.

TODD BLANCHE:

Thank you. So, look, I think calling, um -- calling the men that are sending poison into this country terrorists, um, is exactly what they are. And what it does, by President Trump doing that, is not only there's resources that are more readily available because of that designation, but it also allows our Homeland Security Task Force around the country.

There's one in every single state to effectively focus on not only the narco terrorists that are in Mexico and South America, but the drug dealers that are on our streets, in our communities, rural communities, city communities, everybody's affected by fentanyl. It remains a priority of this department. It will be a priority for as long as President Trump is in office and that's why you see that we have an increase that we're asking for more DEA agents, we're asking for more money and it's exactly to combat that problem.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 14 of 90 PageID# 1883

HAROLD ROGERS:

Let me turn to the issue of illicit vape products, which is something that is sending children to the hospital, some as young as middle schoolers in my district, and it's true around the country. I'm pleased to see that the department and its components, such as DEA, ATF and others directing its efforts to tackle this emerging threat, such as last year's Operation Vapor [ph] Trail.

Please share how the department is tackling that issue and outline your plans to continue this effort in Fiscal 2027.

TODD BLANCHE:

Look, we -- this is an example of an all-of-government approach to tackle this problem. It means working with -- with other agencies outside of DOJ. It means working with state and local partners to combat this very serious problem that affects the youth, it affects a lot of our most vulnerable and it's a -- it's been a priority for the past 14 months, it will remain a priority.

And -- and part of it is not only enforcement, but it's also education and making people understand the importance and the dangers associated with this. And -- and look, we're going to -- we've been doing it for the past year and we'll continue to do it going forward.

HAROLD ROGERS:

As I mentioned in my opening statement, I applaud the department's efforts to take an aggressive stance on those who defraud the American taxpayer. In recent weeks, we've seen several examples of charges brought, guilty pleas entered and successful convictions of those who have committed fraud. Tell us about the department's new

6/13/26, 2:57 PM  Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 15 of 90 PageID#
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department
1884

National Fraud Enforcement Division and highlight some of the division's early successes.

TODD BLANCHE:

This is a -- look, this is -- this is one of the most important things we're doing at this -- at the Department of Justice. We stood up a new fraud division, not because we haven't prosecuted fraud for a long time, but because we want to make sure that there is a renewed focus out of Washington, D.C., and at every US Attorney's office to combat fraud.

And these are individuals, the people that we're targeting are literally stealing from this country. So, they are signing up for programs where they're not entitled to it, whether it's daycare centers, whether it's, um, whether it's SNAP benefits and the focus will be not only on the -- on the big, big players, but on the small players too, and we've asked for money for 100 prosecutors to help with that effort.

But this is, again, an all DOJ effort to combat fraud. You're already -- you mentioned it, you're already seeing results and you're going to continue to see results in the coming months and years as we as we continue to focus on this.

HAROLD ROGERS:

The National Fraud Enforcement Division established after the passage of the Fiscal Year 2026 Commerce Justice Appropriations Act. For this current fiscal year, tell us how the Department plans to fund and staff that division? They seem to be hitting the ground running.

TODD BLANCHE:

So, a couple of different ways. We moved prosecutors from the criminal division that were doing fraud work to the new -- the new division. Um, a different prosecutor from every US attorney's office has been designated to work within this division, although they'll stay, obviously, in their US attorney's office and then with the expected money that we're getting, we're going to hire.

And so, it's a combination of existing talent within the department and then bringing more talent in over the next, um, over the next year or so.

HAROLD ROGERS:
How does this new division interact with other parts of the agency?

TODD BLANCHE:
So, um, closely. And so, it's a partner. It's going to -- it's working with not only FBI and HSI and state AGs and state inspector generals, but also US attorney's offices and, um -- and again, this is not a new thing to tackle fraud, but it's a renewed effort by the Department of Justice to combat what has become a very big problem in this country with a lot of people just stealing from -- from the money, from the generosity of the American taxpayer.

HAROLD ROGERS:
Ms. Meng?

GRACE MENG:
Thank you, Mr. Chairman. Um, Mr. Attorney General, I wanted to ask a few questions about the Anti-Weaponization Fund. We know that

the department has agreed to pause this effort until at least June 12. Uh, I wanted to ask what your plans were for the fund after June 12?

TODD BLANCHE:

So, thank you. So, look, we're not moving forward with the fund. You're right that there's a date that in the case in the Eastern District of Virginia in June, but we are not moving forward with the fund, period. Um, we -- we, the reasons for the fund is something that President Trump talked about for a long time, which is the fact that there were a lot of people in this country who had their government weaponized against them.

The reasons for the fund, I think, were -- were -- it remains as important as they were before, but we are not moving forward with the fund.

GRACE MENG:

Not moving forward, ever?

TODD BLANCHE:

Correct.

GRACE MENG:

Oh, there's no more fund then?

TODD BLANCHE:

Well, to the extent there was a fund. Remember, the fund wasn't set up yet. There were no commissioners named. There was no, um, no claimants brought anything in front of, um, there was no claims made yet. So, yes, um, we're not moving forward with the fund.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 18 of 90 PageID#
1887

GRACE MENG:

Um, you and Associate Attorney General Woodward signed earlier documents regarding the settlement and this fund. Would both of you now sign and release documents reversing the DOJ's position on the fund?

TODD BLANCHE:

I'm not -- we're not moving forward with the fund. I'm not sure what that means to sign documents reversing. There's nothing to reverse, we're not moving forward with the fund.

GRACE MENG:

We -- we know about the court case, the decision when we've heard press reports, obviously, um, but is there any way that you could put this in writing? I don't know if there are other ways that you could use, uh, another vehicle to move forward with a similar fund or similar intention and we just want to reassure the American public.

We've heard from both Republicans and Democrats, constituents and Americans across the country about this fund, um, and I think they would love to be reassured that this fund will not progress.

TODD BLANCHE:

I'm telling you, it's not. I guess I'm not sure. I'm not -- I'm not trying to be flippant with you, I'm just saying I'm telling you it's not. I'm not -- I'm not, um -- there's a -- we put out a statement yesterday. Um, there's been a, um, an injunction, a temporary injunction, filed in Edva there's litigation in DC, there's litigation in the Southern District of Florida.

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 19 of 90 PageID# 1888

But notwithstanding what we do in those litigations and defending our rights and making sure our rights are protected, we're not moving forward with the fund.

GRACE MENG:

OK. Yeah, the statement I thought was just about until June 12. So, if it won't progress after June 12, that's great to hear and we hope to see this in writing. Yeah.

TODD BLANCHE:

I mean, I think there'll be a transcript of what I say here. So, that will be in writing.

GRACE MENG:

OK, well, we will work with you and hold you to it. Thank you very much. I wanted to quickly ask, with my remaining time about hate crimes. We are concerned about the president's budget request eliminating three largest sources of federal support to local law enforcement for hate crimes, responses and prevention.

Legislation passed in a bipartisan basis, Jabara-Heyer NO HATE, Shepard-Byrd Hate Crimes prevention and community-based approaches to prevent and address hate crimes grant programs. Why is the proposal -- why are we proposing to eliminate the very programs that are helping our law enforcement and targeted communities?

TODD BLANCHE:

Well, look, there's a there's a lot of money that we have asked for to combat violent crime, to combat this type of crime. A lot of overlap includes hate crime. I am -- I am happy to have my team work with

you to make sure that we're getting money where it needs to be. That's an important issue to President Trump, and it's an important issue to the Department of Justice as well.

GRACE MENG:

Can you describe or name the areas of overlap?

TODD BLANCHE:

Well, there's -- yes, I mean, sure, there's -- there's billions of dollars. I think we asked for $12 billion to combat violent crime in grants and things like that. A lot of those grants will go to programs that, at least part of it, includes combating hate crime. And so -- and there's other individualized grants, some of which are earmarked along the way that -- that we're certainly -- we've funded for a long time and that we will continue to work with you on -- on making sure that we're addressing that.

GRACE MENG:

Yeah, I just want to make sure that we're working together, as we have seen and worked together here in Congress bipartisan, bicameral ways that hate crimes, combating hate crimes isn't just -- not -- isn't just about prosecution, but also about prevention and working with community organizations as well.

So, I don't have time left, but I would love to continue to work together on this issue.

TODD BLANCHE:

I agree with that.

Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 21 of 90 PageID# 1890

GRACE MENG:

I yield back. Thank you.

TODD BLANCHE:

I agree with that.

HAROLD ROGERS:

Judge Carter.

JOHN CARTER:

Thank you, Mr. Chairman, and Attorney General, thank you for being here.

TODD BLANCHE:

Thank you.

JOHN CARTER:

We appreciate very much hearing from you. I've got to ask you about something that's dear to my heart. I authored the Justice Served Act a while back, and it was allowed to -- its purpose was to help law enforcement use advanced DNA technology to solve crimes and a lot of them don't have advanced. Today is forensic -- the forensic generic genealogy is the next generation of capability.

The FBI has already used it successfully in cases like Rachel Morin and Bryan Nehman [ph] [inaudible]. However, many unsolved violent crimes remain at state and local levels. These agencies lack the funding to scale for these investigations. Can you -- can you discuss the DOJ's version of forensic generic genealogy and whether you can

support the Carla Walker Act, which would help state and local enforcement solve violent crimes?

TODD BLANCHE:

Uh, we very much support it, sir. And I think that we have -- it's extraordinarily important to federal law enforcement and to state and local law enforcement. We have, I think, over a dozen DOJ grant programs that are designed to further the research and further the technology in that space. I think that's an important place for us to be spending our money, because it does solve crime.

JOHN CARTER:

And, in turn, local people are going to get the opportunity to petition you to get help on that.

TODD BLANCHE:

Correct.

