**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **Andrew Floyd, et al.**,<br><br>         Plaintiffs,<br><br>v.<br><br>**Department of Justice, et al.**,<br><br>         Defendants. | Case No. 1:26-cv-01399-LMB |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

Introduction..................................................................................................................................1

Background...................................................................................................................................4

Legal Standard .............................................................................................................................9

Argument ...................................................................................................................................10

    I.      PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE.........................................................10

        A.  Plaintiffs' Claims Are Not Ripe For Adjudication ............................................................10

        B.  This Case Is Moot..............................................................................................................15

        C.  Plaintiffs Lack Standing ....................................................................................................17

    II.     PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION ..................23

        A.  Plaintiffs' First Amendment and Equal Protection Claims Fail .......................................24

            i.    First Amendment ........................................................................................................24
           ii.   Equal Protection ..........................................................................................................25

        B.  Plaintiffs' Separation Of Powers Claims Fail...................................................................26

        C.  Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action ....26

Conclusion .................................................................................................................................29

**INTRODUCTION**

Defendants move this Court to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs cannot establish subject-matter jurisdiction and, in any event, fail to state a claim upon which relief can be granted. This dispute concerns an Anti-Weaponization Fund ("Fund") that has never been set up and is not going forward. As such, Plaintiffs' claims are not justiciable and ought to be dismissed.

Federal courts may resolve "active political debate[s] . . . only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). Article III of the Constitution is thus "an essential limit" on judicial power. *Id.* at 700. "It ensures that [courts] act as *judges*, and do not engage in policymaking properly left to elected representatives." *Id.* at 700. That remains true even when there is a high-profile "controversy" in the *non*-Article III sense. *Id.* After all, "[f]ederal courts are not roving commissions licensed to sally forth each day looking for wrongs to right." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (internal quotation marks and citations omitted). Opining on abstract issues is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. The United States thus moves to dismiss this civil action on justiciability (and other) grounds—not because the Fund will continue (it will not)—but to protect the Executive's institutional interests in the proper application of Article III limitations on judicial review.

On May 18, 2026, the Department of Justice announced through a Settlement Agreement the establishment of "The Anti-Weaponization Fund," which would provide a systematic process to hear and redress certain claims alleging use of the levers of government power to target individuals, groups, and entities for improper and unlawful reasons. ECF No. 1-2. The Acting

1

Attorney General issued a corresponding order the same day. ECF No. 1-4. The Settlement Agreement and order garnered significant attention and provoked widespread debate about the weaponization of government, whether and how any claims process should function, and past settlements reached by other administrations. But when Plaintiffs filed this case—and indeed to date—no money has been transferred to the Fund, let alone any potential claimant. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. Indeed, none of the five contemplated "Members" who would establish and administer such procedures for the Fund have even been appointed. And after Plaintiffs filed this case, the political process continued to play out. On June 2, 2026, the Acting Attorney General told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." ECF No. 93-1 at 17.

Subsequent events underscore that the Fund will not move forward, mooting any concern of the Court or Plaintiffs that the Acting Attorney General's prior comments were "not under oath" and thus could not be afforded the presumption of regularity. As Acting Attorney General testified, under oath, at his Senate Confirmation hearing on July 15, 2026, the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Tood Blanche to be Attorney General of the United States ("Nomination Hearing"), at 1:26:42–:49. When pressed further, he emphasized, "the settlement fund is just not moving forward there's no modification it's just it never started no money went from the Treasury to any other account there's no commissioners it's not moving forward." *Id.* at 1:27:12–:22. Later in the same hearing, he reiterated, "I'm under oath today, and I've said it's dead repeatedly." *Id.* at 2:30:44-:53.

In addition to Plaintiffs' claims being not justiciable, Plaintiffs lack standing to bring the claims they assert. Plaintiffs cannot show any "injury in fact that is concrete, particularized, and actual or imminent," let alone an injury that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because courts are not "general complaint bureaus," a "federal taxpayer" does not have standing just because the taxpayer thinks that a "federal expenditure" is unlawful. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). Yet those are the exact claims Plaintiffs offer here: generalized grievances about a planned government action with which they have a policy disagreement.

Plaintiffs' primary case theory is that they have been injured because—on their mis-reading and convoluted construction that tortures the plain reading of a document—they cannot apply to the Anti-Weaponization Fund. Any application, Plaintiffs say, is fruitless and doomed to fail because they do not have the types of claims that the Fund could have compensated for. ECF No. 1 at ¶¶ 48–67, *see also* ECF No. 25 at 10. Even if this were a fair reading of the terms of the Settlement (it is not), it is the definition of a future speculative harm, making the case unripe. Plaintiffs bear the burden of establishing jurisdiction and they cannot point to one case where a proposed plaintiff pled that they had a claim, opted to sit out of the process, pled that they would not apply or participate, and yet established jurisdiction. Article III standing requires more than a conclusory assertion that participating in the process is useless before invoking a federal court's jurisdiction. The fact of the matter is that they do not know, and thus cannot plead as fact, what would have happened had they submitted a claim to the Fund. We will never know, now though, as the Fund is not moving forward, making this case both unripe and moot.

