**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Andrew Floyd, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Department of Justice, et al.,<br><br>Defendants. | **Case No. 26-cv-1399-LMB** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

    A.   The Trump Administration's Creation of the Anti-Weaponization Fund .........................2

    B.   This Lawsuit ...............................................................................................................6

    C.   The Court's Order Maintaining the Status Quo and Defendants' Responses ....................7

    D.   The Court's Preliminary Injunction..............................................................................8

    E.   The Acting AG's Statements to Congress During His Confirmation Proceedings.............9

LEGAL STANDARD ..........................................................................................................13

ARGUMENT ......................................................................................................................13

I.     Defendants Have Not Met Their Heavy Burden of Showing that Their Unlawful Action Will Not Recur, so Plaintiffs' Claims Are Not Moot. ..........................................................13

II.    Plaintiffs' Claims Are Ripe Because None of Their Claims Turn on Future Events and Plaintiffs Would Suffer Hardship If the Court Were to Delay Ruling. .............................16

III.   Plaintiffs Have Standing As to Each of Their Claims. .......................................................19

    A.   Each of the Plaintiffs Has Suffered an Injury-In-Fact.......................................................19

        1.   Plaintiffs Floyd and Caravello have sufficiently alleged Equal Protection and First Amendment injuries, and New Haven has sufficiently alleged Equal Protection injuries, from the Fund's creation. ...............................................................................19

        2.   Common Cause is injured by the secrecy surrounding the Fund. ...............................21

        3.   The Fund already has, and will continue, to require NAF's members and Common Cause to divert resources to protect themselves from their reasonable expectation of harm. ..............................................................................................................22

    B.   Plaintiffs' Injuries Are Traceable to the Anti-Weaponization Fund and Redressable by Dissolution of the Fund. ...........................................................................................24

    C.   Plaintiffs Have Standing to Bring a Separation-of-Powers Claim. ..................................25

IV.   Plaintiffs Have Sufficiently Alleged Valid Constitutional and Statutory Claims. ............25

    A.   Plaintiffs Have Stated First Amendment and Equal Protection Claims. ..........................26

    B.   Plaintiffs Have Stated a Separation-of-Powers Claim.....................................................28

    C.   Plaintiffs Have Stated an APA Claim. ..........................................................................29

CONCLUSION ....................................................................................................................30

**INTRODUCTION**

This case is a challenge to a $1.776 billion taxpayer-funded Anti-Weaponization Fund ("AWF" or the "Fund"), which arose from a "Settlement Agreement" that a federal district judge recently declared to be a "collusive" arrangement between the President, two of his sons, and their family business on the one hand, and federal agencies that the President himself controls, on the other. *Trump v. IRS*, No. 26-20609-CV, 2026 WL 2015525, at *3–4, *12, *17 (S.D. Fla. July 13, 2026). This Court previously issued a preliminary injunction against the Fund's implementation, over the government's claims that it was abandoning the Fund. The Court did so, in part, because the government "refused to accord a genuine degree of trustworthiness to their representations about the Fund not going forward," including by failing to provide a declaration under penalty of perjury stating that the Fund would not be implemented. Order, ECF No. 96 at 3.

Defendants now move to dismiss the Complaint. Their motion repeats the arguments they made in their preliminary injunction opposition, and claims that one additional fact—recent sworn testimony by Acting Attorney General Todd Blanche ("the Acting AG") before Congress that "there is no weaponization fund" and that "[t]he weaponization fund is … not moving forward"— tips the balance on mootness. Defs.' Mem. in Supp. of Mot. to Dismiss ("MTD"), ECF No. 105 at 9. But the Acting AG's statements have no legal effect on the Fund: the Order issued by the Acting AG effectuating the Fund has not been rescinded, and the Settlement Agreement from which the Fund arose remains in place. Neither the government in its brief, nor the Acting AG in his sworn testimony, has promised not to resurrect the Fund; there is nothing to constrain the government from reviving the Fund once political and judicial attention has waned; and Defendants have continued to insist that the Fund is perfectly legal. The Plaintiffs' claims are thus not moot. And nothing has changed with respect to the Plaintiffs' standing or the ripeness of their injuries.

1

Furthermore, Plaintiffs have successfully stated their constitutional and statutory claims for relief. Given the sufficient factual matter that Plaintiffs alleged and that must be taken as true, their claims are plausible on their face.

## FACTUAL BACKGROUND

**A.    The Trump Administration's Creation of the Anti-Weaponization Fund**

President Trump has sought to reward his allies since day one of his current term. Compl., ECF No. 1 ¶¶ 71–73. On January 20, 2025, he issued an Executive Order ("EO") to "ensure accountability for the previous administration's weaponization of the Federal Government against the American people." *Id.* ¶ 72. The EO cited several examples of the Biden administration's alleged weaponization, including "politically motivated funding revocations" and the "ruthless[] prosecut[ion of] more than 1,500 individuals associated with January 6." *Id.* ¶ 73.

Soon after, then-Attorney General Pam Bondi issued a Memorandum establishing a Weaponization Working Group within DOJ to "conduct a review . . . of all departments and agencies exercising civil or criminal enforcement authority of the United States over the last four years . . . to identify instances where . . . conduct appears to have been designed to achieve political objectives or other improper aims." *Id.* ¶ 74. Bondi's memo focused exclusively on alleged weaponization by Democratic administrations, citing as examples the investigation and prosecution of January 6 rioters and criminal prosecutions of individuals that illegally disrupted abortion clinic access in violation of the Freedom of Access to Clinic Entrances (FACE) Act, among others. *Id.* ¶ 75. When the Weaponization Working Group issued its first report earlier this year, it alleged misconduct by "[t]he Biden DOJ" for, as an example, improperly "pursu[ing] more severe charges and significantly harsher sentences for peaceful pro-life defendants than violent pro-abortion defendants." *Id.* ¶ 76. That report, too, focused solely on the FACE Act and failed to

mention any weaponization by Republican administrations, even though weaponization by the Trump administration has been rampant. *Cf. id.* ¶¶ 76, 85–95.

In January 2026, President Trump, his sons, and the Trump Organization filed a lawsuit against the IRS and Treasury alleging that the disclosure of their tax returns by a former government contractor entitled them to $10 billion in damages. *Id.* ¶ 22. Because the President controlled both sides of the litigation, the parties to the lawsuit were not adverse. *Id.* ¶¶ 24–26; *see, e.g.*, Exec. Order No. 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447–48 (Feb. 24, 2025) (declaring the President's complete supervisory authority over the executive branch, including the power to make "authoritative interpretations of law" that "are controlling on all employees in the conduct of their official duties"). Even the President acknowledged that "I'm supposed to work out a settlement with myself." Compl. ¶ 27. This manifest lack of adverseness led the presiding Judge in that case to order the parties and court-appointed *amici* to brief whether the case satisfied Article III's bedrock case-or-controversy requirement. *Id.* ¶¶ 28, 37.

