**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **Andrew Floyd**; **Jonathan Caravello**; **City of New Haven**; **National Abortion Federation**; **Common Cause;** and **National Treasury Employees Union,**<br><br>    Plaintiffs,<br>v.<br><br>**Department of Justice; Todd Blanche**, in his official capacity as Acting Attorney General; **Stanley Woodward Jr.,** in his official capacity as Associate Attorney General; **Department of the Treasury**; **Scott Bessent**, in his official capacity as Secretary of the Treasury; **Anti-Weaponization Fund; Internal Revenue Service**; **Frank Bisignano**, in his official capacity as Chief Executive Officer of the Internal Revenue Service.<br><br>    Defendants. | **Case No. 1:26-cv-01399-LMB-IDD**<br><br>**Jury Trial Demanded** |

**FIRST AMENDED COMPLAINT**

*"Power tends to corrupt, and absolute power corrupts absolutely."* Lord Acton

## INTRODUCTION

1.      After President Trump brought an untimely and jurisdictionally faulty lawsuit against two federal agencies that he controls, Compl. ¶ 1, *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Jan. 29, 2026), ECF No. 1, the Department of Justice and Department of Treasury (including the Internal Revenue Service) executed a predictably collusive agreement with the President and the other *Trump* plaintiffs.

2.      The agreement led to Acting Attorney General (Acting AG) Blanche issuing orders requiring the United States to give the President two very valuable things: (1) a $1.776 billion slush fund—of taxpayer dollars—to make payments to those the Trump-Vance administration favors (the Anti-Weaponization Fund); and (2) immunity from any civil and criminal liability for President Trump, his family, his businesses, and all others deemed to be "related" or "affiliated," including a release of tax liability and tax audits, based on conduct before May 18, 2026 (the Immunity Order). Three weeks later, the President nominated Blanche for Attorney General.

3.      This scheme is an unprecedented, unlawful, and breathtakingly corrupt attempt by the President and members of his cabinet to manipulate the legal process and laws intended to prevent political interference to achieve benefits that President Trump and his political allies could not have obtained lawfully. As the district court in *Trump* recently held, President Trump filed a "collusive" lawsuit "as a vehicle to achieve a predetermined outcome," to "justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations." 2026 WL 2015525, at *8, *17, *19 (S.D. Fla. July 13, 2026).

4.      By its own terms, the Anti-Weaponization Fund is available only to claimants who assert that they were targeted by Democrats, even though the current Republican administration has weaponized the awesome power of the federal government against its perceived political opponents like no other administration before it. Neither the First Amendment nor the Equal Protection guarantees of our Constitution countenance such blatant partiality.

1

5.      The Fund also violates the Separation of Powers, the express constitutional prohibition on paying "any debt or obligation incurred in aid of insurrection or rebellion against the United States," U.S. Const. amend. XIV, § 4, and the statutory and regulatory requirements safeguarding the use of taxpayer dollars out of the Judgment Fund. And its operation and use of funds without any reasonable justification, guardrails, or parameters violates the basic good governance requirements of the Administrative Procedure Act.

6.      As for the Immunity Order, the President of the United States and his family are obligated to pay taxes owed, just like every other taxpayer, and, per the IRS's own policy, the IRS is required to audit the President each year he is in office. But the Immunity Order prevents the IRS from auditing the President's tax returns and from recovering any underpaid taxes. Under the Immunity Order, career IRS employees will be forced to terminate ongoing audits of the President and his businesses, giving the President a lucrative and unconstitutional emolument. That would be unprecedented under any circumstance; it is all the more remarkable considering that the President profited an eye-popping $2.2 billion after returning to the White House.[1]

7.      The Immunity Order also violates 26 U.S.C. § 7217, which prohibits the President from asking the IRS, either directly or indirectly, to end audits of particular taxpayers, including the President's audits. Section 7217 originated in the wake of shocking revelations that President Nixon weaponized the IRS to target his political enemies and benefit his supporters. To address these concerns, Congress put into place substantial protections to restrict the president's access to tax information and prevent future presidents and their cabinets from carrying out partisan plots under the auspices of tax administration. *See* 26 U.S.C. §§ 7217, 6103. The Immunity Order violates these protections and overrides an IRS requirement, in place for nearly 50 years, that the president's tax returns be audited by career IRS employees each year he is in office.

8.      Plaintiffs bring this suit to halt and permanently set aside the creation and operation of the lawless Fund and to set aside the corrupt Immunity Order.

---

[1] Ben Protess et al, *Trump Pulled in at Least $2 Billion After Returning to the White House*, N.Y. Times (Jun. 30, 2026), https://perma.cc/MMR7-7KDU.

9. Plaintiffs include individuals and entities that were targeted by the Trump-Vance administration as ideological or political opponents. One was arrested for exercising his First Amendment right to protest, while another, a career prosecutor with over a decade of experience, was fired for no discernible reason other than his work on the prosecution of January 6 rioters. Plaintiff City of New Haven has been targeted by the administration through retaliatory civil litigation and threatened funding terminations. None of these individuals or entities can make a claim for monetary payment from the Anti-Weaponization Fund.

10. Instead, the Fund rewards and incentivizes unlawful behavior and facilitates an astounding abuse of taxpayer funds. The Fund puts members of Plaintiff National Abortion Federation (NAF), an association of providers of reproductive healthcare including abortion, at risk of increased threats, as the Fund explicitly identifies individuals convicted of crimes against NAF's members as presumptively entitled to payments. The Fund also operates without basic transparency requirements, evading the review of the public and watchdogs, like Plaintiff Common Cause, that track abusive spending on the public's behalf.

11. Plaintiffs also include the National Treasury Employees Union (NTEU), which represents career IRS auditors who, as a direct result of the Immunity Order, will be given unlawful directions to terminate particular taxpayers' audits in violation of section 7217. The Immunity Order will conscript career IRS employees into providing the President and his relatives and affiliates with a lucrative benefit not available to any other Americans. Acceding to such a request will cause NTEU members to violate their oath of office and subject them to the risk of criminal liability; refusing such a request inevitably places NTEU members at risk of retaliation.

12. The Anti-Weaponization Fund and the Immunity Order are just as unlawful and harmful today as they were the day the orders issued. After this Court preliminarily enjoined the Fund, Acting AG Blanche issued an order on August 2 purporting to rescind his May 18 Funding Order by stating that the Fund "is" not currently "operative." This present-tense wordsmithing assuredly does not affirm, under penalty of perjury, that "the Anti-Weaponization Fund will not proceed *in any manner, or under any name*," either now or in the future. ECF No. 85. Nor does it

3

purport to prevent the parties to the agreement in *Trump*, including President Trump, from enforcing that agreement. Indeed, just six days ago, the President posted that "the so called 'Fund' . . . will not benefit me, but rather the great American Patriots who were hunted down like dogs and whose lives were unfairly and illegally destroyed by the Crooked Joe Biden Administration."[2]

13.     DOJ's concurrent statement about the Immunity Order purports to narrow the scope of that Order but does not rescind it. This unsigned piece of paper, which carries no more weight than a press release, confirms that the IRS will terminate tax audits and liability at the request of the President and conscript Plaintiff NTEU members into violating their oath and the Internal Revenue Code to grant the President with an unconstitutional emolument.

**PARTIES**

14.     Plaintiff **Andrew Floyd** is a former Assistant United States Attorney at the U.S. Attorney's Office in Washington, D.C. and resides in Alexandria, Virginia. Mr. Floyd was a career federal prosecutor in the District of Columbia U.S. Attorney's Office for nearly 11 years, beginning his career combatting local crimes ranging from theft to arson, and later prosecuting a wide range of federal offenses. During the first Trump administration, he was promoted to Deputy Chief of the Felony Trial Unit, supervising cases involving unlawful possession of firearms and narcotics that the U.S. Attorney's Office brought in D.C. Superior Court. Days after the failed insurrection on January 6, 2021, Mr. Floyd was asked to lead a task force that would seek to investigate and prosecute individuals who had violently attacked D.C. Metropolitan Police Department officers on January 6. As the January 6 investigation grew, Mr. Floyd became a supervisor within the U.S. Attorney's Office Capitol Siege Section, devoted to investigating and prosecuting individuals for crimes committed during the failed insurrection that day. In January 2025, Mr. Floyd asked to return to prosecuting local crime in the D.C. Superior Court Division, and he began working in the USAO's Early Case Assessment Section, reviewing more than 300 criminal warrants for probable cause before he was fired from the Department of Justice in June 2025. His termination letter,

---

[2] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2026, 7:03 AM), https://perma.cc/RM9D-66DQ.

which was provided to him without any warning or indications of dissatisfaction with his performance, simply asserted that he was being terminated pursuant to Article II of the United States Constitution. He was fired the same day as at least two other prosecutors who had worked on cases arising out of January 6, and believes he was fired in retaliation for that work. He was given no other discernible reason for his termination.

15.    Plaintiff **Jonathan Caravello** is a professor at California State University Channel Islands who resides in Ventura, California. As part of the Trump-Vance administration's efforts to punish dissent and opposition to its militarized immigration enforcement operations, Mr. Caravello was arrested by federal agents while protesting a massive immigration raid in Camarillo, California. ICE's raid was so chaotic that it resulted in the death of a migrant farm worker. Despite video evidence undermining the government's case, the Department of Justice charged Mr. Caravello with felony assault of a federal officer using a deadly or dangerous weapon. Mr. Caravello stood trial and was acquitted by a jury on April 9, 2026. Judgment of Discharge, *United States v. Caravello*, No. 2:25-cr-00686 (C.D. Cal. Apr. 22, 2026), ECF No. 92. Prior to being acquitted, Mr. Caravello was held in jail for days and then subjected to strict conditions of pre-trial release, including limitations on his movement, among other harms. Mr. Caravello's case is not unique. The Central District of California U.S. Attorney's Office "has aggressively pursued charges against anti-immigration-enforcement protesters under the direction of [U.S. Attorney] Bill Essayli, an acolyte of President Trump," "charg[ing] more than 100 people since June, alleging assaults on agents or interference with immigration enforcement."[3] The office has "lost every assault on a federal officer case they've brought to trial against immigration protesters."[4]

16.    Plaintiff **City of New Haven**, Connecticut, is a municipal corporation organized under Connecticut law and has the capacity to bring a suit in its own name. *See* Conn. Gen. Stat. § 52-73. New Haven is the second-most populous city in Connecticut, with a population of about 135,000 residents. The Trump-Vance administration has targeted New Haven, along with other

---

[3] Brittny Mejia, *"Amateur hour at the U.S. attorney's office": L.A. prosecutors face more losses in protest cases*, L.A. Times (Apr. 3, 2026), https://perma.cc/X8F6-4TMP.

[4] *Id.*

cities, as part of a sustained campaign to use the levers of federal government to punish what it views as "sanctuary" jurisdictions. As part of that campaign, the administration recently filed suit against New Haven and its mayor, challenging a mayoral executive order that affirmed New Haven as "a Welcoming City" and that validly directed local law enforcement in the conduct of their duties. *See* Compl., *United States v. Connecticut*, No. 3:26-cv-568 (D. Conn. Apr. 13, 2026), ECF No. 1. As part of the same campaign, the administration has sought to withhold federal funds from New Haven, in an effort that a federal court determined was likely unlawful on multiple grounds. *See City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d 1077, 1080–83 & n.2 (N.D. Cal. 2025). Both lawsuits have resulted in a substantial expenditure of city resources and staff time that is expected to continue through the pendency of those cases.

17.    Plaintiff **National Abortion Federation** (NAF) is a nonprofit organization incorporated in Delaware that supports and represents abortion providers and the people they serve, in pursuit of accessible and equitable abortion care. It brings this lawsuit on behalf of its more than 400 provider members—which include clinics specializing in abortion care (both brick-and-mortar and virtual clinics), health centers that provide abortion care within a broader primary care or OB-GYN practice, hospitals, and individual physicians and clinicians—across the country, including in this judicial district. The creation of the Anti-Weaponization Fund substantially increases the ongoing and severe risk of violence to NAF's members. By offering people who have engaged in criminal attacks on abortion clinics monetary compensation, the Anti-Weaponization Fund will further embolden criminal activity against NAF's members, who experience continuous and ongoing threats and violence. NAF's individual members have diverted significant time and resources from their core activity of facilitating reproductive healthcare to respond to ongoing threats. Prior to this administration, individuals who blockaded and invaded NAF member clinics were prosecuted under the Freedom of Access to Clinic Entrances (FACE) Act. President Trump,

6

however, has pardoned individuals convicted of FACE Act violations, and some of those individuals have reoffended at NAF member clinics after they were pardoned.[5]

18.    Plaintiff **Common Cause** is a nonpartisan, grassroots organization organized under the laws of the District of Columbia that has a mission of upholding the core values of American democracy. Common Cause has nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. Common Cause works to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process. Common Cause believes that public officials should act in all of our interest, not just to line their own pockets. The organization works to ensure that public officials disclose their personal finances, uphold the rule of law, and not turn their public service into a personal profit scheme. Common Cause is also one of the nation's premier organizations working to protect the safety and integrity of U.S. elections. Each election cycle, Common Cause recruits, trains, and deploys thousands of volunteers to help voters overcome barriers and ensure fair voting. Common Cause devotes significant resources to promoting voter participation and deploying staff to monitor election procedures. After elections, Common Cause works to ensure election results are processed fairly and that the public understands and respects the outcomes of a free and fair election. Throughout, Common Cause conducts educational and advocacy efforts to reduce the risks of political violence.

19.    Plaintiff **National Treasury Employees Union** (NTEU) is an unincorporated association that represents federal employees in thirty-eight federal agencies and departments, including tens of thousands of employees at the IRS. NTEU is the certified, exclusive representative for covered employees at the IRS. NTEU represents, in its IRS bargaining unit, all non-supervisory IRS revenue agents, including all agents who conduct audits implicated by the Immunity Order. The IRS is NTEU's largest bargaining unit, representing roughly half of all

---

[5] Julianne McShane, *Abortion Providers Saw Waves of Threats in 2025 as Trump Pardoned Their Detractors: Report*, MS NOW (May 19, 2026), https://perma.cc/LLS7-K2TR.

NTEU members. It is also NTEU's oldest bargaining unit: NTEU has represented IRS employees since 1938, long before Congress created a statutory right to organize federal workers. NTEU negotiates collective-bargaining agreements, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights.

20. Defendant **Department of Justice** is a federal agency headquartered in Washington, D.C.

21. Defendant **Todd Blanche** is Acting United States Attorney General and is sued in his official capacity.

22. Defendant **Stanley Woodward Jr.** is Associate Attorney General and is sued in his official capacity.

23. Defendant **Department of the Treasury** is a federal agency headquartered in Washington, D.C.

24. Defendant **Scott Bessent** is Secretary of the Treasury and Acting IRS Commissioner and is sued in his official capacity.

25. Defendant **Anti-Weaponization Fund** is a governmental entity unlawfully established by the actions challenged in this suit.

