**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
ALEXANDRIA DIVISION

**Andrew Floyd, et al.**,

Plaintiffs,

v.

**Department of Justice, et al.**,

Defendants.

Case No. 1:26-cv-01399-LMB

**MEMORANDUM IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO DISMISS**

# TABLE OF CONTENTS


Introduction ....1

Background ....3

Legal Standard ....6

Argument ....7

I. PLAINTIFFS' FUND CLAIMS ARE NOT JUSTICIABLE ....7

A. Even Assuming They Were Ripe in the First Place, Plaintiffs' Fund Claims Are, Beyond All Doubt, Now Moot ....7

B. Plaintiffs' Fund Claims Are Not (and Were Never) Ripe For Adjudication ....11

C. Plaintiffs Have No Standing to Challenge the Fund ....14

II. NTEU's CLAIMS ARE NOT JUSTICIABLE ....18

III. PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION ....21

A. Plaintiffs' First Amendment and Equal Protection Claims Fail ....21

i. *First Amendment Claim (And Related APA § 706(2)(B) Claim)* ....21
ii. *Equal Protection (And Related APA § 706(2)(B) Claim)* ....22

B. Plaintiffs' Separation Of Powers and *Ultra Vires* Claims Fail ....23

C. Plaintiffs' APA Challenges to the Fund Must Fail Because There Has Been No Final Agency Action ....24

D. NTEU's APA Challenges to the So-Called "Immunity Order" Fail ....26

E. Plaintiffs Fail to State a Claim Under the Domestic Emoluments Clause ....27

Conclusion ....30

## INTRODUCTION

Defendants move this Court to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs cannot establish subject-matter jurisdiction and, in any event, fail to state a claim upon which relief can be granted. Plaintiffs challenge (1) an Anti-Weaponization Fund ("Fund") that has never existed and will not exist, and (2) a third-party settlement agreement to a civil action in another district with which they have a policy disagreement. As such, Plaintiffs' claims are not justiciable and ought to be dismissed.

The Justice Department and Attorney General have now said countless times, in public, to this Court in briefs, and to Congress in sworn testimony, that the idea of the Anti-Weaponization Fund at the heart of this case is dead and will not go forward. The time has come to stop this inquisition.

Federal courts may resolve "active political debate[s] … only if necessary to do so in the course of deciding an actual 'case' or 'controversy'" as those words are "used in the Constitution." *Hollingsworth v. Perry*, 570 U.S. 693, 697, 700 (2013). And opining on abstract issues—such as here over a fund that was modeled after an Obama Administration compensation fund that was affirmed by the D.C. Circuit, *Keepseagle v. Vilsack*, 815 F.3d 28 (D.C. Cir. 2016); *see infra* n.3—is even more inappropriate where challengers have already received "the precise relief that [they] requested," rendering a case "moot." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020). Those principles control here. Plaintiffs have never had standing. Even the political debate surrounding the Fund is not "active" anymore. This dispute was raised, and resolved, through the political process, which provided all the outcomes Plaintiffs have sought. The United States thus moves to dismiss this civil action on justiciability grounds—not because the Fund will continue (it will not)—but to adhere to core Article III principles. And Plaintiffs have

stated no plausible claim for relief on the merits anyways—providing yet another independent basis to dismiss their claims under Rule 12(b)(6).

Recognizing that any controversy surrounding the Fund is now certainly moot (it has always been non-justiciable), Plaintiffs amended their complaint to add a new plaintiff, National Treasury Employees Union ("NTEU"), and a new Domestic Emoluments Clause cause of action. NTEU's theory is that a release of claims in a third-party settlement agreement—made in a different case in a different district—is an unconstitutional Emolument. But this collateral attack on the Settlement Agreement similarly fails. NTEU cannot explain how such a release injures it or its members. NTEU avers that unnamed federal employees might face some future adverse action for disobeying some future unknown order because those employees disagree with the President. Dkt. 123 at ¶¶ 194–204. Accepting this novel and sweeping theory of standing would render the injury prong in Article III meaningless. And it would afford standing to any federal employee who disagrees with the President on any issue, ranging from immigration to student loans. But that is not the law.

NTEU's Emoluments claim fares even worse on the merits. The Domestic Emoluments Clause provides that the President shall receive "for his Services" a fixed "Compensation" during his tenure and not "any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. As is evident from the text of the clause itself, it was designed to prohibit *the President* from profiting from "Emoluments" for official acts. But Defendants are not the President. And NTEU—the only plaintiff to assert this claim—fails to allege any unlawful Emolument regardless. Instead, it takes issue with an apology the President received in his *individual* (not official) capacity. This is not an "Emolument" in the constitutional sense.

The Court should dismiss all of Plaintiffs' claims under Rule 12(b)(1) and Rule 12(b)(6).

## BACKGROUND

Prior to the 2020 election, Charles Littlejohn obtained a job as an IRS contractor with the goal of leaking President Donald J. Trump's tax data. He succeeded, leaking President Trump's tax returns (as well as Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC's tax data) to the New York Times in 2019. The outlet began publishing stories based on the leak starting in September 2020. Littlejohn separately stole thousands of other wealthy individuals' tax data and shared that information with another media company. That was a felony, and Littlejohn was eventually caught, convicted, and sentenced to the maximum five years in prison. *See* Judgment at 35, *United States v. Littlejohn*, 1:23-cr-343 (D.D.C. Jan. 31, 2024).

The federal tax code provides a right of action for taxpayers whose returns have been leaked to bring a civil action for damages against the United States. 26 U.S.C. § 7431(a)(1). And under the federal Privacy Act, when an agency fails to "establish appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," an injured individual "may bring a civil action against the agency." 5 U.S.C. § 552a(e)(10), (g)(1). And in 2022, another victim of Littlejohn's leak sued the United States in the Southern District of Florida, invoking the same provisions. *See Griffin v. IRS*, 1:22-cv-24023 (S.D. Fla.). The United States's motion to dismiss that case was denied, *see Griffin*, Dkt. 108 at 4–7, ultimately leading to the United States settling the claim with a formal apology to the victim.[1]

[1] *See The IRS Apologizes to Ken Griffin*, WALL STREET JOURNAL (June 26, 2024), available at https://www.wsj.com/opinion/the-irs-apologizes-to-ken-griffin-citadel-taxdata-charles-littlejohn-propublica-d18b-1917.

