**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

Andrew Floyd, et al.,

Plaintiffs,

v.

Department of Justice, et al.,

Defendants.

**Case No. 26-cv-1399-LMB**

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS

## TABLE OF CONTENTS


INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

LEGAL STANDARD .......... 5

ARGUMENT .......... 5

I. The Fund Plaintiffs' claims are justiciable. .......... 5

A. Defendants have not met their heavy burden to show that their unlawful action will not recur, so Plaintiffs' challenge to the Fund is not moot. .......... 5

B. The Fund Plaintiffs have standing. .......... 8

1. The Fund Plaintiffs have alleged injury. .......... 8

a. The individual Plaintiffs and New Haven have alleged Equal Protection and First Amendment injuries. .......... 8

b. The Fund injures NAF and Common Cause by requiring them to divert resources to prevent harm and through its secrecy. .......... 9

2. Plaintiffs' injuries are traceable to the Fund and redressable by dissolution of the Fund. .......... 11

C. Plaintiffs' claims were ripe when the Complaint was filed and Defendants cannot rely on that doctrine to evade their burden to establish mootness. .......... 12

II. Plaintiff NTEU's claims challenging the Immunity Order are justiciable. .......... 14

A. Plaintiff NTEU alleged a cognizable injury-in-fact that is redressable. .......... 14

B. Plaintiff NTEU has standing to represent its members. .......... 17

III. Plaintiffs have alleged valid constitutional and statutory claims. .......... 18

A. The Fund Plaintiffs have stated First Amendment and Equal Protection claims. .......... 19

B. The Fund Plaintiffs have adequately pled their other constitutional claims. .......... 21

C. Plaintiffs have stated ultra vires claims. .......... 22

D. The Fund Plaintiffs have stated an APA Claim. .......... 23

E. Plaintiff NTEU has stated an APA claim against the Immunity Order. .......... 24

F. Plaintiff NTEU has stated an Emoluments Clause claim. .......... 26

1. The Immunity Order is an unconstitutional emolument. .......... 26

2. NTEU has a cause of action to bring an Emoluments Clause claim. .......... 30

CONCLUSION .......... 30

## INTRODUCTION

President Trump, along with his family and businesses, brought an untimely and jurisdictionally faulty lawsuit against two federal agencies that he controls, the Department of Justice and Department of Treasury (including the Internal Revenue Service). The parties then executed a predictably collusive Settlement Agreement. *Trump v. IRS*, No. 1:26-cv-20609 (S.D. Fla. Jan. 29, 2026). The Agreement led to then-Acting Attorney General ("Acting AG") Blanche issuing orders requiring the United States to give the President two very valuable things: (1) a $1.776 billion "Anti-Weaponization" slush fund to make payments to those the Trump-Vance administration favors ("AWF" or "Fund"); and (2) immunity from civil and criminal liability for President Trump, his family, his businesses, and all others deemed to be "related" or "affiliated," including a release of tax liability and tax audits, for all conduct before May 18, 2026 ("Immunity Order"). Three weeks later, the President nominated Blanche for Attorney General ("AG").

This scheme is an unprecedented, unlawful, and corrupt attempt to manipulate the legal process and laws intended to prevent political interference to achieve benefits that President Trump and his political allies could not have obtained lawfully. As the district court in *Trump v. IRS* held, President Trump filed a "collusive" lawsuit to "justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations." No. 1:26-cv-20609, 2026 WL 2015525, at *8, *17, *19 (S.D. Fla. July 13, 2026).

In May, after finding Plaintiffs likely had standing to challenge the Fund, this Court preliminarily enjoined Defendants from moving forward with the Fund. Contrary to Defendants' representations, they did not change course voluntarily; this Court's injunction forced the Executive's hand. And then, when the Court provided clear instructions for Defendants as to how to "avoid any further litigation"—a "declaration under the penalty of perjury" from Defendants Blanche, Woodward, and Bessent "that they will not take any action to create or operate the [AWF], and that the [AWF] will not proceed in any manner, or under any name," Dkt. 85—Defendants resisted, citing a now-oft and overused incantation of their Article II authority to justify their refusal.

On August 2, then-Acting AG Blanche purported to rescind the May 18 Funding Order by stating that the Fund "is" not currently "operative." This present-tense wordsmithing assuredly does not affirm, under penalty of perjury, that "the [AWF] will not proceed *in any manner, or under any name*," either now or in the future. *Id*. Defendants' refusal to provide this assurance is unsurprising. President Trump has made clear his intent that January 6 criminals and insurrectionists be compensated. AG Blanche, too, said that he believes that victims of so-called weaponization should be paid. Meanwhile, Defendants continue to defend the lawfulness of the Fund in their briefing. Defendants have had ample opportunity to demonstrate that this controversy is over, but they have refused to do so. Plaintiffs' challenge to the Fund is therefore not moot.

This Court previously determined that Plaintiffs likely have standing to challenge the Fund, and none of Defendants' arguments cast doubt on that sound conclusion. NTEU likewise has adequately alleged standing to challenge the Immunity Order. NTEU brings claims on behalf of its career IRS members, who, as a direct result of the Immunity Order, will be given unlawful directions to terminate particular taxpayers' audits in violation of section 7217. The Immunity Order will conscript career IRS employees into providing the President and his relatives and affiliates with a lucrative benefit not available to any other Americans. Acceding to such a request would cause NTEU members to violate their oath of office; refusing such a request places them at risk of retaliation for insubordination. The request also triggers statutory reporting requirements and NTEU members must either report (and risk retaliation) or not report (and risk dismissal and criminal prosecution).

Plaintiffs stand on equally solid ground on the merits of their claims. No statute authorizes the creation of a $1.776 billion slush fund to settle a collusive lawsuit and to disburse payment to allies of the Trump-Vance administration, and the Fourteenth Amendment specifically prohibits any such payment to insurrectionists. The Fund's favorable treatment of those who claim to have been targeted by "Democrat" administrations, but not those targeted by Republican administrations, violates both the First Amendment and the Equal Protection guarantees of our Constitution. Furthermore, in creating the payment scheme with no congressional appropriation

violates the separation of powers. The Fund violates both the Constitution and multiple statutes.

The Immunity Order violates 26 U.S.C. § 7217, which prohibits the President from asking the IRS, either directly or indirectly, to end audits of particular taxpayers, including the President's audits. The Immunity Order also overrides an IRS requirement, in place for nearly 50 years, that the President's tax returns be audited annually by career IRS employees. Given the significant financial benefit that the President will receive from the termination and preclusion of audits, the Immunity Order further violates the Domestic Emoluments Clause. Under the Clause, no one—not the AG or any officer or employee of the United States—can take action that would enable the President to "receive" an emolument. In so doing, the Clause guards against "the consequences of allowing a President to convert his or her office into a vehicle for personal profit." *Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995). Because this Court has jurisdiction and Plaintiffs have stated viable claims, Defendants' motion should be denied.

## FACTUAL BACKGROUND

Plaintiffs will not repeat the facts from their Amended Complaint, as the Court is already familiar. *See* First Amended Complaint ("FAC"), Dkt. 123. A few points, however, bear emphasis.

*First*, contrary to their representations, Defendants did not decline to move forward with the Fund of their own volition. *Cf.* Defs.' Am. Mot. to Dismiss ("MTD"), Dkt. 147 at 5. It was this Court's May 29, 2026 order preliminarily enjoining Defendants from taking any action to create or operate the Fund, Dkt. 31, that spurred Defendants' backpedaling. Indeed, two days after the May 29 order, DOJ stated that it intended to "abide by th[is] Court's ruling," FAC ¶ 56. The "political process" that Defendants keep referencing, MTD at 5, 13-14, took place after this Court enjoined the Fund. FAC ¶¶ 55-57.

