# Exhibit 2

THE NOMINATION OF THE HONORABLE TODD BLANCHE TO BE ATTORNEY GENERAL OF THE UNITED STATES

- - -

WEDNESDAY, JULY 15, 2026

United States Senate
Committee on the Judiciary
Washington, D.C.

The Committee met, pursuant to notice, at 9:01 a.m., in Room 216, Hart Senate Office Building, Hon. Chuck Grassley, Chairman of the Committee, presiding.

Present: Senators Grassley, Cornyn, Lee, Cruz, Hawley, Tillis, Kennedy, Blackburn, Schmitt, Britt, Moody, Durbin, Whitehouse, Klobuchar, Coons, Blumenthal, Hirono, Booker, Padilla, Welch, and Schiff.

OPENING STATEMENT OF HON. CHUCK GRASSLEY, A U.S. SENATOR FROM THE STATE OF IOWA, CHAIRMAN OF THE COMMITTEE

Chairman Grassley. We welcome everybody to this hearing when we consider Todd Blanche's nomination to serve as the 88th Attorney General of the United States. Congratulations, Mr. Blanche, on your appointment.

Mr. Blanche. Thank you, Chairman.

Chairman Grassley. These are the ground rules for this meeting. I'll handle this hearing as our Committee handled the nominations of Attorneys General Bondi and Garland. I want everyone to be able to watch without obstruction. If people block the view of those behind them or speak out of turn, it's not fair, it's not considerate, so officers will immediately remove that person or persons.

I'm going to give my opening remarks, and then Ranking Member Durbin will give his remarks, then I'll call on Senator Moody to introduce the nominee. Following that introduction, Mr. Blanche will provide his opening statement, and then we'll turn to questions. Each senator will have 10 minutes to ask questions. My standard approach has been that if you got 1 second left as a member of the Committee, you can ask your question, but after the question's answered, I'm going to move on to the next member.

Mr. Blanche, thank you for being here. As I've said before, this is one of the most important offices in our country. You went through a rough Senate confirmation a little over a year ago, so you know all about it. I appreciate that you cooperated with this Committee at every step and fulfilled your responsibilities in good faith, while simultaneously running the world's largest law office.

The Senate has already judged your fitness for high office and confirmed you as Department second in command. Today, we consider you for a promotion, and we're not starting out from a blank slate. You have a track record. My Democrat colleagues have relentlessly attacked the Department and your and President Trump's leadership. They've called the Department "a disgrace" and suggest that the Agency is broken. Their media allies and activist networks have echoed that message. Are these assertions correct? Let's put aside partisan criticism for a moment and address the evidence.

The Department's primary duty is to enforce our Nation's laws and to keep Americans safe. So, how is the Department stacking up? The answer is, for those who care to judge fairly, it's a record of success. The United States has the lowest murder rate since 1900. The FBI has captured eight of the top 10 most wanted fugitives.

Violent crime arrests by the FBI are up 184 percent. More than 849 individuals have been disrupted from conducting terrorist attacks. The ATF has seized more than 44,000 illegal firearms. That is not a failure.

What about the Department's record on illegal drugs? Since January of last year, the DEA has made more than 6,300 fentanyl arrests, it has seized more than 5,000 kilograms of fentanyl powder, 55 million fentanyl pills, 240,000 kilograms of methamphetamine, and one-and-two-tenths million kilograms of cocaine. The fentanyl alone amounts to more than 428 million fatal seizures. That is not a failure.

And what about protecting children? Our Committee has fought for years on a bipartisan basis to protect our Nation's children from the horrors of exploitation. Ranking Member Durbin and I in a bipartisan way are leading landmark legislation, the James T. Woods Act, to tackle that very issue, and once again, our partners at the Justice Department have a record of success. The FBI has arrested 2,900 child predators and human traffickers, a 70-percent increase from 2024, and located more than 6,940 child victims. The U.S. Marshals have recovered more than 1,182 missing children. That doesn't sound like failure to me. In contrast, the Biden Administration diverted prosecutors from child sex crime cases on January 6 cases.

That is unbelievable.

My Democrat colleagues have criticized the Justice Department for a lack of transparency. I've been critical as well as I am with every Administration, whoever occupies the Oval Office, when we don't get that cooperation. No one cares more about oversight than I do. In all my years of congressional oversight, this Department has been the most responsive to my requests, that means every Republican or Democrat Administration previous to this one, and the numbers back this up. Since January of last year, the Department has produced approximately 43,000 pages of records in response to requests from the Senate and the House. To put that in perspective, that's approximately 3 times the number of records produced and equivalent time by the Biden Justice Department. The Department has also released more than three-and-three-tenths million pages of additional records with more coming every day. Their work is not done and I expect continued responsiveness and as well, the very important thing of declassification, but credit should be given where credit is due.

A few more successes. They've established the National Fraud Enforcement Division to address more than $5 billion in fraud against American taxpayers. They've reduced the immigration case log by more than 468,000. They've challenged and eliminated racist and unlawful

discrimination in government and the private sector. They're exposing and readdressing the Biden-era weaponization of the Department against political opponents. They've captured and are prosecuting the dictator, Nicholas Maduro, for crimes related to narcoterrorism.

The list goes on. This Department is keeping Americans safe, and the numbers back that up. Mr. Blanche, you should take pride in delivering the law enforcement promise the American people voted for in 2024, but at the hearing today, we might expect the opposite. My Democratic colleagues, they won't talk about these successes. I expect the same playbook that we've seen for nearly every one of President Trump's nominees: pure partisan obstruction and partisan attack. This approach is the same one that we've seen over and over. In fact, it becomes such a pattern that I'll just quote myself from a speech I delivered almost a year ago regarding another nominee.

Last July, I said, "Since the very beginning of this Congress, Democrats have engaged in relentless obstruction campaign for nearly every one of President Trump's nominees. Their playbook has included maximum procedural obstruction, unfair media attacks, repeated attempts to allege misconduct and demands for delayed consideration, records, and investigations. Like clockwork, just before a

hearing or a vote, we get another breathless accusation that one of President Trump's nominees needs to be investigated." End of my quote of last January. So, here we are again, just like clockwork. The Democrats and their media allies and activist networks have launched the expected crusade against your nomination.

To be clear, there are fair questions for Mr. Blanche. I don't agree with how Mr. Blanche or the Justice Department has handled every matter, and I've demanded answers and will continue to do so, but many of the criticisms aired in recent days just completely miss the mark, and I'll give one example. We've seen a coordinated campaign from former Justice Department employees opposing Mr. Blanche's nomination. My Democratic colleagues and the partisan media have publicized their letter, framing the signatories as a group of nonpartisan "career civil servants."

Of course they failed to mention that letter was coordinated by the same group that engaged in partisan and misleading campaigns opposing Judge Bove's nomination. They also don't mention that the letters' signatures include a who's who of partisan activists, including former Chicago Mayor Lori Lightfoot and Jack Smith's partisan prosecutors, J.P. Cooney, Molly Gaston, and David Rody, and they certainly don't mention that Mr. Blanche has received

letters of support from organizations representing more than 600,000 law enforcement officers, 23 State attorneys general, and scores of former Justice Department officials.

So, from my vantage point, if the people who engaged in the worst partisan lawfare this country has ever seen have a problem with Todd Blanche, that's a good thing in my book. As sure as sunrise today, some of my Democrat colleagues will tell us that Mr. Branch is a uniquely terrible nominee. Before they do so, however, I urge them to remember the boy who cried wolf and take a long look in the mirror before lecturing anyone about partisanship at the Justice Department.

So, I have one more subject. I'd like to discuss developments in my and Senator Johnson's Jack Smith investigation. The Smith team subpoenaed the National Archives, June 2023. That subpoena sought text messages from cellphones connected to Trump's White House staffers. The date range for the records was October 1, 2020, to January 20, 2021. The Archives' then general counsel, Gary Stern, emailed Thomas Windom, one of Smith's deputies on August 21, 2023, at 12:19 p.m. That email said responsive records were ready. On August 21, the same day, 2023, just 20 seconds later, Windom had already downloaded the texts, and shortly after that, other DOJ and FBI personnel involved in the case did as well.

Whistleblowers told my office that Smith didn't pass these records to a filter team, and you can see in 20 minutes, there wasn't time to go to a filter team. That filter team was already in place. The Justice Department has confirmed that fact in a letter to the Committee, "The Special Counsel's investigative team apparently bypassed the filter team and directly accessed these text messages." The DOJ letter to the Committee also said, "The Special Counsel's Office had previously been made aware of the risks that records relating to members'," meaning members of Congress, "communications, could raise constitutional questions and might be privileged under the speech and debate clause." That speech and debate clause is a constitutional issue.

Even if Smith's team had been instructed to look for congressional or other privileged information, it wouldn't matter because in this example, it appears the filter team was entirely bypassed. Based on the information provided to the Committee, Smith's operation cut corners and blew through constitutional stop signs instead of respecting them and having been advised about the constitutional problems. The White House messages obtained and reviewed by Smith's team included communications with many senators and representatives. The communications included messages with members on this Committee, including this senator.

The subject matter of those members' communication included core constitutional responsibilities, such as congressional legislation, resolutions, and investigative work. It also included other information irrelevant to Jack Smith's case against then citizen Trump.

Instead of that information being walled off, it was intentionally shared. This is another example how this misguided investigation wasn't normal and demands further investigation. Jack Smith's operation was a runaway political train that improperly obtained congressional information. I've requested Acting Attorney General Blanche to allow members to review these records.

Senator Durbin.

STATEMENT OF HON. RICHARD J. DURBIN, A U.S. SENATOR FROM THE STATE OF ILLINOIS, RANKING MEMBER OF THE COMMITTEE

Senator Durbin. Thank you very much Mr. Chairman. Mr. Blanche, thank you for coming by my office yesterday. I think we both knew going into that meeting that we had strongly held political beliefs on both sides of the table, and yet we had, I think, a respectful exchange, and I thank you for coming by.

Mr. Blanche. Thank you.

Senator Durbin. I'm glad you brought your staffers with you. My staff was there as well. If there was any misunderstanding, my representation of your remarks, you'll have a chance to correct the record in a few moments, but I'll do my best to stick by what I said, and as my staff has backed me up and in my memory of it, yours may be different.

Mr. Blanche. Thank you.

Senator Durbin. But thank you for meeting with me yesterday.

I want to acknowledge the obviously empty seat at the dais next to the Chairman. The Committee is mourning the loss of our friend and colleague, Senator Lindsey Graham, former Chairman and Ranking Member of this Committee. I served on the Committee with Senator Graham since he joined

the Senate in 2003. I'm going to cherish my memories of both our fierce partisan battles and our landmark bipartisan agreements. He was a trusted friend. My friends and family back home can't believe it when I say these things. "You mean that Lindsey Graham?" Yes, I do. He was a good person, a valuable part of the Senate family, and an extremely valuable part of this Committee. I'm glad that we're honoring him with this memorial today.

Let me say at the outset that the Chairman spent several minutes talking about Jack Smith. I want to make one thing clear about Jack Smith, who was a special counsel. Months ago, perhaps 6 months ago, maybe longer, he volunteered to appear before this Committee under oath and testify about what he did as special counsel and to answer the questions of the Committee. For reasons I cannot explain, the Republican majority does not want to bring Jack Smith before this Committee and have him testify under oath. They continue on regular basis to take exception to things that he said or did or allegedly did, but will not bring him before this Committee. I don't get it. If they have something they want to raise with Jack Smith, that place is where he should be sitting under oath and answering the questions, and he's volunteered to do it, but they turned him down.

Mr. Chairman, we are here today with the awesome

responsibility of choosing the next Attorney General of the United States of America. We're here because there's a vacancy in the office. The President decided to fire the predecessor of Mr. Blanche after just 14 months on the job, after courts and grand juries blocked her from prosecuting the President's political opponents. Seemingly, President Trump believes you, Mr. Blanche, will be more successful. When you were first nominated to be Deputy Attorney General, Democrats raised concerns about the President's personal attorney serving as the top attorney in the Justice Department.

The Attorney General is the chief law enforcement officer of the United States of America. Since you were confirmed, the Department of Justice has literally violated dozens of court orders to advance the President's agenda. Last year, you declared that the Justice Department was "at war with the Federal judiciary." I brought that up to you yesterday. I believe all of us, both sides of the table, need to be more careful with our rhetoric when it comes to the judiciary. Yesterday, we had the testimony of Justices Kagan and Barrett, and they talked about the impact on them personally and on their families with the threats that have been increasing against them physically. Most of us on this side of the table know what they're talking about. We have a similar experience, but it is a responsibility of

all of us, Democrats and Republicans, liberals and conservatives, in or out of the government, to be careful with what we say about the judiciary. They're doing their job. We should never, ever countenance as violence against anyone on either side.

One of your first official actions as Acting Attorney General, Mr. Blanche, was to establish the $2 billion weaponization or slush fund to benefit January 6 cop beaters while immunizing President Trump from IRS liability. You defended the slush fund by claiming, "People who hurt police get money all the time." Despite resounding bipartisan criticism and admitting that it was a mistake, you've refused to rescind the order creating this fund. That order can still be found on the Department of Justice's website today.

We talked about this yesterday in my office. I didn't quite understand your explanation. I'll give you a chance, of course, to explain it, but you said it was up to Congress to codify the elimination of this fund. This was a creation of the executive branch, it was not a creation of Congress, so I hope you'll clarify that statement. Earlier this week, a Federal judge characterized your explanation of the settlement that led to this fund "at best misleading, and at worst, disingenuous." You told me yesterday that the opinion was "a hit piece on you,"

another troubling attack on a judge for doing her job.

Then there's a coverup of the Epstein files which former Attorney General Bondi herself said you were "in charge of." Under your leadership, more than 1,000 FBI personnel were pulled off of other priorities and directed to flag Epstein records for any mentions of President Trump. When scrutiny of the coverup intensified, you participated in meetings in the White House Situation Room to strategize about how to protect President Trump -- not Epstein survivors; the President. When Congress forced the Administration to release the files, hundreds of survivors' personal information was unredacted, victimizing them again. Meanwhile, the names of powerful Epstein allies remained protected in clear violation of the Epstein Files Transparency Act.

Your explanation: it isn't a crime to party with Mr. Epstein. Mr. Blanche, these survivors deserve much better. I want to recognize many of them who are in the audience today. I thank them for their courage in speaking out. Tomorrow, we will hear one of them during our outside witness panel.

I'd like to enter into the record six letters from Epstein survivors in opposition to the Blanche nomination.

Chairman Grassley. Without objection so ordered.

[The letters appear in the appendix:]

/ COMMITTEE INSERT

Senator Durbin. I'm asking you, Mr. Blanche, today before you leave this room, to agree to meet with these Epstein survivors personally and to bring with you professionals from the Department of Justice to hear them out. They have the courage to tell their story, and they should at least hear from their government that they take it seriously. After your interview with convicted sex trafficker, Ghislaine Maxwell, in an attempt, I believe, to exonerate President Trump, Ms. Maxwell was transferred to a minimum security camp that is unheard of for offenders like her. You said it was for her own personal safety. I hope you'll explain that today.

You told me yesterday you want to be Attorney General because you love the Department of Justice and you love prosecutors, but you have removed from the Department some of the most effective prosecutors that have ever served our government, done that for personal reasons, purging career law enforcement officials who won't prioritize President Trump's interest over their oath to the Constitution. You fired the career pardon attorney because she wouldn't sign off on restoring gun rights to a convicted domestic abuser, Mel Gibson, personal friend of President Trump. You fired career immigration litigator, Erez Reuveni, for refusing to follow unethical orders from your former law partner, Emil

Bove, and other senior DOJ officials to lie to a Federal court.

You bragged about firing career law enforcement professionals simply because they were assigned to investigate the President's criminal misconduct, including FBI agents who specialized in investigating threats from foreign adversaries like Iran. More than 1,200 former career DOJ employees, who worked for both Republican and Democratic Administrations, sent this Committee a letter opposing your nomination because you have purged DOJ of thousands of experienced law enforcement officials, putting our Nation's security at risk.

I would like to enter this letter into the record with unanimous consent.

Chairman Grassley. Without objection, so ordered.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Senator Durbin. You testified under oath last year that as Deputy Attorney General, you would consult with career ethics officials to avoid conflicts of interest, a significant concern since you received nearly $10 million as a President's personal attorney, but you've gutted the DOJ offices that handle ethics and professional responsibility. After the Department's top career ethics lawyer advised you to recuse yourself from any matters

relating to Trump in his personal capacity, that lawyer was fired. Every smarmy suspect deal in this Administration has cryptocurrency behind the curtain, and again, it has happened when it comes to the billion-dollar windfall that went to the President in his first year in office.

Shortly after you were confirmed as Deputy Attorney General, you issued an order dismantling DOJ's crypto enforcement team and shutting down ongoing criminal investigations of the crypto industry. At the time, you owned at least $159,000 worth of crypto-related assets. While you eventually divested, those assets didn't go far. You simply transferred them to your children and grandchild. With the Crypto Enforcement Unit out of the way, President Trump brought in $1.4 billion from his family's cryptocurrency business in 2025 alone.

Take one example of the dealing in the Administration. In April 2024, the founder of the crypto company, Binance, was sentenced to prison and ordered to pay a $50 million fine for a money laundering scheme. Fifty million dollar fine. He then brokered a deal to channel $2 billion into the Trump family's crypto business, World Liberty Finance, after which President Trump pardoned him. Binance accounts have funneled about $1.7 billion to Iranian entities linked to terrorism. The President's World Liberty Financial continues to partner with Binance, even with these facts

that I've spelled out in this statement.

You recently claimed, Mr. Blanche, that "There's a ton of evidence that the 2020 election was rigged." You should see what happens in this Committee room when judicial nominees of this Administration appear before this Committee raise their hands, take the oath, and then field the questions asked by members of the Committee. You'll see some of the people, who are even judges today at State level and have distinguished careers in law, start to avert their eyes, squirm, and then give a script which doesn't acknowledge the obvious. Donald Trump lost the 2020 election by 7 million popular votes -- 7 million popular vote -- and he lost by that number. That's a fact. Any 8th grader in America knows it and can repeat it for you. And yet when it comes down to asking Trump judicial nominees who won the 2020 election, you ought to see them squirm.

What's the reason? The President's Big Lie. He believes in his heart of hearts that he somehow won that election, though he can't produce any evidence of that fact. Well, we'll give you your chance. I hope that you produce the evidence to show one way or the other that the Big Lie is the truth or not the truth.

Your first indictment of former FBI Director Comey failed in a case brought by an unqualified and unlawfully

appointed U.S. Attorney, Lindsay Halligan. So, now Mr. Comey is being prosecuted for taking pictures of seashells, this prosecution personally ordered by the President who despises Mr. Comey for overseeing the investigation of Russian interference in the 2016 election. You have also baselessly indicted the Southern Poverty Law Center, a civil rights organization that has worked tirelessly to expose violent extremists like the Proud Boys and Oath Keepers, a group which we and the Senate know well for their January 6 escapade, the same people you gave a clean slate for their role in attacking this Capitol.

A Federal judge recently singled out your "remarkable statements" targeting Kilmar Abrego Garcia as evidence that his criminal prosecution was "marked by a retaliatory taint for successfully fighting his deportation." And despite my repeated requests, you've yet to produce the DOJ memorandum concluding that it was legally permissible for the President of the United States to accept a gift of a luxury airliner from the royal family of Qatar, despite constitutional and statutory foreign gift prohibitions. Earlier this month, that jet was launched as Air Force One, despite credible reports of security vulnerability. Last weekend, the Department of Justice responded not by addressing these concerns, but by sending Federal agents with subpoenas to the homes of the reporters who exposed

these lapses.

In less than 18 months at the Department of Justice, you have shown you're still President Trump's personal attorney. Your tenure can be summed up in the four words you said -- "I love you, sir" -- to President Trump. This was your response when you were asked what you would say to him. This Nation deserves an Attorney General who loves the Constitution more than any single President, an Attorney General focused on keeping America safe and combating corruption, not satisfying the President's personal grievances or channeling crypto cash to the Administration's MAGA faithful.

Mr. Chairman, I yield.

Chairman Grassley. Thank you.

[The prepared statement of Senator Durbin appears in the appendix.]

/ COMMITTEE INSERT

Chairman Grassley. Now, we'll turn to Senator Moody to give her introduction of the nominee. Senator Moody.

STATEMENT OF HON. ASHLEY MOODY, A U.S. SENATOR FROM THE STATE OF FLORIDA

Senator Moody. Thank you. Thank you, Mr. Chairman, and my goodness, I expect you'll be getting a lot of questions about how one person may influence every decision you make and unduly influence everything you do. And I hope you say you are absolutely right, and it is that granddaughter sitting right behind you. She is the cutest thing I've ever seen.

Good morning, everyone. Thank you for being here. I have the distinct pleasure of introducing Acting Attorney General Todd Blanche. He serves and has served as our Acting Attorney General and our Deputy Attorney General. And amongst all of the questioning today, most of which I hope is in good faith, sometimes it gets lost that he is a former prosecutor and dedicated his life to prosecuting for this Nation. The greatest testament to his good character and wise judgment is he is now a Floridian and my constituent as the newest senator from the great State of Florida.

But he has led a very distinguished career within the realm of the Department of Justice of which he now seeks to head as the permanent Attorney General, and before I go more into that, I want to thank you, Mr. Blanche, for

offering yourself not just, first, as Deputy Attorney General, but now as Acting Attorney General. Any one of us on either side of the aisle sitting here today knows what it means to serve and what comes with that, and what that takes every day, and certainly what that means for your families that stand beside and behind you and sometimes hold you up throughout the process. We thank you, and we thank your family that is here today.

Since President Trump took office and leadership, including you, entered the Department of Justice, as you heard our Chairman say, you have worked to achieve the lowest murder rate since 1900. Violent crime arrests are up 184 percent. Over 2,400 gangs and criminal enterprises have been disrupted and dismantled. Twenty-nine hundred, almost 3,000 child predators and human traffickers have been arrested. That is an increase of 70 percent since 2024.

And when it comes to fighting for a fentanyl-free America, which we both appeared at a summit this week, you and the Department are excelling there, too. DOJ has made over 6,300 fentanyl arrests, seized more than 5,000 kilograms of fentanyl powder, 55 million fentanyl pills. That is fatal doses enough to kill 428 million people. And just so that everybody understands what that means, that is more than the population of the United States of America.

That's just a few top line numbers on core operations at the heart of DOJ's mission. The DOJ is indeed in the driver's seat of the war on fraud, and I hope members on both sides of the dais will give you time to talk about that today, not only for their consideration of your nomination, but also so the American people can hear about that.

I know that you are in for a long process today, so I want to take my remaining time to talk about you, the person, your career, Todd Blanche. Acting Attorney General Todd Blanche is a patriot who was raised in the Department of Justice. He spent nearly a decade in what is recognized as one of the best prosecuting offices in the country, the U.S. Attorney's Office for the Southern District of New York, where he prosecuted drug traffickers and violent criminals. In fact, this career dedicated to justice and the rule of law started even before that. He started at the Department of Justice as a paralegal. I love that story, how you started there and you worked your way through the ranks, and it was always about hard work. Throughout time, he didn't just clock in and clock out. He did really good work, such good work that he was noticed routinely and honored for his commitment to excellence.

In 2011, while he was at the U.S. Attorney's Office for the Southern District of New York, he received the

Director's Award for superior performance as an Assistant U.S. Attorney in the Criminal Division. In 2013, he received the Federal Drug Agents Foundation's True American Hero Award. He received the New York City Police Department commendation 3 different years, he received the U.S. Drug Enforcement Administration commendation 2 different years, and a commendation from the FBI 2 separate years. And to round out this collection, he received recognition from the ATF in 3 years.

I think this is emblematic of a career that was really spent doing the work of the people and trying to do it well, keeping his head down without seeking recognition, but he couldn't help but get it because of the work and the superior performance that he was doing. And I really think that's an example for anyone watching today, anyone in this audience, any young person at home, any young lawyer: do good work; put your head down. You are evidence of that. You do good work, you do a job well done, and you get noticed for that, and opportunities will seek you out, commendations will seek you out more than networking, political connections, anything like that. It is that in which people will seek you out to serve, and it may be just that job well done that got you recognized by the President of the United States and completely changed your life.

Some members will try to hold that against you today.

They will ignore that long career and every commendation that you received before you ever met or served or acted as an attorney for the President. They'll ignore all those orders, and they'll gnash their teeth because they don't like one man, and I believe that misses the mark. It completely ignores the fact that the reason you stepped up to serve is because you love this country. You dedicated your career to the Department of Justice and, in fact, you lived out the motto in Latin. I will not say the Latin because no one will understand that, but I will say the motto of the Department of Justice is, "Who prosecutes on behalf of justice," not who prosecutes on behalf of a political agenda or to target someone: who prosecutes on behalf of justice, and you stood up and took on that responsibility.

And so, I hope today's questions will focus on allowing you to explain the legal positions of the Department that you've been a part of or why you've made certain positions in cases or compliance with orders, all things that might go towards how you will perform on behalf of this great Nation and the people you serve, how you will excel as an Attorney General. But I suspect that nuance and good faith will be the price paid for clips and likes by some members in this room. I hope today is the exception.

Nonetheless, I thank you for stepping up to serve acting as the Attorney General in this time in which we are seeking for your formal nomination. I thank you for being willing to take on, not only this nomination process, but the job itself because that will be an enormous responsibility, not only to the Department of Justice and the people that work there, but for the American citizens in this country moving forward. So, I thank you very much, and with that, Mr. Chairman, I introduce --

Chairman Grassley. Thank you, Senator.

Senator Moody. -- Mr. Todd Blanche as President Trump's nominee.

[The prepared statement of Senator Moody appears in the appendix.]

/ COMMITTEE INSERT

Chairman Grassley. Thank you, Senator Moody. Would you please stand at this point and respond to this oath?

(Witness sworn.)

Chairman Grassley. Thank you for your positive response. Now, it's up to you to take what time you want to make a statement and introduce any people you have with you.

STATEMENT OF TODD BLANCHE, TO BE ATTORNEY GENERAL OF THE UNITED STATES

Mr. Blanche. Thank you. Thank you very much, Chairman Grassley, and thank you, Senator, for that introduction. I appreciate you and your friendship.

Good morning, Chairman Grassley, Ranking Member Durbin, and the other members of the Committee. Thank you for having me. As Senator Durbin said a minute ago, I would like to offer each of you my condolences for the loss of your colleague, Senator Graham. He was a patriot and a friend to so many of us. It's a loss for the American people, and I think honoring him today and as he's been honored for the past several days is the right thing to do.

