**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
ALEXANDRIA DIVISION

| | |
|---|---|
| ANDREW FLOYD, *et al.*,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DEPARTMENT OF JUSTICE, *et al.*,<br><br>*Defendants*. | Case No. 1:26-CV-01399 (LMB/IDD) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ANDREW FLOYD, *et al.*,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DEPARTMENT OF JUSTICE, *et al.*,<br><br>*Defendants.* | Case No. 1:26-CV-01399 (LMB/IDD) |

**BRIEF OF *AMICUS CURIAE* LAWYERS DEFENDING AMERICAN DEMOCRACY IN SUPPORT OF PLAINTIFF NATIONAL TREASURY EMPLOYEES UNION'S OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

LOCAL CIVIL RULE 7.1(A) CORPORATE DISCLOSURE STATEMENT ........ v

INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION ........ 2

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 3

I. The Immunity Order violates Section 7217, which exists to insulate the IRS from political interference and to protect public confidence in tax laws. ........ 3

II. The NTEU has associational standing because individual NTEU members face a credible threat of concrete injuries, relief from which does not require individualized proof, and protecting its members' working conditions and legal obligations is germane to NTEU's mission. ........ 11

A. NTEU members face credibly threatened, concrete injuries from the Immunity Order, and would independently have standing to sue in their own right. ........ 12

B. Protecting the working conditions and legal obligations of IRS employees is germane to NTEU's mission as their exclusive bargaining representative. ........ 20

C. The requested relief does not require individual participation of NTEU members ........ 21

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

Page(s)

Cases

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
103 F.4th 765 (11th Cir. 2024) .......... 13

*Am. Postal Workers Union v. Frank*,
968 F.2d 1373 (1st Cir. 1992) .......... 19

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 (1979) .......... 12

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 19

*Friends for Ferrell Parkway, LLC v. Stasko*,
282 F.3d 315 (4th Cir. 2002) .......... 19

*Gratz v. Bollinger*,
539 U.S. 244 (2003) .......... 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 11, 18, 20, 21

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986) .......... 20, 21, 22

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 19

*Nat'l Treasury Emps. Union v. Devine*,
577 F. Supp. 738 (D. D.C. 1983) .......... 11, 16

*Nat'l Treasury Emps. Union v. Horner*,
659 F. Supp. 8 (D.D.C. 1986) .......... 14

*Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*,
508 U. S. 656 (1993) .......... 12

*Southern Walk at Broadlands Homeowner’s Ass’n v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) .......... 17

*Steffel v. Thompson*,
415 U. S. 452 (1974) .......... 15

*Summers v. Earth Island Inst.*,
*555 U.S. 488* (2009) .......... 17

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... Passim

*United Food & Com. Workers Union Local 751 v. Brown Group, Inc.*,
517 U.S. 544 (1996) .......... 11, 12, 21

*Virginia Coal. for Immigrant Rts. v. Beals*,
803 F. Supp. 3d 454 (E.D. Va. 2025) .......... 18

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 11, 19, 21

Statutes

26 U.S.C. § 7214 .......... 18, 3
26 U.S.C. § 7217 .......... Passim
26 U.S.C. § 7401 .......... 9
26 U.S.C. § 7602 .......... 9
28 U.S.C. § 516 .......... 9
Pub. L. 105-206, 112 Stat. 685 .......... 4

Regulations

28 C.F.R. § 0.70 .......... 9

Other Authorities

H.R. 2676 .......... 7
H.R. 2696 .......... 7
H.R. Rep. No. 93-1305 .......... 7
IRM § 3.28.3.5.3 (Nov. 17, 2020) .......... 9
IRM § 4.2.1.15 (Apr. 23, 2014) .......... 9
IRM § 4.8.4.2 (Mar. 12, 2015) .......... 9
JCS-6-98 .......... 6, 5, 8, 9

## LOCAL CIVIL RULE 7.1(A) CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7.1(A)(1)(c), LDAD certifies that there is nothing to report under Local Civil Rule 7.1(A)(1)(a)–(b) because (a) LDAD has no parent, subsidiary, or affiliate entities (corporate or otherwise) that have issued stock or debt securities to the public, and no publicly held entity (corporate or otherwise) owns 10% or more of its stock; and (b) LDAD is organized as a corporation, and not as a partnership or other entity, and therefore has no partners nor owners or members, or other closely held entities.[1]

[1] LDAD is organized as an IRC 501(c)(3) non-profit corporation under the laws of the State of Delaware. LDAD's board comprises of 16 individual persons, all of whom are publicly identified at the following web-address: https://ldad.org/our-board [https://perma.cc/G3SC-ALCU].

## INTEREST OF *AMICUS CURIAE*

Lawyers Defending American Democracy (LDAD) is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of American democracy and law consistent with our obligations as lawyers, demanding accountability from lawyers and public officials, and identifying and prescribing redress for attacks on American legal norms. LDAD's ultimate mission is to defend the underlying constitutional values and norms of political behavior, the rule of law, institutional checks and balances, separation of powers, press freedom and the integrity of our system of justice upon which our democracy depends. LDAD's Board of Directors includes, among others, a retired state supreme court justice, a former state attorney general, retired partners and managing partners of major law firms, past presidents of two state bar associations, business entrepreneurs, and legal academics.

