**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
ALEXANDRIA DIVISION

| | |
|---|---|
| **Andrew Floyd, et al.**,<br><br>Plaintiffs,<br><br>v.<br><br>**Department of Justice, et al.**,<br><br>Defendants. | Case No. 1:26-cv-01399-LMB |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO DISMISS**

## INTRODUCTION[1]

Plaintiffs brought this case in an effort to kill the Anti-Weaponization Fund. But the Fund never existed—and even if it did, the Fund is now dead (with several nails in the coffin). The political process has already provided Plaintiffs with all the relief they sought. Rather than take yes for an answer, Plaintiffs insist this civil action must go forward. But the "psychic satisfaction" of the "favorable judgment" they seek is not enough to keep a case alive. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). This Court may have concerns about the non-existent Fund. But the Supreme Court has recently reiterated that "courts may not exceed the bounds of their lawful authority simply because they may think another branch has exceeded its own."

[1] At the outset, Defendants note that Plaintiffs' Opposition brief fails to comply with Local Rule 7(F)(3). It is not double spaced as it contains 27 lines of text per page. Double spaced pages with one-inch margins allow for a maximum of 23 lines per page. Thus, the brief is four and one-half pages over the page limit. Everything appearing halfway down page 25 and later should be disregarded, stricken, and considered waived.

*National Park Serv. v. National Tr. For Historic Preservation in the United States*, 609 U.S. ----, 2026 WL 2564318, at *3 (Aug. 31, 2026). The time has come for this case to end.

Plaintiffs' discovery requests only confirm how far off the rails this litigation has gone. Plaintiffs are seeking, *inter alia*, the President's, and his family's tax return information along with the tax return information of up to 418 organizations not a party to this lawsuit. They have propounded interrogatories, requests for documents, and now 30(b)(6) deposition notices seeking to depose Department of Justice officials about how and why it litigated a different civil action in a different court. And they seek wide-ranging discovery into any plans about how the Department might handle future claims or cases. None of this is material to Plaintiffs' claims or the relief they purport to seek. Indeed, speaking to the media after the prior hearing, counsel for Plaintiffs promised that "We will continue to meet the government in court until our investigation is complete and the slush fund is permanently halted."[2] Clearly, what Plaintiffs really seek is to enlist the Court as a partner in a freewheeling "investigation" and ongoing supervision of the Executive Branch. And the relief they seek—halting the Fund—has already occurred.

This is all a distraction. The only questions for the Court are whether Plaintiffs' claims are justiciable and (in the alternative) whether Plaintiffs have stated plausible claims for relief. Supreme Court precedent makes clear that the answers are unequivocally no.

## I. THE FUND PLAINTIFFS' CLAIMS ARE, BEYOND ALL DOUBT, MOOT.

In cessation cases, the mootness doctrine compels dismissal when circumstances show "the challenged conduct cannot reasonably be expected to start up again." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2017) (citation omitted). The Attorney General testified under oath that "there is no

[2] *DOJ Ordered to Turn Over 'Weaponization' Fund Discovery*, Jared Foretek, LAW360 (Sept. 4, 2026) available at https://www.law360.com/articles/2521979/.

weaponization fund," that "the weaponization fund is dead," and that "it's not moving forward." Senate Judiciary Committee, Nomination Hearing of the Honorable Todd Blanche to be Attorney General of the United States at 1:26:42–49. That is exactly the type of evidence this Court explained would carry the "imprimatur of really serious potential sanctions if that is not a truthful representation." Dkt. 86 at 5:16–25. Even President Trump, characterized by Plaintiffs as "the most vocal proponent of the Fund," Opp. 6, has publicly stated that the Fund is not going forward.[3] And despite Plaintiffs' confusing protests to the contrary, these are obviously "representations about the future of the Fund," Opp. 7, and constitute "commit[ments] to forgo" the Fund. Opp. 6.[4]

