**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ANDREW FLOYD, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Case No. 26-cv-1399-LMB |

**BRIEF OF AMICUS CURIAE CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTEREST OF AMICUS .......... 1

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. AN EMOLUMENT IS ANY PROFIT, GAIN, OR ADVANTAGE .......... 3

A. At the Founding, the Common-Use Definition of "Emolument" was a "Profit," "Gain," or "Advantage." .......... 3

B. Defendants' Quid Pro Quo Limitation Has No Basis in Text, Structure, Precedent, or History .......... 7

C. The History of the Domestic Emoluments Clause Before and After Ratification Supports the Broad Definition of "Emolument." .......... 10

1. Colonial and revolutionary antecedents of the Emoluments Clauses .......... 10

2. Constitutional Convention and ratification debates support a broad reading of the Domestic Emoluments Clause .......... 12

D. Defendants' References to Founding-Era Practices Are Inapt and Misleading. .......... 14

II. THE RELEASE OF TAX LIABILITY AND THE TERMINATION OF MANDATORY AUDITS IS AN EMOLUMENT. .......... 15

A. The Discharge of a Federal Tax Liability is a "Gain." .......... 16

B. The Immunity Order Conferred Benefits Vastly Disproportionate to the Negligible Value of the President's Underlying Legal Claims. .......... 16

C. Termination of Ongoing and Future Mandatory Presidential Tax Examinations are "Emoluments," Independent of Any Underpaid Taxes. .......... 18

III. THE EMOLUMENTS CLAUSES AND CONSTITUTIONAL OATHS BAR FEDERAL OFFICERS AND EMPLOYEES FROM ENABLING EMOLUMENTS .......... 19

IV. THE APA SUPPLIES PLAINTIFFS A CAUSE OF ACTION FOR THEIR DOMESTIC EMOLUMENTS CLAUSE CLAIM .......... 21

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Cases**

*Blumenthal v. Trump*,
373 F. Supp. 3d 191 (D.D.C. 2019), *vacated as moot,* 949 F.3d 14 (D.C. Cir. 2020) ....3, 9

*Buckley v. Valeo*,
424 U.S. 1 (1976) ....10

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009) ....10

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....3

*Clark v. City of Wash.*,
25 U.S. (12 Wheat.) 40 (1827) ....5

*Consumer Fin. Prot. Bureau v. Cmty Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ....4

*CREW v. Trump*,
953 F.3d 178 (2d Cir. 2019), *cert. granted, judgment vacated*, 141 S. Ct. 1262 (2021) ....1

*D.C. v. Trump*,
315 F. Supp. 3d 875 (D. Md. 2018), *vacated*, 838 F. App'x 789 (4th Cir. 2021) .... *passim*

*Diedrich v. Comm'r*,
457 U.S. 191 (1982) ....16

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ....4, 6

*Griffin v. United States*,
935 F. Supp. 1 (D.D.C. 1995) ....2

*Himley v. Rose*,
9 U.S. (5 Cranch) 313 (1809) ....5

*Kendall v. United States*,
37 U.S. (12 Pet.) 524 (1838) ....21

*Meredith Corp. v. FCC*,
809 F.2d 863 (D.C. Cir. 1987) ....20

*Nat'l Labor Rels. Board v. Noel Canning*,
573 U.S. 513 (2014) ....4, 6

*Trs. of Dartmouth Coll. v. Woodward*,
17 U.S. (4 Wheat.) 518 (1819) ....5

*Trump v. Barbara*,
609 U.S. ___ (2026) ....4

*Trump v. CREW*,
141 S. Ct. 1262 (2021) ....3

**Cases—Cont.**

*In re Trump*,
958 F.3d 274 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) .......... 1, 22

*United States v. Centennial Sav. Bank FSB*,
499 U.S. 573 (1991) .......... 16

*United States v. Kirby Lumber Co.*,
284 U.S. 1 (1931) .......... 16

*United States v. Miss. Valley Generating Co.*,
364 U.S. 520 (1961) .......... 10

*United States v. Sprague*,
282 U.S. 716 (1931) .......... 4

*Wolford v. Lopez*,
609 U.S. ___ (2026) .......... 3

**Constitutional Provisions**

U.S. Const. art. I
§ 6, cl. 2 .......... 9
§ 9, cl. 8 .......... 7

U.S. Const. art. II
§ 1, cl. 7 .......... 2, 6, 7, 12
§ 4 .......... 9

U.S. Const. art. VI, cl. 3 .......... 19

N.H. Const. of 1784 .......... 11

Pa. Const. of 1776 .......... 5, 11

Va. Const. of 1776 .......... 11

**Statutes, Regulations, and Rules**

5 U.S.C.
§ 702 .......... 21
§ 706(2)(B) .......... 21

12 U.S.C. § 5497 .......... 19

18 U.S.C.
§ 202(c) .......... 10
§ 208 .......... 10

26 U.S.C.
§ 61(a)(11) .......... 16
§ 6405 .......... 21
§ 7122(b) .......... 21
§ 7214(a)(8) .......... 21

**Statutes, Regulations, and Rules—Cont.**


§ 7217(a)–(b) ....................21
§ 7431(c)(1)(A) ....................17

5 C.F.R.
§ 2635.101(b)(1) ....................20
§ 2635.101(b)(14) ....................20
§ 2635.502 ....................10

28 C.F.R. § 45.2 ....................10


**Other Authorities**


1 Joseph Story, *Commentaries on the Constitution* § 374 (1833) ....................19

1 *Records of the Federal Convention* (Max Farrand ed., 1911) ....................12

2 *Records of the Federal Convention* (Max Farrand ed., 1911) ....................13

1 Samuel Johnson, Dictionary of the English Language (6th ed. 1785) ....................4

1 Stat. 65 (1789-1799) ....................12

3 *The Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787* (J. Elliot ed., 1827-1830) ....................10, 14

10 *Documentary History of the Ratification of the Constitution* (Merrill Jensen et al. eds., 1976) ....................9

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ....................5

Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13 (1994) ....................2, 7

Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission, 10 Op. O.L.C. 96 (1986) ....................9

Br. of Amicus Curiae by Certain Legal Historians on behalf of Plaintiffs, *CREW v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), ECF No. 70-1 ....................11