JOHN CARTER:

On their crimes that they consider very important. As I think you may know, I was a former district judge in Texas, and I see the damages caused by lenient policies and judicial overreach. I think that creates damages and not only in moving cases along, but also in the people's view of justice and whether it's being -- justice is being served.

How is the department responding to the activist judges who issued nationwide injunctions against President Trump's immigration and national security actions and what is your strategy for defending the executive authority in the courts?

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 23 of 90 PageID# 1892

TODD BLANCHE:

Look, we are -- we are fiercely fighting for what we believe the law is. And when we have judges that disagree with that at the district court level, we are appealing constantly and we have had extraordinary success at the appellate level, even in places like the Ninth Circuit, but in other circuits as well, because we're right, we are not violating the law.

We're complying with the law that you all passed when it comes to immigration and the way that we're -- we're handling the immigration enforcement. We will continue to do that. When we lose at the district court level, which we do, especially with some of these judges that we think are just not following the law, um, we fight and we go back and we go back and we appeal.

And that's what the system suggests we do and that's exactly what we're doing.

JOHN CARTER:

At least where I come from, judges don't make new law or avoid the law that is written, but they follow the law and it's -- a it's a dilemma as far as I'm concerned. As a district judge, I swore to apply the law fairly. I appreciate the department's effort to restore justice, equal justice, under the law.

The president's executive order ending weaponization of federal government was an important first step. Under the prior administration, the DOJ challenged several state laws restricting gender transition procedures for minors. What steps has the department taken to ensure the DOJ's decisions are guided by the

Constitution, the public safety and equal application of the law rather than politics?

TODD BLANCHE:

Look, we're -- it includes both active investigations in the civil space when there's hospitals or institutions that we believe are not complying with the law, and those are ongoing. We have multiple investigations going on in the civil space. It also includes, um, active litigation against individuals or states that that we believe are violating the Constitution.

And we've been doing that almost since we came in a year -- a little over a year ago, and we're having, again -- it's, you know, we're having success and we're having success because we're right on the law and even if it's not at the first step with the district court, when we appeal, we're having success.

And we -- our appellate lawyers, our civil lawyers, are very busy, but they're doing a good job.

JOHN CARTER:

Thank you. Thank you, Mr. Chairman.

HAROLD ROGERS:

Thank you, judge. Ms. DeLauro?

ROSA DELAURO:

Thank you, Mr. Chairman. If I could just follow-up on my colleague, Congresswoman Meng's questions. I have here, this is the, um, the order on the settlement, the $1.8 billion and then this is the addendum to the order, which is about tax immunity and this is a copy

of the -- the settlement agreement and the Associate Attorney General signed this.

These two documents were signed by -- by yourself. Now, this is all in writing, this is all -- can you tell us here today that you are going to disavow this, that you're going to rescind, um, uh, what you said to Ms. Meng in writing with these efforts, these three documents are in writing, is that a yes or a no?

TODD BLANCHE:

So, I can't answer that yes or no? Do you want an answer?

ROSA DELAURO:

Yeah.

TODD BLANCHE:

OK. So, not yes or no. You gave me three documents. The only document I said we're not moving forward on today is the first document identified, which is the -- which is the Anti-Weaponization Fund. There was still --

ROSA DELAURO:

$1.8 --

TODD BLANCHE:

There was still -- there is still a settlement agreement and there's still -- the second document I signed is not an addendum, it's a separate Attorney General order.

ROSA DELAURO:

OK. OK. So -- so, but you're not -- you're not going to rescind the addendum, not an addendum, the second order?

TODD BLANCHE:

No.

ROSA DELAURO:

The only thing you're talking about here -- so, the blanket immunity is -- is not something that you're going to move back on?

TODD BLANCHE:

It's not blanket immunity, that's not true.

ROSA DELAURO:

It is.

TODD BLANCHE:

No, it's not.

UNKNOWN:

Read it.

ROSA DELAURO:

OK. United States releases, waives, acquits, and forever discharges each of the plaintiffs from [ph] and is hereby forever barred and precluded from prosecuting or pursuing any and all claims, counterclaims, causes of actions, appeals, requests for any reliefs. I mean, this is -- this is a this is an order from you, but you're not prepared.

You are prepared to say that the president and his family will be, uh, barred, uh -- are immune from -- your -- that's a yes.

TODD BLANCHE:

No, it was not a yes. I had not answered the question. I can answer if you want me to.

ROSA DELAURO:

What are you doing with this?

TODD BLANCHE:

OK, so, there was a settlement, which is one of the documents you showed.

ROSA DELAURO:

Yes.

TODD BLANCHE:

OK. Part of the settlement included, the second order that you just held up, and that is still -- nothing has changed with that. What I said today, what I've said a couple times today, as what we talked about yesterday is we're not moving forward with the Anti-Weaponization, um, Fund.

ROSA DELAURO:

OK, but you are moving forward with this second order?

TODD BLANCHE:

It's not moving forward, there's a settlement. There's a settlement that the IRS entered into with President Trump and others, his family, and his companies. As part of that settlement, as is customary in IRS settlements, there's a separate AG order.

ROSA DELAURO:

Friends, listen to what is being said here -- today here. This is really pretty extraordinary, um, that we are going to forever barred and precluded from examining or prosecuting the president, his sons and the Trump Organization's current tax filings. Simply put, you just gave the president and his family a tax immunity to the tune of about $100 million.

TODD BLANCHE:

Not true.

ROSA DELAURO:

Well, yes, you have, my friend.

TODD BLANCHE:

No, that's not true.

ROSA DELAURO:

You know, um -- look, and I just want to say this, the SAVE America Act, you paid -- you -- nearly $10 million between March of 2024 and December of 2024 to serve as the President Trump's personal defense attorney. My God, don't you not find there's any conflict of interest in what you are doing here as the acting attorney general of the United States?

TODD BLANCHE:

I didn't -- what are you saying is a conflict? I don't understand what you're saying.

ROSA DELAURO:

Listen --

TODD BLANCHE:

The fact that I used to have a job and I have a current job?

ROSA DELAURO:

You know, I've got -- Time's up, but I'm going to reclaim my time because I think you've clearly answered where you're going on what you're doing on this, is that you've taken one piece and you said, OK, we have had a ton of backlash on this, uh, on this $1.8 billion slush fund. Uh, however -- so, we'll not move on that.

But as part of the settlement, which you've said, which is this, uh, unity for the president and his family and his business, etc. that stands. Thank you.

TODD BLANCHE:

It's not -- it's not immunity, ma'am. It's -- it's --

ROSA DELAURO:

Thank you.

TODD BLANCHE:

It's a promise.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 30 of 90 PageID# 1899

ROSA DELAURO:

It's immunity.

TODD BLANCHE:

It's not -- it's not immunity. It's -- it's not immunity. OK, so, it's not immunity. What it says is like -- like any time the IRS settles with an individual taxpayer or another company as part of the settlement, it's standard, it's typical, for -- to -- to get rid of past ongoing audits. It's not a forward looking document, it's nothing that gives any sort of immunity in the future to the president or his family or his organizations.

And so, by you saying that, it's just -- it's not true.

ROSA DELAURO:

By you saying what you've said, it is not true. So, thank you and I yield back.

HAROLD ROGERS:

The time of the gentlelady has expired. Mr. Clyde.

ROSA DELAURO:

Thank you. You're an attorney. I never got to do this piece here [ph].

ANDREW CLYDE:

Thank you, Mr. Chairman, and thank you, Acting Attorney General Blanche, for being here today. I want to commend the Department of Justice's work in protecting Americans Second Amendment rights. Your Fiscal Year 2027 budget requested $1.4 million to establish a

Second Amendment rights section within the Civil Rights Division, and I was proud to lead an amendment in the FY 2027 CJS Appropriations Act to codify it. This section monitors state and local laws for unconstitutional infringements and pursues enforcement where necessary.

Unlike the Biden DOJ, which sought to charge service disabled veterans with felonies for using stabilizing braces, the Trump Department of Justice has already sued multiple jurisdictions over unconstitutional gun laws, and I look forward to ensuring that this office has the resources that it needs. Congressional Republicans and President Trump also delivered the biggest Second Amendment victory in over 90 years by eliminating the NFA transfer and manufacturing taxes on short barreled firearms and suppressors in the One Big Beautiful Bill.

For 91 years, the NFA subjected gun owners to these unconstitutional infringements. Removing these taxes is a major step towards restoring those freedoms. However, Congress's intent was to remove both the taxation and the registration requirements, as they are inseparably linked. Without the NFA tax, there is no foundation for the registration requirement.

Since, as I understand it, the registration exists solely to account for the taxes paid literally by the serial number of the firearm. Yet, the Department of Justice is currently not following this Congressional intent. So, sir, do you agree that the National Firearms Act, codified in the Internal Revenue Code and originally part of the Treasury Department, is a tax law?

TODD BLANCHE:

Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 32 of 90 PageID# 1901

Yes, although my disagreement respectfully is on the intent of Congress. If that's the Congressional intent, I welcome it. It's not an objection the Department has to the goal you're talking about, it's just understanding the Congressional intent when it comes to whether the tax is extended.

ANDREW CLYDE:
Well, if it's a tax law and you eliminate the tax, then, you know -- then the registration, in my opinion, has no foundation, and I wrote it, so --

TODD BLANCHE:
Well, that's pretty good -- I suppose.

ANDREW CLYDE:
OK. If the NFA registry no longer requires the payment of a tax on the zero taxed firearms, and it exists solely to register them, then this appears to be in direct conflict with the Firearm Owners Protection Act of 1986, which explicitly prohibits any federal database or system that tracks firearms or their owners.

And I would like to, um, uh, to repeat that for you. And it says in 926, Section USC 18 926 [ph], it says no such rule or regulation prescribed after the date of the of the enactment of the Firearm Owners Protection Act may require that any system of registration of firearms, firearms owners or firearms transactions or dispositions be established.