Because mootness, standing, and ripeness are all fatal to Plaintiffs' motion, there is no need to reach the merits of Plaintiffs' claims. But to be clear, Plaintiffs also fail to plead claims for which

3

relief can be granted. Plaintiffs' First and Fourteenth Amendment claims fail even on Plaintiffs' alleged facts (because they rely on the same misreading of the Settlement Agreement) and the law (because even under Plaintiffs' reading, there is no viewpoint discrimination or irrational unequal treatment). Their separation of powers claim is unintelligible. And their Administrative Procedure Act ("APA") claims fail to even allege any final agency action, among other defects.

The Court should dismiss Plaintiffs' claims.

## BACKGROUND

In anticipation of the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. Littlejohn leaked President Trump's tax returns (and the tax data of his sons Donald J. Trump, Jr. and Eric Trump, as well as the Trump Organization, LLC) to the New York Times in 2019, and the New York times published stories about the returns starting in September 2020. Littlejohn separately stole tax data for thousands of wealthy individuals and shared that information with another media company.

Under 26 U.S.C. § 7213(a)(1), the unauthorized disclosure of tax return information is a felony. Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C.) (Jan. 31, 2024) (sentencing Defendant to "Sixty (60) Months" of incarceration); *see also* U.S. Department of Justice, *Former IRS Contractor Sentenced for Disclosing Tax Return Information to News Organizations* (Jan. 29, 2024) *available at* https://www.justice.gov/archives/opa/pr/former-irs-contractor-sentenced-disclosing-tax-return-information-news-organizations.

The federal tax code also provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or

hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1).

In 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida and invoked these provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States unsuccessfully moved to dismiss the tax code claim on the ground that Littlejohn was not technically an employee of the United States (despite his contractor label). *See Griffin*, ECF No. 108 at 4–7. The court contemplated summary judgment proceedings, and potentially a trial, on that question. *See id.* at 10. Although the court held that the victim did not adequately allege damages under the Privacy Act, the court appeared to assume that the Privacy Act would otherwise apply. *See id.* at 9–10. Ultimately, the victim settled with the United States for a formal apology.[1]

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida. *See* Complaint at 1, *President Donald J. Trump, et al. v. Internal Revenue Serv.*, 1:26-cv-20609 (Jan. 29, 2026). They asserted claims under 26 U.S.C. § 6103, 26 U.S.C. § 7431, and 5 U.S.C. § 552(a)(e)(10). *See id.* In the Settlement Agreement counsel for plaintiffs indicated that they intended to amend their complaint to add a putative class claim. ECF No. 1-2 at 1. President Trump had also submitted Federal Tort Claims Act (FTCA) administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. *See id.*

---

[1] *The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), *available at* https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b 1917.

Because President Trump is the Chief Executive, his lawsuits against the United States presented unique challenges. At the same time, Presidents do not forfeit their personal legal rights merely because they are President. Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims without the United States having to give the plaintiffs "monetary payment or damages of any kind," as memorialized by a Settlement Agreement dated May 18, 2026. ECF No. 1-2 at 1. Instead, the plaintiffs would "receive a formal apology." *Id.* The plaintiffs waived all claims that could have been asserted in connection with the litigation and administrative claims process. *Id.* at 2. And the United States agreed to establish "a systematic process to hear and redress claims of others who, like Plaintiffs, state that they incurred harm from similar Lawfare and Weaponization" through "The Anti-Weaponization Fund." *Id.*

The Settlement Agreement states that the Attorney General, within 30 days of the settlement, would enter an order to "establish funding and any other relevant requirements, rules, conditions, terms, and waivers" and "issue an order appointing [five] Members, including the Chair." ECF No. 1-2 at 2. "One of the Members shall be chosen in consultation with congressional leadership," and all members would continue in their roles until the Fund concludes, "unless they resign or are removed by the President." *Id.* The Members comprising the Fund would "have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* And the "Fund may make those procedures public in whole or in part, in its discretion," while "taking reasonable steps to protect private personal and financial information submitted to [the Fund] under th[e] Settlement Agreement." *Id.* at 2, 4.

The Settlement Agreement further states that the "Fund shall have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request

6

evidence or other support for claims, including requesting information from, or consulting with, federal agencies." ECF No. 1-2 at 2–3. And "[o]n a quarterly basis, or otherwise as directed by the Attorney General, The Anti-Weaponization Fund shall provide to the Attorney General a confidential written report that includes the name and address of each claimant who has received any relief and if so, the nature of such relief." *Id.* at 3. The Fund would "cease processing claims no later than December 1, 2028," and the Fund would "transfer [any remaining] balance . . . to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* (citing 43 U.S.C. §§ 1473, 1737(c); 15 U.S.C. § 1522).