As IRS lawyers have acknowledged, the President's claims lacked merit in several key respects, including that they were brought outside the statute of limitations and that the contractor who disclosed the information was not an "officer or employee of the United States." *See id.* ¶¶ 29– 33 (quoting 26 U.S.C. § 7431(a)(1), (c)(1)(A)-(B), (d)). But rather than raising these viable defenses, the government entered into a "Settlement Agreement" with Trump's private attorneys, who subsequently filed a notice of voluntary dismissal, taking pains to argue that there was no room for judicial oversight. *Id.* ¶ 41. The presiding judge subsequently determined that the litigation "was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact." *Trump v. IRS*, No. 26-20609-CV, 2026 WL

3

2015525, at *17 (S.D. Fla. July 13, 2026). The judge also referred the parties' counsel for disciplinary proceedings. *Id.* at *21, *24.

The Settlement Agreement ("Settlement Agreement" or "Agreement") required the Attorney General to implement an "Anti-Weaponization Fund," the purpose of which is "[t]o provide a systematic process to hear and redress claims of others who, like [the *Trump v. IRS* plaintiffs], state that they incurred harm from similar Lawfare and Weaponization." Compl. ¶¶ 48, 58; *id.* Ex. A ¶¶ III.C, IV.A. The Agreement defines "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *Id.* ¶ 49 (quoting *id.* Ex. A ¶ II.C). It lists several representative examples of "Lawfare and Weaponization," all purportedly perpetrated by Democratic administrations: "the Biden Administration's abuse of the FACE Act, the Biden administration's wrongful labeling of certain parents as domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." *Id.* Ex. A ¶ II.C. To apply for recovery from the Fund, one "must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization," as defined in the Agreement. *Id.* ¶ 53 (quoting *id.* Ex. A ¶ V.C).

The Fund, and the decisions to make payments from it, are governed by five "Members" appointed by the Attorney General and removable at will by President Trump. *Id.* ¶¶ 50; *id.* Ex. A ¶ IV.B. The Fund is empowered "to determine its own procedures for submitting, receiving, processing, and granting or denying claims" and to decide whether and to what extent to "make those procedures public." *Id.* ¶ 51 (quoting *id.* Ex. A ¶ IV.C). The Fund has "the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant

4

claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims." *Id.* ¶ 52 (quoting *id.* Ex. A ¶ IV.D.). Per the Agreement, Fund payments will not be subject to judicial review, *id.* ¶ 55; *id.* Ex. A ¶ VI.B, and the claimants' identities and compensation amounts paid by the Fund will not be made public, *id.* ¶ 56; *id.* Ex. A ¶¶ IV.E, V.F. The Fund will stop processing claims no later than December 1, 2028, just before President Trump's term ends. *Id.* ¶ 57; *id.* Ex. A ¶ IV.G.

As required by the Agreement, the Acting AG "establish[ed] funding" for the AWF by issuing an order calling for Treasury to direct a $1.776 billion payment from the Judgment Fund ("Acting AG's Order"). *Id.* ¶¶ 45, 58; *id.* Ex. A ¶IV.A, Ex. C ¶ C. The Judgment Fund is an appropriation by Congress available to the Attorney General for a specific and limited purpose: to make payment for "final judgments rendered by a district court" and "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." *Id.* ¶ 58 (quoting 28 U.S.C. § 2414). According to the Acting AG's Order, once Treasury has sent Judgment Fund money to the AWF, "the United States has no liability whatsoever for the protection or safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds." *Id.* ¶ 59 (quoting *id.* Ex. C ¶ D). In the event there is a balance remaining in the AWF after December 15, 2028, it will be transferred to any federal government account of the President's choosing. *Id.* ¶ 57; *id.* Ex. A ¶ IV.H.

The AWF's lack of transparency makes it impossible to determine how many claims may already have been submitted. But, as Plaintiffs alleged, many of President Trump's allies have announced that they intend to submit claims. *See id.* ¶¶ 96–105 (providing numerous examples).

### B.    This Lawsuit

Plaintiff Andrew Floyd is a Virginia resident and a former career federal prosecutor in the U.S. Attorney's Office in D.C. who was fired after leading a task force to investigate and prosecute individuals who took part in the January 6 attacks. *Id.* ¶¶ 8, 108. Plaintiff Jonathan Caravello is a professor at California State University Channel Islands who was arrested while protesting an operation by federal immigration agents. *Id.* ¶¶ 9, 108. Despite video evidence undermining the government's case, DOJ charged Mr. Caravello with felony assault of a federal officer. *Id.* ¶ 9. Mr. Caravello was acquitted after being held in jail for days and then subjected to strict pre-trial release conditions. *Id.* Plaintiff City of New Haven has been targeted, along with other cities, by the Trump administration as part of a sustained campaign against "sanctuary" jurisdictions. *Id.* ¶¶ 10, 108. As part of that campaign, the administration filed burdensome and vindictive litigation against the City and threatened to strip it of federal funding for vital services and programs. *Id.* ¶ 10.

Plaintiff National Abortion Federation ("NAF") is a nonprofit that supports and represents abortion providers in pursuit of the provision of accessible and equitable abortion care. *Id.* ¶ 11. The Fund endorses, encourages, and funds people who oppose NAF's mission and harass, threaten, and harm its members, and the Fund expressly invites claims from those that the Biden administration convicted under the FACE Act. *Id.* ¶¶ 11, 113–115. NAF members are diverting significant time and resources from their core activity of facilitating reproductive healthcare to respond to the risk of violence against abortion providers that the Fund foments. *Id.* ¶ 115.

Plaintiff Common Cause is a nonprofit organization with nearly one million members and a mission of upholding the core values of American democracy. *Id.* ¶ 12. As a watchdog group dedicated to open, honest, and accountable government, Common Cause is injured by the secrecy

6

underlying the Fund's operations. *Id.* ¶¶ 12, 118–120. And as one of the nation's premier groups working to protect election integrity, Common Cause is injured by the Fund's emboldening of January 6 defendants and other election deniers. *Id.* ¶¶ 12, 116–117. As a result, Common Cause will be forced to expend more resources to ensure the physical security of its staff, volunteers, members, and individuals involved in election administration. *Id.* ¶¶ 116–117.

Defendants are DOJ, the Acting AG, Associate Attorney General Stanley Woodward Jr., Department of the Treasury, and Treasury Secretary Scott Bessent ("Agency Defendants"), and the Fund itself. *Id.* ¶¶ 13–18. The lawsuit alleges that the Fund violates the First and Fifth Amendments of the U.S. Constitution, the separation of powers, and the Administrative Procedure Act, and is ultra vires. *Id.* ¶¶ 121–193.