26. Defendant **Internal Revenue Service** is a federal agency headquartered in Washington, D.C.

27. Defendant **Frank Bisignano** is the Chief Executive Officer of the Internal Revenue Service. He is sued in his official capacity.

## JURISDICTION

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*

8

**VENUE**

29.     Venue is proper in this District and division because at least one Plaintiff resides in this District. *See* 28 U.S.C. § 1391(e); Local Civil Rule 3(C).

**BACKGROUND**

**I.   President Trump's $10 Billion Lawsuit Against Agencies He Controls**

30.     In January 2026, President Trump, his sons, and the Trump Organization filed a lawsuit against the IRS and Treasury Department, alleging that a former government contractor's public disclosure of their tax returns entitled them to $10 billion in damages. Compl., *Trump*, No. 1:26-cv-20609, ECF No. 1.

31.     From the start, the President's unprecedented lawsuit appeared likely to result in a collusive agreement. Following the finalization of that agreement and subsequent agency actions that led to this lawsuit, the district court in *Trump* confirmed that the agreement was, in fact, the result of collusion between President Trump and the federal agencies he controls. *Trump*, 2026 WL 2015525, at *17, *20 (S.D. Fla. July 13, 2026).

32.     As was evident at the time, the President controlled both sides of the litigation. On the plaintiffs' side, "President Donald J. Trump" was the lead plaintiff, alongside his family members and his family business. Compl. ¶ 1, *Trump*, No. 1:26-cv-20609, ECF No. 1.

33.     On the defendants' side, the President claimed complete supervisory authority via executive order, where he declared the power to make "authoritative interpretations of law for the executive branch" that "are controlling on all employees in the conduct of their official duties." Exec. Order No. 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447, 10448 (Feb. 24, 2025). Indeed, he has long expressed that "I have absolute right to do what I want to do with the Justice Department."[6]

---

[6] *Excerpts From Trump's Interview With The Times,* N.Y. Times (Dec. 28, 2017), https://perma.cc/FYR3-WAF5.

9

34.     The President himself confirmed his control over both sides in *Trump*. In response to questions about the case, the President admitted: "I'm supposed to work out a settlement with myself."[7]

35.     The President's claims also had substantial flaws on the merits, many of which IRS lawyers reportedly identified internally.[8] But Defendants in *Trump* did not make the arguments that they previously raised in other cases involving the same leak of taxpayer information and the same claim of unauthorized disclosure of tax returns.

36.     The President failed to bring his primary claim, for an unauthorized disclosure of tax returns, within the two-year statute of limitations. 26 U.S.C. § 7431(d). But the challenged leak became known more than two years ago, and others subject to the same leaks brought their cases much earlier.

37.     Nor did the President properly bring that claim against the United States, as Littlejohn was not an "officer or employee of the United States," *id*. § 7431(a)(1), but rather a federal contractor not acting at the direction of any federal employee.

38.     And the President's demand for $10 billion in damages was frivolously untethered from any reasonable damages award. Section 7431 sets damages at the greater of $1,000 per unauthorized disclosure, *id*. § 7431(c)(1)(A), or actual and punitive damages, *id.* § 7431(c)(1)(B).

39.     The President's other claim, brought under the Privacy Act's cause of action for damages, suffered from similar defects, including that it was time-barred and that the President did not plead that he or the other plaintiffs sustained actual damages because of the alleged violation.

40.     Given the manifest lack of adverseness, the court *sua sponte* ordered the parties and court-appointed *amici* to brief whether the case satisfied Article III. Order, *Trump*, No. 1:26-cv-20609 (S.D. Fla. Apr. 24, 2026), ECF No. 41; Order, *id.* (Apr. 29, 2026), ECF No. 43.

---

[7] White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (YouTube, Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE.

[8] Andrew Duehren, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026), https://perma.cc/XC6U-34CB.

10

41.    Rather than addressing the court's concerns or defending the lawsuit, the government entered into a "Settlement Agreement" with the *Trump* plaintiffs, who subsequently filed a notice of voluntary dismissal, taking pains to argue that there was no room for any judicial oversight. *See* Plaintiffs' Notice of Voluntary Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) at 2, *Trump*, No. 1:26-cv-20609 (S.D. Fla. May 18, 2026), ECF No. 52. To this day, no government attorney has entered an appearance on the docket.

42.    The presiding judge subsequently determined that the litigation "was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a 'settlement' that had no viable basis in law or fact." *Trump*, 2026 WL 2015525, at *17. The court described the agreement as an "extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties whose future remedies bear no relationship to the claims in this case." *Id.* at *13.

## II. President Trump's Collusive Agreement to Terminate His Lawsuit

43.    Although the May 18, 2026 voluntary dismissal notice did not mention or attach any settlement, DOJ announced hours later that the parties in *Trump* had reached an agreement.[9]

44.    The parties' abrupt "settlement" of the President's lawsuit is anything but an ordinary settlement involving the government. The settlement "fused two ideas that had been kicking around in Mr. Trump's circle for years: a desire by him and his family to avoid extensive tax audits," and a push by his allies for compensation for "legal wrongs they claimed to have suffered during the Biden administration."[10]

45.    The agreement was negotiated by the attorneys representing President Trump, including Daniel Epstein (former White House counsel) and Boris Epshteyn, and Acting AG

---

[9] Dep't of Justice, Press Release, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://perma.cc/7W9V-M9PG.

[10] Alan Feuer, et al., *Inside the Deal to Drop Trump's $10 Billion Suit Against the I.R.S.*, N.Y. Times (May 30, 2026), https://perma.cc/3LL6-HMCV.

Blanche's senior deputy Trent McCotter. Mr. Epshteyn discussed the issues with President Trump and circulated drafts of the agreement to Trump advisers.[11]

46.     The May 18 Agreement was ultimately signed for the *Trump* plaintiffs by attorneys Daniel Epstein and Alejandro Brito. Associate Attorney General Stanley Woodward signed for the United States, and CEO Frank Bisignano signed for the IRS. While Acting AG Blanche has stated that he was not part of the negotiations and his signature does not appear on the May 18 Agreement document, he ultimately signed off on and took "responsibility" for the deal.[12] And he effectuated its two main components: the Anti-Weaponization Fund and Immunity Order.

47.     The Agreement provides for the establishment of a $1.776 billion "Anti-Weaponization Fund" as "part of" the agreement to "settle" the *Trump* case.[13] Agreement (Ex. A) ¶ III.A.[14]

48.     On May 18, Acting AG Blanche issued an "order" establishing the Anti-Weaponization Fund and initiating the transfer of $1.776 billion from Treasury into the Fund. Funding Order (Ex. C).

49.     The Agreement provides that Trump and the other *Trump* plaintiffs will receive a formal apology but no direct monetary compensation. *Id.* ¶ III.A.

50.     On May 19, 2026, Acting AG Blanche issued the Immunity Order—signed by Blanche alone. The Immunity Order shields the President, his family, their businesses, and an undefined universe of affiliates from any federal tax audit or investigation, and absolves them of liability for *any* claims the federal government may have had as of May 18, 2026. Ex. B.

---

[11] *Id*. Indeed, President Trump's lawyers had an ethical duty to convey all settlement agreement terms to him and receive his approval before finalizing any settlement, providing further support to statements by Blanche and news reporting that the President knew about and endorsed the Agreement and termination of audits. *See* R. Regulating Fla. Bar 4-1.4, comment ("a lawyer who receives from opposing counsel an offer of settlement in a civil controversy . . . must promptly inform the client of its substance").

[12] Sen. Judiciary Comm. Hr'g Tr. 179:22-180:19 (July 15, 2026), *available at* https://www.justice.gov/ag/media/1455261/dl?inline.

[13] Dep't of Justice, Press Release, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://perma.cc/7W9V-M9PG.

[14] Agreement (May 18, 2026), https://perma.cc/F8VF-L8FC.

51.    The Immunity Order prohibits the United States from pursuing "any and all claims" or "requests for any relief," including "examinations or similar or related reviews" against President Trump, Donald Trump, Jr., Eric Trump, the Trump Organization, and "related or affiliated individuals (including without limitation family or others filing jointly), or parties including trusts, parent, sister, or related companies, affiliates, and subsidiaries." Ex. B.

52.    The order covers all claims "whether presently known or unknown," that, as of May 18, 2026, "have been or could have been asserted by Defendants" related to "any matters currently pending or that could be pending (including tax returns filed before the Effective Date [May 18, 2026]) before Defendants or other agencies or departments." Ex. B.

53.    When asked about the Immunity Order, Acting AG Blanche said that settlement negotiations "included a discussion around any pending audits."[15]

54.    Three weeks after Acting AG Blanche issued the Funding and Immunity Orders, President Trump nominated Blanche to serve as Attorney General of the United States.

## III.    Defendants' Refusal to Permanently Abandon or Modify the Agreement

55.    Since May 18 and 19, 2026, Defendants have refused to abandon the *Trump* Agreement, or the Anti-Weaponization Fund and Immunity Order that resulted from it. On May 29, this Court enjoined Defendants "from taking any further action pursuant to the creation or operation of the [Fund]." Order, ECF No. 31 at 1.

56.    On June 1, DOJ posted on social media that it intends to "abide by th[is] Court's [May 29] ruling."[16]

57.    Soon after, Acting AG Blanche told a congressional committee that the Fund is "dead," but he did not do so under oath or in writing.[17] And Acting AG Blanche, Associate AG Woodward, and Secretary Bessent have failed to file a declaration in this Court stating that "they

---

[15] Paula Reid, et al., *Blanche insists violent conduct will be weighed when applying for new anti-weaponization fund payouts*, CNN (May 21, 2026), https://perma.cc/F3AV-CHFZ.

[16] DOJ (@TheJusticeDept), X (June 1, 2026, at 3:32 PM ET), https://perma.cc/3ECW-ET9L.

[17] CBS News, *Blanche refuses to put end of "anti-weaponization" fund in writing*, at 3:39 (YouTube, June 2, 2026), https://youtu.be/BL8XsCqMtJ8?si=G7Z9I4tODsESrEE-&t=212 (". . . but we are not moving forward with the fund, period").

will not take any action to create or operate the Anti-Weaponization Fund, and that the Anti-Weaponization Fund will not proceed in any manner, or under any name." Defs.' Notice (June 19, 2026), ECF No. 93.

58.    The Agreement itself provides that "[t]he Settlement Agreement may be modified *only by* the written agreement of the Parties." Ex. A ¶ VIII (emphasis added). Acting AG Blanche has acknowledged that, if the Department of Justice refused to move forward the Fund, the plaintiffs in *Trump* could "say that . . . [DOJ] breached by not moving forward" and "could try to enforce the contract."[18] Yet the *Trump* parties have refused to modify the Agreement in writing, as Republican Senator John Cornyn pointed out at Blanche's confirmation hearing, and which Acting AG Blanche confirmed in writing.[19]

59.    President Trump has similarly refused to abandon the Fund. For example, on June 3, when asked whether the government had fully abandoned the Fund, the President said "I'd have to ask the lawyers. I don't know."[20] In another interview the same day, he responded to the same question with, "No, a court ruled against it," presumably referring to the May 29 Order in this case, and then continued to defend the Fund, saying he was "very proud to have given [people] pardons" and "thinks they should be reimbursed for a crooked government."[21] Thereafter, on June 6, 2026, the President again made public statements that he still "love[d]" the Fund's purpose of compensating individuals charged and convicted in the January 6 attack—individuals whose lives

---

[18]    Sen. Judiciary Comm. Hr'g Tr. 51:19-23 (July 15, 2026), *available at* https://perma.cc/RD5X-YBPQ.

[19] Questions for the Record for the Hon. Todd Blanche, Nominee for Att'y Gen. of U.S., Before the S. Comm. on the Judiciary, 119th Cong. (July 17, 2026) at 154, https://perma.cc/9TKE-ZNVE.

[20] Aysha Bagchi, *Legal battle over Trump's $1.8B 'anti-weaponization' fund rages on*, USA Today (June 5, 2026), https://perma.cc/JHE2-JLPY.

[21] Pod Force One with Miranda Devine and New York Post, *Donald Trump Unleashed: Bibi, "Are You Effing Crazy?!"*, at 40:34–41:13 (YouTube, June 3, 2026), https://youtu.be/SLnB5l1PxCY?si=GxMARqb-ihyHwBmV&t=2434.

the President believed "were destroyed by dirty cops and by weaponization."[22] The President maintained that "[m]any of those people should be compensated."[23]

60.    On July 30, 2026, the President made clear on social media that he would rather withdraw the Acting AG's nomination for Attorney General than agree to permanently end the Fund.[24] The next day, the President posted that "the so called 'Fund' . . . will not benefit me, but rather the great American Patriots who were hunted down like dogs and whose lives were unfairly and illegally destroyed by the Crooked Joe Biden Administration"[25]— confirming that the Fund is for those purportedly targeted by Democrats alone, and demonstrating that the President maintains his firm support for those the Fund was created to benefit. That same day, he said, "It's dead, but you know, I wish it weren't . . . I'd like to see them compensated."[26]

61.    Given this on-again-off-again whiplash, in which the alleged status of the Fund can change by the hour, it is unsurprising that Defendants have not filed a declaration under penalty of perjury in this or any court stating that the Fund will not move forward. But what never changes is President Trump's exertion of control over DOJ and his steadfast commitment to spending taxpayer funds to compensate his supporters. As he said recently, "a lot of big Trump supporters like it."[27]

62.    Indeed, when Senator Tillis asked Acting AG Blanche directly, "If the President directs you to reverse your decision and move forward with the Fund, will you move forward?," the Acting AG did not answer directly but rather said that "it would be inappropriate for me to

---

[22] Peter Nicholas, *Trump doesn't rule out giving Jan. 6 rioters who attacked police payouts from the 'anti-weaponization' fund*, NBC News (June 7, 2026), https://perma.cc/5256-CCXJ.

[23] *Id.*

[24] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 30, 2026, 11:15 AM), https://perma.cc/FK7Y-SK6U.

[25] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2026, 7:03 AM), https://perma.cc/RM9D-66DQ.

[26] Michael Gold, *Trump Escalates Feud With Senate Over Blanche*, N.Y. Times (July 31, 2026),https://perma.cc/U7DN-9D99.