On January 29, 2026, President Trump, Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC filed a complaint in the U.S. District Court for the Southern District of Florida asserting claims under these and similar laws, and they contemplated a possible class claim on behalf of similarly-situated individuals. *See* Complaint at 1, *President Donald J. Trump, et al. v. Internal Revenue Serv.*, 1:26-cv-20609 (Jan. 29, 2026); *see also* Dkt. 123-1 at 1. President Trump had also submitted Federal Tort Claims Act ("FTCA") administrative claims for relief alleging an unlawful raid on his Mar-a-Lago home in Palm Beach, Florida, as well as unlawful targeting in relation to the infamous Russia-collusion hoax. Dkt. 123-1 at 1.

Ultimately, the federal defendants agreed to resolve the litigation and pre-litigation FTCA administrative claims for no "monetary payment or damages of any kind" to the plaintiffs in a May 18, 2026, settlement. *Id.* Instead, President Trump and his family would "receive a formal apology" and, in exchange, waive all claims they could have asserted in that litigation. *Id.* at 1–2. The United States also agreed to release the plaintiffs in that Florida suit from "all claims, charges, counterclaims, causes of action, appeals, or requests for any relief," including for "tax payments" or "debt relief"—if any such proceeding were to "arise out of" the events forming the basis for the Florida suit. *Id.* at 2. And finally, the United States agreed to establish "a systematic process to hear and redress claims of others who," like President Trump and his family, claim "harm from similar Lawfare and Weaponization," through the Fund. *Id.*

Per the Settlement, the Attorney General would issue an Order establishing the Fund, its rules, conditions, terms, and "appointing [its] Members." Dkt. 123-1 at 2. Once appointed, Members would have had "the power to determine [the Fund's] own procedures for submitting, receiving, processing, and granting or denying claims." *Id.* They would also have had "the power to issue formal apologies, issue monetary relief owed to claimants as a result of their legal rights,

grant claims in whole or in part, deny claims in whole or in part, defer review of claims, and receive and request evidence or other support for claims, including requesting information from, or consulting with, federal agencies." *Id.* at 2–3. The Settlement Agreement and corresponding Order garnered significant attention and provoked widespread debate about the weaponization of government, about how any claims process should function and/or whether there should be one at all, and about settlements reached by other administrations.[2]

Importantly, when Plaintiffs filed this case (and indeed still today), no money had been transferred to the Fund, let alone any claimant. No mechanisms were in place for formally submitting, receiving, processing, granting, or denying claims. None of the five contemplated Members who would establish and administer such procedures for the Fund were ever appointed.

After Plaintiffs filed this case, the widespread debate and corresponding political process continued to play out. On June 2, 2026, Attorney General Blanche told Congress that although "the reasons for the Fund remain important," the Fund is "not going forward, period." Dkt. 93-1 at 17. The Justice Department incorporated those statements in numerous briefs before this and other

[2] For example, the *Keepseagle* settlement "created a Compensation Fund … of $680,000,000" that would be paid through a "Non-Judicial Claims Process." 102 F. Supp. 3d at 309. Unlike the Anti-Weaponization Fund, which would revert any balance to the federal government, the *Keepseagle* settlement provided for "leftover" money to be distributed to persons and entities that the plaintiffs' class counsel designated as having benefited Native American farmers and ranchers. *See id.* Such persons and entities included "non-profit organizations." *Id.* (alteration omitted). When the non-judicial claims process concluded, "approximately $380,000,000 remained leftover," leading to further settlement modifications and litigation about what persons and entities would receive the remaining funds despite not having submitted claims. *Id.* at 310. The Obama Administration also administratively created a voluntary claims process for Hispanic and women farmers, without requiring the filing of a prior lawsuit, by making over $1.3 billion available from the Judgment Fund (plus up to $160 million in debt relief). Department of Justice, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), *available at* https://www.justice.gov/archives/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Vilsack*, No. 00-02502 (D.D.C.).

courts.[3] And on July 15, 2026, the Attorney General testified under oath, at his Senate Confirmation hearing, that the Fund "is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead, it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States ("Nomination Hearing"), at 1:26:42–:49. He emphasized: "The settlement fund is just not moving forward. There's no modification. It never started. No money went from the Treasury to any other account. There's no commissioners. It's not moving forward." *Id.* at 1:27:12–:22. Later in the same hearing, he reiterated, "I'm under oath today, and I've said it's dead repeatedly." *Id.* at 2:30:44-:53.

After his hearing, the Attorney General also signed a new, superseding Order, rescinding the May 18 Order, rendering it of "no force or effect," and "establish[ing], beyond any reasonable doubt, that there is no Fund." Dkt. 123-5. And even after being sworn in as the Attorney General he repeated: "The President said in the cabinet meeting that it's dead … I keep on saying this over and over again, but I'm happy to say it one more time. I have testified under oath that it's dead. I have testified in front of the House where I wasn't under oath, where I said it was dead … I'm not sure how I can further say that the Anti-Weaponization Fund doesn't exist." Fox News, *Todd Blanche: The DOJ anti-weaponization fund doesn't exist*, at 00:02–:44 (Aug. 12, 2026).

## LEGAL STANDARD

Defendants move to dismiss this action under Rule 12(b)(1) and Rule 12(b)(6). "[T]he burden rests with the plaintiff" to demonstrate that jurisdiction exists. *Lucas v. Henrico Cnty. Sch.*

[3] While this Court did not believe these and similar statements mooted this action, Dkt. 85, a federal court in the District of Columbia relied on them in denying relief in a case very similar to the instant action. Dkt. 83-1 at 20–21; *see Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789, 2026 WL 1802997 (D.D.C. June 23, 2026) (denying a motion for Preliminary Injunction for lack of subject matter jurisdiction); Minute Entry, *Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789 (D.D.C. June 10, 2026) (denying motion for Temporary Restraining Order).