*Second*, Defendants make much of then-Acting AG Blanche's statements to Congress about the status of the Fund, which culminated in the August 2 Fund Order purportedly "rescinding the May 18 Order" that provided $1.776 billion for the Fund. *See* MTD at 5-6; FAC Ex. E, Dkt. 123-5. But the August 2 Fund Order did not (1) state that Defendants will not recreate the Fund or some iteration of it in the future; or (2) make any commitments regarding the enforceability of the

*Trump v. IRS* settlement agreement that created the Fund and served as the basis for the Immunity Order. The August 2 Fund Order thus fell far short of "declaration[s] under the penalty of perjury" from all three individual Defendants "that they will not take any action to create or operate the [AWF], and that the [AWF] will not proceed in any manner, or under any name." Dkt. 85; *see also* FAC ¶¶ 12, 64–71 (expounding on deficiencies in August 2 Fund Order).

Notwithstanding the AG's statements and August 2 Fund Order, the Fund can be resurrected at any time because the plaintiffs in *Trump v. IRS* can enforce the terms of the Settlement Agreement. Indeed, when Senator Cornyn challenged then-Acting AG Blanche on how the Fund could be dead without any corresponding modification of the *Trump v. IRS* Agreement—which, by its terms can be modified only in writing—the Acting AG acknowledged that the plaintiffs to the Agreement could "enforce the contract." FAC ¶ 58. Shortly after his confirmation hearing, in written answers to Senators' questions, the Acting AG confirmed that there has been no written modification of the Agreement. *Id.* Notably, the most vocal advocate for the Fund's continued existence is AG Blanche's boss, President Trump himself. *Id.* ¶ 59.

Nor does the August 2 Fund Order foreclose resurrection of the Fund or alternative means of compensating would-be claimants. To illustrate, when Senator Tillis asked the Acting AG directly, "If the President directs you to reverse your decision and move forward with the Fund, will you move forward?," the Acting AG responded that "it would be inappropriate for me to comment on hypothetical communications I may or may not have with the President." *Id.* ¶ 62. When asked to commit to prohibiting DOJ payouts to January 6 insurrectionists, the Acting AG declined, stating instead that "[e]very claim submitted pursuant to the Federal Tort Claims Act is reviewed on the merits." *Id.* He declined to issue a memorandum prohibiting such payments to January 6 criminals, and also avoided answering whether DOJ has participated in any settlement discussions with them, saying only that "it would be inappropriate" to comment. *Id.*

*Third*, Defendants do not even mention the Immunity Order in their background section (*cf.* MTD at 3-6), and the public record confirms that Defendants remain committed to it. On June 3, 2026, when Treasury Secretary Scott Bessent was asked about the Immunity Order and the

Settlement Agreement, he confirmed that Treasury "will follow the instructions and the settlement." FAC ¶ 63. On July 17, Acting AG Blanche wrote "Yes" when asked if the May 19 "release order" was "still in effect." *Id.* And although DOJ issued an August 2 Statement that "addresse[d]" the Immunity Order, it did not purport to rescind it and only set forth "DOJ's interpretation," which is inconsistent with the Immunity Order's plain text. In any event, DOJ's interpretation confirms it releases audits and tax liability of President Trump.

In sum, two things remain clear after August 2: President Trump's Executive Branch refuses to commit that the AWF will not proceed in any manner or under any name, as this Court required to moot this action. And the Executive Branch remain committed to terminating existing audits and releasing the tax liability of President Trump, his sons, and their businesses.

## LEGAL STANDARD

In deciding a motion to dismiss, courts "take as true the facts alleged" in the Complaint and "draw all reasonable inferences" in plaintiffs' favor. *Doe v. Univ. of N.C. Sys*., 133 F.4th 305, 310 (4th Cir. 2025). A court should dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "only if … the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). In determining a Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (citation omitted).

On a Rule 12(b)(6) motion, the court analyzes the sufficiency of the plaintiffs' claims as pled. *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022). A complaint survives dismissal where it contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* at 305 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I. The Fund Plaintiffs' claims are justiciable.

#### A. Defendants have not met their heavy burden to show that their unlawful action will not recur, so Plaintiffs' challenge to the Fund is not moot.

"The 'heavy burden of persua[ding]' the court that the challenged conduct cannot

reasonably be expected to start up again lies with the party asserting mootness." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189 (2000)). Only when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will a defendant's voluntary cessation moot an action. *Id.* As this Court observed, the Fourth Circuit requires that defendants put forward specific, uncontestable evidence to meet this burden. Ex. 1 at 6:20–9:11. The burden has not been met here, where Defendants have not made a "nonreversion promise" that binds the agency as a whole; there is no legal barrier preventing Defendants from reverting to the unlawful behavior; and Defendants continue to maintain their conduct was lawful. *See Porter v. Clarke*, 923 F.3d 348, 365 (4th Cir. 2019) (quoting 290 F. Supp. 3d 518, 524–25, 540 (E.D. Va.) (Brinkema, J.)); *Porter v. Clarke*, 852 F.3d 358, 365–66 (4th Cir. 2017); *see also Davidson v. Plowman*, 191 F. Supp. 3d 553, 557 (E.D. Va. 2016).

First, the August 2 Fund Order and the AG's statements that the Fund was "not moving forward," Ex. 2 at 50:19, omit the most essential element of a nonreversion promise: a promise not to revert (let alone one that binds DOJ under different leadership). It is irrelevant that the process for restarting the Fund would require "several procedural steps," MTD at 10; the relevant point here is that Defendants have not committed to forgo them. Their failure to make that commitment, "despite being offered several opportunities to do so," is the "most persuasive" indication that their illegal actions may recur. *Porter*, 923 F.3d at 365 (quoting 290 F. Supp. 3d at 524–25, 540); *Porter*, 852 F.3d at 366 (citing defendant's refusal to promise not to resume prior practice).

It is especially important here to require a durable promise because the Agreement in *Trump v. IRS* remains in place, can only be modified in writing, and could be enforced at any time—a fact that Blanche acknowledged at his confirmation hearing. FAC ¶ 58. That the plaintiffs in that case might seek to enforce the Agreement is hardly chimerical, given that the President, the lead plaintiff in *Trump v. IRS*, has been the most vocal proponent of the Fund. FAC ¶ 59. Indeed, the AG has already said that he believes that victims of so-called weaponization should be made

whole, even if it is not "through the [AWF],"[1] strongly implying that the Executive remains steadfastly committed to effectuating the Fund even through alternate means. If the President or any other *Trump v. IRS* plaintiff were to seek to enforce the Agreement's terms, absent a permanent injunction, nothing would prevent Defendants from resurrecting the Fund or its equivalent. "When a challenged policy is repealed or amended mid-lawsuit … the case is not moot if a substantially similar policy has been instituted or is likely to be instituted." *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014); *see also Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 362 (D.C. Cir. 2018) (case is not moot where defendant "has renewed the challenged conduct in a new form").

Second, aside from the preliminary injunctive relief that this Court issued, there is "no legal barrier" preventing Defendants from resuscitating the unlawful Fund. *Porter*, 923 F.3d at 365 (citation omitted); *Porter*, 852 F.3d at 366 (case not moot where defendant retained authority to return to challenged policies). Defendants focus on the effects of a "political process," media attention, and the public's interest in the AG's decision not to move forward with the Fund as impediments to future actions relating to the Fund. MTD at 9-10. But none of those are legal barriers that bind this or any future AG, or DOJ. *Porter*, 290 F. Supp. 3d at 539. Nor is the threat of penalty of perjury from then-Acting AG's sworn testimony before Congress an impediment—as discussed above, the AG said only that the Fund was not moving forward but was careful not to make representations about the future of the Fund. The Acting AG's congressional testimony reflects, at most, a temporary "change-of-heart," *Davidson*, 191 F. Supp. 3d at 558, and, at worst, a carefully worded attempt to appease his critics in order to garner the votes necessary for confirmation.