Seventeen months ago, I sat at this table as the nominee to be the Deputy Attorney General, and I told you that serving in the Department of Justice was my American Dream. Since then, I've helped lead it, first, as Deputy and now as Acting Attorney General, and I'm here today to earn your trust once more.

I've lived the American Dream. I waited tables to get through college, moved to New York with my wife and two young kids, went to law school at night, read textbooks on the late train home while I worked days as a paralegal at the U.S. Attorney's Office. From that start, I became a

prosecutor and spent 9 years prosecuting violent gangs and drug dealers. I rose through the ranks of the Department of Justice as a line prosecutor, then a division chief, then as of last year, Deputy Attorney General, and now Acting Attorney General, but I did not take that path for a title. I took it to make a difference for American families and the towns they call home.

I am exceedingly grateful to President Trump for his trust and to my family who have carried me through every long day and late night. My wife, Kristine; our wonderful children, Sydney and Justin; my granddaughter, Blaine, who's here today -- all of them are here today -- wonderful friends, many of whom are here today, are really what make this worth it and what gets me through my days. And so, I want to thank them for not only being here today and supporting me, but also being with me every step of the way of the journey that we're on together.

My family's blessings should be available to all Americans. When a family can send their kids to school, walk their neighborhood after dark, and build a life without fear, every promise of the American Dream is within reach. When they cannot, none of it is. That's my job: securing safety for every American. I'm pleased to testify again today to tell everybody here that we are doing just that. We are keeping America safe.

Since President Trump took office -- it's been said a few times this morning already, but it bears repeating -- murders are down roughly 20 percent nationwide. We have the lowest murder rate since 1900. Violent crime arrests are up nearly 114 percent. We've taken almost 5,000 child predators and human traffickers off the streets, and the Department of Justice has filed nearly 100,000 indictments and informations since January 20, 2025. Additionally, in just the last 4 weeks, in just the last month, we've paid $96 million in claims through the Public Safety Officers Benefits Program to eligible surviving families of fallen public safety officers, even while fewer law enforcement officers were killed in the line of duty than the prior years.

And obviously these are not just numbers. Each one is a family that still has its son or daughter and an officer who came home for dinner. If you look at Washington and Memphis as examples, where we have worked with Federal, State, and local partners pulling thousands of criminals off the streets in those two cities, homicides in D.C. are down about 60 percent, and overall crime in Memphis declined by more than 40 percent. We've seized thousands of illegal guns, brought more than 150 missing children home in those two cities, and cleaned up parks and spaces family once avoided so you can take your kids and loved

ones there once again.

We are enforcing our borders. We are prosecuting the smugglers who profited from an open border, removing criminal aliens, and dismantling gangs like MS-13 and TDA. We're smashing the cartels and any of the scourge of drugs in our communities. We designated the major cartels as foreign terrorist organizations because that's exactly what they are, and we're using every tool that unlocked: narcoterrorism charges, forfeiture, and extraditions. Dozens of cartel leaders are now in American custody, drug seizures are skyrocketing, and overdose deaths are finally falling.

We are protecting taxpayers. Last year, the Department brought the largest healthcare fraud takedown in American history, more than $14 billion, and another $11 billion in total fraud in just the last 3 months. That's money stolen from the fisc, stolen from Medicare, from seniors, working families, and we're clawing it back. We're doing all of this, I will add, through partnership: Federal agents, State troopers, county sheriffs, local officers and State attorneys general in your home States all pulling in the same direction. That is what happens when we fight crime together, and I want to bring that model that we've done in a few towns to more communities in every State.

Above all, we are restoring American trust. In recent years, we watched the Justice Department turned against many of you and a former President, and it damaged the public's faith in justice. We are fixing that. Members of this Committee on both sides have fair questions about the hard debates of the past year, and I welcome them. I'm proud of what we've done to help American families see safer streets and to have a fair shot at the life they're working to build. None of this is a Republican or Democrat issue. Every senator here has constituents who just want to be safe. The men and women of this Department are the finest people I have ever worked with, and leading them is the honor of my professional life. We are keeping America safe, and we are just getting started. I love this country. I love the Department of Justice.

Thank you very much, Chairman, for the opportunity to appear before this Committee today, and I look forward to answering your questions. Thank you.

[The prepared statement of Mr. Blanche appears in the appendix.]

/ COMMITTEE INSERT

Chairman Grassley. Thank you for that testimony, and we'll now have our 10-minute rounds of questioning. I'll start and then the Senator from Illinois.

I've long been concerned about concentration and

anticompetitive conduct in healthcare technology, but particularly in agriculture, family farmers deserve fair prices. I held a hearing on anticompetitive activities in this Committee last October on the subject of agriculture. As I recall, as a result of that hearing, the President issued an executive order and an investigation was started in your Department, and I've sensed some pause in that right now. So, if confirmed, do you have a commitment that the Justice Department will make antitrust enforcement a priority? And since I think there aren't too many people in the Justice Department who know much about agriculture, with some concentration on agriculture.

Mr. Blanche. Chairman, absolutely. You're right, President Trump issued an executive order. I have worked already closely with Secretary Rollins on this very issue. We recently held a press conference announcing some of the work that we're doing to not only deal with the anticompetitive behavior that we've seen, but also to help ease prices in the cattle market around the country. So, yes, Chairman, I commit to that.

Chairman Grassley. Our Committee has received a lot of outreach about the Department's litigation position in Louisiana v. FDA. The plaintiffs in this case challenged the relaxed regulation governing mail order abortion drugs. Can you tell the Committee about this case and explain what

the Department's doing?

Mr. Blanche. Chairman, first, President Trump is the most pro-life President in history, and the work that this Department's doing in that space is something that hasn't been done for 10 years. For the first time in a decade, HHS and the FDA are actually taking a real look at what's happening with some of these abortion pills and whether they're actually safe or not. As it relates to the litigation you referenced, it would be wrong for me to talk about any litigation strategy beyond what's in our briefs, but suffice to say, Chairman, that as we talk about in our briefs, we are not in any way defending what Biden and what his Administration did with respect to that judge, but beyond that, I don't want to comment on the strategy about that litigation.

Chairman Grassley. This Committee has also received outreach concerning the Department's handling of the investigation and release of Epstein files and your role in it. Some allegations include problematic redactions, insufficient effort to follow investigative leads, a refusal to meet with victims, and questions regarding the transfer of Maxwell to a lower-security prison. I want you to take the opportunity to respond to these allegations. What would you like this Committee to know regarding these files?

Mr. Blanche. President Trump signed the Epstein Transparency Act. The Department of Justice undertook a Herculean task to review millions and millions of potentially responsive files. We were required under the statute to do this expeditiously and very quickly. The Department of Justice did so. We reviewed over 6 million pages. Many of these pages were not responsive, and what I mean by that is we intentionally over collected potentially responsive documents. So, for example, there was a case going on in Florida at the same time as the Jeffrey Epstein case involving another defendant named Epstein having nothing to do with Jeffrey Epstein. When we collected materials, we collected everything involving Epstein, including the Epstein that had nothing to do with Jeffrey Epstein. So, the review of materials included nonresponsive materials.

The reviewers were qualified, experienced attorneys within the Department and the FBI. They took pains to apply appropriate redactions. There were mistakes that were made. And so, approximately 1 percent of the redactions had to be fixed after we released the Epstein files. Chairman, we had dozens of lawyers on call 24/7. Whenever we learned that any victim's name had been improperly not redacted, we immediately took the document down and fixed it as soon as we could. That doesn't excuse

the mistakes of which I take responsibility, but it does mean that we tried to fix them. We complied with the act. It required us complying with judge's rules in New York, which required us to redact certain victims' names. Even if the victim was also somebody who participated in criminal conduct, judges in New York did not allow us to un-redact those names.

The other thing that we did, Chairman, is we made unredacted versions of the entire database available to everybody in this body, and we did that because of transparency. Remember, for 4 years, there wasn't a peep about Jeffrey Epstein. The Biden Administration did nothing to be transparent about the Epstein case. We have been extraordinarily transparent in not only producing the records, but letting unredacted versions be available to anybody in this body. And if after reviewing unredacted materials, a member had concerns about why something was redacted, they brought them to the Department's attention, and we addressed that. So, I want to make sure the American people know that this Administration, when it comes to Jeffrey Epstein, has been more transparent than any past Administration, than Biden was or anybody else. And what we did is we complied with the law, and if we learn of new material, we will most certainly review it and make it available.

When it comes to the victims of this horrible man, we will never -- never -- not talk to victims. We will never not do everything we can to prosecute anybody that committed any crimes against any of these women. So, that narrative is false. We have spoken with over 30 representatives of dozens and dozens of victims since this process started. Any victim, if they're here today, I would encourage them or their lawyers to meet with the FBI. We will 100 percent investigate. There are no closed investigations. If we learn today, if we learn next week, if we learn next month that there's an individual that we can investigate, indict, and prosecute out of the Epstein files, you better believe it, we will. And so, we worked hard, the hardworking lawyers within the Department, to do the right thing to comply with the act, and we did, and we'll continue to do so, Chairman.

Chairman Grassley. Jack Smith and his team possessed and reviewed congressional information and other sensitive materials when they shouldn't have, and they were advised not to. Describe the steps you've taken to impose accountability so that this egregious and partisan misconduct never happens again.

Mr. Blanche. The biggest thing we can do, Chairman, is be transparent about what happened, and that requires us doing a check on ourselves and on the work that happened

before us, and being transparent with this body and providing records to you. I think when the American people understand and learn what happened and the egregious abuses that happened, it will be a check on making sure it never happens again. We strive every day to not only move forward as a Department doing the right thing, but to make sure that anything that happened in the past, whether it's releasing emails or admitting to things that we did and the Department did that we shouldn't have done, to being transparent with the American people about that, that's the best we can do, and that's what we're doing.

Chairman Grassley. I made messages public between Jack Smith's office that appeared to relate to the Trump classified document case. Those messages showed government personnel left open a classified facility and potentially mishandled classified information, causing a security violation. As defense counsel to Trump, did the government apprise you of these issues, and secondly, did the Biden Justice Administration do any investigation into this misconduct?

Mr. Blanche. We were never advised at that time when I was defense counsel to President Trump, and I'm not aware of any investigation that was started for that alleged conduct.

Chairman Grassley. The Justice Department must do a

full and complete investigation into this matter.

This will probably have to be my last question. On March 15 this year, I made public a signed and sworn statement from an FBI official. That statement says two important things: Special Counsel Mueller's team lacked a legal basis to pursue a FISA renewal of Walid Phares and investigate Thomas Barrack, but did so anyway. What steps have you taken to investigate these very troubling criminal allegations, and if you haven't taken any action, why not?

Mr. Blanche. We are investigating that, Chairman, and it would be inappropriate in this setting to get into the details of that investigation, but the sworn affidavit that we reviewed that you provided does raise serious allegations, yes.

Chairman Grassley. Thank you very much. Senator Durbin.

Senator Durbin. Thank you very much, Mr. Chairman. Mr. Blanche, I have a few questions I'd like to ask you. Is it not true that Congress had to pass a law requiring the Trump Administration to disclose the Epstein files, the Epstein Files Transparency Act passed by bipartisan roll calls in the House and Senate, to finally get the files made public?

Mr. Blanche. President Trump signed that law, yes.

Senator Durbin. And of course he did after

overwhelming numbers of the House members and Senate members voted for it on a bipartisan basis because the Administration would not voluntarily produce these documents. Now, I've mentioned --

Mr. Blanche. That's not true.

Senator Durbin. Well, what part of it isn't true?

Mr. Blanche. We were prohibited by law from producing those documents. This is the Judiciary Committee. There are laws that did not allow us to produce those documents, which we made plain in numerous court filings. And President Trump had said from day one to release the files, even when he was running, and so, yes, he signed it into law, and we complied with it.

Senator Durbin. I remember and everyone in the audience remembers the lengths that the Administration went through to delay production of these documents to the point where Congress did an extraordinary thing: discharge motion in the House to bring this matter before them and vote on a bipartisan basis to compel your Administration to disclose those documents.

Let me talk to you for a moment about the survivors who are in the room. There are 10 individuals who were exploited and abused by Mr. Epstein. They are here today. None of them have had a chance to speak to anyone in the Department or FBI, though they've asked repeatedly. So,

can I get your word under oath that within the next 30 days, you will personally sit down with these 10 victims and hear their case in terms of what needs to be done by the Department of Justice?

Mr. Blanche. Chairman, I appreciate them being here today. I also have somebody from my office who's spent her entire career working on cases like Mr. Epstein's. She's in charge of our task force investigating human trafficking. She's available to talk to them as soon as today.

Senator Durbin. She can sit right next to you. She can sit right next to you when you meet with these survivors.

Mr. Blanche. I have never said I will not meet with survivors. I am --

Senator Durbin. Will you meet with these 10 survivors? I'm asking you on the record.

Mr. Blanche. If they have lawyers, as you know, I'm prohibited from meeting directly with them. I have met with counsel for survivors as has many people in the Department of Justice --

Senator Schiff. So, you --

Mr. Blanche. -- over 30, but if they are represented by counsel, we will work with their counsel. If they don't have a lawyer, I will certainly make arrangements to make

sure the right people at the Department of Justice meet with them, absolutely.

Senator Durbin. Will you get it done? Will you get it done within the next 30 days that each of these survivors --

Mr. Blanche. I will get it done today if that's necessary. My point is there's somebody here who can meet with them today, get their information, and arrange to meet with them, absolutely.

Senator Durbin. I think you ought be in the room.

Mr. Blanche. Pardon me?

Senator Durbin. I think you ought to be in the room because you ought to hear this. You have singular responsibility for these files. There's a delay in meeting the statutory requirement of disclosure. You were involved in that. I think you ought to be part of this and --

[Cross-talking.]

Mr. Blanche. I am definitely part of it, and I have been from day one.

Senator Durbin. And it will be done within the next 30 days?

Mr. Blanche. I can keep on repeating myself, but I said it could get done as soon as today. It could have gotten done last week. We remain available to meet with any victim or their representative at any time.

Senator Durbin. Will you notify the Committee when you've done this?

Mr. Blanche. That would be prohibited by law if they're talking about an ongoing investigation.

Senator Durbin. I'm asking you if you'll notify the Committee that you met with the survivors?

Mr. Blanche. It depends on what they said. I'm not sure I'm allowed to notify you if there's an ongoing investigation.

Senator Durbin. Well, you're dancing on the head of a pin here.

Mr. Blanche. I'm not dancing on any pin at all.

Senator Durbin. You have these survivors who have the courage to come before this Committee, have the courage to tell their terrible stories, how they were exploited. Don't you think it's important that we have a prompt response by our government to these survivors?

Mr. Blanche. Absolutely, and there will be a prompt response.

Senator Durbin. And you --

Mr. Blanche. My heart breaks for every survivor --

Senator Durbin. Well --

Mr. Blanche. -- every victim of Mr. Epstein, absolutely, and I would love to prosecute anybody that did any harm to these victims, so absolutely.

Senator Durbin. Will you meet with them within the next 30 days? It's the last time I asked a question. You can say yes or no.

Mr. Blanche. I keep on answering it the same way. I can meet with them. My staff will meet with them. We have a staff member here today who specializes --

Senator Durbin. If you can meet with them, will you meet with them?

Mr. Blanche. I'm not sure what you're looking for me to say. As I said, there are --

Senator Durbin. Yes --

[Cross-talking.]

Mr. Blanche. If they're represented by counsel, I'm not allowed to meet with them directly, as you know. I assure you the FBI who are experts in this space, prosecutors who are experts in this space, and me if necessary, will absolutely meet with them. I promise you this.

Senator Durbin. I think it's necessary.

Mr. Blanche. I will stay updated and know everything that's happening with any victim that has information about any other people that worked with Epstein, that committed any crimes with Epstein, absolutely.

Senator Durbin. Well, if you're truly committed to extraordinary transparency and you're willing to meet with

these victims, I hope you will do it immediately or we're going to hold you to it.

I want to ask you about the immunity provisions that you assigned relative to the responsibility and liability of the President and his family and their businesses when it comes to tax audits. Would you like to explain how we can give to the President and his family and businesses exemptions from complying with the tax laws of the United States?

Mr. Blanche. It's not an exemption to comply with the tax laws of the United States. As part of the settlement, it was an agreement that any past audits would end.

Senator Durbin. "The United States" -- your signature -- "The United States releases, waives, acquits, and forever discharges each of the plaintiffs when it comes to tax liability." That's how it reads. It's pretty sweeping. You don't believe that is a discharge forever from liability?

Mr. Blanche. Of past. Of any past filings, yes.

Senator Durbin. All right, it is. How do you explain that to the American people, everyone in this room, all of us on this side? We have to follow the tax laws of the United States, and if we don't, we can be held responsible for it, to the point of even criminal prosecution. Why did you decide that President Trump and his family and their

businesses should be exempt from that same responsibility?

Mr. Blanche. As part of the settlement between the IRS and President Trump and some of his family, two of his sons and his organization, as is typical when there's a settlement between plaintiffs and the IRS, part of the settlement included release of any past audits. It does not give any protection to the President, his family, or his organizations for any taxes they file. If they filed it the day of that I signed that agreement or the day after, they have no protection.

Senator Durbin. No matter what their liability, no matter what their violation of tax law, you signed a document that forever discharged them from any legal responsibility.

Mr. Blanche. As part of the settlement that we entered into, any past audits were ended.

Senator Durbin. How often do you think that's been done in the history of the United States?

Mr. Blanche. Involving the President of the United States, I'm not sure it's ever been done, but this type of settlement is done regularly.

Senator Durbin. So, you're saying that when it comes to the President of the United States, his family and businesses have no responsibility under the tax laws for any wrongdoing prior to the signing of this document?

Mr. Blanche. No, I didn't say that at all. What I'm saying is that I think President Trump and his family are the first President that had their tax returns illegally taken illegally and made available to the public. So, that is unique to President Trump, yes, but this type of settlement is not unique to the Department of Justice or the IRS.

Senator Durbin. It's hard to explain to the American people that no one is above the law when that type of document was signed by you forever discharging that family and that President from any liability for violating the tax laws.

Mr. Blanche. Nobody is above the law, and when we enter into settlements like that, we do it with all kinds of people. It's not just President Trump. It doesn't make any of those individuals above the law.

Senator Durbin. So, let me ask you since you don't believe anyone should be above the law, about the January 6 rioters pardoned. We've taken a look at some of the people that the President pardoned on his first day in office, the ones who attacked this Capitol, and I'll use the word "attack" because I was here, and I saw what happened. Anyone looking at the videos knows what happened on that day. Among those who were pardoned by the President are individuals who've gone on to commit serious crimes against

innocent victims across the United States. Do you think that blanket pardon by the President of January 6 rioters was the right thing to do?

Mr. Blanche. The Constitution gives the President the full power to pardon anybody for any reason he wants, and so I don't question President Trump's authority or his decision to do so on January 20.

Senator Durbin. You don't question his decision?

Mr. Blanche. As I said, President Trump, under our Constitution, just like President Biden, has the authority to pardon anybody for any Federal crime. That's a privilege every President's afforded, including President Biden and President Trump.

Senator Durbin. Well, I can tell you he may have had the authority to do it, but I think someone should have grabbed him by the arm and said, stop, you can't release all of those rioters. Some of them actually physically assaulted policemen in the Capitol. Some of them were guilty of serious crimes before that day. And for the President to give a blanket pardon to these individuals is something that I don't think you can explain to the American people. You certainly can't explain it to the policemen who almost lost their lives because of these attackers. I yield Mr. Chairman.

Chairman Grassley. Before I go to Senator Cornyn, I'd

like to enter in the record supporting Mr. Blanche nomination from former Attorney General John Ashcroft, and this is a quote from the letter. "This rule of law is the best friend of liberty. To safeguard this core value, America needs an Attorney General exclusively devoted to the rule of law and will honor his oath to the Constitution. Todd Blanche is the right person for that responsibility. His record and credentials undergird my wholehearted support for his nomination."

Without objection, that'll be entered into the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Cornyn.

Senator Cornyn. Good morning, Mr. Blanche. Congratulations on your nomination. There's a lot to admire about your record or service to our country, and I respect the fact that you want to continue that service as the Attorney General. As I told you in my office, I think the Attorney General has the hardest job in Washington, D.C. because you are at the same time a member of the President's Cabinet, subject to dismissal, of whatever the President wants for any reason or no reason at all, but then you also have a duty as the chief law enforcement officer of the United States, and I think it's a very, very difficult balance. And I want to ask you a little bit

about that, particularly in connection with the settlement of the tax case.

There's so much that's unusual about this. First of all, the fact that the tax returns were leaked by a IRS contractor, Charles Littlejohn, who was appropriately convicted of a crime for doing that. President Trump and his family were definitely victims of a crime there, but it happened back in 2020, and the lawsuit wasn't brought until 2026. So, with the 2-year statute of limitations, it seems to me that that was something I know that was a subject of pleading in the complaint and attempt to avoid the two-year statute of limitations, but that struck me as unusual. But let's talk a little bit about the settlement agreement and the release.

First of all, I believe you have said that the weaponization fund is a moot issue. Is that your position?

Mr. Blanche. Yes, it is a moot issue, meaning there is no weaponization fund. The weaponization fund is dead. It's not moving forward.

Senator Cornyn. Well, I would refer you to the settlement agreement. Do you happen to have a copy of that in front of you?

Mr. Blanche. I do not, Senator.

Senator Cornyn. Okay. Well, you probably know what's in it.

Mr. Blanche. I'm familiar with it, yes.

Senator Cornyn. I'm sure you are. On page 4, "This settlement agreement may be modified only upon the written agreement of the parties." Has there been a written agreement of the parties to modify the settlement fund?

Mr. Blanche. No, the settlement fund's just not moving forward. There's no modification. It never started. No money went from the Treasury to any other account. There's no commissioners. It's not moving forward.

Senator Cornyn. Well, so the settlement agreement remains as it was originally, but I hear what you're saying. Is the settlement agreement enforceable as a contract by the parties?

Mr. Blanche. Well, yes, it's an enforceable document. So, I suppose if President Trump's counsel sought to enforce it, they potentially could, but --

Senator Cornyn. Including the weaponization fund.

Mr. Blanche. Well, they could try to enforce the contract. They can't force the Department of Justice to move forward with the weaponization fund. They could potentially say that, I suppose, that we breached by not moving forward. They haven't done that, and I'm not aware that they're planning on doing that. Like I said, Senator, and Senator Durbin talked about this, but I've talked

extensively with you and other colleagues about potentially codifying so there's no weaponization fund, which is certainly something that could be done. And I wasn't meaning to insult this body, but just in response to questions from senators about whether that could be done, we very much are okay with that.

Senator Cornyn. But just to be clear, the President of the United States, who is a plaintiff in this lawsuit, has not agreed in writing to delete the weaponization fund. And there's no guarantee that he or one of the other plaintiffs might raise that issue by way of a breach of contract lawsuit in the future.

Mr. Blanche. Well, Senator, the plaintiffs have no power over the fund. The fund was administered solely by the five commissioners and through the Department of Justice, so, no, they don't have any power with respect to the fund at all. I suppose they could bring a lawsuit and then we would litigate it, but even if we were litigating it, there's no fund, so the results of such litigation, whatever it would be, wouldn't be revival of the fund.

[Chart]

Senator Cornyn. I want to ask you about the release, and I know I'm guilty of what a lot of lawyers are guilty of and having a chart you can't read, but I know you're familiar with this document, which is the release that you

signed on May 19, 2026. First of all, does this purport to release parties or people who were not parties to the lawsuit?

Mr. Blanche. No, Senator.

Senator Cornyn. Well, it says here that "Claims asserted by defendants or any of the plaintiffs or related or affiliated individuals, including without limitation, family or others filing jointly or parties including trust, parent, sister, or related companies, affiliates, or subsidiaries." They weren't a party to the lawsuit, were they?

Mr. Blanche. I didn't hear everything you just said, Senator, but the only parties that had any release as respect to any potential audits, even if they existed, were the plaintiffs in the lawsuit.

Senator Cornyn. Did you talk to the President about the settlement? He originally sued for $10 billion and settled for an apology in this weaponization fund and then the release of future liability for tax audits. Did you discuss it with him?

Mr. Blanche. No, I did not. He had outside counsel. I did not discuss it with his outside counsel either. It was done by other people in the office.

Senator Cornyn. And this was a lawsuit brought --

Mr. Blanche. Can I qualify that?

Senator Cornyn. Sure.

Mr. Blanche. When we determined not to move forward, as the President has said, that's the only time that he and I had any conversations about this at all, was after when it was dead, when we said we're not moving forward.

Senator Cornyn. And this lawsuit was brought against the IRS and Treasury, yet this release purports to apply to defendants or other agencies or departments. So, does this release apply to, let's say, an investigation by the Security and Exchange Commission or some other Federal Agency?

Mr. Blanche. No. That's the standard language that we use when we enter into settlements between plaintiffs and the IRS, but, no, it doesn't bind. It's issued by me because statutes require and authorize me to do that as opposed to other Cabinet members, and in this case, it binds only the IRS and, by extension, the Treasury.

Senator Cornyn. Well, I hear what you're saying, but I certainly don't read that in the agreement, but let me turn since I only have a few minutes left. Senator Grassley raised the issue of the mifepristone lawsuit, and just to be clear, you understand the difference between the morning after pill and mifepristone, don't you?

Mr. Blanche. Yes.

Senator Cornyn. And so, mifepristone is a chemical

abortion that can be administered up to 10 weeks of gestation. The length of gestation should be, according to the medical literature, confirmed by ultrasound or clinical assessment by a healthcare provider, and it's generally safe and effective, according to the literature, when used under medical guidance. But the problem is that President Biden's Administration changed the Trump policy and allowed the administration of this chemical abortion drug without any medical guidance whatsoever.

And as you know, I've written a letter. Senator Tillis and I sent a letter yesterday. I understand you can't necessarily talk too much about your litigation strategy in the case of Louisiana against FDA, but I would appreciate it if you would respond to this letter for the record about the intentions of the Administration. If President Trump is the most pro-life President, this ought to be a pretty easy call because women are hurt as a result of side effects, heavy bleeding, prolonged potentially infection or sepsis, incomplete abortion, other complications when this is being sold through the mail or through online prescription. Will you do that for me?

Mr. Blanche. Yes, Senator, I will.

[Poster]

Senator Cornyn. Finally, let me just, in the 50 seconds I have, go back to this release. This purports to

release lawfare and/or weaponization. Those aren't legal terms of art, are they?