LDAD files this *amicus* brief in support of Plaintiffs because the actions of the government in this case are antithetical to fundamental principles of the rule of law. These actions include a collusive lawsuit in which the President of the United States (along with his sons and the Trump Organization) sued the Internal Revenue Service (IRS) and the Treasury Department, agencies that he directly controls. *President Donald J. Trump, et al. v. Internal Revenue Service et al.*, No. 1:26-cv-20609, S.D. Fl. (Jan. 29, 2026) (*Trump v. IRS*). The so-called "settlement" of that lawsuit resulted in an agreement providing for a $1.776 billion "fund" for payment of claims to the President's political supporters. The next day, Acting Attorney General Todd Blanche (heading a Department of Justice that the President has explicitly said he controls[2]), unilaterally executed an "amendment" to the agreement which purports to "forever

[2] Ellie Quinlan Houghtaling, *Trump Says It's His Right to Weaponize the Department of Justice*, THE NEW REPUBLIC, February 5, 2026, https://www.yahoo.com/news/articles/trump-says-doj-personal-law-160351193.html.

bar[] and preclude[]" the IRS from examining the prior tax returns of the President, his family, and his businesses ("Immunity Order").

## INTRODUCTION

This brief provides the court with important analysis of two issues raised in this matter that Plaintiffs' brief does not discuss in detail. The first is the analysis of 26 U.S.C. §7217, which prohibits Presidential and high-level influence over IRS audits and investigations. The second is the jurisprudence supporting associational standing for Plaintiff National Treasury Employees Union ("NTEU").

No counsel for a party drafted this brief in whole or in part. No party or other entity has made any financial contribution toward the preparation and submission of this brief. Counsel for all parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The legislative history of 26 U.S.C. §7217 makes clear that the core purpose of the statute is to prevent the President and other high-level officials from influencing the conduct of an Internal Revenue Service (IRS) audit or investigation of any particular taxpayer. The grant of immunity to President Trump, his family, and all his businesses under the agreement at issue in this case (the "Immunity Order") is a direct violation of this provision because it results from a putative lawsuit by the President against government agencies over which he exercises control. Indeed, the purported amendment providing for this immunity was issued by the Acting Attorney General, who is the head of a Department that the President has said that he controls, and who has disclaimed any obligation to act independently of the President. The Immunity Order therefore represents Presidential interference with IRS audits and examinations of his own taxes in direct violation of Section 7217. The exclusion of the Attorney General from the persons described in that law was intended to enable that official to exercise pre-existing authority

regarding audits and investigations in connection with *law enforcement activities* that otherwise would violate the statute. It was not intended, in other words, to enable the President to do through the Attorney General what he is prohibited from doing himself, as has occurred in this case.

Plaintiff National Treasury Employees Union (NTEU) has associational standing to challenge the Immunity Order entered into by the defendants in *Trump v. IRS*. NTEU's IRS employee members have standing to sue in their own right because that Order would force one or more of them to choose between, on the one hand, terminating investigations in violation of mandatory IRS policy requiring them to conduct such investigations *and* in violation of their oath of office by supporting an unconstitutional emolument, or, on the other, refusing an instruction from the President of the United States (either directly or indirectly, through the IRS)—all with the attendant risk of discipline, termination, and even criminal exposure under 26 U.S.C. §§ 7214, 7217. Such interests are germane to NTEU's statutory purpose as exclusive representative of the IRS bargaining unit that includes as members all IRS employees who are responsible for mandatory presidential audits, and to its mission and history. Neither the claims asserted nor the vacatur and injunctive relief requested requires the participation of any of NTEU's individual members.

## ARGUMENT

### I. The Immunity Order violates Section 7217, which exists to insulate the IRS from political interference and to protect public confidence in tax laws.

The Immunity Order between President Trump and the Treasury Department and IRS violates 26 U.S.C. §7217 in that it provides for the President's direction to the IRS "to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer" – in this case, himself, his more than 400 business entities, and his

family members. This section describes legislative history that illuminates the background and purpose of this provision in the tax code.

The National Commission on Restructuring the Internal Revenue Service, co-chaired by Rep. Rob Portman and Sen. Bob Kerrey, issued *A Vision for a New IRS* on June 25, 1997.[3] The Commission described isolating the IRS from political pressures as crucial to public confidence in a voluntary tax compliance system: "It is essential that the IRS be insulated from political interference and that the public have complete confidence that the tax laws are being administered in a fair and impartial manner."[4] In 1998, Congress passed the Internal Revenue Service Restructuring and Reform Act of 1998. Pub. L. 105-206, 112 Stat. 685. A provision in this law, codified as 26 U.S.C. § 7217, provides as follows:

> **26 U.S.C. 7217 – PROHIBITION ON EXECUTIVE BRANCH INFLUENCE OVER TAXPAYER AUDITS AND OTHER INVESTIGATIONS**
>
> (a) PROHIBITION.—It shall be unlawful for any *applicable person* to *request, directly or indirectly, any officer or employee of the Internal Revenue Service* to conduct or *terminate an audit or other investigation* of any particular taxpayer with respect to the tax liability of such taxpayer.