Plaintiffs' argument about the absence of a so-called "durable promise" is a red herring. A government defendant can establish mootness based on cessation of conduct "when the governmental entity 'has not asserted its right to enforce [the challenged policy] at any future time.'" *Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989)). This rule grows out of the well-established "presumption 'that a government is acting in good faith when it changes its policy.'" *Redeemer Fellowship of Edisto Island v. Town of Edisto Beach, S.C.*, 2019 WL 1243108, at *4 (D.S.C. Mar. 18, 2019) (quoting *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014)); *see also Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption

[3] *Trump Says Anti-Weaponization Fund In IRS Settlement is 'Dead' Even As He Defends It*, Mary Clare Jalonick et al., YAHOO!NEWS (July 31, 2026) available at https://www.yahoo.com/news/politics/articles/trump-says-anti-weaponization-fund-194732028.html.

[4] Notably, one of the authors of the amicus brief—that the Court previously found "very useful by providing 'the unique perspective of current members of the U.S. Senate,'" Dkt. 79 at 3—cast the deciding vote *for* the Attorney General after receiving assurances that the Fund would not move forward. *See* Senate Roll Call Vote 230, 119th Cong., 2d Sess., On the Nomination of Todd Blanche, of Florida, to be Attorney General.

that they are unlikely to resume illegal activities."); *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

Plaintiffs cannot point to any recent statement in which the government has asserted its right to enforce the policy at a future time. Instead, they rely on *Porter*—which established a requirement of a written promise only "[i]n the context of litigation regarding the policies governing prisoners' conditions of confinement, *in particular*." 852 F.3d at 365 (emphasis added). In any event, statements made under penalty of perjury and subject to other serious sanctions are *more* durable than such parchment promises. And the Rescission Order is an act "unambiguously terminat[ing] the challenged practice." *Id.* (quoting *Doe v. Wooten*, 747 F.3d 1317, 1324 (11th Cir. 2014)). If there were any doubt before, it explicitly "established, beyond any reasonable doubt, that there is no Fund." Dkt. 123-5. It is those actions—not "media attention" or "the public's interest in the AG's decision" that confirm this case is moot. Opp. 7. And Plaintiffs' bare speculation about what "any future AG, or DOJ" might do obviously cannot give rise to a live controversy in this case. *Id*.

Plaintiffs similarly speculate that the plaintiffs in the Florida suit would have sought specific performance of the Settlement Agreement eventually. Opp. 6. For starters, that argument contradicts Plaintiffs' contention that the Fund is illegal, because a party to a contract cannot enforce an unlawful provision. Restatement (Second) of Contracts § 178; *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir. 1987). Regardless, "declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government," is not available. *Sansone v. USPTO*, No. 1:24-cv-19, 2025 WL 696527, at *6 (E.D. Va. Mar. 4, 2025) (quoting *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 833 F. Supp. 2d 524, 534 (E.D.N.C.

2011)); *see also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (explaining "that the Tucker and Little Tucker Acts impliedly forbid federal courts" from "ordering declaratory or injunctive relief . . . in the form of specific performance"); *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) (same); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68, 971 (D.C. Cir. 1982) (explaining that there is a "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract" in "an action against the United States"). There is also a vast body of case law suggesting that mandamus of cabinet officials—which is effectively what Plaintiffs claim would be required under the Settlement Agreement—is an extraordinary remedy reserved for the rarest of cases. *E.g.*, *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

Plaintiffs resort to the frivolous argument that Defendants' "vigorous defense of the legality of the Fund" somehow bears on mootness. Opp. 7. Of course, defendants can (and routinely do) contest the sufficiency of a plaintiff's allegations on the merits without somehow forfeiting threshold arguments about the Court's power to hear the case in the first place. *E.g.*, *Star v. TI Oldfield Dev., LLC*, 962 F.3d 117, 134 (4th Cir. 2020).

## II. NO PLAINTIFF HAS ADEQUATELY ALLEGED STANDING OR RIPENESS.

### A. Plaintiffs Cannot Show Any Impact On Their Rights Because The Fund Never Existed.

For Article III standing and ripeness purposes, any arguments about the Fund, its structure, the nature of the claims it would process, or the procedures through which it would process such claims, could only be based on three documents: the *Trump v. IRS* Settlement Agreement, Dkt. 123-1; the now-rescinded May 18, 2026 Order setting forth the structure of the Fund and allowing for the process to begin, Dkt. 123-3; or the Department of Justice's informational overview document about the planned Fund, Dkt. 123-4.