Br. of Amicus Curiae by Certain Legal Historians on behalf of Plaintiffs, *D.C. v. Trump*, No. 8:17-cv-01596-PJM (D. Md. Nov. 14, 2017), ECF No. 58-1 ....................12

Charles Rappleye, *Robert Morris: Financier of the American Revolution* (2010) ....................12

"Consular Convention between His Most Christian Majesty and the Thirteen United States of North America," in 4 *The Diplomatic Correspondence of the American Revolution* (1829) ....................12

"Convention Defining and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United States and France," in 1 *The American Diplomatic Code, Embracing a Collection of Treaties and Conventions between the United States and Foreign Powers* ....................12

**Other Authorities—Cont.**


E. James Ferguson, *The Power of the Purse: A History of American Public Finance, 1776-1790* (1961) ....................12

The Federalist No. 55 (James Madison) ....................9

The Federalist No. 73 (Alexander Hamilton) ....................2, 13, 19

H. James Henderson, *Party Politics in the Continental Congress* (1974)....................12

*In re Shaffer*, 62 Comp. Gen. 432 (1983) ....................15

IRM 3.28.3.5.3(3) (Nov. 26, 2024)....................18

IRM 4.2.1.15(9) (Sept. 10, 2025)....................18

IRS News Release IR-2024-172 (June 25, 2024) ....................17

Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* (1979) ....................12

James Barclay, *A Complete and Universal English Dictionary* (1st ed. 1774) ....................5

John Mikhail, *The 2018 Seegers Lecture: Emoluments and President Trump*, 53 Val. U. L. Rev. 631 (2019) ....................4

John Mikhail, *A Note on the Original Meaning of "Emolument",* Balkinazation (Jan. 18, 2017)....................5

John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries* (2017) ....................5, 6

John Mikhail, *"Emolument" in Blackstone's Commentaries,* Balkinization (May 28, 2017) ....................5

Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794) ....................14

Letter from George Washington to Joseph Jones (Dec. 14, 1782), Library of Congress Digital Collection ....................9

Liam E. Cronan, *"In Defiance of Gifts": The Dutch Origins of the Foreign Emoluments Clause*, Touro L. Rev. Vol. 40: No. 2 459 (2025) ....................8

Marissa L. Kibler, *The Foreign Emoluments Clause: Tracing the Framers' Fears About Foreign Influence Over the President*, 74 N.Y.U. Ann. Surv. Am. L. 449 (2019)....................8

Nathan Bailey, Universal Etymological English Dictionary (20th ed. 1763)....................4

Off. of Cong. Ethics, Review No. 17-1147, Report Regarding Rep. Madeline Z. Bordallo (June 2, 2017)....................3

Off. of Inspector Gen., Gen. Servs. Admin., *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease,* JE19-002 (Jan. 16, 2019) ....................14, 15, 20

Order, *Trump v. IRS*, 1:26-cv-20609-KMW, 2026 WL 2015525 (S.D. Fla. July 13, 2026)....................1, 2, 3, 18

Order, *Trump v. IRS*, 1:26-cv-20609-KMW (S.D. Fla. Mar. 3, 2026)....................1

**Other Authorities—Cont.**

President Reagan's Ability to Receive Retirement Benefits from the State of California, 5 Op. O.L.C. 187 (1981) ........ 6

"Proclamation on Intercourse with British Warships, 29 April 1776," *National Archives, Founders Online* (last modified November 26, 2017) ........ 6

*Retired Marine Corps Officers*, B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) ........ 15

Russ Buettner & Paul Kiel, *Trump May Owe $100 Million From Double-Dip Tax Breaks, Audit Shows*, N.Y. Times/ProPublica (May 11, 2024) ........ 18

*Sen. George Mitchell,* B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ........ 6

U.S. Mot. to Dismiss 2d Am. Compl., *Griffin v. IRS*, 22-cv-24023, ECF No. 58 (S.D. Fla. Nov. 27, 2023) ........ 17

U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 8:25-cv-139, ECF No. 31 (D. Md. July 23, 2025) ........ 17

"Virginia Nonimportation Resolutions, 22 June 1770," *National Archives, Founders Online* (last modified November 26, 2017) ........ 6

Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss, 49 Op. O.L.C. __, 2025 WL 3251685 (Nov. 7, 2025) ........ 19

White House, President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL, YouTube (Jan. 31, 2026) ........ 17

Zephyr Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* (2014) ........ 8

Zephyr Teachout, *Gifts, Offices, and Corruption*, Nw. U. L. Rev. Online 30 (2012) ........ 8

## INTEREST OF AMICUS

Citizens for Responsibility and Ethics in Washington (CREW) is a nonpartisan, nonprofit, watchdog organization dedicated to ensuring ethics, accountability, and transparency in government. CREW's staff includes nationally recognized experts on government ethics laws and regulations. Monitoring and identifying potential conflicts of interest in the Executive Branch are among CREW's core functions. For example, the court in *Trump v. IRS*, the underlying "settlement" of which served as the legal predicate for then-Acting Attorney General Todd Blanche's May 19, 2026 Order ("Immunity Order"), cited CREW's investigation into the purported "settlement agreement" to support its holding that "there was never adverseness between the Parties." Order, *Trump v. IRS*, 1:26-cv-20609-KMW, 2026 WL 2015525, at *9 n.18, 56 (S.D. Fla. July 13, 2026).

CREW also has unique expertise in the U.S. Constitution's Emoluments Clauses, having served as counsel for the plaintiffs in litigation challenging President Trump's alleged violations of the Clauses during his first term in office. *See In re Trump*, 958 F.3d 274 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) (deeming case moot due to Trump leaving office); *CREW v. Trump*, 953 F.3d 178 (2d Cir. 2019), *cert. granted, judgment vacated*, 141 S. Ct. 1262 (2021) (same). The *Trump v. IRS* court granted CREW and Public Citizen's motion for leave to file a brief as amici curiae in that proceeding. CREW's brief discussed, in part, the likelihood that any potential settlement would violate the Domestic Emoluments Clause. Br. of Amici Curiae CREW and Public Citizen, *Trump v. IRS*, 1:26-cv-20609-KMW at *7-11 (S.D. Fla. Mar. 3, 2026).