That's the FOPA of 1986. So, um, in your view, is the Department of Justice complying with the FOPAs prohibition against a firearm registry for these zero taxed firearms?

6/13/26, 2:57 PM    Case 1:26-cv-01399-LMB-IDB    Document 93-1    Filed 06/19/26    Page 33 of 90 PageID#
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department
1902

TODD BLANCHE:

Look, I think -- I am familiar with this issue, I know it's under active litigation so I want to be careful. I will tell you that that that is something that we're -- that we're working on getting to a good answer to.

ANDREW CLYDE:

OK. Well, I encourage you to have a great answer and that is to eliminate the registration for those things that are not taxed when the database is indeed a tax database.

TODD BLANCHE:

Understood.

ANDREW CLYDE:

Thank you. Now, I was happy to see that this committee to take action on this very important issue by issuing, uh -- by prohibiting the registration of zero tax firearms in the FY 2027 CJS appropriations bill. And I look forward to continuing this fight moving forward. So, I'm going to give you some ammunition there, OK.

TODD BLANCHE:

OK.

ANDREW CLYDE:

All right. Thank you. Um, now, Acting Attorney General Blanche, I also want to applaud the fantastic work the Trump Administration and your DOJ have done in curbing the waste, fraud and abuse of taxpayer dollars. Vice President Vance's Task Force to Eliminate Fraud is

already leading to results uncovering billions of dollars in fraud and specifically your department has created the National Fraud Enforcement Division to lead the federal government's efforts to investigate, prosecute and remedy rampant fraud.

My constituents want accountability for the fraud that has siphoned away their hard earned tax dollars. So, I certainly welcome the click of handcuffs on those stealing from the American taxpayers. So, can you elaborate on some of the most egregious cases that your department is prosecuting or has already prosecuted?

TODD BLANCHE:

I mean, look, yes. So -- so the there's a couple of examples. The most egregious cases are when individuals create completely fictitious organizations, whether it's a daycare center, whether it's a an autism center. And so, this is money, our tax dollars, going to completely fictitious entities and it runs through the state and what we found in some states is there's virtually no compliance, there's no check on the system.

And so it's, in some ways, a very easy crime to catch once we identify it, because it's completely made up. And so, this isn't an example of a doctor putting, checking, the wrong box, but is actually performing a service. This is pure theft. And we've seen that unfortunately, um, too much in this country.

And so, that's again, one of the main reasons why we started the new fraud division is because, um, we will save hundreds of millions, if not billions of dollars through this effort.

ANDREW CLYDE:

Thank you very much, and Mr. Chairman, I yield back.

HAROLD ROGERS:

Mr. Ivey?

GLENN F. IVEY:

Thank you, Mr. Chairman, uh, to the ranking member. I did want to follow-up on, um, Ranking Member Meng's questions about Binance, um, which, frankly looks to me like a blatant pay for pardon scheme. So, let me walk through some of the facts that lead me to that conclusion. In late 2023, Binance and CEO Zhao agreed to pay a penalty of $4.36 billion.

A US judge approved the guilty plea for multiple federal crimes and a civil settlement for anti-money laundering and sanctions, and that was in 2023. Donald Trump was elected president in November 2024. December 2024, Mr. Zhao and Mr. Witkoff meet in Abu Dhabi at a Bitcoin conference. In March of 2025, a couple months later, you're confirmed as deputy Attorney General.

March 25, 2025 World Liberty Financial announced that it would launch a stablecoin called USD1.World liberty financial is a family-owned business by the Trump -- Trump family, two of his sons are in it. Mr. Witkoff got interest in it as well. One month later, in April 2025, Binance's founder, Mr. Zhao, was sentenced to federal prison for money laundering and other federal crimes, that included funding to terrorist groups like ISIS, al-Qaida and the Iranian Revolutionary Guard.

On May 1, World Liberty Financial announces that an Emirati company called, um, MGX that also has ties to Mr. Witkoff would use

6/13/26, 2:57 PM    Case 1:26-cv-01399-LMB-IDD    House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies holds hearing on the Justice Department

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 36 of 90 PageID# 1905

$2 billion on the stablecoin I just mentioned, USD1, to invest in Binance. This gave President Trump and his family a revenue stream that could be worth tens of millions of dollars, according to the Wall Street Journal.

Binance took steps that catapulted the Trump's family's ventures into stablecoin product, enhancing its credibility and pushing its market capitalization up from $127 million to over $2.1 billion. Now on May 5, Mr. Zhao publicly stated that he had applied for a presidential pardon for the crimes that he previously pled guilty to and had been sentenced to jail for, and the -- the restitution amount of $4.3 billion plus was put in place.

A few months later, on October 21, 2025, President Trump grants him a full pardon. With no explanation, by the way, in the document, at least that I saw. So, this looks like a pay-to-play kind of scenario. You've got the meeting that takes place, you've got the money that's transferred to an entity that's owned by the Trump family.

I don't think the president has actually divested his interest there necessarily, but I could stand corrected on that, but certainly his family still has interests and as does Mr. Witkoff. And then a few months after that, he issues a pardon. So, why haven't you, as appointed a special prosecutor, to take a look at this.

This looks, on its face, it just looks like a quid pro quo scenario that should be investigated. Why haven't you taken that step?

TODD BLANCHE:
Well, to be -- look, the -- the power to pardon in our constitution is given to the President of the United States. The Constitution does not require him to provide any explanation for who he chooses to pardon

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 37 of 90 PageID# 1906

or not pardon or commute or not commute. And so, I don't -- I very much reject the idea that this premise -- that this looks like something is -- is --

GLENN F. IVEY:

Well, let me --

TODD BLANCHE:

-- for me to appoint a special prosecutor --

GLENN F. IVEY:

Let me reclaim my time. The Constitution gives him absolute power to pardon, it does not give power to pardon in exchange for payments, clearly. And a $2.1 billion payment to his family, and we'll set aside the fact that he should have divested from all of those interests anyway, but the fact that he gave the $2 billion -- that he gets the $2 billion piece and then a few months later pardons the guy who was guilty of money laundering and providing money to, or helping to finance the money laundering operation for ISIS and al-Qaida, and the guys we're fighting in Iran right now, the Iranian Revolutionary Guard.

TODD BLANCHE:

I just -- I don't --

GLENN F. IVEY:

That's not a problem?

TODD BLANCHE:

Who he chooses to pardon is not a problem, period, and you're saying all these things that are just not true.

GLENN F. IVEY:

What's the legal basis for that statement?

TODD BLANCHE:

The Constitution of our United States --

GLENN F. IVEY:

The Constitution does not give them the authority --

TODD BLANCHE:

Yes, it does.

GLENN F. IVEY:

-- to pardon in exchange for payments. It does not permit bribery.

TODD BLANCHE:

-- for payments. You have you put -- you have told me nothing about exchange for payments. You said there's --

GLENN F. IVEY:

Well, I just told.

TODD BLANCHE:

-- you a bunch of facts together and --

GLENN F. IVEY:

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 39 of 90 PageID# 1908

Well, that's why you need a special prosecutor. Shouldn't somebody take a -- clearly you're not going to do it. Shouldn't somebody be appointed, a truly experienced prosecutor, to take a look at this and conduct the investigation? And then if he reaches the conclusion that you're right, that's fine. But if he finds that there's a problem with what the president did or his family, then he should he should move forward with prosecuting that case.

[Crosstalk]

HAROLD ROGERS:
The gentleman's time has expired.

TODD BLANCHE:
I very much disagree.

HAROLD ROGERS:
Mr. Strong.

DALE STRONG:
Thank you, Chairman Rogers and Ranking Member Meng for convening this hearing. Acting Attorney General Blanche, thank you for being here with us today. I appreciate you and the department for your work supporting law enforcement and addressing evolving threats across this country. As you know, North Alabama and Redstone Arsenal have become a Premier hub for the DOJ and FBI operations supporting critical work and counterterrorism, explosives and ballistic analysis, emerging, um, UAS threats and coordination across federal agencies.

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 40 of 90 PageID# 1909

North Alabama has repeatedly demonstrated it can support the nation's most critical missions with a highly skilled workforce, state of the art facilities and room for continued growth. The -- the funds this committee approved last month include a planned investment in advanced training and operational support at Redstone Arsenal as part of the department's broader efforts to strengthen the FBI's readiness and capabilities.

As acting attorney general, how do you plan to ensure that these investments, uh, support Redstone Arsenal's continued growth as a center for FBI training and operations?

TODD BLANCHE:
Look, I think it's -- you're -- you're absolutely right that the facilities that the FBI and ATF have in -- in that area is key to our -- to protecting our borders and key to everything from our drone, um, anti-drone, um, capabilities that we're working on. And so, we're doing things like getting FBI personnel out of DC and down there where they should be working and same with ATF. And look, there's a very, um, it's an important law enforcement priority of this administration and of me to continue that -- to continue that effort.

So, I expect that you will see not -- infrastructure, which we've asked for money on, which we're spending money on, but also getting more of our talented personnel there to continue the mission of the FBI.

DALE STRONG:
Thank you. I also want to echo what my colleagues have said, and commend the Department for the DOJ's recent aggressive work to combat fraud. For years, bad actors have treated taxpayer fund --

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 41 of 90 PageID# 1910

funded programs from pandemic -- pandemic relief loans to Medicaid and SNAP benefits like their own personal piggy banks.

In Minnesota, the Feeding Our Future scheme alone involved more than $250 million in fraud tied to federal children's nutrition and pandemic-era programs. And just last month, the DOJ announced charges against 15 defendants accused of participating in more than $90 million in Medicaid fraud schemes. Um, what steps does the department, in taking to ensure that we are not just prosecuting these criminals, but actively clawing back every single stolen taxpayer dollar possible?