The Settlement Agreement states that "[t]o be eligible for relief, a claimant must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." ECF No. 1-2 at 3. In evaluating claims, the Fund would "consider the totality of the circumstances," including

> a. The strength of the claim and supporting evidence.
> b. The claimant's actions.
> c. The claimant's actual damages . . . .
> d. Reasonable attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization.
> e. Any time the claimant spent in prison . . . or custody as a result of the Lawfare and Weaponization.
> f. Whether and to what extent the claimant has already obtained any form of relief . . . from any source.
> g. Other factors The Anti-Weaponization Fund deems just and appropriate.

*Id.* at 3–4.

The Settlement Agreement contains a rule of construction stating, "Nothing contained in this Settlement Agreement shall impose on Defendants . . . any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes." ECF No. 1-2 at 4–5.

On May 18, 2026, the Attorney General issued an order pursuant to the Settlement Agreement. *See* ECF No. 1-4. The order stated that the United States would "provide the U.S.

7

Department of the Treasury with all necessary forms and documentation to direct a payment of $ 1,766,000,000 to an account for the sole use by the Anti-Weaponization Fund" "[w]ithin 60 days." *Id.* at 1. The order also clarified that Fund Members would serve on a volunteer basis. *Id.* And it noted that previous cases have been settled on similar terms. *See id.* at 1–2 (citing, e.g., *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 309 (D.D.C. 2015)).[2]

Following this announcement, however, the political process continued to unfold. In the ensuing weeks, the Department, through its official pages, in its court filings, in its representations to courts, and through the testimony of the Acting Attorney General before a Committee of the House of Representatives stated that "we are not moving forward with the Fund, period." ECF No. 90-1 at 17. Relying on these statements, a federal court in the District of Columbia denied a motion for a temporary restraining order and preliminary injunction in a case very similar to the instant action. ECF No. 83-1 at 20–21; *see Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789, 2026 WL 1802997 (D.D.C. June 23, 2026) (denying a motion for Preliminary Injunction for lack of subject matter jurisdiction); Minute Entry, *Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789 (D.D.C. June 10, 2026) (denying motion for Temporary Restraining Order). This Court gave less credence to those representations and entered a preliminary injunction on June 12. ECF No. 85. Thereafter, the Acting Attorney General testified,

---

[2] The *Keepseagle* settlement "created a Compensation Fund . . . of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

under oath, to the Senate Judiciary Committee, in his confirmation hearing to be Attorney General of the United States of America that "there is no weaponization fund. The weaponization fund is dead, it's not moving forward" and "I am under oath today and I've said it's dead repeatedly." Nomination Hearing at 1:26:42–:49, 2:30:44–47.

**LEGAL STANDARD**

Defendants move to dismiss this action under both Rule 12(b)(1) and 12(b)(6), which have related, but distinct standards.

"In a motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenging the Court's subject matter jurisdiction, the burden rests with the plaintiff, the party asserting jurisdiction, to prove that federal jurisdiction is proper." *Lucas v. Henrico Cnty. Sch. Bd.*, 822 F. Supp. 2d 589, 599 (E.D. Va. 2011) (citing *Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D.Va.1996); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)). Such a motion "can attack subject matter jurisdiction in two ways." *Id.* First, it can assert "that the complaint fails to state a claim upon which subject matter jurisdiction can lie" where a court "assumes the truth of the facts alleged" "thereby functionally affording the plaintiff the same procedural protection" as a Rule 12(b)(6) motion. *Id*. Second, it may "challenge the existence of subject matter jurisdiction in fact, apart from the pleadings," in which case "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

"To survive a Rule 12(b)(6) motion, '[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009); *Bell Atl. Corp. v.*

9

*Twombly*, 550 U.S. 544, 570 (2007)). Importantly, while the Court "must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 269 (4th Cir. 2022) (internal quotations and citations omitted). "A plausible claim to relief 'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

Under Article III, federal courts can exercise jurisdiction over only "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

### A.  Plaintiffs' Claims Are Not Ripe For Adjudication

One part of that "justiciability doctrine"—which on its own independently resolves this matter—is "ripeness." *National Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). The ripeness doctrine is not a mere speedbump; it is a doctrine "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* at 808 (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993)). For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.* Thus, "[a] claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)).

10

The Supreme Court has specifically stated that ripeness is lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). This includes "[i]njuries that are 'contingent upon a decision to be made by a third party that has not yet acted.'" *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 296 (4th Cir. 2022) (quoting *Doe*, 713 F.3d at 758). "The plaintiff bears the burden of establishing ripeness." *Id.* at 293 (quoting *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022)).

Here, there has been (and will be) no concrete action. The dubious assumptions about how the Fund might have operated underlying all of Plaintiffs' theories are precisely the type of speculative harm the Supreme Court and the Fourth Circuit have routinely found are unripe. And for good reason. "These constitutional doctrines ensure that we do not exceed the limits of Article III judicial power, and so guard against our rendering of an opinion "advising what the law would be upon a hypothetical state of facts." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, '[a]llegations of possible future injury do not satisfy the requirements of Art. III.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (internal citation omitted).