### C.    The Court's Order Maintaining the Status Quo and Defendants' Responses

On May 29, 2026, this Court enjoined Defendants "from taking any further action pursuant to the creation or operation of the [Fund]." Order, ECF No. 31 at 1. Soon after, Defendants began indicating in public statements that they were not moving forward with the Fund. On June 1, DOJ posted on social media that it intends to "abide by th[is] Court's [May 29] ruling."[1] Then, on June 2, the Acting AG told Congress, albeit not under oath or in writing, that notwithstanding what the Department does in this and other litigations, it was not moving forward with the Fund.[2]

Meanwhile, the President was making statements that were in tension with those coming from DOJ and the Acting AG. On June 3, when asked whether the government had fully abandoned

---

[1] DOJ (@TheJusticeDept), X (June 1, 2026, at 3:32 PM ET), https://perma.cc/3ECW-ET9L.

[2] CBS News, *Blanche refuses to put end of "anti-weaponization" fund in writing*, at 3:39 (YouTube, June 2, 2026), https://youtu.be/BL8XsCqMtJ8?si=G7Z9I4tODsESrEE-&t=212 ("…but we are not moving forward with the fund, period").

the Fund, the President said "I'd have to ask the lawyers. I don't know."[3] In a separate interview the same day, he responded to the same question with, "No, a court ruled against it," presumably referring to the May 29 Order in this case, and then continued to defend the Fund, saying he was "very proud to have given [people] pardons" and "thinks they should be reimbursed for a crooked government."[4]

It was not until Defendants filed their opposition to Plaintiffs' preliminary injunction motion that they made their first written representation that the Fund would not move forward. Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp."), ECF No. 62 at 10–11. But that claim was not accompanied by any sworn statement or any other evidentiary support documenting the Fund's demise. Thereafter, on June 6, 2026, the President again made public statements that he still "love[d]" the Fund's purpose of compensating individuals charged and convicted in the January 6 attack—individuals whose lives the President believed "were destroyed by dirty cops and by weaponization."[5] The President maintained that "[m]any of those people should be compensated."[6]

### D.    The Court's Preliminary Injunction

In opposing Plaintiffs' motion for a preliminary injunction, Defendants pointed to the Acting AG's unsworn testimony before Congress to argue that the case was moot. Defs.' PI Opp. at 10. The Court deemed that testimony insufficient for mootness purposes, ruled that Plaintiffs'

---

[3] Aysha Bagchi, *Legal battle over Trump's $1.8B 'anti-weaponization' fund rages on*, USA Today (June 5, 2026), https://perma.cc/4HGL-P2M9.

[4] Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed: Bibi, "Are You Effing Crazy?!"*, at 40:34–41:13 (YouTube, June 3, 2026), https://youtu.be/SLnB5l1PxCY?si=GxMARqb-ihyHwBmV&t=2434.

[5] Peter Nicholas, *Trump doesn't rule out giving Jan. 6 rioters who attacked police payouts from the 'anti-weaponization' fund*, NBC News (June 7, 2026), https://perma.cc/5256-CCXJ.

[6] *Id.*

claims were ripe, they had standing, and they had suffered irreparable harm. Ex. 1, June 12 PI Hearing Tr., at 5:17–24, 12:3–11, 16:25–17:3. It issued a preliminary injunction enjoining Defendants "from taking any action to create or operate the [AWF] … or reconstituting the [AWF] under a different name …." Order, ECF No. 85 at 1–2. The Court further stated that, "to avoid any further litigation in this civil action, defendants [Acting AG] Blanche, Associate Attorney General Stanley Woodward, Jr., and Secretary of Treasury Scott Bessent file a declaration under penalty of perjury that they will not take any action to create or operate the [AWF], and that the [AWF] will not proceed in any manner, or under any name." *Id.* at 1.

Defendants never filed that declaration, and, on June 24, 2026, this Court issued an Order concluding that "the President and [Acting AG] Blanche's continued interest in compensating alleged victims of alleged government weaponization, the defendants' unwillingness to provide declarations under the penalty of perjury, and [Acting AG] Blanche's refusal to rescind the May 18, 2026 memo, which set up the structure of the Fund, all support the conclusion that this civil action is not moot." Order, ECF No. 96 at 4. The Court issued an Order setting discovery and directing the government to file a responsive pleading by July 17, 2026. *See id.*; Order, ECF Nos. 95, 96.

### E.    The Acting AG's Statements to Congress During His Confirmation Proceedings

On July 15, 2026, two days before the government's responsive pleading was due, the Acting AG testified before the Senate Judiciary Committee during his confirmation hearing to be Attorney General. When Committee members pressed him about the Fund, he summarily stated that the Fund was "dead" and "not moving forward," this time under oath. Ex. 2, July 15

9

Confirmation Hearing Tr., at 32.[7] But his other sworn statements suggested otherwise. For example, when Senator John Cornyn challenged him on how the Fund could be dead without any corresponding modification of the *Trump v. IRS* Settlement Agreement—which, by its terms, as Senator Cornyn noted, could be modified only in writing—the Acting AG acknowledged that the plaintiffs to the Settlement Agreement, including President Trump, could "enforce the contract." Ex. 2 at 32–34.[8] The Acting AG later claimed that any such enforcement action "wouldn't [result in] revival of the Fund," Ex. 2 at 34,[9] but he could not explain why that specific performance remedy would be unavailable to the President. And in response to questioning by Senator Chris Coons about why the Acting AG had not put in writing that DOJ would not move forward with the Fund, he could only point to Defendants' filings in this case, which contained only unsworn averments in briefing. Ex. 2 at 71.[10] The Acting AG also claimed, without support, that judges lack authority to ask him or Treasury Secretary Bessent to file a declaration. *Id.*[11]

The Acting AG avoided answering questions about the Fund's continued existence as the hearing progressed. When Senator Mazie Hirono asked whether he had rescinded the order that established funding for the AWF, he stated that he was somehow "doing it under oath right now" and then simply repeated his statement that the Fund was no longer in effect. Ex. 2 at 95.[12] As

---

[7] Associated Press, *Todd Blanche testifies at confirmation hearing to be attorney general*, at 1:10:51 (YouTube, July 15, 2026), https://www.youtube.com/watch?v=763ZT4sVSys.

[8] *Id.* at 1:12:01.

[9] *Id.* at 1:13:25.

[10] *Id.* at 2:14:27.

[11] *Id.*

[12] *Id.* at 3:00:30.