[27] Acyn (@Acyn), X (Aug. 2, 2026 at 10:34 PM), https://x.com/acyn/status/2084045272599146589?s=46.

comment on hypothetical communications I may or may not have with the President."[28] When asked by Senator Tillis whether he would commit to prohibiting DOJ payouts to January 6 criminals, the Acting AG declined to make that commitment, stating instead that "[e]very claim submitted pursuant to the Federal Tort Claims Act is reviewed on the merits."[29] He further declined to issue a memorandum prohibiting such payments to January 6 criminals, and also avoided answering whether DOJ has participated in any settlement discussions with them, saying only that "it would be inappropriate for [him] to comment."[30] Senator Coons asked if the Department has any alternative plans to compensate individuals who believe they are the target of government weaponization, but rather than responding, the Acting AG simply stated that the Fund "is dead."[31]

63.    As for the Immunity Order, Defendants remain committed to it. On June 3, 2026, when Treasury Secretary Scott Bessent was asked about the Immunity Order and the Settlement Agreement, he confirmed that Treasury "will follow the instructions and the settlement."[32] On July 17, Acting AG Blanche wrote "Yes" when asked if the May 19 "release order" was "still in effect."[33]

## IV. DOJ's August 2 Actions Two Days Before Acting AG Blanche's Committee Vote

64.    Late in the night on Sunday, August 2, 2026, less than 48 hours before Acting AG Blanche's Judiciary Committee vote, the Department of Justice posted to its website a document addressing the Anti-Weaponization Fund and the Immunity Order. Ex. E (August 2 Document). Although this Document purported to rescind the Anti-Weaponization Fund and limit the Immunity Order to secure key votes for Blanche's confirmation, in reality, it did no such thing.

---

[28] *Supra* note 19, at 20.

[29] *Id.*

[30] *Id.* at 25-26. Indeed, the government has issued several payouts to January 6 defendants and FACE Act violators despite its claimed demise of the Fund. *See, e.g.,* Steve Benen, *Anti-Abortion Activist Agrees to 7-Figure Settlement with Trump Justice Department*, MS Now (July 28, 2026), https://perma.cc/5VZG-5DTC.

[31] *Id.* at 140.

[32] Associated Press, *LIVE: Scott Bessent Testifies Before Senate on Trump's 2027 Budget Request*, at 1:05:29–35 (YouTube, June 3, 2026), https://youtu.be/DlTNIH8znn0?t=3929.

[33] *Supra* note 19, at 16.

65.    The first page contains an order signed only by Acting AG Blanche that purports to rescind the May 18, 2026 Order establishing the Anti-Weaponization Fund by stating that the Fund "is" not currently "operative" (August 2 Fund Order). Ex. E at 1.[34]

66.    Paragraph A of that August 2 Fund Order states that "the Attorney General's May 18, 2026 Order establishing the Anti-Weaponization Fund (Fund) is rescinded and shall have no force or effect." *Id.*

67.    Paragraph B states that "For the avoidance of doubt, nothing in this Order is intended to contradict or otherwise be contrary to prior representations by the Department of Justice that the Fund is not operative. No Members were appointed; no funds were transferred; no process for receiving claims was established; no claims were paid." *Id.* Referring to this lawsuit and others, the August 2 Fund Order goes on to say that "several frivolous lawsuits have been filed challenging the Fund, and at least one court has declined to dismiss those claims as moot. This Order establishes, beyond any doubt, that there is no Fund." *Id.*

68.    This August 2 Fund Order is not a binding representation that DOJ will not proceed with the Anti-Weaponization Fund in any manner or under any name. Nor could it make such a representation. It is signed only by Acting AG Blanche, and the parties to the collusive *Trump* agreement that created the Fund have not made a binding modification to that agreement.

69.    Even after the August 2 Fund Order, absent an injunction prohibiting Defendants from doing so, DOJ and other parties to the *Trump* agreement can resurrect the Fund at any time.

70.    The President, who is a named plaintiff in *Trump* and who exerts unprecedented control over DOJ, made clear that he intends to keep the Fund alive, affirming his belief that the January 6 rioters and other Fund beneficiaries "should be paid back for what they were forced to endure."[35]

---

[34] U.S. Dep't of Justice, Att'y Gen., Department of Justice Rescinds Anti-Weaponization Order (Aug. 2, 2026), https://perma.cc/WAZ9-9TQX.

[35] Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 30, 2026, 11:15 AM), https://perma.cc/FK7Y-SK6U; Pres. Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2026, 7:03 AM), https://perma.cc/RM9D-66DQ; Acyn (@Acyn), X (Aug. 2, 2026, at 10:34 PM), https://x.com/acyn/status/2084045272599146589?s=46, https://perma.cc/5RW5-QD2Z.

17

71.     And the August 2 Fund Order does not in any way address or repudiate the President's statements that the Fund may be operational in the future.

72.     Attached to the August 2 Fund Order is a non-binding statement jointly addressing the Anti-Weaponization Fund and the Immunity Order (Press Release). This Press Release is titled "Department of Justice Rescinds Anti-Weaponization Order and Addresses the May 19 release." Although it is written on Office of the Attorney General letterhead, unlike the August 2 Order and the Immunity Order, it does not include the Acting AG's signature or name (or any other official's signature). Ex. E at 2.

73.     Regarding the Immunity Order, DOJ says that "the May 19, 2026 Order regarding a mutual release of claims applies by its terms only retroactively" and notes that "the terms 'Lawfare and/or Weaponization' in that Order were already defined in the Settlement Agreement." *Id*.

74.     After incorporating the Acting AG's testimony before the Senate Judiciary Committee by reference, the Press Release states that "it is DOJ's interpretation that the [Immunity Order] only has any effect, including on any release of claims, on the named parties in the lawsuit referenced in the Order." *Id.*

75.     This non-binding statement does not even purport to rescind the Immunity Order.

76.     And it is not consistent with the text of the Immunity Order, which applies beyond the "named parties" in the *Trump* lawsuit. The named parties in the lawsuit are President Trump, Donald Trump Jr., Eric Trump, the Trump Organization, the IRS, and the Treasury Department. But the Immunity Order extends far beyond those parties to include "related or affiliated individuals (including, without limitation, family or others filing jointly), or parties including trusts, parent, sister, or related companies, affiliates, and subsidiaries," as well as "any matters currently pending or that could be pending . . . before Defendants *or other agencies or departments*." Ex. B (emphasis added).

77.     The Press Release also only purports to represent "DOJ's interpretation" and is silent about its impact on agencies other than DOJ; how agencies other than DOJ have interpreted

the Immunity Order; and whether other federal agencies intend to drop, or already have dropped, investigations into the conduct of President Trump, his families, and their businesses that occurred before May 18, 2026.

78.    The August 2 Document confirms that President Trump's government still refuses to commit that the Anti-Weaponization Fund will not proceed in any manner or under any name. It also confirms that President Trump's government remains steadfastly committed to terminating existing audits and releasing the tax liability of President Trump, his sons, and their businesses.

## V.  Anti-Weaponization Fund

### A.  Creation of the Anti-Weaponization Fund

79.    As part of the Agreement, Defendants created the Anti-Weaponization Fund "[t]o provide a systematic process to hear and redress claims of others who, like [the *Trump* plaintiffs], state that they incurred harm from similar Lawfare and Weaponization." Ex. A ¶ III.C.

80.    The Agreement defines "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *Id.* ¶ II.C.

81.    The Anti-Weaponization Fund "shall consist of five Members." *Id.* ¶ IV.B. Within thirty days of the effective date of the Agreement, May 18, 2026, all five members will be appointed by the Attorney General, and one of the five will be chosen in consultation with congressional leadership. They are subject to removal at will by the President. *Id.* Final decisions can be made by as few as two members. *Id.* ("A quorum is three Members. A majority of a quorum is authorized to take action.").

82.    "The Anti-Weaponization Fund shall have the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* ¶ IV.C. By the terms of the Agreement, these procedures need not be made public. *Id.* Rather, the Fund has "discretion" whether to "make those procedures public in whole or in part." *Id.*

19

83.     The Fund shall "have the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights, grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* ¶ IV.D.

84.     To apply for recovery from the Fund, a claimant "must assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization." *Id.* ¶ V.C.

85.     The Fund must consider "the totality of the circumstances" to assess each such claim, including "actual damages," "attorneys' fees paid by the claimant as a result of the Lawfare and Weaponization," and "[a]ny time the claimant spent in prison or otherwise in federal prison [sic] or custody as a result of the Lawfare and Weaponization." *Id.* ¶ V.D.

86.     According to the Agreement, Anti-Weaponization Fund payments will not be subject to judicial review, *Id.* ¶ VI.B, and the identity of claimants and amount of compensation paid by the Fund will not be made public. *Id.* ¶¶ IV.E, V.F.

87.     The Fund will stop processing claims no later than December 1, 2028, and after December 15, 2028, the Fund will transfer any money remaining in its account "to the Department of Commerce, Interior, or another appropriate federal government account as designated by the President." *Id.* ¶¶ IV.G, IV.H.

88.     The Anti-Weaponization Fund is funded by a $1.776 billion payment from the Judgment Fund. Ex. C ¶ C.[36] The Judgment Fund is an appropriation by Congress available to the Attorney General for a specific and limited purpose: payment from the Judgment Fund can be made for "final judgments rendered by a district court," as well as "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." 28 U.S.C. § 2414.

89.     According to the Funding Order, once Treasury has sent Judgment Fund money to the Anti-Weaponization Fund, "the United States has no liability whatsoever for the protection or

---

[36] Acting Att'y Gen. Todd Blanche, Order (May 18, 2026), https://perma.cc/SV39-DB4Q.

20

safeguarding of those funds, regardless of bank failure, fraudulent transfers, or any other fraud or misuse of the funds." Ex. C ¶ D.

90.     Some of the $1.776 billion in funds may be used for "per diems, administrative services, funds, facilities, staff, travel, and other support services as may be necessary to carry out the mission of the Anti-Weaponization Fund." *Id.* ¶ E.

91.     On May 21, 2026, DOJ sent a fact sheet to Senate Republicans about the Anti-Weaponization Fund ahead of a meeting with Acting AG Blanche. Ex. D.[37]

92.     Although the fact sheet largely confirmed the language in the Agreement and Funding Order, it made several additions. For example, the fact sheet states that "[t]here is no partisan restriction: Democrats can submit claims, too." *Id.* It does not, however, say that those who claim to have been *targeted* by non-Democrats can submit claims. It also asserts that "the Commissioners must consider a claimant's personal conduct and character when making a [claim] determination." *Id.* It notes that "[t]he A/AG committed to sharing [the Fund's quarterly] reports with Congress (with appropriate redactions to accommodate for privacy concerns and privileges)" and that "Senators and Members are welcome to submit additional inquiries regarding the Fund to DOJ OLA at any time." *Id.* Finally, it contends, but does not require, that "[t]he Fund can be audited, including by a third party" and that "[t]he Fund must take steps to protect private information and avoid fraud." *Id.*

93.     Of course, these statements are not and could not be binding given that "[t]he Settlement Agreement may be modified only by the written agreement of the Parties," Ex. A ¶ VIII.

**B.  Trump and His Allies' Longstanding Fixation on Democratic "Weaponization"**

94.     The creation of the Anti-Weaponization Fund follows directly from President Trump and his allies' longstanding and frequent accusations that Democrats used the government and the legal system as political weapons.

---

[37] Andrew Desiderio (@AndrewDesiderio), X (May 21, 2026, at 10:43 AM ET), https://perma.cc/7NF9-9XGW.

95.    For example, in June 2023, after DOJ charged then-former President Trump with mishandling classified documents, Trump posted a video on social media exclaiming, "This is warfare for the law . . . Our country is going to hell, and they come after Donald Trump, weaponizing the Justice Department, weaponizing the FBI."[38]

96.    Republican lawmakers quickly adopted the same language. Florida Governor Ron DeSantis posted that "the weaponization of federal law enforcement represents a mortal threat to a free society," and then-Speaker of the House Kevin McCarthy pledged on Twitter that House Republicans would "hold this brazen weaponization of power accountable."[39]

97.    Even before his election to a second term, members of President Trump's campaign spent months developing a scheme to compensate Trump's political allies who were purportedly the victims of "weaponization."[40]

98.    On Day 1 of his second administration, President Trump issued an executive order titled "Ending the Weaponization of the Federal Government," claiming to "ensure accountability for the previous administration's weaponization of the Federal Government against the American people." Exec. Order No. 14147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025).

99.    As examples of "weaponization," the order cited "activities directed at parents protesting at school board meetings," "politically motivated funding revocations," and the "ruthless[] prosecut[ion of] more than 1,500 individuals associated with January 6." *Id.*

100.    And on the day she took office, then-Attorney General Pam Bondi established the Weaponization Working Group to "conduct a review [sic] the activities of all departments and agencies exercising civil or criminal enforcement authority of the United States over the last four

---

[38] Roll Call Factbase Videos, *Donald Trump Vlog: Statement on Indictment — June 8, 2023* at 1:50 (YouTube, May 26, 2025), https://www.youtube.com/watch?v=D74k5KbDdxs.

[39] *Trump Indicted: Trump Is Charged in Classified Documents Inquiry*, N.Y. Times (June 8, 2023), https://perma.cc/NX5Q-AD2D.

[40] Adam Cancryn et al., *Trump's 2024 campaign discussed an anti-weaponization fund. They didn't know where to get the money — until now*, CNN (May 21, 2026), https://perma.cc/6RZR-2JXR.

years . . . to identify instances where . . . conduct appears to have been designed to achieve political objectives or other improper aims."[41]

101.    As examples of "weaponization," Bondi's memo cited Special Counsel Jack Smith's investigation of Trump, New York prosecutors' cases against Trump, the investigation and prosecution of January 6 rioters, and criminal prosecutions under the FACE Act, a statute passed with overwhelming bipartisan support, among others.[42]

102.    The Weaponization Working Group issued its first report in April, charging that "[t]he Biden DOJ" improperly "pursued more severe charges and significantly harsher sentences for peaceful pro-life defendants than violent pro-abortion defendants," "ignored" anti-abortion groups while engaging with "pro-abortion" groups, and engaged in conduct and comments that evinced bias, among other allegations.[43]

103.    The Agreement relies on similar examples of "weaponization."

104.    For examples of lawfare and weaponization, the Agreement lists "the Biden Administration's abuse of the FACE Act, the Biden Administration's wrongful labeling of certain parents as domestic terrorists, and the IRS's targeting of groups based on improper ideological criteria." Ex. A ¶ II.C.

105.    DOJ's May 21 fact sheet described "victims of lawfare and weaponization" as including those "whose online speech was censored at the behest of the government, parents silenced at schoolboards, Senators whose records were secretly subpoenaed, [and] churchgoers targeted by the FBI." Ex. D.

106.    The Trump-Vance administration's focus on "weaponization" by Democrats has also resulted in substantial monetary relief and protection for those it considers victims.

---

[41] Att'y Gen. Pam Bondi, *Memorandum re: Restoring the Integrity and Credibility of the Department of Justice*, Dep't of Just. (Feb. 5, 2025), https://perma.cc/UK34-L9PP.
[42] *Id.*
[43] Dep't of Just., *The Biden Administration's Weaponization of the Freedom of Access to Clinic Entrances Act*, https://perma.cc/35FK-YYXY.