*Bd.*, 822 F. Supp. 2d 589, 599 (E.D. Va. 2011) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). And to survive "a Rule 12(b)(6) motion, '[f]actual allegations must be enough to raise a right to relief above the speculative level'" and must contain "'enough facts to state a claim to relief that is plausible on its face.'" *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 269 (4th Cir. 2022) (internal quotations and citations omitted). "A plausible claim to relief 'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I. PLAINTIFFS' FUND CLAIMS ARE NOT JUSTICIABLE

#### A. Even Assuming They Were Ripe in the First Place, Plaintiffs' Fund Claims Are, Beyond All Doubt, Now Moot

Plaintiffs' challenges to the Fund do not present a "Case" or "Controversy" because "the issues presented are no longer live [and] the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). The sworn testimony of the then-Acting Attorney General to Congress, his subsequent written rescission of his May 18 Order, and recent public statements he has made after his confirmation to the position of Attorney General all make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted). That is true "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Id.* Because "the court is not empowered to decide moot questions," *People of State of Cal. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893), the Fund claims must be dismissed.

Previously, this Court expressed the view that the case was not moot because the Attorney General's representations were not made under a significant enough threat "of really serious potential sanctions." Hearing Transcript at 5:21–23. The Court indicated that a statement made "under the penalty of perjury affirming what [he] had represented to the public" would provide enough sufficient "penalties of falsity." Dkt. 96 at 1–2. The Court also weighed the fact that the May 18 Order had not been rescinded in writing. Dkt. 96 at 3. Thus, "on the record" existing on June 24, 2026, the Court reasoned that the Department's "unwillingness to provide declarations under the penalty of perjury, and Acting Attorney General Blanche's refusal to rescind the May 18, 2026 memo, which set up the structure of the Fund," precluded a finding of mootness. *Id.* at 4.

Mootness, however, must be assessed "at each stage" of a case. *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016); *accord SAS Inst. v. World Programming Ltd.*, 874 F.3d 370, 389 (4th Cir. 2017) (courts "must address … the continued justiciability" of a dispute, including "the issue of mootness"). It can arise "due to a change in factual circumstances," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011), or because the court can no longer offer "effective relief." *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013) (quoting *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)). While Defendants respectfully disagree that the case was not already moot in June, both concerns the Court previously raised have been thoroughly addressed. The Attorney General testified, under oath, that the Fund will not move forward. He has also issued a written recission of the May 18 Order.

This case is, now, without a doubt, moot. Plaintiffs' entire Fund-related theory of injury depends on "[t]he creation and existence of the Anti-Weaponization Fund." Dkt. 123 at ¶ 175. Now, the very Order initiating the preliminary process of bringing the Fund into operation has been rescinded and is explicitly "of no force or effect." Dkt. 123-5.

*Porter v. Clarke* does not require a different outcome. 852 F.3d 358 (4th Cir. 2017). There, a prison's regulations applying to the detention of death row inmates was challenged as unconstitutional. *Id.* at 360. During the course of the proceedings, the prison adopted new regulations while not conceding that the challenged regulations were unlawful. *Id.* at 361. The Fourth Circuit explained that the "voluntary cessation exception 'traces to the principle that a party should not be able to evade judicial review … by *temporarily* altering questionable behavior.'" *Id.* at 364 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)) (emphasis added). The exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Id.* (quotations and citations omitted). Thus, consistent with Supreme Court precedent on the matter, defendants claiming mootness by "voluntary compliance" bear the burden of "showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The government meets that standard here. *Porter* dealt with the confinement of death row inmates in a prison, where hours of confinement, visitation rights, yard privileges, and any other aspect of confinement could, conceivably, be changed at any time. And because those conditions could be capable of repeating, as the Fourth Circuit found they were in *Porter*, the defendant's voluntary compliance did not moot the case. Quite the opposite is true here. As this Court has recognized, this proposed Fund, and the associated cases seeking to halt it, have garnered media attention and public interest, *see* Dkt. 86 at 3, 20, significant attention from Members of Congress in the form of an amicus brief in this matter, and questions posed to the then-Acting Attorney

General in both the House and Senate. Through all of this, the Attorney General has been clear: the Fund is not moving forward.

The standard is whether the challenged conduct can be "reasonably expected to recur." *Porter*, 852 F.3d at 364. It cannot. *Cf. Antietam Battlefield KOA v. Hogan*, 20-2311, 2022 WL 1449180, at *2–4 (4th Cir. May 2, 2022) (finding challenges to COVID-19 related Executive Orders and restrictions moot even though those restrictions routinely waxed and waned during the pendency of the litigation). Unlike prison conditions that can suddenly change at a warden's discretion, the Fund would take several procedural steps (the naming of Members, meeting of Members, adoption of rules, submission of claims, etc.) to come into being, all of which would conflict with Department's statements made under the threat of serious penalties; the Fund cannot simply spring into being. Put differently, this case is more moot than cases to have addressed the question; because no action was taken in furtherance of creating the Fund there is no "allegedly wrongful behavior [that] could reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190.

This Court repeatedly recognized that if the Attorney General made the commitment that the Fund was not moving forward under oath, its mootness analysis would be meaningfully altered. Dkt. 86 at 5, 8, 18–20 (reasoning that "none of those statements, the oral statement before Congress or the written pleadings here, have been made under the penalty of perjury" so "from an evidentiary standpoint, they don't have sort of the imprimatur of really serious potential sanctions if that is not a truthful representation"; stating the Acting Attorney General was "unwilling to swear to these statements before Congress"; indicating that a "clear, unambiguous declaration under the penalty of perjury" would likely be "sufficient" "to moot the case"); Dkt. 85 ("declaration under the penalty of perjury"). He has now done so. The Attorney General has said in every conceivable way

that the fund is not moving forward. He said it to Congress; he said it under oath; and now he's said it (again) in writing. This case is moot and must be dismissed.

**B. Plaintiffs' Fund Claims Are Not (and Were Never) Ripe For Adjudication**

This is the rare case that is simultaneously moot and unripe. While "it may seem odd that a controversy can simultaneously be both moot and unripe," that is actually "not odd at all," as courts regularly recognize. *American Fed. of. Gov. Emps. v. Off. of Special Counsel*, 1 F.4th 180, 188 (4th Cir. 2021); *see also Jordahl v. Dem. Party of Va.*, 122 F.3d 192, 204 (4th Cir. 1997) ("The district court properly dismissed Count One on grounds of mootness and lack of ripeness."); *Citizens for Resp. and Ethics in Wash. v. Dep't of Justice*, Case No. 1:26-cv-1789, 2026 WL 1802997, Doc. 20 at *6 (D.D.C. June 23, 2026) ("In this case, I find CREW's motion can be resolved under either doctrine. The Government's decision not to proceed with the challenged Fund 'leav[es] nothing for the Court to remedy (mootness),' and to the extent CREW's claims depend on the highly uncertain implementation of the Fund, they 'are premised on future contingencies and thus unfit for judicial review (ripeness).'") (internal citations omitted).