Finally, Defendants' continued vigorous defense of the legality of the Fund further undercuts any inference of genuine abandonment of the Fund. *Porter*, 923 F.3d at 363–65. Defendants vehemently maintain that the Fund is legal and constitutional, including by pointing

[1] Max Rego, *Blanche Seeks Distance from 'Anti-Weaponization' Fund Questions: 'It Was Never Set Up'*, The Hill (Aug. 12, 2026), https://perma.cc/5AMS-XLNL.

to the *Keepseagle* case as a justification for the Fund. MTD at 5, 17, 22, 24. Defendants' "persistence in [their] belief that [their] challenged actions were legal indicates a risk the defendant will repeat those actions." *Davidson*, 191 F. Supp. 3d at 557. At bottom, "the defendants have failed to put forth even a single piece of evidence establishing that the [illegal] practice … has been terminated once and for all." *Wall*, 741 F.3d at 497.

**B. The Fund Plaintiffs have standing.**

"To establish standing, a plaintiff must show: '(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *AFSCME v. SSA*, 172 F.4th 361, 367 (4th Cir. 2026) (*en banc*) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). This court preliminarily concluded that Plaintiffs demonstrated standing to challenge the Fund. Ex. 1 at 11:2–5. None of Defendants' arguments cast doubt on that conclusion.

**1. The Fund Plaintiffs have alleged injury.**

**a. The individual Plaintiffs and New Haven have alleged Equal Protection and First Amendment injuries.**

As Plaintiffs alleged, a Fund for those who faced weaponization at the hands of Democrats but not Republicans violates First Amendment and Equal Protection principles. FAC ¶¶ 177–181. The Supreme Court "has squarely held that a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception," including under the First Amendment, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 634 (2020) (plurality op.), because "[d]iscriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes." *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 98–99 (4th Cir. 2026) ("effects [of unconstitutional policy] … constitute an injury-in-fact, particularly under a relaxed First Amendment standard"); *NPR v. Trump*, 827 F. Supp. 3d 48, 77 (D.D.C. 2026) ("Plaintiffs are injured because the [challenged action] precludes them from even participating in the competition for federal . . . financial benefits."). The same principle applies under Equal

Protection. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). This unequal treatment is not a generalized grievance, *cf.* MTD at 15–16, as its imposition is limited to the discrete class of individuals targeted by Republicans.

Defendants are wrong that Plaintiffs Floyd, Caravello, and New Haven lack standing because they have not claimed that they would have applied to the Fund. MTD at 15. Plaintiffs clearly allege that those Plaintiffs "would be entitled to, and would pursue, redress for these harms through a fair and lawful process." FAC ¶ 178. For standing purposes, Plaintiffs need only show that they would have applied but for the Fund's discriminatory design. As in *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, Plaintiffs' injury is that the Fund's discriminatory design "prevents [them] from [competing] on an equal basis." 508 U.S. at 666.

**b. The Fund injures NAF and Common Cause by requiring them to divert resources to prevent harm and through its secrecy.**

For good reason, Defendants do not challenge Plaintiff National Abortion Federation's ("NAF's") standing. The Agreement on which the Fund is based specifically identified "the Biden Administration's abuse of the FACE Act" as an example of the Weaponization it is designed to remediate. FAC Ex. A ¶ II.C, Dkt. 123-1. NAF's members have already had to divert significant time and resources from their core activity of facilitating reproductive healthcare to respond to the increased risk of Freedom of Access to Clinic Entrances (FACE) Act violations engendered by the Fund's message to these violators that the Trump Administration supports their activities. FAC ¶ 185. It is eminently reasonable for NAF's members to have concluded that the Fund's mere creation would embolden FACE Act violators. *Id.* ¶¶ 183–85. After the last time the administration gave its imprimatur to these violators' illegal actions—the President pardoned 23 people convicted under the FACE Act last year—several of them rearrested for recommitting those crimes. *Id.* ¶ 184.

That harm suffices for demonstrating an injury in fact. *FDA v. All. for Hippocratic Med.*,

602 U.S. 367, 395 (2024) (reaffirming that organizations may challenge actions that "directly affect[] and interfere[] with [their] core business activities"); *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024) (plaintiffs had standing where they alleged that defendants' actions directly impacted plaintiffs' core organizational missions); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 471 (S.D.N.Y. 2020) (voter-advocacy organizations had standing to challenge intimidating robocalls aimed at suppressing Black voters when the organizations diverted resources to counteract the intimidation effort and protect voters); *see generally Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (plaintiffs allege a "credible threat" when they have been harmed by similar government action in the past (citation omitted)). Given NAF's exposure "to a risk of future harm" that is "sufficiently imminent and substantial," it can "pursue forward-looking, injunctive relief to prevent the harm from occurring." *TransUnion*, 594 U.S. at 435.

As with FACE Act prosecutions, the President and his administration have qualified the prosecutions of January 6 defendants as "weaponization," FAC ¶ 99, and have endorsed paying those individuals from the Fund because they did nothing wrong. Consequently, January 6 rioters have said they intend to file claims with the Fund. *Id.* ¶¶ 98–99, 104. Common Cause has sufficiently alleged that election deniers will be reinvigorated by these messages and by the Fund's very creation, and that access to funding would only intensify their efforts. *Id.* ¶ 186. To combat these efforts, Common Cause will have to invest additional time and resources to keep its staff and volunteers safe and to fulfill its mission-related work of getting voters to the polls safely, maintaining election integrity, and ensuring that their election volunteers are safe from harm. *Id.* ¶ 186-87. As with NAF's expenditures, this diversion of resources is sufficient to create an injury in fact.

Common Cause has standing to challenge the Fund's structural secrecy regarding payments and claims, information that would have been available had Defendants made payments pursuant to Judgment Fund requirements. 31 U.S.C. § 1304(d). Litigants deprived of information to which they are legally entitled suffer an "informational injury that gives [them] Article III standing to

sue." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023). The unlawful secrecy of the Fund's workings impedes Common Cause's ability to carry out its core government oversight functions, FAC ¶¶ 188–190, giving it standing to sue.

Similarly, a plaintiff has standing to "challenge an action taken without required procedural safeguards" if it can show that "the agency action affects [its] concrete interests in a personal way." *Mendoza v. Perez*, 754 F.3d 1002, 1010, 1013 (D.C. Cir. 2014). Had the establishment of the Fund been made available for public comment, Common Cause would have commented on it and would have educated its membership on the proposal and promoted the opportunity for them to also provide comments. FAC ¶ 189.

**2. Plaintiffs' injuries are traceable to the Fund and redressable by dissolution of the Fund.**

The remaining two elements of standing—causation and redressability—are also readily satisfied. Plaintiffs have sufficiently alleged that Defendants' conduct with regard to the Fund is meaningfully connected to their injuries. *See supra* § 1.B.1. Their claims are not like those in *Department of Education v. Brown*, where the plaintiffs' alleged injury of not receiving student loan relief under a specific statute was not traceable to the government's adoption of a loan relief plan under a different statute. 600 U.S. 551, 565 (2023). Unlike the plaintiffs in *Brown*, Plaintiffs' injuries relate to the Fund's design itself, not to the insufficiencies of some other sort of funding besides the AWF.

Defendants also argue that Plaintiffs' injuries would not be redressed by discontinuation of the Fund because that would leave them in the same position they were in before the Fund was created, *i.e.*, unable to obtain remuneration. MTD at 20. But "plaintiffs in discrimination cases may seek equal treatment in the form of a level playing field, regardless of whether this is achieved by extending benefits to the disfavored group or by denying benefits to the favored group." *Planned Parenthood of S.C.*, 361 F.3d at 790 (citing *Heckler v. Matthews*, 465 U.S. 728, 738–39 (1984)); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 74–75 (2017) (curing unequal treatment of children born to unwed U.S.-citizen fathers by extending a burden to children of

unwed U.S.-citizen mothers). Here, because the Fund cannot operate lawfully for reasons in addition to its discrimination, it is imperative to discontinue the benefit to all, rather than to extend it to others. *See infra* § III.A–D. Extending the benefit to others would also do nothing to ameliorate the risks to NAF and Common Cause created by funding FACE Act violators and election deniers, nor correct the Fund's unlawful secrecy. *See supra* § I.B.1.b. Thus, the remedy of dissolving the Fund, and only that remedy, will redress the harms Plaintiffs face.