Mr. Blanche. I think they are just legal terms of art. There's not any --

Senator Cornyn. Have they been defined in any case or any statute?

Mr. Blanche. Not that I'm aware of, no.

Senator Cornyn. So, they're not a legal term of art?

Mr. Blanche. Well, I think that the terms have been used by the legal community and by people within government, but, no, I'm not sure that they're in Black's Law Dictionary, for example.

Senator Cornyn. So, we don't know what that covers.

Mr. Blanche. Well, I think it depends on the circumstances of the facts presented as to whether it covers. As to what it covers, sorry.

Senator Cornyn. Thank you. My time's up.

Senator Grassley. Senator Klobuchar.

Senator Klobuchar. Thank you very much, Mr. Chair. Mr. Blanche, after both the assassination of Melissa Hortman, our former Speaker of the House, and after the Enunciation School shooting in which 20 people were gunned down through stained glass windows, Federal law enforcement, as you and I discussed in my office a few weeks ago, worked cooperatively with State and local. And

we also know that they've worked together on the important work going on in the U.S. Attorney's Office in Minnesota with regard to fraud and the ongoing fraud investigation. And I know we have your commitment to continue giving resources for that investigation. Is that correct?

Mr. Blanche. Yes, absolutely. Yes.

Senator Klobuchar. Thank you. So, we also discussed my concern about the lack of cooperation we saw after the horrific killings of Renee Good and Alex Pretti with the Federal Government refusing to cooperate with State law enforcement for months, blocking Minnesota investigators from accessing the scene of Alex's death, even though they had a judicial warrant. They also, according to news reports, failed to secure and process the scene, failed to process Renee Good's car for evidence. When we met a few weeks ago at length, I asked you to ensure full cooperation, and I appreciated that the Department shared evidence with State investigators early this week.

Will you commit to continued information sharing between Federal and State investigators in these cases as well as with regard to the recent shootings in Texas and Maine?

Mr. Blanche. I expect that these investigations should be run as every investigation of similar kind. And so, that necessarily includes working with State and locals

in the appropriate way. I think that the definition of full cooperation can be disputed, but I very much expect that whether it's the inspector general, or the U.S. Attorney's Office, or the FBI, or who's ever on the Federal side of the investigation, where appropriate, to work with State and locals. I think a lot of the news reporting that you referenced is actually not accurate with what has been happening since the unfortunate events several months ago.

Senator Klobuchar. Okay. But that aside, we've seen these recent shootings in Maine and the reaction of the communities, understandably concerned, as well as Texas, and I think that people are going to want accountability in these cases. And one of the things that doesn't get as much attention is the non-death cases: the Hmong elder pulled out of his house in Minnesota in his underwear and Crocs in 10-below-zero weather. And as the Nation's chief law enforcement official, do you agree that it is unacceptable for Federal agents to forcibly enter someone's home without a warrant and drag them onto the street without even checking that they have the right person?

Mr. Blanche. Well, it depends on the circumstances, as you know. I mean, yes, obviously law enforcement agents need a warrant to enter a house, except for limited exceptions to that, so, yes, we very much believe in the constitutional protections afforded American citizens. The

same protections are not afforded people who are here illegally, so it's not a black-and-white answer where I can say yes or no, but yes, I very much expect the law to be followed by our law enforcement agents.

Senator Klobuchar. So, since the Civil War, along those lines, Federal law has made it clear that the President does not have the authority to deploy armed Federal officials to election sites. Will you commit to following clear Federal law and not deploying Federal agents to polling locations?

Mr. Blanche. I will commit to following the law, Senator, of course. Yes.

Senator Klobuchar. Does that include not deploying Federal agents to polling places?

Mr. Blanche. I will absolutely follow the law no matter what it includes, so, yes.

Senator Klobuchar. Do you understand why voters, U.S. citizens, are concerned about armed agents at polling places?

Mr. Blanche. I'm not aware of armed agents being at polling places.

Senator Klobuchar. Thank you.

Mr. Blanche. So, I'm not aware of that concern, but I will tell you we will follow the law, Senator.

Senator Klobuchar. All right. The DOJ has carried

out a campaign to push States to turn over voters' sensitive and private data to the Administration. Thirty States, including Republican-led, States like Georgia and West Virginia, have refused. In doing so, the West Virginian Republican Secretary of State said, "I will not break the law, give up our State's rights, or compromise the privacy of our citizens." Fifteen Federal courts in decisions from Democratic- and Republican-appointed judges have all found that these actions to force the States to turn over this data is unlawful.

Could you discuss how cutting off antiterrorism funding to States that refuse something that 15 Federal courts have found to be illegal enhances our national security?

Mr. Blanche. So, those cases are still being litigated, so I can't talk specifically about the cases that you mentioned, but overall, what I will say, Senator, is that election integrity is extraordinarily important to this Administration. It's important to this body. And so, to the extent that the work that we're doing is to make sure that we have fair and honest elections, that the only people voting are the people who are eligible to vote and that they're only voting once, that's important.

Senator Klobuchar. If secure elections are important, how does stopping the longstanding practice of critical

information sharing and scenario planning between the DOJ, other Federal agencies, and State and local election officials promote election security --

Mr. Blanche. We're not doing that.

Senator Klobuchar. -- because we have heard from our own Secretary of State that -- Steve Simon -- that these standard briefings trainings have not happened.

Mr. Blanche. We're not doing that, so, I'm not sure what you're referring to --

Senator Klobuchar. Okay. I'll --

Mr. Blanche. -- but I'm happy to follow up with your office about that.

Senator Klobuchar. Thank you. Appreciate that. Appreciate that. So, you and I talked about some of the antitrust concerns I have, the independence of the Department. I was very concerned by the Department's weak settlement of the monopolization suit against Live Nation-Ticketmaster. Do you believe that this settlement was good for consumers? There was another case, of course, that the State Attorney Generals brought that is going to result in much better protections for consumers. Why didn't the DOJ join them, stay in that suit?

Mr. Blanche. I share your concerns, and, yes, I do believe that settlement was good for consumers. The American people got a lot out of that settlement with Live

Nation, and you talk about another case that's separate. That's ongoing litigation that could potentially take years to resolve. And so, when we make a decision as a Department to settle a case, we are only thinking about the American consumer and making sure that we're complying not only with the laws, but with what's right for America.

Senator Klobuchar. Did the White House have any involvement in that decision?

Mr. Blanche. In the decision regarding which case?

Senator Klobuchar. To settle the Ticketmaster case.

Mr. Blanche. We work at times closely with White House counsel on certain issues. I wasn't directly part of discussions, so I can't speak to that, but I'm mostly saying they were not part of it.

Senator Klobuchar. Okay. Are you concerned that former Republican Principal Deputy Assistant Attorney General Roger Alford, who has appeared before this Committee as a Republican witness in the past, has said that in your Department, antitrust cases are being resolved based on political connections, not the legal merits?

Mr. Blanche. No, his words don't concern me because they're not true.

Senator Klobuchar. Well, a lot of us disagree on that front. So, I want to turn to some sort of number of issues involving security. So, in the wake of the shooting last

year, Annunciation Catholic School was approved to receive funding through the Office for Victims of Crime for mental health and other support services. And I appreciate that the Department has worked closely with the Annunciation community on this issue, but the delays in the release of these funds are creating budget concerns. Could you commit to work with me on getting those funds to the school?

Mr. Blanche. Yes, absolutely.

Senator Klobuchar. Thank you. The President's most recent budget reduces COPS Office funding by nearly $500 million, eliminates the STOP School Violence Program that I championed with Senator Hatch. He was the lead on it. Are you concerned that cutting this funding will impact school safety?

Mr. Blanche. No. I understand the question. I fully expect that the grants that ultimately are included in the budget that's passed will make sure that we're providing appropriate funds to our communities so that they can continue their good work.

Senator Klobuchar. I have concerns about, and I've heard this from several law enforcement and domestic violence groups, about the DOJ plan to consolidate the COPS program, HIDTA program, Office of Violence Against Women. And why do you think this will be helpful because we believe that they have very different functions?

Mr. Blanche. I agree with you. That's not what we're doing. There will still be three separate functions. What we're doing is consolidating above them to one group so that the application process is smoother and easier for grantees to do their work. And also, so that internally, some of the bureaucracy that was involved in having three separate bureaucratic streams doing the same work, even though you're right, the underlying programs serve different functions was not efficient. So, we're making that efficient.

Senator Klobuchar. And I'll follow up with you with some of the domestic violence grants and also just want to mention the continued enforcement under the Take It Down Act that Senator Cruz and I passed and how important that is going forward.

Mr. Blanche. Thank you, Senator. Yes.

Chairman Grassley. Before I go to Senator Kennedy, I'd like to read a letter supporting the nominee from the National Association of Police Organizations. More than 1,000 police organizations and 250,000 law enforcement officers nationwide are represented by this letter. "Mr. Blanche has proven his commitment to the rule of law and a fair and impartial justice system. As Deputy Attorney General and later Acting Attorney General, he has built a strong partnership with the law enforcement community, from

supporting the Department of Justice Law Enforcement Assistance Grant Program to working to ensure accountability within the public safety officer's benefits program, he has consistently endeavored to meet the needs of State and local law enforcement officers and their families."

Without objection, this will be entered in.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Senator Grassley. Senator Kennedy.

**BEGINNING OF TRACK 2**

Senator Kennedy. General, I assume that you consider yourself to be qualified to be the permanent Attorney General. Is that right?

Mr. Blanche. Yes, Senator.

Senator Kennedy. I've read your resume. We all have. You don't need to comment on this, but it just seems to me that no fair-minded person could conclude that you're not qualified. You spent a long time with the Department. You spent a long time in private practice. So, the opposition of my Democratic friends must be based on something else. Are you and President Trump friends?

Mr. Blanche. I'm his lawyer, was his lawyer, and now I'm the Deputy Attorney General. So, I met him as his criminal defense attorney. I'm not sure there's very many

people who have ever had a criminal defense attorney who calls that person their friend. I now have a --

Senator Kennedy. Well, let me put it this way. Are you enemies?

Mr. Blanche. No, we're not enemies at all.

Senator Kennedy. Okay.

Mr. Blanche. No.

Senator Kennedy. Have you ever seen a President of the United States appoint an enemy to be Attorney General?

Mr. Blanche. I have not.

Senator Kennedy. Usually they appoint their qualified friends, don't they?

Mr. Blanche. Yes.

Senator Kennedy. I mean, one President appointed his brother, right?

Mr. Blanche. He did, Senator.

Senator Kennedy. And I can think of another President who appointed his former law partner. Is that right?

Mr. Blanche. It is correct.

Senator Kennedy. Okay. Are you responsible for all the President's decisions?

Mr. Blanche. No, Senator, I'm not.

Senator Kennedy. I mean, does the President get up in the morning and give you a call first thing and say, "Todd, tell me what I ought to do today?"

Mr. Blanche. He does not.

Senator Kennedy. Does he ever ask your opinion on actions he should take?

Mr. Blanche. Yes.

Senator Kennedy. Do you tell him the truth?

Mr. Blanche. Every time.

Senator Kennedy. Have you ever disagreed with him?

Mr. Blanche. Yes.

Senator Kennedy. And have you ever disagreed with him and he did it anyway?

Mr. Blanche. Yes.

Senator Kennedy. And did you go call a press conference and announce that the President made a bad decision?

Mr. Blanche. Absolutely not.

Senator Kennedy. That's not what Attorneys General do, correct, is it?

Mr. Blanche. Correct.

Senator Kennedy. Okay. Has he ever asked you to do anything illegal?

Mr. Blanche. No.

Senator Kennedy. Would you do it if he asked you?

Mr. Blanche. Absolutely not.

Senator Kennedy. Hmm. How many pages of the so-called Epstein files has the Department released?

Mr. Blanche. Nearly 3 million.

Senator Kennedy. How many more pages are there?

Mr. Blanche. That are responsive? We're not aware of any.

Senator Kennedy. How about that, in the Department's opinion, are not responsive?

Mr. Blanche. Well, from what we collected, about 3 million that were just nothing to do with Jeffrey Epstein or the case at all.

Senator Kennedy. Okay. Why don't you just release everything, just let it rip?

Mr. Blanche. Well, that would be against the law because the only reason we could release the 3 million we did is because of the Epstein Transparency Act. There are Federal laws that prohibit the release of case files, and the Epstein Transparency Act was very explicit and specific about what could be and should be released.

Senator Kennedy. Well, first, we can agree, can we not, that Mr. Epstein was a pig?

Mr. Blanche. Yes.

Senator Kennedy. Other than to himself, who, if anyone else, did Mr. Epstein traffic young women to?

Mr. Blanche. From what we learned, from what we know, so when we know, I mean, what's in the FBI files and what's in the DOJ files, we did not identify evidence. And by

"we," I mean career prosecutors, not me, not my leadership, but career prosecutors in New York and career prosecutors in Florida who worked this case hard, did identify other participants, some of whom, as has been discussed, were also victims themselves of Mr. Epstein. But we did not have evidence, as of now, of other men that Epstein helped traffic.

That does not mean it didn't happen, and I want to be clear about that. It just means that we have evidence that the FBI gathered and that the Department of Justice gathered and that's the body of work that we have to work with, which is why I said earlier, if there's anybody out there, victim or otherwise, that has information, I beg them to come forward.

Senator Kennedy. Okay. Did Jack Smith read my emails?

Mr. Blanche. I'm not sure, Senator. I don't know.

Senator Kennedy. Would you check for me?

Mr. Blanche. We will check Senator, yes.

Senator Kennedy. I think he read Senator Grassley's emails. How can someone at the Department of Justice get Senator Grassley's emails without probable cause?

Mr. Blanche. There are checks in place that should make it extraordinarily difficult for a prosecutor to collect and review a senator's emails, or a congressman's

emails, or a lawyer's emails, or other folks that have privileged protections associated with their communications, and those checks and balances should always be used.

Senator Kennedy. But Mr. Smith just ignored them?

Mr. Blanche. I cannot speak for Mr. Smith, Senator.

Senator Kennedy. Would you check for me, first, if he read my emails --

Mr. Blanche. We will check.

Senator Kennedy. -- and number two, how he got them. And number three, I don't mean to single out my friend, Senator Grassley, but what emails did he get of Senator Grassley, and, I mean, what were they limited to, if at all? You know, did he get emails of Senator Grassley talking about his corn harvest and all that, and who did he share them with? Do you know if Mr. Smith shared my emails with Attorney General Garland?

Mr. Blanche. I do not know.

Senator Kennedy. Can you check for me?

Mr. Blanche. We are investigating that Senator, yes.

Senator Kennedy. Yeah. I'd kind of like to know all that. Now, Mayor Lori Lightfoot sent us, she sent the world a letter suggesting that we should not confirm you as Attorney General. Who is Mayor Lori Lightfoot, just for the record?

Mr. Blanche. So, she's the former Mayor of Chicago. I believe she had a brief stint in the Department of Justice prior to her political life.

Senator Kennedy. Right, and you had some conflicts with her.

Mr. Blanche. I do not believe she supports our Administration's efforts making America safe again.

Senator Kennedy. Okay. Right. She thinks cops are a bigger problem than criminals. Would that be a fair assessment?

Mr. Blanche. Her public rhetoric is not something that either myself or this Administration supports, which is to always back our law enforcement.

Senator Kennedy. She thinks if a cop shoots a criminal, it's automatically the cop's fault, but if a criminal shoots a cop, it's automatically the gun's fault. Would that be a fair assessment of the mayor's position?

Mr. Blanche. Her public statements suggest that.

Senator Kennedy. Okay. Would you put her even in charge of a ham sandwich?

Mr. Blanche. I don't believe she should be any part of this Administration.

Senator Kennedy. Well, the people in Chicago apparently agreed. I think she ran for reelection and got 16 percent of the vote. Is that right? Do you recall?

Mr. Blanche. I'm not sure what percentage she got, Senator.

Senator Kennedy. Okay. One of the things that under your authority, the Department has concentrated on, which I agree with, in addition to prosecuting crime, is the prosecution of white collar crime, fraud. Tell me a little bit about that.

Mr. Blanche. It's incredible since COVID, the absolute thievery that's happened from the fisc by people in this country. And so, we have focused tremendous amount of efforts, not only in the new division, but at every U.S. attorney's office, with every inspector general and their offices, the FBI, DHS, and HSI to just root out this fraud. You have examples of individuals just stealing, so setting up entire centers for autism when there are no patients, when there is no center, and taking millions of dollars of hard-earned taxpayers' money. And so, we are very focused on that. Like I said earlier, billions and billions we've already collected in just the past couple of months. That effort is going to go forward for as long as I am in the position that I'm in now, no matter whether I'm confirmed or not.

And it's extraordinarily important to every American that this doesn't happen because we're not talking about whether someone agrees or disagrees with a policy. It's

just outright theft by individuals, and unfortunately many State governments, if they didn't absolutely know what was happening and just encourage it, they certainly stood idly by while it was happening, which is also a problem.

Senator Kennedy. Don't forget to check on my emails for me.

Mr. Blanche. Senator, yes.

Senator Kennedy. Thank you.

Chairman Grassley. Senator Whitehouse.

Senator Whitehouse. Good Morning, Mr. Blanche.

Mr. Blanche. Good morning.

Senator Whitehouse. Why won't you tell us what became of the $50,000 in confidential money that the FBI reported that it gave to Tom Homan?

Mr. Blanche. I'm not aware of what you're speaking about. To the extent that there have been public reporting about an investigation, I know nothing about it.

Senator Whitehouse. Well, the public reporting is that the FBI reported giving $50,000 in the nature of a bribe to Tom Homan, and there's been no report of what became of that $50,000. Will you answer that question? Not now, but will you answer that question because we've been asking it for a long time now. Your Department certainly knows what's happening.

Mr. Blanche. I'm not aware that that's true.

Senator Whitehouse. Well, take a look at it, and it's publicly reported, and the FBI reported it, and you should answer the question. That's not the only one. Here's a list of unanswered questions that I have just asked. I don't know how it is that the Chairman thinks that you've cooperated with the Committee or that you've been transparent with the Committee. That is not my experience. You said earlier that you welcome our questions. Great. Answer our questions. That's the real point. Where we've failed to get answers to our oversight questions, we've actually had to revert to the Freedom of Information Act, the general law of government transparency, to try to get answers from the Department of Justice. Here's how we did. Not well.

We have this stack of questions that you haven't answered in the nature of oversight. We have this stack of FOIA requests that you haven't answered. And I think it's important for us to believe that you actually take seriously your constitutional oversight responsibilities in order to confirm you, that you actually take seriously your obligations to this Committee irrespective of party, majority or minority, in order to confirm you. So, I will ask before we get to a vote on this that you take a look at these and get us answers. Where we have had answers, Mr. Blanche, they have not been informative. They have been

blow-offs.

So, let's move on to Trump v. IRS. Our research indicates that senior DOJ officials have never in the history of the Department before faced a judicial inquiry into a fraud on the Court participated in by the Department of Justice. That was the inquiry opened in Florida. The question about fraud on the Court committed by the Department of Justice remains open in the judge's decision.

Here's what she did find. She found that the Department of Justice colluded with the Trump plaintiffs, that the Department of Justice violated DOJ policies in that collusion, that Department attorneys were derelict in their responsibilities as DOJ attorneys, that the Department failed to zealously advocate on behalf of the United States of America, its true client. And as I said, the fraud on the Court question remains open, an unprecedented allegation about the Department. As a result of that, the order was transmitted to the New York State Bar for potential disciplinary proceedings.

I would like to ask in addition, since this is new news, the decision was what, 2 days ago? I would like to ask that you say to us that you will be willing to provide all of the documents and communications between the Department of Justice and the Trump plaintiffs in that matter.

Mr. Blanche. I'm not aware of any communications. I didn't have any, so if you put a request in, we'll look at it. I mean, obviously that's active continued litigation in the Southern District of Florida, so it depends on --

Senator Whitehouse. Explain how it is active continued litigation in the District of Florida.

Mr. Blanche. Well, there's been several indications that the parties dd I never entered notice of appearance -- but that the parties intend to appeal the judge's Monday 56-page decision.

Senator Whitehouse. Well, it'll be interesting. Do you intend to appeal, the Department of Justice?

Mr. Blanche. We weren't really even part of that decision. So, to the extent there's something that we can't appeal, I very vigorously will encourage the Department to do so.

Senator Whitehouse. Well, here's the tell. In that case, the Department of Justice filed no answer, filed no agreement with respect to the extension of time, filed no response to the case or controversy. Amici filed nothing related to the withdrawal of the complaint, filed no settlement and filed no response to the fraud on the Court inquiry. To me, as a one-time litigator, that looks like really weird behavior. And when for the first time in history there's inquiry into fraud upon the Court committed

by the Department of Justice, the silence from the Department in response to that is deafening, Mr. Blanche. Deafening. And it strikes me that the stratagem here was to file no pleadings to try to keep the Department out of the authority of the Court when what the Department knew to be a collusive and false enterprise was blown up in that court.

Now, it didn't work because the Court found collusion and it takes two to collude, and they also went on and made the other adverse findings about the Department's conduct. And the problem here, Mr. Blanche, is that it's not just that one occasion. Between judges appointed by every President harshly criticizing the Department's work in your tenure, grand juries rejecting indictments, judicial findings of outright misconduct, capable lawyers fleeing the stinking ship, this seems to be the most troubled Department of Justice in history.

[Poster.]

Senator Whitehouse. Here are some of the misconduct findings against your U.S. attorneys, and if I haven't put it up yet, here's a word cloud of the commentary by Federal judges about the conduct of your DOJ. These are red flag words that when I was a U.S. attorney would have provoked, at minimum, an internal conversation about what the hell went wrong and very likely a conversation with OPR and

maybe OPR pursuit. Words like "pretext" mean a lot coming from a judge about a government argument usually enjoying the presumption of regularity. We need answers. I need you to be able to tell me that this kind of misconduct is going to stop if you're confirmed as Attorney General. Can you say that?

Mr. Blanche. The Department of Justice works hard. The prosecutors work hard every day, and I appreciate the handpicked words that you have behind you right now, but that's not reflective of the hundred thousand indictments and informations that have been filed to do the work that I talked about earlier today. And so, while cherry-picking a few isolated words from district court or magistrate judges in certain districts is something that you're entitled to do, it's absolutely false to suggest that this Department of Justice is not executing as we should and doing the right thing every single day.

Senator Whitehouse. I will tell you that you are wrong, that in the history of the Department, this kind of criticism by Federal judges is unprecedented, and it comes from judges of every different political persuasion.

Let me ask about the FBI. How long do you intend to put up with that Kash Patel character? Are you good with his airplane jaunts? Are you confident he's not drinking on the job? Are you sure none of his travel is a pretext

for vacation activities like snorkeling Olympics and visiting girlfriends? Are you sure he knows what he's doing? Do you vouch for him? Are you willing to look at whether he lied to this Committee?

Mr. Blanche. That's an extraordinarily obnoxious question, Senator, and I have full faith in Director Patel and the work that he's doing every day and the --

Senator Whitehouse. Great. You got to own that. One last thing if I may. You have refused to exclude January 6 rioters from your anti-weaponization fund. You have refused to put in writing that the slush fund is dead. Indeed, you signal to allies that payouts are still on track. You have vacated seditious conspiracy convictions against members of the Proud Boys and Oath Keepers. You hired January 6 rioter, Jared Wise, who had urged the mob to kill police officers.

You scrubbed press releases about January 6 prosecutions and called the releases partisan propaganda. You denied that Trump encouraged any violence on January 6. You've cleaned house of every attorney who worked on a case related to Trump, and you've bragged that bringing justice for violent rioters meant that every one of them was either pardoned or had their sentence commuted. I hope that our colleagues who are concerned about what happened on January 6 take that into account. Thank you.

Chairman Grassley. Would you like to respond?

Mr. Blanche. I would. Almost everything the Senator just said, and he's protected. He's allowed to lie, but almost everything he just said was absolutely false, okay, starting with the fact that I have never, I have never said that any sort of violence against law enforcement is appropriate. I have never said that publicly, I have never said that in a speech, and I certainly do not believe it. I did not hire the person referenced, and that is, again, something that just happens not to be true.

When I talk about what happened with the convicted January 6 defendants, I talk about what President Trump did. He has the absolute right to pardon anybody for any reason he sees fit, and every one of them got pardoned or committed. I am not celebrating that. It is a fact. And the fact that my Department had to take action in response to those pardons by dismissing some cases is exactly what I have to do under the law, and it's what I did. So, the narrative that the Senator just suggested and put on me as something I believe is absolutely not true.

Senator Whitehouse. Since he accused me of lying personally, Mr. Chairman, let me ask that I put this series of concerns into a question for the record and that you under oath, one by one, tell me where there's a lie, okay?

Mr. Blanche. I'm happy to do that.

Senator Whitehouse. We'll get that to you.

Mr. Blanche. I'm happy to do that. Absolutely.

[The information appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Before I go to Senator Blackburn, since oversight was brought up and responsiveness of your Department, I'd like to speak about how it was with the Biden Justice Department's non-responsiveness to my oversight letters. If the Biden Justice Department would have been remotely responsive, there wouldn't be such a backlog right now. So, let's not pretend for a minute the last Administration was a benchmark of responsiveness, and this Administration, to its credit, has been more responsive. I talked about in my opening statement 43,000 pages of documents that you have released compared to a lot less in the previous Administration. Senator Blackburn.

Senator Blackburn. Thank you Mr. Chairman, and thank you for being with us today.

Before I get to my questions, I would like to make you aware that when Ranking Member Durbin was Chairman in the last Congress, I tried repeatedly to subpoena the Epstein files so that we could get those banking records and those flight logs, and repeatedly, that was blocked. So, the Democrats at that point didn't want to know what was in the Epstein files until they lost the majority, and then they

were hellbent to get that.

I also want to make certain that we get on the record that DOJ has met with the following list of attorneys who represent victims, including many who have claimed that they've never had a meeting with DOJ. Now here is this list: Sigrid McCawley; Jordan Merson, Gloria Allred, Arick Fudali, Alan Goldfarb, Daniel Kaiser, Mariann Meier Wang, Glenn Nick, Adam Horowitz, Jack Scarola, Dennis Ardi, Kevin Mintzer, Jill Greenfield, Julie Kays, David H. Brodie, Robert Glassman, Kate L. Doniger, Andrew Villacastin, Brittany Henderson, Brad Edward, Avrom Robin, Neil Binder, David Fleisigg, Roberta Kaplan, Tasha Thompason, for the record.