(emphasis added).

The term "Applicable Person" is defined in the Statute as follows:

> (e) APPLICABLE PERSON.—For purposes of this section, the term "applicable person" means—
>
> (1) the President, the Vice President, any employee of the executive office of the President, and any employee of the executive office of the Vice President; and

[3] The full text of this report is available at https://www.taxnotes.com/research/federal/other-documents/washington-roundup/full-text-irs-restructuring-commissions-final-report-part-1-of/12db0.

[4] National Commission on Restructuring the Internal Revenue Service, *A Vision for a New IRS*, June 25, 1997, at 12.

> (2) any individual (other than the Attorney General of the United States) serving in a position specified in section 5312 of title 5, United States Code.[5]

Violation of Section 7217 is a criminal offense, punishable by "a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution." 26 U.S.C. §7217(d). The explicit purpose of the Section was to shield the IRS in its audit and investigative capacity from the influence and pressure of the Executive Branch. Such protection is critically important for impartial IRS enforcement of the tax laws, including the investigation of violations of those laws regardless of the identity of the taxpayer. Such impartiality is crucial in maintaining public trust in the integrity of the IRS and the United States tax system. The citizens of this country cannot be expected to have any faith in the fairness of a system that would subject *them* to the full weight of the law for tax code violations while carving out exceptions for other persons based on political or personal favoritism.

The importance of the Section 7217 prohibition was made clear in the General Explanation of Tax Legislation Enacted in 1998 (referred to as the "Blue Book")[6] prepared by the Staff of the Joint Committee on Taxation:

> ***Present and Prior Law***
>
> There was no prior-law explicit prohibition in the Code against high-level Executive Branch Influence over taxpayer audits and collection activity. * * *
>
> ***Reasons for Change***
>
> The Congress believed that the perception that it is possible that high-level Executive Branch influence over taxpayer audits and collection activity could occur has a 'negative influence on

---

[5] The referenced provision, section 5312 of title 5, United States Code, describes the "Level 1" positions of the Executive Branch, essentially, the President and all the members of the Cabinet.

[6] JOINT COMM. ON TAXATION, JCS-6-98, *General Explanation of Tax Legislation Enacted in 1998* (1998).

> taxpayers' views of the tax system. Accordingly, the Congress believed that it is appropriate to prohibit such influence.[7]

The importance of preventing political influence over tax audits and investigations was underscored by Thomas Stanton, then Vice Chair of the National Academy of Public Administration's Standing Panel on Executive Organization and Management, in his statements before the Senate Committee on Finance:

> *The Academy was chartered by Congress and has a special obligation to investigate and report on subjects when called upon by Congress of the Executive Branch.* We carry out our work both through project panels and standing
>
> * * *
>
> Prohibiting political influence in tax enforcement. This Committee is well aware that the nation's tax system must be administered by an impartial, non-political and competent workforce. This has not always been the case. In the early 1950s, the American public was shocked by numerous reports of IRS employee embezzlement and bribery. To halt this corruption, the Finance Committee played a major role in enacting the 1952 congressional requirement that all of the IRS employees under the Commissioner be hired, trained, evaluated, and promoted under the merit system.
>
> Experience since 1952 has demonstrated the wisdom of that congressional decision. The subsequent change in IRS' image was striking. For decades, IRS was viewed as one of the better-managed and professional agencies. *So we urge that this bill continue to stress the importance of a non-political, highly qualified workforce.*
>
> *We strongly support the prohibition in Section 104 of any attempt by some future President or other Executive Branch official to influence tax audits or investigations.* Some of the recently released "Nixon tapes" reveal his anger and frustration over the fact that he had been unable to get the Internal Revenue Service career personnel to audit taxpayers whom he regarded as his political enemies, and that he wanted to get a new Commissioner who would bend the career people to his wishes. There have been reports suggesting that similar efforts were made by other presidents or White House staff as well.

---

[7] JCS-6-98, page 44.

> *We believe that the prohibition on influencing tax audits is so significant that you ought to extend it to cover all political appointees in the Executive Branch.* In addition, we suggest that it be applied to all members of Congress.[8]

The concern about the abuses of the Nixon administration to which Mr. Stanton referred was reflected in the opening remarks of Senator Floyd K. Haskell, then Chairman of the Senate Subcommittee on Administration of the Internal Revenue Code, at the beginning of hearings regarding the Tax Reform Act of 1976:

> Of all the Watergate abuses of power the most alarming to many citizens was the attempt by White House staff to use the Internal Revenue Service for political purposes – to help friends and to harm enemies. The second article of impeachment adopted by the House Judiciary Committee last July charges this specific misuse of the IRS by former President Nixon.[9]

Article I(1) of the Articles of Impeachment of President Nixon charged that he had "acting personally and through his subordinates and agents," endeavored "to cause, in violation of the constitutional rights of citizens, income tax audits or other income tax investigations to be initiated or conducted in a discriminatory manner."[10]