The Settlement Agreement, executed on May 18, 2026, committed the Attorney General to "within 30 days" establish the Anti-Weaponization Fund. But that provision was still "subject to the terms and limitations described" in the remainder of the Agreement, including a host of future implementing actions (that never occurred). Dkt. 123-1 at 2. First, "within 30 days of the Effective Date," the Attorney General would issue "[a]n accompanying order" which would "establish funding and any other relevant requirements, rules, conditions, terms, and waivers." *Id.* Second, "[w]ithin 30 days of the Effective Date, the Attorney General" would "issue an order appointing the Members, including the Chair of The Anti-Weaponization Fund." *Id.* Third, there would be no quorum without at least three Members. *Id.* Fourth, the Fund's Members would have had "the power to determine its own procedures for submitting, receiving, processing, and granting or denying claims," including but not limited to "reasonable steps to protect private personal and financial information" and "controls and systems to avoid fraudulent claims." *Id.* at 2–4. The planned Fund was also designed to operate "consistent with law," with "the validity of [remaining] provisions . . . not . . . impaired" if any provision were "found by a court to be invalid or unenforceable." *Id.* at 4–5.

Most of that did not happen at all, and none of it happened in a way that stuck. On the same day the Settlement Agreement was signed, the Attorney General issued an accompanying Order (which, again, has been rescinded). Dkt. 123-3 at 1. That Order did not effectuate any transfer of any sum of money, did not establish any "rules, conditions, terms, [or] waivers," and did not appoint any Members, much less a Chair. Likewise, the Department of Justice's informational overview page referred to the Fund as an entity that would come into being at some point in the future, saying it "*will consist* of five members appointed by the Attorney General (AG)," with one member who "*will be chosen* in consultation with Congressional leadership," with funding that

"*will come* from the judgment fund." Dkt. 123-4 (emphases added). In other words, no Fund Members or processes were ever established.

Under a straightforward application of the Supreme Court's recent decision in *Trump v. California*, Plaintiffs have always lacked Article III standing and their claims have never been ripe. In *Trump v. California*, state plaintiffs challenged the constitutionality of several provisions in an executive order designed to maintain public confidence in federal elections. 606 U.S. ----, 2026 WL 2473573, at *1 (2026). One challenged provision consisted of a directive from the President to the Secretary of Homeland Security to "take appropriate action to create and distribute State Citizenship Lists." *Id.* at *2. The Supreme Court explained that, as "an internal directive from the President to a subordinate," the provision "imposes no obligations on the States, so they 'suffer no concrete harm from it.'" *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 134 (2020)). The "true source of any injury," the Court explained, "would be the downstream action that the Secretary *might* take in the future to implement" the provision, which in any event could "be implemented only [t]o the extent feasible and consistent with applicable law." *Id.* (citations and quotation marks omitted).

This meant that, "to support the States' supposedly concrete injury," a federal court would have to accept an "*unduly long chain of inferences*" in a manner inconsistent with Article III's limitation on judicial power. *Id.* (emphasis added). "The District Court first had to speculate about whether it would be 'feasible' for the Secretary to create and transmit the Lists before the midterms." *Id.* (citation omitted). "Next, the court had to predict what 'action' the Secretary would deem 'appropriate' for implementing" the provision. *Id.* (citation omitted). "After all that, the court still had to estimate whether those actions would be taken in a manner substantially likely to harm the States." *Id.* (citation omitted). The Supreme Court explained that such "stacking" of

"hypothetical on hypothetical to speculate that harm will eventually materialize" is "prohibit[ed]" by Article III. *Id.*