## INTRODUCTION

The Domestic Emoluments Clause ("DEC") is a prophylactic anti-corruption provision. It provides for the President to receive "a Compensation" fixed by Congress during his term in office

and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. The constitutional text—"any" other emolument—is "both sweeping and unqualified." Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 17 (1994). It broadly prohibits the President's receipt of any "profit, gain, or advantage" from the federal government personally or through businesses he owns. *See D.C. v. Trump*, 315 F. Supp. 3d 875, 904 (D. Md. 2018), *vacated*, 838 F. App'x 789 (4th Cir. 2021). "[E]xecutive branch precedent and practice" has been "overwhelmingly consistent" with this "expansive view of the meaning of the term 'emolument.'" *Id.* at 901, 902 (citing sources). Defendants' arguments narrowing the scope of the DEC cannot be reconciled with the text, structure, and history of the Constitution, as well as decades of executive branch precedent.

"The Framers of the Constitution forbade the President from receiving any emolument other than a fixed compensation, in part because they feared the consequences of allowing a President to convert his or her office into a vehicle for personal profit." *Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995). As Alexander Hamilton explained, because "[n]either the Union, nor any of its members, will be at liberty to give … any other emolument" to the President, he would "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." The Federalist No. 73 (Alexander Hamilton) at 4.

The Framers' concerns are directly implicated by the Immunity Order, which was engineered as part of a purported "settlement agreement" that was the "product of collusion" with "no viable basis in law or fact." Order, *Trump v. IRS*, 2026 WL 2015525, at *1, 17. Defendants do not, and cannot, identify any historical precedent for the receipt of such a massive windfall directed to a President, his family, and his businesses, to include "debt relief," "tax discharge,"

and a release from ongoing mandatory tax audits and any associated liabilities. Order, *Trump v. IRS,* 2026 WL 2015525, at *16 ("No sitting President has ever sued federal agencies completely subject to his control for monetary benefits, or any benefits that inure to him, his family, and associates."). The Framers, in their wisdom, prohibited both the President, and any person who could effectuate the collusive Immunity Order, from carrying out such an order's expansive and corrupt terms.

## ARGUMENT

### I. AN EMOLUMENT IS ANY PROFIT, GAIN, OR ADVANTAGE.

The Emoluments Clauses' text, structure, purpose, history, and past application all support a broad interpretation of "emolument" that encompasses almost any "profit," "gain," or "advantage." It is not limited to payments "that result from an individual's official duties." *See* Off. of Cong. Ethics, Review No. 17-1147, Report Regarding Rep. Madeline Z. Bordallo (June 2, 2017).

Before their decisions were vacated as moot due to the expiration of President Trump's first term, two district courts adopted this definition as the correct one. *See D.C. v. Trump*, 315 F. Supp. 3d at 904 ("any profit, gain, or advantage, of more than de minimis value … directly or indirectly"; "In the case of the Domestic Clause, receipt of any emolument is flatly prohibited"); *Blumenthal v. Trump*, 373 F. Supp. 3d 191 (D.D.C. 2019), *vacated as moot,* 949 F.3d 14 (D.C. Cir. 2020); *see Trump v. CREW*, 141 S. Ct. 1262 (2021) ("'Emolument' Is Broadly Defined as Any Profit, Gain, or Advantage").

#### A. At the Founding, the Common-Use Definition of "Emolument" was a "Profit," "Gain," or "Advantage."

In interpreting the Emoluments Clauses, this Court should "begin with [the] text." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997); *accord Wolford v. Lopez*, 609 U.S. ___, ___ (2026)

(slip op., at 13) (courts "beg[in] by asking whether the restrictions imposed by the challenged law fall within the plain text"). Its analysis should be "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)); *Trump v. Barbara*, 609 U.S. ___, ___ (2026) (slip op., at 11-12) (interpreting the Constitution's Citizenship Clause in its "ordinary sense" at the time of ratification). In determining the normal or ordinary meaning of a word, especially a word in a constitutional provision that has not yet been interpreted by a court, the Court should look first to Founding-era dictionaries. *See, e.g., Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 427, 438 (2024) (assessing the meaning of the word "appropriation" by referring to Founding-era dictionaries); *Nat'l Labor Rels. Bd. v. Noel Canning*, 573 U.S. 513, 527 (2014) (assessing the meaning of the word "recess" by referring to Founding-era dictionaries).

At the Founding, the word "emolument" had a common-use definition: "profit," "gain," or "advantage." *See, e.g.*, 1 Samuel Johnson, *Dictionary of the English Language* (6th ed. 1785) ("Profit; advantage."); Nathan Bailey, *Universal Etymological English Dictionary* (20th ed. 1763) ("Advantage, Profit."); *see also* John Mikhail, *The 2018 Seegers Lecture: Emoluments and President Trump*, 53 Val. U. L. Rev. 631, 666 (2019) ("When the Constitution was written, 'emolument' was a flexible term that generally meant 'profit,' 'gain,' 'advantage,' or 'benefit.' It was commonly used in ordinary English to refer to advantages or benefits of different types. Not only government salaries, but also payments on contracts, interest on loans, and profits from ordinary commercial transactions were all referred to as 'emoluments.'"). Indeed, "over 92% of [] dictionaries define 'emolument' exclusively" in terms of "profit," "advantage," "gain," or

"benefit," including the four dictionaries identified by Justice Scalia and Bryan A. Garner as "the most useful and authoritative" of the period. John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries*, 1523-1806, at 1-2, 8, 18 (2017), https://ssrn.com/abstract=2995693 (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 419 (2012)).

The word was often used during the Founding-era in this broad sense—including by the drafters of state constitutions, Blackstone, Supreme Court justices, and the Framers themselves. *See, e.g.*, Pa. Const. of 1776, art. 5 ("[G]overnment is . . . instituted . . . not for the particular emolument or advantage of any single man"); John Mikhail, *"Emolument" in Blackstone's Commentaries*, Balkinization (May 28, 2017), https://goo.gl/jRRYrP (listing examples in which Blackstone used the word to mean "family inheritance, private employment, and private ownership of land"); John Mikhail, *A Note on the Original Meaning of "Emolument"*, Balkinization (Jan. 18, 2017), https://perma.cc/U9N5-GFM7 (providing examples of the Framers—including Jefferson, Washington, and Madison—using the word to refer to "the consequences of ordinary business dealings"); *Himley v. Rose*, 9 U.S. (5 Cranch) 313, 318–19 (1809) (Johnson, J.) ("profits and advantages" from land ownership); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 688 (1819) (Story, J.) ("benefit"); *Clark v. City of Wash.*, 25 U.S. (12 Wheat.) 40 (1827) (Marshall, C.J.) ("profit" or "benefit" from lottery "proceeds").