TODD BLANCHE:

That's a -- it's a great -- it's a great question, and I will tell you, every single indictment that you have seen from this department includes meaningful forfeiture efforts, whether it's freezing accounts the day of the arrest or in the time leading up to the arrest, or going after the assets that have been purchased by the defendants as part of our criminal forfeiture efforts.

It's as important as arresting the bad guy is trying to recover the assets that they stole from the American taxpayer. Um, it's -- it's every single -- like I said, every time we make an arrest, every part of our investigation is focused on not only identifying the bad actors but recovering our assets.

DALE STRONG:

Thank you. Hard working Americans go to work every day and follow the rules, um, you know, they're sick and tired of the seeing their tax dollars stolen by scammers and non-US citizens. The time is past due,

uh, to make sure that we do what needs to be done and I think that's what America is looking for.

I was pleased to vote with the committee to provide the full request of $30 million for the department to hire 100 more attorneys to more effectively combat fraud targeting government programs and the American public. Uh, Attorney General Blanche, how will you, the additional attorneys, help ensure the large fraud investigation does not stop with first round of indictments, but continue until every individual who knowingly participated has been identified and, where appropriate, and they're appropriately prosecuted?

TODD BLANCHE:

Yes, and thank you for the vote on the funding. Those prosecutors will help lead that effort. And what we're doing is we're working -- this is, again, an all-government approach. So, we're working with HHS, with our other federal partners, to identify bad actors. We're -- we're working with inspector generals from all these locations and working those cases.

FBI, HSI, state and locals and the states that are willing to help us and that's the whole point of the new fraud division is to leave -- whether you have committed a $1,001 fraud or whether you've committed a $100 million fraud, you should face a felony in this country for stealing from the American taxpayer.

And -- and that's what we're committed to doing, um, as you know, we started a year ago and we're not stopping.

DALE STRONG:

Thank you. Mr. Chairman, I yield back.

HAROLD ROGERS:

Gentleman yields back. Mr. Morelle.

JOSEPH D. MORELLE:

Yes, thank you, Mr. Chairman, and thank you for convening this. Thank you to Ranking Member Meng and Ranking Member DeLauro as well and thank you to the Attorney General for appearing. Um, I want to associate myself with the remarks by the chairman. Uh, just to say, I'm deeply frustrated that the department is appearing and the Attorney General is appearing here nearly three weeks after the subcommittee and full committee have marked up Commerce, Justice and Science appropriations bill.

Uh, it's -- it's deeply troubling. This is not how the appropriations process is expected to work and we would love to hear from you in the future, and I think we should ought to your budget priorities, question your leadership, um, what the leadership believes about the -- so, I just deeply frustrated. I hope it doesn't, uh -- I hope next year we don't repeat this.

Uh, so, I just want to associate myself with that. I was just curious, just as a follow up to Mr. Ivey's line of questioning. Is it your testimony that if someone paid the President of the United States a million dollars for a pardon, that that would not violate federal law?

TODD BLANCHE:

No, that is not my testimony.

JOSEPH D. MORELLE:

What is your testimony about?

6/13/26, 2:57 PM    Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 44 of 90 PageID#
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department
1913

TODD BLANCHE:

My testimony is that the power to pardon in our Constitution is not limited. So, what I mean by that is, is there -- he doesn't, the president, doesn't have to say why he's pardoning --

JOSEPH D. MORELLE:

No, I didn't say that. I'm asking you, though. So, if someone wrote in the memo of a check for $1 million to the President of the United States, any president, said for issuance of a pardon, would that be a violation of federal law?

TODD BLANCHE:

Um, yes, potentially. I mean -- I mean, I would --

JOSEPH D. MORELLE:

Under what section of --

TODD BLANCHE:

I mean, I think there would be a -- a --

JOSEPH D. MORELLE:

You just said it was --

TODD BLANCHE:

-- a violation of the bribery law, yes.

JOSEPH D. MORELLE:

6/13/26, 2:57 PM Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 45 of 90 PageID# 1914

House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department

Bribery law, even though the Constitution gives you unlimited power as president?

TODD BLANCHE:

The person that paid the bribe would be -- for the president himself who accepted the money, I think you would need to impeach him in that case.

JOSEPH D. MORELLE:

Gotcha.

TODD BLANCHE:

At least under my reading of the Constitution.

JOSEPH D. MORELLE:

Uh, I just wanted to make sure I understood what you were saying. Um, I wanted to ask you on a completely different topic, I serve as the ranking member of the Committee on House Administration, which has jurisdiction over federal elections. As you know, federal law prohibits the deployment of military personnel or armed federal law enforcement officers from polling places.

TODD BLANCHE:

Yes.

JOSEPH D. MORELLE:

Federal law also prohibits intimidating, threatening, or coercing any person for the purpose of interfering with the right to vote. Violators of either of these laws are subject to criminal penalties, as you know,

6/13/26, 2:57 PM Case 1:26-cv-01399-LMB-IDD House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies Holds Hearing on the Justice Department

Document 93-1 Filed 06/19/26 Page 46 of 90 PageID# 1915

under federal law. The president has continued to talk about and issued rhetoric which suggests that he might be willing to deploy military personnel or federal agents, perhaps even FBI, at polling places, and I just want your assurance that you will not allow Department of Justice personnel around election places, polling places this November.

TODD BLANCHE:

I'm sorry, that I won't allow personnel around election places? [Crosstalk] We will we will comply with the law.

JOSEPH D. MORELLE:

You will comply with the law?

TODD BLANCHE:

Yes.

JOSEPH D. MORELLE:

And will you commit to investigating and prosecuting individuals who violate those protections or otherwise interfere with an American's right to vote?

TODD BLANCHE:

We -- we will -- we will comply with the law and the law enforcement will investigate alleged violations of the law.

JOSEPH D. MORELLE:

Thank you, sir. Um, just weeks ago, changing topics, ATF announced 34 regulatory changes affecting the agency's efforts to combat violent

gun crime. At that announcement, you said what we're doing today will actually help law enforcement. And the director, I think at CCICADA he added, we believe that these rules will not negatively impact public safety.

Those are your words. Um, your regulations tell a different story. In the rule that allows a potential prohibited purchaser to skip a second background check, the department warns a prohibited person who obtains a firearm under the proposed rule and uses that firearm to inflict mass casualties would have been prevented under the current requirement, which the department is asking be taken away.

And in the rule restricting law enforcement from effectively tracing guns, the department, again, in the -- in the body of the regulatory reforms, warned that the change that you are asking for could delay or hinder federal, state and local enforcement officers to track and stop violent offenders. Those are the department's warnings.

Your own analysis acknowledges the changes could make it easier for prohibited individuals to obtain firearms, and harder for law enforcement to track violent criminals. So, I -- you're the nation's chief law enforcement officer, you talked a lot about violent crime. Why is the department pursuing actions when the department analysis states it would potentially create a much higher risk of violent gun crime for the public?

TODD BLANCHE:
The analysis you're talking about is not -- that is not true, right? So, that is -- what we talk about potentials with the new regulations that includes a variety of possibilities. When it comes to the regulation you're speaking about directly, that -- the problem that existed that we were trying to fix with that is making it more efficient and make it

easier for law enforcement and for FFLs to make sure that only people who could have guns have guns.

And so, the, the regulations that exist now that we're -- that we're changing don't do that. They're actually outdated and they're not -- the -- the systems are not up-to-date and that's what the regulation that you're speaking about, I believe, is designed to fix.

JOSEPH D. MORELLE:

But I would just suggest that the analysis by the department in issuing these -- the elimination of these regulations, actually identifies threats and potential harm to the public by doing the regulatory reforms you're suggesting. I'd ask you to look at it further and I know my time is out and I want to yield back, Mr. Chair.

HAROLD ROGERS:

Mr. Shreve?

JEFFERSON SHREVE:

Thank you, Mr. Chairman. Mr. Attorney General, it's encouraging -- it's encouraging to see overdose deaths decline over so much of our country, including in my home state of Indiana. And yet, fentanyl remains the leading cause of death for Americans between ages 18 and 45. We've made progress, but we haven't knocked it down.

So, communities throughout my district continue to feel the consequences of this epidemic. Too many families are still grieving from the loss of loved ones from fentanyl related overdoses. I commend the administration for the actions, uh, it, you, have taken to secure our southern border, for aggressively prosecuting drug

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 49 of 90 PageID# 1918

traffickers and for holding China accountable for its role in supplying the precursor chemicals that have, in part, fueled this crisis.

Those efforts are crucial and I appreciate your leadership on this. However, despite the stronger enforcement measures here at home, fentanyl continues to reach across our borders, too oftentimes through Mexico, where the cartels use these precursor chemicals I've described, um, to manufacture and traffic these drugs into the United States.

Mr. Blanche, would you update us on what the DOJ, under your leadership, is doing to strengthen interdiction efforts real-time, this year, over the year ahead, through coordination and particularly with foreign law enforcement partners?

TODD BLANCHE:
Yes, thank you.

JEFFERSON SHREVE:
-- major transit hub.

TODD BLANCHE:
Thank you. Look, the biggest thing I can say is the Homeland Security Task Force effort, which is focused -- its priority is stopping the flow of illegal narcotics, especially fentanyl, into our communities. And you're right that we've made progress, but we are nowhere near our goal. And -- and with DEA, with HSI, with the FBI, we are now -- every federal law enforcement agent is targeting and working with state and local law enforcement agent and also international partners, including in Mexico, in Ecuador and Colombia, even in Venezuela to

stop not only the flow from South America and Mexico, but also to the extent there's -- there's fentanyl in our communities.