Plaintiffs flunk the ripeness test under every formulation. Even viewing the complaint in the light most favorable to Plaintiffs, the case is unripe. Indeed, the "if we applied, then we would be rejected" theory is the definition of a "contingent future event that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300. And on a 12(b)(1) motion, the Court can

11

consider the fact that the Acting Attorney General has testified, under oath, that "[t]he weaponization fund is dead, it's not moving forward" as a fact that defeats jurisdictional claims. Nomination Hearing at 1:26:45–:49; *see also Lucas*, 822 F. Supp. 2d at 599.

Beyond the Article III limitations, the prudential side of the ripeness doctrine also weighs in favor of dismissing this case. "Prudentially, the ripeness doctrine exists to prevent the courts from wasting [their] resources by prematurely entangling [them]selves in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their 'effects felt in a concrete way by the challenging parties.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (quoting *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). Courts should refrain from opining on matters early, even where doing so could provide additional certainty for the parties because if they did so "courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811–12. The same is true here. Plaintiffs face no threat of imminent harm. Any additional involvement by the Court at this point serves only to produce an advisory opinion on an unripe matter. It is of no consequence that Plaintiffs seek declaratory judgment, which would amount to an advisory opinion, on the legality of the proposed Anti-Weaponization Fund because there is no ripe controversy to litigate.

The Government's position here is consistent with Supreme Court and Fourth Circuit jurisprudence on ripeness. In *Wild Virginia*, a coalition of environmental groups sought to enjoin a Council on Environmental Quality rulemaking that they feared would weaken National Environmental Policy Act (NEPA) regulations. 56 F.4th at 288–89. But their injuries were

"contingent upon a decision to be made by a third party that has not yet acted.'" *Id.* at 296 (internal quotation marks omitted). Because those "fears ha[d] not yet ripened into actionable injuries," the plaintiffs' claims were not justiciable. *Id.* Similarly, in *Texas*, the state claimed that the preclearance provisions of the Voting Rights Act did not apply to Texas law contemplating the appointment of a master or management team in response to a school district's failure to meet State educational requirements. 523 U.S. at 297. But whether Texas would appoint a master or management team under State law was "contingent on a number of factors," such that there was insufficient "certainty regarding ultimate implementation." *Id.* at 300. "The operation of the statute" would be "better grasped when viewed in light of a particular application"—failing that, the case "involve[d] too remote and abstract an inquiry for the proper exercise of the judicial function." *Id.* at 301 (internal quotation marks omitted). Such is the case here given the innumerable factual "what ifs" that have not occurred.

Ultimately, it is Plaintiffs' burden to establish justiciability and they cannot carry that burden here. One of the reasons Plaintiffs were forced to speculate so much about how the Fund would operate—and couch speculative future events as facts—is because so little had happened when they sued. No Members were appointed. No claims procedures were established. No claims were formally submitted, received, adjudicated, granted, or denied. No claimant received money, let alone engaged in any of the (highly attenuated) conduct that Plaintiffs allege they are concerned about. And the Acting Attorney General's statements to Congress only underscore that all of these events could not occur as Plaintiffs anticipate—in fact, they will not "occur at all." *Id.* at 300. The United States is not aware of any federal court ever adjudicating a claim in similar circumstances. On the contrary, courts routinely decline to adjudicate claims based on speculative fears. *See id.* at 301 (rejecting a challenge that relied on contingent and uncertain action by State actors because it

13

"involve[d] too remote and abstract an inquiry for the proper exercise of the judicial function);
*Wild Virginia*, 56 F.4th at 296 (finding plaintiffs' "fears ha[d] not yet ripened into actionable injuries," so their claims were not justiciable).

There is also no hardship to Plaintiffs from this Court withholding consideration of their claims. The bare existence of the Settlement Agreement and corresponding order has no "direct effect on the day-to-day" operations of Plaintiffs. *Texas*, 523 U.S. at 301. Plaintiffs cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* But requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiffs' claims, would cause the parties significant hardship.

Doing so would cause the Court hardship as well. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, Fed. Practice and Procedure § 3532.1 (3d ed. April 2026 update). The Court should instead let the political resolution regarding the Fund stand on its own. "[T]he values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies." *Id.* And "refusal to decide may itself be a healthy spur to inventive private or public planning that alters the course of possible conduct so as to achieve the desired ends in less troubling or more desirable fashion." *Id.*

## B.  This Case Is Moot

This is a rare case that is simultaneously premature *and* already moot. It does not present a "Case" or "Controversy," because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013)

14

(internal quotation marks omitted). The Acting Attorney General's testimony to Congress make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted). And that is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), this case should be dismissed in its entirety.