Senator Hirono noted, the Acting AG's answer that there is no longer any Fund "is not rescinding the order, because [he] could resurrect that order at any time," to which he had no response. *Id.*[13]

Shortly after his confirmation hearing, the Acting AG submitted answers to Senators' questions for the record.[14] Notably, he confirmed that there has been no written modification of the Settlement Agreement.[15] And, he declined to rescind his Order implementing the Fund.[16] The Acting AG sidestepped a number of other questions, including one where Senator Tillis asked directly, "If the President directs you to reverse your decision and move forward with the Fund, will you move forward?"[17] To that, the Acting AG responded that "it would be inappropriate for me to comment on hypothetical communications I may or may not have with the President."[18] When asked by Senator Tillis whether he would commit to prohibiting DOJ payouts to January 6 criminals, the Acting AG declined to make that commitment, stating instead that "[e]very claim submitted pursuant to the Federal Tort Claims Act is reviewed on the merits."[19] He further declined to issue a memorandum prohibiting such payments to January 6 criminals, and also avoided answering whether DOJ has participated in any settlement discussions with them, saying only that "it would be inappropriate for [him] to comment."[20] Senator Coons asked if the Department has

---

[13] *Id.* at 3:00:42.

[14] Questions for the Record for the Hon. Todd Blanche, Nominee for Att'y Gen. of U.S., Before the S. Comm. on the Judiciary, 119th Cong. (July 17, 2026), https://perma.cc/9TKE-ZNVE.

[15] *Id.* at 154.

[16] *Id.* at 225.

[17] *Id.* at 20.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 25-26. Indeed, the government has issued several payouts to January 6 defendants and FACE Act violators despite its claimed demise of the Fund. *See, e.g.,* Steve Benen, *Anti-Abortion Activist Agrees to 7-Figure Settlement with Trump Justice Department*, MS Now (July 28, 2026), https://perma.cc/5VZG-5DTC.

any alternative plans to compensate individuals who believe they are the target of government weaponization, but rather than responding, the Acting AG simply stated that the Fund "is dead."[21]

As of this filing, Acting AG Todd Blanche has not been confirmed as Attorney General. Republican Senators John Cornyn and Thom Tillis have reportedly blocked the Acting AG's confirmation because of his "refusing to put on paper his promise to kill" the Fund.[22] Just yesterday, July 30, 2026, the President made clear on social media that he would rather withdraw the Acting AG's nomination for Attorney General than agree to kill the Fund; according to that social medial post, Todd Blanche "will remain, in any event, as Acting [AG]" and can be confirmed after Cornyn and Tillis are out of office.[23] And on the day on which this brief was filed, the President posted that "the so called 'Fund' … will not benefit me, but rather the great American Patriots who were hunted down like dogs and whose lives were unfairly and illegally destroyed by the Crooked Joe Biden Administration"[24]—broadcasting, by the use of the word "will" rather than "would have," that the Fund is alive, confirming that the Fund is for those purportedly targeted by Democrats alone, and demonstrating that the President maintains his firm support for those the Fund was created to benefit.

---

[21] *Id.* at 140.

[22] Matthew Cullen, *Republicans Threaten to Block Blanche Nomination*, N.Y. Times (July 29, 2026), https://perma.cc/ZUX6-PG6A; Glenn Thrush & Michael Gold, *Vote on Blanche Is Delayed After Senators Express Skepticism Over I.R.S. Provision*, N.Y. Times (July 29, 2026), https://perma.cc/5JYQ-C2YR.

[23] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 30, 2026, 11:15 AM), https://perma.cc/FK7Y-SK6U.

[24] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2026, 7:03 AM), https://perma.cc/RM9D-66DQ.

## LEGAL STANDARD

In deciding a motion to dismiss a case for either lack of subject matter jurisdiction or failure to state a claim, this court "take[s] as true the facts alleged" in the Complaint and "draw[s] all reasonable inferences" in Plaintiffs' favor. *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 310 (4th Cir. 2025). A court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). In determining a Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (citation omitted).

On a Rule 12(b)(6) motion, the court analyzes the sufficiency of the Plaintiffs' claims as pled in their complaint. *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022). A complaint should survive a motion to dismiss where it contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* at 305 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

I.   **Defendants Have Not Met Their Heavy Burden of Showing that Their Unlawful Action Will Not Recur, so Plaintiffs' Claims Are Not Moot.**

"[A] defendant's 'voluntary cessation of a challenged practice' moots an action only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189 (2000)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (quoting *Laidlaw*, 528 U.S. at 189).

13

As this Court observed during the preliminary injunction stage, the Supreme Court and the Fourth Circuit require a specific type of uncontestable evidence to ensure that challenged conduct cannot be repeated. Ex. 1 at 6:20–9:11. That evidence includes a commitment from the government to a "nonreversion promise," a legal barrier preventing the defendants from reverting to the unlawful behavior, and evidence that the defendants have discontinued any insistence that their conduct was lawful. *Porter v. Clarke* ("*Porter II*"), 923 F.3d 348, 365 (4th Cir. 2019) (quoting 290 F. Supp. 3d 518, 524–25, 540 (E.D. Va. 2018) (Brinkema, J.)); *see also Davidson v. Plowman*, 191 F.Supp.3d 553, 557 (E.D. Va. 2016). None of that is present here.

First, while the Acting AG has said that the Fund was "dead" and "not moving forward" (Ex. 2 at 32), neither the Acting AG before Congress, nor the government in its brief, has offered any promise that the Fund will not be revived. *See supra* pp. 8–11. This failure is fatal to the government's mootness argument. *See Porter v. Clarke* ("*Porter I*"), 852 F.3d 358, 365 (4th Cir. 2017) (the modification of a challenged policy, without an express refusal to rule out a reversion to the old policy or a showing that the change was irrevocable, is insufficient to moot the case).

Even a promise from the Acting AG not to revive the Fund would be insufficient to render the case moot, absent action that would bind the DOJ and any future Attorney General. *See Porter II*, 923 F.3d at 365 ("'[A]lthough defendants individually state they do not currently intend to return to the pre-2015 conditions, they have declined to commit [the Corrections Department] to this nonreversion promise,' despite being offered several opportunities to do so." (quoting 290 F. Supp. 3d at 524–25, 540)). Nor could the Acting AG reasonably make any such promise because, as even he acknowledged, the parties in *Trump v. IRS* remain entitled to enforce the terms of the Settlement Agreement creating the Fund. Ex. 2 at 32–34; Compl. Ex. A at 8–10. That Settlement Agreement—which, by its terms, can only be modified in writing—remains in place. *Id.* § VIII.