107.    DOJ reached seven-figure settlements with at least two anti-abortion activists this year: Paul Vaughn, who was convicted under the FACE Act for blockading one of NAF's member clinics and later pardoned by President Trump, and Mark Houck, whose FACE Act prosecution resulted in acquittal but whose lawsuit seeking damages for that prosecution was dismissed by a trial judge.[44]

108.    DOJ also reached a $1.25 million settlement with Michael Flynn, a former Trump administration official who pleaded guilty to a felony count of making false statements to the FBI and who Trump pardoned in 2020.[45]

109.    President Trump pardoned 23 anti-abortion activists who had been convicted of criminal violations under the FACE Act and/or related crimes.[46]

110.    And of course, President Trump granted sweeping clemency for people charged or convicted for their role in the Capitol insurrection on January 6, 2021, on his first day of his second term.[47] The Trump-Vance administration also recently moved to dismiss the seditious conspiracy case against the Oath Keepers and the remaining Proud Boy convictions related to January 6.[48] As a district court gravely expressed, the dismissal of such convictions "diminishes the gravity of that day, denigrates the work of the prosecutors and law enforcement officers who secured these convictions, and excuses criminal acts that caused a centuries-long pillar of our democracy—the

---

[44] *Id.* at 30 & n. 202; *see also* Steve Benen, *Anti-abortion activist agrees to 7-figure settlement with Trump Justice Department*, MS NOW (July 28, 2026), https://perma.cc/8ZC4-ESLS; Julianne McShane, *DOJ paid more than $1 million in settlement to anti-abortion protester — after a federal judge tossed his suit,* MS NOW (Apr. 14, 2026), https://perma.cc/BZ5V-DRT8.

[45] Alan Feuer, *Justice Dept. Settles Flynn's Wrongful Prosecution Suit for $1.25 Million*, N.Y. Times (Mar. 25, 2026), https://perma.cc/B8T5-NNJC.

[46] *Clemency Grants by President Donald J. Trump (2025-Present)*, Dep't of Just. (updated Mar. 2, 2026), https://perma.cc/P6G8-JD9A.

[47] The White House, *Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021* (Jan. 20, 2025), https://perma.cc/85YB-RAP3.

[48] Carrie Johnson, *Judge reluctantly dismisses case against Oath Keepers militia group over Jan. 6 riot*, NPR (Aug. 5, 2026), https://perma.cc/VZ7H-435Q; *see also* Kyla Guilfoil & Ryan J. Reilly, *Judge tosses remaining Jan. 6 Proud Boys convictions after DOJ request*, NBC News (July 10, 2026), https://perma.cc/8RJ8-NX38.

peaceful transfer of presidential power—to buckle." Mem. Op. & Order, *United States v. Rhodes*, No. 1:22-cr-00015 (D.D.C. Aug. 4, 2026), ECF No. 981.

### C.  The Trump-Vance Administration's Own "Lawfare and Weaponization"

111.    Notably, none of the administration's efforts to combat "weaponization" include any mention or review of abuses of government authority by Republican officials.

112.    But President Trump himself has used "the levers of government power" in unprecedented ways "to target individuals, groups, and entities for improper and unlawful political, personal, and/or ideological reasons." *See* Ex. A ¶ II.C.

113.    During his first term, Trump broke historical norms by being the first president to reject the post-Watergate firewall that separated the White House's political decisions from independent DOJ criminal investigations.[49]

114.    In his second term, Trump has been arrogating and using power in increasingly unprecedented and abusive ways to carry out his personal political agenda.

115.    For example, DOJ has sought indictments against Trump's political opponents, including former FBI Director James Comey, New York Attorney General Letitia James, and six Democratic members of Congress.[50] It has also launched investigations into Trump's critics like California Senator Adam Schiff, former New Jersey Governor Chris Christie, and former Special Counsel Jack Smith.[51] Trump revoked the security clearances of 50 people he accused of aiding former President Biden's presidential campaign, including former top intelligence officials. Exec. Order No. 14152, *Holding Former Government Officials Accountable for Election Interference and Improper Disclosure of Sensitive Governmental Information*, 90 Fed. Reg. 8343 (Jan. 20, 2025).

---

[49] *See*, *e.g.*, Megan Mineiro, *Experts Troubled by Lack of Independence at Trump's Justice Department*, Courthouse News Service (Feb. 14, 2020), https://perma.cc/V59Q-8NPC.

[50] Peter Charalambous et al., *Here's a list of the individuals, including James Comey, targeted by the Trump administration*, ABC News (Apr. 29, 2026), https://perma.cc/8YBG-DKFD.

[51] *Id.*

116. Trump also reinstituted a first-term executive order that made it easier to fire federal workers—including by adding a provision stating that failure to "faithfully implement administration policies" is grounds for dismissal. Exec. Order No. 14171, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, 90 Fed. Reg. 8625, 8626 (Jan. 20, 2025). Within weeks, DOJ fired more than a dozen prosecutors who worked on Special Counsel Jack Smith's investigations into President Trump,[52] demoted seven of the most senior prosecutors in the District of Columbia's U.S. Attorney's Office to entry-level roles for political reasons,[53] and reassigned nearly twenty career attorneys to undesirable or sham positions because their work was contrary to the President's agenda.[54] A few months later, it fired several prosecutors involved in January 6 criminal cases.[55]

117. President Trump has also deployed thousands of federal agents and national guard troops to cities run by leaders affiliated with the Democratic Party, noting that he was targeting the "enemy within."[56]

118. President Trump signed sweeping executive orders targeting prominent law firms and lawyers that had represented Democrats or taken litigation positions adverse to him. *See, e.g.*, Exec. Order No. 14230, *Addressing Risks from Perkins Coie LLP*, 90 Fed. Reg. 11781 (Mar. 6, 2025); Exec. Order No. 14246, *Addressing Risks from Jenner & Block*, 90 Fed. Reg. 13997 (Mar. 25, 2025).

---

[52] Glenn Thrush et al., *Justice Dept. Fires Prosecutors Who Worked on Trump Investigations*, N.Y. Times (Jan. 27, 2025), https://perma.cc/K3AB-LVMP.

[53] Spencer S. Hsu, *Seven top D.C. prosecutors demoted in purge by Trump U.S. attorney*, Wash. Post (Feb. 28, 2025), https://perma.cc/6H4E-UTF8.

[54] Andrew Goudsward and Sarah N. Lynch, *Trump administration reassigns close to 20 Justice Department officials, sources say*, Reuters (Jan. 23, 2025), https://perma.cc/K8WF-YRP5.

[55] Alanna Durkin Richer, *DOJ abruptly fires 3 prosecutors involved in Jan. 6 criminal cases, AP sources say*, PBS News (June 28, 2025), https://perma.cc/Q238-LS7R.

[56] *Trump defends use of the U.S. military against the "enemy within,"* NPR (Sep. 30, 2025), https://perma.cc/JE3B-C82K.

119.    The Trump-Vance administration has illegally sought to withhold federal funds to coerce or punish perceived political opponents. For example, the administration has targeted states led by Democratic officials with funding freezes and cuts.[57]

120.    But the Anti-Weaponization Fund does not even purport to cover victims of the Trump-Vance administration's weaponization. The Agreement defines Lawfare and Weaponization as being imposed by "Democrat" officials or federal employees, not officials or employees with other (or no) party affiliation. Ex. A ¶ II.C. It also characterizes the eligible claimants as being "like Plaintiffs" in the case against the IRS, in that they "incurred harm from similar Lawfare and Weaponization." *Id.* ¶ III.C.

121.    When answering questions from reporters about the newly created Anti-Weaponization Fund on May 20, 2026, President Trump confirmed this inherent bias, stating, "the Obama administration started it, the Biden administration was horrible in terms of, what they've done to people is incredible, and we're reimbursing people for their legal fees and for their costs and for anybody involved . . . It was the most violent thing I've ever seen in politics, what they did."[58]

### D. Trump Allies' Claims to the Anti-Weaponization Fund

122.    President Trump's allies quickly staked out their claims to the Anti-Weaponization Fund.

123.    The day after the creation of the Anti-Weaponization Fund, Michael Caputo, a former Trump administration official, posted a letter on X requesting $2.7 million in "restitution and reimbursement" from the Fund. He characterized him and his family as "survivors of the illegal Russiagate investigations" and seeks money for the "costs of the decade-long attack."[59]

---

[57] *See, e.g.*, Minho Kim, *Health Dept. Freezes $10 Billion in Funding to 5 Democratic States*, N.Y. Times (Jan. 6, 2026), https://perma.cc/BQA5-FRBT.

[58] The White House, *President Trump Gaggles with Press Upon Arrival at Joint Base Andrews* (YouTube, May 20, 2026), http://youtube.com/watch?v=CwQB96husNE.

[59] Michael Caputo (@MichaelRCaputo), X (May 19, 2026, 7:17 PM ET), https://perma.cc/UJN4-EW32.

124.    Enrique Tarrio, the Proud Boys leader sentenced to 22 years for seditious conspiracy over the January 6 insurrection, said he planned to apply to the Fund and assumed he could get between $2 and $5 million.[60]

125.    Jenny Cudd, another January 6 defendant, told reporters that "all J6ers will apply for restitution," noting that news of the Anti-Weaponization Fund was widely circulating among January 6 defendants on social media and "group chats."[61]

126.    Caroline Engelbrecht, a prominent election denier and founder of True the Vote, a group that amplified conspiracies that the 2020 election was stolen, stated: "I would put myself and True the Vote . . . squarely in that camp who have been targeted, and we have the receipts to show just how deep that targeting ran. And hopefully, we will see some level of compensation."[62]

127.    Several attorneys aligned with Trump's allies have confirmed that they, too, have already received many requests about submitting claims to the Fund.[63]

128.    For example, Steve Crampton, senior counsel at the Thomas More Society, which defends and advocates on behalf of abortion opponents prosecuted under the FACE Act, said his group is "actively exploring available avenues to seek compensation for clients who were unfairly targeted by politically motivated government overreach."[64]

129.    Another such lawyer, Mike Howell, submitted a request to DOJ declaring his candidacy for one of the Anti-Weaponization Fund's five member positions in order to destroy the "mythology" of the "Radical Left." He stated that, if selected, he would organize "a national gathering of the thousands of victims of weaponization," including "those who had to pay legal

---

[60] Dan Rosenzweig-Ziff, *'I'm Not Greedy': January 6 Rioters and Trump Allies Eye $1.8 Billion 'Weaponization' Fund*, Reuters (May 20, 2026), https://perma.cc/VK2B-P5K2.

[61] Gabe Kaminsky, *Trump's $1.7+ billion fund sparks rush to capitalize: "All J6ers will apply*," CBS News (May 19, 2026), https://perma.cc/KR7C-25KX.

[62] *True the Vote founder hopes "we will see some level of compensation" from Trump's weaponization fund*, Media Matters for America (May 21, 2026), https://perma.cc/WK9W-GS3G.

[63] *Id.*

[64] Brian Schwartz, C. Ryan Barber & Louise Radnofsky, *Trump Allies and Foes Jockey for Payouts From 'Anti-Weaponization' Fund*, Wall St. J. (May 21, 2026), https://perma.cc/AP7G-EDCF.

28

fees because of their support for President Trump, those who were sent to prison, including those involved with January 6th, 2021."[65]

130.    And Peter Ticktin, who represents more than 400 January 6 defendants, said the $1.776 billion-Fund may not be sufficient to cover all of the claims: "People lost multi-million dollar businesses while they were locked up. I don't think the DOJ is ready for us yet."[66]

131.    Trump himself suggested the fund may be too small. "You're talking about peanuts," he told reporters at Joint Base Andrews on May 20, 2026, asserting that "what [the Biden and Obama administrations] did in terms of weaponization . . . destroyed the lives of many, many people." [67]

## VI. Immunity Order

### A.  Scope of the Unauthorized Immunity Order

132.    As written, the May 19, 2026, Immunity Order issued by Acting AG Blanche forever bars and precludes the United States "from prosecuting or pursuing" any claims against President Trump, his sons, their businesses, and an open-ended universe of affiliates, including claims for "monetary relief, damages, examinations or similar or related reviews, appeals, debt relief, costs, attorney's fees, expenses, and/or interest."

133.    The Attorney General's authority to settle tax audits is limited to matters referred to him by the IRS under 26 U.S.C. § 7122, and the tax issues presented in the *Trump* lawsuit for damages have nothing to do with his or anyone else's underlying tax liability. *E.g.*, *Brubaker v. United States*, 342 F.2d 655, 662 (7th Cir. 1965) ("the excess tax liability dispute was with the Commissioner of Internal Revenue and such liabilities cannot be compromised by the Attorney

---

[65] Gabe Kaminsky, *Ally of DOJ pardon attorney seeks to join board of Trump's $1.7+ billion fund*, CBS News (May 20, 2026), https://perma.cc/KW6J-3EQD; *see also* Letter from Mike Howell, President of Oversight Project, to Todd Blanche, Acting Att'y Gen. (May 20, 2026), *available at* https://www.scribd.com/document/1041476230/Letter-to-Acting-AG-Blanche-From-Mike-Howell-and-Oversight-Project.

[66] *Supra* note 60.

[67] *President Trump Gaggles with Press Upon Arrival at Joint Base Andrews*, The White House (May 20, 2026), http://youtube.com/watch?v=CwQB96husNE.

General or the Department of Justice unless and until the Commissioner refers same to the Department for prosecution or defense.")

134. The Immunity Order purports to resolve tax liabilities based on the Acting AG's assumed referral from the IRS to DOJ to defend the *Trump* lawsuit. But the Acting AG never had that authority because the tax issues in *Trump* had nothing to do with the *Trump* plaintiffs' tax liability, let alone the tax liability of unnamed parties. Regardless, because the *Trump* lawsuit was collusive, as the judge in that case determined, 2026 WL 2015525, at *8, *17, there was no viable case for the Acting AG to compromise. Similarly, the Acting AG could not compromise a case where the statute of limitations had already expired.

135. Besides being legally unauthorized, the Immunity Order will force IRS employees to terminate any ongoing tax examinations (i.e., audits), for President Trump, Eric Trump, Donald Trump, Jr., the Trump Organization, the Trump family, those filing jointly with the Trump family, an undefined number of related or affiliated individuals or parties that includes trusts, parent, sister, or related companies, affiliates, and subsidiaries.

136. According to its terms, the Immunity Order bars the IRS from opening any audits of the same group for all tax returns filed before May 18, 2026. The Immunity Order also extends beyond termination of existing audits or opening new audits. By its terms, an auditor carrying out a routine audit is prohibited from pursuing "similar or related reviews" by looking into "related" individuals or companies that might be implicated by an ongoing audit.

137. The Immunity Order also covers not just tax audits and forgiveness of tax liability, but also any non-tax issues, as it applies to "any matters currently pending or that could be pending . . . before Defendants [Treasury and the IRS] *or other agencies or departments*." Ex. B (emphasis added). Thus, the Immunity Order, if given effect, would forever shield the President, his family and their businesses, and potentially hundreds of unidentified "related" or "affiliated" individuals and businesses from federal audit, investigation, and prosecution by all agencies, including, for example, the Securities and Exchange Commission or the Department of Defense or inspector

30

general offices, for any wrongdoing that occurred before May 18, 2026, whether currently known or unknown.