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Cath. Social Servs., Inc.*, 509 U.S. 43, 57, n.18 (1993)). For a controversy to be ripe, its "factual components" should be "fleshed out, by some concrete action" that applies to the challenger "in a fashion that harms or threatens to harm them." *Id.* Thus, "[a] claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)).

The Supreme Court has specifically stated that ripeness is lacking when a claim or injury depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). This includes "[i]njuries that are 'contingent upon a decision to be made by a third party that has not yet acted.'" *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 296 (4th Cir. 2022) (quoting *Doe*, 713 F.3d at 758). "The plaintiff bears the burden of establishing ripeness." *Id.* at 293 (quoting *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022)).

Here, for the reasons extensively discussed, there has been (and will be) no concrete action. The dubious assumptions about how the Fund *might have* operated, underlying the entire Complaint, are precisely the type of speculative harm the Supreme Court and the Fourth Circuit have routinely found to be not ripe. And for good reason. "These constitutional doctrines ensure that we do not exceed the limits of Article III judicial power, and so guard against our rendering of an opinion 'advising what the law would be upon a hypothetical state of facts.'" *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury. As the Supreme Court stated in *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), '[a]llegations of possible future injury do not satisfy the requirements of Art. III.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). Thus, Plaintiffs' "if we applied, then we would be rejected" theory is the definition of a "contingent future event that may not occur as anticipated." *Texas*, 523 U.S. at 300. In fact, it will "not occur at all." *Id.*

Beyond an Article III limitation, the ripeness doctrine also exists in prudential form, counseling courts to decline to "wast[e] [their] resources by prematurely entangling [them]selves

in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their 'effects felt in a concrete way by the challenging parties.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (quoting *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). Courts should refrain from opining on matters early, even where doing so could provide additional certainty for the parties, because otherwise "courts would soon be overwhelmed with requests for what essentially would be advisory opinions." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811–12. The Amended Complaint narrates the political process that unfolded from May to August that ultimately resulted in the August 2 Order. Dkt. 123 at ¶¶ 48–78; Dkt. 123-5. And the culmination of the political process was that the Senate, including the Senators who opposed the Fund, voted to confirm Todd Blanche as the 88th Attorney General of the United States. Any additional involvement from courts—including, and perhaps especially, in the form of a declaratory judgment—would amount to an advisory opinion on a nonexistent Fund.

Ultimately, it is Plaintiffs' burden to establish that their challenges to the Fund are ripe, and they cannot do so here. One of the reasons Plaintiffs were forced to speculate so much about how the Fund would operate—and couch speculative future events as facts—is because so little had happened when they sued. The same remains true at the time the Amended Complaint was filed. No Members have been or will be appointed. No claims procedures have been or will be established. No claims were formally submitted, received, adjudicated, granted, or denied. No claimant received money, let alone engaged in any of the (highly attenuated) conduct that Plaintiffs allege they are concerned about. And the Attorney General's statements to Congress only underscore that all of these events could not occur as Plaintiffs anticipate—in fact, they will not "occur at all." *Texas*, 523 U.S. at 300. The United States is not aware of any federal court ever

adjudicating a claim in similar circumstances. On the contrary, courts routinely decline to adjudicate claims based on speculative fears. *See id.* at 301 (rejecting a challenge that relied on contingent and uncertain action by State actors because it "involve[d] too remote and abstract an inquiry for the proper exercise of the judicial function"); *Wild Virginia*, 56 F.4th at 296 (finding plaintiffs' "fears ha[d] not yet ripened into actionable injuries," so their claims were not justiciable).

There is also no hardship to Plaintiffs from this Court withholding consideration of their challenges to the Fund. The May 18 Order has been rescinded, and the bare existence of the Settlement Agreement has no "direct effect on the day-to-day" operations of Plaintiffs. *Texas*, 523 U.S. at 301. Plaintiffs cannot rely on "abstraction[s]" in the absence of some "primary conduct [that] is affected." *Id.* at 302. The "hardship . . . of biding [their] time" is thus "insubstantial." *Id.* But requiring the parties to litigate in the abstract, without a concrete set of facts against which to analyze Plaintiffs' claims, would cause the parties significant hardship.

Doing so would cause the Court hardship as well. "Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance." Wright & Miller, Fed. Practice and Procedure § 3532.1 (3d ed. April 2026 update). The Court should instead let the political resolution regarding the Fund stand on its own. "[T]he values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies." *Id.*

### C. Plaintiffs Have No Standing to Challenge the Fund

Plaintiffs' Fund claims suffer from a third fatal flaw: there is no Article III standing. "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and

(iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). As ideological objectors to a proposed program that could have resulted in government expenditures, Plaintiffs are no different from litigants who have unsuccessfully sought to invoke taxpayer standing. They have no individualized interests separate from "the interests of the public at large." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 600 (2007).

Indeed, Plaintiffs do not even attempt to allege monetary harm as not a single plaintiff alleges they would apply to the Fund. Instead, the Complaint states, "none of these individuals or entities can make a claim for monetary payment." Dkt. 123 at ¶ 9. Based on this, Plaintiffs seek "to halt and permanently set aside the creation and operation of" the Fund. *Id.* at ¶ 8. First, that "none of these individuals or entities can make a claim" is a bare (incorrect) legal conclusion based on speculation about how future events might unfold, the exact type of pleading that is foreclosed by *Texas*. 523 U.S. at 300. Second, the proposed relief (shutting down the non-existent Fund) does nothing to remedy the claimed injury (exclusion from the non-existent Fund). It would leave them in the exact same position they claimed to be in when they filed their complaint (and in the position they are in now, since the Fund is not going forward).