### C. Plaintiffs' claims were ripe when the Complaint was filed and Defendants cannot rely on that doctrine to evade their burden to establish mootness.

This case was ripe when it was filed and the Court implicitly acknowledged as much when it issued its preliminary injunction. Ex. 1 at 9:12–10:21; Dkt. 85. Yet Defendants argue that "[t]his is the rare case that is simultaneously moot and unripe." MTD at 11. That argument conflates ripeness and mootness. As the Fourth Circuit made clear in *Deal v. Mercer Cnty. Bd. of Educ.*, Defendants "cannot, as [they] evidently seek[] to do here," discontinue the challenged action and then "reframe this case as an unripe challenge to some future iteration of [the Fund] in order to avoid the demanding requirements of demonstrating mootness." 911 F.3d 183, 191 (4th Cir. 2018). There, a public school board suspended the challenged program and then tried to reframe the issue as one of ripeness by arguing that the contours of any future version of the course were unclear. *Id.* at 190–92. That is the precise tactic Defendants pursue here, and it should beget the same result.

Neither of the cases the government cites for its claim that it is "not odd at all" for a controversy to be both moot and unripe, MTD at 11, pertains here. In *American Fed. of. Gov. Emps. v. Office of Special Counsel*, 1 F.4th 180, 187–90 (4th Cir. 2021), the case was moot because the defendants withdrew the challenged guidance "not with the aim of avoiding judgment in court, but in response to the outcome of the presidential election" to which the guidance pertained; and the court concluded that, even if it had not been moot, the plaintiffs' challenge to the guidance would have been unripe for reasons unrelated to the guidance's withdrawal. In *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 197–98 (4th Cir. 1997), the plaintiffs' challenge was found moot because the statute on which it was based had been amended, and a challenge to the new

statute was deemed unripe. In neither case did the lack of ripeness stem from cessation of the challenged conduct resulting from a preliminary injunction. Here, the reason no members have been appointed and no claims have been processed (*cf.* MTD at 13) is that this Court issued a preliminary injunction and Defendants had to stop in their tracks. This is thus the run-of-the-mill case in which a defendant discontinues a practice that was ripe for review at the time the lawsuit was filed—a circumstance that is assessed under the "additional rigor" of the voluntary-cessation doctrine, rather than under the doctrine of ripeness. *Deal*, 911 F.3d at 191.

To the extent Defendants repeat their earlier arguments that Plaintiffs' case was "never" ripe, MTD at 11, those arguments remain meritless. Plaintiffs' claims are fully crystalized and Defendants' decision to create the Fund and the eligibility requirements imposed by the Agreement are "final and not dependent on future uncertainties." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). Waiting for Plaintiffs to apply for relief from the Fund "would not improve the parties' advocacy[,] ... clarify the legal issues presented for review[,] ... or ... contribute in any way to [the court's] ability to decide a question presented and contested by parties"; accordingly, there is no reason for the Court to wait to decide the issues. *Planned Parenthood of S.C.*, 361 F.3d at 790–92 (citation and internal quotation marks omitted).

Further, at the time the Complaint was filed, Plaintiffs faced an immediate threat and burden. *See Deal*, 911 F.3d at 191 (plaintiff's challenge to a program "*as it existed* at the time the suit was filed" was ripe, notwithstanding later suspension of the program); *Lansdowne*, 713 F.3d at 199 ("The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." (citation omitted)). As described *supra* § I.B.1.a, Plaintiffs Floyd, Caravello, and New Haven were excluded from the opportunity to apply for benefits from the Fund because they were targeted by Republicans rather than Democrats, a discriminatory feature of the Fund baked into its founding document, the Settlement Agreement. Plaintiffs NAF and Common Cause faced ongoing risk of emboldened FACE Act violators and January 6 rioters disrupting their core activities. Defendants' sole argument regarding hardship, MTD at 14, is based on its contention

that the Fund was rescinded months after the Complaint, which, as discussed above, impermissibly conflates ripeness with mootness.

**II. Plaintiff NTEU's claims challenging the Immunity Order are justiciable.**

NTEU has alleged a concrete, non-speculative, injury-in-fact on behalf of its members, including that specific IRS employees in its bargaining-unit will be forced to terminate the President's audits. *See* FAC ¶¶ 150-155. The Immunity Order will force NTEU's members to violate their oath of office by providing the President with an unconstitutional emolument or to risk retaliation and firing for insubordination. It also triggers statutory reporting requirements, putting NTEU's members in the position of risking retaliation for reporting or dismissal and criminal prosecution for not reporting. A court order vacating the Immunity Order will redress this injury and ensure that NTEU members are not forced to make this impossible choice.

**A. Plaintiff NTEU alleged a cognizable injury-in-fact that is redressable.**

"At the motion to dismiss stage," standing requirements are "relatively modest." *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 194 (4th Cir. 2026) (quoting *Bennett*, 520 U.S. at 171). A complaint need only "allege 'nonconclusory factual details'" because plaintiffs "'only have so much information at [their] disposal at the outset" of litigation.'" *Id.* (quoting *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012)). Plaintiffs may sue to prevent injury that "is certainly impending" or where "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). A threat of enforcement, through retaliation, firing, or prosecution is "credible" "so long as the threat is not 'imaginary or wholly speculative.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt*, 442 U.S. at 302).

NTEU's allegations do not require "a significant degree of guesswork." MTD at 18. They rest on specific facts showing that NTEU members will be asked to take specific actions to terminate President Trump's audits to effectuate the Immunity Order. *TransUnion*, 594 U.S. at 431. Such a request will immediately place NTEU members in an untenable position: violate their oath of office by complying and providing the President with an unconstitutional emolument; or,

refuse and risk retaliation. They must also either report the request, which again risks retaliation, or be fired and face criminal prosecution for not reporting. FAC ¶¶ 191-210. This "sufficiently imminent and substantial" exposure "to a risk of future harm" suffices to establish an injury-in-fact. *TransUnion*, 594 U.S. at 435.

*First*, it is not speculative that the IRS will terminate audits under the Immunity Order, including those of President Trump. Statements by President Trump and the IRS's mandatory presidential audit process both support Plaintiffs' allegations that the President has ongoing audits that will be terminated under the Immunity Order. President Trump himself recently acknowledged that he is under audit "every year." FAC ¶ 161. And, for nearly 50 years, the IRS has required that the President's tax returns be audited while in office. *Id.* ¶ 150. Audits of these returns are "mandatory," *id.* ¶ 163, and conducted "by career IRS employees and managers," *id.* ¶ 152. And Acting AG Blanche and Secretary Bessent made clear that the Immunity Order is in effect and will be implemented. *Id.* ¶ 198.

*Second*, Plaintiffs plausibly allege that NTEU's members "will be forced to terminate audits under the Immunity Order," including those of President Trump. *Id.* ¶ 193. Plaintiffs identified multiple NTEU-represented employees, including: "the lead auditor and all other non-managerial auditors assigned to examine the President's tax returns," *id.* ¶ 153, the employee(s) responsible for returning the audit file to the IRS office in Baltimore responsible for closing presidential audits, *id.* ¶ 154, the Employee Audit Reviewer in Baltimore, *id.*, and the employee(s) who post the outcome of the audit to the IRS system and close out the audit, *id.* ¶ 155.