I do want to talk with you a little bit about Memphis and the Memphis Safe Task Force. We are so grateful. When you talk about a success, the work that has been done in Memphis in fighting crime, this is going to be a big part of President Trump's legacy in his commitment to Memphis. The commitment that has been made by his Administration is something that Memphians and all West Tennesseans are incredibly grateful for. And this is something with President Trump, with Kash Patel, we started saying please help us, and that call was answered.

I brought the crime stats. We get the daily report from Memphis. Eleven thousand forty arrests have been

made, and yesterday there were 40 arrests. These included someone charged with second-degree murder, another with first-degree murder, aggravated child abuse, attempted rape, and aggravated assault. There have been nearly 2,000 firearms that have been seized, and there have been 155 children that have been recovered. The stats here tell the story.

You, President, Director Patel and the agencies that are there working with our governor, State agencies, the Memphis mayor, the Memphis police chiefs, this is the way to fight crime, and we are ever so grateful, and we want to be able to sustain and build on that. And I'd like for you to talk just a moment about Memphis and what lies ahead for Memphis and, more broadly, for other cities and counties that are focused on public safety.

Mr. Blanche. Thank you, Senator. What we have don, and by "we," I don't mean the Department of Justice alone. I mean State and local partners, the National Guard, all of our Federal agencies, DHS in Memphis should be a poster child for a lot of cities in this country. You have a city that had skyrocketing crime and restaurants that were out of business, storefronts that didn't exist. They were boarded up, and we came together. And you're right, it was President Trump working with you, working with the Governor, working with our partners and said we're going to

fix this. Just like we did in D.C., we're going to go into this city and we're going to arrest. I mean, amazingly, a very small percentage of Memphis' population was committing a very large percentage of the crimes. And so, if you can focus on that small percentage, you're actually able to bring the crime stats down remarkably, which is exactly what we did.

As far as what happens going forward, we keep on doing it. There's restaurants opening in Memphis. There's stores opening in Memphis. It's a new city compared to where it was one year ago, and that's something that we can't let up on. But again, I look at it as a poster child of what we should do in cities across this country.

Senator Blackburn. And we are pleased to know that you all are doing a Model City Program at DOJ in order to help with public safety in other areas.

Mr. Blanche. Yes, and that's not just for Memphis, but for several cities around the country where we are going to put money where our mouth is and put a lot of resources into the cities to help make sure that cities that need to be safer are safer, and if they're on the right track, that they have the resources they need to keep doing it.

Senator Blackburn. When you were in the office, we talked about my carjacking bill that would lower the intent

standard to a general knowingly requirement, giving the Federal prosecutors, more tools so that they could hold some of these violent carjackers accountable. We thought it was going to move with the NDAA, and Leader Schumer has blocked that, and we're disappointed. It's a bipartisan bill. But talk about the importance of lowering that statute so that we can prosecute these crimes.

Mr. Blanche. Yes. It needs to be done because they're carjacking not only in Tennessee, but in every city in this country has gotten out of hand. The criminals are better at it. They have tools that make it easier to get into cars. They're willing to exact violence. And so, the standard that exists now under the statute, but also because of certain cases, make it higher than a regular general intent crime. And law enforcement and prosecutors will do the right thing, so we need to be empowered with tools to prosecute these cases, and if there's cases where somebody was in the car and didn't know, prosecutors are not going to move forward. They'll do the right thing, but it shouldn't be the law that puts the damper on that. And so, I'm hopeful that we can continue to work together on that because it is very important.

Senator Blackburn. There was a deeply disappointing decision from the Court in the Trump v. Barbara case that it's clear that Congress, we are going to have to step up

and do something about birthright citizenship, and this is our opening. We know that birthright tourism is something that is taking place in our country. We know that during the first Trump Administration, there was a good bit of evidence on this. I've had a ban birthright tourism bill that would block these 33,000 births a year from people who are circumventing our laws and coming here simply for the purpose of giving birth. It's primarily the Chinese, and it is also the Russian oligarchs that are exploiting this, and my bill would make coming here to give birth inadmissible as a way to obtain a visa and immediately deportable as an offense. And touch on why Congress needs to act and give the Administration more tools to enforce this.

Mr. Blanche. Yes. So, the very day or the day after the decision came out, the Department of Justice issued a directive to prosecutors to focus on the conduct you're describing using existing laws and tools that we have, which is mostly around false statements or fraudulent information in the visa application process. We're going to do that. We are limited in how we can prosecute folks that are coming here and lying about why they're coming here, and coming here just to give birth, and also the organizations that are facilitating that. Any congressional statutory adjustment, the Supreme Court

opinions relied in part on the statutory part of this that would control, would give us more tools, and would give the President more tools to keep out people who are absolutely not coming for the right reason, only coming to give birth.

Senator Blackburn. And you're doing a great job on fraud and going after fraud that has been committed. The Fraud Task Force seems to be working well, and from Tennesseans, I hear a good bit about this. They want the fraudulent activity to stop. It's taxpayer money, and they want their money to be used wisely. We have had legislation that would apply to individuals that have come into the country either illegally or maybe they've been naturalized citizens, but the Fraud Accountability Act would push for that deportation and de-naturalization if they have been found to be defrauding individuals or local, State, or Federal Government. And I'm over time, and I'll ask you for this in writing since I'm over my time, but I'd like to hear from you why it is important to put more tools in that toolbox for you all to go after these individuals that are defrauding the U.S. taxpayer. Thank you, Mr. Chairman.

Mr. Blanche. Thank you.

Chairman Grassley. Before I call on Senator Coons, Senator Durbin, would like to speak for a short time.

Senator Durbin. Very short. Thank you, Mr. Chairman.

Based on the statements just made by the Senator from Tennessee, we've checked the transcript of the Committee. During the November 30, 2023, Supreme Court ethics subpoena authorization markup, I chaired and attempted to recognize Senator Blackburn multiple times so that she could offer an amendment regarding Epstein's flight logs, but her Republican colleagues prevented her from doing so by filibustering and then invoking the Senate rule on 2 hours to end the markup. Many Epstein records, including flight logs, have been public for years. My staff subsequently reached out to Senator Blackburn to work to identify which records she actually wanted and still believes had not been made public. To this day, she's never responded.

Senator Blackburn. Mr. Chairman, since he mentioned my name, I have previously and will continue. There is video, there is a transcript, and, Mr. Blanche, I'll be happy to forward that to you.

Chairman Grassley. Senator Coons.

**[35:33] - Coons**

Senator Coons. Thank you, Mr. Chairman, Ranking Member. Acting Attorney General Blanche, thank you for your service and for appearing here. Thank you to your family and to the men and women of the Department of Justice who worked tirelessly to fight crime and to make our Nation secure. I'm grateful for their service. I'm

sorry that your schedule apparently didn't permit us to meet before this confirmation hearing, but I hope and expect we'll find time to meet soon after today.

Mr. Blanche. Absolutely.

Senator Coons. Thank you. As I consider your nomination, like all other nominations to similar Cabinet positions, I need to know you're qualified to serve, you demonstrably are, that you have the policy views to serve well -- we will discuss that today -- and most importantly in this role, that you have the independence to serve as the Attorney General for the American people, and that last question has troubled me the most. You're in charge of a Department of Justice I don't recognize prosecuting the President's political enemies, firing rank-and-file prosecutors and FBI agents because of the cases they were assigned to, slashing grants for law enforcement and public safety. These are some actions that in your previous confirmation hearing before us you said you would not take. Now, I appreciate your statement walking back the $1.8 billion weaponization fund that you created, but I question how it got that far, and we'll get into that. You sat in Appropriations hearing earlier this year before me and defended it at that time. In fact, if I remember correctly, you told me I was wrong for criticizing it, but following questions by Senators Durbin and Cornyn, I'm

concerned it's not dead yet, and I think we should talk that through. Overall, this is not what I believe the American people expect or deserve from the Department of Justice.

Having spent critical parts of January 6 in this room taking shelter from the mob, I just wanted to open with some questions. How many people were convicted of assaulting law enforcement officers on January 6?

Mr. Blanche. I believe around 120 approximately, but I could be off a few more.

Senator Coons. You are. The answer is more than 200, and how many of those individuals had their sentences commuted or were pardoned by President Trump?

Mr. Blanche. President Trump either commuted or pardoned every defendant from the January 6 events.

Senator Coons. That's correct. And in this room right now and outside this room are Capitol police officers protecting us in this hearing room. How many of them do you think might have friends or colleagues who were attacked by supporters of the President on January 6?

Mr. Blanche. I don't know the numbers, but I'm sure many of the Capitol Police officers who are here today either were working on January 6 or knew people who were.

Senator Coons. I'll just say that I consider it a shameful slap in the face of the men and women of law

enforcement for those convicted of assaulting police officers to have been pardoned. I know you were not serving as Deputy Attorney General when President Trump pardoned those folks, but you said just a few moments ago that you were not celebrating this decision by the President. He was exercising his constitutional power. But earlier this year in front of CPAC, a conservative event, I would say from the transcript, you actually trumpeted it as an achievement saying, "If you look at what happened to the men and women convicted because of January 6, by 5:00 p.m., on January 20, every one of them was either pardoned or had their sentence commuted by President Trump." So, when folks say you've done nothing, I say you have a very short memory. Would you say that you are proud of President Trump's decision to pardon individuals who assaulted law enforcement?

Mr. Blanche. That not what I was saying there at all, Senator. So, I was responding to inquiries around why more hadn't been done by the Department of Justice with respect to January 6 defendants. And so, my answer was that January 6 defendants and some of their lawyers had a short memory because a lot had already been done. Indeed, by the end of the day on January 20, they had all been pardoned or commuted, so I wasn't celebrating it. I was merely stating a fact, which is that the January 6 defendants did receive

a very generous pardon or commutation from President Trump, every one of them on January 20.

Senator Coons. A generous and, in my view, for those who had assaulted police officers, unwarranted, unjustified, a historical and a terrible precedent. Let me move on to questions I've asked in previous hearings. Is President Trump, just as a simple matter of constitutional law, eligible to run for another term as President in 2028?

Mr. Blanche. I don't believe he is, no.

Senator Coons. That is a correct, in my view, reading of the plain language of the 22nd Amendment. Why do you think several of the judicial nominees of this Administration have refused repeatedly to answer that question simply and clearly as you just did when I put it to them?

Mr. Blanche. I have no idea why they answered questions with me.

Senator Coons. Me neither.

Mr. Blanche. You're asking me to speculate about something. I don't know.

Senator Coons. Is the Department of Justice that you are running independent from the White House?

Mr. Blanche. The Department of Justice, like every single Department in the executive, is part of the executive. I mean, Article II of the Constitution gives

the power of the executive to President Trump, so we certainly operate with integrity. We certainly operate in the single mindset to serve the American people and do the right thing, but if confirmed, I will be a member of the Cabinet. I'm serving in the acting capacity that way now, just like the Abbott Cabinet members. President Trump can fire me whenever he wants.

Senator Coons. Do you have a sense why he fired your predecessor?

Mr. Blanche. I have no idea. We all serve at the pleasure of President Trump in this Administration.

Senator Coons. Did President Trump ever post on Truth Social directing your predecessor to get at it to prosecute his perceived political enemies?

Mr. Blanche. I don't think those were his exact words, but he didn't --

Senator Coons. Those were --

Mr. Blanche. -- not his exact words.

Senator Coons. I clearly thought was the intention. It is my impression, sir, that you are here rather than your predecessor because the President was unhappy with her failures to actually secure convictions of folks like Attorney General Tish James or former FBI Director Jim Comey. If you're confirmed and you're asked to take an action you believe to be illegal or unethical, would you

resign?

Mr. Blanche. That will never happen, but yes, if it were to happen, I'm not going to violate my oath to the Constitution.

Senator Coons. I appreciate that answer. You did answer a question by a colleague about input that you gave to the President. Did you ever say no to the President on the slush fund, the anti-weaponization fund? Did you advise him against this?

Mr. Blanche. I will not talk about communications I have with the President. I served as his lawyer for a couple of years before he was elected. I'm the Deputy Attorney General and the Acting Attorney General, so I'm not going to talk about communications that I have with him. But Senator, I will say that President Trump trusts me to give him counsel. Counsel does not mean "yes man," and that's true in my case like it should be in any Attorney's General's case.

Senator Coons. Let me just for a minute bear down on the anti-weaponization fund. You've testified to the House we are not moving forward with that fund period, but you've repeatedly refused to put that commitment in writing or just submit a declaration to the Court. You're an officer of the Court, a member of the Bar. You should be able to make that assertion in a court filing or even in a letter

submitted to this body.

On May 19, you testified before the Justice Appropriation Subcommittee since the case had been dismissed. There was no judge and no mechanism for judicial review, but in an opinion this week, a Federal judge wrote, and I'm quoting, that your testimony "was at best misleading, and at worst disingenuous," explaining the Court remained available to review this agreement had you sought relief. Why not seek review of the settlement agreement or submit some record, some writing, given that the President continues to publicly champion this weaponization fund and given your previous answer to me in another hearing that you wouldn't say whether or not those who assaulted cops on January 6 would be eligible for multimillion-dollar payouts?

Mr. Blanche. So, there's a lot of questions there. First of all, we have put it in writing. It's in repeated court filings in EDVA and D.C., so this narrative that you won't put it in writing happens not to be true. The reason why neither myself nor Secretary Bessent agreed to put a declaration in is because there's longstanding precedent that judges cannot ask Cabinet secretaries or people like me to put in declarations that has nothing to do with whether the fund is alive. I'm under oath today, and I've said it's dead repeatedly. I said it to the House

Oversight Committee, and I'm happy to say it as many times as necessary. As far as what the judge said in Florida, just the last question you asked about Florida, that judge disagreed with what I said. I still believe the 11th Circuit precedent, which I've studied, I am right. So, we'll see.

Senator Coons. You did say earlier this is the most transparent Department of Justice in American history, we have nothing to hide, and you started by saying we're here to rebuild trust. Two decisions or two OLC opinions I'm very interested in. I'm the senior Democrat on Defense and Intelligence. I'm the most senior member of the Foreign Relations Committee on my side who's currently serving on this Committee. I'm curious as to why the most transparent Department has refused to release the OLC opinion that justifies the 66 strikes the military has conducted on boats in the Caribbean, which have killed more than 220 people, either a redacted version or in a classified setting to me and others who are in relevant decision making positions.

Mr. Blanche. Well, Senator, we made the head of OLC available on multiple occasions to explain that to you and other members of the Committee, and that is extraordinarily transparent and unprecedented that we've done that. Whether an OLC opinion is released, there's a lot of

process that goes into that, but the idea that we were not transparent about our legal basis there is absolutely not true.

Senator Coons. Okay. Another chance to be transparent: the FISA Court in March certified your Section 702 proceedings, but found compliance deficiencies. This is an important power of the Federal Government that will soon be up again for a vote, and you have not declassified that opinion. Senators Cotton and Warner, Republican and Democrat leads on Intelligence, in April wrote the Administration saying that they expected declassification of this March opinion within 2 weeks, yet it remains classified. You have a bipartisan request from the leadership of Intel. Will you declassify it or make it available to us?

Mr. Blanche. We'll continue to look at that. I agree with you that that's a very important issue, and we need 702 reauthorized.

Senator Coons. Thank you. Last question, if I could. The Safer Supervision Act is co-sponsored by Senators Lee, Cornyn, Tillis, and Lankford, and it gives a path forward to making sure that Federal probation and parole is more effective. We've discussed it before. Will you meet with me to talk about ways that this important criminal justice reform supported by Federal law enforcement could move

forward?

Mr. Blanche. I think that that effort --

Chairman Grassley. Please give a short answer to that.

Mr. Blanche. Yes, I very much agree with what you're trying to do there, Senator.

Senator Coons. Thank you.

Chairman Grassley. Before I call on Senator Schmitt, and after Schmitt gets done questioning, we're going to take a 15-minute break, and that 15-minute break starts when you leave the chair and be back in at the 15th minute.

Before then, I'd like to enter into the record supporting your nomination from 382,000 members of the National Fraternal Order of Police. The letter emphasized "Mr. Blanche's distinguished record of public service and his commitment to work closely with law enforcement across the Nation." The letter states, "We believe Mr. Blanche's leadership will help ensure that the Department of Justice remains focused on public safety, the rule of law, and providing unwavering support for the law enforcement professionals who risk their lives daily to protect our families."

Without objection, it'll be entered.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Schmitt.

Senator Schmitt. Thank you, Mr. Chairman. Mr. Blanche, welcome.

You're entering this arena and this confirmation hearing as the Nation's chief law enforcement officer at a very interesting time in our country's history where the folks on the other side of the dais, the Democrats, in my view, have just taken an all-out assault on the men and women of this country who serve in a law enforcement capacity. We just a couple of months ago got through a government shutdown where I was on the Senate floor listening to things that I never heard, certainly, an elected official say, in characterizing the men and women who serve this country to enforce its laws, calling them the Gestapo, President Trump's secret police, masked mercenaries. This is insane, these calls to defund ICE, this hammer-and-sickle wave that came through New York just a few weeks ago that's now dominating the discussion on the other side of the aisle. The central plank, of course, is defunding the police, assaulting, overthrowing Western civilization. This is not your grandfather's Democrat Party, and you're fielding questions that I think are totally unfair, but it's all meant, I think, to undermine and demoralize.

I saw it in my time as Attorney General in Missouri

where we had a Soros-funded prosecutor who refused to prosecute crime, and police officers, many retired early. Fewer came into the ranks to protect and serve, and so you're coming at an important time. I think President Trump, like he has with the military, has inspired the men and women on the front lines to serve. You're helping, I think, restore that with your focus on violent crime, your focus on fraud.

I heard one of my colleagues say that this is the most troubled Department of Justice in history. I happened to live through the previous Administration where you had a Department of Justice completely weaponized against political opponents. They tried to throw their chief political opponent in jail, ruin his family's lives. You were his lawyer to see some of that, and I was with you in a courtroom in New York to witness that defense in one of those cases; were aimed against Catholics in this country who happen to attend a traditional Catholic Latin mass; went after parents under the Patriot Act for showing up to school board meetings to object to critical race theory or the masking of their kids.

We lived through Jack Smith, and the Chairman has just revealed new revelations, of course, that he was reading text messages. By the way, Jack Smith testified under oath he didn't do that. He testified that they just had the

phone logs. We know that's not true now. Jack Smith should be subject to prosecution for lying to Congress. So, this weaponization, let's draw a distinction. When you go after your political opponents, that is a weaponization. When you hold people accountable who weaponize the justice system, that's not the same thing. So, you have a very important job.

I want to highlight a few things that you've done in your time as Acting Attorney General, hopefully as Attorney General, if you're confirmed. You created the National Fraud Enforcement Division. I think this is very, very important. I think it's the tip of the iceberg what we're seeing in Minneapolis, in California, and places that I think the work will continue. Carried out the largest healthcare fraud takedown in Department history, expanded the fight against Medicaid fraud after the $90 million Minnesota fraud takedown. You secured six fraud convictions involving more than $1.1 billion in less than 3 weeks; cleared the backlog of immigration cases allowing for more deportations. You filed a historic number of de-naturalization cases. You secured major anti-DEI wins against IBM and PayPal. You ended the EEOC's racist disparate impact regime. You secured 450 years of prison time for Antifa members involved in the terrorist attacks against ICE. You prosecuted the Southern Poverty Law

Center for secretly funneling millions of dollars to the KKK and neo-Nazis. That's a hell of a record in a hundred days, but more work continues.

I want to talk about a few things, and I'm going to allow you to answer to focus on. First, I think we have to break this sanctuary city scam, the system. To the people watching or listening at home, what is a sanctuary jurisdiction? Here's what it means. It means that if you are a criminal child rapist, and you're here illegally, and you've been released from prison, they will not tell Federal immigration authorities that that person is being released. They would rather have that individual, that monster released into the community than be deported. That's how sick this regime is. And so, I was able to secure in the ICE funding $350 million to clean up this mess to allow ICE in those sanctuary jurisdictions to actually carry out those deportations, sanctuary cities be damned. Will you use every tool that you have in your toolbox to go after these sanctuary jurisdictions?

Mr. Blanche. I mean, absolutely. You just hit the nail on the head when you described one example, but there are thousands of examples of our law enforcement agents being put at risk because, instead of going into a jail to arrest somebody or take somebody who's here illegally, even with a final order of deportation, that individual gets

released in the community, and it puts everybody in the community at risk. It puts law enforcement at risk. It's not consistent with the law. And so, yes, I definitely pledge to you that we will do everything that we can in the Department to combat that.

Senator Schmitt. The second one is to crush the machinery that converts illegal conduct into political power for the left, and I'm talking about the racial gerrymandering, the straw donations, foreign money, identity theft, fraudulent online contributions, the nonprofits that finance extremism while lying to their donors. Will you enforce the Constitution and Voting Rights Act against unlawful racial gerrymandering and investigate credible evidence of straw donations, foreign contributions, identity fraud, and other illegal activity through ActBlue or other fundraising platforms?

Mr. Blanche. Yes, of course, Senator. Yes.

Senator Schmitt. Thank you. Third, protect free speech from the new censorship machine. Search engines determine what information Americans find. We're more and more reliant on these things. App stores determine which platforms can reach the public. AI systems increasingly determine which claims are treated as true, false, respectable, extreme, or beyond discussion. Will you enforce a zero tolerance policy for Federal officials who

pressure technology companies to suppress lawful speech, and work with Congress to expose communications between Federal agencies and the companies controlling search, social media, app distribution, and AI?

Mr. Blanche. Absolutely. Yes, Senator.

Senator Schmitt. Thank you. I want to, for the 2-and-a-half minutes I have left with my time, I guess, give you an opportunity. You saw what happened to the Department of Justice under Merrick Garland and the dirtbag, Jack Smith, under Joe Biden's regime. What lessons do you draw from that?

Mr. Blanche. The biggest one is that the Department of Justice belongs in the business of protecting our communities. And so, when I talked about during my opening statement about bringing the violent crime rates down, and combating fraud, and going after the fentanyl crisis in this country, that's the lesson I learned is that we do not need to be spending millions and millions of dollars bringing hundreds and hundreds, if not thousands of prosecutors to D.C. to go after, literally, an entire Administration: yes, the President, yes, his family, but also anybody that knew him, anybody that worked with him. His gardener at Mar-a-Lago was targeted. We should not be doing that. We should be arresting bad guys, and that's what we're doing.

So, we're empowering assistant U.S. attorneys around the country, FBI, ATF, Marshals, DEA, HSI agents to go out and make communities safe. And in my mind, when it comes to the Federal Government that's combating drug dealing, combating illegal immigration, narcoterrorism, using our HSTF task forces, and above all, and just as importantly is fraud and bringing money that is stolen from the American taxpayer and getting it back and putting the guys responsible in prison, that's what I've learned is that we can just go out and do our jobs, and we can do it. There'll be noise in D.C. Like I said, we've prosecuted nearly a hundred thousand informations and indictments since January 20. We're talking about three or four, and that's the message that I take to prosecutors around the country.

Senator Schmitt. Thank you, and I also want to thank you, early on with this Administration in Kansas City, but specifically in St. Louis working with the Department, Kash Patel, others, St. Louis got the largest infusion of permanent FBI agents anywhere in the country, and they're helping clean up the streets. People feel safer. It's a great American turnaround as relates to crime. Those numbers hopefully will continue, and I look forward to working with you on those efforts as well.

Mr. Blanche. Thank you. We will. Thank you,

Senator.

Chairman Grassley. Before we take this 15-minute break, I wanted to say that from 12:30 until 1:00, I'll be in the Capitol to vote. Another Republican will chair the meeting, so we're going to go on through the noon hour. And so, we'll take a break now, and we'll be back at 11:45, and Senator Blumenthal will be the first person to ask questions.

[Recess.]

Chairman Grassley. I'll ask Senator Blumenthal, is it quiet enough for you to proceed?

Senator Blumenthal. Yes, sir.

Chairman Grassley. Proceed then.

Senator Blumenthal. Thank you. Welcome back, Mr. Blanche. Thank you for being here.

Mr. Blanche. Thank you.

MR. BERMAN: Thank you to your family, and I want to join in thanking the men and women of the Department of Justice for their service.

I want to begin where maybe we have some common ground. You would agree that the Islamic Republic of Iran is well known to detain, torture, even kill political dissidents, including evangelical Christians, would you not?

Mr. Blanche. Yes, Senator, they have done that. Yes.

Senator Blumenthal. And last week, the Iranian American Legal Defense Fund filed a lawsuit alleging that the Trump Administration has adopted a policy of collaborating with the Islamic Republic of Iran to provide details about asylum applicants. This is the United States Government providing information regularly and frequently to the Iranian Government about Iranian nationals who are seeking asylum here in the United States. These are declarations made under oath before the court about high officials stationed here, with Iran getting information from the United States Government and then the American Government deporting hundreds of individuals, including evangelical Christians, back to Iran where they face torture, imprisonment, potential death. Were you or the Department of Justice consulted about this policy?

Mr. Blanche. That's not our policy, Senator. We would never send somebody home to be tortured. That's not what the American people would expect of us. That's certainly not what President Trump does. So, I'm not familiar with the lawsuit you're talking about, but there's no such policy.

Senator Blumenthal. Will you commit to investigate these allegations?

Mr. Blanche. I know nothing about the lawsuit. When you say, "commit to investigate allegations," we don't do

that, but certainly if the lawsuit needs to be answered and part of that includes investigation, absolutely.

Senator Blumenthal. Well, you do investigate allegations of illegality. This policy would clearly be not only illegal --

Mr. Blanche. But there is no such policy.

Senator Blumenthal. -- but morally repugnant, would it not? You agreed with me that it should not be the policy of the United States to do it.

Mr. Blanche. But in your question, you're suggesting there is such a policy. I'm telling you there is no such policy.

Senator Blumenthal. Well, if there is no such policy, then I presume you would investigate it.

Mr. Blanche. When I see the lawsuit -- I'm just not familiar with it -- we will, of course, do what's appropriate.

Senator Blumenthal. Well, you'd agree with me that it would be wrong.

Mr. Blanche. That it would be wrong, meaning it would be wrong to send somebody home to be tortured. Yes.

Senator Blumenthal. Let me ask you about allegations in connection with David Gentile. I think we talked about these allegations when you visited me. Thank you for coming to my office.