The General Explanation of Tax Legislation Enacted in 1998 reiterated this explanation of Section 7217:

> ***Explanation of Provision***
>
> *The provision makes it unlawful for a specified person to request that any officer or employee of the IRS conduct or terminate an audit or otherwise investigate or terminate the investigation of any particular taxpayer with respect to the tax liability of that taxpayer. The prohibition applies to the President*, the Vice President, and

---

[8] Hearings before the Committee on Finance United States Senate, 105th Congress, Second Session on H.R. 2676, Jan. 28, 29; Feb. 5, 11 and 25, 1998 pp. 394-397 (Prepared Statement of Thomas H. Stanton. Vice Chair of the National Academy of Public Administration's Standing Panel on Executive Organization and Management re: H.R. 2696).

[9] *See* Federal Tax Return Privacy Hearing Before the Subcomm. on Admin. of the Internal Revenue Code of the S. Comm. on Fin., 94th Cong. 147 (1975) (statement of Senator Floyd K. Haskell).

[10] H.R. Rep. No. 93-1305, *Impeachment of Richard M. Nixon, President of the United States* (1974).

> employees of the executive offices of either the President or Vice President, as well as any individual (except the Attorney General) serving in a position specified in section 5312 of Title 5 of the United States Code (these are generally Cabinet-level positions). *The prohibition applies to both direct requests and requests made through an intermediary.*
>
> *Any request made in violation of this rule must be reported by the IRS employee to whom the request was made to the Chief Inspector of the IRS.* The Chief Inspector has the authority to investigate such violations and to refer any violations to the Department of Justice for possible prosecution, as appropriate. *Anyone convicted of violating this provision will be punished by imprisonment of not more than 5 years or a fine not exceeding $5,000 (or both).*[11]

(emphasis added).

As noted above, the definition of "applicable person" includes "(1) the President, the Vice President, any employee of the executive office of the President, and any employee of the executive office of the Vice President; and (2) any individual (other than the Attorney General of the United States) serving in a position specified in section 5312 of title 5, United States Code. 26 U.S.C. § 7217(e). Title 5 of the United States Code § 5312 sets forth an "Executive Schedule" of positions and an annual rate of pay for those positions. The delineated positions include the Secretaries of a number of administrative agencies as well as the Attorney General.

The exception for the Attorney General in Section 7217 does not authorize that officer to bind the IRS to the terms of Immunity Order, which directs the IRS to terminate on-going examinations of the President's tax returns and immunizes the President, his family, and his businesses from any future liability with respect to those tax years. This exception, rather, reflects the function of the Attorney General as the chief law enforcement officer of the United States, and the need to ensure that exercise of the Attorney General's preexisting authority does

---

[11] JCS-6-98, page 44.

not run afoul of Section 7217. With respect to civil enforcement, for instance, 26 U.S.C. §7401 says: "No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced." With respect to criminal enforcement, 26 U.S.C. § 7602 authorizes IRS investigative functions, but 28 U.S.C. § 516 reserves to the Justice Department all litigation in which the United States is interested, and 28 C.F.R. § 0.70 assigns to the Assistant Attorney General, Tax Division, responsibility for prosecution of criminal proceedings arising under the internal revenue laws, with limited exceptions. Without the exception in Section 7217(e), the Justice Department would be unable to carry out these functions without violating that law. It is not surprising, therefore, that there was no need to elaborate the rationale for the exception.

The General Explanation of Tax Legislation quoted above reflects this understanding of the purpose of the exception in stating that "[i]n the case of a *law enforcement action* authorized by the Attorney General, discussions involving specified persons with respect to that law enforcement action shall not be considered to be requests made through an intermediary." JCS-6-98, page 44 (emphasis added).

Any other interpretation of this provision would enable the President to do through the Attorney General what he is prohibited from doing himself. Congress could not have intended to provide such an obvious avenue for circumvention of a statute adopted for the explicit purpose of prohibiting the President from influencing the IRS, with criminal penalties for its violation.

Further, section 3.28.3.5.3 of the Internal Revenue Manual (IRM) requires that "[i]ndividual income tax returns for the President and Vice President are subject to mandatory examinations." *See* IRM § 3.28.3.5.3 (Nov. 17, 2020). *See also* IRM §§ 4.8.4.2 (Mar. 12, 2015)

and 4.2.1.15 (Apr. 23, 2014). It would be hard to imagine a clearer exercise of Executive influence than the Attorney General directing an IRS employee to disregard this requirement for the personal and financial benefit of the President, his family, and their businesses. The exception in Section 7217(e) for the Attorney General therefore must be construed consistently with the underlying concerns that led Congress to adopt that provision and to impose criminal penalties for its violation.