Another provision, which the Supreme Court also held the States lacked standing to challenge, "direct[ed] the Postal Service to issue a notice of proposed rulemaking." *Id.* at *4. The provision "order[ed] the Postal Service to initiate the process of proposing a rule that might bind the States in the future." *Id.* It was not itself "a proposed rule, let alone a final rule," and "impose[d] no legal requirements . . . on anyone outside the Executive Branch." *Id.* Like the challenge to the citizenship list provision, here the District Court would have to engage in an impermissible "string of speculations to find this suit justiciable," first speculating "about whether the Postal Service would propose a rule," then speculating "about how the agency would weigh the comments it received," then speculating about "whether the agency would issue a final rule," then speculating "about what the final rule would say," and "[f]inally, after all that, . . . speculat[ing] about whether the text of a hypothetical final rule would harm the States." *Id.*

The same reasoning that led the Supreme Court to conclude that Article III jurisdiction was lacking—under both the standing and ripeness doctrines—applies with full force here. Plaintiffs ask this Court to recognize Article III injury based on predictions about how the Fund would have operated, even though the Fund has never existed, none of its Members have ever been appointed, and no comprehensive procedures governing claims processing have ever been established. "Article III demands more certainty." *Id.* at *2.

**B. Floyd, Caravello, and New Haven Do Not Have Standing.**

Floyd, Caravello, and the City of New Haven contend they have standing because "a Fund for those who faced weaponization at the hands of Democrats but not Republicans violates First Amendment and Equal Protection principles." Opp. 8 (citing Dkt. 123 at ¶¶ 177–181). But a

plaintiff cannot satisfy Article III by advancing an abstract allegation that some practice violates the law. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").

Regardless, on its face, the Fund would not have discriminated on the basis of claimants' viewpoints, nor would it have screened out claims alleging improper weaponization of government by Republican government officials. *See* Dkt. 147 at 16–17. This means the line of cases associated with *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), do not apply. While those cases explain that a plaintiff may sometimes satisfy Article III standing to challenge a government benefits program or employment scheme without applying for eligibility for such a role or benefit, that is only where it is apparent on the face of a policy that the government has "erect[ed] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." 508 U.S. at 666; *see also Turner v. Fouche*, 396 U.S. 346, 361 (1970) (explicitly limiting school board membership to property owners); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 (1978) (racial affirmative action policy). That is not the case here. Plaintiffs do not allege that they would have applied to the Fund or interacted with it in any way. And in that light, they are no different than the Plaintiff in *Nat'l Park Serv. v. Nat'l Trust for Historic Preservation in the United States*, 609 U.S. ----, 2026 WL 2564318, at *2 (2026).

Because Plaintiffs are unable to show that the Fund structurally and/or facially would have discriminated against potential claimants in violation of the First Amendment or Equal Protection clause, Plaintiffs' concerns about viewpoint discrimination amount to a prediction about how any Fund would have operated, and as explained above, such predictions are insufficient to support standing. Even the Opposition acknowledges that Article III standing under Floyd, Caravello, and

New Haven's legal theory requires "a plaintiff *who suffers unequal treatment*." Opp. 8 (emphasis added). The "true 'source of any injury'" to Floyd, Caravello, and the City of New Haven "would be the downstream action that" the Fund "might [have] take[n] in the future" if it had become operative. *Trump v. California*, 2026 WL 2473573, at *2. To the extent any ambiguity or questions remain concerning how the Fund would have been implemented, that only underscores the severe ripeness problems that are fatal to Plaintiffs' claims.

**C. NAF and Common Cause Do Not Have Standing.**

NAF claims that it has standing because its members "have already had to divert significant time and resources from their core activity of facilitating reproductive healthcare to respond to the increased risk of Freedom of Access to Clinic Entrances (FACE) Act violations engendered by the Fund's message to these violators that the Trump Administration supports their activities." Opp. 9. Common Cause's alleged injury is even more attenuated than NAF's. It claims it "*will have to* invest additional time and resources to keep its staff and volunteers safe" because "election deniers will be reinvigorated by" the Fund. Opp. 10 (emphasis added). Both organizations fail to establish Article III standing because "[s]pending money to hedge against a 'speculative threat' does not constitute an Article III injury." *Trump v. California*, 2026 WL 2473573, at *4. "Though it may sometimes be a reasonable reaction to incur certain costs in advance" of agency action, "those costs cannot establish standing" when the action "remains a hypothetical future harm that is not certainly impending." *Id.*; *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

When this Amended Complaint was filed, the Attorney General had already testified under oath that there was not going to be a Fund, so any harm was not "certainly impending." *Id.* The

Amended Complaint incorporates by reference that testimony, Dkt. 123 at ¶ 58 & nn.18, 19, as well as the Rescission Order, *id.* at ¶ 66, and "[c]ourts . . . look to the amended complaint to determine jurisdiction." *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 36 (2025).