A second, much less prevalent definition of "emolument" also existed. It was associated with a particular kind of benefit: "profit arising from an office or employ," with "employ" defined as "a person's trade, [or] business." James Barclay, *A Complete and Universal English Dictionary* (1st ed. 1774). This definition was not nearly as common at the Founding. Whereas the primary definition appears in every Founding-era dictionary, the secondary definition "appears in less than

8% of these dictionaries." Mikhail, *The Definition of "Emolument,"* at 1–2.

There is every reason to believe that the Framers intended the broader, more common one to apply.[1] Not only is that the "ordinary" meaning that would have been most understandable to the people at the time, *Heller*, 554 U.S. at 576, but it is also the definition that best fits with the surrounding text and best accomplishes the Clauses' anti-corruption purposes. Indeed, even if the meaning of emolument were "ambiguous," the purposes of the Clauses would "demand[] the broader interpretation." *Noel Canning*, 573 U.S. at 528. Here, that means applying the Clauses to the President's acceptance of profits and other benefits from domestic governments.

The Domestic Emoluments Clause entitles the President to receive "a Compensation" while in office (a fixed salary and benefits) and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. There are no exceptions to this prohibition, and no indications that the Framers meant to exclude the general definition of emolument.[2]

---

[1] The court in *D.C. v. Trump* noted, "George Washington himself used the term 'emolument' frequently in private commercial contexts." 315 F. Supp. 3d at 894 (citing "Proclamation on Intercourse with British Warships, 29 April 1776," *National Archives, Founders Online*, (last modified November 26, 2017), http://founders.archives.gov/documents/Washington/03-04-02-0132 (referring to "wicked Persons, preferring their own, present private Emolument to their Country's Weal"); "Virginia Nonimportation Resolutions, 22 June 1770," *National Archives, Founders Online*, (last modified November 26, 2017), http://founders.archives.gov/documents/Jefferson/01-01-02-0032 (calling for a boycott of sellers of British and European goods who "have preferred their own private emolument, by importing or selling articles prohibited by this association, to the destruction of the dearest rights of the people of this colony.").

[2] OLC has interpreted the Domestic Emoluments Clause to exclude President Reagan's retirement benefits from his service as California governor because they were "vested rights" rather than "gratuities which the state is free to withdraw." President Reagan's Ability to Receive Retirement Benefits from the State of California, 5 Op. O.L.C. 187, 187–88 (1981); *see also Sen. George Mitchell,* B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (reaching same conclusion because pension was "previously earned," "fully vested," and "set by statute"). But this conclusion is consistent with defining emolument to mean "profit" or "gain," because a legal entitlement that was fully vested *before* winning office is not a profit or gain "received" or "accepted" while *in*

### B. Defendants' Quid Pro Quo Limitation Has No Basis in Text, Structure, Precedent, or History.

The Emoluments Clauses contain *no* language requiring a quid pro quo exchange. Beyond lacking any textual foundation, Defendants' argument for such narrowing of the Clauses would eviscerate their purpose, has no basis in precedent, and, as described below, *infra* I.C., is inconsistent with the drafting history of the DEC.

The limitations Defendants attempt to graft on to their narrowed definition are particularly inappropriate because they are entirely unsupported by the surrounding text. The text of the Clauses is "sweeping and unqualified," 18 Op. O.L.C. at 17. The Foreign Emoluments Clause bans "*any*" "Emolument . . . of *any kind whatever*." U.S. Const. art. I, § 9, cl. 8 (emphasis added). Similarly, the Domestic Emoluments Clause prohibits the President's receipt of "*any other* Emolument." *Id.* art. II, § 1, cl. 7 (emphasis added). The additional "any" modifiers in each clause indicate that they were meant to have the widest possible scope.

Defendants' argument that the DEC's "for his Services" language carries into "any other Emolument" to limit its scope misreads the provision. The DEC contains two independent clauses each with their own subject and verb. Defendants' interpretation would render the DEC's second independent clause superfluous, because the first independent clause already fixes presidential compensation. If a President's "Compensation" shall not be "encreased . . . during the Period for which he shall have been elected," then a further prohibition on compensation for services performed as President would be surplusage. Instead, the second clause is best understood as distinguishing "Compensation" for services from "other emoluments" a President might receive from domestic governments and prohibiting the latter. While compensation for services rendered would certainly be an emolument, as explained above, the common founding-era definition of

---

office. It is also consistent with the Clause's purpose.

emolument sweeps much broader. In fact, OLC implicitly rejected the President's argument when it interpreted the word "emolument" to exclude President Reagan's gubernatorial retirement benefits because they were already "vested rights." *See supra* note 2. If the argument were correct, this would have been the most straightforward way of resolving the issue. But OLC did not say that President Reagan could accept the pension for that reason. Instead, OLC assumed that "any other Emolument" includes financial benefits not received as compensation for being president.[3]

Defendant's argument that this interpretation of the DEC would render the FEC's language barring "presents" superfluous is incorrect. This word was likely included in the FEC to ensure that the Clause would cover the acceptance of unreciprocated, possibly unsolicited "gifts" commonly given as a matter of European custom.[4] *See* Zephyr Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* 1–5 (2014). The Framers' decision to use broad and overlapping categories—with expansive modifiers—demonstrates their desire to make certain that they were prohibiting all profits, benefits, and gifts (monetary or otherwise). In any event, "presents" and "emoluments" are not coextensive. A present is gratuitous whether or not it produces net advantage. An emolument is a profit, gain, or advantage whether or not the transfer is gratuitous.

---

[3] The drafting record points in the same direction: "any other Emolument" derives from John Rutledge and Benjamin Franklin's emoluments provision drafted and approved separately from the DEC's compensation provision. *See infra* I.C.2.