We're also completely focused on -- on ridding the drug dealers and the fentanyl out of the communities as well. So, this is not a problem that gets fixed overnight. It is such a crisis in this country that I promise you, the next time that I'm before you, we will still be talking about it. But that doesn't mean that we're not making extraordinary progress and that we're not getting fentanyl off the streets, and we're putting bad guys in jail who are dealing it. And I commit to you that President Trump all the way down to every federal prosecutor in this country and every FBI and DEA agent is focused on it.

JEFFERSON SHREVE:
And, in your view, your budget will reflect that increased prioritization?

TODD BLANCHE:
Correct.

JEFFERSON SHREVE:
-- working with --

TODD BLANCHE:
A hundred percent.

JEFFERSON SHREVE:
-- our foreign law enforcement partners?

TODD BLANCHE:

Case 1:26-cv-01309-LMB-IDD    Document 93-1    Filed 06/19/26    Page 51 of 90 PageID#
1920

Yes, yes.

JEFFERSON SHREVE:

Uh, effective information sharing across our federal, state, local and tribal law enforcement agencies is one of the key tools that we have. Uh, programs like the regional information sharing systems, the risks are key to supporting criminal investigations. Um, and I see that back in my home district. I was in Columbus, Indiana, this past week.

That police department, city of 50,000 people is using risk technology to enhance audio and video evidence leading to the identification, arrest and prosecution of armed robbery suspects. These programs deliver results for my constituents and the constituents of everyone else that I serve with up here today.

I appreciate the work that Congress and DOJ continues to prioritize information sharing across all levels of law enforcement. Uh, Mr. Blanche, what is your department -- how is your department prioritizing information sharing this year going into the next year with these partnerships that are so crucial, uh, to bringing in these results?

TODD BLANCHE:

So we -- we work with -- at the -- at the -- at the basic level in the districts around this country. We work with our state and local partners in every single case, um, that -- that -- whether it's a state case or a federal case, we're working with them. And that -- you're totally right that includes sharing information and making sure the systems can talk to each other.

That costs money and upkeep. We have multiple grants that are designed to go to state and local law enforcement to make sure they're

able to continue to, um, to have information technology that allows it to be effective with the federal government and I agree with you that we cannot solve violent crime. We cannot solve the drug problem.

We cannot help with murders and violent -- in any sort of narcotics trafficking without, um, strong information sharing, and we spend a lot of money on that and it's money that we should be spending.

JEFFERSON SHREVE:

All right. Thank you and I yield back.

HAROLD ROGERS:

Ms. Dean?

MADELEINE DEAN:

Thank you, Chairman Rogers. Uh, thank you to our ranking members. Uh, welcome, acting attorney general. Uh, I want to speak about justice for the Epstein victims and survivors and I'm going to begin with the closing words of Virginia Roberts Giuffre in her book, it's literally the last paragraph. She writes, I hope for a world in which predators are punished, not protected.

Victims are treated with compassion, not shamed, and powerful people face the same consequences as anyone else. I yearn too for a world in which the perpetrators face more shame than their victims do, and where anyone who's been trafficked can confront their abusers when they are ready, no matter how much time has passed.

We don't live in this world yet. I mean, seriously, where are those videotapes the FBI confiscated from Epstein's houses? And why haven't they led to prosecution of any more abusers? That's from

Virginia. It was printed, as you know, posthumously after her death. Mr. Blanche, you and I had a chance a couple of weeks ago at the Department of Justice to speak about these cases.

We discussed three things in connection with this monstrous, decades long crime spree. Number one, your failure to fully redact survivor information. Number two, your failure to follow the law and release the remaining files. And number three, your refusal to prosecute anybody else. Mr. Blanche, let's continue that inane conversation.

But this time, it's public. This time, and more importantly, it's under oath, you're speaking to Congress. So, let's get into it. When will you comply with the law and release all of the files?

TODD BLANCHE:
Um, as I said to you when we spoke before, um, we have complied with the law. We have --

MADELEINE DEAN:
There are three million more documents and you know what you said to me, they're all duplicative and they include another guy named Epstein. Nobody's buying --

TODD BLANCHE:
No, I didn't say that.

MADELEINE DEAN:
That's what you said. That's what you said.

TODD BLANCHE:

So, look --

MADELEINE DEAN:

Reclaiming my time.

TODD BLANCHE:

Can I answer? Can I answer the question?

MADELEINE DEAN:

No, you may not.

TODD BLANCHE:

OK.

MADELEINE DEAN:

I just gave you the answer you gave me. No, actually, it's my time, Mr. Chairman. I think those are the rules of this committee. I told him the answer he gave me and now in public, he's trying to say something else. Please stop the clock. Can I get that time back? May I have 20 seconds back, Mr. Chairman?

Thank you, I very much appreciate that.

TODD BLANCHE:

Do you want me --

MADELEINE DEAN:

Mr. Blanche --

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 55 of 90 PageID#
1924

TODD BLANCHE:

You don't want me to answer the question?


MADELEINE DEAN:

Mr. Blanche, as you know, I visited DOJ three times for as much as ten hours, and I'll be going back. Does the Epstein File Transparency Act say that the files should be available to members of Congress with a minder at DOJ, where you're in a secure room, you can't write on any of the binders, you can take your own notes.

Is that what the Transparency Act says?


TODD BLANCHE:

It doesn't require we allow you to come to DOJ at all. We did that on our own.


MADELEINE DEAN:

What does it say in terms of transparency? It says that they should be made publicly available.


TODD BLANCHE:

And they were.


MADELEINE DEAN:

Am I correct? Publicly available?


TODD BLANCHE:

And they were.

Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 56 of 90 PageID# 1925



MADELEINE DEAN:

Oh, let's talk about that.

TODD BLANCHE:

OK.

HAROLD ROGERS:

Time of the gentlelady has expired.

UNKNOWN:

No, it hasn't.

MADELEINE DEAN:

I beg your pardon, Mr. Chairman?

UNKNOWN:

No, that's not --

MADELEINE DEAN:

What rules are we operating under? Because he's under a little bit of heat for not prosecuting anyone in these monstrous crimes? I've been in the room. I have been there. This is what we, I, had to do to transcribe, to show what is true. What is true is that the president has lied about being on Epstein's -- Epstein's plane, and the unredacted files prove that.

There's a lot in here. I am -- I am shocked at this. There's also this set of files in the in the file. This is investigation into the potential coconspirators of Jeffrey Epstein. I almost used up all the blank ink in

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 57 of 90 PageID#
1926

the hallway because it's all covered up. It's all covered up. The American people are not stupid.

They know that when members of Congress have to go in and actually unredacted to try to find the truth for these victims, something is corrupt. Something is corrosive. You were paid $10 million to represent the president. You hang a 30-foot banner of the president's menacing face over the entrance to the Department of Justice.

You said that if you were terminated or not moved forward as attorney general, you would say to the president, I love you, sir. So, I have one question for you, is your obligation to the victims and survivors of Epstein's heinous crimes and all his perpetrators, or is your first obligation to the President of the United States?

TODD BLANCHE:
So, without a doubt, we want to bring justice to every victim.

MADELEINE DEAN:
When will you bring that justice?

TODD BLANCHE:
Can I please finish?

MADELEINE DEAN:
Excuse me --

TODD BLANCHE:
Can I finish?



MADELEINE DEAN:

It's been decades, when will you bring --

TODD BLANCHE:

Can I finish? Can I finish?

MADELEINE DEAN:

When will you bring the justice?

TODD BLANCHE:

So, as I was saying --

MADELEINE DEAN:

When will you prosecute, and who will you prosecute?

TODD BLANCHE:

Can I speak?

HAROLD ROGERS:

Please allow the witness to answer.

MADELEINE DEAN:

You told me in our conversation you blamed the victims.

TODD BLANCHE:

Every victim, every victim --

MADELEINE DEAN:

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 59 of 90 PageID# 1928

Let the record -- Mr. Epstein told me the victims didn't give good names.

TODD BLANCHE:

Let me -- let me be crystal clear that this Department of Justice will always, will always, protect victims and will always prosecute anybody we can, OK, full stop. No ifs, ands or buts, OK? What you are showing in a game of showmanship are redactions because of victims, because that prosecution memorandum --

MADELEINE DEAN:

Perpetrators.

TODD BLANCHE:

-- talks about -- Excuse me?

MADELEINE DEAN:

Perpetrators too.

TODD BLANCHE:

How do you know that? Go ahead.

MADELEINE DEAN:

Talked to the victims.

TODD BLANCHE:

Exactly. So, the --

MADELEINE DEAN:

6/13/26, 2:57 PM     Case 1:26-cv-01399-LMB-IDD     Document 93-1     Filed 06/19/26     Page 60 of 90 PageID# House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies holds hearing on the Justice Department

1929

Talked to the victims.

TODD BLANCHE:

There are -- there are victims' names, which we are required to redact, required by law to redact, which we did. OK. So -- so, I take umbrage to the idea --

MADELEINE DEAN:

Mr. Chairman, I realize I'm over time. I thank you for that indulgence. I have -- I want to ask for unanimous consent to enter records into the, onto the, record. May I do that now?

HAROLD ROGERS:

Without objection.

MADELEINE DEAN:

Thank you.

HAROLD ROGERS:

The time of the gentlelady has expired. Mr. Alford?

MADELEINE DEAN:

I would like to enter these records, may I please list what they are, sir?

HAROLD ROGERS:

You've had your chance. Mr. Alford.

MADELEINE DEAN:

You're denying me the chance to list what these records are.

6/13/26, 2:57 PM House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies Holds Hearing on the Justice Department

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 61 of 90 PageID# 1930

HAROLD ROGERS:

Mr. Alford.

MARK ALFORD:

Thank you, chair. Uh, Mr. Attorney General, would you like to respond to any of these allegations?