*Porter v. Clarke* does not require a different outcome. 852 F.3d 358 (4th Cir. 2017). There, a prison's regulations applying to the detention of death row inmates was challenged as unconstitutional. *Id.* at 360. During the course of the proceedings, the prison adopted new regulations while not conceding that the challenged regulations were unlawful. *Id.* at 361. The Fourth Circuit explained that the "voluntary cessation exception 'traces to the principle that a party should not be able to evade judicial review … by *temporarily* altering questionable behavior.'" *Id.* at 364 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1, (2001)) (emphasis added). The exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Id.* (quotations and citations omitted). Thus, consistent with Supreme Court precedent on the matter defendants claiming mootness by "voluntary compliance" bears the burden of "showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earh, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The government meets that standard here. *Porter* dealt with the confinement of death row inmates in a prison, where hours of confinement, visitation rights, yard privileges, and any other aspect of confinement could, conceivably, be changed at any time. And because those conditions

15

could be capable of repeating, as the Fourth Circuit found they were in *Porter*, the defendant's voluntary compliance did not moot the case. Quite the opposite is true here. As this Court has recognized, this proposed Fund, and the associated cases have garnered media attention and public interest, *see* ECF No. 86 at 3, 20, significant attention from Members of Congress in the form of an amicus brief in this matter, and questions posed to the Acting Attorney General in both the House and Senate. Through all of this the Acting Attorney General has been clear: the Fund is not moving forward. And there is no reason to believe that Plaintiffs (with their 10 attorneys) and amici (with their nine attorneys) would not be right back in court; not to mention that those Representatives and Senators would engage through the political process to address the issue.

The standard is not simply "voluntary cessation" but rather whether the challenged conduct can be "reasonably expected to recur." *Porter*, 852 F.3d at 364. It cannot. *Cf. Antietam Battlefield KOA v. Hogan*, 20-2311, 2022 WL 1449180 (4th Cir., May 2, 2022) (finding challenges to COVID-19 related Executive Orders and restrictions moot even though those restrictions routinely waxed and waned during the pendency of the litigation). Unlike prison conditions that can suddenly change at a warden's discretion, the Fund would take several procedural steps (the naming of members, meeting of Members, adoption of rules, submission of claims, etc.) to recur; it cannot simply spring back to life.

Finally, this Court has repeatedly recognized that if the Acting Attorney General made the commitment that the Fund was not moving forward under oath, that would meaningfully alter this Court's mootness analysis. ECF No. 86 at 5, 8, 18–20 (reasoning that "none of those statements, the oral statement before Congress or the written pleadings here, have been made under the penalty of perjury" so "from an evidentiary standpoint, they don't have sort of the imprimatur of really serious potential sanctions if that is not a truthful representation"; stating the Acting Attorney

16

General was "unwilling to swear to these statements before Congress"; indicating that a "clear, unambiguous declaration under the penalty of perjury" would likely be "sufficient" "to moot the case"); ECF No. 85 ("declaration under the penalty of perjury"). Now the Acting Attorney General has testified to the House Appropriations Committee that the Fund was "not moving forward, period" and *under oath* to the Senate Judiciary Committee in his confirmation hearing to be the Attorney General of the United States of America that "the weaponization fund is dead, it's not moving forward." Nomination Hearing at 1:26:45–:49.[3] The case is moot and ought to be dismissed.

### C. Plaintiffs Lack Standing

Independent of the mootness and ripeness issues—both of which independently deprive this Court of jurisdiction to hear this action—Plaintiffs have a third fatal flaw: they lack Article III standing. "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of government wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). The standing doctrine also "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472. "[T]he standing requirement means that the federal courts may never need to decide

---

[3] The Acting Attorney General's sworn assurances are more than sufficient to resolve this matter because the terms of the settlement agreement say that the "Attorney General of the United States agrees to create the Anti-Weaponization Fund" and gives to the Attorney General the ability to appoint Members and establish requirements. ECF No. 1-2 at 2. This is the reason the May 19 Order was issued by the Acting Attorney General. ECF No. 1-3, 1-4. Nothing that the Secretary of the Treasury or the Associate Attorney General can put in a declaration or testimony can add more because all action must start with the Attorney General, who has said (countless times now) that the "Fund is dead." For the same reason, the recission of a memo is immaterial compared to the sworn statements of the Acting Attorney General.

some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *All. For Hippocratic Med.*, 602 U.S. at 380 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)). Thus, federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Id.* at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). For the same reason, "taxpayer standing" does not exist just because a plaintiff "challenges [a] Government expenditure." *Hein*, 551 U.S. at 593.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423.

The first requirement, "injury in fact," requires an injury that is "real and not abstract," and "particularized" to "the plaintiff in a personal and individual way" (rather than a "generalized grievance"). *All. for Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted). To count as a concrete harm, an alleged injury must have a "close relationship" to a harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted). "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Certain "intangible harms can also be concrete" if they have a sufficient historical pedigree "as providing a basis for lawsuits in American courts." *Id.* "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

To establish causation, a plaintiff must show that his alleged "injury likely was caused or likely will be caused by the defendant's conduct." *Id.* at 382. When a plaintiff does not challenge government action "that require[s] or forbid[s] some action by the plaintiff," causation "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks omitted). That is partly because "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). "The causation requirement precludes speculative links" where "downstream injury to plaintiffs" is not "sufficiently predictable," as well as "attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

To establish redressability, Plaintiffs must show "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Such relief must benefit the plaintiff "as opposed to the citizenry at large" or the "undifferentiated public interest." *Id.* at 106, 107. "[A]lthough a suitor may derive great comfort and joy" from a favorable judgment because they would believe "the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107.