14

That the plaintiffs in that case would take action to enforce the Agreement is hardly chimerical, given that the President, the named plaintiff in *Trump v. IRS*, has repeatedly *declined* to confirm that he has abandoned the Fund, and instead has continued to support its creation and the provision of payments to January 6 defendants. *See supra* pp. 7–8, 12. And, even if it were true that the process for restarting the Fund would require "several procedural steps," MTD at 16, that is irrelevant. In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982), reinstating the challenged policy would have required the City Council to go through a process of passing a new ordinance (introduction, vote, etc.), but that was still insufficient to render the case moot.

Second, in determining whether the requirements of the voluntary-cessation doctrine have been satisfied, courts "often look for a change in official policy or law, or some other external constraint on the defendant's action, such as a collateral court order." *Davidson*, 191 F. Supp. 3d at 557. Here, not only has the government failed to point to any such change or external constraints on resurrection of the Fund, but the Acting AG has actually refused to rescind his Order implementing the Fund,[25] which remains in effect to this day. And, the President has made clear that he would rather withdraw Todd Blanche's nomination for AG than agree to kill the Fund. *See supra* p. 12.

At most, the Acting AG's congressional testimony reflects a momentary, personal "change-of-heart" (*Davidson*, 191 F. Supp. 3d at 558), if not an attempt to appease his critics during confirmation proceedings. His testimony is "merely a 'bald assertion' ... and there is no external constraint preventing him from again refusing to cooperate in the future." *GW Acquisition Co., LLC Pageland Ltd. Liab. Co. v. MagLandBroker*, LLC, No. 1:22-CV-255 (LMB/JFA), 2023 WL

---

[25] Questions for the Record, *supra* note 14, at 225.

125018, at \*17 (E.D. Va. Jan. 6, 2023) (quoting *Davidson*, 191 F. Supp. 3d at 557), *aff'd sub nom. GW Acquisition Co., LLC v. Pageland Ltd. Liab. Co.*, No. 23-1611, 2025 WL 1625447 (4th Cir. June 9, 2025). Where "a defendant retains the authority and capacity to repeat an alleged harm," a case is simply not moot. *Wall*, 741 F.3d at 497.

Finally, the government's ongoing insistence that the Fund is lawful undercuts the inference of any genuine abandonment of the Fund. *See Porter II*, 923 F.3d at 363–64 ("Additionally, State Defendants have repeatedly reaffirmed—including in their briefing to this Court—that they do not believe the challenged conditions violate the Eighth Amendment."). The government vehemently maintains in its briefing that the Fund is legal and constitutional, continuously referencing the funding program in the *Keepseagle* case. MTD at 8, 22, 25–26. Defendants' "persistence in [their] belief that [their] challenged actions were legal indicates a risk the defendant will repeat those actions." *Davidson*, 191 F. Supp. 3d at 557.

At bottom, "the defendants have failed to put forth even a single piece of evidence establishing that the [illegal practice] has been terminated once and for all." *Wall*, 741 F.3d at 497. Defendants have thus failed to meet their "'heavy burden of persuading' the court that 'subsequent events [make] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) (emphasis in original) (citing *Laidlaw*, 528 U.S. at 189).

## II.    Plaintiffs' Claims Are Ripe Because None of Their Claims Turn on Future Events and Plaintiffs Would Suffer Hardship If the Court Were to Delay Ruling.

In evaluating ripeness, courts consider (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citation omitted).

16

This Court already determined at the preliminary injunction stage that this case is ripe for review, *see supra* pp. 8–9, and nothing has happened since then to change that conclusion.

For starters, Defendants cannot credibly argue the Fund is "dead" for mootness purposes *and* that the Fund isn't final enough to challenge for ripeness purposes. If the Fund is "dead," it necessarily means the Fund came into being as a real, ripe, non-speculative creation. The Plaintiffs' claims were ripe when they were filed, and they remain ripe today, because the facts giving rise to the Plaintiffs' claims are mature: the Settlement Agreement and its eligibility requirements have been finalized, and Defendants have taken steps to effectuate the Fund as mandated by that Agreement. There is no future event to await, because the operative legal instruments are already final "and not dependent on future uncertainties." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006)). Nor do they turn on the actions of third parties or contingent future events. *Contra* MTD at 12–13.

Moreover, Plaintiffs would suffer hardship if this Court were to delay ruling. Claims regarding "First Amendment rights … are particularly apt to be found ripe for immediate protection." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). Plaintiffs need not file a claim with the Fund before the case will become ripe because "the complained-of unequal treatment (or discrimination) would persist regardless of whether the plaintiffs actually applied for or even obtained" relief from the Fund. *See Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 791 (4th Cir. 2004). Here, the operative injury of unequal treatment has already occurred by the very fact that the Fund's eligibility criteria reflect a present, facial constitutional violation. *See e.g., Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (injury from a discriminatory classification is being denied the ability to compete on equal footing, regardless of whether the

17

benefit is ever actually distributed to anyone). The exclusionary injury arises the moment the criteria are set, not when checks are cut. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993) (discriminatory classification is itself the injury). And the discriminatory legal criteria remain codified in a live, enforceable Settlement Agreement. Waiting for Plaintiffs to apply for remuneration from the Fund "would not improve the parties' advocacy[,] ... clarify the legal issues presented for review[,] ... or ... contribute in any way to [the court's] ability to decide a question presented and contested by parties." *Planned Parenthood of S.C.*, 361 F.3d at 790–92 (citation and internal quotation marks omitted).

Plaintiffs' separation of powers claim likewise "inflicts a here-and-now injury." *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (cleaned up). As explained in *Seila Law*, the Court has "'reject[ed]' the 'argument that consideration of the effect of a removal provision is not "ripe" until that provision is actually used,' because when such a provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

Common Cause would likewise continue to suffer hardship with respect to its transparency concerns if resolution of this case were delayed. As alleged in the Complaint, had the establishment of the Fund been made available for public comment, Common Cause would have commented on it and would have educated its membership on the proposal and promoted the opportunity for them to also provide comments. Compl. ¶ 119. The government's continued opacity regarding its plans for the Fund, *see supra* pp. 5, 9–11, creates an ongoing injury to Common Cause's mission of ensuring governmental transparency, which is ripe for consideration *now*. Compl. ¶ 120.

At least one NAF member has already diverted substantial resources to the escalation of activity by FACE Act violators, both because of the violators' potential access to additional funds,

18

and also because of the Fund's "anti-weaponization rhetoric." *See* Ex. 3, Fonteno Decl. ¶¶ 33–36. Not only would NAF's current diversion of resources continue, but both NAF and Common Cause would have to undertake further diversion of resources if and when funds make their way to FACE Act violators and election deniers. Compl. ¶¶ 112–117. This funding could be undertaken on a moment's notice, without so much as notice-and-comment rulemaking.

Finally, for their APA claim to be ripe for review, the Plaintiffs need only show that the challenged agency action is final. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). That showing is easily made here. *See infra*, § IV.C.