### B. The Immunity Order's Inconsistency with Federal Law Prohibiting Political Abuse of Tax Authorities and Longstanding IRS Procedure

138.    In the 1970s, President Nixon told his aides that he wanted "to be sure" his next IRS Commissioner was "a ruthless son of a bitch, that he will do what he's told, that every income tax return I want to see I see, that he will go after our enemies and not our friends."[68] President Nixon lamented IRS investigations into Republicans, and asked, "When the Christ are they going to go after some Democrats?"[69]

139.    President Nixon attempted to weaponize the IRS by requesting that they audit hundreds of his political enemies, including members of Congress, mayors and governors, non-profit organizations, Black civil rights leaders, members of the media, labor leaders, and businesspeople.[70] The White House also helped President Nixon's supporters with their tax audits and obtained tax information about various taxpayers at the request of the president. Congressional investigation subsequently revealed that the IRS under-determined President Nixon's liability by more than $400,000.

140.    In response to President Nixon's shocking attempts to weaponize the IRS to target his political enemies and benefit his supporters, Congress enacted substantial protections to restrict the president's access to tax information and prevent future presidents from carrying out partisan plots under the auspices of tax administration. *See* 26 U.S.C. §§ 7217, 6103.

141.    In 1976, Congress overhauled the Internal Revenue Code's confidentiality provisions to restrict the President's access to tax returns. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976). Section 6103(a) of the Code prohibits the disclosure of taxpayer

---

[68] Richard M. Nixon, et al., *Conversation 498-015*, Richard Nixon Presidential Library and Museum, at 37:40 (May 13, 1971), https://www.nixonlibrary.gov/white-house-tapes/498/conversation-498-015.

[69] *Id.*

[70] Eileen Shanahan, *An Explanation: The Allegations Nixon's I.R.S. Interference,* N.Y. Times (June 14, 1974), https://perma.cc/Q3T8-WE7P.

returns and other return information. 26 U.S.C. § 6103(a). If a taxpayer's information is unlawfully disclosed, that taxpayer can seek damages, generally up to a statutory cap (the same provision the *Trump* plaintiffs invoked, although disregarding the cap entirely). *Id*. § 7431(c)(1).

142.    In 1977, the IRS adopted a requirement that the President's and Vice President's tax returns be subject to a mandatory audit each year they are in office.[71] By making these examinations mandatory, the IRS expressly intended to insulate the process from political interference.[72] As the IRS stated when this provision was added to the Internal Revenue Manual (IRM), "automatically auditing the returns of the President and Vice President . . . removes from any particular employee of the IRS the necessity of having to make a decision as to whether to audit the particular returns involved."[73] As IRS previously represented, "[i]n the more than 40-year history of the mandatory examination procedures, the IRS is not aware of any reports of improper bias or partiality in the examination of Officeholders' returns."[74]

143.    In 1998, after recordings were released of President Nixon making shocking statements about accessing tax returns and having the IRS go after "our enemies and not our friends," Congress enacted 26 U.S.C. § 7217 with overwhelming bipartisan support to explicitly limit presidential and political interference with IRS audits.[75]

144.    Section 7217 prohibits the President, Vice President, White House employees, and most cabinet-level officials (including the Secretary of the Treasury) from "request[ing], directly

---

[71] *See* Staff of Joint Comm. on Internal Revenue Tax'n, Examination of President Nixon's Tax Returns for 1969 through 1972, S. Rep. No. 93-768, at 4 (1974); H.R. Rep. No. 116-186, at 4, 24-27 (2019).

[72] *See* Staff of Joint Comm. on Tax'n, 116th, Cong., No. JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* at 20-21 (Feb. 4, 2019), https://perma.cc/9HY2-ZYAT.

[73] *Id.*

[74] H. Comm. on Ways & Means, Attachment D: Briefing Materials and Exhibits, in Ways and Means Comm. Investigation of the IRS's Mandatory Audit Program Under the Prior Administration (Dec. 30, 2022), https://perma.cc/3UCX-WBJF.

[75] Section 7217 of the Internal Revenue Code passed with a 402-8 vote in the House and a 96-2 vote in the Senate. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 1105, 112 Stat. 685, 711 (1998), https://www.congress.gov/bill/105th-congress/house-bill/2676/all-info.

32

or indirectly, any officer or employee of the Internal Revenue Service to conduct *or terminate* an audit or other investigation of any particular taxpayer." *Id.* § 7217(a) (emphasis added).

145.    The prohibition in section 7217 does not extend to the Attorney General, *see id.* § 7217(e), but the Attorney General nevertheless cannot request termination of an audit for a particular taxpayer on behalf of the President, Vice President, White House employees, or other cabinet members, as those individuals cannot make such requests "directly or indirectly," *id.* § 7217(a); *see Trump*, 2026 WL 2015525, at *15–16.

146.    Congress also created a mandatory reporting requirement to ensure that prohibited requests would be investigated by an independent inspector general. Any IRS employee who receives a request that is prohibited under section 7217 must report that request to the Treasury Inspector General for Tax Administration (TIGTA). 26 U.S.C. § 7217(b). Any IRS employee who receives such a request but fails to report it is subject to a $10,000 fine or 5 years imprisonment, or both. *Id*. § 7217(d).

147.    The Internal Revenue Code separately requires that IRS employees report in writing a "violation of any revenue law by any person." *Id*. § 7214(a)(8). If an IRS employee fails to do so, that employee "shall be dismissed from office or discharged from employment," and subject to a $10,000 fine or 5 years imprisonment, or both. *Id.* § 7214(a); *see also* 26 C.F.R. § 301.7214-1 (requiring report to be submitted "to the Commissioner, or to a regional commissioner or district director").

### C.  Audit and Audit Closure Processes

148.    The Internal Revenue Manual (IRM) is the IRS's "single official compilation of IRS policies, procedures and guidelines." IRM 1.11.2.1(1). It serves as the primary source of information and procedures that IRS employees are required to follow in carrying out their duties under the Internal Revenue Code. IRM 1.11.2.2(1). It includes "information integral to the employee's job responsibilities" and "affects their evaluation." IRM 1.11.2.2(2). The IRM "remain[s] in effect until changed, superseded, or obsoleted" by certain IRS guidance. IRM 1.11.2.2(6).

33

149.    The IRM includes detailed procedures for opening, conducting, and terminating all audits, including presidential audits. IRS employees, including auditors, must follow the IRM's procedures in carrying out audits.

### 1.    Mandatory Presidential Audits Under the Internal Revenue Manual

150.    President Trump, like every president since 1977, is subject to an audit of his taxes each year he is in office. IRM 4.2.1.15 ("The individual income tax returns for the President and Vice President are subject to mandatory examinations and cannot be surveyed."). This includes returns for tax years 2016 through 2020, and 2024 through the remainder of his final term.

151.    The IRM sets forth a detailed process by which the President's tax returns are to be audited by career IRS employees, including mandatory steps that individual auditors must take in opening, conducting, and closing a presidential audit. IRM 4.2.1.15.

152.    An individual auditor "must be assigned" to examine the President's returns. IRM 4.2.1.15(9); *see also* IRM 3.28.3.5.3(3). As the IRS stated, "[t]he mandatory audit process for Officeholders is handled by career IRS employees and managers."[76]

153.    The lead auditor and all other non-managerial auditors assigned to examine the President's tax returns are bargaining unit employees represented by NTEU. The lead auditor maintains "contact with the authorized representatives of the President." IRM 3.28.3.5.3(3). Thus, the President, or his authorized representative, has knowledge of the individual IRS employees auditing his returns.

154.    When an NTEU-represented auditor completes an audit of the President's tax returns, "[t]he returns are subject to mandatory review and must be closed directly to the Employee Audit Reviewer in Baltimore Technical Services." IRM 4.2.1.15(15)(b). The entire audit package (including the physical case file or email files) is either physically mailed or emailed by an NTEU-represented employee to the Employee Audit Reviewer, who is also represented by NTEU.

155.    During this final review, the Employee Audit Reviewer must verify that the audit followed established IRS procedures and that the appropriate conclusion was reached. Once

---

[76] *Supra* note 74.

verified, an NTEU-represented employee in the Baltimore Technical Services Unit will post the outcome of the audit to the IRS internal system and provide "Centralized Case Processing with advance notice when the return is being closed." IRM 4.2.1.15(15)(b). Following this review and posting, the processing and audit process is complete and the audit is closed.[77]

### 2. Other Audits

156.    Audits of individuals and businesses are likewise carried out by career IRS auditors represented by NTEU. Audits of individuals and smaller business entities are conducted by NTEU auditors in the Small Business and Self-Employed Division. Audits of larger business entities are conducted by NTEU auditors in the Large Business and International Division. While management provides oversight and direction for an ongoing audit, the audit itself is conducted and closed by auditors represented by NTEU.

157.    Within the Large Business and International Division, "Package Audit Procedures" require the audit team to inspect all returns (both business and personal) related to the primary return being audited. IRM 4.10.5.1(1).

158.    Once the audit investigation has been completed, the audit team issues a revenue agent report, which summarizes all the proposed adjustments and provides the individual or entity with the additional net tax owed to the government, or the net refund. IRM 4.10.8.

159.    An NTEU-represented employee then closes the audit by sending the physical or electronic audit file to a IRS's Technical Services Unit, where an NTEU-represented employee then posts the outcome to the IRS internal system.

### D. Ongoing Audits of President Trump and His Businesses

160.    President Trump, his family, and the Trump Organization own a sprawling array of hundreds of businesses that have been subject to audits by the IRS over the years.

161.    In 2016, President Trump's tax attorneys represented that his returns had been under continuous examination since 2002.[78] During his first term, President Trump expressed that it was

---

[77] *Supra* note 72, at 22.

[78] Letter from Sheri A. Dillon and William F. Nelson to Mr. Donald J. Trump, Re: Status of U.S. federal income tax returns (Mar. 7, 2016), https://perma.cc/XQ38-YL94.

"very unfair" that he was "always audited," [79] and his administration extended these complaints to the mandatory presidential audit. On August 3, 2026, President Trump confirmed that he has been "audited every year for my entire life," and repeated that he "was treated very unfairly by the I.R.S."[80]

162.    In 2019, the House Ways and Means Committee launched a multi-year investigation into IRS's presidential audit program. As part of this investigation, Treasury provided Congress with detailed information about the operation of this process and the ongoing audits of President Trump.[81]

163.    Treasury confirmed that "mandatory examinations" apply to "returns filed while President."[82]

164.    The Committee's investigation found a number of inconsistencies in President Trump's tax returns, including unsubstantiated charitable contributions, questionable carryover of losses, potential evasion of the gift tax, unsupported unreimbursed expense deductions, and other improprieties totaling tens of millions of dollars.[83]

165.    Public reporting and investigation of President Trump's previous tax returns show substantial gaps between the earnings figures President Trump touted in financial disclosures and the losses he claimed on tax forms, as well as inconsistent business expense claims that misleadingly lowered President Trump's tax liabilities.[84]

---

[79] Jenna Johnson, *Donald Trump says IRS audits could be tied to being a 'strong Christian'* Wash. Post (Feb. 26, 2016), https://perma.cc/68A8-DM32.

[80] Andrew Duehren, *Republicans Let Trump Keep Unparalleled Benefit: I.R.S. Immunity,* N.Y. Times (Aug. 3, 2026), https://perma.cc/3UM3-NR6A.

[81] This information is included in the House Ways and Means Committee Report released in 2022. *See infra* note 83.

[82] Letter from Douglas W. O'Donnell, Acting Comm'r, IRS, to Richard E. Neal, Chairman, H. Comm. on Ways & Means 2 (Dec. 15, 2022) (on file with House Comm. on Ways & Means), https://perma.cc/ZS7G-QDHD.

[83] *Report on the Internal Revenue Service's Mandatory Audit Program Under the Prior Administration (2017-2020),* H. Comm. On Ways & Means 22 (Dec. 20, 2022), https://perma.cc/69BT-HY3U.

[84] Russ Buettner et al., *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance*, N.Y. Times (Sep. 27, 2020), https://perma.cc/HA4L-VTJ4.

166.    Given the complexity of President Trump's tax returns, as well as hundreds of flow-through entities associated with President Trump's various businesses, there has historically been a multi-year delay between when President Trump's returns are filed, when the IRS commences an audit, and when an audit is closed.

167.    For example, in December 2022, IRS audits of the individual tax returns of President Trump for years 2015 to 2019 were still ongoing. The audits also included returns for two of President Trump's companies, DJT Holdings Managing Member, LLC and DJT Holdings, LLC, for tax years 2015 through 2020.[85]

168.    President Trump's tax returns were reportedly still under audit in 2024 for improperly writing off losses from his Chicago Tower twice, an investigation that could result in an assessment of $100 million in tax liability.[86]

169.    Eric Trump confirmed in 2024 that the IRS audit of the Chicago Tower was ongoing.[87] This audit included DJT Holdings, LLC, the holding company for the Chicago Tower at the center of the write-offs.

170.    DJT Holdings, LLC, is managed by Eric Trump and Donald Trump, Jr.

171.    The Immunity Order's exemption of the President from audits and tax liability comes after the President's financial disclosures revealed that he made an eye-popping $2.2 billion during his first year back in office, nearly quadrupling the $622 million that he made in 2024. As is true of all Americans, President Trump is required to pay taxes on the income he earns, regardless of the office he holds.

172.    Under the IRM and past Treasury practice regarding mandatory presidential audits, IRS employees are at the very least required to audit President Trump's individual returns and the

---

[85] *Supra* note 82, at 2.

[86] Russ Buettner and Paul Kiel, *Trump May Owe $100 Million from Double-Dip Tax Breaks, Audit Shows*, N.Y. Times (May 11, 2024), https://perma.cc/JC9M-ST8G.

[87] Russ Buettner, *With Trump's Deal, a Possible $100 Million I.R.S. Penalty Melts Away,* N.Y. Times (May 19, 2026), https://perma.cc/SGK3-LEQ4.

returns of DJT Holdings, LLC and DJT Holdings Managing Member, LLC for years 2016 through 2020, 2024, and 2025.

173.    Upon information and belief, one or more of President Trump's tax returns is presently under audit.

174.    Upon information and belief, one or more of the other individuals and businesses included in the Immunity Order is presently under audit.

**INJURIES TO PLAINTIFFS**

175.    The creation and existence of the Anti-Weaponization Fund, including its discriminatory structure, its illegal secrecy, and its implicit endorsement of dangerous conduct harm Plaintiffs Floyd, Caravello, New Haven, NAF, and Common Cause in a number of ways.

176.    The Immunity Order harms Plaintiff NTEU's IRS members. By forcing them to carry out unlawful orders to terminate required audits, it puts them at concrete risk of violating their oath of office, losing their employment, and/or facing discipline and criminal liability.