Nor do Plaintiffs connect their alleged harm to a redressable grievance with the Fund. Plaintiffs allege that they have each "incurred significant costs as a result of this targeting, including legal fees, loss of income, diversion of critical resources and reputational damage." Dkt. 123 at ¶ 178. To the extent that any of this is true, Plaintiffs have shown that they are able to get into court and obtain relief, and nothing would stop them from seeking redress against the proper defendant in the proper venue based on a concrete claim. And if they had a valid claim, they (like anyone else) could have applied to the Fund. But what no plaintiff can do is say that they have a claim they will not submit in an effort to stop a program for everyone else. Such "generalized

grievances about the conduct of government" are insufficient to establish a "Case" or "Controversy" within the meaning of Article III. *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 225 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).

Plaintiffs' inability to participate in the program would not be fairly traceable to any *government* conduct by any named Defendant. Rather, per Plaintiffs' own allegations, the failure to obtain compensation from the Fund would be due to their own decision to abstain from the voluntary process. There is no government action for the Court to redress that rights an alleged wrong specific to Plaintiffs.

Plaintiffs here are in the same position as the challengers who lacked standing in *Department of Education v. Brown*, 600 U.S. 551 (2023). There, borrowers did "not qualify for the maximum relief available" under a loan forgiveness program and "sued to enjoin it" as unlawful. *Id.* at 556. But their theory that they were "injured because the Government has not adopted a lawful benefits program under which they would qualify" failed. *Id.* at 563–64. "It would be quite strange to think that a party experiences an Article III injury by *not* being affected" by a government action that the same party argues is "unlawful." *Id.* at 564; *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45–46 (1976) (plaintiffs lacked standing to challenge an IRS tax-exemption). The same is true here. Plaintiffs explicitly eschew any plan to participate in the Fund process and, in so doing, admit their lack of standing to challenge the Fund.

With respect to Plaintiffs' misreading of the Settlement Agreement, nothing in that document would have precluded them from applying as they claim. Dkt. 123 at ¶ 2. Claimants to the Fund need only "assert at least one legal claim stating that the claimant was a victim of Lawfare and/or Weaponization," Dkt. 123-1 at 3, meaning they were "target[ed] … for improper and unlawful political, personal, and/or ideological reasons," *id.* at 1. To be sure, the Settlement

Agreement notes "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents in order to" engage in such "target[ing]." *Id.* But that recital does not narrow the scope of permitted claims.[4] And even if the Settlement Agreement were ambiguous in that respect, such contractual indeterminacy would just underscore Plaintiffs' lack of injury prior to the Fund's implementation (which now will not occur) by its Members (who have never existed). In any event, Plaintiffs do not meaningfully explain what "legal claim[s]" they planned to "assert," *id.* at 3, let alone why those claims would be precluded under the actual terms of the Settlement Agreement.

Setting all this aside, exclusion from a targeted, settlement-derived compensation scheme does not pose any harm to "a legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). There is no legal right to participation in a bespoke federal claims process. Otherwise, anyone omitted from a compensation program would have standing to challenge it despite having a "plainly undifferentiated" and "generalized grievance." *Id.* at 575 (internal quotation marks omitted). Given that targeted compensation schemes are ubiquitous, accepting Plaintiffs' standing theory would have broad and unpredictable consequences. For example, it would imply that all non-"Native-American[s]" claiming discrimination under various government programs would have had standing to challenge the *Keepseagle* settlement despite not having suffered the discrimination the class action was filed to remedy. *See Keepseagle*, 856 F.3d at 1043. The absence of harm to a legally protected interest is even more apparent here. Plaintiffs ignore that the Settlement Agreement contemplates that claimants would have been required to "assert at least

[4] Even if that language were relevant to the scope of permitted claims, the word "Democrat" modifies only "elected officials." Dkt. 123-1 at 1. If there were any doubt, the person who leaked President Trump's tax returns, ultimately leading to the Settlement Agreement, was a contractor working in a Republican administration. *See* pp. 3–5, *supra*.

one legal claim," Dkt. 123-1 at 3, and that nothing would have prevented Plaintiffs from bringing such claims by other means outside the structure of the Fund.

Ultimately, the relief that Plaintiffs seek does not redress their claimed injury—the purported exclusion from the Fund's claims process. Rather than seeking relief that would allow them to submit claims, Plaintiffs ask the Court to shut down the (never running, already shut down) Fund. That would leave Plaintiffs in the same position they are in now and claimed to be in before. Plaintiffs, by definition, lack Article III standing.

## II. NTEU's CLAIMS ARE NOT JUSTICIABLE

NTEU's challenge to the release of claims Order fails on justiciability grounds as well.

*First*. NTEU fails to allege a cognizable injury. *Trump v. New York*, 592 U.S. 125, 131–32 (2020) (no Article III injury where plaintiffs' claim involves a "significant degree of guesswork" and is "riddled with contingencies and speculation"). NTEU claims that some unnamed federal employees at the Internal Revenue Service (1) have a legal duty to conduct tax audits, Dkt. 123 at ¶ 200; (2) took an oath to "support and defend the Constitution," *id*. at ¶ 194; (3) might think a third-party settlement agreement not before this Court providing tax relief to the President is an unconstitutional Emolument, *id*. at ¶ 196, (4) also think that the tax immunity provision might violate 26 U.S.C. § 7217, *id*. at ¶ 197; and (5) believe that federal law might be violated if they honor the settlement agreement, and that their jobs would be at risk due to their view on what federal law requires, *id*. at ¶¶ 203–04.

No court has ever approved such a capacious theory of injury. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (explaining that "one-step-removed, anticipatory" allegations, or "theories that require guesswork as to how independent decisionmakers will exercise their judgment," cannot satisfy the standing requirement (citations and quotation marks omitted)). NTEU's "theory of

*future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper v. Amnesty Int'l*, 568 U.S. 398, 401 (2013) (emphasis in original). And while NTEU has gestured towards past disciplinary directed at other employees for insubordination, Dkt. 123 at ¶¶ 205–09, it has not plausibly "link[ed]" those events to the future harms it speculates will occur here. *Murthy*, 603 U.S. at 62 (explaining that plaintiffs' reliance "on allegations of past Government censorship as evidence that future censorship is likely" was insufficient to satisfy standing without allegations plausibly linking the prior acts to the alleged future harm); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting "if it happened there, it could have happened here" allegation).