Contrary to Defendants' assertions, MTD at 18-19, Plaintiffs are not speculating about this process. Plaintiffs' allegations are consistent with the IRS's Internal Revenue Manual (IRM) procedures regarding the specific employees involved in terminating a presidential audit. *Id.* ¶¶ 150-155. Plaintiffs had ample basis to allege "on information and belief" that "NTEU members will necessarily be called upon to carry out the Immunity Order." *Id.* ¶ 199. Critically, Defendants do not disclaim the process set forth in the IRM, that presidential audits are mandatory, or that audits *will be terminated* under the Immunity Order. Terminating audits is, of course, the point of

the Immunity Order, and why the settlement negotiations included a discussion of "pending audits." *Id.* ¶ 53.

*Third*, Plaintiffs have sufficiently alleged that the identified subset of NTEU members face a non-speculative risk of impending harm. These members have no good options: If they comply with a request to terminate audits, they violate their oath of office; and if they refuse to comply, they will likely face retaliation for insubordination. *Id.* ¶¶ 203-204. Moreover, an order to carry out the Immunity Order itself triggers a statutory obligation to report a violation of the Internal Revenue Code. If they report, they are likely to face retaliation. *Id.* ¶¶ 202, 209. If they do not report, they "shall be dismissed from office or discharged from employment," and will be subject to a $10,000 fine or 5 years' imprisonment, or both. 26 U.S.C. § 7214(a); *see also id.* § 7217(d); FAC ¶¶ 146-147, 202, 205. There is "no doubt" that a plaintiff has standing to vindicate their oath of office where the plaintiff has "taken an oath to support the United States Constitution" and is "in the position of having to choose between violating their oath" and "taking a step—refusal to comply with [the challenged law]—that would be likely to" lead to their removal from employment. *Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5. (1968). The Immunity Order puts NTEU members in precisely that position.

Defendants state that NTEU's theory of injury is "capacious" and "too speculative," without explaining why that is so or addressing the numerous factual allegations supporting NTEU's claims about the impact the challenged audit termination provisions will have on its members. MTD at 18-19. Defendants' cursory argument focuses only on "adverse employment action[s]," *id.* at 19, and entirely fails to respond to the injury that would come from violating one's oath of office and the risk of criminal prosecution and mandatory reporting to the Treasury Secretary and Inspector General that arise directly from the request itself. And though Defendants claim that "no court has ever approved such a capacious theory of injury," MTD at 18, that is precisely the type of harm that the Supreme Court had "no doubt" conferred standing. *Allen*, 392 U.S. at 241 n.5; *see also City of El Cenizo v. Texas*, 890 F.3d 164, 185 (5th Cir. 2018) (plaintiffs had standing to challenge state statute that "would force plaintiff local government officials to

choose between violating their oaths of office to defend the U.S. Constitution and facing criminal penalties and expulsion from office").

As to retaliation (the only harm addressed), Defendants maintain that NTEU members must wait until the alleged harm "*actually occurs*" before their claims are ripe. MTD at 19. But "[e]stablishing standing does not require that a litigant fly as a canary into a coal mine before she may enforce her rights." *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021). The entire premise of pre-enforcement suits is to prevent harm before it "actually occurs." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (parties need not wait for the government to take action against it before filing suit "so long as it faces a credible threat of enforcement" (citation and internal quotation marks omitted)). Plaintiffs alleged that "NTEU members face a concrete risk of retaliation if they raise concerns about the legality of terminating ongoing audits pursuant to TIGTA or to the Secretary, as they are required to do under sections 7214 and 7217," or if they do not report, they risk firing or criminal prosecution. FAC ¶ 205. Plaintiffs gave numerous examples forming the basis of this fear, including that the IRS's Chief Counsel was pushed out because of his concerns that the Immunity Order "violate[d] Section 7217"; retaliation against an IRS employee after she refused to take an action that she believed was unlawful; retaliation against federal whistleblower employees who were fired after they reported illegal conduct; and previous instances in which "NTEU members at the IRS have been disciplined and fired for insubordination when they refused to carry out an order." *Id.* ¶¶ 206-209.

*Fourth*, Defendants argue in passing that Plaintiffs' claims are not redressable because an order setting aside or vacating the Immunity Order will "do nothing to the provision in the settlement agreement that NTEU (incorrectly) claims is an emolument." MTD at 20. But a court order vacating the Immunity Order will redress NTEU's harms and remove the emolument's benefits because NTEU members will not be required to terminate the President's audits.

**B. Plaintiff NTEU has standing to represent its members.**

NTEU has standing to represent its members. This lawsuit is germane to NTEU's mission, FAC ¶ 191, NTEU is statutorily obligated to represent its IRS bargaining unit, and "NTEU

represents all non-supervisory, non-managerial IRS employees" including "IRS auditors and employees who will be forced to terminate audits under the Immunity Order." *Id.* ¶¶ 192-193. Defendants' sole argument is that NTEU has not identified a "member who has faced anything that could be construed as harm." MTD at 20. But as just discussed, *supra* at 15-16, NTEU included allegations about a subset of its members in specific job positions and in specific offices who will be required to take specific actions to terminate President Trump's audits. FAC ¶¶ 150-155; *e.g.*, *id.* ¶¶ 154-55 (audits must be closed directly with "the Employee Audit Reviewer in Baltimore Technical Services" and "an NTEU-represented employee in the Baltimore Technical Services Unit" must close the audit within the system"). These allegations are not based on supposition but on Defendant IRS's own Manual, and Defendants do not dispute that these individuals will be tasked with terminating audits. Defendants do not dispute that such individuals exist, nor that they will, necessarily, be NTEU members. Their particular identities are irrelevant to the resolution of the motion to dismiss. *See New Mexico v. Musk*, 824 F. Supp. 3d 80, 96 (D.D.C. 2026) (if "a defendant does not need to know the identity of a particular member to defend" against a standing claim, then the association "does not have to" furnish names). To the extent that that Defendants take issue with allegations based on "information and belief," MTD at 20, pleading based on information and belief is "expressly authorized by the applicable Rules of Civil Procedure," and suffice "where the belief is based on sufficient factual material that makes the inference of culpability plausible." *Lowy*, 167 F.4th at 198–99 (citations omitted).

## III. Plaintiffs have alleged valid constitutional and statutory claims.

Plaintiffs have successfully pled that the Fund violates both the First Amendment and Equal Protection Clauses because the Fund is available only to those the President perceives as his allies, namely those purportedly targeted by Democrats. Plaintiffs have likewise properly pled that the Fund violates the separation of powers because Defendants have usurped Congress's exclusive authority over the public fisc, and that the Fund and Immunity Order are ultra vires. And contrary to Defendants' cursory arguments, Plaintiffs have sufficiently pled that the Defendants' actions violate the Fourteenth Amendment's prohibition on payments to insurrectionists, and that the

creation of the Fund violates the Appointments Clause by improperly assigning to the Attorney General the authority to appoint principal officers. Finally, Plaintiffs have sufficiently pled final agency action for their APA claims.

### A. The Fund Plaintiffs have stated First Amendment and Equal Protection claims.

Plaintiffs allege that the Fund unconstitutionally conditions funding on perceived political allegiance, in violation of the First Amendment. FAC ¶¶ 215–217. They also allege that the Fund violates Equal Protection because it treats potential claimants to the Fund unequally without a rational basis. *Id.* ¶¶ 223–26. Both claims are based on the plain text of the Agreement that gave rise to the Fund. FAC Ex. A ¶ II.C (defining "Lawfare and Weaponization" as "the sustained use of the levers of government power by Democrat elected officials, political and career federal employees, contractors, and agents"). This interpretation of the Agreement does not reflect a "misreading," MTD at 22 n.5; it is "required by the ordinary rules of grammatical construction." *Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) ("The use of the adverb 'forcibly' before the first of the string of verbs, with the disjunctive conjunction used only between the last two of them, shows quite plainly that the adverb is to be interpreted as modifying them all.").[2]

Defendants' assertion that "Democrats can submit claims too" misunderstands the relevant discrimination. MTD at 21. The Fund is for those who claim persecution *by* Democrats,—*i.e.*, those whom this administration understands to be its allies. *See id*. at 22 n.5. The fact that claimants can be members of either party is irrelevant; what matters is one's perceived associations, rather than one's formal party registration. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715 (1996) (describing right as "political association or the expression of political allegiance"); *cf. Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273–74 (2016) (perceived political activity is protected). "None would deny" that "Congress may not enact a regulation providing that no Republican … shall be appointed to federal office." *United Pub. Workers of Am.*

[2] *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive ... modifier normally applies to the entire series.").