In May of 2025, David Gentile was sentenced to 7 years in prison for his role in an almost $1.8 billion Ponzi-like scheme that defrauded over 10,000 investors, many of them middle-class retirees, of their hard-earned savings. And when he was in prison, he boasted to fellow inmates and others that he was going to be released because he paid $2.5 million for clemency. Evidence collected by the Eastern District of New York supported those allegations, and reportedly also included statements by Father Frank Mann that he spoke to the President about David Gentile. The Eastern District of New York was investigating these allegations and reportedly received a call from one of your top deputies instructing them about the concerns of the Department of Justice. The investigation was stopped by the Eastern District of New York.

I wrote to you on June 23 and United States Attorney Joseph Nocella about these allegations, that an investigation into this impropriety was shut down at the request of your office. Did you have any involvement or knowledge about the commutation of Mr. Gentile's sentence?

Mr. Blanche. President Trump, as I've said a couple of times today, has full authority to pardon or commute anybody convicted of a Federal crime.

Senator Blumenthal. That's not my question.

Mr. Blanche. So, I'm answering your question,

Senator.

Senator Blumenthal. Did you know that?

Mr. Blanche. I'm answering your question. So, my communications with President Trump, I will not talk about. He does not, nor should he. He has no obligation to discuss pardon or commutations decisions with me, and he has not. As far as what you just suggested about an investigation, I believe you're referring to a news article that was the result of apparent leaks, and I would caution that there's falsehoods in those news articles.

Senator Blumenthal. I'm asking you whether you had any involvement in commuting that sentence or in stopping the investigation into the allegations of impropriety of possibly payment to Father Frank Mann.

Mr. Blanche. And I answered the first question, but when you say, "stopping an investigation," there's an assumption built into your question that I will not concede. We will not talk about whether investigations exist or don't exist, and certainly some leak about something that we supposedly did doesn't warrant an answer either.

Senator Blumenthal. There was an investigation, correct?

Mr. Blanche. No, that's my whole point in saying is that there's an assumption baked into your question that I

don't think is true, meaning that we cannot comment on even the existence of investigations like that.

Senator Blumenthal. You commented this morning to Republican colleagues about several investigations.

Mr. Blanche. No, I haven't.

Senator Blumenthal. Well, you commented in response to the Chairman about the FISA investigation.

Mr. Blanche. About the what? Excuse me?

Senator Blumenthal. The investigation that he asked you about.

Mr. Blanche. So, Senator, my point is that you're asking me questions about a news article, the source of which was apparently leaks. It would be inappropriate for me as the acting Attorney General to comment on such leaks or news articles that you're referencing, but when it goes --

Senator Blumenthal. I accept that you're not going to answer my question, but I think there is a need for the Inspector General to look into the investigation that was apparently, according to these articles and other information, stopped as a result of your intervention. Let me move on.

In 2017, more than 10,000 9/11 victims filed suit against the Kingdom of Saudi Arabia. That lawsuit is heading to trial. Information was promised by President

Trump in September of 2019. That information has not been provided. Will you commit to meet with those families and provide the information they need for their lawsuit?

Mr. Blanche. Folks from my office have met with the representatives of those families. We will commit to continuing to have communications, of course.

Senator Blumenthal. And provide the information they're seeking?

Mr. Blanche. Well, I don't know what the information is you're talking about, so obviously, I can't just commit to providing the information.

Senator Blumenthal. Well, let's talk about other information, information about the Epstein abuses. Your predecessor apologized to the Epstein survivors, with good reason because, as you've said today, mistakes were made. I'm asking you today, with Epstein survivors in this room, to apologize to them.

Mr. Blanche. Well, so my heart breaks for every victim of any sexual crime, whether it's involving Mr. Epstein or somebody else, and so if you're asking me to apologize that this happened to them, of course, absolutely. This is a horrible thing, which is why this Department of Justice, this Administration is focused very heavily on going after these predators. And so, yes, of course, that's part of my job is being empathetic to the

victims of crime.

Senator Blumenthal. Will you apologize to them for the mishandling and mistakes that were made by the United States Department of Justice?

Mr. Blanche. I will absolutely say that any mistake that we made should not have been made, and I very much --

MR. BERMAN: Well, they're --

[Cross-talking.]

Mr. Blanche. I can answer the question or you can just interrupt me, Senator, but I am answering your question. I very much, and I have said this to anybody that asked publicly before. Any mistake that was made is not appropriate, and so, yes, I am sorry that in about 1 percent of the documents, mistakes were made. But what I will say on top of that is we put tons of resources to rectifying those mistakes immediately, including pulling down documents within minutes of being informed that there were mistakes, potential mistakes made, and working 24/7 to rectify any mistakes, and that's what I would expect the victims would want us to do, and their counsel and this body as well.

Senator Blumenthal. And you'd agree with me, wouldn't you, that you can well meet with any of the survivors or victims with their counsel present? You said you can't meet with them, but you could meet with them if they're --

Mr. Blanche. I never said I can't meet with them. I said if they were represented, I had to meet through counsel, but of course I can meet with them. I'm the Acting Attorney General of the United States, so yes, I can. I very strongly believe that for these victims to tell their stories and the evidence that they have, they should meet, like any victim of a crime, with the FBI or a law enforcement agent, and that we will do everything we can to prosecute if we can.

Senator Blumenthal. The judge in Florida referred to your misconduct -- she concluded that there was misconduct and misrepresentation and improper purpose in that legal action -- to the Bar of New York for potential discipline, including losing your law license. I know you disagree with the result of the ruling. Has that kind of referral ever happened by a Federal judge for an Attorney General of the United States? Can you do that?

Mr. Blanche. I don't know, but I'll tell you something: that judge never asked us to respond. She never gave us an opportunity to respond to anything and she didn't refer me. She just asked that a copy of the order be provided the New York Bar because there are several activist groups that have filed complaints against me. So, listen, as I said earlier, I think anybody on this Committee, especially the lawyers that have practiced, can

read that opinion and reach their own conclusions, but I very much disagree with the judge's insinuations about me, and we're going to do what we can to make that right.

Senator Blumenthal. One last question. Would you agree with me that agents of the United States should not fire their weapons into cars, unless there is an imminent threat?

Senator Britt. Mr. Chairman?

Chairman Grassley. Give a short answer to that.

Mr. Blanche. There's a well-established standard as to when an agent can discharge their firearm, and I think that that's something that should be followed in every case.

Senator Blumenthal. And that includes not firing weapons into cars.

Senator Britt. Mr. Chairman --

Chairman Grassley. Well, do you want to respond to --

Mr. Blanche. I mean, there's not really a response. It requires Federal agents to follow the rules.

Chairman Grassley. Then let's move on. Before I call on Senator Britt, I want another letter supporting the nominee from the American Border Story, a national organization representing 300 angel families. Quoting from the letter, "The families we work with are not focused on politics. They want leaders who take crime seriously, who

understand the national security implications of open border criminal networks, and who will prioritize victims over ideology. We believe Todd Blanche understands that responsibility and would approach the Office of Attorney General with seriousness it demands."

Without objection, that'll be entered in the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Britt.

Senator Britt. Thank you, Mr. Chairman, and I think that's an excellent segue. I appreciate your commitment to all of the victims, the Epstein victims, your commitment to hear from them and fight for them. Thank you for saying that today. I only wish that my Democratic colleagues had that same level of conviction when it came to meeting with the families of those who have lost loved ones at the hands of illegal aliens, so thank you for that letter. Thank you for your commitment. I can only hope that they will answer the call and meet with their own constituencies who, unfortunately, have lost ones that they hold dear.

Mr. Blanche, I want to applaud the work that you and DOJ have done to reduce crime and violent crime across the country. We've heard it a number of times here today, both in the Chairman's opening, to Senator Moody talking about it, to you talking about it. We currently have the lowest

murder rate that we've had since 1900. When you're looking at violent crime arrests, we are up 184 percent. This is real results. This is what you're supposed to be doing: keeping Americans safe. We know that you've done that through a number of ways: task force and joint operations, interagency cooperation. We've seen those task forces successfully pursue numerous cases in our State related to major drug trafficking, related to firearms trafficking, all of which has been linked to, in many cases, you know, broader criminal enterprises. So, we're glad that our children are safer and that our communities are safer.

What I'd like to know from you because we've seen in Alabama this have tremendous results. We've even seen in one case, a corrupt local law enforcement officer in the Southern District of Alabama, who had engaged in a range of criminal activities in his capacity as an officer, being held accountable through this work. Based on what I've seen in Alabama, I hope that you continue this all across the country. Can you speak to the work of these task forces and the success that you've seen and how you intend to build upon this work moving forward if and when confirmed?

Mr. Blanche. Yes. So, the Homeland Security Task Force regime that we've set up in every single State and every single district in this country is designed to do

just what you were describing, so work not just with the Federal Government, not just DOJ, but to work with Department of Homeland Security, sheriffs, cops, local prosecutors, local law enforcement, and assistant U.S. attorneys to go into that community and eradicate it of human trafficking, drug dealers, narcoterrorism.

It's been set up for almost a year in most places, and the results are evident in the statistics that we show, but they're really more evident when I go out to U.S. attorney's offices and meet with HSTF groups like I do all the time. To a person they say, this is what we needed forever. This is what works, having law enforcement get together in a room and say we need to tackle this gang, or this apartment building has a drug problem, or even this individual needs to be targeted because he's a violent felon, and he needs to go off the streets.

It's basic law enforcement that I've done for a long time, that President Trump echoes and trumpets and has done since January 20. I think that's why we're seeing the success that we're seeing, and we're not slowing down. HSTFs are up and running full speed ahead, and I hope that we continue to still see the results that we've seen over the past 10 months or so.

Senator Britt. Thank you for your commitment to that and all the work that you've done. I want to take a brief

moment. Our distinguished late colleague, Senator Graham, was excited about your nomination. He was passionate about many things, which we saw here in this Committee just in amazing ways. One of the things that he was a champion of was the unborn, and that is a deeply held conviction that we both have, and I want to talk to you and address the issue of the chemical abortion drug that we have seen just spread coast to coast.

As you know, pursuant to a Biden-era administrative action, the FDA, there is no longer an in-person dispensing requirement in place for the drug, for mifepristone. It allows it to literally be disbursed across State lines all across the country. We are losing children, and we are putting women in harm's way. Look, it has no oversight, no safeguard.

I got to hear the story of Jona's Affholder, who's here with us today and I am so grateful for her willingness to be here, but I got to hear it firsthand yesterday. I know many people have read her story in recent news articles about her then boyfriend, now ex-boyfriend, a doctor no less, actually forcing a crushed abortion pill into her mouth in the middle of the night, then taking her keys, holding her hostage so that she could not go get help. This is sick and twisted and must stop. He used his ex-wife's information to buy those drugs online to kill his

own child and to endanger Jona's life, and sadly, her story is one of many.

And so, can you commit to me today that this Administration and DOJ will prioritize taking meaningful and thoughtful action to address the dangers that occurred in the current status quo to women all over this country?

Mr. Blanche. Absolutely, Senator, and it's not only what the Department of Justice can do, but it's what the FDA is doing right now for the first time in a decade, actually doing real studies about the safety and the appropriateness of these drugs. And, you know, I've seen video myself of what appears to be pills coming even from overseas to young women, and it doesn't matter who applies for it. Anybody can get it. There's no instructions. They just come dumped out of a little plastic bag, and it's wrong, and I very much commit our resources to stopping this.

Senator Britt. Thank you very much. I want to turn to an issue that I also raised with former Attorney General Bondi, and that's illegal offshore gaming and the concern in the rise of illegal gaming amongst minors. In 2024, a study found that individuals who began gambling before the age of 18 are 50 percent more likely to develop an addiction to gambling. This has become a major issue among America's youth, in particular, America's young men.

Just last year in the Northern District of Alabama, we saw a case where 10 men pleaded guilty to managing a sports betting operation and accepted over $2 billion in wagers via an offshore server located in Costa Rica. Senator Blumenthal and I have worked together on this issue and recently introduced the GAME Act, which would prohibit social media companies and advertising websites from targeting minors with sports betting advertising online. We also sent a letter to DOJ encouraging the Department to use its existing statutory authorities to pursue injunctive relief and to block illegal offshore gaming operations.

I want to tell you how much I appreciate the response. It was very substantive that I got to that letter, but can you also commit to me today that you're going to make this issue a priority, and take robust action to combat the reach of illegal gaming operations within the United States and then, in particular, the targeting of minors through this?

Mr. Blanche. Yes, Senator. Absolutely.

Senator Britt. Thank you. The U.S. Census Bureau reported over a decade, between 2010 and 2020, that the over 65 population in the United States experienced the largest-ever 10-year numeric gain and percentage point increase in terms of share of the overall population. In its annual report to Congress last December, the FTC noted

that total fraud losses by older Americans, defined as age of 60 and older, increased almost fourfold from 2020 to 2024, shooting up from $600 million in 2020 to $2.4 billion in 2024. As our society ages, and it will continue to be a problem that we must take robust action to address, particularly given technological advances and other ways that this fraud is occurring.

I introduced the GUARD Act with Senator Gillibrand, and it would allow State and local law enforcement agencies to use certain Federal grant funding to utilize blockchain for investigating financial fraud. It would also permit Federal law enforcement to assist State and local law enforcement with tracing tools for blockchain technology. I'm thrilled it was reported out of this Committee by voice vote earlier this year. I know that DOJ has programs in place, like Elder Justice Initiative, but can you speak specifically to DOJ's efforts with respect to elder financial fraud and the extent to which we will work to continue to make this a priority under your leadership, and the importance of collaboration with State and local law enforcement officers as we work to bring justice to these people who have been abused?

Mr. Blanche. Yes, Senator. We are very focused, not only at Main Justice, but at every U.S. attorney's office, on protecting our elderly who are absolutely victims of

scams of any sort. And many of the scams are coming from overseas, from Burma and from literally entire buildings filled with individuals cold calling our senior citizens, trying to get them to give them money or send them money. And so, we've charged, I think, over 300 this year alone. We'll keep on doing that, and it has been a priority, as it should be, and it will remain a priority of the Department to target these criminals, again, many of whom are not even in this country going after our senior citizens.

Senator Britt. Thank you so much for your service, and I look forward to supporting your nomination.

Mr. Blanche. Thank you, Senator.

Chairman Grassley. Before I call on Senator Hirono, I have another letter for the nominee supporting Mr. Blanche from the Americans United for Life, a pro-life organization. "Mr. Blanche's commitment to respecting human life is evident in his actions as Acting Attorney General. We at Americans United for Life are confident in Mr. Blanche's commitment to a fair and even application of law."

Without objection, it'll be entered in the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Hirono.

Senator Hirono. Thank you, Mr. Chairman. Welcome,

Mr. Blanche.

To ensure the fitness to serve of all nominees who come before any of my Committees, I ask the following two initial questions. Since you became a legal adult, have you ever made unwanted requests for sexual favors or committed any verbal or physical harassment or assault of a sexual nature?

Mr. Blanche. No, Senator.

Senator Hirono. Have you ever faced discipline or entered into a settlement relating to this kind of conduct?

Mr. Blanche. No, Senator.

Senator Hirono. Mr. Blanche, over the course of the past 5 months, the New Mexico Department of Justice has talked to your staff about getting access to information for its investigation into alleged crime at Jeffrey Epstein's Zorro Ranch. Will you and your team continue to cooperate with the New Mexico Department of Justice and help it get the information it needs?

Mr. Blanche. Yes, we're continuing to work with them, yes. Yes, Senator.

Senator Hirono. Thank you. Mr. Blanche, at an April 8 press conference, a reporter asked you a question about President Trump's desire to see his perceived political enemies prosecuted. You answered, "That is his right, and indeed, it is his duty to do that." To clarify, Mr.

Blanche, do you believe it is the President's right and duty to order the investigation or prosecution of his perceived enemies? Yes or no.

Mr. Blanche. I can't answer that yes or no. That wasn't the question, and my answer was that as the President of the United States, under Article II, he's in charge of the Department of Justice, and so my answer reflects that idea --

Senator Hirono. I think what the --

Mr. Blanche. -- not that he has a right to go after his political enemies.

Senator Hirono. Reclaiming my time. I think that what the President meant was pretty clear, and I just wanted to know whether you thought that that is indeed his right and duty to prosecute his perceived enemies, so let me get to that. Investigations of the President's perceived enemies aren't theoretical. They are happening.

For example, last August, President Trump posted on social media that George Soros should be charged with RICO. Weeks later, one of your deputies directed several U.S. attorney's offices to investigate Soros' charitable foundations for violating the RICO statute. Mr. Blanche, to confirm, were the U.S. attorney's offices asked to launch these investigations because of the President's post? Yes or no?

Mr. Blanche. I'm not even confirming that they were asked to do so --

Senator Hirono. Well, the President definitely --

Mr. Blanche. -- but most certainly not because of any Truth from President Trump.

Senator Hirono. Excuse me. The President definitely posted that Mr. Soros should be charged with RICO, and lo and behold, several weeks later, that is exactly what your office sought to have done. Since last year, DOJ has sued 30 States seeking their voter lists. Fourteen of those lawsuits have been resolved by Federal judges. Mr. Blanche, did any of those 14 Federal court judges from across the country agree with DOJ's legal position? Again, yes or no.

Mr. Blanche. With some of the legal positions, yes.

Senator Hirono. Pardon?

Mr. Blanche. The answer to the question is, yes, some of the judges agreed with some --

Senator Hirono. Fourteen judges?

Mr. Blanche. Agreed with some of our legal positions, and most of those cases are under appeal.

Senator Hirono. Actually, that's not correct. The answer is actually no. These 14 Federal judges -- some of them were Trump appointees -- disagreed with DOJ's position in terms of getting access to these voter rolls.

Mr. Blanche. Well, I think the --

Senator Hirono. It's all part of DOJ's attempt with the President's attempt at election interference. We know that Federal judges are a problem for you, certainly a problem for President Trump, because they actually care about facts and evidence. And that's why last fall, at a Federalist Society event, you called for young lawyers at that event to join you in fighting a war, and you said, "We need you because it's a war, and it's something we will not win unless we keep on fighting." The war that you were talking about was against Federal judges who were ruling against the Administration, correct?

Mr. Blanche. No.

Senator Hirono. Well, then do you believe that judges should be impeached based on their rulings against this Administration and the President? Yes or no.

Mr. Blanche. No. No, I don't believe that.

Senator Hirono. On that you disagree with the President because he believes judges should be impeached for disagreeing with him. President Trump sees DOJ not only as a tool to attack his enemies, but also useful for helping his friends. To that end, on May 18, you signed an Attorney General order establishing funding and setting out requirements for the so-called anti-weaponization fund, correct? Did you sign such an order?

Mr. Blanche. Yes. I did sign that document, yes.

Senator Hirono. Have you rescinded that order?

Mr. Blanche. Yes. The order is no longer in effect.

Senator Hirono. No, that --

Mr. Blanche. There is no weaponization fund, correct.

Senator Hirono. Mr. Blanche, that is not my question. My question is, did you rescind that order?

Mr. Blanche. Yes. I'm doing it under oath right now.

Senator Hirono. No, no, the fact --

Mr. Blanche. It does not exist.

Senator Hirono. When you answer that there's no fund, that is not rescinding the order because you can resurrect that order at any time. So, actually your answer is, no, you have not rescinded that order.

Mr. Blanche, one of your first acts as a Deputy Attorney General was to issue a memo eviscerating DOJ's enforcement work against crypto criminals. Crypto crime surged in 2025. Mr. Blanche, are you aware that Americans reported over $11 billion in crypto fraud losses to the FBI last year?

Mr. Blanche. Our crypto enforcement is way up compared to a year and a half ago, so I didn't eviscerate anything. To the contrary actually. We empowered AUSAs around the country to go after criminals in the right circumstances, and we are doing --

Senator Hirono. Mr. Blanche --

Mr. Blanche. And we continue to do it.

Senator Hirono. -- I take it you are not aware that there were reports of over $11 billion in crypto fraud reported to the FBI. That was my question. Are you aware, or are you not aware?

Mr. Blanche. Are you talking about the fraud that we have prosecuted, that $11 billion?

Senator Hirono. No, I'm talking about the $11 billion worth of crypto crime. This is a pretty simple question.

Mr. Blanche. I just don't understand the question.

Senator Hirono. Are you or are you not aware, but it doesn't seem you're aware because you're making all kinds of excuses. The fact is that crypto enforcement, you eviscerated that work that your Department is supposed to be doing. And so, anyway, Mr. Blanche, when you issued your memo ending crypto crime enforcement, you held significant amounts of cryptocurrency yourself, and I sent you several letters asking you about it, and I am still awaiting your answer.

Mr. Blanche, it is clear to me that your leadership is going to be a continuation of what we have seen so far at the Trump Department of Justice, or more likely to be called the Department of Retribution and Corruption. You see nothing wrong with the President treating DOJ as his

own personal law firm, to use as a weapon against his perceived enemies and as a way of helping his friends, and as a tool to interfere with the upcoming elections. The States run elections in this country, but you want to insert DOJ at every step of the process, suing the States with frivolous claims and sending threatening letters to secretaries of state. You want to suppress the votes of American citizens who will have a chance to resoundingly reject the President's corruption at the ballot box this November.

You signed a memo eviscerating DOJ's cryptocurrency enforcement work, leading to a surge in Americans being victimized by cryptocurrency fraud. You also championed a slush fund for the President's allies who attacked police officers on January 6. From the beginning, we all knew that that's what this fund was for, but now we have findings of fact from a Federal judge concluding that the fund came out of a fake lawsuit filed solely to lend an air of legitimacy to the President's attempt to compensate his insurrectionist allies. You played a key role in attempting to perpetuate this fraud on American taxpayers, and you oversaw the botched release of the Epstein files, denying justice once again to survivors who have been waiting so long for it.

You have no business being the Attorney General of the

United States of America. I certainly urge my colleagues to vote against your confirmation. Thank you, Mr. Chairman.

Chairman Grassley. Mr. Blanche, would like you to respond?

Mr. Blanche. Chairman, on the crypto point, our crypto prosecutions are way up, and it is very true that crypto fraud is a thing and it's still happening, but getting rid of a task force of a bunch of lawyers in Washington, D.C. did nothing more than empower AUSAs around the country to bring cases, which is what they've done. So, I'm proud of the work that we're doing in that space, and we'll continue to do it.

Chairman Grassley. Before I call on Senator Tillis, we've been talking about political prosecutions. You've been criticized and the Department's been criticized, but I wish you'd spare me the outrage. They cheered on Biden as he weaponized the Justice Department targeting President Trump, congressional Republicans, parents, Catholics, and conservative Americans nationwide. So, I think that the other party has zero credibility on this issue.

Moreover, let's look at some of the so-called political prosecutions underway. How about the Southern Poverty Law Center? The group's apparently been funding extremist groups like the Ku Klux Klan and the National

Socialist Movement. How about Don Lemon and the ICE protestors? They stormed and intimidated folks in the middle of a church service. Those are not political prosecutions. Protecting the taxpayers and other First Amendment rights is the responsibility of the government and the Justice Department. Senator Tillis.

Senator Tillis. Thank you, Mr. Chair, and I'm going to take up where you just left off. Thank you for being before the hearing. I think you're doing very well, Mr. Blanche.

I'm going to kind of ascend to the rarefied era of the moral high ground here for a minute. As I've heard some of the Democrats talking about this Administration, it's almost as if they weren't here when the Biden Administration did the indictments against President Trump. We've already heard talk about Jack Smith. We haven't talked about the way that they dealt with a family member who was being indicted in Hunter Biden. I don't remember them saying anything during those days in Judiciary Committee. I don't think I remember them ramping up the freedom of access to clinic entrances and trying to arrest pro-life people from the law that they decided to ratchet up in 1994, a couple of important cases there.

And then the January 6 Capitol riot prosecutions. The fact of the matter is, and I'll get to this in a minute,

the part I don't like about it, but hundreds or thousands of people's lives were destroyed because they did something stupid that day. And there's a vast difference between doing something stupid and doing something that destroys your career and ruins you financially. And this Administration, the Biden Administration tapped on the emotions of the time to over-prosecute and weaponize the DOJ, and went after people that I believe deserved a pardon because they weren't the people that attacked police officers. They weren't the people who knowingly destroyed the Capitol. They weren't the people who proudly went in, like the QAnon Shaman, and pretended like he'd taken the Senate ground. They're the people that get me mad, which is why I'm not going to talk about them anymore.

But it's remarkable how it's almost as if that Men in Black, that device they use to erase their memories, it's remarkable that these people sat before this Committee when all that was going on and not a whiff. I hate duplicity, and I hate situational ethics, and I want to lay the groundwork to say I was against that, and I'm also against some of the decisions of the President. Not you, Mr. Blanche. You work for somebody, and you got to do what you're told to do, and I hope you stay within the ethical bounds of the law. You have to answer to the bars and everyone else. But it's just jarring to hear people

criticize this Administration when they can't look in the mirror and ask themselves why they weren't criticizing an Administration when they happen to have a blue jersey.

Now, my criticism of the Administration with the red jersey. January 6, I have searched heaven and earth and I haven't found anything except a passing comment at a C-SPAN conference. So, can you tell me definitively that you think that any Capitol Police officer who was harmed on January the 6 was a victim of a heinous crime at the hands of the person who did it?

Mr. Blanche. Yes, and should have been prosecuted and was.

Senator Tillis. And they were, and so just with the members, please, you know, as long as you can prove you've been consistent, use those soundbites, but don't use them when you look the other way when, fundamentally, at the abstract level, President Biden did everything that you're accusing President Trump of doing. And a part of what we've got to get rid of, Mr. Blanche, is this political physics going on. American people are an exceptional people, and they always like to best each other, and what I've seen happening here is when we have a bad action of one Administration, I'll be damned if we don't repeat it with the other one. I want leadership that says we're going to ratchet things down and not make the heinous

mistakes that the Biden Administration did.

Let's be better than them, not better at prosecuting people that maybe we shouldn't or take a little bit more time before we indict them, but let's just be better than them. Let's set an example and stop this spiraling, or the next Congress that I will not be a part of, will be talking about it again, or in 2029, if a Democrat President comes in, they're going to up the ante, and they're going to go right after the behavior of this Administration as an example of why they should because this Administration has done the same thing to justify some of their behavior.

I'm not criticizing you, but I'm trying to just cut through the rhetoric and let people all know that we are at this place today, in part, because of the actions of the Biden Administration and the weaponization that I even saw under Garland, who I generally supported. So, let's just be real here, people. If you're going to criticize one Administration, look in the mirror before you do it.