Section 7217 also requires that any IRS employee who receives a request from an applicable person to terminate an audit of the President in violation of Section 7217(a) "shall report the receipt of such a request to the Treasury Inspector General for Tax Administration." 26 U.S.C. §7217(b). Further, any person violating subsection (a) or failing to report such a violation is subject to criminal penalties including fines up to $5,000.00 and a prison term up to five years. 26 U.S.C. §7217(d). Thus, in order for an IRS employee to comply with the purported amendment to the Immunity Order at issue here, they would have to willingly violate both Sections 7217(a) by complying with the request to terminate or forego a mandatory audit and investigation of the President's tax returns *and* violate 7217(b) by failing to report the request, thereby subjecting themselves to criminal prosecution and possible fines and imprisonment. Congress surely did not intend to put IRS employees in the untenable position of having to choose between compliance with a purported settlement agreement engineered by the President on the one hand, and adherence to the mandatory requirements of Section 7217 on the other, all the while putting themselves in jeopardy of criminal liability. To the contrary, Congress made its intent clear when it prohibited the President from requesting "directly or indirectly, any officer or employee of the Internal Revenue Service to conduct *or terminate* an audit or other

investigation." The Immunity Order at issue in this case clearly violates the will of Congress as set forth in 26 U.S.C. § 7217 and therefore must be, *ab initio*, permanently restrained.

## II. The NTEU has associational standing because individual NTEU members face a credible threat of concrete injuries, relief from which does not require individualized proof, and protecting its members' working conditions and legal obligations is germane to NTEU's mission.

It is well-settled that via associational standing, an organization like the NTEU has a legal right to litigate a claim that is, in substance, its members' claim. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Nat'l Treasury Emps. Union v. Devine,* 577 F. Supp. 738 (D. D.C. 1983), *aff'd,* 733 F.2d 114 (D.C. Cir. 1984). Under associational standing, an organization may serve as the representative of members who themselves possess Article III standing when the association's purpose, structure, and relationship to its members provide assurance that it is an appropriate and reliable proxy for their interests. *See, e.g., United Food & Com. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552–57 (1996).

To claim associational standing, the organization must meet each prong of an enduring three-part test set out in *Hunt*: 1) at least one member would "have standing to sue in their own right"; 2) the interests the association "seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The purpose of these requirements is to ensure that the organization is an appropriate representative of members who themselves possess Article III standing, and that the organization has a sufficient stake in the litigation to serve as their legal proxy. *Brown Group*, Inc., 517 U.S. at 555–56 ("*Hunt's* second prong is complementary to the first, because it raises an assurance that the association's litigators will

themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary.").

The NTEU meets each of the three *Hunt* test requirements. This Court should therefore find that the NTEU has associational standing to join this lawsuit.

### A. NTEU members face credibly threatened, concrete injuries from the Immunity Order, and would independently have standing to sue in their own right.

The first *Hunt* prong is essentially Article III's test for standing. *See, e.g., Brown Group*, 517 U.S. at 555. This case falls squarely within the category of cases the Supreme Court has repeatedly recognized are cases or controversies under Article III, which requires that there be 1) an injury in fact, 2) a causal relationship between the injury and the challenged conduct, and 3) a likelihood that the injury will be redressed by a favorable decision. *See, e.g., Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U. S. 656, 663 (1993).

It is well-settled that Article III permits pre-enforcement standing when association members face a "credible threat of enforcement." *See, e.g., Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298–302 (1979) (farm workers' representatives could challenge unenforced provisions because they intended to engage in conduct arguably covered by the statute and faced a credible threat of future enforcement).

The NTEU plaintiff members are the direct subjects of the challenged Immunity Order and have Article III standing because: 1) The Immunity Order credibly threatens them with injury in fact whether they comply or refuse to comply with the Order; 2) This injury is caused directly by the Government's own directives to follow the Immunity Order; and 3) The relief requested by plaintiff NTEU barring implementation of those directives would eliminate the threatened injury.

1. **Injury**

a. **Threatened Injury**

A future injury satisfies Article III if "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The Supreme Court has repeatedly held that Article III does not require a plaintiff who is the object of threatened governmental action to "wait for the government to carry out the threatened action before seeking judicial relief." *Id.* at 158-59. Rather, an injury is "ripe" where a plaintiff alleges an intention to engage in conduct arguably affected by the challenged governmental action and faces a "credible threat" that the challenged action will be enforced. *Id.* at 167. Here, the "conduct" NTEU members will engage in is a Presidential audit mandated by IRS policy, and the challenged governmental action is the Immunity Order that would terminate those audit(s).

In determining whether there is "a substantial risk that the harm will occur," courts evaluate whether the plaintiff has "sufficiently demonstrated an intent to take the action that she asserts is prohibited." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024) (citing *Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003) and noting that "If the plaintiff can show that she is "able and ready" to [take the action], she has demonstrated a concrete injury."). In the instant case, the "action" that the NTEU is asserting is "prohibited" is terminating a Presidential audit.

President Trump's tax returns are being and have been audited annually and, at least absent the Immunity Order, will be audited every year. Am. Compl. ¶¶ 142-144, 161 ("In 2016, President Trump's tax attorneys represented that his returns had been under continuous examination since 2002. * * * On August 3, 2026, President Trump confirmed that he has been "audited every year for my entire life," and repeated that he "was treated very unfairly by the

I.R.S."). *See also* Joseph J. Thorndike, *Why Presidents Are Audited Every Year*, Tax Notes Tax History Project (Feb. 22, 2019), https://www.taxnotes.com/tax-history-project/tax-history-why-presidents-are-audited-every-year/2019/02/22/2957m.