Common Cause additionally contends it satisfies Article III because the "secrecy of the Fund's workings impedes Common Cause's ability to carry out its core government oversight functions." Opp. 11. But "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit." *Nat'l Park Serv. v. Nat'l Trust for Historic Preservation in the United States*, 609 U.S. ----, 2026 WL 2564318, at *2 (2026) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024)).

**D. NTEU's Alleged Injuries Are Not Cognizable Under Article III.**

NTEU's claims are constitutionally nonjusticiable because they challenge the Executive Branch's exercise of enforcement discretion, a core Article II power. Dkt. 147 at 20–21. Moreover, the Attorney General has the inherent (and statutory) authority to direct the conduct of litigation in which the United States is a party, including to settle any claim against the United States. 28 U.S.C. §§ 516, 2677. This extends to, and includes, any civil case arising under the internal revenue laws. *See* 26 U.S.C. § 7122; Justice Manual 6-6.100. NTEU does not advance any argument to the contrary. NTEU's Opposition only confirms that any injury suffered by its members consists of disagreement with a particular exercise of core Article II power. *See* Opp. 15 ("[T]he IRS will terminate audits under the Immunity Order."); *id.* ("NTEU's members will be forced to terminate audits under the Immunity Order.").

NTEU's theory of standing is also untenable because it rests on an "unduly long chain" of speculative and attenuated events. *California*, 2026 WL 2473573, at *2. NTEU claims that the so-called "Immunity Order will force NTEU's members to violate their oath of office by providing

the President with an unconstitutional emolument or to risk retaliation and firing for insubordination." Opp. 14. In other words NTEU's theory goes something like: some unnamed IRS employee will, at some point in the future, be ordered to stop doing something (that may or may not be ongoing), and that hypothetical order will be taken by that unidentified employee as a violation of said employee's duty to the Constitution. Then, that unnamed employee will face the Hobson's Choice of violating their oath of office or facing discipline. All of this is absolutely sure to happen, of course, because IRS employees have previously been disciplined for insubordination. The Supreme Court rejected a standing theory based on potential future injury that "relie[d] on a highly attenuated chain of possibilities," including government investigative and enforcement decisions and the rulings of Article III judges in a hypothetical future case in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). It reiterated in *California* that this "unduly long chain of inferences" is insufficient. 2026 WL 2473573, at *2. NTEU falls well short of establishing standing.

The problem for NTEU is, that for the same reason Federal Rule of Evidence 404 prohibits evidence of a person's character trait to prove that "on a particular occasion the person acted in accordance" with that trait, the Supreme Court in *Murthy v. Missouri* held that "the events of the past do little to help any of the plaintiffs establish standing to … prevent future harms." 603 U.S. 43, 62 (2024). Instances of prior discipline within the IRS (or any agency) are unique to the facts of those cases. And if those employees or former employees contend that an adverse personnel action was unlawful, they have processes available to them to seek remedial action. And so too would any employee harmed in the future. But speculation of future harm by an unknown employee on an unknown fact pattern is insufficient to establish Article III standing.

Moreover, the release does not require NTEU's members to do anything at all. NTEU's theory is also illogical; if the release itself is an unconstitutional emolument, then NTEU's members cannot "provid[e]" the President with such an emolument by doing nothing. Regardless, NTEU's premise that they would risk retaliation and firing for whatever unknown acts they appear to think they would need to take to avoid a purported emolument is entirely unfounded. Defendants are not aware of any court ever adopting NTEU's theory of harm—that Executive Branch employees automatically have standing to challenge any directive that they think is unconstitutional, even if that directive does not require them to do *anything*, on the theory that by not doing anything they would be somehow complicit in the purportedly unconstitutional government action.