[4] The prohibition of "presents" was likely influenced in part by Dutch practice which barred its ambassadors from accepting consular gifts. *See* Zephyr Teachout, *Gifts, Offices, and Corruption*, Nw. U. L. Rev. Online 30, (2012) https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1039&context=nulr_online; Marissa L. Kibler, *The Foreign Emoluments Clause: Tracing the Framers' Fears About Foreign Influence Over the President*, 74 N.Y.U. Ann. Surv. Am. L. 449 (2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3224408; Liam E. Cronan, *"In Defiance of Gifts": The Dutch Origins of the Foreign Emoluments Clause*, Touro L. Rev. Vol. 40: No. 2 459, (2025), https://digitalcommons.tourolaw.edu/cgi/viewcontent.cgi?article=3497&context=lawreview.

"In fact, it seems that when the founding generation intended 'emolument' to refer only to an official salary or payments tied to holding public office, they did so expressly." *D.C. v. Trump*, 315 F. Supp. 3d at 894 (citing The Federalist No. 55) ("emoluments *of office*") (emphasis added); Letter from George Washington to Joseph Jones (Dec. 14, 1782), Library of Congress Digital Collection, https://www.loc.gov/resource/mjm.01_0833_0835/?sp=2 ("if both were to fare equally alike with respect to the emoluments *of office*") (emphasis added). And elsewhere in the Constitution, the Incompatibility Clause uses "the Emoluments whereof" to connect emoluments expressly to compensation for an office. U.S. Const. art. I, § 6, cl. 2. Clause 7 contains no corresponding office-based limitation.

The Impeachment Clause provides further structural support for a prophylactic rule covering all forms of profit, gain, or advantage. Because bribery was already an impeachable offense, U.S. Const. art. II, § 4, a clause limited to proven quid pro quo would therefore contribute little to the constitutional design. *Accord Blumenthal v. Trump*, 373 F. Supp. 3d at 201 ("Given that Article II, Section 4 of the Constitution already addresses the crime of bribery, making it an impeachable offense, there would have been little need to include two additional and distinct Emoluments Clauses prohibiting the acceptance of money from foreign or state governments for official services rendered.") (quoting *D.C. v. Trump*, 315 F. Supp. 3d at 889). A categorical prohibition on receipt avoids the evidentiary problem of proving the bargain itself. *See* Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission, 10 Op. O.L.C. 96, 98 (1986) (referring to the Foreign Emoluments Clause as a "prophylactic provision."). Hamilton's terms—seduction, terrors, allurements, pecuniary inducement—describe the danger of temptation rather than a provable agreement. Mason's warning about detection and Randolph's reference to suspected corruption rest on the same premise. 10 *Documentary History of the*

*Ratification of the Constitution* 1365–66 (Merrill Jensen et al. eds., 1976); 3 *The Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787* 465–66 (J. Elliot ed., 1827-1830).[5]

### C. The History of the Domestic Emoluments Clause Before and After Ratification Supports the Broad Definition of "Emolument."

The framers adopted the Emoluments Clauses to protect against corruption and other threats to republican government and federalism. Both clauses are written broadly to accomplish these purposes. Defendants' arguments unduly limiting the meaning and applicability of the DEC are at odds with historical understandings of the Emoluments Clauses, similar prohibitions adopted from 1776 to 1789, the Framers' use of the word "emolument," and their purposes in adopting the clauses in prophylactically preventing corruption that would otherwise be difficult to prove.

#### 1. Colonial and revolutionary antecedents of the Emoluments Clauses

The DEC arose from the Framers' experience with the effects of the royal governors' dependence on royal favor, leading to widespread colonial disputes over executive compensation. Because the colonial governors depended on fickle royal support, the colonists found that the governors were far more responsive to the whims of the Crown than to the needs of the people

[5] Prophylactic financial-conflict rules are common in federal law and have been consistently upheld for decades. *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 549–50 (1961) (conflict-of-interest statutes require no proof of actual corruption or loss); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Buckley v. Valeo*, 424 U.S. 1, 27–28 (1976) (contribution limits justified by the difficulty of proving actual quid pro quo). Agency regulations contain similar prophylactic rules. 5 C.F.R. § 2635.502 (limits on participation in matters where participation "would cause a reasonable person to question their impartiality"); 28 C.F.R. § 45.2 (disqualification from participating in criminal investigations or prosecutions based on "personal or political relationship"). Because the President is exempt from these laws, including the criminal conflict statute, 18 U.S.C. §§ 208, 202(c), only the DEC is left to address the collusive Immunity Order.

they governed. *See generally* Br. of Amicus Curiae by Certain Legal Historians on behalf of Plaintiffs, *CREW v. Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017), ECF No. 70-1, at 12.

In response, many early state legislatures fixed executive compensation in their constitutions. *See, e.g.*, Va. Const. of 1776 ("no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services"); Pa. Const. of 1776 ("government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or [sort] of men, who are a part only of that community"); N.H. Const. art. 10 (1784 text) ("Government being instituted for the common benefit, protection, and security, of the whole community, and not for the private interest or emolument of any one man, family, or class of men . . . .").

In the years between the drafting of the first state constitutions in the 1770s and the calling of the Federal Convention of 1787, these prohibitions on emoluments were seriously tested. Without an institutional bureaucracy, the Continental Congress and the state legislatures necessarily relied on merchants to obtain the goods needed to sustain the American Revolution. There were no mechanisms readily available to monitor these exchanges. Charges of corruption, which were often easy to offer but difficult to prove, flowed freely.[6] Merchants like Robert Morris, who played a critical role in importing military supplies while also serving as Superintendent of

[6] The Framers chose a categorical prohibition precisely to avoid the evidentiary inquiry Defendants now demand: proof of a bargain. While the Court need not determine whether Plaintiffs have alleged an exchange, *see supra* I.B, the allegations in the First Amended Complaint establish one. Blanche released all federal claims against the President, his family, and his businesses; three weeks later, the President nominated Blanche for U.S. Attorney General. FAC ¶ 2.

Finance, frequently blended their public and private ventures.[7] Drawing a manageable line between these activities proved both difficult and controversial, leading to further emoluments restrictions being enacted in the lead-up to the Constitutional Convention.[8]

**2. Constitutional Convention and ratification debates support a broad reading of the Domestic Emoluments Clause**

Learning from the colonial experience, the Framers drafted the DEC's compensation and emoluments provisions separately to serve different purposes. By the end of the Convention, they were ultimately combined into art. II, § 1, cl. 7.