TODD BLANCHE:

Well, look, I think that -- that, um, the idea that this Department of Justice does not stand up to victims and does not do everything we can to stand up for victims, rather. Do everything we can to prosecute anybody who harms our most vulnerable, ignores the facts. We -- we will always protect victims. We have said from the beginning, anybody, whether it's their lawyer, whether it's a victim who wants to meet with the FBI or who has information, they don't have to come in, they can use their lawyers, they can use nonprofit groups.

I've spoken to nonprofit groups. My leadership team has spoken to nonprofit groups and victims. When we released the Epstein Files earlier this year, I spent the whole weekend on the phone with -- with many of Epstein's victims lawyers and Director Patel has said the same thing. And so, I will say again, if there is a lawyer or a victim who has information, please come forward.

And it doesn't mean coming forward to a Congressman's office, it means coming forward to the FBI. And if there's nervousness or if there's something that, um -- that it's a difficult thing to do, we will work with you. That's what we do, that's what the FBI does. And -- and that's what we've said for months and months and it remains as true today as it was the first time we said it.

MARK ALFORD:

I had no intention of asking about Epstein, but there were three allegations made; a failure to fully redact victims' names. Have you done that?

TODD BLANCHE:

So, we -- we, um -- we were required by law to redact victims' names. We did not get to choose victims. So, what the judge told us in New York was if somebody identified themselves as a victim, we had to redact that. And, um -- and that's what we did, um --

MARK ALFORD:

Has there's been a failure to prosecute perpetrators?

TODD BLANCHE:

Never and if there's a -- if we learn of a bad guy that we can prosecute today, we will prosecute them today.

MARK ALFORD:

Has there been a failure to release all the files?

TODD BLANCHE:

No. So, there's -- we reviewed more than enough -- we over collected on purpose to make sure we could comply with the law. And so, necessarily by over collecting some of the materials we collected were not responsive, they had nothing to do with -- with the Epstein files or the Transparency Act.

6/13/26, 2:57 PM
House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 63 of 90 PageID#
1932

MARK ALFORD:

I want to dramatically shift gears now and talk about what's going on in New Jersey. Our federal officers are being assaulted by people who are funded, we believe, from outside sources. Um, one man was arrested recently, death threats on ICE officers. It's no -- no wonder they don't want to wear a mask, I mean, they want to wear masks to protect their identity, to protect their families, to protect their lives while they're trying to deport criminal illegal aliens and protect this detention center, which is legally there.

What is going on in America? Who is funding, uh, these, uh, people, Antifa and these other groups that are causing these issues? Uh, criminals, uh, that are causing chaos in our country and what is the Department of Justice doing about it?

TODD BLANCHE:

So, thank you for that question. Look, if you look at the people who are arrested in New Jersey, very few of them were from New Jersey. There was one that was from as far away as Portland. There were a ton from New York, a ton from further out west. And so, you do have a concerted effort by national organizations to disrupt and really just try to create chaos because you also have an ICE-run facility that, um, that is completely compliant with the law, and the men and women that are defending that facility are just doing their jobs.

And what we saw until earlier this this week was -- was unfortunately, a local government that didn't let their cops come and help, even though I'm sure every one of those cops would have loved to. And so, until we had that happen, um, there was -- there was chaos, but we have it under control. And there is -- we will always defend ICE. We

will always prosecute anybody who touches an ICE officer and that's what we can do.

MARK ALFORD:

Mr. Attorney General, that is great. How is the investigation going into finding out this illegal funding of these illegal groups that are committing illegal activities?

TODD BLANCHE:

It's, um -- we have multiple investigations and they're ongoing and we will find them.

MARK ALFORD:

And do what?

TODD BLANCHE:

Well, prosecute them, because what they're doing is absolutely a violation of the law. So, the money they're raising is being used for, without a doubt, they're not telling the IRS, for example, that they're going to spend their money on, um, on -- on umbrellas to hand out at -- at -- at, um, at riots, right?

And so, that's the kind of information that -- that they're lying about and that they're raising money to do.

MARK ALFORD:

And is this outside money from -- from overseas coming in or is this funded within our borders?

TODD BLANCHE:

6/13/26, 2:57 PM
Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 65 of 90 PageID#
House Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies Holds Hearing on the Justice Department
1934

I think both. Um, our investigation to-date is ongoing. So -- so, but certainly a lot of it's from within our borders. A lot of it, unfortunately, is from here. But there's no doubt that there's also foreign funding involved.

MARK ALFORD:

Well, thank you for the work you're doing. And, uh, Mr. Chair, I yield back 15 seconds.

HAROLD ROGERS:

Thank you, Mr. Alford. Uh, offered Mr. Cline.

BEN CLINE:

Thank you, Mr. Chairman. Attorney general, welcome. I want to discuss a troubling development in my home state of Virginia and in states across the country and that's a crimes committed by illegal immigrants who are released back into communities like Virginia, um, to continue to commit crimes, not, uh, deported to their countries of origin.

Uh, for years under the leadership of Governor Glenn Youngkin, Virginia law enforcement agencies partnered with the federal government under a 287(g) agreement. These agreements allow trained law enforcement officers to work with federal immigration authorities to identify and remove criminal illegal aliens who had already been involved in the criminal justice system.

Now, Governor Spanberger has chosen to revoke these agreements and move Virginia in the direction of a sanctuary commonwealth. At a time when Americans are demanding secure borders and safer

communities, Virginia is walking away from one of the most effective cooperative tools available to law enforcement.

The result is that dangerous individuals who could have been transferred to federal custody may instead be released back into the communities and we heard from the inept Commonwealth's Attorney of Fairfax County, Steve Descano, in Judiciary Committee two weeks ago, who was confronted with crime after crime committed by illegal immigrants who were released back into the community because they were not prosecuted or held to account by his office.

So, from the DOJ's perspective, does this lack of cooperation between federal government and state law enforcement agencies make it more difficult to identify and remove criminal aliens?

TODD BLANCHE:

I mean, more difficult and a lot less safe. It puts everybody at danger, not only the community, but the federal law enforcement that have to then go and arrest the person who should have been just picked up in jail when they were there. And the best way to know that it's not working is because when you go to the jurisdictions where it does work, where there is law enforcement working, local law enforcement working with federal -- the federal government, it's safer, it's efficient, and it complies with all the laws.

And so, the best -- the best way to know that which way works is to just do a compare and contrast.

BEN CLINE:

One of the things we have in this committee is the power of the purse and there's a lot of money flowing through cops, grants and other

federal support for our local law enforcement agencies. We support our local law enforcement agencies.

TODD BLANCHE:

Yes.

BEN CLINE:

We stand with our men and women in law enforcement. We back the blue. But in those jurisdictions where you see a refusal or reluctance to enter into these types of 287(g) agreements, um, could it be encouraged through the tying of these COPS grants to these 287(g) agreements, could that be a productive use of the funds?

TODD BLANCHE:

Yes, and look, the problem is, or the challenge is, that we love our cops and we want them to have funding. And it's -- it's usually not them, it's usually the leadership in the local jurisdictions. And so, we do want to be sensitive to taking away the money that they need because it's not their fault. But yes, the power of the purse is exactly that, its power.

BEN CLINE:

Well, it's hopeful -- I'm hopeful that the legislation I've introduced, which would do just that, will move through the legislative process. I also want to discuss your department's data security program administered through the National Security Division. For years, Congress has become increasingly concerned that foreign adversaries like the Communist -- Chinese Communist Party have been acquiring vast quantities of Americans personal information through data

brokers, corporate acquisitions, commercial relationships and other means.

Um. In the hands of a foreign adversary, this information can be used to identify intelligence targets, facilitate surveillance, support cyber operations, and strengthen artificial intelligence capabilities. The department's data security program represents an important step toward addressing these vulnerabilities and protecting Americans from exploitation by foreign adversaries.

Uh, since implementation of the program, can you answer what the DOJ has learned about the scale of foreign efforts to obtain US data through commercial channels?

TODD BLANCHE:

I mean, it happens every day. And -- and it's a constant, um, effort by, not only the Department of Justice, but a lot of the -- a lot of the federal government to combat that because, um, the foreign actors are trying, are spending, a lot of money, a lot of resources, and they're smart to try to get our data.

And so, you're right, the money that we've put up in these agencies, NSD and other places, um, it's because we have to make sure that we're not only stopping it, but also putting preventative measures in place so it's not worth it for them to try.

BEN CLINE:

And have -- has the DOJ identified any gaps in current law that make it difficult to prevent sensitive US data from reaching these foreign adversaries?

TODD BLANCHE:

I don't think gaps is the right way to say it, but I think that we need to make sure that we're constantly robust and that we remain strong in our regulatory efforts to stop it.

BEN CLINE:

Thank you, yield back.

HAROLD ROGERS:

That concludes the regular hearing. However, there is a request for a second round. The Attorney General has important matters to attend to, so, we will attempt to shorten what would normally be a second round and keep it to two minutes per member, if that's OK with you, Miss Meng.

GRACE MENG:

Yes.

HAROLD ROGERS:

All right. Well, in that case, I'll recognize myself for two minutes. Let me ask you, general, about the surge operations that the department has conducted on cities across the United States. Um, our state and local partners, uh, have mixed feelings about the success of that program. Can you share the impact these operations have had on officer morale, for example, in large cities with historically high crime rates?

And is the department planning to continue these efforts? And if so, what resources are needed to continue those efforts?

TODD BLANCHE:

So, the surges have been extraordinarily successful. From August 25 -- sorry, from August of last year to April of this year we directed almost $44 million and over 1,100 agents to these surge efforts. And in DC and in Memphis, you see a remarkable reduction in crime but you also see a community that's appreciative.