As those principles make clear, Plaintiffs' efforts to establish standing do not pass muster. As ideological objectors to a proposed program that could have resulted in government expenditures, Plaintiffs are no different from the many litigants who have unsuccessfully sought to invoke taxpayer standing; they have no individualized interests separate from "the interests of

19

the public at large." *Hein*, 551 U.S. at 600. Indeed, Plaintiffs do not even attempt to allege monetary harm as not one of them even alleges that they would apply to the Fund.

Instead, Complaint gives away the game on the first page. Claiming that "none of these individuals or entities can make a claim for monetary payment" Plaintiffs seek "to halt and set aside the creation and operation of" the Fund. ECF No. 1 at ¶ 4. First, that "none of these individuals or entities can make a claim" is not a fact. At best, it's a legal conclusion (albeit an incorrect one) based on the reading of various documents. But really it is an assertion of how Plaintiffs believe future events might unfold, the exact type of pleading that is foreclosed by *Texas*. 523 U.S. at 300. Second, the proposed relief (shutting down the non-existent Fund) also would not remedy their claimed injury (exclusion from the non-existent Fund). It would leave them in the exact same position they claimed to be in when they filed their complaint, and which they are in now that the Fund is not going forward: unable to obtain relief from the Fund.

Nor do Plaintiffs connect the harm they allege to have suffered to a redressable grievance with the Fund. Plaintiffs allege that thy have each "incurred significant costs as a result of this targeting, including legal fees, loss of income, diversion of critical resources and reputational damage." ECF No. 1 at ¶ 108. To the extent that any of this is true, Plaintiffs have shown that they are able to get into court and obtain relief and nothing is stopping them from seeking redress against the proper defendant in the proper venue with a proper claim. And if they had a valid claim, they (like anyone else) could have applied to the Fund. Or they could have (and maybe still can) pursue their claim through the appropriate action. But what they cannot do, and really what no plaintiff can do, is say that they have a claim they will not submit in an effort to stop a program for everyone else. Such "generalized grievances about the conduct of government" are insufficient

20

to establish a "Case" or "Controversy" within the meaning of Article III. *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 225 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).

Put differently, the reason Plaintiffs would not recover from the Fund (assuming, *arguendo*, it was moving forward) is not because their claims were submitted and denied but rather their own failure to submit them. Thus the denial is not fairly traceable to any *government* conduct or the conduct of any named defendant. Rather, the failure to obtain compensation from the Fund would be, as Plaintiffs plead it, due to their own decision to abstain from the voluntary process by not submitting a claim in the first instance. Ultimately, even in a reading of the complaint in a light most favorable to Defendants, there is no government action for the Court to redress that rights an alleged wrong specific to Plaintiffs.

Plaintiffs here are in the same position as the challengers who lacked standing in *Department of Education v. Brown*, 600 U.S. 551 (2023). There, borrowers did "not qualify for the maximum relief available" under a loan forgiveness program and "sued to enjoin it" as unlawful. *Id.* at 556. But their theory that they were "injured because the Government has not adopted a lawful benefits program under which they would qualify" failed. *Id.* at 563–64. "It would be quite strange to think that a party experiences an Article III injury by *not* being affected" by a government action that the same party argues is "unlawful." *Id.* at 564; *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45–46 (1976) (plaintiffs lacked standing to challenge an IRS tax-exemption). The same is true here. Plaintiffs explicitly eschew any plan to participate in the Fund process and, in so doing, admit their lack of standing to challenge the Fund.

With respect to Plaintiffs' mis-reading of the Settlement Agreement, nothing in the Settlement Agreement would have precluded them from applying as they claim. ECF No. 1 at ¶ 2. Claimants to the Fund need only "assert at least one legal claim stating that the claimant was a

21

victim of Lawfare and/or Weaponization," ECF No. 1-2 at 3, meaning they were "target[ed] . . . for improper and unlawful political, personal, and/or ideological reasons," ECF No. 1-2 at 1. To be sure, the Settlement Agreement notes "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to" engage in such "target[ing]." *Id.* But that recital does not narrow the scope of claims.[4] And even if the Settlement Agreement were ambiguous in that respect, such contractual indeterminacy would just underscore Plaintiffs' lack of injury prior to the Fund being implemented (which now will not occur) by its Members (who have never existed). In any event, Plaintiffs do not meaningfully explain what "legal claim[s]" they planned to "assert," ECF No. 1-2 at 3, let alone why those claims would be precluded under the actual terms of the Settlement Agreement.