## III.    Plaintiffs Have Standing As to Each of Their Claims.

"To establish standing, a plaintiff must show: '(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *AFSCME v. Soc. Sec. Admin.*, 172 F.4th 361, 367 (4th Cir. 2026) (en banc) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Only one plaintiff must satisfy Article III for a suit to proceed. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026). This court concluded, at the preliminary injunction stage, that Plaintiffs have sufficiently demonstrated standing to challenge the Fund. Ex. 1 at 11:2–5. None of Defendants' arguments casts doubt on that conclusion.

### A.    Each of the Plaintiffs Has Suffered an Injury-In-Fact.

#### 1.    Plaintiffs Floyd and Caravello have sufficiently alleged Equal Protection and First Amendment injuries, and New Haven has sufficiently alleged Equal Protection injuries, from the Fund's creation.

As Plaintiffs' complaint alleged, Defendants' decision to set up a Fund for those who faced weaponization at the hands of Democrats but not Republicans violates First Amendment and Equal Protection principles. Compl. ¶¶ 107–111. "[T]he [U.S. Supreme] Court has squarely held that a

19

plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception" under the First Amendment, because "[d]iscriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes." *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 634 (2020); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 98–99 (4th Cir. 2026) ("effects [of unconstitutional policy] … constitute an injury-in-fact, particularly under a relaxed First Amendment standard"); *Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 77 (D.D.C. 2026) ("Plaintiffs are injured because the [challenged action] precludes them from even participating in the competition for federal . . . financial benefits."). The same principle applies in the Equal Protection context. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666 ("[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit"). This unequal treatment is not a generalized grievance, *contra* MTD at 22–23, as its imposition is limited to the discrete class of individuals targeted by Republicans.

New Haven asserts an Equal Protection, but not a First Amendment, claim. Compl. ¶ 108. Contrary to Defendants' position, MTD at 25 n.6, New Haven has standing to "protest Defendants' unequal treatment of their [federal] funding based on a classification … that is not rationally related to a legitimate government interest." *City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 73 (D.D.C. 2026).[26]

Defendants wrongly argue that Plaintiffs Floyd, Caravello, and New Haven lack standing because they have not applied to the Fund. For standing purposes, Plaintiffs need only demonstrate

---

[26] Although courts have held that cities cannot assert constitutional rights against the *state* that created them, *see, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (cited by Defendants in MTD at 25 n.6), those cases do not bear on suits against the federal government.

that they *would* have applied but for the discriminatory design "ma[king] it unlikely that such amount would be repaid." *FEC v. Cruz*, 596 U.S. 289, 300 (2022); *see also* Ex. 4, Floyd Decl. ¶ 28; Ex. 5, Caravello Decl. ¶ 16; Ex. 6, Elicker Decl. ¶ 23. As in *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, their injury is not the inability to *obtain* the benefit—it is that the Fund's discriminatory design "prevents [them] from [competing] on an equal basis." 508 U.S. at 666.

### 2. Common Cause is injured by the secrecy surrounding the Fund.

Defendants do not articulate any challenge to Common Cause's standing. For good reason: Common Cause has adequately alleged that the secretive processes the government has maintained here injure the organization by impeding its ability to carry out its core government oversight functions. Compl. ¶¶ 119–120. As mentioned above, had the establishment of the Fund been made available for public comment, Common Cause would have commented on it and would have educated its membership on the proposal and promoted the opportunity for them to also provide comments. Compl. ¶ 119; Ex. 7, Bellows Decl. ¶ 15.

And if and when the Fund begins doling out awards, which could happen without notice to the public, the Fund's design allows for secret transfers of funds, including the non-reporting of the amounts of payments and the basis for the claims paid—information to which Common Cause would have had access if the Fund were subject to the statutory requirements for Judgment Fund payments, for which Common Cause would have filed FOIA requests, and which it would have publicized. Compl. ¶¶ 118–120; Bellows Decl. ¶ 14. It is well-established that this kind of injury gives rise to standing. *See Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) (plaintiff establishes informational injury where it alleges that it "failed to obtain information which must be publicly disclosed pursuant to a statute" (quotation marks and alteration omitted)); *Mendoza v. Perez*, 754 F.3d 1002, 1010, 1013 (D.C. Cir. 2014) (a plaintiff has standing to

21

"challenge an action taken without required procedural safeguards" if it can show that "the agency action affects [its] concrete interests in a personal way").

> **3.  The Fund already has, and will continue, to require NAF's members and Common Cause to divert resources to protect themselves from their reasonable expectation of harm.**

For good reason, Defendants fail to articulate any challenge to NAF's standing. The Agreement on which the Fund is based specifically identified "the Biden Administration's abuse of the FACE Act" as an example of the Weaponization it is designed to remediate. Compl. ¶ 78; Compl. Ex. A ¶ II.C. NAF's provider members have already had to divert significant time and resources from their core activity of facilitating reproductive healthcare to respond to the increased risk of FACE Act violations that is engendered by the Fund's sending the message to these violators that the Trump Administration supports their activities. Compl. ¶ 115; Fonteno Decl. ¶¶ 33–36. It is eminently reasonable for NAF's members to have concluded that the Fund's mere creation would embolden FACE Act violators: the last time the administration gave its imprimatur to these violators' illegal actions—when the President pardoned 23 people convicted under the FACE Act last year—several of them were rearrested for those crimes. Compl. ¶ 114; Fonteno Decl. ¶¶ 19–21. As NAF's members adequately allege, the Fund's endorsement of their activities emboldens these violators in their efforts to illegally block access to the dwindling number of abortion providers left in our country, just as the pardons did. Compl. ¶¶ 113, 115; Fonteno Decl. ¶¶ 25–26.

That harm suffices for demonstrating an injury in fact. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (reaffirming that organizations may challenge actions that "directly affect[] and interfere[] with [their] core business activities"); *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024) (plaintiffs had standing where

22

they alleged that defendants' actions directly impacted Plaintiffs' core organizational missions); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 471 (S.D.N.Y. 2020) (voter-advocacy organizations had standing against defendants who sent intimidating robocalls aimed at suppressing Black voters when the organizations diverted resources to counteract the intimidation effort and protect voters).