**I.    Harms From the Anti-Weaponization Fund's Unconstitutional Discrimination**

177.    The Anti-Weaponization Fund ostensibly seeks to compensate individuals and entities who have been targeted by government actors and their agents for "improper and unlawful political, personal, and/or ideological reasons."

178.    As described above, Plaintiffs Mr. Floyd, Mr. Caravello, and City of New Haven have been targeted in this way. Mr. Floyd was apparently fired in retaliation for prosecuting the President's allies—January 6 defendants who are now themselves entitled to recover from the Fund. Mr. Caravello was subject to an unwarranted and abusive prosecution for protesting immigration enforcement and went through an ordeal much like the one the Trump-Vance administration ascribes to anti-abortion and January 6 rioters. And City of New Haven has faced a sustained campaign involving litigation brought against it by the federal government as well as the threat of federal funding termination to punish its opposition to the Trump-Vance administration's agenda. Moreover, each of these Plaintiffs has incurred significant costs as a result of this targeting, including legal fees, loss of income, diversion of critical resources, and reputational damage. Each

of these Plaintiffs would be entitled to, and would pursue, redress for these harms through a fair and lawful process.

179.    But the Anti-Weaponization Fund does not treat these Plaintiffs and their claims as equally worthy of consideration or relief, solely because these Plaintiffs were targeted by *Republican* officials or federal employees, rather than Democratic ones. By its own terms, the Anti-Weaponization Fund thus treats these Plaintiffs as a disfavored class, excluding them from a government program on the basis of the political affiliation of those who targeted them for abuse, and, by extension, on the basis of the perceived political affiliation of the Plaintiffs themselves.

180.    These Plaintiffs are injured by being treated as "less worthy participants in the political community," and "personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).

181.    That harm is compounded by the fact that the Fund's discriminatory treatment implicates First Amendment concerns. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 632 (2020) ("[T]he First Amendment is a kind of Equal Protection Clause for ideas." (citation and quotation marks omitted)). The Fund improperly differentiates between those claiming persecution by one political party but not the other. And it creates a mechanism by which those alleging weaponization by Democratic officials or federal employees may petition the Fund for redress from the government, while shutting the door entirely on those who would allege weaponization by Republicans. *See id.* at 634 (confirming plaintiffs' standing where "the First Amendment complaint at the heart of their suit was unequal treatment" and rejecting argument that plaintiffs lacked standing to challenge "a discriminatory exception that favors others"); *cf. Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 77 (D.D.C. 2026) ("Plaintiffs are injured because the Executive Order precludes them from even participating in the competition for federal grants or other financial benefits" on the basis of their disfavored speech).

## II.  Harms from the Anti-Weaponization Fund's Endorsement of Unlawful Conduct

182.    Plaintiffs NAF and Common Cause also face harm as a direct result of the Fund's endorsement, financing, and emboldening of unlawful conduct.

183.    NAF and its members face increased threats of vigilante violence due to the creation of the Anti-Weaponization Fund. Section II.C. of the Agreement on which the Fund is based lists "the Biden Administration's abuse of the FACE Act" as an example of the Lawfare and Weaponization that the Fund is designed to remediate. Ex. A ¶ II.C. The creation of the Fund is thus a dog whistle for FACE Act violators to continue violating the law with the government's blessing. NAF's member clinics have been and continue to be targeted by these FACE Act violators. This new funding stream will foment and facilitate the vigilante violence that NAF's member clinics face.

184.    Indeed, about half of NAF's more than 400 members reported incidents of violence or harassment in 2025 in NAF's annual survey. These findings follow the Trump-Vance administration's repeated efforts to protect individuals who disrupt clinics that provide abortions. Days into his second term, President Trump pardoned 23 individuals convicted of criminal FACE Act violations, several of whom were convicted due to activity at NAF's clinic members. Since being pardoned, FACE Act defendants have operated with a renewed license to mobilize, and at least three of the 23 individuals have been rearrested on multiple occasions for participating in blockades of abortion clinics.[88] Right after the pardons, DOJ's political leadership imposed strict limitations on "abortion-related" FACE Act cases, permitting cases to proceed only in "extraordinary circumstances," such as cases involving death, serious bodily harm, or significant property damage.

185.    Now, by offering those who protested at clinics that provide abortions monetary compensation, the Anti-Weaponization Fund will further embolden such violence and harassment against NAF's members, who already reasonably feel as though they are under siege. NAF's provider members must devote significant time and money to strengthening security measures at their clinics, at the expense of focusing on their core mission of providing reproductive healthcare.

---

[88] Julianne McShane, *'We're Going to Disrupt This Country': Pardoned Anti-Abortion Activists Plot Mass Clinic Protests*, MS NOW (Jan. 29, 2026), https://perma.cc/S7J8-QYA8.

For example, brick-and-mortar clinics are installing security cameras and secure locked doors, and providers of all kinds are setting up new trainings and drills for staff.

186.    Common Cause also faces direct harm from the creation of the illegal Anti-Weaponization Fund, as it disrupts Common Cause's voter education and protection efforts. First, by rewarding people bent on undermining free, fair, and safe elections, the Fund's establishment will force Common Cause to invest additional time and resources to fulfill a core part of its mission and to keep its staff and volunteers safe. Every part of this election protection process—from recruiting day-of election protection volunteers, to analyzing electoral conduct, to promoting the safety of election officials—will be made markedly more time consuming, more costly, and more challenging as a result of the Fund. That election deniers, such as the former Colorado elections clerk Tina Peters, who conspired with Trump's allies to breach voting systems, and those convicted of violence on January 6, can be Fund beneficiaries emboldens and funds those seeking to undermine elections through illegal and violent intimidation tactics, which puts Common Cause's election protection staff and volunteers personally at risk. [89]

187.    Additionally, since those participating in elections will similarly share fears for their own security due to the Fund's enablement of violent election deniers, Common Cause will be forced to expend more resources to convince voters of the security of our elections and to promote their participation. Defendants' actions have undermined the effectiveness of Common Cause's core activities of promoting political participation by chilling voter participation. And these injuries are heightened by the ongoing election cycle, for once an election passes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

## III.    Harms to Common Cause from Lack of Transparency and Procedure

188.    As a watchdog group dedicated to holding power accountable and creating open, honest, and accountable government that serves the public interest, Common Cause is also injured

---

[89] Aaron Blake, *Defenders of Trump's 'anti-weaponization' fund are few. And they're struggling*, CNN (May 22, 2026), https://perma.cc/YBW5-Z8A9.

by the procedural violations in the creation of the Fund and the lack of transparency required for its operations.

189.    Common Cause routinely files comments on federal rulemakings and actions impacting government accountability. For example, earlier this year it commented on DOJ Proposed Rule OAG199, which would strip independent state bar associations of their power to enforce state ethics rules against their own attorneys.[90] Common Cause also serves its membership through educating them about comment opportunities and coordinating comment campaigns. For example, Common Cause garnered thousands of comments from its members on DOJ's Proposed Rule OAG199. Had the establishment of the Fund been made available for public comment, Common Cause would have commented on it and would have educated its membership on the proposal and promoted the opportunity for them to also provide comments.

190.    Common Cause is also injured by the secrecy permitted in the Fund's operations because this impairs its core work and withholds information otherwise required to be made public. Among its core activities in pursuit of its mission to promote government accountability, Common Cause reviews government spending and, when it identifies unlawful or unethical payments, files complaints with appropriate oversight bodies. It also uses publicly available information regarding government spending to raise awareness about corruption and advocate for legislative oversight. For example, Common Cause has filed complaints with the Federal Election Commission and DOJ alleging that the payment of $130,000 from a shell company established by President Trump's personal lawyer to adult film actress Stormy Daniels was an unreported and illegal in-kind contribution to the Trump campaign.[91] It has similarly filed complaints against Colorado state legislators alleging that they accepted luxury resort expenses funded by a special interest group in violation of Colorado Ethics Law.[92] And it has filed numerous other complaints addressing

---

[90] *Common Cause Opposes DOJ "Self-Policing" Ethics Rule*, Common Cause (Apr. 2, 2026), https://perma.cc/2MCR-ZYPU.
[91] *Read Our Complaints: Stormy Daniels Hush Money*, Common Cause, https://perma.cc/KLR7-T5CA.
[92] *Colorado Common Cause Files Complaints Over Undisclosed Dark Money Luxury Retreat for Legislators*, Common Cause (Nov. 5, 2025), https://perma.cc/B27Z-EL8M.

government ethics violations and seeking accountability in relation to the conduct of public officials of both parties. If basic descriptive information, including payment amounts made by the fund and the basis for the claim were made public or additional information was made available through Freedom of Information Act requests, Common Cause would make such FOIA requests, track this spending, and identify potentially unlawful or unethical payments to file complaints with appropriate oversight bodies as well as raise public awareness of them. Indeed, Common Cause has submitted ten FOIA requests to Treasury, the IRS, and various DOJ divisions to understand what communications have already taken place to effectuate the Anti-Weaponization Fund and the Immunity Order. Additionally, had the entity overseeing the Fund been established through normal rule-making procedures under the Administrative Procedure Act requiring notice and comment, Common Cause would have had the opportunity to provide comments that would need to be considered by DOJ. Had the Administration made these payments based on the normal protocols of the Judgment Fund, there would be a statutory requirement to publish such information about them. 31 U.S.C. § 1304(d). The Fund's confidentiality frustrates Common Cause's entitlement to this information, its ability to use that information to pursue relief via complaints, and its ability to raise awareness about apparently corrupt payments.

## IV. Harms to NTEU and its Members From the Immunity Order

191.    NTEU represents federal workers in thirty-eight agencies and departments across the country. NTEU is comprised of 229 chapters, each of which has its own leadership. NTEU's IRS bargaining unit is spread across dozens of chapters, which are organized geographically.

192.    This lawsuit is germane to NTEU's mission. NTEU fight[s] for fair pay and benefits, improved working conditions and other issues that affect the working lives of federal employees. NTEU has a statutory obligation to represent the interests of its IRS bargaining unit, including through its collective bargaining and representational activities. *See* 5 U.S.C. § 7114(a).

193.    NTEU represents all non-supervisory, non-managerial IRS employees, with certain exceptions not relevant to this lawsuit. These members include IRS auditors and employees who will be forced to terminate audits under the Immunity Order.

43

194. Like all federal employees, NTEU's IRS members swear an oath "support and defend the Constitution of the United States." 5 U.S.C. § 3331.

195. Putting IRS auditors in danger of violating their oath of office, losing their employment, or facing discipline and risk of criminal liability by requiring them to carry out unlawful orders is an issue that deeply affects the working lives of NTEU members at the IRS.

196. The Immunity Order is an unconstitutional emolument. *See Trump*, 2026 WL 2015525, at *16 (the Immunity Order's "conferral of possibly millions of dollars in tax relief and corollary benefits potentially violates" the emoluments clause). The broad release of all of the United States' claims against the President, his family, and his businesses, including a release of tax audits and liability, gives the President a tremendously valuable profit, gain, or advantage. *Id.* ("No sitting President has ever sued federal agencies completely subject to his control for monetary benefits, or any benefits that inure to him, his family, and associates.").

197. The Immunity Order also violates 26 U.S.C. § 7217. According to news reporting, in order to secure the *Trump* agreement, President Trump and other officials covered by section 7217 unlawfully requested that the IRS terminate audits, including those of the President and his family and businesses, either directly or indirectly, and those requests led to the Immunity Order.

198. Secretary Bessent and Acting AG Blanche have made clear that the Immunity Order will be effectuated at Treasury and IRS, despite concerns from top Treasury and IRS lawyers that the Order is illegal; a court order holding that the Order violates section 7217 and likely constitutes an unconstitutional emolument; and widespread, high-visibility bipartisan congressional pressure to limit or disavow the Order.

199. On information and belief, NTEU members will necessarily be called upon to carry out the Immunity Order.

200. It is mandatory for the IRS to audit President Trump's tax returns, and mandatory that a career IRS auditor be assigned to such examination. NTEU represents all non-managerial IRS auditors, who have the primary responsibility for conducting audits for mandatory presidential audits and audits of individuals and businesses covered by the Immunity Order.

44

201.    But any request to terminate an audit because of the Immunity Order will put NTEU members in an impossible position.

202.    A request that an IRS employee terminate an audit under the Order will trigger mandatory reporting by NTEU members to TIGTA and the Secretary or Commissioner. Reporting that the President or the White House violated 7217 raises the concrete risk of subjecting NTEU members to retaliatory firing or discipline. But a failure to make such a report carries civil and criminal penalties, including dismissal from their jobs.

203.    In addition, an NTEU member who complies with such a request would violate their oath of office to uphold the Constitution because the member would be giving the President an emolument in violation of the Domestic Emoluments Clause.

204.    On the other hand, an NTEU member who refuses to terminate an audit risks being disciplined in retaliation or fired for insubordination. That could cause NTEU members to lose their income, their health benefits, and other incidents of employment, causing severe harm to them and their families.

205.    Based on recent, high-profile examples of retaliation against IRS employees and others, NTEU members face a concrete risk of retaliation if they raise concerns about the legality of terminating ongoing audits pursuant to TIGTA or to the Secretary, as they are required to do under sections 7214 and 7217, or if they refuse to carry out an unlawful order.

206.    The two most senior lawyers at Treasury and IRS were reportedly pushed out because of clashes with the White House over the legality of the Agreement and Immunity Order. The General Counsel for the Treasury Department, Brian Morrisey, resigned within hours of Defendants' announcement of the *Trump* agreement.[93] Shortly after the district court issued its opinion in *Trump*, Kenneth Kies, the IRS Chief Counsel, was reportedly "forced out of his job"[94] after he "warned White House officials that they were at risk of violating a federal law that

---

[93]Richard Rubin & C. Ryan Barber, *Treasury Lawyer Quits as Government Settles Trump IRS Suit*, WSJ (May 18, 2026), https://perma.cc/EC6C-G6P8.

[94] Richard Rubin, *Treasury Tax Official Making Faster Exit After IRS Audit Flap*, WSJ (July 21, 2026), https://perma.cc/LG25-J6LT.

prohibits certain officials from requesting that the Internal Revenue Service start or stop an audit."[95] This included "a recent meeting in which [Kies] contended that a potential White House request would violate Section 7217."

207.    The IRS has also retaliated against career employees for perceived opposition to the Trump-Vance administration. For example, Traci DiMartini, a former human capital officer for the IRS, was placed on administrative leave after she refused to sign termination notices of more than 6,000 probationary employees that she believed to be unlawful and refused an IRS request to require employees who were already working 60 to 70 hours a week to onboard a DOGE operative over the weekend.[96] As another example, Holly Paz, the former IRS Commissioner of the Large Business and International Division, was placed on administrative leave after a conservative group alleged that the Division was led by Trump critics and Democrats.[97]

208.    In the past, NTEU members at the IRS have been disciplined and fired for insubordination when they refused to carry out an order.