*Second*. For the same reasons these speculative allegations fail to make out a cognizable injury-in-fact, the claims are clearly unripe. NTEU has alleged that "on information and belief," its members "*will* be called upon" to implement a directive they disagree with, that doing so "*would* violate" a constitutional provision (one which has never been enforced by any court), and that refusing to do so "would" lead to discipline. Dkt. 123 at ¶¶ 199, 203, 204 (emphases added). None of those things have happened. And given that NTEU's real quarrel is with the *absence* of a government enforcement action, it seems far more likely that *nothing* is going to happen. Regardless, even if some employee suffered an adverse employment action at some point in the future, that employee could go to the Inspector General, could pursue the protections of the Whistleblower Protection Act, not to mention bring a claim to the Equal Employment Opportunity Commission, the Merit Systems Protection Board, or file a lawsuit to redress whatever injury *actually occurs*. NTEU's "allegations" as they stand, though, are not even close to ripe.

*Third*. NTEU lacks organizational standing. "In determining whether an organization has standing, we must conduct the same inquiry as in the case of an individual." *Lane v. Holder*, 703

F.3d 668, 674 (4th Cir. 2012). An organization may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Roe v. Shanahan*, 359 F. Supp. 3d 382, 408 (E.D. Va. 2019) (Brinkema, J.), *aff'd sub nom*. *Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020). In *Roe*, the organization identified the named plaintiffs and "several additional members" who "faced imminent separation." *Id.*; *see also id.* at 408 n.27. Here, NTEU has not named one member who has suffered Article III injury. In fact, amid the Amended Complaint's 20 additional pages of conclusory allegations and legal contentions, NTEU does not identify even one member who has faced anything that could be construed as harm. Claiming "on information and belief" that some unnamed member, at some point in the future, "will be called upon" to do some unknown act that supposedly violates a legal right, is not enough. Dkt. 123 at ¶ 199.

*Fourth*. NTEU cannot show redressability. NTEU's requested relief is a "court order setting aside or vacating" the May 19 Order. ECF No. 123 at ¶ 210. That relief would do nothing to the provision in the Settlement Agreement that NTEU (incorrectly) claims is an Emolument.

*Fifth*. At bottom, NTEU's challenge amounts to a disagreement with the decision made, by the officials charged with making such decisions, to settle a claim and redirect resources within an agency. Such a claim has long been presumptively unreviewable. *Heckler v. Chaney*, 470 U.S. 821, 834 (1985) (finding "a general presumption of unreviewability of decisions not to enforce"); *Donovan v. Un. Steelworkers of Am., AFL-CIO*, 722 F.2d 1158, 1159–60 (4th Cir. 1983) ("upholding fully the position of the Secretary" that "the authority of the Secretary to settle a citation is within his prosecutorial discretion"). *Chaney* applies equally "to an agency's decision to settle an enforcement action." *Assoc. of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C.

Cir. 2007); *see also Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001) (explaining that "FERC's decision to settle with [a gas transmission company], and its consequent decision not to see its enforcement action through to fruition, is a paradigmatic instance of an agency exercising its presumptively nonreviewable enforcement discretion"). This principle is widely recognized by several circuits. *See, e.g.*, *SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 164 (2d Cir. 2012); *Donovan v. Allied Indus. Workers of Am.*, 760 F.2d 783, 785 (7th Cir. 1985).

## III. PLAINTIFFS FAIL TO PLEAD ANY COGNIZABLE CAUSE OF ACTION

### A. Plaintiffs' First Amendment and Equal Protection Claims Fail

#### *i. First Amendment Claim (And Related APA § 706(2)(B) Claim)*

Plaintiffs' argument that the Fund is premised upon viewpoint discrimination does not make sense. On its face, the Settlement Agreement contemplates the submission of claims by putative victims of Lawfare and Weaponization without regard to a claimant's speech or viewpoint. Indeed, Plaintiffs themselves submitted to the Court a Department of Justice overview document stating that "Democrats can submit claims, too." Dkt. 123-4. Yet Plaintiffs assert viewpoint discrimination on the convoluted theory that "the Fund exists to compensate claimants who allege 'Lawfare and Weaponization' by Democratic administrations but not Republican ones" in direct opposition to the exhibits they attached to the Complaint. *See* Dkt. 123 at ¶ 181; Dkt. 25 at 13; *but see* Dkt. 123-4.

This theory suffers from several defects beyond justiciability. To start, Plaintiffs misread the Settlement Agreement, which covers both Republican and Democrat administrations. *See* p. 16–17, *supra*. And even if Plaintiffs' (mis)interpretation were correct, there would be no First Amendment problem. Limiting the scope of a claims process is not conditioning or denying a benefit based on viewpoint discrimination. The government is free to "selectively fund a program," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), so long as the government does not "seek to leverage

funding to regulate speech outside the contours of the program," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 US. 205, 214–15 (2013). There is no apparent way that the Fund's (hypothetical) Members could have regulated speech. And if that somehow occurred, it would at most have been the basis for a challenge on such concrete facts—not one resting on hypotheticals and speculation.

*ii. Equal Protection (And Related APA § 706(2)(B) Claim)*

Plaintiffs similarly assert an equal protection theory based on the supposed distinction the Fund makes between those allegedly targeted by Democrats and those targeted by Republicans. Dkt. 123 at ¶¶ 218–28. Once again, this claim fails for the simple reason that the Settlement Agreement does not draw this distinction. But even if it did, that would not give rise to an equal protection claim. The government can create compensation programs to address limited categories of past misconduct, as in *Keepseagle* (which involved a "political" preference for Native Americans, *see Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974)), without incurring an obligation to compensate other categories of grievances on the same terms. 856 F.3d at 1043–44.[5] Such a classification does not "affect fundamental rights nor proceed along suspect lines," so it would not trigger heightened scrutiny. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). And there is "a rational basis for the classification," *Heller*, 509 U.S. at 320 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)), because the Fund was part of a Settlement Agreement that resolved specific litigation by providing compensation for those targeted by the same category of Lawfare and Weaponization that prompted the lawsuit. There is nothing "invidious" about trying to solve a particular problem "without at the same time funding an alternative program which seeks

[5] Even under Plaintiffs' misreading, Democrats targeted by Democrats could have asserted claims. *See* Emily Goodin, *Hunter Biden could be among those that cash in as Trump drops IRS suit in exchange for $1.776B fund for victims of gov't weaponization*, NEW YORK POST (May 18, 2026).

to deal with the problem in another way." *Rust*, 500 U.S. at 193.[6] Likewise, Plaintiffs' premature, speculative, and conclusory, Fourteenth Amendment Insurrection challenge, Dkt. 123 at ¶ 266, is not well-pled. Nor can there be any Appointments Clause violation without any appointment, *see id.* at ¶ 267, or any violation of any statute if the Fund does not exist, *see id.* at ¶¶ 269–82.