*(C.I.O.) v. Mitchell*, 330 U.S. 75, 100 (1947) (internal quotation marks omitted). It would be quite a loophole if Congress could rescue such a law by instead providing that "no political opponent of Democrats shall be appointed to federal office."[3]

Defendants argue that the Fund is a selective funding program authorized by cases like *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). MTD at 21–22. But unlike the program in *Rust*, the Fund does not purport to "use[] private speakers to transmit specific information pertaining to its own program." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 833–34 (1995) (distinguishing program in *Rust* from scheme in which government "favors" certain private speakers over others); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (confirming that *Rust* was a government speech case). *Rust* itself recognized this distinction. 500 U.S. at 194–95 (distinguishing fact pattern at issue there from one in which government "singl[es] out a disfavored group on the basis of speech content"). Here, the private individuals seeking to avail themselves of the Fund are the ones speaking—not the government. The Fund, accurately understood, "den[ies] a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (government violates First Amendment when it conditions re-employment on refraining from public criticism of the school's administration); *accord Speiser v. Randall*, 357 U.S. 513, 518 (1958) (applying same principle to tax exemptions); *Rosenberger*, 515 U.S. at 845 (program that extended funding on a viewpoint-discriminatory basis is unconstitutional).

Defendants' effort to defeat Plaintiffs' Equal Protection arguments fares no better. As explained above, the Fund *does* "affect fundamental rights" by impermissibly discriminating based on viewpoint. *Contra* MTD at 22. In any event, Defendants' actions do not pass even rational basis

[3] Nor does it matter that the contractor who leaked the President's returns did so during a Republican administration. MTD at 17 n.4. That contractor would likely be a "Democrat … contractor" under the Fund's definitions. FAC Ex. A ¶ II.C. Indeed, Trump has publicly criticized that contractor as a "politically-motived employee" leaking information to "left-wing news outlets." Katherine Faulders, et al., *Trump poised to drop IRS suit, launch $1.7B 'weaponization' fund for allies: Sources*, ABC News (May 14, 2026), https://perma.cc/2A2W-DTFQ.

review; "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *USDA v. Moreno*, 413 U.S. 528, 534 (1973). And contrary to Defendants' argument, MTD at 22, there is no legitimate government interest in the Fund's disparate treatment, where weaponization by the federal government has equally taken place at the hands of Republican administrations. *See* FAC ¶¶ 4, 14-16. Defendants also wrongly argue that New Haven lacks Equal Protection rights altogether. MTD at 23 n.6. New Haven has standing to "protest Defendants' unequal treatment of their [federal] funding based on a classification … that is not rationally related to a legitimate government interest." *City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 73 (D.D.C. 2026).[4]

Finally, Defendants' analogy to the *Keepseagle* settlement is misguided. The Fund does not legitimately "resolve[] specific litigation." MTD at 22. To the contrary, the *Trump v. IRS* court found that the Agreement "had no viable basis in law or fact." 2026 WL 2015525, at *17; *see also id.* at *13 & n. 40 (distinguishing *Keepseagle*). And it was this very concern—that the *Trump v. IRS* parties would use the pretense of settling litigation to legitimize the Fund and the Immunity Order—that led the court to prohibit those parties, including Defendants from "offering" the Agreement "as evidence of a 'settlement' reached in [that] matter." *Id.* at *21.

### B. The Fund Plaintiffs have adequately pled their other constitutional claims.

Defendants argue that Plaintiffs' separation of powers claim is an excess-of-statutory-authority claim in a constitutional guise. MTD at 23. But Plaintiffs are not alleging in this claim that Defendants have exceeded their statutory authority; they are alleging that Defendants violated the very structure of the Constitution by usurping "Congress's exclusive power under the Spending Clause and the Appropriations Clause" and other "legislative authority conferred by the

[4] Although courts have held that cities cannot assert constitutional rights against the *state* that created them, *see, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009), those cases do not bear on suits against the federal government. MTD at 23 n.6. New Haven does not assert a First Amendment claim. FAC ¶ 178.

Constitution" on Congress alone. FAC ¶¶ 230-235; *contra Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026) (no separation of powers issue where plaintiffs' constitutional claims asserted only that executive officials violated statutes). The Supreme Court has "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Plaintiffs allege the former.

Defendants' brief included only two sentences regarding Count VI's reliance on the Constitution's Insurrection and Appointments Clauses: "Plaintiffs' premature, speculative, and conclusory, Fourteenth Amendment Insurrection challenge ... is not well-pled. Nor can there be any Appointments Clause violation without any appointment ... or any violation of any statute if the Fund does not exist." MTD at 23. These cursory sentences are insufficient to preserve objection. *See Grayson O Co., v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (undeveloped "passing shot" arguments are not preserved (citation omitted)). To the extent the Court wishes to entertain them, these sentences appear to sound in ripeness. As discussed above, Defendants cannot take refuge in having not made appointments or processed payments from the Fund without meeting the rigors of the voluntary-cessation doctrine. As for the Insurrection Clause, Plaintiffs pled that the President has explicitly touted the Fund as a way to compensate January 6 rioters, FAC ¶¶ 59, 70, 266, which is more than sufficient to withstand a motion to dismiss.

**C. Plaintiffs have stated ultra vires claims.**

Defendants' claim that "*ultra vires* review is available only for statutory [ ] violations" is incorrect. MTD at 24. Ultra vires claims take two forms. A statutory ultra vires claim lies when the government acted "entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Sustainability Inst.*, 165 F.4th at 832 (quoting *NRC v. Texas*, 605 U.S. 665, 681 (2025)) (emphasis omitted). A constitutional ultra vires claim lies "where the Executive acts in the '*absence* of *any* statutory authority' whatsoever." *Id.* (quoting *Dalton*, 511 U.S. at 473) (emphasis in original). Plaintiffs have alleged that the Fund and the Immunity Order are "constitutionally and statutorily ultra vires," FAC ¶ 300, and Defendants offer no argument that Plaintiffs' *constitutional* ultra vires claim should be dismissed. *See* MTD at 24 (citing only the

statutory ultra vires standard).

With respect to statutory ultra vires, Defendants' only argument is that the *Keepseagle* settlement was once affirmed by the D.C. Circuit, and thus there is no clear violation of a specific statute. *Id.* But the D.C. Circuit in *Keepseagle* explicitly did not decide the merits of any of the Judgment Fund authority issues at play in this case. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1052 (D.C. Cir. 2017) (declining to review claims related to the Judgment Fund that were "waived or forfeited."). And Defendants do not explain how the Fund at issue in *this* case is within the bounds of the Judgment Fund statutes, 28 U.S.C. §§ 1304, 2414. *See* FAC at ¶¶ 88, 272-75 (alleging that the Judgment Fund cannot authorize the AWF).

Defendants do not contest that the Immunity Order is "contrary to express statutory limitations placed on presidential and cabinet level interference with IRS audits," FAC ¶ 288, suggesting instead that NTEU may go to the Inspector General, the EEOC, or the MSPB. MTD at 19, 24. But these fora do not provide a "meaningful and adequate opportunity for judicial review." *Sustainability Inst.*, 165 F.4th at 830 (cleaned up). Unlike this Court, they cannot set aside the Immunity Order; only that relief will prevent the AG or the IRS from compelling NTEU members to give the President an unconstitutional emolument and resolve NTEU members' present dilemma. NTEU members must either comply with the Order and violate their oaths or refuse to comply and risk firing and retaliation for insubordination. They must also report and face retaliation or fail to report and face dismissal or criminal prosecution. And any judicial review at the end of such administrative process would "come too late to be meaningful." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023).