Now, Mr. Blanche, I want to stick a fork in this turkey of a 1776 fund, and you've said that it's moot. I've had colleagues here who are attorneys. I'm not an attorney. I'm a business consultant. I see a problem, I want to solve it. This is a problem. It should never be paid out. You've said that it's moot. Others, these smart attorneys that I'm surrounded by, I think that the courts

are probably going to deal with it, but why should we waste the court capacity on this issue if I could walk to the Senate floor with an agreed-to piece of text coming from the Administration that just renders this whole thing dead, gone?

I don't need approps probes language. I don't need a statement from the Administration. All I need is language to say everybody around here said it's over. So, why can't we agree to language that I could walk down to the Senate floor and get a UC, and dare the Democrats to oppose ending this, and dare a Republican, too, if the President supports it? Why is that a bad strategy?

Mr. Blanche. It's not. I mean, certainly the Department of Justice and the White House has worked with you and your colleagues to come up with language. We do not object that path or including it in some other --

Senator Tillis. I want to make the distinction, though, because I know that Senator Collins and the Appropriations team are working on this language. I don't know if you've been paying attention to Congress. You've got your own job to do, but we're not necessarily getting along really well right now on the party lines. I mean, Schumer's already threatening a government shutdown. We haven't even had appropriations discussions, you know, except ongoing negotiations. He's already threatening a

shutdown, so that language could be in a bill that's dead on arrival because nobody's going to do it.

My question is who on earth, who in this Senate chamber would raise an objection if we were able to put something on the floor that ended this debate? The only reason I think that a Democrat would be opposed to it is they love milking this thing for what it is. I want to stick a fork in it, and can I get your commitment to maybe provide us with some technical assistance on what that language would look like?

Mr. Blanche. Absolutely.

Senator Tillis. Thank you. Mr. Blanche, I did want to just echo, and, Mr. Chairman, I know I caught him off guard. I can seek unanimous consent to put into the record the letter that Senator Cornyn and I sent to Mr. Blanche.

Senator Lee. [Presiding.] Without objection.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Senator Tillis. So, that's the letter on the issue that Senator Britt most recently brought up. I think there's a way to solve that, and I have confidence in your ability to do it, Mr. Blanche, but it is very important.

And I guess back to the pardons, I get pretty emotional about that. I think we need to do a better job of looking through the pardons process, okay? I've talked

about the January 6 pardons, but in this Administration, and I'm no fan of Ed Martin. That's exactly why he'll never get confirmed in the U.S. Senate as long as I'm here. That's only 172 days. Maybe he can come back next year, but I think the pardons process is something else we have to look at.

The Democrats are criticizing this Administration for pardons. You take a look at the egregious list of pardons in the Biden Administration. Let's not forget that the Biden Administration also had prospective pardons, get-out-of-jail-free card. I heard people criticizing some of the get-out-of-audit arguments for the 1776 agreement. Have they all forgotten that Biden in the 11th hour gave prospective pardons to people who hadn't even been charged with anything?

Again, the point that I'm trying to make, folks, is you're all victims of political physics. There was no criticism about that then, and now we're trying to criticize this President for pardons that I've criticized. So, the point here, and I do believe that in the Trump Administration, I have talked about the January 6 pardons, but I'm concerned that the Binance CEO got pardoned. I'm concerned that there was talk about a corporation getting a pardon. So, I'd be very curious, if you're confirmed, if we could sit down and understand how that process goes, and

to what extent we can have visibility into these people getting pardons, starting with a lot of the pardons that came out of the Biden Administration. Can I get your commitment, if confirmed, to walk through that process?

Mr. Blanche. Of course. Yes, Senator.

Senator Tillis. Thank you, Mr. Blanche. You've done a great job today.

Senator Lee. Senator Booker.

Senator Booker. Good afternoon, Mr. Blanche.

Mr. Blanche. Good afternoon.

Senator Booker. Our President has a very well-documented history of attempting to corruptly influence government officials to advance his own personal interests. He called the Republican Secretary of Georgia asking him to find enough votes to overturn the election. He withheld military aid to pressure Zelensky to investigate Joe Biden's son. For these things, he has been impeached. He's been indicted in Georgia because he uses his power to unjustly influence people.

When a President routinely pressures public officials for his own personal benefit, the Department of Justice has to remain independent. This brings me really to you, and I think what has you at the center of so much concern is that you seek to lead the Department of Justice after being the President's personal lawyer. The American people are

really entitled to know whether your allegiance to the rule of law is your focus, or your allegiance to one man who clearly has an insatiable appetite for revenge, self-enrichment, and the abuse of power. So, I want to talk about your record.

Under you, the Department has prosecuted people that have caught folks on both sides of the political aisle by surprise: Jim Comey, Leticia James, my colleague, Adam Schiff, Federal Reserve Governor Lisa Cook. This casts a shadow over any ideas of independence. You directed the arrest of Mayor Ras Baraka of my City of Newark. You weren't at Delaney Hall on May 9, 2025, when he was arrested, but yes or no, did you have a conversation with Special Agent in Charge Ricky Patel ordering him to arrest Mayor Baraka?

Mr. Blanche. I had a conversation. I didn't order him to arrest. I authorized the arrest, which is my job.

Senator Booker. So, you were not there, and we have body camera footage of him then moving and saying, "We are arresting the mayor right now per" -- this is his quote -- "the Deputy Attorney General of the United States." I want to put that into the record, your comments there, and the District Court, assessing all of your conduct, admonished the Department of Justice. This is the quote of the Federal judge: "Your role is not to advance political

agendas. Your allegiance is to the impartial application of the law and to uphold due process for all." But this is just one example cited by over 1,200 current and former Department of Justice officials appointed under Presidents of both parties who warned that you should not be in this position because of your inability to be independent from your personal allegiance to Donald Trump over the rule of law.

I met yesterday with Epstein survivors. Some of them are here in the room today. Congress, in a bipartisan fashion, passed the Epstein Files Transparency Act because the American people were demanding justice, yet you failed to abide by that law and release the files by the deadline established by the law. And when the files were finally released, you failed to protect the survivors that that law was intended to protect. Survivors' personal information, including names, phone numbers, home addresses, and images, were released. Powerful people were redacted. Survivors were subjected to re-traumatization. More than 1,200 victims, yet only two people have ever been prosecuted: Jeffrey Epstein and Ghislaine Maxwell.

Now, I was stunned earlier by your conversation with one of my colleagues that you wouldn't even commit to meeting with the survivors, but you did meet with Ghislaine Maxwell. Your claim that you can't meet with these victims

because they're represented by counsel is utter nonsense. Counsel can be present or a client can waive their right to have counsel, but you're a lawyer. You know this. That was not truthful what you said to my colleague. You said that they should meet with the FBI. All of these women have reported their crimes decades ago, but yet you won't meet with them. What you will do is meet with Ghislaine Maxwell. Over a year ago, you sat with her and you publicly said you were seeking the truth.

So, let's talk about what that two-day meeting produced. Did your interview with Ms. Maxwell lead to a single additional person being charged? Yes or no.

Mr. Blanche. No.

Senator Booker. Did it lead to a single new investigation? Yes or no.

Mr. Blanche. I can't talk about whether there was any investigations.

Senator Booker. I'm not asking you about an ongoing or closed investigation. I'm just asking you about this. Are you --

Mr. Blanche. I can't answer your question "yes" or "no."

Senator Booker. Did you or anyone else from the DOJ or associated with the President discuss a presidential pardon with Ghislaine Maxwell or her attorneys?

Mr. Blanche. No.

Senator Booker. Did you discuss clemency? Yes or no.

Mr. Blanche. No.

Senator Booker. Did you discuss --

Mr. Blanche. She was convicted. What do you mean clemency?

Senator Booker. Did you discus her transfer to another institution? Yes or no.

Mr. Blanche. No.

Senator Booker. Well, just one week after your meeting, Ms. Maxwell was transferred from a low-security Federal institution to a minimum-security prison camp. Were you involved with that transfer?

Mr. Blanche. As I've talked about before, in the time leading up to me going down to meet with her, we learned that she was receiving threats. It turned out when we were there --

Senator Booker. I'm going to interrupt you for a matter of time because --

Mr. Blanche. Okay. Well, it's not a question I can answer apparently in the time you're giving me.

Senator Booker. Sir, I'm going to tell you this because I deal with issues of criminal justice. When people are under threats in a Bureau of Prison facility, they're put into solitary confinement or protective.

They're not moved to a camp.

Mr. Blanche. That's not always true.

Senator Booker. It is.

Mr. Blanche. You're just wrong.

Senator Booker. What is true is someone that is accused of child sex trafficking under the Bureau of Prison's own policies is not put in a facility like this that seems clearly like a reward.

The Department of Justice is also responsible that powerful corporations play by the same rules. Let's take the proposed merger between Paramount-Warner Brothers, and Discovery. This is no ordinary transaction. It was a proposed $111 billion merger involving two of the last remaining legacy Hollywood studios. As Deputy Attorney General and later Acting Attorney General, you exercised oversight of the Antitrust Division. Did you approve the decision to close the Department's investigation into that merger? Yes or no.

Mr. Blanche. I was part of the decision. I don't know whether --

Senator Booker. Yes, you were involved in that.

Mr. Blanche. You don't let me answer, man. That's incredible.

Senator Booker. Did the career attorneys --

Mr. Blanche. So, the answer to --

Senator Booker. -- who investigated that deal recommend closing that investigation?

Mr. Blanche. I didn't have a conversation with the career, but as I was saying earlier, I was --

Senator Booker. I didn't ask you that. I asked you, did the career attorneys who investigated the deal recommend closing the investigation?

Mr. Blanche. I have no idea what they were --

Senator Booker. You were in charge of that Department, yet you have no idea. Well, this is --

Mr. Blanche. I didn't say I had no idea. I had no idea about the question you asked about what the career attorney's view was.

Senator Booker. You do not know what the career attorney's view was.

Mr. Blanche. I'm not sure what the view was with respect to closing it or not closing it.

Senator Booker. Well, let me tell you why ethics laws that bind you about the appearance of impropriety are so, so damning in this case. On the same day that Paramount shareholders voted to approve the merger, David Ellison, the head of the acquiring company, hosted a dinner that you attended honoring the President of the United States. While you were at that dinner, the DOJ was still investigating a merger. Did you speak with Mr. Ellison on

that evening?

Mr. Blanche. No.

Senator Booker. Did you discuss with anyone involved in that organization that evening the Department's ongoing investigations?

Mr. Blanche. No.

Senator Booker. Well, 6 weeks later after that dinner, that investigation was closed that you're stating you have no idea if the attorneys in charge even finished their investigation.

Mr. Blanche. That's not what I said.

Senator Booker. What did you say?

Mr. Blanche. You asked me a question about whether the attorneys recommended that the investigation be closed, and I said I wasn't sure. That's different than what you just threw back at me.

Senator Booker. Well, do you believe that that creates an appearance of impropriety that you were at a dinner?

Mr. Blanche. No.

Senator Booker. Okay. The Justice Department ethics rules are very clear about avoiding the appearance of impropriety. In a case like this, I don't think that's appearance of impropriety. I think that's improper, that the connected and the powerful are getting a chance to rub

shoulders. It would seem appropriate that you avoid those kind of appearances and dinners like that.

Mr. Blanche. Every appearance or dinner or speech that I give are cleared by ethics officials.

Senator Booker. So, your attendance at that dinner was cleared by ethics officials?

Mr. Blanche. Everything that I do, that I do outside --

[Cross-talking.]

Senator Booker. I didn't ask you everything you do. Was your appearance at that dinner cleared?

Mr. Blanche. You can ask the questions, but you cannot control my answers. I'm under oath, and I can answer the questions. I choose to answer them, okay?

Senator Booker. Were you approved --

Senator Booker. So, what I will tell you is what I do things outside --

Senator Booker. Yes or no, were you approved by ethics --

Mr. Blanche. When I do things outside of the Department, whether it's a speech, whether it's a dinner, whether it's an event, they are approved by ethics officials.

Senator Booker. You did not answer whether that attendance was approved.

Mr. Blanche. Every time I go out, it's approved, yes.

Senator Booker. You know, Lincoln, it was said about him that if you want to see the true character of a man, don't view him in adversity. Give him power. I believe you've had a lot of power, and so we don't have to speculate about what has been revealed with your time in that office. We don't need to worry about what kind of Attorney General. You've already had that power. This isn't a job interview like usually. You've sat before this Committee before. You've made promises time and time again before. You got the job actually to be the number two and the acting director, so this isn't a confirmation hearing. This is more of a performance review, and clearly, when it comes to the treatment of Epstein victims, when it comes to politically motivated prosecutions, when it comes from avoiding appearance of impropriety with corporations, you have failed.

You're asking this body for a promotion, and you've spent today making a lot of promises, promises to follow the law, promises to be independent, promises to serve the American people and not the President, but we don't need your promises. We have your record. We have watched you exercise one of the greatest powers entrusted to any public servant, and what have you shown us? One thousand two hundred victims waiting for justice. What have you shown

us? There's two prosecutions. While the people involved, the victims are waiting for action, one of the people prosecuted gets the most cushy arrangement possible after you visit with her. Again and again, you seem to be favoring the interests of a President and the powerful. You've chosen Trump over truth. You've chosen corporations over the Constitution, and you've failed to meet the test.

I'll say this in closing. This is why your nomination should fail. The Attorney General's client is not the President. It's the American people. You've been protecting one man for most of your career, for years and years and years. He has demonstrated himself to put undue pressure. This is why he was impeached. This is why he was criminally indicted. If your record and your testimony today should show us anything, it should show you, in my opinion, that you should not be confirmed to this job.

Senator Lee. Thank you, Senator Booker. Before I commence with my questions, I've been asked by Chairman Grassley to enter something into the record.

On behalf of Senator Grassley, I'd like to enter into the record a letter supporting Mr. Blanche's nomination. This is from the Newark Police Superior Officers Association, which represents the leaders of the Newark, New Jersey Police Department. The letter touts Mr. Blanche's experience, character, temperament, and

leadership.

It goes on to state, "Mr. Blanche has consistently demonstrated an unwavering commitment to the rule of law, the fair administration of justice, and the constitutional rights afforded to every citizen, including the due process rights of law enforcement officers. Throughout his distinguished legal career, he has earned a reputation for integrity, professionalism, sound judgment, and respect for the rule of law. These qualities are essential for the Nation's chief law enforcement officer."

Without objection, I will enter this into the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Senator Lee. Mr. Blanche, at the outset, earlier you were asked by one of my colleagues about the settlement agreement and about the definition of some of the terms. Now, as I've been going through that, it seems to me that some of those terms were defined earlier in the agreement, albeit not in the section of the agreement that you were shown on the board. Is that correct?

Mr. Blanche. Yes, Senator.

Senator Lee. And those make a difference, do they not, to the nature of the question asked to you?

Mr. Blanche. Yes, of course. Yes.

Senator Lee. You have no reason to believe that the

so-called weaponization fund will continue because of the settlement agreement. Is that correct?

Mr. Blanche. I am confident it will not.

Senator Lee. Great. During the previous Administration, we saw an unprecedented and unfortunate weaponization of the U.S. Department of Justice, an institution near and dear to my heart, as I know it is to yours, and an institution that's got a long and storied reputation for impartiality. Public trust in law enforcement plummeted as a result. That should concern every member of this Committee and, indeed, every American.

The Arctic Frost investigation swept up more than 400 Republican-aligned groups and individuals with blanket investigations, fishing expeditions in some instances, designed to intimidate and silence conservative voices or anyone deemed not favorable to President Biden and those who served with him. Investigators even violated the sanctity of Congress in a brazen move that tramples on all sorts of protections, including the fundamental separation of powers.

As Chairman Grassley's investigation continues, just yesterday, we learned that Jack Smith's team bypassed a required filter review and directly accessed the texts -- not metadata, not information about who texted who and what time they did so -- but the actual content, the substantive

content of texts of 44 members of Congress, six of them on the Senate Judiciary Committee, all without notice in a baseless fishing expedition. This was un-American, and it comes uncomfortably close to spying on a co-equal, coordinate branch of the U.S. Government.

As you know, protecting individual liberty and our constitutional rights is a top priority of mine. I appreciated your testimony in May before the CJS Appropriation Subcommittee in which you called the secret collection of phone records from a dozen members of Congress "the worst form of abuse." I sponsored the bipartisan NDO legislation long before Arctic Frost, and I believe this must be fixed no matter who holds the presidency, in a way that protects all Americans. In fact, this calls upon us, this underscores the need to pass that NDO reform measure.

What steps have you already taken in your capacity as Deputy Attorney General and now Acting Attorney General, and what reforms do you plan in the future to end these practices and this trend of weaponization within the Department?

Mr. Blanche. Thank you, Senator. Well, there's a number of things we're doing. Most significantly, it's getting materials together and being transparent with this body and this Committee like we did recently with the

emails that you just referenced, because one of the best ways that we can make sure we never do again what we did before is by exposing ourselves and letting the American people see what we did. We're also taking steps to right the wrongs, so that means, again, going back and issuing reports and issuing findings and conclusions around not only what the Department of Justice did at times, but other agencies within the executive, and holding ourselves to account that we shouldn't do it again.

And the most important thing, and it's come up a lot today, but it is just having prosecutors prosecute bad guys. And so, it's getting prosecutors out of D.C. and into U.S. attorney's offices, and unleashing them to do what they should be doing and what they should have been doing for the past 4 years as well, which is tackling the drug pandemic and epidemic we have in this country, going after the fraudsters. And that's the best way to make sure that the next Department of Justice continues doing the right thing and not the wrong thing.

Senator Lee. That's wonderful to me. Sometimes when you're doing the things that are not supposed to be done, you're not doing the things that are supposed to be done. I appreciate your efforts in that regard.

On another topic, Federal law prohibits non-citizens from voting in Federal elections. Separately, a law called

the National Voter Registration Act of 1993, sometimes known as the NVRA, requires, among other things, that the States keep their voter registration files clean, removing voters who have died, who have become ineligible, and to make those maintenance records available for public inspection. The Department of Justice has relied on that disclosure requirement to request State voter rolls and to confirm compliance with this mandate in the NVRA among the States. But a number of States have refused, and when the Department of Justice has sued in order to correct this problem, some Federal courts have issued rulings indicating that the NVRA doesn't clearly authorize doesn't clearly authorize this kind of compelled production of the complete voter registration files. So, the Department is thus left without a reliable, viable enforcement tool, even where noncompliance might be staring us in the face as it is in some jurisdictions.

Put simply, non-citizens can't legally vote, but a number of these States, blue States more than others, are doing everything they can to prevent the Department of Justice from enforcing the law. In the meantime, we've got an interpretation of other provisions of the NVRA that have made it, in tandem with this other problem, virtually impossible to enforce the law prohibiting non-citizen voting in Federal elections. In your view, would the SAVE

America Act give the Department of Justice clear authority in its efforts to protect the sanctity and security of those elections?

Mr. Blanche. Yes, absolutely. Yes.

Senator Lee. Thank you. I appreciate that very much. This is a very important issue.

Now, under your leadership, the Department of Justice fraud enforcement has seen some real success. You've got a lot of success stories under your belt already. Can you describe how you're leading that effort in the Department to combat citizen fraud, healthcare fraud, and fraud in taxpayer-funded programs and organizations?

Mr. Blanche. Yes. We're making it a high priority. We're working with the White House and the Anti-Fraud Task Force and, again, having prosecutors focus on fraud, and so, that means working with inspectors general. That means working with the FBI, DHS to get these cases, take them to prosecutors. The Fraud Division itself is being built up. We've already had tremendous success just in the past 4 weeks in recovering billions of dollars that had been stolen from the fisc, and this is work that is just starting. We've always done fraud cases. This isn't a new thing for the Department of Justice to do, but the focus on these fraud cases and the focus on every U.S. attorney having multiple prosecutors focused on going after fraud

cases is something new, and it's something that is important to President Trump. And it should be important to everybody. Not a Republican or Democrat issue at all, and that's why we're doing it.

Senator Lee. Shifting gears a little, tell us just very briefly about what the Department's doing under your leadership to protect children from predators.

Mr. Blanche. Listen, there is no greater responsibility prosecutors have than protecting our most vulnerable. I have a leader -- she's here today -- running our task forces, going after any sort of human trafficking or child predators in those cases, making sure we're coordinated. We are, again, focusing AUSAs on going after these cases. We've seen multiple investigations leading to prosecutions and even multiple sentences at this point, starting since we first took office over a year ago, and, again, this is about spending resources where they should be spent. So, instead of spending time in D.C. working on cases that we really have no business working on, we are out in the field protecting our victims, protecting children, and going after the predators that are in every community, and putting them in Federal prison.

Senator Lee. I'd like to turn now briefly to Section 702 of the Foreign Intelligence Surveillance Act, FISA 702, and I want to address some of the repeated claims made by

some of my colleagues that our intelligence collection under 702 would go dark when the statute lapsed as of midnight on June 12. As you know, Section 702 operates under year-long certifications approved annually by the FISA Court. Is that correct?

Mr. Blanche. Yes, that's correct.

Senator Lee. And the government most recently obtained approval of its 702 certifications in March of this year. Is that correct?

Mr. Blanche. It did, yes.

Senator Lee. So, those certifications remain valid until they expire, right?

Mr. Blanche. Correct.

Senator Lee. And they don't expire until midnight on March 16 of 2027. Is that correct?

Mr. Blanche. That is correct.

Senator Lee. Okay. So, in the event that the telecommunications providers don't comply, that FISA Court can and would compel compliance and impose fines. Isn't that right?

Mr. Blanche. We would certainly try, yes.

Senator Lee. Thank you. I want to echo briefly what my colleague, Senator Coons, has commented with regard to the Safer Supervision Act to ensure that supervised release is focused on those who need it, promoting both efficiency

and public safety, so thanks for your comments on that. I really appreciated those. And then also, you know, some of my colleagues have mentioned a recent court order in the case regarding the leak of President Trump's tax returns and the ensuing settlement. Responding to that opinion, was there any improper coordination of any kind between the Department of Justice and the Trump team as to this settlement?

Mr. Blanche. No, not at all.

Senator Lee. Okay. So in fact, the case itself was settled based on an apology without any compensation being awarded, without the President receiving a penny. Isn't that right?

Mr. Blanche. Correct, and completely consistent with the Federal Rule of Civil Procedure 41, which absolutely allows what happened here to happen. It happens in hundreds, if not thousands of cases around the country every year.

Senator Lee. For any entity, whether it's the U.S. Government or otherwise, that's been sued for $10 billion or any significant sum of money, that's seems like a pretty darn good deal. I see my time's expired. I believe Senator Padilla is up next.

Senator Padilla. Thank you, Mr. Chairman. Mr. Blanche, welcome. Do you believe every human life is

sacred?

Mr. Blanche. Can you repeat that, Senator? Sorry.

Senator Padilla. Do you believe that every human life is sacred?

Mr. Blanche. Yes.

Senator Padilla. So do I. A lot of my colleagues have made remarks about our colleague who recently passed. This last week, we've also seen Lorenzo Salgado Araujo fatally shot by an ICE agent during an enforcement operation in Houston. Earlier this week, Joan Sebastian Guerrero was killed in another fatal ICE-involved shooting in Maine. I'm not here to debate immigration policy or how immigration enforcement has been conducted by this Administration. My questions are specific to law enforcement policy and best practices. Given that these are Federal officer-involved shootings, what role should the Department of Justice play in ensuring independent and transparent review and investigations over these incidents?

Mr. Blanche. It depends on the agency that the law enforcement officer was a member of. So, if it's a FBI agent as opposed to an ICE agent or an HSI agent, and the role that we should play depends. It depends on the conduct. Normally, each agency has their own procedures for investigating any type of shooting, and it usually involves their inspector general or an internal office. At

some point along the way, the DOJ --

Senator Padilla. I don't want to catch up too quickly here.

Mr. Blanche. Sure.

Senator Padilla. I want to come back to that point --

Mr. Blanche. Sure.

Senator Padilla. -- but first ask, should State and local law enforcement be involved in ensuring that there's an independent investigation of these incidents?

Mr. Blanche. It depends. I think there's a lot of times when State and locals should definitely be involved, but I don't think unequivocally State and local have to be involved for independence. Of course not.

Senator Padilla. Here's the bottom line why I'm asking these two questions, because in prior incidents -- you referenced Minnesota earlier in your testimony -- Alex Pretti and Renee Good were also fatally shot, and as far as I can tell, it's been months and months. There's been no justice in these cases. As far as I can tell, those officers were not fired. They have not faced any charges. So, it does undermine any confidence anybody should have in the Department of Homeland Security's ability, through the inspector general or otherwise, to investigate its own. So, I come back to the question, what should the role of the Department of Justice be when there's federally

officer-involved shootings?

Mr. Blanche. Well, I very much disagree with the statement you just made. The mere passage of time between January and today doesn't mean there's no justice. It doesn't mean that. So, these investigations do take time, and as Senator Klobuchar talked about, and it's her State, we are -- we, meaning the Federal Government -- have worked with the State and locals in that case.

Senator Padilla. I do want to move on to other issues, but here's what I see: no justice, clear justice. And I get investigations take time, but no justice in those two cases. What we have seen is people continuing to die, not just in detention facilities, but on the streets of America.

Next topic. Coming back to January 6, there've been several of my colleagues who've asked about the "slush fund." Do you personally believe that someone who forcibly entered the U.S. Capitol and assaulted law enforcement should be rewarded with taxpayer money? Yes or no.

Mr. Blanche. I can't answer it ""yes" or "no," but if you want the answer, I think that the fund that doesn't exist anymore set up parameters where, no, somebody that you just described would likely not recover funds.

Senator Padilla. Which brings me to my other point, because several members have asked, and I know Senator

Tillis specifically focused on the weaponization slush fund and language versus declarations versus appropriations bills on how to undo this. I also need to be clear that January 6'ers cannot, should not be able to seek payouts from other sources, including the Federal Tort Claims Act. Do you commit to vigorously defending taxpayer money from being paid out to January 6 rioters, those who were convicted of their involvement with January 6, regardless of the source of funding from the Department of Justice?

Mr. Blanche. You're talking about a statute that exists, and it allows anybody to file a suit against the United States. So, I can tell you we always vigorously defend our cases, but I can't speak to a particular case of filing the statute.

Senator Padilla. We know this is a hypothetical. There's been at least four letters that I've signed on to, along with Senators Durbin, Klobuchar, and Whitehouse, who asked earlier about the status of January 6 rioters seeking payouts from the Department. When can we expect responses to those letters?

Mr. Blanche. When you say "status," do you mean those that have filed cases in court? I don't know what that means.