The NTEU represents the career IRS auditors who are statutorily responsible for conducting these mandatory presidential audits and audits of individuals and entities covered by the challenged Immunity Order. Second Am. Compl. ¶ 200 ("It is mandatory for the IRS to audit President Trump's tax returns, and mandatory that a career IRS auditor be assigned to such examination. NTEU represents all non-managerial IRS auditors, who have the primary responsibility for conducting audits for mandatory presidential audits and audits of individuals and businesses covered by the Immunity Order."). The Internal Revenue Manual, Pt. 3, Ch. 28, Sect. 3, provides: "Individual income tax returns for the President and the Vice President are subject to mandatory examinations."

NTEU need not wait until an employee currently auditing the President is ordered to terminate that audit, nor wait until Treasury selects the particular IRS employee who will be directed to conduct future audits of President Trump, before seeking prospective declaratory and injunctive relief. *See Nat'l Treasury Emps. Union v. Horner*, 659 F. Supp. 8, 12–13 (D.D.C. 1986) (holding that the threatened loss of procedural protections, job-retention rights, and promotional opportunities presented a sufficiently immediate injury to confer standing "without the necessity of waiting until a given plaintiff is demoted, fired, RIFed or denied a promotion"). In *Susan B. Anthony List*, the Court held that anti-abortion advocacy organizations suffered a credible threat of injury where they intended to engage in political speech and faced a substantial threat that Ohio's false-statement law would again be invoked against them, even though no future enforcement proceeding had yet commenced. 573 U.S. at 158–67. In coming to this

conclusion, the Court relied on *Steffel v. Thompson,* 415 U. S. 452, 459 (1974), where the petitioner and a companion had been distributing anti-Vietnam war literature. The petitioner left to avoid arrest, but his companion stayed and was arrested. The Court found that the petitioner had alleged a "credible threat of enforcement," in part because his companion's "prosecution showed that his 'concern with arrest' was not 'chimerical.'" *Id.*

The respondents in *Susan B. Anthony List* argued that the petitioner's claims were not ripe for review because the organization had not yet engaged in its planned speech in order to avoid government enforcement. 573 U.S. at 166. Justice Thomas, writing for the majority, distinguished *Younger v. Harris*, where injuries were not ripe because the petitioners had not shown them to be "even…remotely possible." The petitioner in *Susan B. Anthony List* planned to engage in the same speech that had been the "subject of a prior enforcement proceeding." *Id.* at 166-67 ("[Petitioner] is far more akin to the plaintiff in *Steffel*, who was not arrested alongside his handbilling companion but was nevertheless threatened with prosecution for similar speech.").

The NTEU members are similar to both the petitioners in *Susan B. Anthony List* and *Steffel* because they face a credible threat of enforcement. The petitioners in *Susan B. Anthony List* planned to engage in protected conduct in political campaigns that had not even started yet, and here, while an audit hasn't happened yet, and an auditor hasn't yet been assigned, pursuant to the IRM's mandates, both of these events will take place. And while the plaintiffs in *Susan B. Anthony List* alleged only an *intention* to engage in future conduct that might trigger governmental enforcement, NTEU members' ordinary, mandatory job duties will require them to confront the challenged directive itself and immediately choose between conflicting obligations carrying serious employment and legal consequences. As soon as a request is made to terminate

a Presidential audit, these NTEU members will encounter not just threatened injury, but actual, concrete injury, making it clear that the Immunity Order "would certainly create problems if implemented." *See Susan B. Anthony List*, 573 U.S. at 167; *Devine*, 577 F. Supp. at 743–45.

Thus, the NTEU members will be forced to face the horns of a dilemma: When an NTEU member receives a request to terminate an audit pursuant to the Immunity Order, the member must either refuse to comply and report the request as required by federal law—thereby risking discipline or termination in retaliation for insubordination—or comply with the request and fail to report, thereby violating mandatory IRS policy, the member's oath of office and a criminal statute, subjecting the member to the risk of adverse personnel action and criminal penalties. *Id.* ¶¶ 195, 201–05. Am. Compl. ¶ 202 ("A request that an IRS employee terminate an audit under the Order will trigger mandatory reporting by NTEU members to TIGTA [Treasury Inspector General for Tax Administration] and the Secretary or Commissioner. Reporting that the President or the White House violated 7217 raises the concrete risk of subjecting NTEU members to retaliatory firing or discipline. But a *failure to make such a report carries civil and criminal penalties,* including dismissal from their jobs.") (emphasis added).

If the NTEU members choose to comply with their job requirements and those of Section 7217, they face retaliatory firing. Like the petitioner in *Steffel*, who knew that his friend had been arrested, NTEU members know that IRS employee Chief Counsel Kenneth Kies was fired for warning that White House officials were *at risk* of violating federal laws prohibiting a White House request that an IRS audit be stopped. Am. Compl. ¶ 206.