Supreme Court precedent makes clear that mere offense to government projects is not an Article III injury—otherwise "virtually every citizen" would have "standing to challenge virtually every government action that they do not like." *National Trust*, 2026 WL 2564318, at *2. That rule is no different for government officials who happen to be offended.

Finally, Plaintiffs argue the Fund and May 19 Order contemplated by the Settlement Agreement in *Trump v. IRS*, violate 26 U.S.C. §§ 7217 and 7122. They do not. Section 7122(a) states that the "Secretary [of the Treasury] may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense." That's exactly what occurred here. With respect to the claims under the internal revenue laws, the Settlement Agreement between the parties resolved such claims and was executed by Secretary Bessent's delegate, IRS Chief Executive Officer Frank. J. Bisignano, on May 18, 2026. The May 19 Order, signed by then-Acting Attorney General, merely documented that resolution as part of a settlement. The Settlement Agreement and Order are not a "request" to anyone.

Plaintiffs can only speculate that a "request" to which § 7217 applies will ever be made.[5] Rather, the Secretary resolved potential liabilities of certain taxpayers that purportedly arose before the date of the settlement as § 7122 authorized him to do. But even if the Attorney General did settle the claim unilaterally, he was plainly authorized to do so by virtue of the fact the United States was the defendant in an action for money damages. 26 U.S.C. § 2677. And even if the Court construed the May 19 Order as a request, it was well within his authority per the text of § 7217(e)(2).

## III. PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF.

### A. Plaintiffs Do Not Seriously Contest Their Failure to Allege Final Agency Action.

Plaintiffs fail to meaningfully contest Defendants' argument that they have not alleged final agency action. They cite no materials supporting their statement that a "Fund was created, with specified criteria for applicants and a process for approval of claims." Opp. 24. For the same reasons the Fund Plaintiffs fail to allege Article III standing and ripeness, as explained above, there never was any Fund, no Members were ever appointed, and no procedures were established, as that would have been up to the Members to do. Similarly, there is no final agency action, within the meaning of the APA for NTEU (or any Plaintiff for that matter) to challenge with respect to the May 19 Order.

### B. NTEU's Emoluments Clause Arguments Are Unpersuasive.

#### 1. NTEU's Expansive Interpretation of the Clause is Untenable.

[5] Section 7217 imposes penalties against "applicable persons" who engage in the proscribed conduct. The Attorney General, however, is specifically excluded from the definition of an "applicable person." § 7217(e)(2). Moreover, Plaintiffs' attempt to enforce this provision in this civil action is wholly misplaced. As the Court noted during the Preliminary Injunction hearing, this is not the proper forum to determine whether the Settlement Agreement is legal or enforceable. That question is (if at all) properly raised by an affected taxpayer in a future proceeding where some concrete legal right is at issue.

Properly construed, an "Emolument" under the Domestic Emoluments Clause must arise from the President's service as President. The Clause thus fulfills its natural purpose of ensuring that a President's compensation and other benefits remain unaltered during his tenure, but does not preclude a President from acting on the same terms as any other citizen in transacting business with a federal or state instrumentality. Nor does it constrain the actions of a private organization in which a President may hold an interest.

NTEU's arguments—which appear in its brief in pages in excess of what is allowed under the local rules had the brief been formatted in accordance with the rules—advances the novel view that an Emolument can arise from acts completely unrelated to the President's official duties. NTEU attempts to support its untenable, concededly "expansive" interpretation of the Emoluments Clause with an appeal to the broad interest in eliminating "pecuniary inducement[s]." Opp. 27. But in addition to conflicting with the text, NTEU's interpretation cannot be squared with historical sources. These sources demonstrate that the original public meaning of the term "emolument" was not a generic reference to profit or gain but, rater, gains arising from office or employment. One source from 1766 explained that "[e]molument relates to commissions and employments; intimating, not only the salaries, but, all other perquisites."[6] Another source from 1774 defined the term to mean "profit arising from an office or employ."[7] The Oxford English Dictionary ("OED"), citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[8] Indeed, the definition is closely related to the etymology of emolument, which is profit from labor, or more