The language of the compensation provision, including the "for his services" modifier, requiring the national executive (eventually the president) to receive a fixed salary traces directly to Edmund Randolph's Virginia Plan, introduced on May 29, 1787. *See* 1 Records of the Federal Convention 81–85 (Max Farrand ed., 1911) ("a National Executive be instituted; to be chosen by the National Legislature for the term of years, to receive punctually at stated times, a fixed compensation for the services rendered, in which no increase or diminution shall be made so as to affect the Magistracy") (Madison's notes). After Benjamin Franklin's June 2 proposal to pay the executive nothing was considered and rejected, *id.*, the Convention unanimously agreed to include

---

[7] *See* Brief of Amici Curiae by Certain Legal Historians on Behalf of Plaintiffs at 14 & n.41, *D.C. v. Trump*, No. 8:17-cv-01596-PJM (D. Md. Nov. 14, 2017), ECF No. 58-1 (citing E. James Ferguson, *The Power of the Purse: A History of American Public Finance, 1776-1790*, at 70-105 (1961); H. James Henderson, P*arty Politics in the Continental Congress* 218-245 (1974); Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* 249-274 (1979); Charles Rappleye, *Robert Morris: Financier of the American Revolution* 149-197, 331-357 (2010).

[8] Emoluments restrictions were placed in the 1784 Consular Convention with France, the 1788 Consular Convention with France, and the 1789 Act to Establish the Treasury Department. *See* "Consular Convention between His Most Christian Majesty and the Thirteen United States of North America," in 4 *The Diplomatic Correspondence of the American Revolution* 198-208, 199-200 (1829); "Convention Defining and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United States and France," in 1 *The American Diplomatic Code, Embracing a Collection of Treaties and Conventions between the United States and Foreign Powers* 70-82; *See* 1 Stat. 65 (1789-1799).

a Presidential compensation provision on July 20, 1787. 2 Farrand 69. The substance of the compensation provision was settled by the Committee of Detail and added to its August 6 draft of the Constitution. 2 Farrand 146, 172, 177, 185. The Committee of Style subsequently reported the provision complete on September 12, 1787. 2 Farrand 590, 599.

On September 15, three days later and two days before the Convention adjourned, the possibility of a president receiving other benefits while in office was considered for the first time. John Rutledge and Franklin moved to append an entirely new provision to the previously-approved compensation language: "and he (the President) shall not receive, within that period, any other emolument from the U.S. or any of them." 2 Farrand 626. The Convention adopted the provision 7 to 4 without debate. *Id.* By its own terms, the emolument provision identifies only two limits: a temporal limitation ("within that period") and a source limitation ("from the United States, or any of them"). It says nothing about services, offices, or official acts. That drafting history forecloses treating "for his services" as a qualification of "emolument": the phrase was neither drafted as a modifier of "emolument," nor used as one in the provision the Convention ultimately adopted.

In his Federalist 73 arguing for the ratification of the Constitution, Alexander Hamilton defended the DEC's limitation of *both* the President's "salary *and* emoluments" as a protection of the separation of powers and defense against corruption. The Federalist No. 73 at 4 (emphasis added). Fixing the president's salary, Hamilton argued, was critical to protect against "intimidation or seduction of the Executive by the terrors or allurements of the pecuniary arrangements of the legislative body." *Id.* More broadly, however, Hamilton stressed that "[n]either the Union, nor any of its members, will be at liberty to give, nor will be at liberty to receive, any other emolument," because the President "can, of course, have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *Id.* Both the Constitution's fixing of

compensation *and* its limiting of emoluments, Hamilton argued, was a broad prophylactic loyalty and anti-corruption mechanism.

Modeled after similar provisions in state constitutions, the DEC received little attention during the ratification debates. To the extent the Emoluments Clauses were discussed, they indicate that emoluments were understood broadly. For example, Randolph told the Virginia convention that "[a]ll men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community." 3 Elliot's Debates 465–66. A natural right to receive emoluments "from any one" is difficult to reconcile with a definition limited to official salary.

**D. Defendants' References to Founding-Era Practices Are Inapt and Misleading.**

Defendants' cited historical examples do not support their argument. Beginning with Washington's 1793 lot purchases, the historical record indicates that the land Washington purchased was privately owned and that the "sales did not provide a benefit from the United States." Off. of Inspector Gen., Gen. Servs. Admin., *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease*, JE19-002, at 15–16 (summary), App'x A, at 2–4 (Jan. 16, 2019), https://perma.cc/NMF8-NKNY. The commissioners who conducted the sales of the lots acted pursuant to authority held by trustees who held the land on behalf of private owners, rather than under authority of the United States. *Id.* Further, Washington was the *purchaser* rather than the *seller*. Founding-era uses did not tend to apply to a purchaser as they would to the seller.

Washington's own defense to any concern about the sale rested on his equal footing with other buyers. He wrote that he had "no desire … to stand on a different footing from every other purchaser" and was "ready to relinquish." Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), https://tinyurl.com/4r3npbpd. Immunity from tax

liability conferred by the President's appointees on the President is different in kind. No other audit target or tax debtor has ever secured, or could ever secure, such an immunity deal.

The export transactions involving Washington's gristmill and Jefferson's tobacco crop do not alter the analysis. The Foreign Emoluments Clause does not prohibit overseas sales or sales to foreign buyers. Only profit gained from sales to foreign governments or royalty would be prohibited. There is no evidence that either man sold to such a buyer. Off. of Inspector Gen., Gen. Servs. Admin., JE19-002, at 15–16.

## II. THE RELEASE OF TAX LIABILITY AND THE TERMINATION OF MANDATORY AUDITS IS AN EMOLUMENT.

The immunity from any civil and criminal liability purportedly granted by then-Acting Attorney General Blanche to President Trump, his family, his businesses, and all others deemed to be "related" or "affiliated," including a release of tax liability and tax audits, is an emolument in violation of the Constitution's Domestic Emoluments Clause. The transaction's formal nomenclature or structure does not determine whether the Immunity Order would confer a prohibited gain to the president. *See In re Shaffer*, 62 Comp. Gen. 432, 434 (1983) ("such unity of interest and ownership") (substance, rather than form, controls emoluments analysis); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) at *3 (analysis turns on "the actual relationship involved and not merely on form"). Defendants described the substance of the transaction in the May 19 Immunity Order. In their own brief, they characterize the Order as conferring "no monetary payment or damages of any kind," while acknowledging that it was a "tax discharge" that released claims "including for 'tax payments' or 'debt relief.'" *See* Defs.' Br. at 4, 30.