In this city, we work very well with -- with local leadership, including the mayor, because the results of the surges is exactly what you expect it to be, which is we're taking bad guys off the streets, we're letting people feel comfortable walking around and that's the same thing we did in DC. And in Memphis, um, we expect to spend another $100 million doing that over the next fiscal year because it's working, because it's a good thing to do in this country.

And so, we, um -- sending a lot of law enforcement into a crime ridden area works.

HAROLD ROGERS:

Amen. Ms. Meng?

GRACE MENG:

Thank you, Mr. Chairman. Um, Mr. Attorney General, I want to thank you for verbally committing to not moving forward with the so-called, um, Anti-Weaponization Fund. I just want to make sure, are you going to issue a new memo in writing rescinding that May 18 memo?

TODD BLANCHE:

I'm not committing to putting anything in writing. And I said it over and over again.

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 71 of 90 PageID# 1940

GRACE MENG:

Nothing in writing. OK, thank you.

TODD BLANCHE:

I mean, I don't know what the purpose of putting something in writing, I'm telling you what we're doing. Meaning, like, what's the -- why do I need to put something in writing if I'm telling you what we're doing?

ROSA DELAURO:

Trust and verify.

GRACE MENG:

Well, you -- you started it, you established it in writing, so it just makes sense to rescind it in writing. I think a lot of Americans, both sides of the aisle, are concerned about it, and it would restore a lot of trust about this issue.

TODD BLANCHE:

OK, I'm not committing to doing anything in writing. No.

GRACE MENG:

OK.

TODD BLANCHE:

I mean, I'll take it under advisement.

GRACE MENG:

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 72 of 90 PageID# 1941

I'm just concerned because you're not under oath and I want to trust you, and I want to believe you, we all do, but putting it in writing would -- would settle that issue. Um, I have one minute left. I still want to ask in writing, but, um, every year the committee reports and the joint explanatory statement accompanying the Appropriations Act direct the Department to provide to the Appropriations Committee various reports on various subjects.

These reports assist the committee's work and help ensure transparency and accountability. Numerous reports from your department have not yet been sent to us and are now overdue. Are you aware of this issue, and will you please work to deliver these reports to both the House and Senate Appropriations Committees?

TODD BLANCHE:
I will.

GRACE MENG:
Thank you, I yield back.

HAROLD ROGERS:
Gentlelady yields back. Mr. -- Judge Carter.

JOHN CARTER:
Thank you very much, Mr. Chairman. This settlement that you entered -- that was entered into, that started off to be a lot of conversation about. Everybody that was involved as a litigant, was they were represented by competent lawyers?

TODD BLANCHE:

Yes, sir.


JOHN CARTER:

So -- so this wasn't just one lawyer doing this thing, this was --
[inaudible] there's a whole bunch of lawyers doing this thing, right?


TODD BLANCHE:

Yes, that's correct.


JOHN CARTER:

When you -- when you have a lawsuit for anything and you decide to
settle it, you want to make sure nobody's coming back on the facts
that that lawsuit was based on and trying to go forward again. That's
why you have to put something like the, what the lady read, into -- into
the agreement and say, now that if they want to break the law, pass
that set of facts and do it again, they're not covered and protected by
that.


TODD BLANCHE:

Correct. That's correct.


JOHN CARTER:

They're only protected if that's what your lawsuit was about.


TODD BLANCHE:

Correct.


JOHN CARTER:

And all the lawyers signed off on it, and all lawyers agreed for all the litigants that were involved in that case.

TODD BLANCHE:
One hundred percent. That's correct.

JOHN CARTER:
So, nobody was forcing anybody without a lawyer to make a settlement. They all had a lawyer, they all probably had good lawyers, cost a lot of money, and they settled for the facts that we have before us. You're stating that you're not going to continue the -- the way to pay it --

TODD BLANCHE:
Correct.

JOHN CARTER:
-- at this time or at any time for that matter?

TODD BLANCHE:
Correct.

JOHN CARTER:
In your knowledge?

TODD BLANCHE:
Correct.

JOHN CARTER:

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 75 of 90 PageID# 1944

I don't see where the fault is. I yield back.

HAROLD ROGERS:

Ms. DeLauro?

ROSA DELAURO:

Thanks, Mr. Chairman. I just want to run through some questionable transactions, uh, Mr. Secretary. Uh, president received a luxury jet from the Qatari government valued at hundreds of millions of dollars, an apparent violation of the Emoluments Clause of the Constitution. Jared Kushner's real estate and financial deals with the Saudi royal family raised serious questions related to kickbacks and bribery that could be in violation of federal bribery laws and the Foreign Corrupt Practices Act. White House adviser Peter Navarro, a friend of Donald Trump Jr., got the Pentagon to loan more than $600 million to Vulcan Elements, a small North Carolina startup founded just two years earlier, and Donald Trump Jr.'s venture capital firm has a stake in this company.

Estimates of the company's valuation grew tenfold after the deal was announced. AAFS Infrastructure & Energy, which is on the cusp of securing a waiver, a $1 billion contract to build and operate a pipeline across the Balkans has ties to former national security adviser Michael Flynn and a lawyer, Jesse Binnall, that defended the president and Donald Trump Jr., against a lawsuit that sought to hold them responsible for January 6. This company would be allowed to ship fossil gas from the United States to replace Russian fuels.

My question is, and we know that the administration, you gutted the public integrity section, for the last 50 years, investigated, prosecuted crime related to government integrity, and they prosecuted both

Democrats and Republicans. Simple yes or no question, what I've just mentioned, do you believe that what I've talked about is enough here for the next attorney general to open a criminal investigation?

Yes or no?

TODD BLANCHE:

No, you just read a bunch of -- a bunch of random, unsourced news articles and reports. No, that's not what -- that's not the basis to open a criminal investigation. I mean, you're looking around, but it's not.

ROSA DELAURO:

This is not the basis on which to --

TODD BLANCHE:

It is not. Just reading something that's just a hypothetical of a news article, it's not.

ROSA DELAURO:

It's not a hypothetical. It is real. Did the president get a Qatari -- I -- what -- do you read the press? Are you on knowledgeable --

TODD BLANCHE:

Not the same press you do.

ROSA DELAURO:

Apparently not, my friend. Apparently not. Did the president receive a luxury jet from the Qatari government valued at hundreds of millions of dollars, which is a --

6/13/26, 2:57 PM Case 1:26-cv-01399-LMB-IDD House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Holds Hearing on the Justice Department

1946

TODD BLANCHE:

The United States of America did.

ROSA DELAURO:

-- of the Emoluments Clause of the Constitution.

TODD BLANCHE:

It is not. It is not.

ROSA DELAURO:

Wow. You do not belong in this job, Mr. Attorney, Acting Attorney General. You should always and recuse yourself from these issues because you are the president's lawyer, you are not the lawyer for the United States.

TODD BLANCHE:

I am not the president's lawyer.

ROSA DELAURO:

Yes, you are.

TODD BLANCHE:

I am not.

ROSA DELAURO:

Thank you, Mr. Chair.

HAROLD ROGERS:

Mr. Clyde.

ANDREW CLYDE:

Thank you, Mr. Chairman. Um, first, uh, Mr. Acting Attorney General, I'm sorry to hear that the Weaponization Fund is not moving forward. Uh, you would have my full support. Uh, when our government is weaponized so as to steal money from innocent, law abiding citizens, whether by making the process into the penalty or forcing citizens to spend their resources on legal fees for their defense, or by acting -- or by actually seizing their bank accounts through civil asset forfeiture when there is no criminal prosecution, it is only right and fair to make these citizens whole.

And as a victim myself, for which every solitary member on this committee who is eight years or more in Congress voted for the bill that has my name on it, the federal law that has my name on it, against the IRS, people need to be made whole when the -- when the government has been weaponized against them.

But what I'd like to talk to you about, other than that, is in in 1873, Congress enacted the Comstock Act, 18 USC Section 1461, which prohibits the mailing of abortion inducing materials in the United States. Although the statute has been amended numerous times, including as recently as 1994, Congress has never repealed these criminal prohibitions.

And as Justice Thomas recently noted, the Comstock Act remains valid federal law and is fully enforceable. So, my question to you is, how will the Department of Justice ensure that this federal law prohibiting the mailing of abortion inducing drugs is properly enforced? And I wish I had more time to really go through this, because we in the state of Georgia have a -- have a heartbeat bill, and

we prohibit this type of drug, all right, inducing abortions, and yet it can come across from other states, all right, and kill innocent unborn children.

How -- how will the Department of Justice ensure that this federal law is enforced?

TODD BLANCHE:

So, that's a -- that's an important law and an important question, and I will tell you that -- that there's a lot of effort within the department, and it's not just at the Department of Justice, it's other agencies in the federal government into how the best way is to make sure that we're protecting the rights of Georgians and other individual states, but also the rights of every American.

And, um, you're right, I wish we had more time to discuss that because it's a complicated issue. On the -- on the first question that you asked, I could not agree with you more that this Department of Justice was -- was -- was weaponized, unfortunately, against many, many Americans and we're trying every day to -- to fix it and we've made a lot of progress, but we have a lot more to do.

ANDREW CLYDE:

Well, thank you. And, by the way, I had an apology from Mr. Lewis, the ranking member of that subcommittee, y'all remember him, all right. He said, I want to apologize to you for what a piece of my government, what the IRS did to you. I wish you well. I thank you, and I yield.

HAROLD ROGERS:

Mr. Ivey.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 80 of 90 PageID#
1949

GLENN F. IVEY:

Thank you, Mr. Chairman. I wanted to ask you, it's a follow-up, actually, to a letter that I think 57 of my colleagues and I sent. This is about the shootings of Alex Pretti and Ms. Good in Minneapolis. The issue there is the attorney general for the state, and I think some local prosecutors have said, they haven't been able to get access to the evidence related to those shootings so they can make their own independent judgments about whether they should move forward with cases or not.