Even if Plaintiffs had somehow made that showing, exclusion from a targeted, settlement-derived compensation scheme does not pose any harm to "a legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). There is no legal right to participation in a bespoke federal claims process. Otherwise, anyone omitted from a compensation program would have standing to challenge it despite having a "plainly undifferentiated" and "generalized grievance." *Id.* at 575 (internal quotation marks omitted). Given that targeted compensation schemes are ubiquitous, accepting Plaintiffs' standing theory would have broad and unpredictable consequences. For example, it would imply that all non-"Native-American[s]" claiming discrimination under various government programs would have had standing to challenge the *Keepseagle* settlement despite not having suffered the discrimination the class action was filed to remedy. *See Keepseagle*, 856 F.3d at 1043. The absence of harm to a legally protected interest is

---

[4] Even if that language were relevant to the scope of claims, the word "Democrat" modifies only "elected officials." ECF No. 1-2 at 1. If there were any doubt, the person who leaked President Trump's tax returns, ultimately leading to the Settlement Agreement, was a contractor working in a Republican administration. *See* pp. 4–5, *supra*.

22

even more apparent here. Plaintiffs ignore that the Settlement Agreement contemplates that claimants would have been required to "assert at least one legal claim," ECF No. 1-2 at 3, and that nothing would prevent Plaintiffs from bringing such claims by other means.

Ultimately, the relief that Plaintiffs seek does not redress their claimed injury—the purported exclusion from the Fund's claims process. Rather than seeking relief that would allow them to submit claims, Plaintiffs ask the Court to shut down the (never running, already shut down) Fund. ECF No. 1 at ¶ 4, p. 44. That would leave Plaintiffs in the same position they are in now and claimed to be in before. Plaintiffs, by definition, lack Article III standing.

## II.    PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION

Given all those justiciability issues, the Court has ample grounds on which to dismiss the complaint on the basis of Rule 12(b)(1) alone and it need not reach the substance of the pleadings. That said, Plaintiffs' also fail to allege facts that state a cognizable claim for which relief can be granted under the standard of Rule 12(b)(6). A key factor here is that the Court must take the well-pled facts as true, but the Court need not accept speculation or legal conclusions couched as facts. *Harvey*, 48 F.4th at 269. And all Plaintiffs offer are hypotheticals that boil down to "*If* we applied to the Fund, *then* our claim would be rejected, *because* of political discrimination." See ECF No. 1 at ¶ 109–110. These are not facts. They are not even factual allegations. This is pure, unadulterated speculation about how future events would occur or unfold. It is the opposite of the standard requiring plaintiffs to "plead[ ] factual content that allows the court" to assess the claims Plaintiffs are asserting. *Iqbal*, 556 U.S. at 678. Here, the Complaint does not contain "well pleaded, nonconclusory factual allegation[s]," *id.* at 680, that go beyond the "unadorned, the-defendant-unlawfully-harmed-me accusation" and should be dismissed, *id.* at 678.

23

Case 1:26-cv-01399-LMB-IDD    Document 105    Filed 07/17/26    Page 26 of 32 PageID# 2091

### A. Plaintiffs' First Amendment and Equal Protection Claims Fail

#### i.    First Amendment

Plaintiffs' argument that the Fund is premised upon viewpoint discrimination does not make sense, as just explained. On its face, the Settlement Agreement contemplates the submission of claims by putative victims of Lawfare and Weaponization without regard to a claimant's speech or viewpoint. Indeed, Plaintiffs themselves submitted to the Court a Department of Justice overview document stating that "Democrats can submit claims too." ECF No. 1-5. Yet Plaintiffs assert viewpoint discrimination on the convoluted theory that "the Fund exists to compensate claimants who allege 'Lawfare and Weaponization' by Democratic administrations but not Republican ones" in direct opposition to the exhibits they attached to the Complaint. *See* ECF No. 1 at ¶ 126, ECF No. 25 at 13; *but see* ECF No. 1-5.

This theory suffers from several defects (beyond justiciability). To start, Plaintiffs misread the Settlement Agreement, which covers both Republican and Democrat administrations. *See* p. 21–22, *supra*. And even if Plaintiffs' (mis)interpretation were correct, there would be no First Amendment problem. Limiting the scope of a claims process is not conditioning or denying a benefit based on viewpoint discrimination. The government is free to "selectively fund a program," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), so long as the government does not "seek to leverage funding to regulate speech outside the contours of the program," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 US. 205, 214–15 (2013). There is no apparent way that the Fund's (hypothetical) Members could have regulated speech. And if that somehow occurred, it would at most have been the basis for a challenge on such concrete facts—not one resting on hypotheticals and speculation.