FACE defendants have already noted their plans to apply to the Fund, Compl. ¶ 102; Fonteno Decl. ¶ 23, and NAF's members would be further injured if and when the Fund pays on their claims. Compl. ¶¶ 112–115; Fonteno Decl. ¶ 29. About half of NAF's abortion provider members reported incidents of violence or harassment in 2025—a fact that Defendants do not contest. Compl. ¶ 114; Fonteno Decl. ¶ 17. With access to additional funds, anti-abortion networks will expand their existing capabilities, which already include coordinated interstate travel, training, and legal support. Fonteno Decl. ¶ 29. This realistic and predictable harm is sufficient to support NAF's standing. Unlike the plaintiffs in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), NAF does not rely on mere "speculation," but has set forth "specific facts" documenting a "sufficiently imminent and substantial" risk of future harm resulting from the administration's support for violent anti-abortion activists. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 415, 431 (2021); *see generally Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (plaintiffs allege a "credible threat" when they have been harmed by similar government action in the past). Given NAF's exposure "to a risk of future harm" that is "sufficiently imminent and substantial," it can "pursue forward-looking, injunctive relief to prevent the harm from occurring." *TransUnion*, 594 U.S. at 435.

As with FACE Act prosecutions, the President and his administration have qualified the prosecutions of January 6 defendants as "weaponization," Compl. ¶ 73, and have expressed the

23

view that those individuals should be paid by the Fund because they did nothing wrong.[27] Consequently, January 6 rioters have already indicated that they intend to file claims with the Fund. Compl. ¶¶ 98–99, 104. Common Cause has sufficiently alleged that election deniers will be reinvigorated by these messages and by the Fund's very creation, and that access to funding would only intensify their efforts. *Id.* ¶ 116; Ex. 8, Nunez Decl. ¶ 20. To combat these efforts, Common Cause will have to invest additional time and resources to fulfill its mission-related work of getting voters to the polls safely, maintaining election integrity, and ensuring that their election volunteers are safe from harm. Compl. ¶ 117; Nunez Decl. ¶ 21. As with NAF's expenditures, this diversion of resources is sufficient to create an injury in fact. *See supra* pp. 22–23 (citing *All. for Hippocratic Med.*, 602 U.S. at 395 and *Republican Nat'l Comm.*, 120 F.4th at 396–97).

Common Cause's allegations do not rest on conjecture; they rest on "specific facts" showing a "sufficiently imminent and substantial" risk of harm. *TransUnion*, 594 U.S. at 415, 431. This "sufficiently imminent and substantial" exposure "to a risk of future harm" suffices to establish an injury-in-fact. *Id* at 435. Common Cause need not wait for election interference to come to pass. *See Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 471 (voter-advocacy organizations had standing on the basis of the diversion of resources to counteract voter-intimidation efforts).

## B.    Plaintiffs' Injuries Are Traceable to the Anti-Weaponization Fund and Redressable by Dissolution of the Fund.

The remaining two elements of standing—causation and redressability—are also readily satisfied. Indeed, Defendants do not contest causation; instead, they argue that Plaintiffs' injuries would not be redressed by discontinuation of the Fund because that would leave them in the same

---

[27] *See supra* note 5.

position they were in before the Fund was created, *i.e.*, unable to obtain remuneration. MTD at 20. But "plaintiffs in discrimination cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group or by denying benefits to the favored group." *Planned Parenthood of S.C.*, 361 F.3d at 790 (citing *Heckler v. Matthews*, 465 U.S. 728, 738–39 (1984)); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 74–75 (2017) (curing unequal treatment of children born to unwed U.S.-citizen fathers by extending a burden to children of unwed U.S.-citizen mothers). Here, because the Fund cannot operate lawfully for reasons in addition to its discrimination, it's imperative to discontinue the benefit to all, rather than to extend it to others. *See infra* §§ IV.A, IV.B, IV.C. Extending the benefit to others would also do nothing to ameliorate the risk to NAF and Common Cause created by funding election deniers and FACE Act violators. *See supra* pp. 21–24. Thus, the remedy of dissolving the Fund, and only that remedy, will redress the various harms Plaintiffs face.

### C.    Plaintiffs Have Standing to Bring a Separation-of-Powers Claim.

The government summarily asserts, without citation, that Plaintiffs do not have standing to bring a separation-of-powers claim because only Congress would be harmed by any such violation. MTD at 26. But individuals adversely affected by a structural violation of the Constitution may challenge that violation themselves; the right to raise such a claim is not confined to the political branch whose prerogatives have been displaced. *See Bond v. United States*, 564 U.S. 211, 220–24 (2011); *see also Seila Law*, 591 U.S. at 211 (a litigant challenging government action as void under the separation of powers has standing where the litigant sustains injury from that action).

### IV.    Plaintiffs Have Sufficiently Alleged Valid Constitutional and Statutory Claims.

Plaintiffs have successfully pled that the Fund violates both the First Amendment and Equal Protection because the Fund is available only to those the President perceives as his allies,

25

namely those targeted by Democrats. Plaintiffs have likewise properly pled that the Fund violates the separation of powers because Defendants have unilaterally usurped Congress's exclusive authority over the public fisc. Lastly, Plaintiffs have sufficiently pled the existence of final agency action for purposes of their APA claims. Notably, Defendants make no argument that Plaintiffs' ultra vires claim is insufficient.

**A.       Plaintiffs Have Stated First Amendment and Equal Protection Claims.**

Plaintiffs allege that the Fund unconstitutionally conditions funding on perceived political allegiance, sufficiently stating a First Amendment violation. Compl. ¶¶ 124–126. They also allege that the Fund treats potential claimants to the Fund unequally without a rational basis, in violation of the Equal Protection Clause. *Id.* ¶¶ 132–36. Both claims are based on the plain text of the Settlement Agreement that is the exegesis of the Fund. Compl. Ex. A ¶ II.C (defining "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents"). This interpretation of the Agreement does not reflect a "misreading," MTD at 24–25; it is "required by the ordinary rules of grammatical construction." *Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) ("The use of the adverb 'forcibly' before the first of the string of verbs, with the disjunctive conjunction used only between the last two of them, shows quite plainly that the adverb is to be interpreted as modifying them all.").[28]

Defendants' assertion that "Democrats can submit claims too" misunderstands the relevant discrimination. MTD at 24. The Fund is patently for those who claim persecution *by* Democrats,

---

[28] *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive ... modifier normally applies to the entire series."); *Facebook, Inc. v. Duguid*, 592 U.S. 395, 410 at asterisk (2021) (Alito, J., concurring) ("As set out in Reading Law 147, this canon also applies when the modifier precedes the series of verbs or nouns.").