209.    Unfortunately, examples of retaliation against federal employees are not limited to the IRS. There have been numerous examples of the Trump-Vance administration retaliating against or firing federal whistleblower employees who reported illegal conduct. These include 190 FEMA employees placed on administrative leave after they filed a whistleblower complaint;[98] an NIH employee being fired after filing a whistleblower complaint that NIH had defied a court order;[99] and firing HUD attorneys who blew the whistle that HUD leadership "violated the law."[100]

---

[95] Brian Schwartz, et al., *Top Treasury Tax Official Ousted After Clashes With White House Over IRS Audits*, WSJ (July 16, 2026), https://perma.cc/A2FC-D89N.

[96] *See Maryland v. United States Department of Agriculture*, No. 1:25-cv-748-JKB (D. Md. Mar. 7, 2025), ECF No. 4-37, Ex. HH.

[97] David Zimmermann, *IRS official Holly Paz proposed for removal after review of her targeting conservative organizations* (Sept. 9, 2025), https://perma.cc/6JBR-5S78.

[98] Letter from Rick Larsen et al. to Hon. Joseph Cuffari, Inspector General, Dep't of Homeland Sec. (October 14, 2025), https://perma.cc/CFU8-CZU9.

[99] Benjamin Mueller, *Kennedy Fires N.I.H. Scientist Who Filed Whistle-Blower Complaint*, N.Y. Times (Oct. 2, 2025), https://perma.cc/6U2K-65M7.

[100] Letter from Elizabeth Warren to Brian D. Harrison, Acting Inspector General, HUD (Sept. 22, 2025), https://perma.cc/AZD2-9UPG.

210.    A court order setting aside or vacating the Immunity Order will redress these harms and prevent NTEU members from being placed in an untenable situation between following an illegal order and violating their oath, or being fired for insubordination.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the First Amendment—Freedom of Association, Viewpoint Discrimination & Unconstitutional Conditions**
**(By Plaintiffs Floyd and Caravello Against Defendants DOJ, Blanche, Woodward, Treasury, Bessent, and Anti-Weaponization Fund)**

211.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

212.    The First Amendment of the United States Constitution protects "the freedom of speech" and the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Assoc. v. Vullo*, 602 U.S. 175, 187 (2024). The First Amendment also protects "political association or the expression of political allegiance," *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715 (1996), whether actual or perceived, *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273–74 (2016).

213.    The First Amendment prohibits the government from "us[ing] government power—including the power of the purse—'to punish or suppress disfavored expression' by others." *Nat'l Pub. Radio*, 827 F. Supp. 3d at 59 (quoting *Vullo*, 602 U.S. at 188). In a similar vein, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (citation and quotation marks omitted).

214.    Those protections prohibit the federal government from conditioning funding or access to benefits on the basis of one's viewpoint or political association, whether in the context of a public forum or otherwise.

215.    The Anti-Weaponization Fund does not offer benefits to victims of ideological targeting by Democrats and Republicans alike; instead, it offers benefits to those who claim persecution by Democrats, and whom this administration therefore understands to be its political allies.

216.    And on the face of its terms, the Anti-Weaponization Fund is not viewpoint neutral, as required by the First Amendment. It makes access to the Anti-Weaponization Fund dependent on whether the claimant's viewpoint is that they were the subject of "Lawfare and Weaponization" by "Democrat" officials or federal employees, as opposed to Republican or nonpartisan officials or federal employees.

217.    The Anti-Weaponization Fund violates the First Amendment.

**COUNT II**
**Violation of the Fifth Amendment—Equal Protection**
**(By Plaintiffs Floyd, Caravello, and New Haven**
**Against Defendants DOJ, Blanche, Woodward, Treasury, Bessent, and Anti-**
**Weaponization Fund)**

218.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

219.    The Fourteenth Amendment of the United States Constitution guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

220.    This equal protection guarantee is applicable to the federal government, and all of its agencies, officials, and employees through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

221.    These principles require "all persons similarly situated [to] be treated alike" by the federal government. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

222.    "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis under any level of scrutiny. *Id.* at 447 (first citation and quotation marks omitted); *see also Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the . . . guarantee of equal protection under the law, . . . settling personal vendettas by targeting a disliked business or individual for punitive government

48

action is not a legitimate use of the powers of the U.S. government . . . ."), *appeal filed,* No. 25-5241 (D.C. Cir. July 2, 2025).

223.    The Anti-Weaponization Fund does not treat all persons similarly situated alike.

224.    Specifically, the Anti-Weaponization Fund is available only to claimants whose claims are based on alleged "Lawfare and Weaponization" "by Democrat elected officials, political and career federal employees, contractors, and agents." Ex. A ¶ II.C. The Anti-Weaponization Fund is, definitionally, not available to claimants who say that they have been the subject of "Lawfare and Weaponization" by Republican or nonpartisan elected officials or federal employees. The only examples of "Lawfare and Weaponization" cited in the Agreement concern Democrats. *See id.* And the Trump-Vance administration—which has established and will oversee the operations of the Fund—has, from Day 1, focused relentlessly on alleged "weaponization" by "[t]he prior administration and allies throughout the country." Exec. Order No. 14147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. at 8235. Simultaneously, it engaged in unprecedented actual weaponization of the federal government; yet those experiencing this weaponization will not be eligible.

225.    Claimants who believe they have been the subject of "Lawfare and Weaponization" are similarly situated, regardless of the perceived political affiliation of the person the claimant believes was unfairly exercising government power.

226.    There is no rational basis for the Anti-Weaponization Fund's unequal treatment of potential claimants.

227.    Rather, Defendants' differential treatment is motivated by animus towards the actual or assumed political views of claimants who believe they have been the subject of "Lawfare and Weaponization" by Republican or nonpartisan officials or federal employees, as compared to claimants alleging mistreatment by "Democrat" officials or federal employees.

228.    The Anti-Weaponization Fund violates the Fifth Amendment.

49

**COUNT III**
**Violation of the Separation of Powers**
**(By Plaintiffs Floyd, Caravello, New Haven, NAF, and Common Cause**
**Against Defendants DOJ, Blanche, Woodward, Treasury, Bessent, and Anti-**
**Weaponization Fund)**

229.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

230.    The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

231.    Congress has the exclusive authority under Article I of the Constitution to pass laws creating government agencies, to assign their duties, and to appropriate funds for the effectuation of those duties.

232.    Congress has the exclusive power under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds for purposes defined by Congress. *See* U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl. 7. The "fundamental" purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

233.    The President may not confer powers upon other federal officers or agencies within the Executive Branch that he does not himself possess. And the President does not have the power under the Constitution unilaterally to amend statutes.

234.    The Anti-Weaponization Fund is a governmental slush fund outside the appropriations of Congress. It is shielded from congressional oversight, wields substantial independent authority, and exceeds presidential and executive authority. The Fund usurps legislative authority conferred by the Constitution, in violation of the separation of powers.

235.    The Anti-Weaponization Fund violates the Separation of Powers.

50

**COUNT IV**
**Violation of the Domestic Emoluments Clause**
**(By Plaintiff NTEU against Defendants DOJ, Blanche, Woodward,**
**Treasury, Bessent, IRS, and Bisignano)**

236.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

237.    The Domestic Emoluments Clause provides that "[t]he President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

238.    An "Emolument" is "defined broadly as any profit, gain, or advantage." *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 207 (D.D.C. 2019), *vacated as moot,* 949 F.3d 14 (D.C. Cir. 2020); *District of Columbia v. Trump*, 315 F. Supp. 3d 875, 904 (D. Md. 2018), *vacated as moot*, 838 F. App'x 789 (4th Cir. 2021).

239.    The extraordinary and unprecedented broad release of all of the United States' claims against the President, his family, his businesses, and an undefined universe of "related" or "affiliated" individuals or entities, including claims known or unknown, that were brought or could have been brought before May 18, 2026, is an emolument that Defendants cannot give to the President.

240.    The Immunity Order violates the Domestic Emoluments Clause.

**COUNT V**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(By All Plaintiffs Against Defendants DOJ, Blanche, Woodward,**
**Treasury, Bessent, IRS, and Bisignano)**

241.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

242.    The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

243.    Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from

51

which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

244.    Plaintiffs challenge the government's creation of the Anti-Weaponization Fund, an agency action that encompasses both establishing and funding that entity.

245.    The government's creation and funding of the Anti-Weaponization Fund marks the consummation of DOJ and Treasury's decisionmaking process because it affirmatively establishes the Fund. As Acting AG Blanche has stated, the Agreement in *Trump* "created the Anti-Weaponization Fund." Ex. C. Acting AG Blanche has likewise issued an order "establishing funding and any other relevant requirements for the [Anti-Weaponization Fund]." *Id.*

246.    The creation of the Anti-Weaponization Fund is also an action by which rights or obligations have been determined or from which legal consequences will flow because it establishes a legal process by which some individuals (but not others) have the right to pursue claims against the United States. The creation of the Anti-Weaponization Fund also establishes obligations, including the transfer of $1,776,000,000 from the Judgment Fund and a permanent bar on claims that claimants could otherwise pursue.

247.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

248.    The creation of the Anti-Weaponization Fund is arbitrary and capricious in multiple respects. Several examples follow.

249.    First, as set forth herein, the creation of the Anti-Weaponization Fund conflicts with laws, regulations, and constitutional provisions. This alone renders it arbitrary and capricious.

250.    Second, DOJ and Treasury have failed to proffer a reasonable explanation for the creation of the Anti-Weaponization Fund, including addressing its conflicts with laws and constitutional provisions. Although DOJ and Treasury purport to create the Fund to settle the *Trump* lawsuit, the creation of the Anti-Weaponization Fund has no connection to the claims at issue there. Indeed, the Agreement provides the *Trump* plaintiffs with "a formal apology from the United States" outside the procedures of the Anti-Weaponization Fund and further states that the

*Trump* plaintiffs "receive no economic benefit from this Settlement Agreement." Ex. A ¶¶ III.A, IV.A.

251.    Third, the creation of the Anti-Weaponization Fund fails to address, and is irreconcilably at odds with, DOJ's own policy prohibiting settlements that involve payments to third parties "that were neither victims nor parties" to the suit. Mem. from the Att'y Gen. to All Dep't Emps., *Reinstating the Prohibition on Improper Third-Party Settlements* (Feb. 5, 2025), https://perma.cc/Q9FL-A5VS. DOJ has failed to offer an adequate explanation for its change in position exclusively for this one settlement.

252.    Fourth, the creation of the Anti-Weaponization Fund reflects no consideration of reasonable alternative approaches. DOJ and Treasury fail to explain, for example, why the existing Judgment Fund is insufficient to address legitimate claims by individuals they believed were targeted and why only claimants allegedly subject to certain kinds of "Lawfare and Weaponization" are permitted.

253.    Fifth, the creation of the Anti-Weaponization Fund failed to consider important aspects of the problem. For example, DOJ and Treasury altogether failed to consider the increased harm organizations like NAF and Common Cause would face when agitators that are rewarded through the Anti-Weaponization Fund are further emboldened to commit more acts of violence and disruption in abortion clinics and at polling places, among other venues.

254.    Sixth, the creation of the Anti-Weaponization Fund does not set forth procedures for an adversarial process to test claims or to permit the government to produce evidence that the investigation or prosecution targeting the claimant was well founded. Nor does it require that awards under it be made public, as is required for payments under the Judgment Fund and as is consistent with DOJ's policy that settlements not be confidential. 28 C.F.R. § 50.23. Indeed, it does not set forth meaningful procedural safeguards at all, instead permitting the Fund "to determine its own procedures," which it may or may not even make public.

255. Seventh, the lack of adversarial process and the secrecy—among other procedural deficiencies—fails to adequately safeguard the taxpayer dollars at issue, and DOJ and Treasury provide no explanation for their failure to do so.

256. Eighth, the creation of the Anti-Weaponization Fund itself, for such an astronomical sum, is substantively unreasonable because the sum does not reflect the true value of future claimants' claims under the Anti-Weaponization Fund; it instead appears to refer, arbitrarily, to the year of our nation's independence. The creation of the Anti-Weaponization Fund was likewise unreasonably explained, because DOJ and Treasury did not provide (and could not have provided) a rational explanation of why they set aside near two billion dollars provided by taxpayers for a small subset of people who may not have even threatened litigation against the federal government. Rather, the entire process of why Defendants created the fund, how they determined its amount, and how they will evaluate claims is shrouded in secrecy and creates grave risk of corruption.

257. The Immunity Order is also final agency action. Per Acting AG Blanche, the Order is in effect. Legal consequences flow from the Order, as it alters the potential tax liability for its beneficiaries. It also forces IRS agents to grant an emolument to the President, in violation of the Constitution, and it also violates 26 U.S.C. § 7217. Those who carry out the Order—including NTEU-represented internal revenue agents who are instructed to do so—would violate their oath of office and would be subject to legal requirements to report to the request to TIGTA and the Secretary. .

258. The Immunity Order is arbitrary and capricious because, among other reasons, like the Anti-Weaponization Fund, the Immunity Order resulted from a "settlement" of the *Trump* case, but the tax audits and liability claims released in Immunity Order have no connection to the wrongful disclosure claims at issue there and include releasing unknown claims against unknown parties. *See Trump*, 2026 WL 2015525, *13 (Noting the "extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties whose future remedies bear no relationship to the claims in this case."). Without displaying awareness that DOJ changed position, explaining why, or addressing any consequences,

54

Acting AG Blanche departed from DOJ's longstanding policy of settling only issues that are germane to the matter referred to DOJ (in tax liability claims, only the specific taxpayers, tax years, and issues referred).[101]

259.    The Immunity Order also departs without explanation or acknowledgement from IRS's requirement, and nearly 50 years of practice, of annual audits of a sitting President's tax returns without acknowledgment or adequate explanation of the change. Indeed, Acting AG Blanche has stated that he "do[es] not have specific knowledge of the presidential audit program."[102] The Immunity Order also does not explain or take into account that IRS employees must still to follow the IRM, which includes provisions that are contrary to, or made impossible by, the Immunity Order.

260.    Both the Anti-Weaponization Fund and the Immunity Order are arbitrary and capricious in violation of the APA.

**COUNT VI**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right**
**(By All Plaintiffs Against Defendants DOJ, Blanche, Woodward,**
**Treasury, Bessent, IRS, and Bisignano)**

261.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

262.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

263.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the First Amendment because it discriminates on the basis of viewpoint.

264.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the Fifth Amendment because it violates the guarantee of equal protection.

265.    As set forth above, the creation of the Anti-Weaponization Fund is contrary to the separation of powers guaranteed by the United States Constitution.

---

[101] *See* 26 U.S.C. § 7122(a); 38 U.S. Op. Atty. Gen. 98, 102 (1934); U.S. Dep't of Just., Justice Manual § 4-3.400, https://perma.cc/T8TP-DZ7H

[102] *Supra* note 19, ¶ 123.