**B. Plaintiffs' Separation Of Powers and *Ultra Vires* Claims Fail**

Plaintiffs' separation-of-powers claim fails because "the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here." *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026); *see also id.* ("[T]he Supreme Court considered and rejected the argument that 'whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine.'" (quoting *Dalton v. Specter*, 511 U.S. 462, 471 (1994))). This means "'claims simply alleging that the President has exceeded his statutory authority are not constitutional claims' freely reviewable at equity." *Id.* (quoting *Dalton*, 511 U.S. at 471). Plaintiffs' theory, that "[t]he Fund usurps legislative authority conferred by the Constitution in violation of the separation of powers," is clearly foreclosed by this binding precedent. *See* Dkt. 123 at ¶ 234. Regardless, there is no Fund.[7]

Plaintiffs' *ultra vires* claim also fails for several reasons. "An ultra vires claim is 'essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds.'" *Sustainability Inst*, 165 F.4th at 830. *Ultra vires* claims are "not available simply because an agency has arguably reached a conclusion which does not comport with the law." *Id.* (quoting *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025)). But here, the claims rely on a conclusory

[6] Plaintiff the City of New Haven also does not have rights under the First Amendment or the Equal Protection Clause. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (contrasting a "political subdivision" of a State with "[a] private corporation [that] enjoys constitutional protections").

[7] Plaintiffs' APA § 706(2)(B), (D) theories fail for the same reasons.

allegation that the challenged actions are "contrary to law and constitutional right." Dkt. 123 at ¶ 299. Second, *ultra vires* claims are not available where any other statutory scheme "provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Sustainability Inst.*, 165 F.4th at 830 (quoting *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776). As explained above, NTEU's claims are in essence hypothetical employment disputes which can be remedied through existing schemes if the events it fears ever come to pass. As for the Fund claims, the Fund cannot be *ultra vires* if it does not exist. Third, *ultra vires* review is available only for statutory, not constitutional violations. *Id.* at 829–30. To the extent Plaintiffs' ultra vires claim is directed at constitutional violations, it must be dismissed. *See* Dkt. No. 123 at ¶¶ 298–99.

Finally, *ultra vires* claims can only proceed "where there is a strong and clear demonstration that a clear, specific and mandatory statutory provision has been violated." *Sustainability Inst.*, 165 F.4th at 830 (quoting *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 234 (4th Cir. 2008)). The simple fact that in *Keepseagle* the D.C. Circuit affirmed the settlement is, on its own, sufficient to prevent any strong or clear showing of a specific violation of a specific statutory prohibition. 856 F.3d at 1056.

**C. Plaintiffs' APA Challenges to the Fund Must Fail Because There Has Been No Final Agency Action**

The Administrative Procedure Act ("APA") contemplates judicial review of "final agency action." 5 U.S.C. § 704. "[T]wo conditions generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "The core question is whether the agency

has completed its decision-making process, and whether the result of that process is one that will directly affect the parties." *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Here, there is no final agency action. Not even close. The Settlement Agreement and accompanying Order do not award relief on any claims or even establish formal processes for the Fund to do so—that would have been up to the Members, who were not even appointed. No rights or obligations were determined, and no legal consequences flowed—let alone rights, obligations, or consequences that directly impact Plaintiffs. The fact that the Order has now been rescinded just confirms there was no action from which concrete legal consequences flowed to begin with.

Plaintiffs' threadbare argument to the contrary misses the mark. They say the Fund reflects "the consummation of DOJ and Treasury's decision-making process because it affirmatively establishes the Fund." Dkt. 123 at ¶ 245. But the creation of the Fund, without further action, is a legal nullity. At best, the Settlement Agreement is the *conception* of—not "consummation of"—an agency process. *Hawkes Co.*, 578 U.S. at 597. Even if there were money in the Fund—there is not—there would still be only tentative, interlocutory action that does not impact Plaintiffs. In fact, Plaintiffs' only argument that the Fund determines rights and obligations, and causes legal consequences, is that the government has "establishe[d] a legal process by which some individuals … have the right to pursue claims." Dkt. 123 at ¶ 246. That is indisputably inaccurate as the Members of said Fund were never appointed, never adopted any process or standards for evaluating or compensating claims, never received any money, and never disbursed any money.

APA principles in the grant-making context are instructive. Courts have consistently held that an agency does not take final action in the grant context until the agency completes review of an application and decides whether to award or disburse funds. *Friends of the Everglades, Inc. v.*

*Sec'y of U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 831 (11th Cir. 2026) ("The *agency* has taken no action to fund the project. Even congressional appropriation of funds for a project will not allow challengers to an agency's use of those funds to obtain relief 'until the [agency] has reviewed a grant application and decided to disburse the funds.'" (quoting *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)); *see also Karst Env't Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007) (finding that the "district court's decision is unassailable"); *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430–32 (2d Cir. 2015) (considering HUD's rejection of county's proposals and decision to withhold allocated funds was final because it made a definitive funding determination); *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, 179 F.4th 169, 184–85 (3d Cir. 2026) (NPS exhibit-removal decisions not final agency action because they did not alter obligations). Indeed, the scope of APA review for spending decisions is so narrow that agency decisions to *terminate* funding are not even subject to APA review, but are instead governed by the Tucker Act and routed to the court of Federal Claims. *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026); *Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d. 563, 569 (E.D. Va. 2025) (appeal pending).