**D. The Fund Plaintiffs have stated an APA Claim.**

Defendants' sole argument against Plaintiffs' APA claims against the Fund is that there has been no final agency action. MTD at 24–26. Agency action is final when: (1) it "mark[s] the consummation of the agency's decisionmaking process" and (2) is a policy "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (quotation marks omitted). The creation of the Fund satisfies the "consummation"

requirement because there are no further steps Defendants need take to create the Fund. Defendants do not contest that the Fund was created, with specified criteria for applicants and a process for approval of claims. That alone satisfies the "rights, obligations, legal consequences" requirement, *id.* (cleaned up), because the Fund subjects the individual Plaintiffs to unequal treatment and the organizational Plaintiffs to mission-related harms. *HIAS v. Trump*, 415 F. Supp. 3d 669, 683 n.18 (D. Md. 2020) ("[r]ights and consequences clearly flow from [an] Order and Funding Notice" that "determine eligibility for funding in certain jurisdictions in the first place"), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The Fund therefore meets the APA's "pragmatic" finality test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).[5] This "legal regime" is final. *Bennett*, 520 U.S. at 178.

Defendants' attempt to analogize to the grant context is also unavailing. In the cases Defendants cite, Congress appropriated the grant money and therefore the only *agency* action at issue was an award or disbursement. MTD at 27–28 (citing, *e.g.*, *Friends of the Everglades, Inc. v. Sec'y of DHS*, 174 F.4th 822, 831 (11th Cir. 2026) (not allowing APA challenge to "congressional appropriation of funds for a project")). But here, it is Defendants who purported to make the "appropriation," a final agency action, and to set eligibility for the funds. *Cf. Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 329 (S.D.N.Y. 2018) ("courts routinely hold that agency action is final where it affects grant eligibility criteria").

**E. Plaintiff NTEU has stated an APA claim against the Immunity Order.**

Defendants' sole argument against NTEU's APA claims challenging the Immunity Order—that the Immunity Order is committed to agency discretion under law—is wrong. MTD at 20-21, 26-27; 5 U.S.C. § 701(a)(2). Defendants insist that they have unreviewable discretion over "the Department's decision to settle a case and release claims," but that is not the law in this circuit.

[5] Defendants DOJ and Treasury are indisputably agencies subject to the APA, but so is the AWF itself, as it is an independent authority that can take final and binding action that affects the rights and obligations of individuals. *See Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) ("[T]he APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.").

MTD at 26. The APA exception Defendants invoke is construed "quite narrowly," and this case does not involve one of the "rare" circumstances in which courts have no law to apply. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citation omitted). Agency actions that stem from a settlement agreement are no exception: it would be "alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation," and "[t]he Attorney General's authority to settle litigation for its government clients stops at the walls of illegality." *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *see also United States v. Carpenter*, 526 F.3d 1237, 1241–42 (9th Cir. 2008) (DOJ's "circumvent[ion] [of] federal law" in "entering into a settlement agreement" is "reviewable under the APA"); *Auth. of the United States to Enter Settlements Limiting the Future Exercise of Exec. Branch Discretion*, 23 Op. O.L.C. 126, 163 (1999) (settlement of litigation cannot "transgress valid, otherwise applicable, statutory restrictions on agency conduct"). Plaintiffs have alleged that the Immunity Order violates the Emoluments Clause, section 7217, numerous statutory provisions that place limits on DOJ's settlement of tax litigation (including section 7122), and the APA, each of which place limits on Defendants' actions and provide ample law for this Court to apply.

Defendants boldly claim that "Plaintiffs have not identified any meaningful provision limiting Executive discretion here," and then (tellingly) relegate to a footnote two statutes that place clear limits—indeed, an outright prohibition in the case of section 7217—on the President's and Executive's ability to terminate audits and settle tax disputes. MTD at 27. Defendants' cursory "footnote does not … sufficiently raise or preserve this argument for review," and Defendants have forfeited their merits arguments about sections 7217 and 7122. *Clark v. Brown*, 536 F. Supp. 3d 56, 66 n.16 (E.D. Va. 2021).

In any event, neither section 7217 nor 7122 gives the Executive "absolute discretion." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (citation omitted). Section 7217 straightforwardly *prohibits* the President and members of his cabinet, including the Treasury Secretary, from directly or indirectly requesting a termination of audits and provides a standard by which to judge the Immunity Order. Defendants' proffered interpretation

that "Section 7217 does not prevent an individual, who happens to be the President, from settling tax claims with the IRS on behalf of himself and his Family" is not only unpersuasive *ipse dixit* but cuts against Defendants' position that there is no meaningful standard to apply to Plaintiffs' claims. Defendants' argument that the Treasury Secretary has the authority to compromise under section 7122 is just as underdeveloped and meritless. MTD at 27 n.9. Secretary Bessent did not issue the Immunity Order; then-Acting AG Blanche did. Defendants do not explain how the Secretary's effectuation of the Immunity Order satisfies section 7122. If Defendants can articulate an (incorrect) interpretation of sections 7217 and 7122, there is law that this Court can (correctly) apply. *Heckler's* "narrow" presumption against reviewability is not applicable because sections 7217 and 7122 and the Emoluments Clause "provide[] meaningful standards" for reviewing Defendants' actions. *Heckler v. Chaney*, 470 U.S. 821, 834–35 (1985); *see also Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 560 (D. Md. 2025) (even for action committed to agency discretion, courts can determine whether agency "exceeded its legal authority [or] acted unconstitutionally" (citation omitted)).

**F. Plaintiff NTEU has stated an Emoluments Clause claim.**

The Domestic Emoluments Clause forbids the President from receiving an emolument from the United States, its agencies, and employees. U.S. Const. art. II, § 1, cl. 7. The Immunity Order's release of the President's tax audits and liability provides the President with a forbidden profit, gain, or advantage. This would be an unprecedented advantage under any circumstance; it is all the more remarkable considering that the President profited an eye-popping $2.2 billion after returning to the White House. FAC ¶ 6. Under the Immunity Order, NTEU's members will be forced to terminate ongoing audits of the President and his businesses, to the President's substantial benefit. Defendants' claim that the Emoluments Clause requires a *quid quo pro* finds no support in the Clause's text, and their remaining underdeveloped arguments fare no better.

**1. The Immunity Order is an unconstitutional emolument.**

The Domestic Emoluments Clause provides that "[t]he President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during

the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

The constitutional text—"any" other emolument—is "both sweeping and unqualified." *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17 (1994). "[T]he term 'emolument'" broadly prohibits the President's receipt of any "profit, gain, or advantage" from the federal government "directly or indirectly." *D.C. v. Trump*, 315 F. Supp. 3d 875, 904 (D. Md. 2018) ("In the case of the Domestic Clause, receipt of any emolument is flatly prohibited."), *vacated as moot*, 592 U.S. 1233 (2021).[6] "[E]xecutive branch precedent and practice" has been "overwhelmingly consistent" with this "expansive view of the meaning of the term 'emolument.'" *Id.* at 901, 902. The Clause "cover[s] all types of financial transactions—solicited or unsolicited, reciprocated or unreciprocated, official or private." *Id.* at 889; *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (interpreting "emolument" to cover "any profits" received by federal government employees).