Senator Padilla. Yeah, status of their request for payouts being reviewed, approved, or not.

Mr. Blanche. I think anybody, including January 6 defendants, can file a claim under the Federal Torts Claims Act, and I think some of them have. Those cases are ongoing. They're publicly available on ECF.

Senator Padilla. And I know some people would suggest, well, they've all been pardoned for their crimes on January 6, and so this may be fair game. Are you aware that at least 97 January 6'ers rioters have been accused of new crimes since January 6, 2021, including violent crimes, by the way, child molestation, et cetera? That sounds like the worst of the worst to me.

Mr. Blanche. If anybody commits a crime, they should be investigated, arrested, and prosecuted. So, if you're talking about people that committed Federal crimes and they happen to have been pardoned before, they should be arrested and prosecuted, yes.

Senator Padilla. I look forward to that as well, and we'll follow up in questions for the record.

Mr. Blanche, during our courtesy meeting a few weeks ago, you said that, "Independence of the Department was a misnomer in the context of the Department of Justice because the President sets policies and priorities," and in your view, "The Department of Justice must enforce the law in a way that carries out the President's goals." Do you recall that conversation?

Mr. Blanche. Yeah, I definitely did not say that, but nice try.

Senator Padilla. No, that's exactly what I recall from our conversation, so I want to be on the record saying I --

Mr. Blanche. Well, I'm happy to tell you what I said to help your recollection.

Senator Padilla. So, the Department of Justice should be independent or not?

Mr. Blanche. I think as I said earlier, the Department of Justice is under the executive branch. If confirmed, I will be a member of the President's Cabinet. So, absolutely my obligation is the American people and the rule of law.

[Cross-talking.]

Mr. Blanche. With that being said, I am a member of the Cabinet of the President of the United States.

Senator Padilla. We'll talk about the if confirmed in a minute, but let me also point out the Department of Justice's own website states right on the homepage that the Department's core missions is independence and impartiality, so let me bring a specific example.

Last fall, President Trump issued a statement for National Domestic Violence Awareness Month where he said, "I'm steadfastly devoted to uplifting survivors of domestic

violence and ensuring they know they are never alone, and that help and support are always within reach." Sounds like a statement that we'd all agree with, but the Office of Violence Against Women is a vital component of the Department of Justice that administers grants to organizations that provide services for victims of domestic violence, sexual assault, dating violence, and stalking. It provides critical resources to organizations that support victims. Yes or no, are you aware that the office is substantially delayed in notifying grant recipients of awards that were intended to begin October 1 of last year?

Mr. Blanche. We are rolling grants out on a rolling basis, and we continue to do so. We will continue to do so. We didn't have the grants authorized until January of this year, so --

Senator Padilla. And it's now July. It's been 6 months. Next "yes" or "no" question: are you aware that as a result of the delays, many organizations have been forced to lay off staff and reduce services for domestic violence victims? Yes or no.

Mr. Blanche. I am not aware of that, no.

Senator Padilla. Okay. I'm happy to provide you information and cases. Are you aware that many notices of funding opportunities for the fiscal year 2026 have yet to be posted for grants that are supposed to begin on October

1 of this year?

Mr. Blanche. I know that we are posting, that we are caught up from the last fiscal year. The budget wasn't approved until January of this year. We had to finish last year's first. We're putting them out every single day.

Senator Padilla. Again, it's been 6 months. Are you aware that multiple congressional offices from both sides of the aisle -- this is not partisan -- on a bipartisan basis have reached out to the office about delays and have not been given any concrete timeline, despite the real and substantial impact that these delays are having on domestic violence services?

Mr. Blanche. That's not true. I've testified publicly about it on multiple occasions, and we have given a timeline. I just gave you the timeline today, which is that we're doing it every day on a rolling basis. We're caught up to last year's, and we're moving forward --

Senator Padilla. I'd like to see a specific schedule so that organizations in California --

Mr. Blanche. -- and we anticipate having all of them done by the end of this fiscal year.

Senator Padilla. -- and every other State for that matter can know when to expect their funding. I know my time is running out. Let me just end with this.

Mr. Blanche, it's the duty of the Attorney General of

the United States to "operate free from partisan consideration and protect citizens' rights to equal justice," but what I've heard today fails to inspire much confidence in your ability to carry out that duty or to put Federal law before loyalty to the President. I add to that facts from the judiciary. District courts in 31 cases have recognized that the Administration has violated court rulings that the Attorney General refuses to rule out, refusing to abide by the circuit court rulings that they disagree with. In immigration cases alone, the Administration has admitted violating court orders in the District of New Jersey alone more than 50 times. This does not sound like a Department of Justice.

The American people deserve better, and a lot of nominees come before us and say, well, if I'm fortunate enough to be confirmed, then this or that. I'm not buying that. I know you're not confirmed for the top spot. You're acting in the top spot. You were the number two from nearly the beginning of the term. Yes, a lot of this accountability falls on your shoulders. The American people deserve an Attorney General who put the Constitution above political retribution. I don't think you're fit for this job. Thank you, Mr. Chair.

Senator Lee. We'll go next to Senator Moody. Before we do that, I've been asked by Senator Grassley, the

chairman, to enter into the record a letter supporting Mr. Blanche's nomination from the United Coalition of Public Safety, which represents many of the Nation's largest law enforcement organizations and tens of thousands of law enforcement officers across the country. The letter highlights both Mr. Blanche's qualifications to serve as Attorney General and his unique approach to the criminal justice system. It states, "We believe Mr. Blanche will serve with honor, fairness and a steadfast commitment to the rule of law. His leadership will undoubtedly enhance collaboration between law enforcement and the Department of Justice, ensuring that our communities remain safe while reinforcing public confidence in our own system."

Without objection, this letter will be admitted into the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Senator Lee. And Senator Moody, you're recognized.

Senator Moody. Thank you, Mr. Chairman. Good to see you again and get to talk with you about your nomination, Mr. Blanche. And everything that I warned about in my introduction seems to be proving true, that good faith and nuance is just going to be thrown out the door as a price to be paid for clicks and tweets and promotion of some partisan agenda today because I'm going to quote from one

of my colleagues. They said to you, "Protecting one man for most of your career." Would you define your career as protecting one man, Mr. Blanche, and if not, why not?

Mr. Blanche. I mean, absolutely not. I mean, I am a prosecutor. I'm a career prosecutor. I started out as an intern down the street at the Department of Justice. I was a paralegal. I was a law clerk. When I was representing President Trump, I had other clients as well. So, the fact that I represented President Trump for a period of time, under 2 years, does not define my career, nor does it define me. I should be defined by the work that I did as a prosecutor and by the work that I've done leading this Department since March of last year.

Senator Moody. I think one of the true crises that we face as a Nation right now, and you can pick the subject matter which this would apply, but the American people, who are supposed to be where the power lies in this country. It was how our government was set up. It was a government to serve them, first and foremost, to protect their rights. And as part of that, even our founding fathers said, in order to do that, you have to have a government that effectuates safety. And so, I truly believe that your Agency is one of the most important in our government structure for those reasons, because you have the responsibility of all of that.

The most serious challenge I see facing our Nation right now is that the people don't trust that Washington is indeed working for them, or being accountable to them, or serving their interests first. And I just came from a hearing where you had Nick Shirley, James O'Keefe, really a partisan swath of witnesses testifying about fraud in this country, and I think, you know, this Administration is making announcement after announcement, you yourself are making announcement after announcement, the extent of fraud that has been uncovered. And I commended Nick Shirley, and he described himself as an independent journalist, but he started out disrupting, you know, young at, like, 15 weddings, I want to say. And I think that spirit of challenging the status quo or formality has really driven him to disrupt what I think the American people believe is a bureaucracy, historically, that has not only maybe because of its size, maybe because personnel and they aren't too quick to want to uncover, but has really been not inclined, complacent, or is set up to not uncover and really go after some of this fraud.

And I've been astounded by the amount that this Administration has uncovered, and I commend people like Nick Shirley and James O'Keefe that have been out there because they're American citizens, and they believe that their government owes them accountability and stewardship

of taxpayer money first and foremost. And he said, "I can't believe that for so long, nobody paid attention to this, and we're seeing just fraud that is just something that we haven't imagined."

And I'm really proud of this Administration and the DOJ, specifically under your leadership, for setting up a specific division now to go after these things that are raised, and the results speak for themselves. I mean, you've established a new National Fraud Enforcement Division, charged with bringing a comprehensive approach to rooting out fraud. We just saw a 2026 national healthcare fraud takedown where you charged 455 defendants in connection with schemes involving more than $6.5 billion in fraud. I believe we brought together the most States and territories ever in the history of the Department's existence in going after fraud. That was all under your leadership and this Administration, and I think that delivers a remarkable message, not only to the people out there committing this fraud against the American taxpayer and really against the next generation that's going to inherit this.

I mean, I'm a mother of a teenager right now. I feel terrible that they're going to inherit all of this because before Biden ever pushed out swaths of money that went to corruption and fraud, an American taxpayer had to earn it

or we had to borrow it on the backs of our next generation. And so, I am proud of the Department saying enough is enough. The free ride is over. We are digging in. Not only are we just going to, you know, talk about it. We're going to actually show you what we're doing, and we're going to create an entire different division. I think it speaks volumes you have the new head of your fraud division with you today in the audience. I think America should know that that didn't exist before you.

I would like for you to tell the American people right now a little bit about that because I have to tell you, when some of these States learned about this fraud going on, when Nick Shirley showed up and exposed some of this insane fraud that was happening right under State administration government's noses, the reaction from State leadership, the Governor of Minnesota called Shirley a far-right delusional conspiracy theorist, maybe because he campaigned on these small businesses that were set up with that money so that the American people like, "We are growing small businesses, make me your Vice President." Maybe that's why he had to knock Nick Shirley down a notch. Governor Newsom came out and said, "Slow Shirley is the fraud." He tried to ridicule and demean this 24-year-old kid who's just uncovering fraud, and these are chief executives of States.

So, I'd like for you to explain what you're doing differently because, right now, I just came from a hearing where not one Democrat was in the room to ask this bipartisan witness panel about the fraud that's happening or what we could do about it. Not one Democrat was in the room, and we've got elected officials around the State, when people are trying to bring it to their attention, calling out the people bringing it to their attention, and not only that, trying to pass legislation to stop them uncovering it. In California, they have a Stop Nick Shirley Act, which should be called the Protect Fraudsters Act, I assume.

But tell us what you're doing different and how you're going to work to uncover and root out and go against criminals in these States where these elected officials are complicit, maybe aiding and abetting because they're going after the people that are trying to raise the issues.

Mr. Blanche. Yes. So, before we talk about California and Minnesota, it's worth talking about States that are working with us. So places like Florida, places like Ohio, where we're working closely with the local government, getting information about individuals who are committing fraud, applying for money from the Federal Governments where the State serves as a passthrough. and what President Trump and the Vice President did last fall

was said enough is enough. We need an all-out government approach to combat fraud.

And so, part of that is our new Fraud Division, and the work that they're doing is exactly what you just described. and some of the stuff that Nick Shirley has uncovered has been incredible, but it's going into these States and identifying at this point, just low-hanging fruit, so fraudsters that have set up daycare centers that have set up autism centers and --

Senator Moody. Learning centers.

Mr. Blanche. Learning centers.

Senator Moody. Hearing. Hearing.

Mr. Blanche. Hearing centers, everything, and there's no patients. They're just collecting money off the backs of taxpayers. It's true, the Governor of Minnesota did nothing but obstruct our efforts month after month, and then when we did a takedown and we executed a law enforcement action on a given day, he hopped onto X and said he was happy to partner with us. He's not partnering with us, he's not working with us, and so that's very disappointing. The same thing with the Governor of California where the amount of fraud that's being stolen out of the generosity of taxpayers around this country is in the billions of dollars.

But listen, without talking about that, what we can

say that is extraordinarily positive is that we have arrested hundreds and hundreds of fraudsters just this year alone, and we've got a lot more to do between now and the end of the year. And that's the work of, again, our Federal agents, our inspector generals, DHS, HSI working with us, FBI, and then our prosecutors who now have been given full authority and have been unleashed to tackle this problem. There is no fraud too small. Colin McDonald says it, and it's right: if you commit $1,001 of fraud, you should expect to go to Federal prison. And we're going after the biggest fraudsters and the smallest fraudsters because any dollar that's taken inappropriately is something that this Department of Justice won't tolerate.

So, it's a big effort and it's going to take a lot of work. We're hiring a lot of prosecutors. We're using a lot of AUSAs around the country, but I expect that we'll continue to see the results that we're already seeing. So, thank you very much for the work that you guys have done as well to help facilitate our success there.

Senator Moody. Thank you, Mr. Blanche.

Chairman Grassley. [Presiding.] Senator Welch.

Senator Welch. Thank you very much, Mr. Chairman. Thank you very much, Deputy Attorney General.

I want to talk to you a little bit about the anti-weaponization fund. Just by way of background, you've had

a longstanding relationship, of course, with President Trump, served as his personal criminal attorney, right?

Mr. Blanche. I met him for the first time a couple years ago.

Senator Welch. Right, and in the course of your representation of the President, you earned over $9 million, correct?

Mr. Blanche. My law firm was paid that much. I had six or seven lawyers.

Senator Welch. Well, that was in your financial disclosures. I don't have a problem --

Mr. Blanche. No, I did. I was paid it. Sorry.

Senator Welch. Right.

Mr. Blanche. But I'm saying it went to my law firm. I had employees.

Senator Welch. Right. It's been raised that you have a close relationship with the President, but you're entitled to that, and the President is entitled to appoint as Attorney General a person in whom he has some trust, so that's not an issue for me. But on the anti-weaponization fund, there is the question of whether a President who is suing the taxpayers, the IRS, for $10 billion, and where his formerly personal lawyer is representing the taxpayers, is there a conflict of interest? And my understanding is that before you actually got here, you did get ethics

training after you were acting Deputy Attorney General, correct?

Mr. Blanche. Yes.

Senator Welch. And my understanding is that you were advised that you should not be engaged in matters that affected President Trump in his individual capacity. Is that correct?

Mr. Blanche. No. I'm not sure what your understanding's based upon, but no. There's very clear ethics rules that I was required to follow that I do follow.

Senator Welch. It's based on the letter from Mr. Tirrell, and you've received normal ethics training.

Mr. Blanche. Yes.

Senator Welch. And normal ethics includes that you do not represent someone with whom you have been representing them before in a personal matter, right?

Mr. Blanche. I'm not trying to get uber technical, but there are very technical rules around the ethics requirements --

Senator Welch. Well, let me --

Mr. Blanche. -- and I follow them.

Senator Welch. All right. Well, maybe you could provide us with what the ethical materials you can provide.

Mr. Blanche. I can tell you right now if you're

interested.

Senator Welch. What I'd like you to do is send us the materials. Let me go on. If you had an issue, there was a dispute involving, say, Paramount, would you have a lawyer from the Justice Department who owned $9 million in stock negotiate on behalf of the government with that company?

Mr. Blanche. It depends. As long as there's an ethical and there was no conflict in doing it --

[Cross-talking.]

Senator Welch. So, if I had $9 million in stock with Paramount, I'm representing the people, there's an adversarial relationship, you'd let me negotiate on behalf of the people when the outcome of those negotiations would have an impact on my stock price?

Mr. Blanche. Sorry. I just want to understand your hypo. If a lawyer for the Department of Justice has $9 million in Paramount stock, they should not be on that case.

Senator Welch. Right.

Mr. Blanche. I agree, yes.

Senator Welch. Okay, and, you know, what happened here with the President that's so mystifying to many of us, it would be analogous if the Governor of Vermont sued the Department of Taxes for $10 billion. We don't appoint attorney generals, but in New Hampshire they do, but let's

say we did, and the governor's formerly personal attorney --

Mr. Blanche. There's no comparison between --

Senator Welch. Let me finish my question. The governor sues the Department of Taxes for $10 billion. His former personal attorney, who now he's appointed Attorney General, negotiates with the Department of Taxes and ends up settling by setting up a fund in the control, essentially, of the governor for $1.77 billion, that doesn't sound fishy to you?

Mr. Blanche. Well, the hypo you just described, I don't think it's appropriate to use the word "fishy." It's either ethical or not ethical.

Senator Welch. Well, you know --

Mr. Blanche. And there's no --

Senator Welch. -- Vermonters would just say it stinks. I mean, that is truly bizarre that the chief executive gets his appointed person, who was formerly his personal attorney, to negotiate on his behalf where, at the end of the day, taxpayers are going to pay. So, I'll just leave it at that.

Mr. Blanche. The other thing I'll correct, though, is you use the word as if I negotiated. I wasn't part of the negotiation which I've said before, so.

Senator Welch. Your Department is. You had to sign

off on it.

Mr. Blanche. Yes, that's true.

Senator Welch. That is your signature.

Mr. Blanche. Yes, that is my signature.

Senator Welch. I mean, look, you're at the top of the pile here.

Mr. Blanche. Yes.

Senator Welch. So, you don't get involved in all the phone calls and all the details, but at the end of the day, you have to do due diligence and satisfy yourself that you in good faith can sign off on the agreement.

Mr. Blanche. Correct.

Senator Welch. And you did.

Mr. Blanche. Yes.

Senator Welch. So, that is your responsibility, and I'm sure you --

Mr. Blanche. Oh, I do have responsibility for it.

Senator Welch. That's right.

Mr. Blanche. I agree with that, yes.

Senator Welch. All right. You know, let's talk about the pardons. I understand any President has total authority to pardon anyone he or she wants, and that includes commuting sentences, and it includes restoration of gun rights. You know who Liz Oyer is?

Mr. Blanche. Yes.

Senator Welch. And you know who Mel Gibson is?

Mr. Blanche. Yes.

Senator Welch. All right. Mel Gibson was convicted of domestic violence. What he did was he punched his then girlfriend in the teeth, threatened her with a gun while she had their infant in her arms. Now, it's the President's decision. He can restore Mr. Gibson's gun rights. That's not your decision. But my understanding is you had a pardon attorney who, when requests were made to restore gun rights to domestic abusers, they'd be vetted -- mental health issues, other issues -- and that's because of a 500 percent increase in homicide rates of domestic abusers who have guns. You asked or one of your people asked Liz Oyer to provide a letter that basically said, okay, we can restore his gun rights. Is that correct?

Mr. Blanche. That happened the day I was starting.

Senator Welch. It was 2days.

Mr. Blanche. I know Ms. Oyer has claimed that --

Senator Welch. It was two days after.

Mr. Blanche. I know that Ms. Oyer has claimed that that had anything to do with her firing. I didn't even know of that. I know nothing about Mel Gibson or that letter when I fired her. Nothing.

Senator Welch. So, why did you fire her?

Mr. Blanche. For a number of reasons. For one,

her --

Senator Welch. For the two days?

Mr. Blanche. Yes, for a number of reasons. It had nothing to do with Mel Gibson. The decisions that she made as a pardon attorney in the weeks and months leading up to the end of President Biden's term were completely inconsistent with President Trump's authority, including recommending commuting every single individual on death row, which even President Biden didn't do, so.

Senator Welch. I'll let Americans be the jury of whether that sounds right --

Mr. Blanche. It is right.

Senator Welch. -- but 2 days after you were there, she got fired. She was told to do a letter that was basically going to validate the decision the President had made to restore gun rights to a man who smashed his girlfriend's mouth, threatened her with a gun, and did it with her holding their infant.

Mr. Blanche. It had nothing to do with why she was fired, by the way. Nothing.

Senator Welch. What also is documented is that she was going to testify here in Congress before a roundtable, and people were dispatched, Federal marshals, to go to her home at night. It turns out she was not there. Her 11-year-old son was there alone, and fortunately, at the very

last minute, that access to her house or that the trip to her house was canceled.

Mr. Blanche. That's not true. I mean, if you want me to answer with the truth, I can.

Senator Welch. What part of it is not true?

Mr. Blanche. When we learned that she was going to testify about privileged communications, like we do anytime a former employee is going to violate their ethical duties, we drafted a letter. We tried to serve that letter on her via email. We tried to contact her. She would not answer her phone. So, the way the Department of Justice serves people in every case is with Deputy United States Marshals. We endeavored to do that, and then she accepted service.

Senator Welch. Oh, thank you. I'll go on. Kash Patel, I do want to go back to my colleague, Senator Whitehouse's, concerns. I have concerns about him because of the reports about his drinking, about the incredibly bad morale there, but I'm not going to ask you on that. You are his supervisor, so obviously you have some responsibility to be reviewing this behavior, but --

Mr. Blanche. I don't think he has any issues drinking. He has no issues with morale either.

Senator Welch. All right. Here's what is very clear. He was at the White House for 8 hours, and this is after a report came out in the New York Times that talked about the

$400 million Qatari plane that was Air Force One not having certain defensive capabilities, and issued subpoenas to reporters demanding that they turn over their news sources. I happen to believe it's extremely important to protect the right of the press to have confidential sources in order to get out information that is absolutely in the public interest. Do you support Mr. Patel's efforts to subpoena and get reporters under the grill to disclose who their confidential sources are?

Mr. Blanche. The Department of Justice requires that I authorize it, which I did, and those reporters, we're not targeting reporters. They're material witnesses, just like a reporter would be a material witness to a car crash. They are witnesses, and so --

Senator Welch. And the question you want to ask them is who were their sources.

Mr. Blanche. No. No.

Senator Welch. That goes to the heart of the First Amendment.

Mr. Blanche. No. The question we want to ask them is who provided them with classified national security information which everybody in this body should want to protect, I would hope.

Chairman Grassley. Senator Hawley.

Senator Hawley. Thank you very much, Mr. Chairman.

Mr. Blanche, good to see you.

Mr. Blanche. You too, Senator.

Senator Hawley. You're getting towards the end here. Are you still sure you want this job?

Mr. Blanche. I do, Senator.

Senator Hawley. Good. All right. Good, good. Well, that was a rhetorical question, but I'm glad the answer is yes.

I want to start with Jack Smith and the latest revelations of his illegalities, which seem to have no end. I mean, listen, I've had my text messages, did have my text messages by him scooped up, read. Who knows what he did with them. I've had my cellphone monitored. He tracked my incoming calls, my outgoing calls. He tracked my metadata. He tracked my location, I mean, Lord knows what else. The part that really offends me, though, is that he didn't just do it to me and members of Congress. He did it to ordinary Americans. I've had Missourians come to me and say, I had FBI agents show up at my door, knock on my door and say, "Were you in Washington, D.C., in January of 2021?" These are people who did nothing wrong. They weren't even here. They come to me and they said, "What is going on? What am I going to do? I can't afford an attorney."

What really gets me at the end of the day is he lies about it. I mean, he has lied and lied about it, and I

want to just make good that claim. Here is a record -- I'm going to read it to you -- a record of Jack Smith's responses under oath now to members of Congress. He is asked, Question: "As it relates to members and their staffs and senators, it's just the toll records as far as you remember." Smith: "That is my recollection." Question: "Did the records that you requested include the content of text messages?" Smith, Answer: "No." Now, maybe there's some nuance I'm missing here, but it sounds a lot to me like this guy didn't tell the truth. Have you thought about investigating this guy for perjury?

Mr. Blanche. We take testimony in front of this body very seriously, yes.

Senator Hawley. Good. Well, I think he absolutely should be investigated. I think he absolutely should be prosecuted, if at all possible, and based on his responses under oath, I think he should be. And I think it's time that we say that these people who did this, who engaged in this mass illegality, blatant violation of the separation of powers, blatant violation of the Constitution. We know what they did to President Trump, we know what they did to everyday, innocent Americans, and that's before we even touched the issue of trying to recruit spies into Catholic parishes, sending members of the Anti-Terrorism Division to go hound parents who went to school board meetings.

It's unlike anything we've ever seen in American history, and my view is there needs to be accountability for it. I hope that you will investigate Jack Smith for perjury, and I hope that possibly you'll prosecute him.

Mr. Blanche. Yes, Senator.

Senator Hawley. Let me switch gears and ask you about a Missouri-specific issue. My State has a number of laws that protect the unborn. We're a very pro-life State in Missouri, and that includes laws that limit the use of the chemical abortion drug, the circumstances under which it can be prescribed. You need to see a physician and so forth under Missouri law. Now, as you know, Joe Biden gutted all of those restrictions. He took away President Trump's safety restrictions on this chemical abortion drug. He instituted a mail order abortion policy, so my State went to court to try to defend our State's laws. A number of other Republican States did this.

Now, of course, in the meantime, the President changed, thank goodness, and now we have President Trump, but that means that now we have the State of Missouri, a Republican State, along with a number of other conservative Republican States are in court against a Republican Administration fighting over Joe Biden's abortion policy. And by the way, while I'm on this subject, I just want to show you why it matters to Missouri. Here's what happened

in Missouri after Joe Biden changed the rules and contravened our State laws.

[Poster]

Senator Hawley. Look at the abortions. I mean, dramatic increase, dramatic increase because under Joe Biden's abortion rules, it doesn't matter what your State law is. It doesn't matter what the voters in my State do. You can just mail in this abortion drug, no prescription, no follow-up visits for the mother, no medical support at all. You mentioned this earlier I think. You can mail these in from overseas, from India for heaven's sake, and that's where many of them come from. Nationally, we see the same thing since Biden put his policy in place: massive increases, massive increases in the number of abortions.

Here's what I want to get at with you. I just hate this policy, first of all, but I hate it that we have these Republican States in court against a Republican Administration, and it just seems to me there's got to be some solution to this. So, I just want to ask you, what do you think that is? I mean, how do you think we can get to some solution here from all of this mess and find our way out of it? I turn it over to you.

Mr. Blanche. I share your concerns as does this entire Administration. As you know, I mean, we have the

most pro-life President in history, and you are one of the most pro-life senators in this body, and so that is a good thing. I don't want to talk about litigation strategy here, it's not appropriate, but I will say, as we said in our briefing, we are not defending what Biden did and will not. The FDA has a process that we're letting them go forward in, and this is, again, in our briefings. It takes a year. They've committed to do it significantly less time than a year. We'll always, and when I say "we," I'm not just saying the Department of Justice. I'm saying President Trump's Administration in its entirety will protect the life of the unborn and work with States and obviously you to make sure that we do that in the best way. I want to get to a solution as well. I don't want to talk about litigation strategy here. I don't think that's the right forum, but I very much share your concerns, Senator.

Senator Hawley. You mentioned just a second ago, I think this is an important point. I just want to make sure I drive this home. This abortion policy, Biden's abortion policy, which changed President Trump's own rule, you're not defending that in court, right? I mean, you're not defending that on the merit.