Thus, the injury in this instance is ripe for adjudication because NTEU member IRS auditors will engage in conduct arguably affected by the challenged governmental action, and face a credible threat that the Immunity Order will be enforced.

**b. Identified Member**

Finally, Plaintiffs have "identified" the NTEU members who will suffer harm from the Immunity Order: the career IRS auditors assigned to audits governed by the order. The Second Amended Complaint makes specific factual allegations referencing these specific members who will be directly affected because they will necessarily be called upon to implement the challenged Immunity Order. Second Am. Compl. ¶¶ 199–205. As discussed above, these NTEU members face a credible threat of injury. This identification of NTEU members satisfies the requirement recognized in *Summers v. Earth Island Inst., 555 U.S. 488* (2009), and applied by the Fourth Circuit in *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, where the court held that the association lacked representational standing because it had "failed to identify a single specific member injured" by the challenged conduct. 713 F.3d 175, 181–82 (4th Cir. 2013). In *Broadlands*, the Fourth Circuit explained that requiring identification of an injured member accords with the court's obligation under Article III to ensure that "'plaintiff is the proper party to bring [the] suit.'" *Id.* at 182. The reasoning behind identifying the specific member is not to have a name on a pleading, but rather to provide facts to the court sufficient to assess whether at least one of the association's members has or will suffer an injury in fact.

In *Summers*, the Court required that the party claiming associational standing show more than a "statistical probability" that one of its members be "threatened with concrete injury." *Summers,* 555 U.S. at 497. Unlike in *Summers*, here it is not just a statistical probability that one or more of NTEU's members will be injured if Defendants enforce the Immunity Order, it is a certainty—since NTEU represents all of the IRS employees who could be ordered to terminate a presidential audit or investigation. *Summers* did not address this situation, in which it is a

certainty that at least one of an association's members would be adversely affected by enforcement, and any of those described in the complaint would be harmed in the same ways.

Accepting the Second Amended Complaint's well-pleaded allegations as true at this stage, NTEU has made "specific allegations" based on "specific facts…that one or more of [its] members would be directly affected" if the Immunity Order is allowed to stand. *See Virginia Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 468 (E.D. Va. 2025) ("[At the pleading] stage, it is not necessary that an organizational plaintiff alleging associational standing disclose the identity of the specific member that was harmed as long as they allege a sufficient injury to a member."). The threatened injury is neither conjectural nor speculative, but sufficiently concrete and credible to satisfy Article III and, consequently, *Hunt's* first prong. *See Susan B. Anthony List*, 573 U.S. at 158–67; *Hunt*, 432 U.S. at 343. The challenged Immunity Order operates directly upon IRS employees and would require NTEU members to choose between a risk of discipline, termination and even criminal exposure by terminating mandatory IRS investigations and failing to make an illegal termination request report as required under 26 U.S.C. §§ 7214, 7217, or refusing an instruction from the President of the United States and making the report, risking the retaliation they have seen others who cross the President suffer.

These NTEU employees need not first comply with the directive, violate their statutory duties, or become the subject of disciplinary proceedings before Article III standing arises. The credible threat that they will be required to carry out the challenged directives is sufficient to meet the injury in fact requirement of Article III.

### 2. Causation

Causation is also present here. The challenged Immunity Orders operate directly upon IRS employees themselves. As the Court explained in *Lujan v. Defenders of Wildlife*, when "the plaintiff is himself an object of the action ... at issue," "there is ordinarily little question" that the

challenged action causes injury and that judicial relief will redress it. 504 U.S. 555, 561–62 (1992). The opposite is true only where the plaintiff's asserted injury arises from the government's regulation of someone else; in that case, standing depends upon the independent decisions of third parties not before the court. *Id.* at 562. *See also Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367 (2024) (finding injuries indirect and speculative where the FDA was not directly regulating plaintiff doctors, and their injuries depended on a lengthy chain of independent decisions by others). That is not this case. Here, the asserted injuries arise from directives imposed upon the IRS employees themselves, not from downstream effects of the government's regulation of others. The Immunity Order – not an independent third party – would direct NTEU employees in this instance. If the Immunity Order is allowed to stand, NTEU members will be required to violate their statutory duties and their oaths of office.

**3. Redress**

An association member satisfies the Article III redressability requirement when the requested relief is likely to prevent, remove, or materially alleviate that member's injury. *See, e.g., Warth,* 422 U.S. at 515 (finding that where an association seeks declaratory or injunctive relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 324 (4th Cir. 2002) (emphasizing that standing existed because a favorable decision was "likely" to create the desired opportunity even though plaintiffs could not establish "with certainty" that the downstream event would occur). *Cf. Am. Postal Workers Union v. Frank,* 968 F.2d 1373, 1377 (1st Cir. 1992) (finding no redressability only because existing union members' injuries were wholly past and therefore could not be alleviated by prospective relief).