[6] John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766) (emphasis omitted).
[7] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).
[8] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.

specifically, from grinding corn."[9] And this definition accords with the Supreme Court's observation that "the term *emoluments*" embraces "every species of compensation or pecuniary profit derived from a discharge of the duties of the office." *Hoyt v. United States*, 51 U.S. 109, 135 (1850); *see United States v. MacMillan*, 253 U.S. 195, 205 (1920) (referring to precedent holding that "a sum collected by a clerk for a service not pertaining to his office or provided for in the schedule of fees allowed him for official services was not a fee or emolument in the sense of the statute").

Executive and Legislative Branch precedents conflict with Plaintiffs' theory that a payment unconnected to official acts constitutes an Emolument. *Contra* Opp. 27. Published opinions of the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC") are in accord with the history discussed above. For example, both components determined that President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "Emoluments" from a State. The Comptroller General explained that President Reagan's pension from California could not "be construed as being in any manner received in consequence of his possession of the Presidency." *See The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983); *see id.* (stating that it is "evident" the Domestic Emoluments Clause "was intended to prevent the President from being subject to influence in carrying-out his duties. . . by rewards given for

---

[9] Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Dictionary of Etymology* 326 (1988) (emolument: "*n.* profit from an office or position. 1435, *in Proceedings of the Privy Council*; borrowed through Middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn, from *émolere* grind out (*é*-out + *molere* to grind; see MEAL grain)"); *The Oxford Dictionary of English Etymology* 310 (1966) (similar).

additional services performed as President"). Similarly, the very OLC opinion Plaintiffs cite, *see* Opp. 27, opined that "those [retirement] benefits are not emoluments in the constitutional sense." *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981)).

**2. NTEU Does Not Have a Cause of Action Under the Emoluments Clause.**

To support its asserted cause of action under the Emoluments Clause, NTEU relies on the principle that courts may "in some circumstances grant injunctive relief" targeting violations of federal law against federal actors as a matter of their equitable authority, even without an Act of Congress. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *see* Opp. 30. But that power is exceptional, and the Supreme Court has made clear that "accord[ing] a type of relief that has never been available before" is Congress's job, not the court's, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). NTEU concedes that the availability of an equitable cause of action to enforce the Emoluments Clause is a "novel" issue, Opp. 30 n.8. In other words, such relief is not available.

**3. NTEU's New *Quid Pro Quo* Theory is an Improper Complaint Amendment.**

For the first time in its Opposition, NTEU alleges that President Trump's nomination of Todd Blanche to the position of Attorney General was itself an official act undertaken in consideration of the Settlement Agreement's release of certain tax claims against the President. Opp. 28. The Court should disregard that theory, which is nowhere in the Amended Complaint. A plaintiff may not use an opposition brief to amend its theory of the case. *Couch v. City of Virginia Beach*, 768 F. Supp. 3d 741, 748 n.7 (E.D. Va. 2025). While the Amended Complaint mentions that Mr. Blanche was nominated to the position of Attorney General weeks after the Settlement Agreement was finalized, NTEU never alleged that was a *quid pro quo*. NTEU's alleged theory of

an Emoluments Clause violation is keyed to its erroneous interpretation of the clause, and it alleged only that "[t]he extraordinary and unprecedented broad release" of relevant claims "is an emolument," regardless of any Presidential official acts. Dkt. 123 at ¶ 239. In any event, this argument is also made in excess of the page limits and should be disregarded for that reason alone.

**CONCLUSION**

Because the court lacks subject-matter jurisdiction and because Plaintiffs fail to state a claim to relief that is plausible on its face, the Court should dismiss the Complaint.

Dated: September 11, 2026

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

*/s/ Andrew J. Block*
ANDREW J. BLOCK
*Senior Counsel to the Associate Attorney General*
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, I filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, thereby serving all counsel who have appeared in this case.

/s/ *Andrew J. Block*
Andrew Block