Not only is the discharge of tax liability a clear gain, but it far exceeds the value of the President's near-worthless claims underlying the collusive settlement resulting in the Immunity

Order. And independent of the dollar value of any discharged taxes owed by the President, the termination of legally required examinations that were reportedly already underway is itself an advantage not available to other taxpayers, constituting an unlawful emolument.

**A. The Discharge of a Federal Tax Liability is a "Gain."**

Defendants do not dispute that the Immunity Order's discharge of a tax liability is a "gain," nor could they. Their brief describes the Immunity Order as "a tax discharge President Trump received." Br. at 30. The United States has long recognized that such a "discharge" of an obligation is a realized gain for tax purposes. *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3 (1931) (retirement of an obligation for less than face value is realized gain); *see* 26 U.S.C. § 61(a)(11) ("Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) . . . Income from discharge of indebtedness"). The Supreme Court has repeatedly reaffirmed that principle. *See United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 580–83 (1991) ("[T]he term 'discharge . . . of indebtedness' conveys forgiveness of, or release from, an obligation to repay."); *Diedrich v. Comm'r*, 457 U.S. 191, 194–97 (1982) (a taxpayer "relieved of [a] tax liability realizes an economic benefit"). Any argument by Defendants that such a discharge would not constitute a "gain" under the DEC would lead to the absurd result of the United States treating discharge of indebtedness as a realized gain for every other taxpayer, while maintaining that an identical discharge produces no "gain" to the President for purposes of Article II.

**B. The Immunity Order Conferred Benefits Vastly Disproportionate to the Negligible Value of the President's Underlying Legal Claims.**

President Trump's claims—seeking a jaw-dropping $10 billion in damages for the leaking of his tax returns by government contractor Charles Littlejohn—was subject to formidable threshold defenses that the United States had vigorously litigated in similar cases concerning

Littlejohn's leaks. *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF No. 58 (S.D. Fla. Nov. 27, 2023) (seeking dismissal because, among other things, Littlejohn was not a government employee); U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 8:25-cv-139, ECF No. 31 (D. Md. July 23, 2025) (same). For example, President Trump was required to bring this claim within two years of discovering the unauthorized disclosure of his tax returns. And because President Trump had alleged no actual damages, the most that President Trump could recover is $1,000 per unauthorized disclosure by a government employee. *See* 26 U.S.C. § 7431(c)(1)(A). But rather than zealously guarding the public fisc, the President made good on his promise to "work out a settlement with myself,"[9] resulting in an Immunity Order which was "a product of collusion" with "no viable basis in law or fact." Order, *Trump v. IRS*, 2026 WL 2015525, at *1, 38, 55.

The exchanged claim therefore had little or no demonstrated value. Had the claim been brought in a timely manner, *Griffin* supplies a market reference point for the settlement of a Littlejohn disclosure claim litigated at arm's length: a written apology and zero dollars. *Griffin v. IRS*, No. 22-cv-24023 (S.D. Fla.); IRS News Release IR-2024-172 (June 25, 2024). The Immunity Order, on the other hand, conferred enormous value to President Trump: by releasing all claims held by the United States (a release not granted in *Griffin*), terminating mandatory examinations, and extending immunity to family members and affiliated entities that were not parties to the suit. *See* Settlement Agreement, FAC, Ex. A ¶ III.B. The exchange ran one way. By failing to defend against the President's non-meritorious claims and instead entering into an unprecedented and collusive immunity agreement, Defendants conferred on the President precisely the type of "profit,

---

[9] White House, President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL, YouTube (Jan. 31, 2026), https://tinyurl.com/mr3p3ac8 (at 02:40).

gain, or advantage" that the Domestic Emoluments Clause prohibits. *D.C. v. Trump*, 315 F. Supp. 3d. at 904. The *Trump v. IRS* finding that President Trump "controls this litigation" and "leverage[d] control over Defendants" to secure the Immunity Order underscores its gratuitous nature. Order, *Trump v. IRS*, 2026 WL 2015525 at *17, 18.

**C. Termination of Ongoing and Future Mandatory Presidential Tax Examinations are "Emoluments," Independent of Any Underpaid Taxes.**

The Immunity Order's release of President Trump from the legally required annual presidential audits would constitute an emolument in violation of the DEC, even if President Trump would owe no additional tax as a result. In addition to discharging any tax claims against the President, his family, and affiliates, it purports to release the President from ongoing and future tax examinations required by law, preventing the IRS from auditing his tax returns and from recovering any underpaid taxes. *See* FAC ¶¶ 150-153. The examinations are non-discretionary. IRM 4.2.1.15(9) (Sept. 10, 2025); *see also* IRM 3.28.3.5.3(3) (Nov. 26, 2024). These audits were reportedly underway at the time the Immunity Order was signed. *See* FAC ¶¶ 160-174.

The value conferred to the President by the termination of these ongoing audits is substantial. When the Immunity Order was signed, the IRS was reportedly investigating President Trump's deductions claimed from his Chicago tower and hotel, which alone carried a reported exposure exceeding $100 million. Russ Buettner & Paul Kiel, *Trump May Owe $100 Million From Double-Dip Tax Breaks, Audit Shows*, N.Y. Times/ProPublica (May 11, 2024), https://www.nytimes.com/2024/05/11/us/trump-taxes-audit-chicago.html. The Immunity Order would terminate that exposure, resulting in a net gain to the President and his business for any additional taxes due.

And an unlawful emolument would exist even if the audit does not uncover any underpaid taxes. The Immunity Order confers an advantage to the President that no other taxpayer, perhaps

even no other president, shares. Future presidents remain subject to the mandatory audit program and all associated compliance costs. Regular taxpayers remain subject to standard IRS audits and all associated compliance costs. The Immunity Order advantages the president above them all.