The letter we sent, I don't think has been answered, but are you going to be committing to sharing that information immediately to these state and local prosecutors?

TODD BLANCHE:

No, no.

GLENN F. IVEY:

Why not?

TODD BLANCHE:

That's not what we do in criminal investigations.

GLENN F. IVEY:

I disagree.

TODD BLANCHE:

Well I'm right, you're wrong.

Case 1:26-cv-01399-LMB-IDD Document 93-1 Filed 06/19/26 Page 81 of 90 PageID# 1950

GLENN F. IVEY:

Well, let me -- let me say this, your predecessor, Rod Rosenstein and I, when he was US attorney in Maryland, I was the state prosecutor, we shared evidence in these kinds of cases all the time and then we made the determination about which would go forward. But the refusal to share evidence is

TODD BLANCHE:

No, no, that's not what I said. I didn't say I refuse your evidence, sir. You said, do I --

GLENN F. IVEY:

I mean, immediately, you share evidence.

TODD BLANCHE:

Right, that's what I said no to.

GLENN F. IVEY:

We shared -- we shared the evidence --

TODD BLANCHE:

It's a process.

GLENN F. IVEY:

-- immediately.

TODD BLANCHE:

No, you didn't.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 82 of 90 PageID#
1951

GLENN F. IVEY:

Yes, we did.


TODD BLANCHE:

That's not -- look, it's --


GLENN F. IVEY:

On to the next thing. You mentioned that, um, it's important to make sure that bad guys don't just get arrested, but they pay back their victims. And that struck me as ironic, given the number of pardons that this president has issued, uh, with respect to, um -- I'll come back to you later. Devon Archer, Sioux Nation, $60 million, $43 million in restitution was wiped away by the pardon.

Carlos Watson, uh, $36.7 million was wiped away by the restitution. The Chrisley's, $21 million was wiped away by the restitution. Mr. Schwartz, I don't have -- I don't remember what that number was in his particular case. But over and over again, victims have -- of fraud, so they personally lost the money, it was taken out of their pockets.

Issue a pardon, they don't get paid. They don't get made whole. Will you commit to trying to find a way to make those people whole who've been denied this access to the information?


TODD BLANCHE:

As I said to you earlier, sir, the Constitution of our United States gives the president the power to pardon. That is not a decision for me to make or you to make. It's a -- it's a decision for the President of the United States to make.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 83 of 90 PageID#
1952

GLENN F. IVEY:

Could I have just one more question, Mr. Chairman?

HAROLD ROGERS:

Without objection.

GLENN F. IVEY:

With respect to civil liability for these people, which they're not pardoned for, would you -- and the Department of Justice can pursue civil remedies in cases that involve --

TODD BLANCHE:

It depends on the case, right. It depends on the case.

GLENN F. IVEY:

Well, if they've been convicted for criminal liability already, certainly they can be convicted --

TODD BLANCHE:

I mean, it depends on what the crime they were convicted of.

GLENN F. IVEY:

Well, I just read them off to you. They were fraud convictions.

TODD BLANCHE:

You didn't read off the crimes. No, I mean, it just depends. I appreciate what you're saying and you're right that a pardon doesn't cover civil liability.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 84 of 90 PageID#
1953

GLENN F. IVEY:

Will you pursue civil liability in these cases?


TODD BLANCHE:

I'm not going to commit to civil liability right here. No.


HAROLD ROGERS:

Time of the gentleman has expired. Mr. Strong.


DALE STRONG:

Thank you, Mr. Chairman. Attorney General Blanche, the National Children's Advocacy Center, located in my district, was the original model for the CAC approach nationwide and continues to play a leading role in training and best practices. How does the DOJ view the role of the National Center in strengthening child advocacy centers capacity across the country?


TODD BLANCHE:

Yeah, look, it's extraordinarily important. Um, that's -- that's a, you know, the -- the work that they're doing and they've done for, I mean, at least many years now is, um, is key to the partnership and the future success of making sure that they're on the right path. So, look, the DOJ plays a small role in that, it doesn't play as important a role maybe as others, but that type of education and work is important.


DALE STRONG:

I understand that the Victims of Child Abuse Act fund, funded, programs include the training and technical assistance for child abuse professionals grants are coming up for competition this year. How

does the DOJ, you know, thinking about ensuring continuity so that the training pipelines and services are not disrupted?

That goes through your department.

TODD BLANCHE:

That's what our grant folks do very well and they'll continue to do so, and I definitely will be happy to have my folks work with you to make sure that there's continuity there.

DALE STRONG:

Thank you, Mr. Chairman. I yield back.

HAROLD ROGERS:

Ms. Dean.

MADELEINE DEAN:

Thank you, Mr. Chairman, and thank you for the second round. I did want to explain what I held up here.

TODD BLANCHE:

OK.

MADELEINE DEAN:

For the viewing public, what you do as a member of Congress is you go in, you release your phone, you release anything that would have electronics and you go in and you attempt to capture some redacted material. So, I took a look at this email from Jack Goldberger, Wednesday, October 14, 2009. The subject is Trump.

Case 1:26-cv-01399-LMB-IDD    Document 93-1    Filed 06/19/26    Page 86 of 90 PageID# 1955

It is to Jeffrey Epstein and the language here that is not redacted reads spoke to Alan Garten, Trump's attorney. Garten arranged a 20 minute phone conference with Trump and Brad [ph] in lieu of a depo, deposition. Following was discussed. The blacked out box is what was discussed, a regurgitation of that.

I'll read to you what was -- what I was able to see underneath. It's, as I say, it's shorthanded, it's clipped as a regurgitation of what took place. JE never expelled from Mar-a-Lago. No, he was not a member, may have been a guest, never asked to leave. Mark Epstein said Trump on JE plane. Is that true?

Answer, I've been on a lot of planes, may have been on his plane, no young girls on plane. What do you know about allegations against JE? Only what I read in the paper. Trump ever at JE house? I may have been there with my wife. Any young girls there? No, may have been some children of guests, but that's it. Trump specifically asked Garten to advise us of the interview.

Brad had also talked to manager of Mar-a-Lago, Bernd Lembcke. Lembcke confirmed, JE never asked to leave Mar-a-Lago. I say that to say what a silly exercise that members of Congress have to go through to find out what actual conversations were taking place with the president in lieu of a deposition. This has nothing to do with redacting victims' names.

My only point, my only -- I don't have a question for you. My only point is you are gravely conflicted. It is so obvious you are gravely conflicted. These survivors deserve prosecutions, they deserve them years ago, and now it's in your lap, as Pam Bondi told us, they need an independent prosecutor. I hope you will do that.

TODD BLANCHE:

So, if -- may I briefly respond? Um, the -- the law -- the -- the Epstein Transparency Act requires us to redact victims. We also have other laws that apply that require us to apply other redactions. That's not my law, that's your law. And what -- what was just read, the reason why that was redacted, the reason why that was redacted is because that's, um, a privileged communication between counsel.

So, the fact that it was read is fine, but that wasn't redacted because there were victims' names, that was redacted for another purpose, which were legally obligated to do.

HAROLD ROGERS:

That concludes today's hearing. I want to thank our witness, Acting Attorney General Blanche, for being here and giving us his opinion over a great stretch. Uh, without objection, members may have seven days to submit additional questions for the record. The committee stands adjourned.

TODD BLANCHE:

Thank you.

**List of Speakers**

REP. HAROLD ROGERS (R-KY.), CHAIRMAN

REP. JOHN CARTER (R-TEXAS)

REP. BEN CLINE (R-VA.)

REP. ANDREW CLYDE (R-GA.)

REP. MARK ALFORD (R-MO.)

Case 1:26-cv-01399-LMB-IDD   Document 93-1   Filed 06/19/26   Page 88 of 90 PageID# 1957

REP. DALE STRONG (R-ALA.)

REP. RILEY MOORE (R-W.VA.)

REP. JEFFERSON SHREVE (R-IND.)

REP. TOM COLE (R-OKLA.), EX-OFFICIO

REP. GRACE MENG (D-N.Y.), RANKING MEMBER

REP. GLENN F. IVEY (D-MD.)

REP. JOSEPH D. MORELLE (D-N.Y.)

REP. MADELEINE DEAN (D-PA.)

REP. FRANK J. MRVAN (D-IND.)

REP. ROSA DELAURO (D-CONN.), EX-OFFICIO

DEPARTMENT OF JUSTICE ACTING ATTORNEY GENERAL
TODD BLANCHE

## Members

**Rep. Shreve (R-Ind.)**

**Rep. Rogers (R-Ky.)**

**Rep. Ivey (D-Md.)**

**Rep. Clyde (R-Ga.)**

**Rep. Alford (R-Mo.)**

**Rep. Cline (R-Va.)**

**Rep. Carter (R-Texas)**

**Rep. DeLauro (D-Conn.)**

**Rep. Morelle (D-N.Y.)**

**Rep. Dean (D-Pa.)**

**Rep. Strong (R-Ala.)**

**Rep. Meng (D-N.Y.)**

Issues

Appropriations

Financial Services

Foreign Policy

Homeland Security

Congressional Affairs

Intelligence

Elections

States

Taxes

Technology & Communications

**Testimony & Transcripts**

[Complete written testimony for this event](#) June 2, 2026

[AI Generated transcripts for this event](#) June 2, 2026

**About House Appropriations**

[Staff](#)

[Hearing](#)

[Transcripts](#)

[Testimony](#)

[Committee Reports](#)

[Associated Bills](#)

[Schedules](#)

[Markup](#)

[Amendments](#)

© 2026 · CQ - Roll Call, Inc · All Rights Reserved.

1201 Pennsylvania Ave NW, 6th floor · Washington, D.C. 20004 · 202-793-5300