24

>    ii.    *Equal Protection*

Plaintiffs similarly assert an equal protection theory based on the supposed distinction the Fund makes between those allegedly targeted by Democrats and those targeted by Republicans. ECF No. 1 at ¶ 126, 133–36. Once again, this claim fails for the simple reason that the Settlement Agreement does not draw this distinction. But even if it did, that would not give rise to an equal protection claim. The government can create compensation programs to address limited categories of past misconduct, as in *Keepseagle* (which involved a "political" preference for Native Americans, *see Moron v. Mancari*, 417 U.S. 535, 553 n.24 (1974)), without incurring an obligation to compensate other categories of grievances on the same terms. 856 F.3d at 1043–44.[5] Such a classification does not "affect fundamental rights nor proceed along suspect lines," so it would not trigger heightened scrutiny. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). And there is a "a rational basis for the classification," *Heller*, 509 U.S. at 320 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)), because the Fund was part of a Settlement Agreement that resolved specific litigation by targeting compensation for the same category of Lawfare and Weaponization that prompted the lawsuit. There is nothing "invidious" about trying to solve a particular problem "without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.[6]

---

[5] Even under Plaintiffs' misreading, Democrats targeted by Democrats could have asserted claims. *See* Emily Goodin, *Hunter Biden could be among those that cash in as Trump drops IRS suit in exchange for $1.776B fund for victims of gov't weaponization*, New York Post (May 18, 2026), *available at* https://nypost.com/2026/05/18/us-news/trump-drops-irs-suit-in-exchange-for-apology-1-776b-fund-for-victims-of-government-weaponization-and-even-hunter-biden-can-ask-for-award/.

[6] Plaintiff the City of New Haven also does not have rights under the First Amendment or the Equal Protection Clause. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (contrasting a "political subdivision" of a State with "[a] private corporation [that] enjoys constitutional protections").

### B. Plaintiffs' Separation Of Powers Claim Fails

The substance of Plaintiffs' separation-of-powers claim is indiscernible. Plaintiffs argue only that "Congress has the exclusive power under the Spending Clause." ECF No. 1 at ¶ 140. But that general power does not preclude the Fund, as the court-ratified *Keepseagle* settlement confirms. *See Keepseagle*, 815 F.3d at 30. No one suggested the *Keepseagle* adjudicators comprised a new agency or an expenditure without an appropriation. So it would be especially odd to treat the hypothetical Fund—which consists of zero Members—as one. In any event, Plaintiffs offer no explanation as to how they have standing to assert claims they aver harm Congress's interest in light of the fact there is no general taxpayer standing.

### C. Plaintiffs' APA Claims Must Fail Because There Has Been No Final Agency Action

The Administrative Procedure Act ("APA") contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights

26

or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiffs.

Plaintiffs' threadbare argument to the contrary misses the mark. They say the Fund reflects "the consummation of DOJ and Treasury's decisionmaking process because it affirmatively establishes the Fund." ECF No. 1 at ¶ 149. But the creation of the Fund, without further action is a nullity. At best, the Settlement Agreement is the *conception* of—not "consummation of"—an agency process. *Hawkes Co.*, 578 U.S. at 597 Indeed, Plaintiffs allege that the Fund compensating certain claims while denying theirs is the basis of their harm. Thus, their primary argument for standing for their constitutional harms is at direct odds with their argument for standing on their APA claim. Even if money was now in the Fund—which it is not—there would still be only tentative, interlocutory action that does not impact Plaintiffs. In fact, Plaintiffs' only argument that the Fund determines rights and obligations, and causes legal consequences, is that the government has "establishe[d] a legal process by which some individuals . . . have the right to pursue claims." ECF No. 1 at ¶ 150. That is indisputably inaccurate when the Members of said Fund were never appointed, never adopted any process or standards for evaluating or compensating claims, never received any money, and never disbursed any money.

The best comparator is APA review in agency grantmaking decisions. In that context, courts have consistently held that an agency does not take final action in the grant context until it completes review of an application and decides whether to award or disburse funds. *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The *agency* has taken no action to fund the project. Even congressional appropriation of funds for a project will not allow challengers to an agency's use of those funds to obtain relief 'until the [agency] has reviewed a grant application and decided to disburse the funds.'" (quoting

27

*Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)); *see also Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007) (finding that the "district court's decision is unassailable"); *Friends of the Everglades, Inc.*, 174 F.4th at 830–31 (finding that requests for voluntary action, entering into contracts that adhere to federal standards, and the availability of congressionally appropriated funds without a decision to disburse such funds, all fall short of final agency action); *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430–32 (2d Cir. 2015) (considering HUD's rejection of county's proposals and decision to withhold allocated funds was final because it made a definitive funding determination); *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, No. 26-1348, 2026 WL 1755493 (3d Cir. June 18, 2026) (NPS exhibit-removal decisions not final agency action because they did not alter obligations). Indeed, the scope of APA review for spending decisions is so narrow that agency decisions to *terminate* funding are not even subject to APA review, but are instead governed by the Tucker Act and routed to the court of Federal Claims. *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026); *Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d. 563, 569 (E.D. Va. 2025) (appeal pending).

In sum, there is no final agency action here, and that alone is fatal to Plaintiffs' APA claims.

28

**CONCLUSION**

Because the court lacks subject-matter jurisdiction and because Plaintiffs fail to state a claim to relief that is plausible on its face, the Court should dismiss the Compliant.

Dated: July 17, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

/s/ Andrew J. Block
ANDREW J. BLOCK
*Senior Counsel to the Associate Attorney General*
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Defendants*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block