26

regardless of their own political party, and whom this administration therefore understands to be its allies. *See id.* at 25 n.5. Contrary to Defendants' suggestion, the claimant's party registration is irrelevant to the constitutional inquiry, which rests on one's associations (or perceived associations) rather than their formal political party. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715 (1996) (describing right as "political association or the expression of political allegiance"); *cf. Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273–74 (2016) (perceived political activity is protected). "None would deny" that under our Constitution "Congress may not enact a regulation providing that no Republican … shall be appointed to federal office." *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 100 (1947) (internal quotation marks omitted). It would be quite a loophole if Congress could rescue such a law by instead providing that "no political opponent of Democrats shall be appointed to federal office."[29]

Defendants argue that the Fund is a selective funding program authorized by cases like *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). MTD at 24. But unlike the program at issue in *Rust*, the Fund does not purport to "use[] private speakers to transmit specific information pertaining to its own program." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 833–34 (1995) (distinguishing program in *Rust* from scheme in which government "favor[s]" certain speakers over others "[i]n the realm of private speech or expression"); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (confirming that *Rust* was a government speech case). *Rust* itself recognized this distinction. 500 U.S. at 194–95 (distinguishing fact pattern at issue there from

---

[29] Nor does it matter that the contractor who leaked the President's returns did so during a Republican administration. MTD at 22 n.4. That contractor would likely be a "Democrat … contractor" under the Fund's definitions. Compl. Ex. A ¶ II.C. Indeed, Trump has publicly criticized that contractor as a "politically-motived employee" leaking information to "left-wing news outlets." Katherine Faulders, et al., *Trump poised to drop IRS suit, launch $1.7B 'weaponization' fund for allies: Sources*, ABC News (May 14, 2026), https://perma.cc/2A2W-DTFQ.

one in which government "singl[es] out a disfavored group on the basis of speech content"). Here, the private individuals seeking to avail themselves of the Fund are the ones speaking—not the government. The Fund, accurately understood, "den[ies] a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (government violates First Amendment when it conditions re-employment on refraining from public criticism of the school's administration); *accord Speiser v. Randall*, 357 U.S. 513, 518 (1958) (applying same principle to tax exemptions); *Rosenberger*, 515 U.S. at 845 (program that extended funding on a viewpoint-discriminatory basis is unconstitutional).

Defendants' effort to defeat Plaintiffs' Equal Protection arguments fares no better. As explained above, the Fund *does* "affect fundamental rights." *Contra* MTD at 25. And "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *USDA v. Moreno*, 413 U.S. 528, 534 (1973).

Finally, Defendants' analogy to the *Keepseagle* settlement is misguided. The Fund here does not legitimately "resolve[] specific litigation." MTD at 25. To the contrary, the *Trump v. IRS* court found that the Agreement "had no viable basis in law or fact." 2026 WL 2015525 at *17; *see also id.* at *13 & n. 40 (distinguishing *Keepseagle*), and that the *Trump v. IRS* parties—which expressly include Defendant Treasury Department—are "prohibited" from "offering" the Agreement "as evidence of a 'settlement' reached in [that] matter." *Id.* at *21.

## B.    Plaintiffs Have Stated a Separation-of-Powers Claim.

There is nothing "unintelligible" or "indiscernible" (MTD at 4, 26) about that claim that the executive branch has usurped Congress's authority over both appropriations and the creation of new governmental bodies by illegally funneling money out of the Judgment Fund into a secretive slush fund for its allies. Compl. ¶ 144. Congress's "exclusive power over the federal

28

purse" is meant precisely to be a "bulwark" against an executive that would otherwise "possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213–14 (1833)). Defendants do not provide any analysis substantiating their authority to spend the money funneled to the Fund; instead, they simply point to the existence of the *Keepseagle* settlement. MTD at 26. But *Keepseagle* did not opine on any separation-of-powers implications, and the resolution there followed vigorous litigation confirming the viability of plaintiffs' claims (unlike claims for "Lawfare" or "Weaponization" by claimants who were not parties to the *Trump v. IRS* litigation) and therefore justified payment from the Judgment Fund. 28 U.S.C. § 2414; *see also Keepseagle v. Veneman*, No. 99-cv-3119, 2005 WL 8159814, at *7, *9–11 (D.D.C. Mar. 31, 2005) (plaintiffs properly stated claims under the Equal Credit Opportunity Act and APA); *cf. also Garcia v. Vilsack*, 563 F.3d 519, 524–26 (D.C. Cir. 2009) (noting that Hispanic and female farmers likely had valid ECOA claims against USDA). If nothing else, it is clear that *Keepseagle* offers no solace to the "collusive settlement" in *Trump v. IRS*.

### C.   Plaintiffs Have Stated an APA Claim.

Defendants' sole argument against Plaintiffs' APA claims is their erroneous assertion that there has been no "final agency action." *Contra* MTD at 26–28. Agency action is final when: (1) it "mark[s] the consummation of the agency's decisionmaking process" and (2) is a policy "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (quotation marks omitted).

The creation of the Fund satisfies the "consummation" requirement because there are no further steps the Agency Defendants need take to create the Fund. Defendants do not contest that

the Fund was created. That alone satisfies the "rights, obligations, legal consequences," requirement, *id.*, because the Fund subjects the individual Plaintiffs to unequal treatment and the organization Plaintiffs to mission-related harms. *See HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 683 n.18 (D. Md. 2020) ("[r]ights and consequences clearly flow from [an] Order and Funding Notice" that "determine eligibility for funding in certain jurisdictions in the first place"), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The policy therefore meets the APA's "pragmatic" finality test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).[30]

Defendants' attempt to analogize to the grant context is also unavailing. *See* MTD at 27–28. In the cases Defendants cite, Congress appropriated the grant money and therefore the only *agency* action at issue was an award or disbursement. MTD at 27–28 (citing, *e.g.*, *Friends of the Everglades, Inc. v. Sec'y of DHS*, 174 F.4th 822, 831 (11th Cir. 2026) (not allowing APA challenge to "congressional appropriation of funds for a project")). But here, the Agency Defendants were the ones who made the "appropriation." Plaintiffs do not challenge a specific award or disbursement, but rather the Agency Defendants' creation of the Fund itself.

## CONCLUSION

For all of these reasons, the Court should deny Defendants' motion to dismiss.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Joel McElvain*
Joel McElvain (Va. Bar No. 95215)
 jmcelvain@democracyforward.org
Pooja A. Boisture*

---

[30] Defendants DOJ and Treasury are indisputably agencies subject to the APA, but so is the AWF itself—which remains in place, *supra* pp. 13–16—as it is an independent authority that can take final and binding action that affects the rights and obligations of individuals. *See Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) ("[T]he APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.").

pboisture@democracyforward.org
Jyoti Jasrasaria*
jjasrasaria@democracyforward.org
Aman George*
ageorge@democracyforward.org
Ayesha Khan*
akhan@democracyforward.org
Robin F. Thurston*
rthurston@demodracyforward.org
Skye L. Perryman*
sperryman@democracyforward.org
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs*

*admitted pro hac vice*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of July, 2026, I will cause the foregoing notice to be electronically filed with the Clerk of Court using the CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ Joel McElvain
Joel McElvain (Va. Bar No. 95215)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
*Counsel for Plaintiffs*