266.    The Fourteenth Amendment of the United States Constitution provides that the United States shall not "assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States," but that "all such debts, obligations and claims shall be held illegal and void." U.S. Const. amend. XIV, § 4. The creation of the Anti-Weaponization Fund is contrary to Section 4 of the Fourteenth Amendment because it provides for the United States to pay claims, calculated to include debts such as attorney's fees, to individuals who were arrested and/or prosecuted for their participation in the January 6, 2021 riots, even though those individuals had engaged in an act of insurrection against the United States by attempting to prevent by means of violence the certification of a presidential election.

267.    Under the Appointments Clause of the United States Constitution, people exercising "significant authority pursuant to the laws of the United States" and who "occupy a continuing position established by law" must be appointed as officers. *See Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quotation marks omitted). "Only the President, with the advice and consent of the Senate," can appoint "principal officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (quotation marks omitted). "[T]he Appointments Clause permits Congress to dispense with joint appointment, but only for inferior officers." *Id.* The creation of the Anti-Weaponization Fund is contrary to the Appointments Clause because it provides for the Attorney General, rather than the President, to appoint its members. This is impermissible because the members are principal officers: they "have the power to render a final decision on behalf of the United States without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *Id.* at 14 (citation and quotation marks omitted). Indeed, the Agreement specifically provides that "there shall be no appeal, arbitration, or judicial review of claims, offers, or other determinations made by The Anti-Weaponization Fund." *See* Ex. A ¶ VI.B. But even if they were inferior officers, only Congress can dispense with joint appointment, and Congress has not done so here.

268.    As to the Immunity Order, as set forth above, it violates the Domestic Emoluments Clause.

56

**COUNT VII**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Contrary to Law**
**(By All Plaintiffs Against Defendants DOJ, Blanche, Woodward,**
**Treasury, Bessent, IRS, and Bisignano)**

269.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

270.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

271.    The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

272.    As to the Anti-Weaponization Fund, 28 U.S.C. § 2414 (which governs the federal government's Judgment Fund) provides for "payment of final judgments rendered by a district court," as well as "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States." The creation of the Fund is contrary to Section 2414 because it permits the settlement of claims that do not fall within those strictures.

273.    Moreover, the "imminent litigation" in *Trump*, the resolution of which resulted in the creation of the Anti-Weaponization Fund, is wholly unrelated to the alleged claims of the unnamed and unlimited claimants of the Anti-Weaponization Fund. In *Trump*, the President, two of his sons, and their family business alleged that the government unlawfully disclosed their tax return information. The creation of the Anti-Weaponization Fund for claims of third parties has no connection to *Trump*. Because the United States has no "obligations or liabilities" to those third parties from which payment from the Judgment Fund could be made using the *Trump* lawsuit as its basis, the use of the Judgment Fund for the creation of the Anti-Weaponization Fund is unlawful. *See* 28 U.S.C. § 2414.

274.    The creation of the Anti-Weaponization Fund separately violates the statute because it permits payment from the Judgment Fund to claimants that need not bring "imminent litigation or suits." *Id.*

275.    31 U.S.C. § 1304, which appropriates money for the Judgment Fund, requires the Secretary of the Treasury to "make available to the public on a website" information about each payment from the Judgment Fund, including the name of the claimant and their counsel, the name of the agency whose actions gave rise to the claim, the name of the agency that submitted the claim, the amount paid, and a brief description of the facts that gave rise to the claim. *See* 31 U.S.C. § 1304(d). The creation of the Anti-Weaponization Fund is contrary to section 1304(d) because it does not require this level of transparency, and instead permits the Anti-Weaponization Fund to make "its own procedures for submitting, receiving, processing, and granting or denying claims . . . public in whole or in part, in its discretion." Ex. A ¶ IV.C.

276.    The creation of the Anti-Weaponization Fund also violates the APA because it is contrary to binding agency regulations implementing the Judgment Fund, 31 C.F.R. part 256. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). For example, under those binding regulations, the Judgment Fund can be used for settlement of "claims arising under actual or imminent litigation." 31 C.F.R. § 256.1(a). But, as noted above, the creation of the Anti-Weaponization Fund permits claimants to come forward without filing litigation or an administrative claim, and it thus violates that regulation. Those binding regulations also require that the "Department of Justice must normally submit the request for payment from the Judgment Fund." *Id.* § 256.10(a). The creation of the Anti-Weaponization Fund is contrary to those regulations because it permits individual claimants to submit requests for payment (of money that was initially appropriated to the Judgment Fund), and the members of the Anti-Weaponization Fund, not DOJ, will determine if the amount requested is appropriate. Similarly, the binding regulations require that a request for payment (from an agency) must be accompanied by "a copy of the judgment or settlement agreement, as applicable." *Id.* § 256.12(a). But the creation of the Anti-Weaponization Fund circumvents that requirement, as neither a judgment nor a settlement agreement is required to submit a claim.

277.    The Freedom of Information Act requires federal agencies to make certain records available to the public. *See* 5 U.S.C. § 552(a). The Anti-Weaponization Fund is acting as an agency,

58

and would ordinarily be subject to FOIA. Or in the alternative, and at a minimum, the Fund is administered by two agencies that are subject to FOIA, and so falls within those FOIA obligations. The creation of the Anti-Weaponization Fund is contrary to FOIA because it permits the Anti-Weaponization Fund to make "its own procedures for submitting, receiving, processing, and granting or denying claims," procedures which the Anti-Weaponization Fund can make "public in whole or in part, in its discretion." Ex. A ¶ IV.C. The Anti-Weaponization Fund is thus empowered to keep its procedures entirely secret—contrary to both the letter and spirit of FOIA.

278. The creation of the Anti-Weaponization Fund is not in accordance with law because it is contrary to these many provisions.

279. The Immunity Order is similarly "not in accordance with law" under 5 U.S.C. § 706(2)(A).

280. The President may not request, either directly or indirectly through others, that an IRS officer or employee terminate any particular taxpayer's audit, 26 U.S.C. § 7217, but he has done so here.

281. Also, like the Anti-Weaponization Fund, the Immunity Order is contrary to laws governing settlement authority. Under 26 U.S.C. § 7122(a), "the Attorney General or his delegate may compromise" a civil or criminal case arising under the internal revenue laws, but only "*after* reference to the Department of Justice for prosecution or defense." (emphasis added). On information and belief, the only matter referred by IRS to DOJ were the wrongful disclosure claims in *Trump* case, but those have nothing to do with the many years' worth of tax liability released in the Immunity Order. Further, the Immunity Order applies not only to the *Trump* plaintiffs, but also to unidentified taxpayers who are "related" or "affiliated" with the plaintiffs. And because the *Trump* lawsuit was not viable because it was (1) collusive, and (2) outside the relevant statute of limitations, there was no case that could have been referred to DOJ in any event.

282. Both the Anti-Weaponization Fund and the Immunity Order are contrary to law.

## COUNT VIII
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(C)
### In Excess of Statutory Authority
### (By All Plaintiffs Against Defendants DOJ, Blanche, Woodward, Treasury, Bessent, IRS, and Bisignano)

283. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

284. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

285. "An agency . . . literally has no power to act—including under its regulations— unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

286. No statutory provision, including 31 U.S.C. § 1304 or 28 U.S.C. § 2414, authorizes DOJ and Treasury to create the Anti-Weaponization Fund.

287. No statutory provision authorizes the Immunity Order.

288. The Immunity Order is contrary to express statutory limitations placed on presidential and cabinet level interference with IRS audits, 26 U.S.C. § 7217.

289. Additionally, Acting AG Blanche had no authority to issue the Immunity Order releasing all tax claims and terminating tax audits and liability of the President, his family, and all unnamed affiliated businesses for all previous tax years. 26 U.S.C. § 7122. The IRS must refer a "civil or criminal case arising under the internal revenue laws" to DOJ "for prosecution or defense." *Id.* § 7122(a). On information and belief, the IRS did not refer any cases to DOJ involving tax liability or audits of any of the plaintiffs in *Trump*, let alone any cases involving the tax liability or audits of unknown "related" or "affiliated" taxpayers for all previous tax years that were not party to the *Trump* lawsuit. Moreover, the tax liabilities of the President, his sons, the Trump Organization, and all "related" or "affiliated" individuals or businesses were never at issue in the *Trump* lawsuit, and therefore cannot be said to have been referred to DOJ for prosecution or defense. Finally, because the *Trump* lawsuit was not viable because it was (1) collusive, and (2) outside the relevant statute of limitations, there was no case that could have been referred to DOJ

in any event. Under section 7122, without a referral, Acting AG Blanche had no authority to enter into a compromise agreement that encompassed tax liabilities and ongoing IRS audits for all taxpayers covered by the Immunity Order.

290.   The creation of the Anti-Weaponization Fund and the Immunity Order therefore are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

**COUNT IX**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(D)**
**Failure to Observe Required Procedure**
**(By Plaintiffs Floyd, Caravello, New Haven, NAF, and Common Cause**
**Against Defendants DOJ, Blanche, Woodward, Treasury, and Bessent)**

291.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

292.   A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

293.   The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See id.* § 553(b), (c). Defendants failed to provide notice and an opportunity for public comment regarding the creation of the Anti-Weaponization Fund, including its governing procedures.

294.   The Creation of the Anti-Weaponization Fund is a legislative rule within the meaning of the APA.

295.   Had the creation of the Anti-Weaponization Fund been the subject of advance publication and notice-and-comment rulemaking under the APA, DOJ and Treasury could have considered comments from Plaintiff Common Cause. Because DOJ and Treasury chose not to follow these procedures, they were not, and will not be, able to consider comments opposing the creation of the Anti-Weaponization Fund.

296.   DOJ thus failed to observe required procedure when creating the Anti-Weaponization Fund.

**COUNT X**
**Ultra Vires Action**
**(By All Plaintiffs Against Defendants DOJ, Blanche, Woodward, Treasury, Bessent, IRS, Bisignano, and Anti-Weaponization Fund)**

297.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

298.    "[J]udicial review is available when an agency acts *ultra vires*." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). Neither the President nor an agency or its officials may take any action that exceeds the scope of their constitutional or statutory authority. An agency acts constitutionally or statutorily *ultra vires* when it plainly acts in excess of its delegated powers or has violated the law. Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions . . . reflects a long history of judicial review of illegal executive action.").

299.    There is no statute, constitutional provision, or other source of law that authorizes the Anti-Weaponization Fund or the Immunity Order. Rather, the Anti-Weaponization Fund and Immunity Order are contrary to law and constitutional right, as set forth above. Such "exercising [of] immense power without any grant of statutory authority whatsoever" is "the sort of extreme legal error that can sustain a claim for *ultra vires* review." *New Mexico v. Musk*, 824 F. Supp. 3d 80, 105 (D.D.C. 2026) (quotation marks omitted).

300.    Plaintiffs have a non-statutory right of action to declare unlawful, set aside, and enjoin Defendants' actions as constitutionally and statutorily ultra vires.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter the following relief:

A.    Declare unlawful the creation and operation of the Anti-Weaponization Fund as a violation of the Constitution and the APA, and as *ultra vires*;

B.      Vacate and set aside the creation of the Anti-Weaponization Fund as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A); contrary to constitutional right under 5 U.S.C. § 706(2)(B); not in accordance with law under 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C. § 706(2)(D);

C.      Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate process to postpone the effective date of the Anti-Weaponization Fund or to preserve the status and rights of Plaintiffs during the pendency of this lawsuit. This includes a stay of the Anti-Weaponization Fund and an order that directs Defendants to immediately take all steps necessary to ensure that Defendants' employees and agents do not implement, maintain, or give effect to the Anti-Weaponization Fund during this litigation, and to provide status reports to the Court demonstrating compliance.

D.      Preliminarily and permanently enjoin Defendants, their officers, employees, and agents from taking any further action pursuant to the creation of the Anti-Weaponization Fund, including, but not limited to,

    a.  Transferring any money to an account for the Fund, or, if such money has already been transferred, ordering Defendants to immediately reverse that transfer;

    b.  Accepting or processing any claim submitted to the Fund;

    c.  Making any payment out of the Fund;

    d.  Appointing any Members to the Fund; and

    e.  Reconstituting the Fund under a different name.

E.      Enter an order in exercise of the Court's equitable powers that directs Defendants to immediately take all steps necessary to ensure that Defendants' employees and agents do not enforce, implement, maintain, or give effect to the Anti-Weaponization Fund and to provide status reports to the Court demonstrating compliance.

63

F.      Declare that the Immunity Order violates the Constitution, the APA, and is *ultra vires*;

G.      Vacate and set aside the Immunity Order as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A); contrary to constitutional right under 5 U.S.C. § 706(2)(B); not in accordance with law under 5 U.S.C. § 706(2)(A); and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

H.      Preliminarily and permanently enjoin Defendants from enforcing, implementing, maintaining, or giving effect to the Immunity Order.

I.      Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate process to postpone the effective date of the Immunity Order or to preserve the status and rights of Plaintiffs during the pendency of this lawsuit. This includes a stay of the Immunity Order and an order that directs Defendants to immediately take all steps necessary to ensure that Defendants' employees and agents do not enforce, implement, maintain, or give effect to the Immunity Order during the pendency of this litigation, and to provide status reports to the Court demonstrating compliance.

J.      Enter an order in exercise of the Court's equitable powers that directs Defendants to immediately take all steps necessary to ensure that Defendants' employees and agents do not enforce, implement, maintain, or give effect to the Immunity Order, and to provide status reports to the Court demonstrating compliance.

K.      Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate.

L.      Grant such other relief as the Court deems just, equitable, and proper.

64

August 6, 2026

Paras N. Shah†
General Counsel
NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
paras.shah@nteu.org

*Counsel for NTEU*

Respectfully submitted,

*/s/ Joel McElvain*
Joel McElvain (Va. Bar No. 95215)
Pooja A. Boisture*
Jyoti Jasrasaria*
Aman George*
Lisa Newman† ^
Cynthia Liao†
Ayesha Khan*
Robin F. Thurston*
Skye L. Perryman*
jmcelvain@democracyforward.org
pboisture@democracyforward.org
jjasrasaria@democracyforward.org
ageorge@democracyforward.org
lnewman@democracyforward.org
cliao@democracyforward.org
akhan@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

*Counsel for Plaintiffs*

* Admitted *pro hac vice*

† Motions for admission *pro hac vice*
forthcoming

^ Not admitted to practice law in the District of
Columbia; practicing under the supervision of
Democracy Forward lawyers who are members
of the District of Columbia Bar.

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August, 2026, I will cause the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, thereby serving all counsel who have appeared in this case.

I will also serve Defendants Internal Revenue Service and Frank Bisignano, in his official capacity as Chief Executive Officer of the Internal Revenue Service, pursuant to Federal Rule of Civil Procedure 4.

*/s/ Joel McElvain*
Joel McElvain (Va. Bar No. 95215)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org

*Counsel for Plaintiffs*