In sum, there is no final agency action here, and that alone is fatal to Plaintiffs' APA claims.[8]

**D. NTEU's APA Challenges to the So-Called "Immunity Order" Fail**

NTEU cannot challenge the Department's decision to settle a case and release claims under the APA. In the APA context, "certain categories of administrative decisions are unreviewable,

[8] Plaintiffs also bring a conclusory claim that the Fund is a "legislative rule within the meaning of the APA," requiring "advance publication and notice-and-comment." Dkt. 123 at ¶¶ 294–95. But "[t]hreadbare recitals of the elements of a notice-and-comment cause of action, supported by mere conclusory statements," are "not enough to survive a 12(b)(6) motion to dismiss." *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 347 (D.C. Cir. 2018). Regardless, as has been thoroughly explained above, this so-called "legislative rule" does not exist.

among which are agency decisions not to institute enforcement proceedings." *CREW v. FEC*, 892 F.3d 434, 439 (D.C. Cir. 2018) (citation and quotation marks omitted); *see also Pharma. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (explaining that "[a]n agency's discretion not to prosecute or enforce" is generally subject to the APA's prohibition on "judicial review of actions committed to agency discretion by law" because such decisions "often involve[] complicated interest-balancing of factors within the agency's expertise" and "resemble[] the strong discretion given to prosecutors on charging decisions"). Where "no judicially manageable standards are available to assess how and when an agency should exercise its discretion," such exercises of discretion are immune from APA review. *Pharmaceutical Coalition*, 126 F.4th at 964. In determining whether a "meaningful standard for reviewing agency discretion exists, … courts consider the particular language and overall structure of the statute in question, … as well as the nature of the administrative action at issue." *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008). Plaintiffs have not identified any meaningful statutory provision limiting Executive discretion here, and indeed it is "difficult to think of a category of administrative action less prone to review." *Id.* at 317–18.[9]

**E. Plaintiffs Fail to State a Claim Under the Domestic Emoluments Clause**

No cause of action is available under the Domestic Emoluments Clause, and the Clause simply does not reach the alleged conduct. The Domestic Emoluments Clause states:

> The President shall, at stated Times, receive for his Services, a Compensation which shall neither be encreased nor diminished during the Period for which he shall have

[9] Plaintiffs fail to plausibly allege any violation of 26 U.S.C. §§ 7217 or 7122(a). Section 7217 does not prevent an individual, who happens to be the President, from settling tax claims with the IRS on behalf of himself and his Family. And § 7122(a) does not conflict with the Settlement Agreement. Dkt. 123 at ¶ 281. That very statute provides that the Secretary of the Treasury "may compromise any civil or criminal case arising under the internal revenue laws." 26 U.S.C. § 7122(a). As Plaintiffs' own Complaint acknowledges, Secretary Bessent has stated he will effectuate the Settlement's claim-release provision. Dkt. 123 at ¶¶ 63, 198.

> been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const. art. II, § 1, cl. 7.

First, the only time the Fourth Circuit considered this issue on the merits, a unanimous panel explained—in an opinion vacated on the mandamus grounds in which the appeal arose—"by its terms," the clause "give[s] no rights and provide[s] no remedies." *In re Trump*, 928 F.3d 360, 368 (4th Cir. 2019), *vacated on different grounds on reh'g*, 958 F.3d 274 (4th Cir. 2020). This is fatal; "the power to create causes of action belongs to Congress." *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1890 (2026). Indeed, the Court has "virtually eliminated the practice of fashioning" causes of action, because doing so "offend[s] the separation of powers in almost every circumstance." *Id.* at 1891. Furthermore, the presence of "an alternative remedial structure … *alone* precludes the creation of a cause of action." *Id.* The Constitution itself supplies an alternative, political remedial structure in the form of the Impeachment clauses. *See In re Trump*, 958 F.3d 274, 291 (4th Cir. 2020) (en banc) (Wilkinson, J., dissenting) (explaining that "the powers of Congress to include emoluments abuse in articles of impeachment" foreclose a judicially crafted cause of action, and explaining that the Fourth Circuit never reached the issue). Ultimately, equity "may not be used to create new substantive rights." *E. Tenn. Nat. Gas. Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004). That is exactly what NTEU asks the Court to do here, and the Court should not accept the invitation.

Second, NTEU's Emoluments Clause claim is premised on an obvious misreading of the provision—that an "Emolument is defined broadly as any profit, gain, or advantage." *See* Dkt. 123 at ¶ 237 (citations omitted). That reading is impossible to square with the constitutional text. The correct reading of the Clause is that it prohibits "[t]he *President*" from engaging in a *quid pro quo* through the exchange of "Emoluments" for official acts. U.S. Const. art. II, § 1, cl. 7.

Context makes that clear. The Foreign Emoluments Clause prohibits the receipt of any "present." U.S. Const. art I, § 9, cl. 8. But Plaintiffs' reading of the Domestic Clause would render "presents" in the Foreign Clause superfluous. *See Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 570–71 (1840) ("[N]o word [in the Constitution] was unnecessarily used, or needlessly added."). Furthermore, in the Domestic Clause, the term "Compensation" is qualified by "for his Services" as President. U.S. Const. art. II, § 1, cl. 7. That qualification must also apply to "any other Emolument"—the word "other" appears between "for his Services" and "Emolument," confirming that "Compensation" and "Emolument" are intended to be read in parallel. *Id.*

Founding-era evidence supports this reading. George Washington, for instance, directly transacted business with the federal government while he was President, for example by buying several lots of federal land in the then-Territory of Columbia in a public sale he himself authorized. *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793);[10] Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793).[11] Similarly, several early Presidents owned plantations and continued to export cash crops overseas while in office, including Washington and Thomas Jefferson. *See Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9; Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75–76 (Paul Leicester Ford ed., 1905).[12] There is no evidence any of these activities were seen as Emoluments Clause violations.

But the most fundamental flaw in NTEU's theory is that it fails to allege any *quid pro quo* through the exchange of "Emoluments" for official acts. Indeed, the President is not even a party

[10] Available at http://founders.archives.gov/documents/Washington/05-14-02-0074.
[11] Available at https://founders.archives.gov/documents/Washington/05-14-02-0068.
[12] Available at http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-thegristmill.

to this action. Plaintiffs take issue with a tax discharge President Trump received in his *individual* capacity. This cannot be an "Emolument" in the constitutional sense.[13]

**CONCLUSION**

Because the Court lacks subject-matter jurisdiction and because Plaintiffs fail to state a claim to relief that is plausible on its face, the Court should dismiss the Complaint, in its entirety, with prejudice.

Dated: August 21, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/ Andrew J. Block*
ANDREW J. BLOCK
*Senior Counsel to the Associate Attorney General*
HENRIQUE CARNEIRO
*Counsel to the Associate Attorney General*
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Counsel for Defendants*

[13] NTEU's APA § 706(2)(B) claim fails for the same reason.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block