"The Framers of the Constitution forbade the President from receiving any emolument other than a fixed compensation, in part because they feared the consequences of allowing a President to convert his or her office into a vehicle for personal profit." *Griffin*, 935 F. Supp. at 3. By including such broad language—prohibiting the President's receipt of "any other Emolument" from the federal government—the Framers intended to prevent "influence [of] the President through financial awards or penalties." *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 189 (1981). They sought to eliminate any "pecuniary inducement" he might have to betray what the Constitution insists be his exclusive duty: serving the people of the United States. *The Federalist* No. 73 (Alexander Hamilton)

[6] *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 207 (D.D.C. 2019) ("emolument" is "defined broadly as any profit, gain, or advantage"), *vacated as moot,* 949 F.3d 14 (D.C. Cir. 2020); *see also* Mikhail, The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806, 1–2 (June 30, 2017), https://perma.cc/2EVF-9UGG (survey that every English dictionary definition of 'emolument' "from 1604 to 1806" includes this broad meaning).

(Because "[n]either the Union, nor any of its members, will be at liberty to give … any other emolument" to the President, he will "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution."). The Emoluments Clause reflects a concern that giving any federal official the ability to affect the President's financial circumstances could "tempt him by largesses" and cause him "to surrender" his "judgment to their inclinations," and influence the President by "appealing to his avarice." *Id.* That concern rings true today. Three weeks after then-Acting AG Blanche issued the Immunity Order, the President nominated Blanche for AG.

The release of all of the United States' claims that were brought or could have been brought before May 18, 2026, is manifestly an "Emolument." President Trump has long complained about IRS audits, and the Immunity Order's termination of audits and outstanding liability satisfies "a desire by [President Trump] and his family to avoid extensive tax audits, FAC ¶¶ 44, 161. But "the President should not have the ability to convert his or her office for profit." *Griffin*, 935 F. Supp. at 4. The Immunity Order's release of tax audits and liability is a sweetheart deal—neither available nor given to other Americans—that could result in a windfall of $100 million to President Trump. FAC ¶ 168. And because the Emoluments Clause restricts the conduct of both the President and any person who could enable him to "receive" prohibited emoluments "from the United States," U.S. Const. art. II, § 1, cl. 7, it is a profit, gain, or advantage that neither Defendants nor NTEU's members can give to the President. The Clause prohibits *any* federal official—including employees at DOJ and NTEU's IRS members—from taking action that would enable the President to "receive" an emolument, including steps to close the President's audits.

Defendants argue the Clause only prohibits "'[t]he President' from engaging in a *quid pro quo* through the exchange of 'Emoluments' for official acts." MTD 27-30. Even assuming this is required, there was a *quid pro quo* here: then-Acting AG Blanche released all of the United States' claims against President Trump, his sons, and his businesses, including any pending audits, and three weeks later, President Trump nominated Blanche for AG. FAC ¶ 2. These facts are similar to several Domestic Emoluments Clause violations found plausibly alleged in *D.C. v. Trump*. 315

F. Supp. 3d at 906–07. There, the General Services Administration (GSA) leased the Old Post Office to President Trump for his hotel's use, and the President then proposed a budget increase for GSA. *Id.* The Governor of Maine patronized the Trump Hotel during an official visit where President Trump signed an executive order to review a previous president's national monument designations in Maine, to which the governor had objected. *Id.* at 888, 906. And the D.C. government provided tax concessions to the Trump Organization after the Trump organization re-filed a previously dismissed lawsuit against the District seeking a tax reduction. *Id.* at 906.

But Defendants' *quid pro quo* argument is fatally flawed because "*quid pro quo*" does not appear in the text of the Emoluments Clause. Defendants try to read those words in, arguing that (1) the word "presents" in the Foreign Emoluments Clause would otherwise be rendered superfluous; and (2) the word "Emolument" in the Domestic Emoluments Clause, like the word "Compensation," is qualified by "for his Services," MTD 29, but those arguments have been rejected by other courts. The Foreign Emoluments Clause bans "*any* present, Emolument, Office, or Title, of *any kind whatever*, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8 (emphasis added). "Use of such expansive modifiers significantly undermines the . . . argument that this Clause was meant to prohibit only payment for official services rendered in an employment-type relationship." *D.C.*, 315 F. Supp. 3d at 887–88; *accord Blumenthal*, 373 F. Supp. 3d at 201–02. "The phrase '*any other* Emolument' in the Domestic Emoluments Clause suggests the same broad interpretation of the term." *D.C.*, 315 F. Supp. 3d at 888 (emphasis in original).[7]

[7] Defendants also cite to historical examples involving previous Presidents to support their narrow reading of the Domestic Emoluments Clause, MTD at 29, but this similarly rehashes previously rejected arguments. President "Washington later made clear that he was 'ready to relinquish' the property if necessary, which itself calls into question the actual relevance of this transaction." *D.C.*, 315 F. Supp. 3d at 903–04 (citing Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), *Founders Online,* National Archives, last modified Nov. 26, 2017, https://perma.cc/R5US-8L59 ). In any event, "this single example" is outweighed by "the vast amount of historical evidence, textual support, and executive branch precedent" supporting the broader understanding of "emolument." *Id.* at 904; *accord Blumenthal*, 373 F. Supp. 3d at 203. Moreover, there is no evidence that President Jefferson or other early presidents who "export[ed] cash crops overseas while in office," MTD at 29, were even engaged in activities implicating the Domestic Emoluments Clause.

### 2. NTEU has a cause of action to bring an Emoluments Clause claim.

Defendants erroneously argue that "no cause of action" is available under the Domestic Emoluments Clause. MTD at 27-28. NTEU can bring its Emoluments Clause claim through an equitable cause of action to challenge "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) ("plaintiffs may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a public officer" (citation and internal quotation marks omitted)). NTEU is not proceeding under a new right of action as Defendants suggest, MTD at 28 because "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. NTEU is suing to prevent its members from being conscripted into an oath violation by providing the President with an unconstitutional emolument. Defendants rely on dicta in *In re Trump*, 928 F.3d 360, 368 (4th Cir. 2019), about the rights and remedies provided by the Clause, MTD at 28, but that dicta does not displace the availability of an equitable cause of action.[8] *See Sustainability Inst.*, 165 F.4th at 831 (confirming availability of equitable causes of action). Defendants also fail to explain why Congress's impeachment power precludes suits against the Executive for constitutional violations, particularly in light of the high bar for preclusion of constitutional claims. *Id.* at 830 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)). NTEU may bring this claim as an equitable cause of action. In the alternative, NTEU also raised this claim under the APA. FAC ¶ 268.

## CONCLUSION

For all of these reasons, the Court should deny Defendants' Amended Motion to Dismiss.

[8] A Fourth Circuit panel, analyzing whether the appeal could be heard on mandamus, took into account the "novel" issues the case presented, but ultimately did not pass on the merits of those questions because the district court lacked jurisdiction. *In re Trump*, 928 F.3d at 369, 379-80. The *en banc* Fourth Circuit vacated the panel decision and determined that mandamus was not the proper vehicle for appeal. *In re Trump*, 958 F.3d 274, 289 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 592 U.S. 1233 (2021).

September 4, 2026

Respectfully submitted,

Paras N. Shah*
General Counsel
NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
paras.shah@nteu.org

*Counsel for NTEU*

/s/ Joel McElvain
Joel McElvain (Va. Bar No. 95215)
Pooja A. Boisture*
Jyoti Jasrasaria*
Aman George*
Lisa Newman* ^
Cynthia Liao*
Ayesha Khan*
Robin F. Thurston*
Skye L. Perryman*
jmcelvain@democracyforward.org
pboisture@democracyforward.org
jjasrasaria@democracyforward.org
ageorge@democracyforward.org
lnewman@democracyforward.org
cliao@democracyforward.org
akhan@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

*Counsel for Plaintiffs*

* Admitted *pro hac vice*

^ Not admitted to practice law in the District of Columbia; practicing under the supervision of Democracy Forward lawyers who are members of the District of Columbia Bar.

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I will cause the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, thereby serving all counsel who have appeared in this case.

*/s/ Joel McElvain*
Joel McElvain (Va. Bar No. 95215)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org

*Counsel for Plaintiffs*