Mr. Blanche. And it's in all of our pleadings that we are not, correct.

Senator Hawley. Yeah, and, you know, even the FDA

Commissioner said -- I'm just going to quote him here -- that "Biden's rules, as a legal matter, lacked adequate consideration." The HHS Secretary, Bobby Kennedy, said that "Biden's rules invite potential dangers by offering the mifepristone without sufficient medical support or supervision." So, those are from your filings, so I want to be clear on this. You do not defend this policy on the merits whatsoever.

Mr. Blanche. Correct.

Senator Hawley. And presumably, you have no issue with President Trump's earlier rule, which had commonsense safety restrictions. You had to see a doctor, get a prescription. There had to be a follow-up visit to see if there was any hemorrhaging. Those were in place before Biden gutted them. Presumably, there's no issue with any of those.

Mr. Blanche. I anticipate the Department would defend those rules, yes.

Senator Hawley. Okay. That leads me to this question. While the FDA's doing its review, why not put President Trump's rules in place? They're good rules. Why not do that rather than leave in place these rules? I mean, just explain that to me.

Mr. Blanche. Well, this gets to my original point when I don't think it's appropriate to talk about our

litigation strategy here, except to say that we want to get to a good result consistent with President Trump's administrative directive and priorities, and we very much believe that the Biden rules were wrong. So, we're continuing.

Senator Hawley. Good. I'm glad to hear that. Do you have any thought about what a solution, a good result might be? And I'm not asking you to discuss your litigation. I mean, apart from that, I mean, how are we going to get out of the litigation? I want to be clear, I want to get out of the litigation. I hate the fact that, again, all these Republican States are litigating against a Republican Administration. We got to find some way to end that, so maybe you have a thought. Go ahead.

Mr. Blanche. I hope that the work the FDA is doing now, because, remember, we have to have studies that we can defend in court. We have to be able to say to a judge, probably in this district, that our change was not arbitrary and capricious. So, we're trying to let FDA -- "we" meaning the Department of Justice -- do their work so that we can continue to protect the lives of the unborn children and, frankly, the State's laws like Missouri's, which is really what's being violated here at its core.

Senator Hawley. Let me just ask you one other thing on this. I know that you've seen these stories, these news

reports about women who are assaulted by their boyfriends or whomever. They get pregnant. The boyfriend doesn't want it, you know. They take the drug, crush it up, lace it in their drink or what have you. You know, one example, Rosalie Markovich. You know, Rosalie, she got pregnant. She was excited. She did not want to have an abortion. She wanted to have her baby. Her boyfriend did not want that, so without telling her, certainly without her consent, he laced the drug into her drink. It caused her to begin to miscarry. He restrained her so she couldn't go to the hospital. I mean, you know, this is assault. Multiple States now have brought dozens of criminal charges against men who do this.

My question to you is, have you thought about devoting resources at the Department of Justice, you know, putting together an initiative that might bring resources from the Criminal Division, the Civil Division, and the U.S. attorneys together, you know, call it a Protecting Women and Children Initiative, that would work then with States to go after these coerced abortions, you know, to protect these women, to help States enforce their laws, and to go after these criminals who are using Joe Biden's policies to commit assault left, right, and center?

Mr. Blanche. I very much commit to looking at that. I share your concerns. The story you mentioned, I'm aware

of that story. It's horrible. I think a lot of that is not necessarily a Federal crime, but the Federal Government can certainly help in that space.

Senator Hawley. And I'll end with this, Mr. Chairman. As a former State Attorney General, I can just tell you that when you can get resources in investigation and prosecution, it's immensely helpful. You've had tremendous success with that already under your tenure in other criminal areas. I think that if you were to stand up a full-fledged initiative at DOJ, put somebody senior in charge of it, to go after these actors who are abusing the rules that Biden put in place, I think that would do a lot for women and children and their safety in this country.

Mr. Blanche. Thank you, Senator.

Senator Hawley. Great.

Chairman Grassley. Before I go to Senator Schiff, I'd like to enter another letter in the record. This supports the nominees from civil rights lawyers who litigated cases against the Justice Department across multiple presidential Administrations. The letter states that "Mr. Blanche has gone a long way to restoring faith in the rule of law and has been especially encouraging to pro-life cause for which so long has been relegated to a second-class status."

Without objection, that will be entered in the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Schiff.

Senator Schiff. Thank you, Mr. Chairman. Mr. Blanche, you represented the President in at least three criminal cases: the hush money payment case in New York, the January 6 case, and the Mar-a-Lago classified documents case. You said when you appeared last before this Committee you would consult with ethics lawyers about that apparent conflict of interest in handling any case involving the President having been his personal counsel. Did you consult with Joseph Tirrell, a senior ethics lawyer at the Department?

Mr. Blanche. I believe I met with Mr. Tirrell, yes.

Senator Schiff. Did Mr. Tirrell tell you that ethics laws and policies required that you not be involved in cases involving your prior --

Mr. Blanche. Yes.

Senator Schiff. -- representation of the President?

Mr. Blanche. Yes.

Senator Schiff. So, in those three matters -- the hush money payment case, January 6 case, Mar-a-Lago case -- you were to recuse yourself.

Mr. Blanche. I'm recused, correct.

Senator Schiff. So --

Mr. Blanche. Well, by the way, the cases are not

ongoing, Senator, but to the extent there's any work around those cases, yes, I'm recused.

Senator Schiff. So, you said to CPAC a couple months ago, "The other things that are happening, there is not a single man or woman at the Department of Justice who had anything to do with those prosecutions," meaning the prosecution of the President. She was saying that it's not a conflict of interest for you to be involved in the firing of prosecutors who prosecuted your former client. There's no conflict there? Is that --

Mr. Blanche. No, there is. I wasn't involved. That would be a conflict.

Senator Schiff. So, at CPAC, you're taking credit for the firing of these Department of Justice lawyers, but you're not willing to take responsibility before this Committee. Is that the case?

Mr. Blanche. No.

Senator Schiff. Okay.

Mr. Blanche. There was a statement I gave at CPAC.

Senator Schiff. You were bragging about this at CPAC, the firing of these prosecutors, the firing of the FBI agents. The getting rid of everyone who investigated your client, you were proud of that, speaking for the Department of Justice, but you don't think that's a conflict of interest. You moved to vacate -- I don't think you're

going to deny involvement in this -- you moved to vacate the convictions of 12 Proud Boys and Oath Keepers, which erased their convictions, restored their gun rights. These people were convicted in the January 6 investigation, which also involved the President, who you represented. You were involved in dismissing those cases, were you not?

Mr. Blanche. I'm the Acting Attorney General, so, yes, my Department moved to dismiss. I was not involved, no.

Senator Schiff. So, you didn't recuse yourself from that matter. You're willing --

Mr. Blanche. No. There's no reason. From the Proud Boys matter?

Senator Schiff. Yes, there is --.

Mr. Blanche. I mean, you're a lawyer. You know the rules.

[Cross-talking.]

Mr. Blanche. There are rules that say when I have to recuse --

Senator Schiff. Yes, there are rules --

Mr. Blanche. -- and that's not one of them.

Senator Schiff. There are rules, and when you're told to recuse yourself from investigations --

Mr. Blanche. I always do.

Senator Schiff. -- in things you handle for the

President, you're supposed to recuse yourself. So you have also --

Mr. Blanche. No, when I represented the President.

Senator Schiff. You've also refused to release Volume 2 of the Special Counsel's report. That was an investigation into the Mar-a-Lago documents case. How is that not an abundant conflict of interest, refusing to release to the public an investigative report of an investigation into your client?

Mr. Blanche. I am not a judge. A Federal judge has said it could be released.

Senator Schiff. No, no, no, no, no. The Department's position under you, Mr. Blanche, was do not release the report. If you went --

Mr. Blanche. So, that position --

Senator Schiff. If you went into court asking them to release it, it would be released by now. So, how is that not a patent conflict of interest?

Mr. Blanche. What you're saying happens to not be true. I did not do that. What you're talking about happened before I became the Deputy Attorney General.

Senator Schiff. So, do you support the release of Volume 2?

Mr. Blanche. No, I don't, but I'm recused and had nothing to do with that case. Like, you can't accuse me of

violating my ethical rules and then lie about what I did.

Senator Schiff. So, you had nothing to do with the decision to prohibit the release of the report? You had nothing to do with the President's position?

Mr. Blanche. I wasn't in court. I wasn't the deputy --

Senator Schiff. No, I'm not asking whether you were in court.

Mr. Blanche. I was --

Senator Schiff. I'm asking you whether anyone sought your opinion or used your guidance in refusing to release Volume 2.

Mr. Blanche. When that that litigation was ongoing --

Senator Schiff. You're saying you had nothing to do that decision?

Mr. Blanche. -- I was a private citizen still representing the President of the United States. It was before March. Since March, to the extent there's been anything in front of that judge, I haven't been part of it.

Senator Schiff. Mr. Blanche, I asked you in your last confirmation hearing whether you would release the report, and your answer was no. Your answer was not, "I will recuse my answer myself." Your answer was, no, I will not release the report. That was your testimony last before this committee. You subsequently were advised by ethics

lawyers not to be involved in these matters, but it appears you were involved in these matters. Let me ask you about another matter.

Mr. Blanche. But I wasn't involved.

Senator Schiff. Well, let --

Mr. Blanche. You can't say it appears I was involved when I said I wasn't.

Senator Schiff. All right. Well, let me ask you about another one you have your name on.

Mr. Blanche. Geez. The truth has to matter at some point.

Senator Schiff. It does matter. We just don't hear much of it from you, but let me ask you about another matter you have your name on. I don't think you can deny responsibility here, and that is the IRS settlement agreement.

Mr. Blanche. Yes.

Senator Schiff. So, you put your name on this. That absolves the President of tax liabilities in the past. The President was convicted in the case you represented him in of falsifying business records, in part, for tax purposes. Does this settlement not absolve the President of any liability for tax crimes associated with what he's already been convicted of?

Mr. Blanche. That's not what he was convicted of, not

have anything to do for tax purposes.

Senator Schiff. Well, I'm happy to read the statement of facts: "The participants took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme." So, you know, Mr. Blanche, you --

Mr. Blanche. But the participant there was not the President. It was somebody else.

Senator Schiff. Well, if the President is conspiring with others to falsify business records to help them cheat on taxes, he is also exposed to liability. You know that as well as I do, and --

Mr. Blanche. He can't be audited for that.

Senator Schiff. Of course he can be. Of course he can be, and he can be prosecuted for it, but the agreement you signed on behalf of your former client, on behalf of your current client in a staggering example of self-dealing, prohibits that. Let me ask you this: does this tax agreement, this addendum you signed, also hold him harmless from any audit or tax liability with respect to the billions in crypto money he made in his first year as President?

Mr. Blanche. It's not forward looking, so to the extent there are taxes filed by the President, or his sons, or the Trump Organization after the date of that agreement,

there's no protection.

Senator Schiff. No, but before that agreement, so any taxes --

Mr. Blanche. So, he hasn't filed taxes yet for money he made last year, right?

Senator Schiff. Yes.

Mr. Blanche. So, no.

Senator Schiff. So, if he filed --

Mr. Blanche. So, no protection.

Senator Schiff. If he filed tax returns this year for money he earned last year that his sons earned as his World Liberty Financial all those people earned and defrauded taxpayers on it, he faces no liability under this --

[Cross-talking.]

Mr. Blanche. There's no evidence taxpayers were defrauded, and he is not protected. He is not protected.

Senator Schiff. But there is. There's evidence in this agreement --

Mr. Blanche. He's not protected.

Senator Schiff. -- that you've absolved him of any liability over it.

Mr. Blanche. No, I just said he's not absolved, so the question was --

Senator Schiff. So, this agreement doesn't apply to a tax return filed last year --

[Cross-talking.]

Senator Schiff. -- filed this year --

Mr. Blanche. To tax returns after the date of the agreement, no, it does not apply.

Senator Schiff. Before the agreement. A tax return filed in this calendar year before the agreement --

Mr. Blanche. Before the agreement it applies, not after.

Senator Schiff. Yes. Okay. So, for a tax return filed this year for last year, for the billions he made, there is no tax liability. Even if he cheats on his taxes, or his kids do, or his business do, he is absolved of that further potential liability.

Mr. Blanche. No.

Senator Schiff. Well, it's in the plain language of your agreement. Did you write this language, by the way? Did you --

Mr. Blanche. You have to use the facts, though.

Senator Schiff. Did you --

Mr. Blanche. He hasn't filed taxes yet, so when he files taxes, there's no protection based upon this agreement.

Senator Schiff. Did you write this language?

Mr. Blanche. Did I type it up myself? No.

Senator Schiff. Did you write this language?

Mr. Blanche. No.

Senator Schiff. But you put your name to it.

Mr. Blanche. I did.

Senator Schiff. So, who wrote this?

Mr. Blanche. I don't know the person that actually typed it. I don't know who it is. Someone within the Department of Justice.

Senator Schiff. Was it one of the President's lawyers, or was it someone from the Justice Department or IRS?

Mr. Blanche. This document?

Senator Schiff. Yes.

Mr. Blanche. It would've been somebody within the Department of Justice.

Senator Schiff. But you have no idea who that is?

Mr. Blanche. I don't know the name of the person that typed it up.

Senator Schiff. And did you debate with them the statute of limitations, which clearly would preclude the President's claim, this $10 billion lawsuit?

Mr. Blanche. We had extensive discussions internally about the underlying litigation.

Senator Schiff. And did you reject the statute of limitations defense?

Mr. Blanche. I'm not a judge. I don't reject things.

There was --

Senator Schiff. Well, you signed an agreement for the U.S. --

Mr. Blanche. There was discussion around the litigation.

Senator Schiff. You signed an agreement for the U.S. basically indicating that the Justice Department's position that the statute of limitations applies doesn't matter.

Mr. Blanche. That's not what I said. I didn't say that anywhere.

Senator Schiff. Well, who rejected the 25 defenses the IRS had to this sham lawsuit? Who rejected them? Who said that these defenses we're not going to accept, we're just going to go with the President's agreement in the slush fund and immunity?

Mr. Blanche. There was a lot of discussion internally about this.

Senator Schiff. But you made the decision.

Mr. Blanche. What's the decision? What do you mean?

Senator Schiff. You made the decision to not defend the IRS and the Justice Department. You made the decision and said to sign this slush fund agreement.

Mr. Blanche. We made the decision to settle the case, correct.

Senator Schiff. Yeah, and in doing that, you

basically decided that you were going to be the lawyer for the President and the lawyer for the IRS and the Justice Department.

Mr. Blanche. No.

Senator Schiff. As the Court found in this case, there was no adversarial relationship.

Mr. Blanche. Yes, sir.

Senator Schiff. The Court found it was a sham. It was a collusive relationship. And what I don't understand, Todd Blanche, what happened to the Todd Blanche who was a prosecutor in the Southern District of New York? What happened to the prosecutor people had respect for? What happened to the prosecutor who once respected the rule of law? What happened to the prosecutor who said that there wouldn't be a whiff of political partisanship and then prosecutes the President's enemies over seashells cases, over making a video stating the plain law and Constitution? What happened to the Todd Blanche of the Southern District of New York that could convert him into you, someone willing to say the President has both the right and the duty to prosecute his political enemies?

Mr. Blanche. I never said that.

Senator Schiff. I cannot imagine the Todd Blanche of the old days would have ever done that. What happened to you, Todd Blanche? I'll tell you this. I think Robert

Caro had it right when he said that power doesn't corrupt as much as it reveals. I suspect it has just revealed who you are, and who you are is someone willing to sacrifice everything you once believed in for that title, for that position of Attorney General, and it is a sad story that we have seen from Trump appointee after appointee after appointee. We have seen people compromise themselves little by little and then a lot by a lot, until they're sitting before this committee and trying to justify the unjustifiable. I yield back.

Mr. Blanche. May I just briefly respond, Chairman?

Chairman Grassley. Yes, you may.

Mr. Blanche. Very briefly. So, you asked me what happened to Todd Blanche. I am still here. I am the same exact person I was when I was a Federal prosecutor in the SDNY, which is do the right thing and do everything you can to keep communities safe. So, when I was a line prosecutor, when I was a supervisor, when I was the head of a division, my motivation and my goal was the same thing with the people who worked with me and worked for me, which is do the right thing, enforce the laws, and put bad guys in jail. And so, you spend time talking about --

Senator Schiff. Well, that line prosecutor would never have created a slush fund.

[Cross-talking.]

Mr. Blanche. I did not interrupt you. I did not interrupt you. A little courtesy would be appropriate.

So, when you ask me what has changed, okay, and you talk about a single document that I signed, okay, and somebody had to sign that document when the President sued, okay? So, I tried to do the right thing. What I do every single day and what the prosecutors in this country do every single day, and the nearly hundred thousand indictments and informations that have been filed since January 20 is exactly what everybody in this building should want the Department of Justice to do, which is to make our communities safer, enforce the laws both civilly and criminally, and always do the right thing with integrity, which is exactly what I'm doing. So, I am the same Todd Blanche I was when I was a Federal prosecutor in the SDNY.

Chairman Grassley. Before I call on the last senator to ask questions, I'd like to enter into record a letter supporting the nominee from Peter Forcelli, retired law enforcement officer. As the NYPD homicide detective and ATF special agent, Mr. Forcelli worked alongside Mr. Blanche when he was a prosecutor in the Southern District of New York. The letter states, "I know Todd Blanche to be a quiet, thoughtful, softspoken man, but make no mistake: beneath that measured demeanor is a tenacious, fair, and

deeply ethical Federal prosecutor. He is the kind of lawyer who does not seek the spotlight, yet he consistently delivers results grounded in the law and justice."

Without objection, that is entered in the record.

[The letter appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. Senator Cruz.

Senator Cruz. Thank you, Mr. Chairman. Mr. Blanche, thank you for the job you are doing. It is rich seeing Senate Democrats complaining about weaponization and politicization of the Department of Justice after 4 years in which they were complicit in the greatest abuse we have ever seen of the Department of Justice. I want to do something that was strikingly absent in much of the questioning from our Democrat colleagues, which is actually focus on facts instead of made-up stories, and I want to compare where the Department was under Joe Biden to where it is now under your leadership.

During the Biden Administration, the Justice Department devoted extraordinary resources to investigating and prosecuting President Trump and his supporters. Is that correct, Mr. Blanche?

Mr. Blanche. It is.

Senator Cruz. The Department authorized Operation Arctic Frost, which investigated members of Congress and

other political figures. Is that correct?

Mr. Blanche. Yes, Senator.

Senator Cruz. The Department's senior leadership -- Attorney General Merrick Garland, Deputy Attorney General Lisa Monaco, FBI Director Chris Wray -- all personally approved the opening of this investigation. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. This investigation involved nearly 200 subpoenas, targeted over 400 Republican-aligned groups and individuals. Is that right?

Mr. Blanche. Yes, Senator.

Senator Cruz. And then the FBI obtained, without our knowledge, the cellphone data of 20 percent of the Republicans in the Senate, including me and many of my colleagues on this committee, as well as now FBI Director Kash Patel and now White House Chief of Staff Susie Wiles. Is that correct?

Mr. Blanche. Yes, Senator.

Senator Cruz. Just yesterday, Chairman Grassley revealed that even more senators' communications were targeted. Jack Smith's team obtained and reviewed the text messages of 44 members of Congress, including 19 Republican senators. When the Department of Justice loses sight of criminals because it has turned into a partisan arm of the DNC, the American people pay the price. It also meant the

Department of Justice was not doing its job, which is enforcing the law and putting criminals in jail. During the Biden Administration, there were roughly 12 million encounters at the Southern border. Is that correct?

Mr. Blanche. Yes.

Senator Cruz. Approximately 2 million illegal aliens were known to have entered but were not apprehended, the so-called gotaways. Is that right?

Mr. Blanche. Yes, that's correct.

Senator Cruz. Fentanyl became the leading cause of death for Americans between the ages of 18 and 45. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. That was courtesy of the Democrats: open border policies of letting drug dealers and human traffickers flood into this country because they believed it would benefit them politically. Violent transnational criminal organizations, including the Sinaloa Cartel, the Jalisco New Generation Cartel, MS-13, Tren de Aragua expanded their operations inside the United States. Is that right?

Mr. Blanche. It is absolutely correct.

Senator Cruz. And then something we never heard from the Democrat side of the aisle: the victims. Jocelyn Nungaray, I've not heard one Democrat so much as utter her

name, the little girl tragically raped and murdered by two Venezuelan gang members, the Biden Administration released. Laken Riley, again, the Democrats cannot even say her name. Rachel Moran, a mom brutally raped and murdered by another illegal, the Biden Justice Department released. These were daughters, these were students, these were mothers, and they would be alive if the Department of Justice had done its duty. So, let's compare the lawlessness, the partisanship, the abuse of power of the Biden Department of Justice to what has happened in the last 18 months.

Mr. Blanche, objectively, the American people are safer today than they were 18 months ago. Is that correct?

Mr. Blanche. There is no doubt.

Senator Cruz. Now, that's not simply empty rhetoric. Since President Trump took office, Federal law enforcement has arrested approximately 29,000 violent gang members. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. The Department has disrupted or dismantled approximately 2,700 gangs, a 360-increase over the comparable period of time in the previous Administration. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. Arrests of Tren de Aragua members have increased by approximately 519 percent. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. In 2025, the United States saw the largest one-year drop in violent crime and murder since 1937. Homicides across America's largest cities fell more than 19 percent. Is that right?

Mr. Blanche. That's right.

Senator Cruz. Robberies fell nearly 20 percent. Aggravated assaults fell nearly 10 percent. That trend has continued into this year, with homicides falling by yet another 17.7 percent and robberies by over 20 percent during the first quarter of 2026. Is that right?

Mr. Blanche. It is, yes.

Senator Cruz. The Department has also made protecting America's children one of its highest priorities. Since the beginning of this Administration, the FBI has allocated approximately 7,200 child victims, a 42-percent increase. Is that right?

Mr. Blanche. Yes.

Senator Cruz. The FBI has arrested approximately 3,500 child predators and human traffickers, a 102-percent increase. Is that right?

Mr. Blanche. That's correct.

Senator Cruz. In April alone, Operation Iron Pursuit located more than 200 child victims and arrested more than 350 alleged child sex abuse offenders. Is that right?

Mr. Blanche. That's right.

Senator Cruz. And across my home State of Texas, Operation Soteria Shield rescued 89 children and resulted in 276 child exploitation arrests. Is that right?

Mr. Blanche. That's the correct stat.

Senator Cruz. Mr. Blanche, after less than 18 months, would it be fair to say that the Department is once again focused on protecting the American people and faithfully enacting the laws?

Mr. Blanche. That's exactly what we're focused on, Senator.

Senator Cruz. And I will point out that one direct result of that also is deaths by drug overdoses have dropped 20 percent. There are literally thousands of Americans who are alive today because of the job you and your colleagues at the Department of Justice are doing, and I for one want to say thank you for focusing the Department on saving people's lives and putting criminals in jail.

Mr. Blanche. We have great prosecutors, Senator, and great agents.

Senator Cruz. Now, I want to go to a topic that Senator Hawley asked you about, which is the Biden Administration rule concerning the abortion pill. 18 USC Section 1461, Comstock Act, provides that every article or thing designed or adapted or intended for producing

abortion is declared to be nonmailable. I have to admit that statutory text to me looks quite straightforward. It is not subtle. It is not difficult. It is straightforward. As you know, during the Biden Administration, the Office of Legal Counsel issued an opinion concluding that those provisions generally do not prohibit mailing abortion drugs unless the sender intends them to be used unlawfully. Is that right?

Mr. Blanche. Yes, that's correct.

Senator Cruz. Now, Office Legal Counsel opinions may be reconsidered when the Attorney General concludes they are inconsistent with the law. Is that right?

Mr. Blanche. That is right.

Senator Cruz. Will you commit to carefully reviewing that opinion to ensure that it is faithfully reflects the actual statutory text that Congress enacted?

Mr. Blanche. Yes.

Senator Cruz. Likewise, as Senator Hawley asked, Louisiana v. FDA remains pending before the 5th Circuit. Without asking you to comment on the merits of that litigation, will you commit that the Department will carefully evaluate every lawful action available to ensure the faithful enforcement of the Comstock Act and other Federal pro-life acts?

Mr. Blanche. Yes.

Senator Cruz. And I want to point out the real consequences of the Biden Administration's lawless authorization of mail order abortions. According to FDA reporting, the abortion pill has taken more than 3.7 million unborn lives, caused 24 maternal deaths -- moms are being killed -- and resulted in at least 4,195 adverse maternal reactions, including hemorrhage, excruciating abdominal pain, and severe life-threatening infections. The position of the Democrats now seem to be that women and teenage girls should be able to be get mail order abortions without a doctor being involved at all, and I will tell you, the death toll from that is horrific, and it needs to stop.

Final question. Will you commit as Attorney General to faithfully and vigorously defending the Second Amendment right to keep and bear arms?

Mr. Blanche. Yes, absolutely.

Senator Cruz. Thank you.

Chairman Grassley. Mr. Blanche, thank you for your testimony today, and to your family and friends who are here, I thank you all as well. You should be very proud of your performance today. I think you performed admirably, showed this entire country that you're eminently qualified to serve as Attorney General. If confirmed, I'm confident, very confident that you'll continue to do that superb job.

Now, for everyone's information, written questions can be submitted for the record until 5:00 p.m., this Friday, July 17. I hope, as the nominee, when you receive those questions, please answer and return them to the Committee as soon as possible.

[The information appears in the appendix:]

/ COMMITTEE INSERT

Chairman Grassley. This hearing is adjourned, but I want to say we'll reconvene tomorrow here at 9:00 a.m. for an executive business meeting and hopefully, that doesn't take very long. Immediately following that business meeting, we'll have a panel of outside witnesses on this nomination.

Meeting adjourned.

Mr. Blanche. Thank you, Senator.

[Whereupon, at 2:02 p.m., the Committee was adjourned.]

C O N T E N T S

| STATEMENT OF: | PAGE |
| --- | --- |
| THE HONORABLE CHUCK GRASSLEY<br>a United States Senator<br>from the State of Iowa | 2 |
| THE HONORABLE RICHARD J. DURBIN<br>a United States Senator<br>from the State of Illinois | 11 |
| THE HONORABLE ASHLEY MOODY<br>a United States Senator<br>from the State of Florida | 22 |
| THE HONORABLE TODD BLANCHE<br>to be Attorney General<br>of the United States | 28 |