That setting aside the Immunity Order would redress NTEU member's injuries requires no in-depth discussion. *Res ipsa loquitur*. This Court's order setting aside or vacating the Immunity Order will "prevent NTEU members from being placed in an untenable situation between following an illegal order and violating their oath, or being fired for insubordination." Am. Compl. ¶ 210. *See also* Am. Compl. ¶¶ 202-205. NTEU has met the first prong of the *Hunt* test, because "at least one member would independently have standing to sue in his, her, or its own right." 432 U.S. at 343.

**B. Protecting the working conditions and legal obligations of IRS employees is germane to NTEU's mission as their exclusive bargaining representative.**

Associational standing is not an independent grant of a right to sue; it presupposes that the organization functions as a reliable proxy for members who could sue individually, that those members are the primary beneficiaries of the organization's activities, and that the organization is sufficiently accountable to its membership that its litigation choices can be trusted to track members' actual interests. *See, e.g., Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289–90 (1986) ("The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."). Consequently, to have associational standing, the interests that the NTEU seeks to protect in this lawsuit must be germane to the organization's purpose. *Id.* at 290.

Protecting its members from the types of harms laid out in the Amended Complaint is not only central to the NTEU's mission, it is one of the reasons the organization was founded: "It all started back in 1938 when a group of Internal Revenue collectors organized to improve their working conditions. At the Bureau of Internal Revenue, the pay was low, the work dangerous and many had no civil service protections to protect them from the *whims of political bosses*. Other federal employee organizations were unwilling to represent these revenue collectors

because they were in patronage positions." https://www.nteu.org/who-we-are/history, last visited Aug. 21, 2026 (emphasis added). In explaining "What We Do," the NTEU describes actions that it is taking in this very case: being "the voice of the federal workforce on Capitol Hill, in the courts," fighting "for fair pay and benefits, improved working conditions and other issues that affect the working lives of federal employees." https://www.nteu.org/who-we-are/what-we-do, last visited Aug. 21, 2026.

As the NTEU's mission and founding objectives make clear, the interests that the Plaintiffs seek to protect in this lawsuit are germane to the NTEU's purpose.

### C. The requested relief does not require individual participation of NTEU members.

The third prong of the associational-standing inquiry asks whether "the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. *See also Brown*, 517 U.S. at 553-57 (explaining that *Hunt's* third prong "ordinarily presents no obstacle where an association seeks prospective relief" and that the third prong is not an Article III limitation, but a prudential rule concerned with "administrative convenience and efficiency."). As the Court first explained in *Warth*, "So long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the case, the association may be an appropriate representative of its members." 422 U.S. at 511. *See also Brock,* 477 U.S. at 287 ("An organization of construction firms, we held [in *Warth*], could not seek damages for the profits and business lost by its members because 'whatever injury might have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.' Each member therefore had to be a party to the suit, and the association lacked standing to proceed on his behalf.") (internal citations omitted).

It is not necessary that individual NTEU members participate in the lawsuit because their harms and the redress requested do not change from member to member. *See* Second Am. Compl. ¶¶ 199–205 (The NTEU represents the career IRS auditors responsible for mandatory presidential audits and those members "will necessarily be called upon to carry out the Immunity Order, thereby immediately confronting conflicting legal obligations").

The Plaintiffs ask this Court to determine whether the challenged agreement and its Immunity Order and implementing directives violate the Constitution and federal law. Those questions are purely legal. Resolution of those issues does not depend on the circumstances of any individual NTEU member, nor does it require testimony from bargaining-unit members regarding the extent of their injuries, or any individual monetary or other damages. The legality of the challenged governmental action will be resolved by examining the Immunity Order, OPM/Treasury guidance, the governing statutes, and constitutional principles—not by conducting individualized factual inquiries.

Likewise, the relief sought confirms that individual participation is unnecessary. NTEU seeks declaratory and injunctive relief preventing enforcement of the challenged directives. Such prospective relief would operate uniformly, protecting every bargaining-unit employee subject to the challenged policy without requiring individualized determinations regarding damages or entitlement to monetary relief. *See, e.g., Brock*, 477 U.S. at 287-90. The NTEU members' harms and the relief requested would be the same regardless of which IRS employee is assigned, their individual participation is not required.

Consequently, NTEU has met the third prong of the *Hunt* test because neither the adjudication of the issues in this case nor the vacatur and injunctive relief requested require individual participation by NTEU members.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion, ECF No. 146, and find that Plaintiff National Treasury Employees Union has established standing in this Court and properly pleaded a claim for relief.

Dated: ____________________

**Respectfully submitted,**

Lawyers Defending American Democracy,
*by and through its counsel,*

Christopher Leibig (VSB No. 40594)
LAW OFFICE OF CHRISTOPHER LEIBIG
421 King St. Suite 505
Alexandria, VA 22314
(703) 683–4310
chris@chrisleibiglaw.com

Jonathan Shapiro (VSB No. 13953)
PROFESSOR OF PRACTICE, WASHINGTON & LEE UNIVERSITY SCHOOL OF LAW
441 Lewis Hall
300 East Denny Circle
Lexington, VA 24450
(703) 217–7455
shapiroj@wlu.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on ________________________, I electronically filed this Motion with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Dated: 9-11-26

/s/
Christopher Leibig (VSB No. 40594)