## III. THE EMOLUMENTS CLAUSES AND CONSTITUTIONAL OATHS BAR FEDERAL OFFICERS AND EMPLOYEES FROM ENABLING EMOLUMENTS.

The Domestic Emoluments Clause restricts the conduct of both the President and any person who could enable him to "receive" prohibited emoluments. *See* Federalist No. 73 at 4 ("[n]either the Union, nor any of its members, will be at liberty to *give*…") (emphasis added). The Clause thus prohibits *any* federal official, including members of the National Treasury Employees Union ("NTEU"), from taking action that enables the President to "receive" the "profits," "gains," and "advantages" of the collusive, gratuitous Immunity Order.

Treasury officials, including NTEU members, have an affirmative duty to consider potential Emoluments Clause violations in effectuating the Immunity Order and refuse to effectuate the order to the extent it violates the DEC. Under the Constitution's Oath or Affirmation Clause, "all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI, cl. 3. Officers under the oath are "conscientiously bound to abstain from all acts[] which are inconsistent with" the Constitution. Joseph Story, 1 *Commentaries on the Constitution* § 374, at 255 (1833); *see also* Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss, 49 Op. O.L.C. __, 2025 WL 3251685, at *22 (Nov. 7, 2025) ("The Oath or Affirmation Clause effectively charges each covered official with considering the constitutionality of their actions."); *Meredith Corp. v. FCC*, 809 F.2d 863, 874 (D.C. Cir. 1987) ("Federal officials are not only bound by the Constitution, they must also take a specific oath to support and defend it. … The [FCC's] failure

to [consider a properly raised constitutional claim] seems to us the very paradigm of arbitrary and capricious administrative action."). Moreover, the Standards of Ethical Conduct for Employees of the Executive Branch requires employees "to place loyalty to the Constitution, laws, and ethical principles above private gain," 5 C.F.R. § 2635.101(b)(1), and to "endeavor to avoid any actions creating the appearance that they are violating the law or … ethical standards," *id.* § 2635.101(b)(14).

During President Trump's first term, the Office of the Inspector General of the General Services Administration (GSA) issued a scathing report faulting the agency for willfully "ignoring" potential violations of the Constitution's Emoluments Clauses in approving a federal lease with a Trump-owned entity. Off. of Inspector Gen., Gen. Servs. Admin., JE19-002, at 10. As the Inspector General found, "the decision to exclude the emoluments issues from GSA's consideration of the lease was improper because GSA, like all government agencies, has an obligation to uphold and enforce the Constitution." *Id.* at 1; *see also id.* at 17 ("As an executive agency of the United States, both GSA and its employees have an obligation to ensure that agency actions comply with the law . . . Like any other federal agency, it is not only appropriate that GSA address potential violations of the Constitution that arise with its activities, GSA cannot ignore them. GSA did not fulfill that obligation.").

NTEU members' duty to refrain from enabling the President to receive any domestic emoluments is reinforced by the specific statutory duties effectuating the Immunity Order would violate. Since 1838, in its seminal decision in *Kendall v. United States*, the Supreme Court has made clear that federal officers remain bound by their statutory duties notwithstanding contrary presidential direction. 37 U.S. (12 Pet.) 524, 610, 613 (1838) (asserting that a contrary rule "would be vesting in the President a dispensing power, which has no countenance for its support in any

part of the Constitution; and is asserting a principle which, if carried out in its results to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice.”). Treasury employees who receive an unlawful request “to conduct or terminate an audit or other investigation of any particular taxpayer” must report it. 26 U.S.C. § 7217(a)–(b). A related provision requires a revenue officer to report in writing information concerning such conduct and imposes dismissal and criminal penalties for failure to do so. *Id.* § 7214(a)(8). Other statutory duties point in the same direction. *Id.* § 7122(b) (written General Counsel opinion required for specified compromises); *id.* § 6405 (refunds above the statutory amount reported to the Joint Committee before payment). The Immunity Order places the officers responsible for implementing it at risk of criminal sanction.

## IV. THE APA SUPPLIES PLAINTIFFS A CAUSE OF ACTION FOR THEIR DOMESTIC EMOLUMENTS CLAUSE CLAIM.

While Defendants wrongly contend that no cause of action exists in equity to restrain federal officers from violating the Domestic Emoluments Clause, the Court may resolve the claims here without deciding whether the Clause is independently self-executing. Counts V through VIII arise under the APA. Section 702 waives sovereign immunity for suits seeking relief other than money damages. 5 U.S.C. § 702. Section 706(2)(B) directs a reviewing court to hold unlawful and set aside agency action “contrary to constitutional right, power, privilege, or immunity.” *Id.* § 706(2)(B). The APA thus supplies a cause of action for Plaintiffs here to enforce the Domestic Emoluments Clause.

That distinction also addresses the institutional objection raised by the *In re Trump* dissenters. They criticized a judge-made action said to “confer no right, provide no remedy, and lack all guidance in precedent and history.” 958 F.3d at 297 (Wilkinson, J., dissenting). That objection concerned a freestanding implied constitutional action. It does not apply where Congress

has authorized APA review. The statutory cause of action supplies the procedural vehicle, and the Constitution supplies the substantive rule of decision.

## CONCLUSION

The Constitution's Emoluments Clauses reflect the fundamental republican value that government is a public trust derived directly from the people and that the material benefits it provides are to be regarded solely as a compensation for public duties, and not a means of personal enrichment. The Domestic Emoluments Clause safeguards this value by broadly restricting the conduct of both the President and any person who could enable him to "receive" prohibited "profits," "gains," or "advantages" from the federal government. For the reasons stated above, this Court should reject Defendants' arguments narrowing the definition and applicability of the Domestic Emoluments Clause and instead apply the definition supported by the text, structure, and history of the Constitution, as well as decades of executive branch precedent. In doing so, the Court should find that the Immunity Order is a prohibited emolument, set aside the Order, and enjoin the President's subordinates from giving it effect.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Jonathan E. Maier*

Jonathan E. Maier (Va. Bar No. 84145)
Kayvan Farchadi*
Stuart C. McPhail*
Nikhel S. Sus*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jmaier@citizensforethics.org
kfarchadi@citizensforethics.org
smcphail@citizensforethics.org
nsus@citizensforethics.org

*Counsel for Amicus Curiae*
**pro hac vice* motion forthcoming